UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

Automated Teller Machine Advantage LLC, The
Abraham Wolfson 1983 Trust, The Aaron Wolfson 1983
Trust, The Aliza Wolfson Safier 1983 Trust, The
Rebecca Wolfson Wolmark 1983 Trust, The Daniel
Wolfson 1983 Trust, and The Elisheva Wolfson 1983
Trust,

                                  Plaintiffs,

- against -

Vance Moore, Jr. a/k/a Vance Moore II a/k/a Vance
Moore, Exclusive Properties Group, Inc., Walter Netschi,
36 Main Street LLC, ATM Capital Inc., Danielle Jones,
Alain Brossman a/k/a Harry Brossman, and William
Munier,

                                  Defendants.

------------------------------------------------------------------ x

Index No.: 08-CV-3340(RMB)(FM)(ECF)

**COMPLAINT**

Plaintiffs Demand a Trial By Jury

       Plaintiffs, Automated Teller Machine Advantage LLC ("ATMA"), The Abraham

Wolfson 1983 Trust, The Aaron Wolfson 1983 Trust, The Aliza Wolfson Safier 1983

Trust, The Rebecca Wolfson Wolmark 1983 Trust, The Daniel Wolfson 1983 Trust and

The Elisheva Wolfson 1983 Trust (the "Plaintiff Trusts") (hereinafter collectively

referred to as the "Plaintiffs"), by their attorneys, Lankler & Carragher, LLP, and for their

Complaint herein, allege as follows:

# I
# INTRODUCTION

1.     This action is brought against individual and corporate Defendants who have

engaged in a complex scheme to defraud Plaintiffs of $16.475 million invested by

Plaintiffs with and through the Defendants.

2.      Defendants engaged in racketeering activities to solicit private investment capital to fund a scheme by which Defendants defrauded innocent individuals and entities out of their invested monies.

3.      Defendants' scheme involved inducing investors to purchase large numbers of automated teller machines ("ATMs").  There is a well-established market for investors, other than bank owner/operators, who wish to purchase and sell ATMs.  Non-bank purchasers can either buy an ATM that has previously been placed at a location, generally via a lease agreement with a business store owner (a "Placed ATM"), or a new ATM that needs to be located in an existing or prospective business establishment.  A Placed ATM, particularly one with a long-term lease and verifiable transaction activity, will sell at a substantial premium compared to a non-Placed ATM.

4.      The value of a Placed ATM and its eligibility for potential investment by Plaintiffs was derived from its predicted ability to generate future revenue and was, *inter alia*, predicated on the receipt and analysis of reliable reports reflecting due diligence for each Placed ATM demonstrating: (i) at least one year of transaction history with an average of 400 transactions per month; (ii) projected net revenues of approximately $4,800 per year based on the transaction history; (iii) the existence of a lease with at least a five year term with a renewal provision for an additional five year term provided that neither party terminated the lease (hereinafter the "Performance Criteria").[1]

5.      To effect their scheme, Defendants induced Plaintiffs to purchase non-existent "phantom" Placed ATMs by making false verbal representations and delivering fraudulent, false, fabricated and fictitious information to Plaintiffs, including

---

[1]      As described, *infra,* at Paragraph 42, Plaintiffs later purchased ATMs with alternative Performance Criteria at a different price.

representations and warranties, purporting to demonstrate that the "phantom" Placed ATMs met the Performance Criteria set by Plaintiffs to purchase Placed ATMs.

6.      Defendants furthered their scheme by delivering fraudulent, false, fabricated and fictitious information to Plaintiffs in connection with the ATMs purchased by Plaintiffs including: bills of sale, due diligence reports, lease agreements, assignments of the lease agreements and other fictitious documents.

7.      Following the sale of the "phantom" Placed ATMs to Plaintiffs, the Defendants perpetuated their scheme by providing monthly reports to Plaintiffs that purported to state the transactional activity of the Placed ATMs purchased by Plaintiffs and by delivering funds purportedly based on that transactional activity.

8.      Defendants systematically sought and received additional investments from Plaintiffs and other investors to perpetuate the scheme.

9.      Defendants, through their scheme, induced Plaintiffs and other investors to deliver millions of dollars to Defendants for the purchase of the ATMs.

10.      Plaintiffs bring this action against the Defendants for violations of the Racketeer Influenced and Corrupt Organizations statute (hereinafter "RICO"), 18 U.S.C. §§ 1961 through 1968, and New York State common law causes of action, including: fraudulent misrepresentation, fraudulent inducement, fraudulent concealment, negligent misrepresentation, breach of contract, breach of warranty, conversion, unjust enrichment and breach of fiduciary duty.

11.      Plaintiffs herein seek the return of the funds they invested with the Defendants, damages, treble damages, punitive damages, pre-judgment interest, costs and fees and all other relief deemed appropriate by this Court.

## II
## JURISDICTION

12.    This Court has subject matter jurisdiction over this matter pursuant to RICO, 18 U.S.C. § 1964 and 28 U.S.C. § 1331, because Plaintiffs' claims arise under the laws of the United States, and pursuant to its supplemental jurisdiction, 28 U.S.C. § 1367.

## III
## VENUE

13.    The venue of this action is proper in this judicial district pursuant to 18 U.S.C. § 1965(a) and 18 U.S.C. § 1391 in that Defendants transacted affairs in the Southern District of New York and in that the negotiations, decisions to enter in to the contractual agreements, transfers of funds and subsequent business dealings between the parties named herein occurred within the Southern District of New York.  Venue is also proper in this judicial district pursuant to 18 U.S.C. § 1965(b) because, to the extent any Defendant may reside outside of this district, the ends of justice require such Defendant or Defendants to be brought before this Court.

## IV
## THE PARTIES

14.    ATMA is a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at 324 Grix Court, New Milford, New Jersey 07646.  ATMA was formed in November of 2004.

15.    The Plaintiff Trusts are trusts created under laws of the State of New York with a principal place of business at One State Street Plaza, 29th Floor, New York, New York 10004.

4

16.     Defendant Vance Moore, Jr., also known as Vance Moore II, ("Moore") is a resident of Fruitland Park, Lake County, Florida and also maintains a residence, upon information and belief, in Raleigh, Wake County, North Carolina.

17.     Moore owned and controlled unnamed co-conspirator ATM Financial Services LLC ("ATMFS"), a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at Leesburg, Lake County, Florida.  ATMFS purported to provide services to owners of Placed ATMs as an Independent Sales Organization ("ISO").  An ISO, via a management agreement, is responsible for, *inter alia*, the deployment, management and servicing of Placed ATMs, and also for the reporting of the transaction activity of Placed ATMs, collection of revenue from that transaction activity, and payment of the net revenue to the owners of the Placed ATMs. ATMFS filed for Chapter 11 bankruptcy protection on February 12, 2008 in the United States Bankruptcy Court for the Middle District of Florida.

18.     Defendant Exclusive Properties Group, Inc. ("Exclusive Properties" or "EPG") is a domestic business corporation organized and existing under the laws of the State of Florida with a principal place of business at 301 S. Richey Road, Suite 101, Leesburg, Florida.  Upon information and belief, Moore is the President, Secretary, Treasurer and Director of EPG.  Upon information and belief, EPG is a real estate holding company controlled by Moore that owns two warehouses from which Moore operates numerous businesses, including ATMFS.

19.     Defendant Walter Netschi ("Netschi") is a resident of Hot Springs Village, Garland County, Arkansas and McKinney, Collin County, Texas.  Netschi is the

managing member of 36 Main Street LLC and the President of Defendant ATM Capital, Inc.

20.     Defendant 36 Main Street LLC ("36 Main") is a limited liability company organized and existing under the laws of the State of Nevada with a principal place of business at 2400 Dallas Parkway, Suite 180, Plano, TX 75093.  Since at least 2005, 36 Main has been engaged in the business of selling ATMs to third-parties, including ATMA.

21.     Defendant ATM Capital Inc. ("ATM Capital") is a domestic business corporation organized and existing under the laws of the State of Texas with a principal place of business at 2001 Beach Street, Fort Worth, Texas.  Netschi is the President of ATM Capital.

22.     Defendant Danielle Jones ("Jones") is the Secretary Treasurer and Vice-President of 36 Main and the daughter of Netschi.  Jones maintains a residence in McKinney, Collin County, Texas.

23.     Defendant Alain Brossman a/k/a Harry Brossman ("Brossman") is a resident of Tabernacle, Burlington County, New Jersey.  Brossman is a member and former employee of ATMA.

24.     Defendant William Munier ("Munier") is a resident of New Milford, Bergen County, New Jersey.  Munier is a member and former employee of ATMA.

## V
## THE ENTERPRISE

25.     At all times material to this Complaint, the Defendants, collectively, have constituted an "enterprise" (hereinafter the "ATM Sales Enterprise") as that term is

defined in 18 U.S.C. § 1961(4), which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce.

## VI
## BACKGROUND

### The Plaintiff Trusts Are Fraudulently Induced by Defendants

26.     In or around November of 2004, Brossman and Munier, who had conducted a prior scheme with certain of the Defendants named herein (more fully described *infra* at Paragraphs 76 through 83), sought to attract large scale financing for the purported purpose of investing in the purchase of a large number of Placed ATMs and to then make money managing that investment (the "ATM Venture").

27.     In or about August of 2005, Brossman, Munier and others, eventually including Netschi and Moore, approached the Plaintiff Trusts, through unnamed intermediaries, to request investment financing from the Plaintiff Trusts to participate in the "ATM Venture."

28.     The ATM Venture involved the use of a limited liability company, known as ATMA, in which Munier and Brossman would be members, employees and minor investors.  ATMA would receive funding from the Plaintiff Trusts for the purchase of identified Placed ATMs and would thereafter receive a return on investment from the monthly revenue generated by the Placed ATMs.

29.     On November 14, 2005, Brossman, Munier and unnamed others met with representatives of the Plaintiff Trusts at the offices of the Plaintiff Trusts in New York for the purpose of inducing the Plaintiff Trusts to participate in the ATM Venture; Netschi and Moore participated in portions of the November 14, 2005 meeting telephonically.

30.     During the November 14, 2005 meeting, Netschi, prior to the Plaintiff Trusts'
agreement to participate in the ATM Venture and to induce the Plaintiff Trusts to
participate in the ATM Venture, represented to senior representatives of the Plaintiff
Trusts, that:

> a.     Netschi, through 36 Main, was in the business of locating sellers of
> Placed ATMs, conducting due diligence on the Placed ATMs, negotiating
> a price for and purchasing the Placed ATMs, holding the 36 Main
> purchased Placed ATMs as inventory and reselling the Placed ATMs to
> interested third parties;
>
> b.     Moore, through ATMFS, served as the ISO for the 36 Main owned
> ATMs and that Moore was prepared to continue to act as the ISO for those
> Placed ATMs;
>
> c.     ATMFS was in possession of leases with businesses where Placed
> ATMs owned by 36 Main were located and that the leases were valid, in
> effect, and assignable to the purchaser of  the Placed ATMs; and,
>
> d.     Moore, through ATMFS performed due diligence confirming the
> Performance Criteria for the Placed ATMs provided to the purchaser of
> the Placed ATMs prior to purchase;

31.     During the same meeting, the Plaintiff Trusts, as part of making an informed
decision concerning their participation in the ATM Venture, specifically questioned
Netschi with respect to whether Netschi and 36 Main were purchasing Placed ATMs
from disinterested third party owners and expressed their reliance on Netschi and 36

Main conducting due diligence on the Performance Criteria of the of the Placed ATMs being purchased by 36 Main for later resale.

32.    Also during the same meeting, Netschi, to induce the Plaintiff Trusts to participate in the ATM Venture, represented that the business of 36 Main was separate from the business of Moore and ATMFS, and that 36 Main was exclusively in the business of purchasing and reselling Placed ATMs and Moore was exclusively in the business of operating as an ISO.

33.    Also during the same meeting, Brossman, Munier, and Netschi, to induce the Plaintiff Trusts to participate in the ATM Venture, informed Plaintiffs that Moore, through ATMFS, would act as the ISO for any ATMs purchased by ATMA and would conduct due diligence and provide truthful and accurate reporting as to the Performance Criteria of the Placed ATMs identified for potential purchase by ATMA.

34.    Also during the same meeting, Brossman, Munier, representatives of the Plaintiff Trusts and unnamed others participated in a conference call with Moore during which Moore, to induce the Plaintiff Trusts to participate in the ATM Venture, represented that: (i) neither he, nor his company ATMFS, were engaged in the purchase or sale of Placed ATMs; (ii) that ATMFS acted solely as an ISO for Placed ATMs; and, (iii) that ATMFS's operations were separate and apart from those of 36 Main.

35.    Also during the same meeting, Netschi, to induce the Plaintiff Trusts to participate in the ATM Venture, caused to be sent, via electronic mail ("email"), copies of bills of sale, equipment management agreements and due diligence documents (more fully defined *infra* at Paragraph 45) for 100 Placed ATMs purportedly available for

purchase from 36 Main, for the Plaintiff Trusts' review. <u>See</u> Volume I, Ex. 1 – Ex. 3.[2]

The documents were forwarded at the Plaintiff Trusts' request to demonstrate the

Performance Criteria of the 100 Placed ATMs purportedly being offered for sale and

other factors relevant to the Plaintiff Trusts' review of the ATM Venture.

36.     Also at the same meeting, Moore, to induce the Plaintiff Trusts to participate

in the ATM Venture, made representations indicating the authenticity of the leases, due

diligence documents and management agreements for the same 100 Placed ATMs.

37.     Also at the same meeting, in reliance on the representations made by Munier,

Brossman, Netschi, 36 Main and Moore, detailed *supra* at Paragraphs 29 through 36, the

Plaintiff Trusts entered into the ATM Venture and became the largest Class A member of

ATMA and agreed to make an initial investment of five million dollars to fund the

purchase of Placed ATMs.

38.     Also at the same meeting, Munier and Brossman, each agreed to invest

$62,500 in ATMA and entered into an employment relationship as co-Chief Executive

Officers with ATMA pursuant to which they would each be paid $10,416 per month out

of the operating revenue of ATMA with salary increases based on performance

incentives, specifically linked to the number of Placed ATMs owned by ATMA (the

"ATMA Machines"), plus other benefits of value including medical coverage.

39.     Brossman's agreed upon duties included performing due diligence obligations

on behalf of ATMA that included, but were not limited to: (i) identifying and vetting

_____

[2]     Due to the volume of exhibits to this Complaint, for the Court's convenience the
exhibits hereto are attached and submitted herewith and incorporated herein by reference
as part of separate Exhibit Appendices, Volumes I – XX (hereinafter referred to as
Volume " ", Ex. " ").

potential Placed ATM machines for purchase by ATMA; (ii) visiting existing ATMA

Machines at their locations; and, (iii) exploring opportunities to enhance the value and

performance of the ATMA Machines.  Brossman's due diligence obligations also

required interfacing with Moore as the ISO of the ATMA Machines.  On numerous

occasions during the period relevant to this Complaint, Brossman represented to

representatives of the Plaintiff Trusts that he was performing the above duties, including

representations that he was personally visiting the businesses where the ATMA Machines

were located.

40.     Munier's duties were to receive and review monthly reports, delivered by

Moore and purportedly related to the ATMA Machines, detailing the location, transaction

activity, monthly costs and expenses, and net revenue for each ATMA Machine (the

"Monthly Reports") and to subsequently deliver the Monthly Reports to representatives

of the Plaintiff Trusts.

41.     In or about February of 2006, at the Plaintiff Trusts' offices in New York,

Netschi again represented to representatives of the Plaintiff Trusts that Netschi and 36

Main were purchasing Placed ATMs from disinterested third party owners and that

Netschi and 36 Main were conducting due diligence with respect to the Placed ATMs

being purchased by 36 Main for later resale.  At the same meeting, representatives of the

Plaintiff Trusts expressed their reliance on the representations made by Netschi to

continue ATMA's purchases of Placed ATMs from 36 Main.

*Purported ATM Purchases/Sales*

42.     To date, Plaintiffs have transferred $16.475 million to 36 Main for the

purchase of 940 ATMA Machines.  The ATMA Machines purchases commenced in

November of 2005, and ended in September of 2006, and were accomplished in fifteen

(15) tranches, varying in size from 2 to 101 ATMs per tranche, (the "ATMA Tranche

Purchases"). The purchase price for each of the ATMA Machines varied from between

$14,500 to $22,000 per machine.[3]

43.    The individual ATMA Tranche Purchases occurred as follows:

a.    On or about November 16, 2005, ATMA purchased 100 Placed ATM machines from 36 Main for $1,900,000.00. (See the "November 16, 2005 Tranche Purchase" documents at Volumes II – III, Ex. 5 – Ex. 13);

b.    On or about December 20, 2005, ATMA purchased 100 Placed ATM machines from 36 Main for $1,900,000.00 (See the "December 20, 2005 Tranche Purchase" documents at Volumes III – V, Ex. 14 – Ex. 22);

c.    On or about February 22, 2006, ATMA purchased 100 Placed ATM machines from 36 Main for $1,900,000.00 (See the "February 22, 2005 Tranche Purchase" documents at Volumes VI - VII, Ex. 23 – Ex. 31);

d.    On or about April 26, 2006, ATMA purchased 100 Placed ATM machines from 36 Main for $1,950,000.00 (See the "April 26, 2006 Tranche Purchase" documents at Volumes VII – IX, Ex. 32 – Ex. 40);

e.    On or about May 27, 2006, ATMA purchased 100 Placed ATM machines from 36 Main for $1,950,000.00 (See the "May 27, 2006 Tranche Purchase" documents at Volumes IX – XI, Ex. 41 – Ex. 47);

f.    On or about June 16, 2006, ATMA purchased 50 Placed ATM machines from 36 Main for $975,000.00 (See the "June 16, 2006 Tranche Purchase" documents at Volume XII, Ex. 48 – Ex. 54);

---

[3]    The purchase price for a Placed ATM was based on the Performance Criteria of each tranche of Placed ATMs and subsequent designation of the Placed ATM as an "A" or "B" Placed ATM as determined by the verified transaction history of the ATMs in the tranche. Placed ATMs designated as "A" Placed ATMs had an average of at least 400 verified fee paying transactions per month. Placed ATMs with at least 400 verified fee paying transactions per month were originally priced at $19,000.00 per Placed ATM and were later priced at $19,500.00 per Placed ATM. Two of the Placed ATMs with an average of at least 500 verified fee paying transactions per month were priced at $22,000.00 per Placed ATM. Placed ATMs designated as "B" Placed ATMs had an average of from 330-399 verified fee paying transactions per month and were priced at $14,500.00 per Placed ATM. A chart summarizing the date of purchase and amount paid by ATMA for each tranche of ATM purchases is annexed hereto at Volume I, Ex. 4.

g.      On or about June 27, 2006, ATMA purchased 74 Placed ATM machines from 36 Main for $1,073,000.00 (See the "June 27, 2006 Tranche Purchase" documents at Volume XIII, Ex. 55 – Ex. 61);

h.      On or about July 28, 2006, ATMA purchased 101 Placed ATM machines from 36 Main for $1,469,500.00 (See the "July 28, 2006 Tranche Purchase" documents at Volumes XIV – XV, Ex. 62 – Ex. 68);

i.      On or about August 30, 2006, ATMA purchased 7 Placed ATM machines from 36 Main for $136,500.00 (See the "August 30, 2006 Tranche Purchase #1" documents at Volumes XVI - XVII, Ex. 69 – Ex. 70, Ex. 77 – Ex. 81);

j.      On or about August 30, 2006, ATMA purchased 17 Placed ATM machines from 36 Main for $331,500.00 (See the "August 30, 2006 Tranche Purchase #2" documents at Volumes XVI – XVII, Ex. 71 – Ex. 72, Ex. 77 – Ex. 81);

k.      On or about August 30, 2006, ATMA purchased 36 Placed ATM machines from 36 Main for $522,000.00 (See the "August 30, 2006 Tranche Purchase #3" documents at Volumes XVI – XVII, Ex. 73 – Ex. 74, Ex. 77 – Ex. 81);

l.      On or about August 30, 2006, ATMA purchased 68 Placed ATM machines from 36 Main for $986,000.00 (See the "August 30, 2006 Tranche Purchase #4" documents at Volumes XVI - XVII, Ex. 75 – Ex. 81);

m.      On or about September 26, 2006, ATMA purchased 2 Placed ATM machines from 36 Main for $44,000.00 (See the "September 26, 2006 Tranche Purchase #1" documents at Volumes XVII - XVIII, Ex. 82 – Ex. 83, Ex. 88);

n.      On or about September 26, 2006, ATMA purchased 21 Placed ATM machines from 36 Main for $409,500.00 (See the "September 26, 2006 Tranche Purchase #2" documents at Volumes XVII - XVIII, Ex. 84 – Ex. 85, Ex. 88);

o.      On or about September 26, 2006, ATMA purchased 64 Placed ATM machines from 36 Main for $928,000.00 (See the "September 26, 2006 Tranche Purchase #3" documents at Volumes XVII - XVIII, Ex. 86 – Ex. 88).

44.    With respect to each Tranche Purchase by ATMA, a series of documents were executed which, on their face, provided for the transfer of title and assignable leases to ATMA and provided for the management of the ATMA Machines.

45.    The documents executed for each Tranche Purchase are identified as follows:

a.    Asset Purchase Agreement: 36 Main, by Netschi and Jones, prepared, or caused to be prepared, an Asset Purchase Agreement that sold title in Placed ATMs from 36 Main to ATMA (hereinafter "Asset Purchase Agreement"). The Asset Purchase Agreements provide a representation and warranty that 36 Main held good and marketable title to the Placed ATMs being sold to ATMA. Upon delivery of an executed Asset Purchase Agreement by Jones on behalf of 36 Main, ATMA would remit funds to 36 Main via wire transfer in an amount corresponding to the value of ATMs set forth in a schedule of ATMs affixed to the Asset Purchase Agreement. See Asset Purchase Agreements for the ATMA Tranche Purchases in Volume II, Ex. 5; Volume III, Ex. 14; Volume VI, Ex. 23; Volume VII, Ex. 32; Volume IX, Ex. 41;Volume XII, Ex. 48; Volume XIII, Ex. 55; Volume XIV, Ex. 62; Volume XVI, Exs. 69, 71, 73, 75; Volume XVII, Exs. 82, 84, 86.

b.    Bills of Sale: 36 Main, by Netschi and Jones, prepared, or caused to be prepared, a Bill of Sale for each tranche of Placed ATMs being sold by 36 Main to ATMA. Each Bill of Sale provided a representation and warranty that 36 Main held good and marketable title to the Placed ATMs being sold to ATMA. See Bills of Sale for the ATMA Tranche Purchases

in Volume II, Ex. 6; Volume III, Ex. 15; Volume VI, Ex. 24; Volume VII,

Ex. 33; Volume IX, Ex. 42; Volume XII, Ex. 49; Volume XIII, Ex. 56;

Volume XIV, Ex. 63; Volume XVI, Exs. 70, 72, 74, 76; Volume XVII

Exs. 83, 85, 87.

c.      Addition to Equipment:  36 Main, by Netschi and Jones, prepared,

or caused to be prepared, a separate document entitled "Addition to

Equipment," that stated that the Placed ATM being sold to ATMA was

"Virtual switch capable."   Virtual switch capability allowed the Placed

ATM to fund minutes for pre-paid cell phone accounts (hereinafter

"Addition to Equipment").  After the completion of the first three tranche

purchases, ATMA elected to not pay for Virtual Switch capability and

Addition to Equipment documents were no longer delivered for

subsequent tranche purchases.  See the Addition to Equipment documents

in Volume II, Ex. 7; Volume III, Ex. 16; Volume VI, Ex. 25; Volume VII,

Ex. 34.

d.      Diligence Warranty:  Contemporaneous with the execution of a

Bill of Sale, and Asset Purchase Agreement, Netschi, by and through 36

Main provided a written statement that it had engaged the services of

Moore, through ATMFS, to perform a verification of the transaction

history of each ATM being  sold to ATMA (hereinafter "Diligence

Warranty").  See the Diligence Warranties in Volume II, Ex. 8; Volume

III, Ex. 17; Volume VI, Ex. 26; Volume VII, Ex. 35. Each Diligence

Warranty warranted that the transaction history that 36 Main provided to

ATMA was the same transaction history that 36 Main had received from Moore and ATMFS.

e.      Each and every Bill of Sale, Asset Purchase Agreement, Addition to Equipment and Diligence Warranty (hereinafter "36 Main Transaction Documents") was signed by Jones as Vice-President and/or Secretary Treasurer of 36 Main and was signed, upon information and belief, with the knowledge of and/or at the direction of Netschi.

f.      Placement Program Space Leases:  For each and every Placed ATM being sold to ATMA, Moore provided copies of a "Placement Program Space Lease" (hereinafter "Placed ATM Lease") between ATMFS and a purported lessor, usually a convenience store or other similar business, where the ATMs being sold to ATMA were allegedly located.  See the Placed ATM Leases in Volumes II – III, Ex. 9a – Ex. 9b; Volumes IV – V, Ex. 18a – Ex. 18b; Volumes VI – VII, Ex. 27a – Ex. 27b; Volumes VIII – IX, Ex. 36a – Ex. 36b; Volumes X – XI, Ex. 43a – Ex. 43b; Volume XII, Ex. 50; Volume XIII, Ex. 57; Volumes XIV – XV, Ex. 64a – Ex. 64b; Volumes XVI – XVII, Ex. 77a – Ex. 77b; Volume XVIII, Ex. 88. Annexed to each Placed ATM Lease were site surveys and audit reports, signed by Moore, that purportedly identified: (1) the business where each Placed ATM was located; (2) the annual merchandise sales for that business; (3) the terminal number for the Placed ATM at the location; (4) the average monthly transaction history for the Placed ATM; and, (5) purported reports from searches for UCC-1 statements.  The

purported Placed ATM Leases and the transaction history identified in the

documents annexed to the Placed ATM Leases correlated to a schedule

identifying each Placed ATM purchased in the ATMA Tranche Purchases.

g.      Assignment of Placement Programs Space (ATM) Leases:  The

Placed ATMs sold to ATMA and their locations were further identified in

a document entitled "Assignment of Placement Programs Space (ATM)

Leases" (hereinafter "Lease Assignment(s)").  See the Lease Assignments

in Volume III, Ex. 10; Volume V, Ex. 19; Volume VII, Ex. 28; Volume

IX, Ex. 37; Volume XI, Ex. 44; Volume XII, Ex. 51; Volume XIII, Ex. 58;

Volume XV, Ex. 65; Volume XVII, Ex. 78. Each Lease Assignment for

each Placed ATM Lease was prepared, or caused to be prepared, by

Moore and stated that ATMFS had a current and existing Placed ATM

Lease and that the Placed ATM Lease was being assigned to ATMA for

each ATM being sold to ATMA.  In each Lease Assignment, Moore

warranted that each Placed ATM Lease was in full force and effect, was

assignable, and was free and clear from all liens and encumbrances.

h.      Due Diligence Report:  Moore, prepared, or caused to be prepared,

a separate document (hereinafter "Due Diligence Report"), that

represented and warranted to ATMA that ATMFS had reviewed the

average monthly transaction history for each ATM being sold to ATMA

and that the average transactions reported on the schedules affixed to the

Asset Purchase Agreements were correct.  Moore, in the Due Diligence

Report, acknowledged that ATMA "was relying upon such data in making

its purchase from 36 main [sic] Street." <u>See</u> the Due Diligence Reports in

Volume III, Ex. 11; Volume V, Ex. 20; Volume VII, Ex. 29; Volume IX,

Ex. 38; Volume XI, Ex. 45; Volume XII, Ex. 52; Volume XIII, Ex. 59;

Volume XV, Ex. 66; Volume XVII, Ex. 79.

i.      Equipment Management Agreement:  On or about the same day of

a closing of a tranche purchase of ATMA Machines, ATMA and ATMFS

would enter into an Automated Teller Machine (ATM) Equipment

Management Agreement (hereinafter "Equipment Management

Agreement") obligating ATMFS to manage a tranche of ATMA

Machines.  ATMA entered into an Equipment Management Agreement for

ATMFS, by Moore, to manage all of the ATMA Machines.   <u>See</u> the

Equipment Management Agreements in Volume III, Ex. 12; Volume V,

Ex. 21; Volume VII, Ex. 30; Volume IX, Ex. 39; Volume XI, Ex. 46;

Volume XII, Ex. 53; Volume XIII, Ex. 60; Volume XV, Ex. 67; Volume

XVII, Ex. 80.  Pursuant to the terms of each Equipment Management

Agreement, ATMFS, by and through Moore, is obligated to manage the

ATMA Machines for the benefit of ATMA.  The Equipment Management

Agreement requires Moore and ATMFS to: (1) collect data processing and

electronic deposit and transfer information for all collected revenues and

fees, including surcharge revenues generated by the ATMA Machines, on

a monthly basis; (2) provide ATMA with the Monthly Reports and to

make regular payments to ATMA based on the monthly net revenue of the

ATMA Machines (the "Periodic Revenue Payments"); and, (3) provide

ATMA with a full disclosure of the number of transactions for each ATMA Machine on a monthly basis.

j.      Amendment to the Equipment Management Agreement:  On or about April 27, 2006, ATMA and ATMFS entered into an Amendment to the Equipment Management Agreement ("hereinafter Equipment Management Agreement Amendment") that amended the existing Equipment Management Agreements between ATMFS and ATMA.  See the Equipment Management Agreement Amendments in Volume III, Ex. 13; Volume V, Ex. 22; Volume VII, Ex. 31; Volume IX, Ex. 40; Volume XI, Ex. 47; Volume XII, Ex. 54; Volume XIII, Ex. 61; Volume XV, Ex. 68; Volume XVII, Ex. 81. Pursuant to the terms of each Equipment Management Agreement Amendment, ATMFS, by and through Moore, is obligated, in addition to its obligations under the Equipment Management Agreements, to not: (1) solicit any business owner identified in the Lease Agreements to cease doing business with ATMA; or (2) solicit any business owner identified in the Lease Agreements to lease space to ATMFS or any other party for the purpose of placing any additional ATMs at the same business location.  ATMFS's non-solicitation obligation further prohibited ATMFS from sharing any information identifying the locations of the ATMA Machines or the terms of the Lease Agreements with any other parties.

k.      For each of the ATMA Tranche Purchases, Moore signed every Placed ATM Lease, Lease Assignment, Due Diligence Report, Equipment

Management Agreement and Equipment Management Agreement

Amendment (hereinafter the "ATMFS Transaction Documents")

individually or as a member or president of ATMFS.

46.     Each of the 36 Main Transaction Documents and ATMFS Transaction

Documents associated with the ATMA Tranche Purchases included a schedule of ATMs

that purportedly identified the transaction history of each Placed ATM in the ATMA

Tranche Purchases.

47.     Each Asset Purchase Agreement and corresponding Bill of Sale contained

representations and warranties by 36 Main, that 36 Main possessed good and marketable

title to the Placed ATMs being sold to ATMA, that it had full authority to sell the Placed

ATMs, that the Placed ATMs were in good condition and fit for use, and were free and

clear "of all liens, encumbrances, liabilities and adverse claims, of every nature and

description."  See Paragraphs 45(a) and 45(b), *supra*.

48.     Every Tranche Purchase of ATMA Machines was accompanied by some or all

of the documents identified in Paragraphs 45(a) through 45(d) and 45(f) through 45(j) of

this Complaint.

49.     For every Tranche Purchase of ATMA Machines, the Plaintiff Trusts

transferred purchase funds, via a bank wire transfer, to the bank account of ATMA.

ATMA subsequently delivered, via a bank wire transfer, the purchase funds to Netschi,

through 36 Main.  The purchase funds paid by ATMA to 36 Main for the ATMA

Machines are detailed, *infra*, at Paragraphs 107 through 117 and incorporated herein by

reference.

50.     Additionally, after each Tranche Purchase of ATMA Machines, ATMA delivered, via a bank wire transfer, funds to ATM Capital and/or 36 Main which represented 36 Main's prorated share of the monthly net-revenues earned by that tranche of ATMA Machines for that portion of the month during which 36 Main owned those ATMs sold to ATMA (the "Residual Revenue Funds").  See Paragraphs 140 through 147, *infra*, incorporated herein by reference.

51.     Brossman and Munier, together and/or in conjunction with others, including Netschi, calculated the Residual Revenue Funds purportedly owed 36 Main and to be delivered to ATM Capital or 36 Main.  Munier, Brossman, and Netschi caused the Residual Revenue Funds to be paid to ATM Capital and/or 36 Main with the knowledge that the Residual Revenue Funds were based on fabricated calculations because the ATMA Machines did not exist.

### Post Sale Activities of Defendants

52.     From on or about December of 2005 through November of 2007, Moore forwarded via email to Munier and/or Brossman, the Monthly Reports.  See Paragraphs 153 - 154, 156, 162, 164, 169, 172, 175, 180, 183, 185, and 188, *infra*, incorporated herein by reference.

53.     The Monthly Reports were received and reviewed by Munier and/or Brossman for accuracy pursuant to their duties as employees of ATMA.  Brossman and/or Munier subsequently delivered the Monthly Reports to representatives of the Plaintiff Trust. See Paragraphs 155, 151 – 158, 160 – 161, 163, 165, 170 – 171, 174, 176 – 178, 181 – 182, 184, 186, 187, 189 – 190, 202 – 220, *infra*, incorporated herein by reference.

54.    From on or about December of 2005 through September of 2007, Moore, by

and through ATMFS and/or Exclusive Properties, delivered, by wire transfer, the

Periodic Revenue Payments.  See Paragraphs 118 through 139, *infra*, incorporated herein

by reference.

55.    The Periodic Revenue Payment delivered in September of 2007, which related

to the Monthly Report for June of 2007, was the final payment received from ATMFS,

Moore, or Exclusive Properties.  In or about November of 2007, Moore ceased providing

the Monthly Reports.

56.    In response to numerous requests from Plaintiffs concerning the failures of

ATMFS and Moore to provide the Monthly Reports and/or Periodic Revenue Payments,

Moore, by letter dated December 20, 2007, stated:

> We'd like to give you an update on the events that occurred this year that
> has caused a delay in receiving your monthly payments.  *In the Spring of
> 2007 we made a commitment to purchase Jack Henry ATM software . . .
> that would allow us to track ATM assets and transactions and receive
> electronic reports on a daily basis.*  We *received the software in July* and
> did the installation at that time.  . . . We expect to be fully operational and
> current with all reports by the mid to end of January. . . We're presently
> reconciling each ATM from the old manual system to the new system to
> get reports done to get them out to each one of our ATM owners . . . *I
> want to assure each ATM owner that their funds received on the settlement
> of each ATM are secure in a settlement account by each network.*

See Volume XIX, Ex. 89. (Emphasis added.)

57.    On January 10, 2008, Moore, in response to demands by Plaintiffs for

information related to the ATMA Machines, delivered, via email, a report to a

representative of Plaintiff Trusts that purportedly identified ATMA Placed ATM

machines.  See Volume XIX, Ex. 90.

58.     On January 11, 2008, Brossman emailed a representative of the Plaintiff Trust and represented that ". . . vance is going to be sending u a cornucopia of reports and then explain the first reports.i think that the first reports were from elan a processor owned by us bank-spoke to him at 830 and  1030 this morning-harry" [sic].  <u>See</u> Volume XIX, Ex. 91.

59.     On January 11, 2008, Moore, in response to demands by Plaintiffs for information related to the ATMA Machines, delivered, via email, a report, allegedly prepared by ATMFS, listing the store locations, without addresses, of 352 ATMs. Brossman also received a copy of the report via the same email.  <u>See</u> Volume XIX, Ex. 92.

60.     Also on January 11, 2008, Brossman, in an email, represented to an agent of ATMA that he had ". . .matched 250 machines to the [Plaintiffs] . . ." list of the ATMA Machines.  <u>See</u> Volume XIX, Ex. 93.

61.     Also on January 11, 2008, Moore, in response to further demands by Plaintiffs for information related to the ATMA Machines, represented that he had requested ". . . the file on transaction history from processors for recent months, and am still waiting for the files."  <u>See</u> Volume XIX, Ex. 94.

62.     Also on January 11, 2008, Moore sent another email to a representative of the Plaintiff Trusts wherein he represented that he would provide a copy of a bank statement related to the settlement account where the Periodic Revenue Payments were purportedly being held.  <u>See</u> Volume XIX, Ex. 94.  Moore sent a copy of a purported bank statement via email on January 11, 2008.  <u>See</u> Volume XIX, Ex. 95.

63.    On or about January 15, 2008, Moore, during a visit by a representative of the Plaintiff Trusts and a third party auditor to ATMFS's warehouse in Garner, North Carolina, presented a bank statement dated December 31, 2007, that purportedly showed an account balance of $11,259,194.75 which Moore stated represented Plaintiffs' Periodic Revenue Payments that were being held in escrow pending completion of software upgrades to ATMFS's computer system.  See Volume XIX, Ex. 96.

64.    On January 20, 2008, Brossman, in response to demands by Plaintiffs for information related to the ATMA Machines, represented to Plaintiffs in an email that: "ok-vance and i have gone through the lists till we accounted for the 940 machines including the moved ones.i have sent the list to you.they have all the present terminal numbers---i told u david that i would get it done no matter what-harry" [sic].  See Volume XIX, Ex. 97.

65.    On or about January 22, 2008, Moore, via an electronic message to Plaintiffs, represented that the ATMA Machines existed as Placed ATMs and represented that new lease agreements for any ATMA Machines moved from their original locations would be provided to Plaintiffs by January 24, 2008.  See Volume XIX, Ex. 98.

### Discovery That the ATMA Machines Do Not Exist

66.    In January of 2008, Plaintiffs directed a private investigative firm to investigate certain locations where ATMA Machines were, according to Moore and ATMFS, located.  The investigation was conducted for the purpose of determining whether the ATMA Machines were in fact present at those locations.

67.    On or about January 24, 2008, the investigative firm reported that its investigation had uncovered that the majority of the ATMA Machines they attempted to

locate: (1) were not located at the business locations identified by Moore, Netschi, 36 Main and Jones; (2) in some instances may not have ever existed at the locations identified by Moore, Netschi, 36 Main, and Jones; and, (3) in some instances, were either owned by persons other than Plaintiffs and/or were managed by parties other than ATMFS.

*Fraudulent Sales to Other Investor Groups Are Revealed*

68.     On or about February 6, 2008, a California based entity known as ATM Equity, LP ("ATM Equity") filed suit against ATMFS in North Carolina Superior Court, County of Wake, alleging that ATMFS and Moore had defrauded ATM Equity out of $20 million delivered to Netschi, through 36 Main, by providing fraudulent due diligence reports in order to induce ATM Equity to purchase ATMs from 36 Main.  The complaint further alleges that ATMFS and Moore misappropriated and/or failed to disclose the locations of certain ATMs that ATM Equity owned and had contracted with ATMFS to service, and that ATMFS and Moore had failed to remit monthly revenues for either the ATMs purchased from 36 Main or the ATMs owned by ATM Equity being serviced by ATMFS and Moore.

69.     On or about February 12, 2008, ATMFS filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Middle District of Florida (the "ATMFS Bankruptcy").

70.     In its petition in the ATMFS Bankruptcy, ATMFS did not list or otherwise disclose either ATMA or ATM Equity as creditors of ATMFS.

71.     Since the filing of the ATMFS Bankruptcy, numerous other investors in ATMs purchased through Netschi and 36 Main, and managed by ATMFS and Moore

have surfaced, and appeared in the ATMFS Bankruptcy (together with ATMA and ATM Equity, the "ATMFS Creditors").

72.     The ATMFS Creditors have purchased, in the aggregate, in excess of 4000 ATMs through Netschi, 36 Main, Jones and Moore.

73.     In a disclosure made by the ATMFS Bankruptcy Trustee on or about March 10, 2008, the ATMFS Bankruptcy Trustee has only been able to confirm the existence of approximately 400 ATMs (ten percent 10% of the Placed ATMs purportedly being managed by ATMFS and Moore) and, that most of those 400 ATMs are owned by the merchants where the ATMs are located and not the ATMFS Creditors.

74.     Netschi, in a telephone call on February 28, 2008, admitted that 36 Main took a percentage of the gross purchase funds for each tranche purchase of ATMA Machines and then subsequently transferred the balance of Plaintiffs' funds to Moore or entities controlled by Moore - a representation totally at odds with prior representations made to representatives of the Plaintiff Trusts to induce them to participate in the ATM Venture. See Paragraphs 30 - 32, *supra*.

75.     Subsequently on March 19, 2008, Netschi was sued in New York State Supreme Court, New York County, by Fortress Credit Opportunities I LP for breach of guarantee in connection with the financing of purchases of Placed ATMs by ATM Equity from 36 Main.

### *The Defendants Prior ATM Sales Scheme*

76.     From approximately 2002 through 2005, Munier, Brossman, Moore and Netschi, along with others not named herein, engaged in the sale of ATM business

opportunities that bundled and sold ATMs together with management, operation and other services to investors (the "Business Opportunity").

77.    An investor in the Business Opportunity was entitled to receive a set monthly payment in exchange for his or her investment, with a bonus payment in the event that the transactional activity of an ATM exceeded a certain threshold number (usually 400 transactions) within a given month.

78.    Munier, operating through an entity that, on information and belief, was doing business as EFinancial, was responsible for the sale of the Business Opportunity to potential and actual investors.

79.    When Munier sold a Business Opportunity to an investor, he would arrange to purchase a single or multiple ATMs from an entity owned and controlled by Netschi.

80.    Brossman, operating through an entity that, on information and belief, was doing business as National Escrow Limited LLC ("National Escrow"), agreed, for a percentage of the revenue generated by the transaction activity of Business Opportunity ATMs, to purchase the ATMs from the Business Opportunity owners at the expiration of the term of the Business Opportunity (usually seven years) or a mutually agreeable date.

81.    Upon information and belief, each ATM sold to an investor as part of the Business Opportunity was purportedly operated by Moore pursuant to an agreement whereby a Moore controlled entity would act as the ISO for the ATM.

82.    In addition to Brossman and Munier, the Business Opportunity also included management services by a management company, unnamed herein, that employed, amongst others, Munier's sister, and which acted as conduit between the owner of the Business Opportunity and Netschi, Brossman, Munier and Moore.  Though the

management services were allegedly provided by a separate management company,

Moore's entity controlled access to any funds generated from the Business Opportunity

ATMs, and distributed funds to the purported management company and to Brossman's

company, National Escrow.

83.    On information and belief, including statements made by investors and

lawyers for investors in the Business Opportunity, investors in the Business Opportunity

were sold non-existent "phantom" ATMs as part of a scheme conducted by Munier,

Brossman, Netschi and Moore.

## VII
## PATTERN OF FRAUDULENT AND RACKETEERING ACTS

84.    Defendants, by and in furtherance of the ATM Sales Enterprise, induced

Plaintiffs to enter into agreements to purchase phantom ATMs by providing Plaintiffs

with false and misleading purchase information, including: (1) the source from whom

Netschi and 36 Main were allegedly purchasing the ATM machines ultimately purchased

by Plaintiffs; (2) the existence of the ATMs purchased by Plaintiffs; (3) the transaction

activity of the ATMs purchased by Plaintiffs; (4) the locations of the ATMs purchased by

Plaintiffs; and, (5) the existence of leases for the placement of the ATMs purchased by

Plaintiffs.

85.    To effect the ATM Sales Enterprise scheme, Munier, Brossman, Netschi, 36

Main, Jones, ATM Capital, Exclusive Properties and Moore agreed and conspired to sell

phantom ATMs to Plaintiffs.

86.    As part of the ATM Sales Enterprise scheme, Netschi and 36 Main explicitly

and intentionally misrepresented to Plaintiffs that they had acquired ownership of the

ATMs to be purchased by Plaintiffs from disinterested third-party owners of the ATMs

when, in fact, they had not done so, but had instead "purchased" the phantom ATMs from Moore.

87.     In furtherance of the ATM Sales Enterprise scheme, Netschi, 36 Main, and Jones created fictitious Asset Purchase Agreements, Bills of Sale, Additions to Equipment, and Due Diligence Warranties (collectively, the "36 Main Fictitious Transaction Documents").

88.     In furtherance of the ATM Sales Enterprise scheme, Moore created fictitious Lease Assignments, Placed ATM Leases, Due Diligence Reports, Equipment Management Agreements and Equipment Management Agreement Amendments (collectively, the "Moore Fictitious Transaction Documents")(collectively with the 36 Main Fictitious Documents, the "Fictitious Transaction Documents").

89.     Knowing that the Fictitious Transaction Documents related to the purchase of phantom Placed ATMs by Plaintiffs, Munier and Brossman furthered the ATM Sales Enterprise scheme by executing the Fictitious Transaction Documents on behalf of ATMA and/or not disclosing to Plaintiffs that the Fictitious Transaction Documents related to phantom ATMs.

90.     Knowing that ATMA had purchased "phantom" Placed ATMs, Brossman furthered the ATM Sales Enterprise scheme by stating he had performed due diligence on the ATMA Machines, including visits to ATMA Machine locations, when he had not performed such due diligence.

91.     In continued furtherance of the ATM Sales Enterprise scheme, Moore caused ATMFS to create fictitious Monthly Reports for the ATMA Machines (the "Fictitious

Monthly Reports"). See Paragraphs 153 - 154, 156, 162, 164, 169, 172, 175, 180, 183, 185, and 188, *infra*, incorporated herein by reference.

92.    The Fictitious Monthly Reports were transmitted to Munier and Brossman, who, knowing they were false and were generated for the purpose of misleading Plaintiffs, provided the Fictitious Monthly Reports to Plaintiffs. See Paragraphs 155, 157 – 158, 160 – 161, 163, 165, 170 – 171, 174, 176 – 178, 181 – 182, 184, 186, 187, 189 – 190, 202 – 220, *infra*, incorporated herein by reference.

93.    In continued furtherance of the ATM Sales Enterprise scheme, Moore caused the Periodic Revenue Payments to be made to ATMA. The Periodic Revenue Payments were transmitted via a wire transfer at the direction of Moore and originated from either ATMFS or Exclusive Properties. See Paragraphs 118 – 139, *infra*, incorporated herein reference.

94.    Upon information and belief, the source of the Periodic Revenue Payments was the monies invested in the purchase of phantom ATMs by Plaintiffs and/or the other ATMFS Creditors.

95.    In continued furtherance of the ATM Sales Enterprise scheme, Munier and Brossman caused the Periodic Revenue Payments to be recorded by ATMA as revenue and paid their individual salaries and benefits, along with the salaries and benefits of others, from the Periodic Revenue Payments with the knowledge that the Periodic Revenue Payments had a source other than the revenue generated by the transaction activity of the ATMA Machines.

96.    In continued furtherance of the ATM Sales Enterprise scheme, upon completion of the sale of a tranche of ATMs to ATMA, Netschi and ATM Capital would

demand payment of the Residual Revenue Funds.  The Residual Revenue Funds were paid by ATMA via an interstate bank wire transfer to Netschi, through ATM Capital.

97.     In continued furtherance of the ATM Sales Enterprise scheme, when ATMFS ceased to provide Plaintiffs with the Fictitious Monthly Reports in or around November of 2007 and Periodic Revenue Payments in or around September of 2007, Munier and Brossman represented to Plaintiffs that they were actively communicating with Moore and ATMFS for the purpose of ascertaining the cause for the absence of reporting and payments from ATMFS.  Munier and Brossman, knowing such representations to be false, informed Plaintiffs that the cause for the delay in reporting and payment from ATMFS was a software upgrade allegedly installed by ATMFS on its computers.

## COUNT 1
### (Civil Racketeering Violations –  All Defendants)
### (18 U.S.C. § 1962(c))

98.     Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.     At all times relevant to this Complaint, Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier and Brossman were "persons" as defined by 18 U.S.C. § 1961(3).

100.     At all times relevant to this Complaint, Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier and Brossman, as detailed in Paragraphs 26 - 65, 74 and 84 – 97, *supra*, engaged in the operation or management of the ATM Sales Enterprise, which is an enterprise as defined by 18 U.S.C. § 1961(4), the activities of which affect interstate commerce.

101.    Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier and Brossman conducted the ATM Sales Enterprise's affairs through a pattern of racketeering activity, detailed in Paragraphs 106 - 239 below, which were directed at Plaintiffs since at least November of 2005.

102.    Since at least November of 2005, Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier and Brossman shared a common purpose while engaging in the fraudulent course of conduct detailed in Paragraphs 26 – 65 and 84 – 97 above, and worked together to achieve such purpose, specifically to:

    a.    Induce Plaintiffs and other individuals and entities to enter into agreements to purchase ATMs which do not exist in exchange for the receipt of millions of dollars of funds.  The scheme was carried out through the complex offering of fraudulent documentation and verbal statements by the Defendants to hide the true nature of their "sale" of "phantom" ATMs to Plaintiffs.

    b.    Use funds from new investors, including Plaintiffs', to provide an apparent return on investment of at least twenty percent (20%) per annum to investors, including Plaintiffs, thus allowing Defendants to maintain the scheme while reaping substantial profits for themselves.

103.    Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier and Brossman, operating together and individually, and in conjunction with unnamed others, directed and controlled the ATM Sales Enterprise, by: (a) creating the Fictitious Transaction Documents and delivering, or causing to be delivered, the Fictitious Transaction Documents to Plaintiffs or their representatives/agents; (b) creating the

Fictitious Monthly Reports and delivering, or causing to be delivered, the Fictitious Monthly Reports to Plaintiffs or their agents; (c) delivering, or causing to be delivered, the Periodic Revenue Payments to ATMA or their agents; (d) demanding from ATMA, and receiving, the Residual Revenue Funds; and, (e) engaging in a fraudulent course of conduct against Plaintiffs, and unnamed others.

104.    The pattern of racketeering activity engaged in by Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier and Brossman involved fraudulent acts in support of the above conduct constituting wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341), all of which constitute "racketeering activity," as defined in 18 U.S.C. § 1961(1)(B).

105.    Defendants engaged in the predicate acts detailed below between November 14, 2005, when Netschi delivered Fictitious Transaction Documents to a representative of the Plaintiff Trust, and continued through January 31, 2008, when Brossman delivered Fictitious Monthly Reports to a representative of the Plaintiff Trust.

**Violations of 18 U.S.C. § 1343 (Wire Fraud)**

106.    The predicate acts, and evidence of the schemes constituting the pattern of racketeering, include, but are not limited to interstate telephone calls, interstate electronic ("e-mail") messages, interstate facsimile transmissions, and interstate electronic banking transactions containing false or fraudulent pretenses, representations, or promises made in furtherance of the ATM Sales Enterprise caused to be transmitted by the Defendants, in violation of 18 U.S.C. § 1343.

***Predicate Acts and Evidence Concerning Interstate Wire Transfers Related to the
Purchases of ATMA Machines***

107.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on or about
November 16, 2005 from ATMA's Citibank, N.A. account located in New York to 36
Main's account number 061003415 at Florida Choice Bank located in Florida to purchase
ATMA Machines.

108.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on December 19,
2005 from ATMA's Citibank, N.A. account located in New York to 36 Main's account
number 061003415 at Florida Choice Bank located in Florida to purchase ATMA
Machines. See Volume XIX, Ex. 99.

109.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on February 24,
2006 from ATMA's Citibank, N.A. account located in New York to 36 Main's account
number 061003415 at Florida Choice Bank located in Florida to purchase ATMA
Machines. See Volume XIX, Ex. 100.

110.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,950,000 on April 27, 2006
from ATMA's Citibank, N.A. account located in New York to 36 Main's account number
061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See
Volume XIX, Ex. 101.

111.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the
ATM Sales Enterprise,  caused ATMA to wire transfer  $1,950,000.00 on May 26, 2006

from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 102.

112.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the ATM Sales Enterprise,  caused ATMA to wire transfer $975,000.00 on June 14, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 103.

113.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,073,000.00 on June 29, 2006, from ATMA's Citibank, N.A. account located in New York to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 104.

114.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,469,500 on July 27, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 105.

115.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,975,500.00 on September 5, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 106.

116.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $500.00 on September 6, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 107.

117.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,381,500.00 on September 29, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 108.

### Predicate Acts and Evidence Concerning Interstate Wire Transfers for the Periodic Revenue Payments

118.    On December 30, 2005, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $42,812.46 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 109.

119.    On February 3, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $85,760.28 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 110.

120.    On March 2, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of am interstate bank wire transfer, the following:

$56,646.44 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. <u>See</u> Volume XIX, Ex. 111.

121.    On April 3, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $51,911.65 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. <u>See</u> Volume XIX, Ex. 112.

122.    On April 4, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $26,997.50 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments the ATMA Machines. <u>See</u> Volume XIX, Ex. 113.

123.    On May 1, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $126,283.26 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. <u>See</u> Volume XIX, Ex. 114.

124.    On May 31, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $170,993.83 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. <u>See</u> Volume XIX, Ex. 115.

125.     On July 5, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $212,902.75 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 116.

126.     On August 2, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $256,028.99 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 117.

127.     On September 12, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $289,021.76 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 118.

128.     On October 11, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $340,231.77 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 119.

129.     On November 14, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $369,447.76 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 120.

130.    On December 19, 2006, in furtherance of the ATM Sales Enterprise, Moore

caused ATMFS to transmit, by means of an interstate bank wire transfer, the following:

$358,430.65 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 121.

131.    On February 1, 2007, in furtherance of the ATM Sales Enterprise, Moore

caused ATMFS to transmit, by means of an interstate bank wire transfer, the following:

$353,017.35 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 122.

132.    On February 28, 2007, in furtherance of the ATM Sales Enterprise, Moore

caused ATMFS to transmit, by means of an interstate bank wire transfer, the following:

$344,170.03 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 123.

133.    On April 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused

ATMFS to transmit, by means of an interstate bank wire transfer, the following:

$161,012.89 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 124.

134.    On May 14, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $120,000.00 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 125.

135.    On May 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $48,000.00 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 126.

136.    On May 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $5,784.37 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 127.

137.    On June 18, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $254,382.50 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 128.

138.    On August 15, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $695,737.93 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 129.

139.    On September 27, 2007, in furtherance of the ATM Sales Enterprise, Moore

caused ATMFS to transmit, by means of an interstate bank wire transfer, the following:

$374,187.25 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines.

### *Interstate Wire Transfers: Residual Revenue Payments*

140.    On January 3, 2006, Netschi and 36 Main caused ATMA to wire transfer

$21,406.23 from Citibank, N.A. account number 48842629 located in New York to

Automated Teller Machine Advantage Ltd's bank account number 977285936 at First

American Bank located in Dallas, Texas in furtherance of the ATM Sales Enterprise

scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36

Main for the November 16, 2005 Tranche Purchase. See Volume XIX, Ex. 130.

141.    On February 6, 2006, Netschi and 36 Main caused ATMA to wire transfer

$27,801.71 from Citibank, N.A. account number 48842629 located in New York to ATM

Capital's bank account number 977285936 at First American Bank located in Dallas,

Texas in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire

transfer Residual Revenue Funds allegedly owed 36 Main for the December 20, 2005

Tranche Purchase. See Volume XIX, Ex. 131.

142.    On June 1, 2006, Netschi and 36 Main caused ATMA to wire transfer

$35,560.14 from Citibank, N.A. account number 48842629 located in New York to 36

Main's bank account number 061003415 at The Bankers Bank located in Atlanta,

Georgia in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the April 26, 2006 Tranche Purchase. See Volume XIX, Ex. 132.

143.     On July 11, 2006, Netschi and 36 Main caused ATMA to wire transfer $38,458.55 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the May 27, 2006 Tranche Purchase. See Volume XIX, Ex. 133.

144.     On August 7, 2006, Netschi and 36 Main caused ATMA to wire transfer $33,621.17 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the June 16, 2006 Tranche Purchase and the June 27, 2006 Tranche Purchase. See Volume XIX, Ex. 134.

145.     On September 11, 2006, Netschi and 36 Main caused ATMA to wire transfer $30,500.33 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the July 28, 2006 Tranche Purchase. See Volume XIX, Ex. 135.

146.     On October 13, 2006, Netschi and 36 Main caused ATMA to wire transfer $43,911.72 from Citibank, N.A. account number 48842629 located in New York to 36

Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the August 30, 2006 Tranche Purchase #1, August 30, 2006 Tranche Purchase #2, August 30, 2006 Tranche Purchase #3 and August 30, 2006 Tranche Purchase #4. See Volume XIX, Ex. 136.

147.    On November 14, 2006, Netschi and 36 Main caused ATMA to wire transfer $27,389.12 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the September 26, 2006 Tranche Purchase #1, the September 26, 2006 Tranche Purchase #2, and September 26, 2006 Tranche Purchase #3. See Volume XIX, Ex. 137.

### Predicate Acts and Evidence Concerning Interstate Telephonic Wire Communications

148.    As detailed in Paragraphs 34 and 36, *supra*, on November 14, 2005, in furtherance of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM Venture, Moore, while in Florida or North Carolina, engaged in an interstate telephone conversation with representatives of the Plaintiff Trusts in New York during which he made false representations concerning the operations of ATMFS and 36 Main.

149.    As detailed in Paragraphs 30 – 33, *supra*, on November 14, 2005, in furtherance of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM Venture, Netschi, while in Texas, engaged in an interstate telephone conversation with representatives of the Plaintiff Trusts in New York during which he made false representations concerning the operations of ATMFS and 36 Main.

*Predicate Acts and Evidence Concerning Interstate Wire Communications*

150.     On November 14, 2005, at 3:18 p.m., in furtherance of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM Venture, ATM Capital, at the direction of Netschi, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from ATM Capital in Texas to a representative of the Plaintiff Trusts in New York, Munier in New Jersey and Brossman in New Jersey, attaching a schedule of phantom Placed ATMs and an undated Equipment Management Agreement, each constituting false information related to the existence of Placed ATMs available for sale and management. See Volume I, Ex. 1.

151.     On November 14, 2005, at 3:19 p.m., in furtherance of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM Venture, ATM Capital, at the direction of Netschi, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from ATM Capital in Texas to a representative of the Plaintiff Trusts in New York, attaching a Bill of Sale dated November 16, 2005, an Asset Purchase Agreement dated November 16, 2005, and a schedule of phantom Placed ATMs, each constituting false information related to the existence of Placed ATMs available for sale and management. See Volume I, Ex. 2.

152.     On November 14, 2005, at 4:17 p.m., in furtherance of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM Venture, ATM Capital, at the direction of Netschi, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from

ATM Capital in Texas to a representative of the Plaintiff Trusts in New York, Munier in New Jersey, Brossman in New Jersey, and Bernard Bushnell, a potential investor in ATMA, in New York, attaching an undated Equipment Management Agreement, constituting false information related to the existence of Placed ATMs available for sale and management. See Volume I, Ex. 3.

153.    On November 30, 2005, at 9:00 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to ATM Capital in Texas, Brossman in New Jersey and Marianne Munier with an attached Fictitious Monthly Report. See Volume XIX, Ex. 138.

154.    On December 29, 2005, at 7:52 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XIX, Ex. 138 – Ex. 141.

155.    On January 5, 2006, at 12:15 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 142.

156.     On February 2, 2006, at 9:00 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XIX, Ex. 143 – Ex. 145.

157.     On February 6, 2006, at 2:38 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 146.

158.     On March 7, 2006, at 10:11 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York with an attached Fictitious Revenue Report. See Volume XIX, Ex. 147.

159.     On April 27, 2006, at 1:21 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York containing false

representations as to ATMFS's possession of $200,000,000.00 in capital funds held in escrow by ATMFS for the expansion of ATMFS's business. See Volume XIX, Ex. 148.

160.    On May 2, 2006, at 11:43 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to Brossman in New Jersey and A representative of ATMA in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 149.

161.    On May 4, 2006, at 1:49 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 150.

162.    On May 31, 2006, at 9:43 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to ATM Capital in Texas and Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XIX, Ex. 151.

163.    On May 31, 2006, at 11:13 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Brossman, knowingly transmitted and caused to be transmitted by wire communication in

interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 151.

164.    On July 3, 2006, at 2:34 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina, Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. See Volume XIX, Ex. 152.

165.    On July 3, 2006, at 4:34 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of the Plaintiff Trusts in New York with an attached Fictitious Monthly Report See Volume XIX, Ex. 152.

166.    On July 4, 2006, at 10:55 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York containing false representations as to the operation of, and potential upgrades to, the ATMA Machines. See Volume XIX, Ex. 153.

167.    On July 26, 2006, at 2:31 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York containing false information related to the operation of the ATMA Machines. <u>See</u> Volume XIX, Ex. 154.

168.    On July 26, 2006, at 2:53 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York containing false information related to operation of the ATMA Machines. <u>See</u> Volume XIX, Ex. 155.

169.    On July 31, 2006, at 3:26 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. <u>See</u> Volume XIX, Ex. 156 – Ex. 158.

170.    On August 2, 2006, at 5:28 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. <u>See</u> Volume XIX, Ex. 159.

171.    On September 12, 2006, at 10:21 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 160.

172.    On October 6, 2006, at 11:26 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. See Volume XIX, Ex. 161 – Ex. 162.

173.    On October 30, 2006, at 11:04 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York containing a false "ATM Detail Transaction Report." See Volume XIX, Ex. 163.

174.    On November 14, 2006, at 11:55 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XIX, Ex. 164.

175.    On January 19, 2007, at 2:42 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. <u>See</u> Volume XIX, Ex. 165 – Ex. 167.

176.    On January 22, 2007, at 11:03 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. <u>See</u> Volume XIX, Ex. 168.

177.    On February 26, 2007, at 10:43 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. <u>See</u> Volume XIX, Ex. 169.

178.    On April 11, 2007, at 10:49 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 170.

179.    On April 12, 2007, at 8:38 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York and Brossman in New

Jersey containing false information related to the operation of the ATMA Machines. <u>See</u> Volume XX, Ex. 171.

180.    On April 30, 2007, at 9:17 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 172 – Ex.174.

181.    On April 30, 2007, at 3:49 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 175.

182.    On June 6, 2007, at 11:33 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report <u>See</u> Volume XX, Ex. 176.

183.    On July 12, 2007, at 3:20 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 177 – Ex.179.

184.    On July 12, 2007, at 11:56 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XX, Ex. 180.

185.    On August 15, 2007, at 7:58 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. See Volume XX, Ex. 181 – Ex. 182.

186.    On August 15, 2007, at 1:40 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XX, Ex. 183.

187.    On September 18, 2007, at 10:34 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XX, Ex. 184.

188.    On November 5, 2007, at 2:33 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in

Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 185 – Ex. 186.

189.    On November 5, 2007, at 11:52 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of Plaintiff Trust in New York and Brossman in New Jersey with an attached Fictitious Monthly Report.  <u>See</u> Volume XX, Ex. 187.

190.    On January 10, 2008, at 2:38 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 188.

191.    On January 10, 2008, at 3:20 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York, attaching a report from a third-party processor, constituting false information related to the existence of ATMA Machines. <u>See</u> Volume XIX, Ex. 90.

192.    On January 11, 2008, at 11:49 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York,

attaching a report from a ATMFS, constituting false information related to the existence of ATMA Machines. See Volume XIX, Ex. 92.

193.    On January 11, 2008, at 12:34 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York containing false representations that requests had been submitted to third-party processors for reports pertaining to the operation of the ATMA Machines. See Volume XIX, Ex. 94.

194.    On January 11, 2008, at 2:14 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York containing a false representation that a bank account existed where ATMA Periodic Revenue Payments were being held and that a statement from that account would be produced to a representative of the Plaintiff Trusts. See Volume XIX, Ex. 94.

195.    On January 11, 2008, at 3:19 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York, attaching a purported bank statement dated December 31, 2007, constituting false information related to the amount of funds being held in escrow on behalf of ATMA. See Volume XIX, Ex. 95.

196.    On January 11, 2008, at 7:18 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA containing a misrepresentation that 250 of the ATMA Machines had been identified. See Volume XIX, Ex. 93.

197.    On January 18, 2008, at 5:47 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman attaching a purported schedule identifying the locations of the ATMA Machines, constituting false information related to the existence and location of the ATMA Machines. See Volume XX, Ex. 189.

198.    On January 20, 2008, at 12:30 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of the Plaintiff Trusts in New York containing a misrepresentation that Brossman had accounted for the existence of the ATMA Machines. See Volume XIX, Ex. 97.

199.    On January 20, 2008, at 9:05 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of the Plaintiff Trusts in New York containing a false representation as to the existence of ATMs owned by Brossman. See Volume XX, Ex. 190.

200.    On January 22, 2008, at 1:23 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of the Plaintiff Trusts in New York, attaching a schedule identifying the locations of the ATMA Machines, constituting false information related to the existence and location of the ATMA Machines. See Volume XX, Ex. 189.

201.    On January 22, 2008, at 2:32 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in North Carolina or Florida to a representative of the Plaintiff Trusts in New York, containing a false representation as to the existence and locations of the ATMA Machines. See Volume XIX, Ex. 98.

202.    On January 31, 2008, at 3:51 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 138.

203.    On January 31, 2008, at 3:58 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 139.

204.    On January 31, 2008, at 3:59 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 140.

205.    On January 31, 2008, at 4:00 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 143.

206.    On January 31, 2008, at 4:01 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 144.

207.    On January 31, 2008, at 4:05 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 156.

208.    On January 31, 2008, at 4:06 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XIX, Ex. 157.

209.    On January 31, 2008, at 4:09 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XIX, Ex. 161.

210.    On January 31, 2008, at 4:10 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XIX, Ex. 165.

211.    On January 31, 2008, at 4:12 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 172 – Ex. 173.

212.    On January 31, 2008, at 4:20 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XIX, Ex. 141.

213.    On January 31, 2008, at 4:24 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 158.

214.    On January 31, 2008, at 4:26 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 162.

215.    On January 31, 2008, at 4:30 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XX, Ex. 174.

216.    On January 31, 2008, at 4:31 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XX, Ex. 179, Ex. 181.

217.    On January 31, 2008, at 4:32 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of Plaintiff Trusts in New York with an attached

Fictitious Monthly Report. See Volume XX, Exs. 182 and 186.

218.    On January 31, 2008, at 5:03 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of Plaintiff Trusts in New York with an attached

Fictitious Monthly Report. See Volume XX, Ex. 191 – Ex. 192.

219.    On January 31, 2008, at 5:19 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of Plaintiff Trusts in New York with an attached

Fictitious Monthly Report. See Volume XX, Ex. 191.

220.    On January 31, 2008, at 5:20 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of Plaintiff Trusts in New York with an attached

Fictitious Monthly Report. See Volume XX, Ex. 192.

**Violations of 18 U.S.C. § 1341 (Mail Fraud)**

221.    The predicate acts, and evidence of the schemes constituting the pattern of

racketeering, further include, but are not limited to interstate mailings containing false or

fraudulent pretenses, representations, or promises made in furtherance of the ATM Sales

Enterprise caused to be transmitted by the Defendants, in violation of 18 U.S.C. § 1341.

### *Interstate Mailings*

222.    Upon information and belief, on or about November 15, 2005, in furtherance
of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM
Venture, Moore, knowingly placed or caused to be placed in a post office or authorized
depository for the Postal Service in Florida or North Carolina or with a private,
commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in
New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated
November 15, 2005; a Due Diligence Report and Placed ATM Leases for each of the 100
ATMs; and an Equipment Management Agreement dated November 15, 2005.

223.    Upon information and belief, on or about December 20, 2005, in furtherance
of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to further invest
funds in the ATM Venture, Moore, knowingly placed or caused to be placed in a post
office or authorized depository for the Postal Service in Florida or North Carolina or with
a private, commercial interstate carrier in Florida or North Carolina, for delivery to
Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease
Assignment dated December 20, 2005; a Due Diligence Report and Placed ATM Leases
for each of the 100 ATMs; and, an Equipment Management Agreement dated December
20, 2005.

224.    Upon information and belief, on or about February 22, 2006, in furtherance of
the ATM Sales Enterprise and to further  induce the Plaintiff Trusts to further invest
funds in the ATM Venture, Moore, knowingly placed or caused to be placed in a post
office or authorized depository for the Postal Service in Florida or North Carolina or with
a private, commercial interstate carrier in Florida or North Carolina, for delivery to

Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated February 22, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; and, an Equipment Management Agreement dated February 22, 2006.

225.    Upon information and belief, on or about April 26, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to further invest funds in the ATM Venture, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated April 26, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; an Equipment Management Agreement dated April 26, 2006.

226.    Upon information and belief, on or about May 27, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to further invest funds in the ATM Venture, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated May 23, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; and, an Equipment Management Agreement dated May 23, 2006.

227.    Upon information and belief, on or about August 30, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to further invest funds in the ATM Venture, Moore, knowingly placed or caused to be placed in a post office or

authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated September 5, 2006; a Due Diligence Report and Placed ATM Leases for each of the 127 ATMs; and an Equipment Management Agreement dated September 5, 2006.

228.    Upon information and belief, on or about November 15, 2005, in furtherance of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated November 16, 2005, Asset Purchase Agreement dated November 16, 2005, and Due Diligence Commitment dated November 16, 2005.

229.    Upon information and belief, on or about December 20, 2005, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated December 20, 2005, Asset Purchase Agreement dated December 20, 2005, and Addition to Equipment dated December 20, 2005.

230.    Upon information and belief, on or about February 22, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated February 22, 2006, Asset Purchase Agreement dated February 22, 2006, and Addition to Equipment dated December 20, 2005.

231.    Upon information and belief, on or about April 26, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated April 26, 2006, Asset Purchase Agreement dated April 26, 2006, and Addition to Equipment dated April 26, 2006.

232.    Upon information and belief, on or about May 27, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated May 27, 2006, and Asset Purchase Agreement dated May 27, 2006.

233.    Upon information and belief, on or about June 16, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated June 16, 2006, and Asset Purchase Agreement dated June 16, 2006.

234.    Upon information and belief, on or about June 27, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated June 27, 2006, and Asset Purchase Agreement dated June 27, 2006.

235.    Upon information and belief, on or about July 28, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated July 28, 2006, and Asset Purchase Agreement dated July 28, 2006.

236.    Upon information and belief, on or about August 30, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the

ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: four Bills of Sale dated August 30, 2006, and four Asset Purchase Agreements dated August 30, 2006.

237.    Upon information and belief, on or about September 26, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: three Bills of Sale dated September 26, 2006, and three Asset Purchase Agreements dated September 26, 2006.

238.    The allegations in Paragraphs 222 - 237 are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.  The allegations in Paragraphs 222 - 237 are based in part upon information and belief because the Defendants are alleged to have sent or delivered the documents identified in Paragraphs 222 - 237 above amongst themselves.

239.    As a direct and proximate result of Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman's conduct of the ATM Sales Enterprise through the pattern of racketeering activity detailed in Paragraphs 106 – 237 above, Plaintiffs have been injured in their business and property, specifically the loss of $16,475,000.00 paid to purchase the phantom ATMA Machines.  Netschi, 36 Main, Jones, Moore, Exclusive Properties ATM Capital, Munier, and Brossman's conduct and

participation in the ATM Sales Enterprise as part of their pattern of racketeering activity was in the violation of 18 U.S.C. § 1962(c) and caused Plaintiffs' losses. Accordingly, Plaintiffs are entitled, under the provisions of 18 U.S.C. § 1964(c), to recover treble damages, the costs of bringing this action, pre-judgment interest, and reasonable attorney's fees.

## COUNT 2
### (Civil Racketeering Violations – All Defendants)
### (18 U.S.C. § 1962(d))

240.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 239 of this Complaint as if fully set forth herein.

241.    The Defendants, as detailed in Paragraphs 26 – 65, 74 and 84 – 97 above, entered into an agreement with each other to engage in a conspiracy to violate 18 U.S.C. § 1962(c). As set forth Each Defendant entered into an agreement to join the conspiracy, took acts in the furtherance of the conspiracy and knowingly participated in the conspiracy.

242.    The purpose of the conspiracy was to induce investors, including Plaintiffs, to enter into agreements to purchase phantom Placed ATMs to their economic detriment and to the economic benefit of the Defendants. The conspirators each carried out the scheme and each conspirator was put on notice of the general nature of the conspiracy, that the conspiracy extended beyond the individual role of any single member, and that the conspiratorial venture, the ATM Sales Enterprise, functioned as a continuing unit for a common purpose. The Defendants, as conspirators, adopted the goal of furthering the ATM Sales Enterprise. Each of the Defendants' stake in the ATM Sales Enterprise was in making profits through each Defendant's role in the ATM Sales Enterprise.

243.    The Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by: (1) participating or causing the acquisition or maintenance of, through a pattern of racketeering activity, an interest or control in the ATM Sales Enterprise, the activities of which affect interstate or foreign commerce; and, (2) participating, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

244.    By engaging in the overt acts and other conduct described in Paragraphs 26 – 65 and 84 – 97 above, Defendants have agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d), to engage in illegal predicate acts, detailed in Paragraphs 106 - 237 above, which formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. § 1962(c).

245.    The Defendants participated in and cooperated with each other in the aforementioned conspiracy that enabled Defendants to engage in the fraudulent sale of ATMs and thereby amass substantial sums of money, believed to be tens of millions of dollars, from investors throughout the United States of America, including Plaintiffs who reside and conduct business in the Southern District of New York.

246.    The membership of the conspiracy includes each of the Defendants.  As coconspirators, the Defendants are liable for all of the actions committed by all of the coconspirators within the conspiracy and are liable for all of the damages sustained by Plaintiffs that were caused by any members of the conspiracy, regardless of whether the Defendants were themselves directly involved in a particular aspect of the ATM Sales Enterprise.

247.    As a direct and proximate result of the violations set forth above, Plaintiffs, have been injured in their business and property. The Defendants violations of 18 U.S.C. § 1962(d) were the proximate cause of these losses.  Under the provisions of 18 U.S.C. § 1962(c), Plaintiffs are entitled to bring this action and recover herein treble damages, the cost of bringing this suit, pre-judgment interest, and recoverable attorney's fees.

### COUNT 3
### (Fraudulent Misrepresentation, Inducement – Moore)

248.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 247 of this Complaint as if fully set forth herein.

249.    The representations by Moore, as detailed above at Paragraphs 34, 36, 52, 54, 56 – 57, 59, 61 – 63, 65, 88, 91, 93, 159, 166 - 168, 173, 179, 191 - 195, and 197 - 201 were material false representations made to Plaintiffs that Moore knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiffs and Plaintiffs justifiably relied on Moore's materially false representations.

250.    Moore, as detailed above at Paragraphs 34, 36, 52, 54, 56 – 57, 59, 61 – 63, 65, 88, 91, 93, 159, 166 - 168, 173, 179, 191 - 195, and 197 - 201 made false misrepresentations to Plaintiffs of facts that were material to Plaintiffs' decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

251.    Moore knew or should have known of: the falsity of the verbal and written representations made to Plaintiffs; the incompleteness of the representations made to Plaintiffs at the time they were made; and, that the representations made to Plaintiffs omitted material facts.

252.    Moore's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 34, 36, 52, 54, 56 – 57, 59, 61 – 63, 65, 88, 91, 93, 159, 166 - 168, 173, 179, 191 - 195, and 197 - 201, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiffs to enter into the Asset Purchase Agreements for the purchase of "phantom" Placed ATMs from 36 Main, to transfer funds to 36 Main for those "phantom" Placed ATMs, and to engage the services of ATMFS, through Moore, to manage the ATMA Machines. Moore intentionally or recklessly attempted to hide such fraud by delivering the Moore Fictitious Transaction Documents, Fictitious Monthly Reports, and Periodic Revenue Payments to Plaintiffs.

253.    Plaintiffs reasonably and justifiably relied to their detriment on the truthfulness of Moore's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines, and conduct business with the ATM Sales Enterprise.

254.    In addition, for Tranche Purchases subsequent to the November 15, 2005 Tranche Purchase, Plaintiffs justifiably relied upon and were further induced into continuing to purchase the "phantom" Placed ATMs by Moore's delivery of Fictitious Monthly Reports and Periodic Revenue Payments.

255.    But for Moore's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiffs would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

256.    Moore had a pecuniary interest in the transactions between Plaintiffs and 36 Main and/or the ATM Sales Enterprise.

257.    As a direct and proximate result of the Moore's intentional misrepresentations, omissions, and concealment of material facts, Plaintiffs have been damaged to the extent that it has lost the value of all principal amounts invested with and through 36 Main, plus all applicable interest thereon.

258.    Moore's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiffs.  Plaintiffs are therefore entitled to the award of punitive damages from Moore.

## COUNT 4
### (<u>Fraudulent Misrepresentation and Inducement</u> – <u>Netschi</u>)

259.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 258 of this Complaint as if fully set forth herein.

260.    The representations by Netschi, as detailed above at Paragraphs 30 – 33, 35, 41, 74, 87, and 96, were material false representations made to Plaintiffs that Netschi knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiffs and Plaintiffs reasonably relied on Netschi's materially false representations.

261.    Netschi, as detailed above at Paragraphs 30 – 33, 35, 41, 74, 87, and 96, made false misrepresentations to Plaintiffs of facts that were material to Plaintiffs' decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

262.    Netschi knew or should have known of: the falsity of the verbal and written representations made to Plaintiffs; the incompleteness of the representations made to Plaintiffs at the time they were made; and, that the representations made to Plaintiffs omitted material facts.

263.    Netschi's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 30 – 33, 35, 41, 74, 87, and 96, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiffs to enter into the Asset Purchase Agreements for the purchase of "phantom" ATMs from 36 Main, to transfer funds to 36 Main for those "phantom" ATMs, and to engage the services of ATMFS, through Moore, to manage the ATMA Machines. Netschi intentionally or recklessly attempted to hide such fraud by delivering or causing to be delivered the 36 Main Transaction Documents.

264.    Plaintiffs reasonably and justifiably relied to their detriment on the truthfulness of Netschi's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

265.    But for Netschi's material misrepresentations, omissions, and concealment of facts concerning the 36 Main Fictitious Transaction Documents, Plaintiffs would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

266.    Netschi had a pecuniary interest in the transactions between Plaintiffs and 36 Main and/or the ATM Sales Enterprise.

267.     As a direct and proximate result of the Netschi's intentional misrepresentations, omissions, and concealment of material facts, Plaintiffs have been damaged to the extent that it has lost the value of all principal amounts invested with and through 36 Main, plus all applicable interest thereon.

268.     Netschi's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiffs.  Plaintiffs are therefore entitled to the award of punitive damages from Netschi.

## COUNT 5
## (Fraudulent Misrepresentation, Inducement, Concealment – Brossman)

269.     Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 268 of this Complaint as if fully set forth herein.

270.     The representations by Brossman, as detailed above at Paragraphs 33, 53, 58, 60, 64, 89 – 90, 92, 95, 97, 196, 198 - 200, 202 - 220, were material false representations made to Plaintiffs that Brossman knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiffs and Plaintiffs reasonably relied on Brossman's materially false representations.

271.     Brossman, as detailed above at Paragraphs 33, 53, 58, 60, 64, 89 – 90, 92, 95, 97, 196, 198 - 200, 202 - 220, made false misrepresentations to Plaintiffs of facts that were material to Plaintiffs' decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

272.     Brossman knew or should have known of: the falsity of the verbal and written representations made to Plaintiffs; the incompleteness of the representations made to

Plaintiffs at the time they were made; and, that the representations made to Plaintiffs omitted material facts.

273.    Brossman's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 33, 53, 58, 60, 64, 89 – 90, 92, 95, 97, 196, 198 - 200, 202-220, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiffs to enter into the Asset Purchase Agreements for the purchase of "phantom" ATMs from 36 Main, to transfer funds to 36 Main for those "phantom" ATMs, and to engage the services of ATMFS, through Brossman, to manage the ATMA Machines. Brossman intentionally or recklessly attempted to hide such fraud by delivering the Fictitious Transaction Documents and/or Fictitious Monthly Reports to Plaintiffs.

274.    Plaintiffs reasonably and justifiably relied to their detriment on the truthfulness of Brossman's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

275.    But for Brossman's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiffs would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

276.    Brossman had a pecuniary interest in the transactions between Plaintiffs and 36 Main and/or the ATM Sales Enterprise.

277.    Brossman was under a duty to disclose the facts described in Paragraphs 33, 53, 58, 60, 64, 89 – 90, 92, 95, 97, 193, 196, 198 - 200, 202 - 220, above and chose to not do so.

278.    As a direct and proximate result of the Brossman's intentional misrepresentations, omissions, and concealment of material facts, Plaintiffs have been damaged to the extent that it has lost the value of all principal amounts invested with and through 36 Main, plus all applicable interest thereon.

279.    Brossman's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiffs.  Plaintiffs are therefore entitled to the award of punitive damages from Brossman.

## COUNT 6
### (Fraudulent Misrepresentation, Inducement, Concealment – Munier)

280.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 279 of this Complaint as if fully set forth herein.

281.    The representations by Munier, as detailed above at Paragraphs 33, 53, 89, 92, 95 and 97, were material false representations made to Plaintiffs that Munier knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiffs and Plaintiffs reasonably relied on Munier's materially false representations.

282.    Munier, as detailed above at Paragraphs, 33, 53, 89, 92, 95 and 97, made false misrepresentations to Plaintiffs of facts that were material to Plaintiffs' decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

283.    Munier knew or should have known of: the falsity of the verbal and written representations made to Plaintiffs; the incompleteness of the representations made to Plaintiffs at the time they were made; and, that the representations made to Plaintiffs omitted material facts.

284.    Munier's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 33, 53, 89, 92, 95 and 97were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiffs to enter into the Asset Purchase Agreements for the purchase of "phantom" ATMs from 36 Main, to transfer funds to 36 Main for those "phantom" ATMs, and to engage the services of ATMFS, through Munier, to manage the ATMA Machines. Munier intentionally or recklessly attempted to hide such fraud by delivering the Fictitious Transaction Documents and/or Fictitious Monthly Reports to Plaintiffs.

285.    Plaintiffs reasonably and justifiably relied to their detriment on the truthfulness of Munier's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

286.    But for Munier's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiffs would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

287.    Munier had a pecuniary interest in the transactions between Plaintiffs and 36 Main and/or the ATM Sales Enterprise.

288.    Munier was under a duty to disclose the facts described in Paragraphs 33, 53, 89, 92, 95 and 97 above and chose to not do so.

289.    As a direct and proximate result of the Munier's intentional misrepresentations, omissions, and concealment of material facts, Plaintiffs have been damaged to the extent that it has lost the value of all principal amounts invested with and through 36 Main, plus all applicable interest thereon.

290.    Munier's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiffs.  Plaintiffs are therefore entitled to the award of punitive damages from Munier.

## COUNT 7
## (Negligent Misrepresentation – 36 Main and Netschi)

291.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 290 of this Complaint as if fully set forth herein.

292.    The representations made by Netschi and 36 Main to Plaintiffs in Paragraphs 30 - 33, and 35 above (collectively the "36 Main Misrepresentations")  were false when made and material to Plaintiffs' decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines and conduct business with the ATM Sales Enterprise.

293.    Netschi and 36 Main were in a superior position to know the truth or falsity of the 36 Main Misrepresentations.

294.    Netschi and 36 Main should have known the truth or falsity of the 36 Main Misrepresentations.

78

295.    Under the circumstances, Netschi and 36 Main were under a duty to ensure the accuracy of the 36 Main Misrepresentations.

296.    Netschi and 36 Main made the 36 Main Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

297.    Netschi and 36 Main intended and were aware that Plaintiffs would rely upon the 36 Main Misrepresentations in deciding whether to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines and conduct business with the ATM Sales Enterprise.

298.    Netschi and 36 Main had a pecuniary interest in the ATM Venture and the ATM Sales Enterprise.

299.    Plaintiffs reasonably and justifiably relied to their detriment upon the 36 Main Misrepresentations and on the completeness of their disclosure of material facts, in choosing to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise and but for the 36 Main Misrepresentations, Plaintiffs would not have entered the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise.

300.    Netschi and 36 Main's breach of their duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

301.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the 36 Main Misrepresentations.

302.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the value of all principal amounts invested with and through the Defendants, plus all applicable interest thereon.

**COUNT 8**
**(Negligent Misrepresentation – Moore)**

303.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 302 of this Complaint as if fully set forth herein.

304.    The representations made by Moore in Paragraphs 34, 36,and 52 above (collectively the "Moore Misrepresentations") were false when made and material to Plaintiffs' decision to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with the ATM Sales Enterprise.

305.    Moore was in a superior position to know the truth or falsity of the Moore Misrepresentations.

306.    Moore should have known the truth or falsity of the Moore Misrepresentations.

307.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore Misrepresentations.

308.    Moore made the Moore Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

309.    Moore intended and was aware that Plaintiffs would rely upon the Moore Misrepresentations in deciding whether to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise.

310.    Moore had a pecuniary interest in the ATM Venture, the sale of the ATMA Machines by 36 Main and/or the ATM Sales Enterprise.

311.    Plaintiffs justifiably relied to their detriment upon the Moore Misrepresentations by entering the ATM Venture, purchasing the ATMA Machines and/or conducting business with ATM Sales Enterprise and but for the Moore Misrepresentations, Plaintiffs would not have entered the ATM Venture, purchased the ATMA Machines and/or conducted business with ATM Sales Enterprise.

312.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

313.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore Misrepresentations.

314.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the value of all principal amounts invested with and through the Defendants, plus all applicable interest thereon.

### COUNT 9
### (Negligent Misrepresentation – Moore)

315.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 314 of this Complaint as if fully set forth herein.

316.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the undated Due Diligence Report provided to Plaintiffs on or about November 16, 2005 (the "Moore November 2005 Due Diligence Misrepresentations") (See Volume III, Ex. 11) were false when made and material to Plaintiffs' decision to enter into the November 16, 2005 Tranche Purchase.

317.    Moore was in a superior position to know the truth or falsity of the Moore November 2005 Due Diligence Misrepresentations.

318.     Moore should have known the truth or falsity of the Moore November 2005
Due Diligence Misrepresentations.

319.     Under the circumstances, Moore was under a duty to ensure the accuracy of
the Moore November 2005 Due Diligence Misrepresentations.

320.     Moore made the Moore November 2005 Due Diligence Misrepresentations
without the exercise of reasonable care to ascertain their truth or falsity.

321.     Moore intended and was aware that Plaintiffs would rely upon the Moore
November 2005 Due Diligence Misrepresentations in deciding whether to enter into the
November 16, 2005 Tranche Purchase.

322.     Moore had an undisclosed pecuniary interest in the November 16, 2005
Tranche Purchase, because his company, ATMFS, was actually 36 Main's source of the
ATMs for the November 16, 2005 Tranche Purchase.

323.     Plaintiffs reasonably and justifiably relied to their detriment upon the Moore
November 2005 Due Diligence Misrepresentations by entering into the November 16,
2005 Tranche Purchase, whereby Plaintiffs agreed to purchase 100 Placed ATM
machines for $1,900,000.00.

324.     But for the Moore November 2005 Due Diligence Misrepresentations,
Plaintiffs would not have entered the November 16, 2005 Tranche Purchase.

325.     Moore's breach of his duty of reasonable care to Plaintiffs is the proximate
cause of Plaintiffs' injuries.

326.     The type and extent of Plaintiffs' injuries were reasonably foreseeable results
of the Moore November 2005 Due Diligence Misrepresentations.

327.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

## COUNT 10
### (Negligent Misrepresentation – Moore)

328.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 327 of this Complaint as if fully set forth herein.

329.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the undated Due Diligence Report provided to Plaintiffs on or about December 20, 2005 (the "Moore December 2005 Due Diligence Misrepresentations") (See Volume V, Ex. 20) were false when made and material to Plaintiffs' decision to enter into the December 20, 2005 Tranche Purchase.

330.    Moore was in a superior position to know the truth or falsity of the Moore December 2005 Due Diligence Misrepresentations.

331.    Moore should have known the truth or falsity of the Moore December 2005 Due Diligence Misrepresentations.

332.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore December 2005 Due Diligence Misrepresentations.

333.    Moore made the Moore December 2005 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

334.    Moore intended and was aware that Plaintiffs would rely upon the Moore December 2005 Due Diligence Misrepresentations in deciding whether to enter into the December 20, 2005 Tranche Purchase.

335.    Moore had an undisclosed pecuniary interest in the December 20, 2005 Tranche Purchase, because his company, ATMFS, was actually 36 Main's source of the ATMs for the December 20, 2005 Tranche Purchase.

336.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore December 2005 Due Diligence Misrepresentations by entering into the December 20, 2005 Tranche Purchase, whereby Plaintiffs agreed to purchase 100 Placed ATM machines for $1,900,000.00.

337.    But for the Moore December 2005 Due Diligence Misrepresentations, Plaintiffs would not have entered the December 20, 2005 Tranche Purchase.

338.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

339.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore December 2005 Due Diligence Misrepresentations.

340.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

## COUNT 11
## (Negligent Misrepresentation – Moore)

341.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 340 of this Complaint as if fully set forth herein.

342.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the Due Diligence Report for the February 22, 2006 Tranche Purchase and provided to Plaintiffs on or about February 22, 2006 (the "Moore February 2006 Due Diligence Misrepresentations") (See Volume VII, Ex. 29) were false when made and material to Plaintiffs' decision to enter into the February 22, 2006 Tranche Purchase.

343.    Moore was in a superior position to know the truth or falsity of the Moore February 2006 Due Diligence Misrepresentations.

344.    Moore should have known the truth or falsity of the Moore February 2006 Due Diligence Misrepresentations.

345.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore February 2006 Due Diligence Misrepresentations.

346.    Moore made the Moore February 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

347.    Moore intended and was aware that Plaintiffs would rely upon the Moore February 2006 Due Diligence Misrepresentations in deciding whether to enter into the February 22, 2006 Tranche Purchase.

348.    Moore had an undisclosed pecuniary interest in the February 22, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the February 22, 2006 Tranche Purchase.

349.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore February 2006 Due Diligence Misrepresentations by entering into the February 22, 2006 Tranche Purchase, whereby Plaintiffs agreed to purchase 100 Placed ATM machines for $1,900,000.00.

350.    But for the Moore February 2006 Due Diligence Misrepresentations, Plaintiffs would not have entered the February 22, 2006 Tranche Purchase.

351.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

352.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore February 2006 Due Diligence Misrepresentations.

353.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

**COUNT 12**
**(Negligent Misrepresentation – Moore)**

354.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 353 of this Complaint as if fully set forth herein.

355.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the Due Diligence Report dated April 26, 2006 (the "Moore April 2006 Due Diligence Misrepresentations") (See Volume IX, Ex. 38) were false when made and material to Plaintiffs' decision to enter into the April 26, 2006 Tranche Purchase.

356.    Moore was in a superior position to know the truth or falsity of the Moore April 2006 Due Diligence Misrepresentations.

357.    Moore should have known the truth or falsity of the Moore April 2006 Due Diligence Misrepresentations.

358.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore April 2006 Due Diligence Misrepresentations.

359.    Moore made the Moore April 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

360.    Moore intended and was aware that Plaintiffs would rely upon the Moore April 2006 Due Diligence Misrepresentations in deciding whether to enter into the April 26, 2006 Tranche Purchase.

361.    Moore had an undisclosed pecuniary interest in the April 26, 2006 Deal because his company, ATMFS, was actually 36 Main's source of the ATMs for the April 26, 2006 Tranche Purchase.

362.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore April 2006 Due Diligence Misrepresentations by entering into the April 26, 2006 Tranche Purchase, whereby Plaintiffs agreed to purchase 100 Placed ATM machines for $1,950,000.00.

363.    But for the Moore April 2006 Due Diligence Misrepresentations, Plaintiffs would not have entered the April 26, 2006 Tranche Purchase.

364.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

365.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore April 2006 Due Diligence Misrepresentations.

366.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,950,000.00 paid to 36 Main.

## COUNT 13
## (Negligent Misrepresentation – Moore)

367.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 366 of this Complaint as if fully set forth herein.

368.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the undated Due Diligence Report provided to Plaintiffs on or about May 27, 2006 (the "Moore May 2006 Due Diligence Misrepresentations") (See Volume XI, Ex. 45) were false when made and material to Plaintiffs' decision to enter into the May 27, 2006 Tranche Purchase.

369.    Moore was in a superior position to know the truth or falsity of the Moore May 2006 Due Diligence Misrepresentations.

370.    Moore should have known the truth or falsity of the Moore May 2006 Due Diligence Misrepresentations.

371.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore May 2006 Due Diligence Misrepresentations.

372.    Moore made the Moore May 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

373.    Moore intended and was aware that Plaintiffs would rely upon the Moore May 2006 Due Diligence Misrepresentations in deciding whether to enter into the May 27, 2006 Tranche Purchase.

374.    Moore had an undisclosed pecuniary interest in the May 27, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the May 27, 2006 Tranche Purchase.

375.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore May 2006 Due Diligence Misrepresentations by entering into the May 27, 2006 Tranche Purchase, whereby Plaintiffs agreed to purchase 100 Placed ATM machines for $1,950,000.00.

376.    But for the Moore May 2006 Due Diligence Misrepresentations, Plaintiffs would not have entered the May 27, 2006 Tranche Purchase.

377.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

378.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore May 2006 Due Diligence Misrepresentations.

379.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,950,000.00 paid to 36 Main.

**COUNT 14**
**(Negligent Misrepresentation – Moore)**

380.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 379 of this Complaint as if fully set forth herein.

381.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the undated Due Diligence Report provided to Plaintiffs on or about June 16, 2006 (the "Moore June 16, 2006 Due Diligence Misrepresentations") (See Volume XII, Ex. 52) were false when made and material to Plaintiffs' decision to enter into the June 16, 2006 Tranche Purchase.

382.    Moore was in a superior position to know the truth or falsity of the Moore June 16, 2006 Due Diligence Misrepresentations.

383.    Moore should have known the truth or falsity of the Moore June 16, 2006 Due Diligence Misrepresentations.

384.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore June 16, 2006 Due Diligence Misrepresentations.

385.    Moore made the Moore June 16, 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

386.    Moore intended and was aware that Plaintiffs would rely upon the Moore June 16, 2006 Due Diligence Misrepresentations in deciding whether to enter into the June 16, 2006 Tranche Purchase.

387.    Moore had an undisclosed pecuniary interest in the June 16, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the June 16, 2006 Tranche Purchase.

388.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore June 16, 2006 Due Diligence Misrepresentations by entering into the June 16, 2006 Tranche Purchase, whereby Plaintiffs agreed to purchase 50 Placed ATM machines for $975,000.00.

389.    But for the Moore June 16, 2006 Due Diligence Misrepresentations, Plaintiffs would not have entered the June 16, 2006 Tranche Purchase.

390.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

391.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore June 16, 2006 Due Diligence Misrepresentations.

392.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $975,000.00 paid to 36 Main.

## COUNT 15
### (Negligent Misrepresentation – Moore)

393.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 392 of this Complaint as if fully set forth herein.

394.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the undated Due Diligence Report provided to Plaintiffs on or about June 27, 2006 (the "Moore June 27, 2006 Due Diligence Misrepresentations") (See Volume XIII, Ex. 59) were false when made and material to Plaintiffs' decision to enter into the June 27, 2006 Tranche Purchase.

395.    Moore was in a superior position to know the truth or falsity of the Moore June 27, 2006 Due Diligence Misrepresentations.

396.    Moore should have known the truth or falsity of the Moore June 27, 2006 Due Diligence Misrepresentations.

397.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore June 27, 2006 Due Diligence Misrepresentations.

398.    Moore made the Moore June 27, 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

399.    Moore intended and was aware that Plaintiffs would rely upon the Moore June 27, 2006 Due Diligence Misrepresentations in deciding whether to enter into the June 27, 2006 Tranche Purchase.

400.    Moore had an undisclosed pecuniary interest in the June 27, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the June 27, 2006 Tranche Purchase.

401.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore June 27, 2006 Due Diligence Misrepresentations by entering into the June 27, 2006 Tranche Purchase, whereby Plaintiffs agreed to purchase 74 Placed ATM machines for $1,073,000.00.

402.    But for the Moore June 27, 2006 Due Diligence Misrepresentations, Plaintiffs would not have entered the June 27, 2006 Tranche Purchase.

403.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

404.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore June 27, 2006 Due Diligence Misrepresentations.

405.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,073,000.00 paid to 36 Main.

**COUNT 16**
**(Negligent Misrepresentation – Moore)**

406.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 405 of this Complaint as if fully set forth herein.

407.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the undated Due Diligence Report provided to Plaintiffs on or about July 28, 2006 (the "Moore July 2006 Due Diligence Misrepresentations") (See Volume XV, Ex. 66) were false when made and material to Plaintiffs' decision to enter into the July 28, 2006 Tranche Purchase.

408.    Moore was in a superior position to know the truth or falsity of the Moore July 2006 Due Diligence Misrepresentations.

409.    Moore should have known the truth or falsity of the Moore July 2006 Due Diligence Misrepresentations.

410.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore July 2006 Due Diligence Misrepresentations.

411.    Moore made the Moore July 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

412.    Moore intended and was aware that Plaintiffs would rely upon the Moore July 2006 Due Diligence Misrepresentations in deciding whether to enter into the July 28, 2006 Tranche Purchase.

413.     Moore had an undisclosed pecuniary interest in the July 28, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the July 28, 2006 Tranche Purchase.

414.     Plaintiffs reasonably and justifiably relied to their detriment upon the Moore July 2006 Due Diligence Misrepresentations by entering into the July 28, 2006 Tranche Purchase, whereby Plaintiffs agreed to purchase 100 Placed ATM machines for $1,450,000.00.

415.     But for the Moore July 2006 Due Diligence Misrepresentations, Plaintiffs would not have entered the July 28, 2006 Tranche Purchase.

416.     Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

417.     The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore July 2006 Due Diligence Misrepresentations.

418.     By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,450,000.00 paid to 36 Main.

## COUNT 17
### (Breach of Contract – 36 Main)

419.     Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 418 of this Complaint as if fully set forth herein.

420.     On or about November 16, 2005, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "November 16, 2005 Asset Purchase Agreement") (See Volume II, Ex. 5).

421.     Pursuant to the terms of the November 16, 2005 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM machines to ATMA.

422.     On or about November 16, 2005, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

423.     36 Main, in breach of the November 16, 2005 Asset Purchase Agreement failed to perform in accordance with the terms of the November 16, 2005 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the November 16, 2005 Asset Purchase Agreement.

424.     36 Main's conduct detailed above constituted a material breach of the November 16, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 18
### (Breach of Contract – 36 Main)

425.     Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 424 of this Complaint as if fully set forth herein.

426.     On or about December 20, 2005, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "December 20, 2005 Asset Purchase Agreement") (See Volume III, Ex. 14).

427.     Pursuant to the terms of the December 20, 2005 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM machines to ATMA.

428.     On or about December 20, 2005, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

429.     36 Main, in breach of the December 20, 2005 Asset Purchase Agreement

failed to perform in accordance with the terms of the December 20, 2005 Asset Purchase

Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the

December 20, 2005 Asset Purchase Agreement.

430.     36 Main's conduct detailed above constituted a material breach of the

December 20, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the

award of the return of the $1,900,000.00 paid to 36 Main.

**COUNT 19**
**(Breach of Contract – 36 Main)**

431.     Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 430 of this Complaint as if fully set forth herein.

432.     On or about February 22, 2006, ATMA and 36 Main executed an Asset

Purchase Agreement for the purchase of 100 Placed ATM machines (the "February 22,

2006 Asset Purchase Agreement") (See Volume IV, Ex. 23).

433.     Pursuant to the terms of the February 22, 2006 Asset Purchase Agreement, in

exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM

Machines to ATMA.

434.     On or about February 22, 2006, ATMA paid $1,900,000.00 to 36 Main via a

bank wire transfer.

435.     36 Main, in breach of the February 22, 2006 Asset Purchase Agreement failed

to perform in accordance with the terms of the February 22, 2006 Asset Purchase

Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the

February 22, 2006 Asset Purchase Agreement.

436.    36 Main's conduct detailed above constituted a material breach of the February 22, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 20
## (Breach of Contract – 36 Main)

437.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 436 of this Complaint as if fully set forth herein.

438.    On or about April 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "April 26, 2006 Asset Purchase Agreement") (See Volume VII, Ex. 32).

439.    Pursuant to the terms of the April 26, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,950,000.00, 36 Main agreed to sell 100 Placed ATM Machines to ATMA.

440.    On or about April 26, 2006, ATMA paid $1,950,000.00 to 36 Main via a bank wire transfer.

441.    36 Main, in breach of the April 26, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the April 26, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the April 26, 2006 Asset Purchase Agreement.

442.    36 Main's conduct detailed above constituted a material breach of the April 26, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 21
## (Breach of Contract – 36 Main)

443.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 442 of this Complaint as if fully set forth herein.

444.    On or about May 27, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "May 27, 2006 Asset Purchase Agreement") (See Volume IX, Ex. 41).

445.    Pursuant to the terms of the May 27, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,950,000.00, 36 Main agreed to sell 100 Placed ATM Machines to ATMA.

446.    On or about May 27, 2006, ATMA paid $1,950,000.00 to 36 Main via a bank wire transfer.

447.    36 Main, in breach of the May 27, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the May 27, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the May 27, 2006 Asset Purchase Agreement.

448.    36 Main's conduct detailed above constituted a material breach of the May 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 22
## (Breach of Contract – 36 Main)

449.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 448 of this Complaint as if fully set forth herein.

450.    On or about June 16, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 50 Placed ATM machines (the "June 16, 2006 Asset Purchase Agreement") (See Volume XII, Ex. 48).

451.    Pursuant to the terms of the June 16, 2006 Asset Purchase Agreement, in exchange for the consideration of $975,000.00, 36 Main agreed to sell 50 Placed ATM Machines to ATMA.

452.    On or about June 16, 2006, ATMA paid $975,000.00 to 36 Main via a bank wire transfer.

453.    36 Main, in breach of the June 16, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the June 16, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement.

454.    36 Main's conduct detailed above constituted a material breach of the June 16, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 23
## (Breach of Contract – 36 Main)

455.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 454 of this Complaint as if fully set forth herein.

456.    On or about June 27, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 74 Placed ATM machines (the "June 27, 2006 Asset Purchase Agreement") (See Volume XIII, Ex. 55).

457.    Pursuant to the terms of the June 27, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,073,000.00, 36 Main agreed to sell 74 Placed ATM Machines to ATMA.

458.    On or about June 27, 2006, ATMA paid $1,073,000.00 to 36 Main via a bank wire transfer.

459.    36 Main, in breach of the June 27, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the June 27, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the June 27, 2006 Asset Purchase Agreement.

460.    36 Main's conduct detailed above constituted a material breach of the June 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

## COUNT 24
## (Breach of Contract – 36 Main)

461.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 460 of this Complaint as if fully set forth herein.

462.    On or about July 28, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 101 Placed ATM machines identified in Schedule A of the Asset Purchase Agreement (the "July 28, 2006 Asset Purchase Agreement") (See Volume XIV, Ex. 62).

463.    Pursuant to the terms of the July 28, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,450,000.00, 36 Main agreed to sell 101 Placed ATM Machines to ATMA.

464.    On or about July 28, 2006, ATMA paid $1,469,500.00 to 36 Main via a bank wire transfer.

465.    36 Main, in breach of the July 28, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the July 28, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement.

466.    36 Main's conduct detailed above constituted a material breach of the July 28, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 25
## (Breach of Contract – 36 Main)

467.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 466 of this Complaint as if fully set forth herein.

468.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 7 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #1") (See Volume XVI, Ex. 69).

469.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #1, in exchange for the consideration of $136,500.00, 36 Main agreed to sell 7 Placed ATM Machines to ATMA.

470.    On or about August 30, 2006, ATMA paid $136,500.00 to 36 Main via a bank wire transfer.

471.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #1 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase

Agreement #1 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1.

472.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $136,500.00 paid to 36 Main.

## COUNT 26
### (Breach of Contract – 36 Main)

473.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 472 of this Complaint as if fully set forth herein.

474.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 17 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #2") (See Volume XVI, Ex. 71).

475.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #2, in exchange for the consideration of $331,500.00, 36 Main agreed to sell 17 Placed ATM Machines to ATMA.

476.    On or about August 30, 2006, ATMA paid $331,500.00 to 36 Main via a bank wire transfer.

477.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #2 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #2 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #2.

478.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $331,500.00 paid to 36 Main.

## COUNT 27
## (Breach of Contract – 36 Main)

479.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 478 of this Complaint as if fully set forth herein.

480.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 36 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #3") (See Volume XVI, Ex. 73).

481.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #3, in exchange for the consideration of $522,000.00, 36 Main agreed to sell 36 Placed ATM Machines to ATMA.

482.    On or about August 30, 2006, ATMA paid $522,000.00 to 36 Main via a bank wire transfer.

483.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #3 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #3 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3.

484.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $522,000.00 paid to 36 Main.

## COUNT 28
## (Breach of Contract – 36 Main)

485.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 484 of this Complaint as if fully set forth herein.

486.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 68 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #4") (See Volume XVI, Ex. 75).

487.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #4, in exchange for the consideration of $986,000.00, 36 Main agreed to sell 68 Placed ATM Machines to ATMA.

488.    On or about August 30, 2006, ATMA paid $986,000.00 to 36 Main via a bank wire transfer.

489.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #4 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #4 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4.

490.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #4 and ATMA is therefore entitled to the award of the return of the $986,000.00 paid to 36 Main.

## COUNT 29
### (Breach of Contract – 36 Main)

491.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 490 of this Complaint as if fully set forth herein.

492.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 2 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #1") (See Volume XVII, Ex. 82).

493.    Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #1, in exchange for the consideration of $44,000.00, 36 Main agreed to sell 2 Placed ATM machines to ATMA.

494.    On or about September 26, 2006, ATMA paid $44,000.00 to 36 Main via a bank wire transfer.

495.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #1 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #1 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1.

496.    36 Main's conduct detailed above constituted a material breach of the September 26, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

## COUNT 30
### (Breach of Contract – 36 Main)

497.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 496 of this Complaint as if fully set forth herein.

498.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 21 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #2") (See Volume XVII, Ex. 84).

499.    Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #2, in exchange for the consideration of $409,500.00, 36 Main agreed to sell 21 Placed ATM machines to ATMA.

500.    On or about September 26, 2006, ATMA paid $409,500.00 to 36 Main via a bank wire transfer.

501.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #2 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #2 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2.

502.    36 Main's conduct detailed above constituted a material breach of the September 26, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

## COUNT 31
### (Breach of Contract – 36 Main)

503.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 502 of this Complaint as if fully set forth herein.

504.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 64 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #3") (See Volume XVII, Ex. 86).

505.    Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #3, in exchange for the consideration of $928,000.00, 36 Main agreed to sell 64 Placed ATM machines to ATMA.

506.    On or about September 26, 2006, ATMA paid $928,000.00 to 36 Main via a bank wire transfer.

507.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #3 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #3 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3.

508.    36 Main's conduct detailed above constituted a material breach of the

September 26, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the

award of the return of the $928,000.00 paid to 36 Main.

### COUNT 32
### (Breach of Warranty – 36 Main)

509.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 508 of this Complaint as if fully set forth herein.

510.    The November 15, 2005 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

511.    ATMA relied on 36 Main's representations as a condition of the purchase.

512.    36 Main breached the warranty set forth in section 4.5 of the November 15,

2005 Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the November 15, 2005 Asset Purchase

Agreement purchased by ATMA.

513.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the November 15, 2005 Asset Purchase Agreement purchased by

ATMA was not good or marketable.

514.    36 Main's conduct breached the warranty stated in the November 15, 2005

Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of

the $1,900,000.00 paid to 36 Main.

## COUNT 33
## <u>(Breach of Warranty – 36 Main)</u>

515.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 514 of this Complaint as if fully set forth herein.

516.    The December 20, 2005 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

517.    ATMA relied on 36 Main's representations as a condition of the purchase.

518.    36 Main breached the warranty set forth in section 4.5 of the December 20, 2005 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the December 20, 2005 Asset Purchase Agreement purchased by ATMA.

519.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the December 20, 2005 Asset Purchase Agreement purchased by ATMA was not good or marketable.

520.    36 Main's conduct breached the warranty stated in the December 20, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 34
## <u>(Breach of Warranty – 36 Main)</u>

521.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 520 of this Complaint as if fully set forth herein.

522.    The February 22, 2006 Asset Purchase Agreement states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

523.    ATMA relied on 36 Main's representations as a condition of the purchase.

524.    36 Main breached the warranty set forth in section 4.5 of the February 22, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Asset Purchase Agreement purchased by ATMA.

525.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

526.    36 Main's conduct breached the warranty stated in the February 22, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 35
## (Breach of Warranty – 36 Main)

527.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 526 of this Complaint as if fully set forth herein.

528.    The April 26, 2006 Asset Purchase Agreement states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

529.    ATMA relied on 36 Main's representations as a condition of the purchase.

530.     36 Main breached the warranty set forth in section 4.5 of the April 26, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Asset Purchase Agreement purchased by ATMA.

531.     36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

532.     36 Main's conduct breached the warranty stated in the April 26, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 36
### (Breach of Warranty – 36 Main)

533.     Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 532 of this Complaint as if fully set forth herein.

534.     The May 27, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

535.     ATMA relied on 36 Main's representations as a condition of the purchase.

536.     36 Main breached the warranty set forth in section 4.5 of the May 27, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Asset Purchase Agreement purchased by ATMA.

537.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

538.    36 Main's conduct breached the warranty stated in the May 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 37
## (Breach of Warranty – 36 Main)

539.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 538 of this Complaint as if fully set forth herein.

540.    The June 16, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

541.    ATMA relied on 36 Main's representations as a condition of the purchase.

542.    36 Main breached the warranty set forth in section 4.5 of the June 16, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement purchased by ATMA.

543.    36 Main was notified that title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

544.    36 Main's conduct breached the warranty stated in the June 16, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$975,000.00 paid to 36 Main.

## COUNT 38
### (Breach of Warranty – 36 Main)

545.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 544 of this Complaint as if fully set forth herein.

546.    The June 27, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

547.    ATMA relied on 36 Main's representations as a condition of the purchase.

548.    36 Main breached the warranty set forth in section 4.5 of the June 27, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 74

Placed ATM machines listed in Schedule "A" of the June 27, 2006 Asset Purchase

Agreement purchased by ATMA.

549.    36 Main was notified that title to the 74 Placed ATM machines listed in

Schedule "A" of the June 27, 2006 Asset Purchase Agreement purchased by ATMA was

not good or marketable.

550.    36 Main's conduct breached the warranty stated in the June 27, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$1,073,000.00 paid to 36 Main.

## COUNT 39
## (Breach of Warranty – 36 Main)

551.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 550 of this Complaint as if fully set forth herein.

552.    The July 28, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

553.    ATMA relied on 36 Main's representations as a condition of the purchase.

554.    36 Main breached the warranty set forth in section 4.5 of the July 28, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement purchased by ATMA.

555.    36 Main was notified that title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

556.    36 Main's conduct breached the warranty stated in the July 28, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 40
## (Breach of Warranty – 36 Main)

557.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 556 of this Complaint as if fully set forth herein.

558.    The August 30, 2006 Asset Purchase Agreement #1 states at section 4.5 that,

112

4.5. Seller represents and warrants that it has good and marketable title to
the Assets set forth on Schedule A, full authority to sell and transfer same
and that the Assets are in good working condition, and are free and clear
of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
every nature and description.

559.    ATMA relied on 36 Main's representations as a condition of the purchase.

560.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006

Asset Purchase Agreement #1 by failing to deliver good and marketable title to the 7

Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase

Agreement #1 purchased by ATMA.

561.    36 Main was notified that title to the 7 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1 purchased by ATMA

was not good or marketable.

562.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset

Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the

$136,500.00 paid to 36 Main.

## COUNT 41
### (Breach of Warranty – 36 Main)

563.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 562 of this Complaint as if fully set forth herein.

564.    The August 30, 2006 Asset Purchase Agreement #2 states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to
the Assets set forth on Schedule A, full authority to sell and transfer same
and that the Assets are in good working condition, and are free and clear
of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
every nature and description.

565.    ATMA relied on 36 Main's representations as a condition of the purchase.

566.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #2 by failing to deliver good and marketable title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #2 purchased by ATMA.

567.    36 Main was notified that title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #2 purchased by ATMA was not good or marketable.

568.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $331,500.00 paid to 36 Main.

## COUNT 42
### (Breach of Warranty – 36 Main)

569.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 568 of this Complaint as if fully set forth herein.

570.    The August 30, 2006 Asset Purchase Agreement #3 states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

571.    ATMA relied on 36 Main's representations as a condition of the purchase.

572.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #3 by failing to deliver good and marketable title to the 36 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3 purchased by ATMA.

573.    36 Main was notified that title to the 36 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3 purchased by ATMA was not good or marketable.

574.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $522,000.00 paid to 36 Main.

## COUNT 43
## (Breach of Warranty – 36 Main)

575.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 574 of this Complaint as if fully set forth herein.

576.    The August 30, 2006 Asset Purchase Agreement #4 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

577.    ATMA relied on 36 Main's representations as a condition of the purchase.

578.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #4 by failing to deliver good and marketable title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4 purchased by ATMA.

579.    36 Main was notified that title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4 purchased by ATMA was not good or marketable.

580.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #4 and ATMA is therefore entitled to the award of the return of the $986,000.00 paid to 36 Main.

### COUNT 44
### (Breach of Warranty – 36 Main)

581.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 580 of this Complaint as if fully set forth herein.

582.    The September 26, 2006 Asset Purchase Agreement #1 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

583.    ATMA relied on 36 Main's representations as a condition of the purchase.

584.    36 Main breached the warranty set forth in section 4.5 of the September 26, 2006 Asset Purchase Agreement #1 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1 purchased by ATMA.

585.    36 Main was notified that title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1 purchased by ATMA was not good or marketable.

586.    36 Main's conduct breached the warranty stated in the September 26, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

116

**COUNT 45**
**(Breach of Warranty – 36 Main)**

587.     Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 586 of this Complaint as if fully set forth herein.

588.     The September 26, 2006 Asset Purchase Agreement #2 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

589.     ATMA relied on 36 Main's representations as a condition of the purchase.

590.     36 Main breached the warranty set forth in section 4.5 of the September 26, 2006 Asset Purchase Agreement #2 by failing to deliver good and marketable title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2 purchased by ATMA.

591.     36 Main was notified that title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2 purchased by ATMA was not good or marketable.

592.     36 Main's conduct breached the warranty stated in the September 26, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

**COUNT 46**
**(Breach of Warranty – 36 Main)**

593.     Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 592 of this Complaint as if fully set forth herein.

117

594.     The September 26, 2006 Asset Purchase Agreement #3 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

595.     ATMA relied on 36 Main's representations as a condition of the purchase.

596.     36 Main breached the warranty set forth in section 4.5 of the September 26, 2006 Asset Purchase Agreement #3 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3 purchased by ATMA.

597.     36 Main was notified that title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3 purchased by ATMA was not good or marketable.

598.     36 Main's conduct breached the warranty stated in the September 26, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $928,000.00 paid to 36 Main.

## COUNT 47
### (Breach of Warranty – 36 Main)

599.     Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 598 of this Complaint as if fully set forth herein.

600.     On or about November 16, 2005, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,900,000.00 (the "November 16, 2005 Bill of Sale").

601.    The November 16, 2005 Bill of Sale states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

602.    ATMA relied on 36 Main's representations as a condition of the purchase.

603.    36 Main breached the warranty set forth in the November 16, 2005 Bill of

Sale by failing to deliver good and marketable title to the 100 Placed ATM machines

listed in Schedule "A" of the November 16, 2005 Bill of Sale.

604.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the November 16, 2005 Bill of Sale was not good or marketable.

605.    36 Main's conduct breached the warranty stated in the November 16, 2005

Bill of Sale and ATMA is therefore entitled to the award of the return of the

$1,900,000.00 paid to 36 Main.

## COUNT 48
## (Breach of Warranty – 36 Main)

606.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 605 of this Complaint as if fully set forth herein.

607.    On or about December 20, 2005, ATMA and 36 Main executed Bill of Sale

for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed

ATM machines to ATMA for the sum of $1,900,000.00 (the "December 20, 2005 Bill of

Sale").

608.    The December 20, 2005 Bill of Sale states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

609.    ATMA relied on 36 Main's representations as a condition of the purchase.

610.    36 Main breached the warranty set forth in the December 20, 2005 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the December 20, 2005 Bill of Sale.

611.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the December 20, 2005 Bill of Sale was not good or marketable.

612.    36 Main's conduct breached the warranty stated in the December 20, 2005 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

### COUNT 49
### (Breach of Warranty – 36 Main)

613.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 612 of this Complaint as if fully set forth herein.

614.    On or about February 22, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,900,000.00 (the "February 22, 2006 Bill of Sale").

615.    The February 22, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

120

616.    ATMA relied on 36 Main's representations as a condition of the purchase.

617.    36 Main breached the warranty set forth in the February 22, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Bill of Sale.

618.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Bill of Sale was not good or marketable.

619.    36 Main's conduct breached the warranty stated in the February 22, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 50
## (Breach of Warranty – 36 Main)

620.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 619 of this Complaint as if fully set forth herein.

621.    On or about April 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,950,000.00 (the "April 26, 2006 Bill of Sale").

622.    The April 26, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

623.    ATMA relied on 36 Main's representations as a condition of the purchase.

624.    36 Main breached the warranty set forth in the April 26, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Bill of Sale.

625.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Bill of Sale was not good or marketable.

626.    36 Main's conduct breached the warranty stated in the April 26, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 51
### (Breach of Warranty – 36 Main)

627.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 626 of this Complaint as if fully set forth herein.

628.    On or about May 27, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,950,000.00 (the "May 27, 2006 Bill of Sale").

629.    The May 27, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

630.    ATMA relied on 36 Main's representations as a condition of the purchase.

631.    36 Main breached the warranty set forth in the May 27, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Bill of Sale.

632.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Bill of Sale was not good or marketable.

633.    36 Main's conduct breached the warranty stated in the May 27, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 52
## (Breach of Warranty – 36 Main)

634.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 633 of this Complaint as if fully set forth herein.

635.    On or about June 16, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 50 Placed ATM machines to ATMA for the sum of $975,000.00 (the "June 16, 2006 Bill of Sale").

636.    The June 16, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

637.    ATMA relied on 36 Main's representations as a condition of the purchase.

638.    36 Main breached the warranty set forth in the June 16, 2006 Bill of Sale by failing to deliver good and marketable title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Bill of Sale.

639.    36 Main was notified that title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Bill of Sale was not good or marketable.

640.    36 Main's conduct breached the warranty stated in the June 16, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 53
### (Breach of Warranty – 36 Main)

641.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 640 of this Complaint as if fully set forth herein.

642.    On or about June 27, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 74 Placed ATM machines to ATMA for the sum of $1,073,000.00 (the "June 27, 2006 Bill of Sale").

643.    The June 27, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

644.    ATMA relied on 36 Main's representations as a condition of the purchase.

645.    36 Main breached the warranty set forth in the June 27, 2006 Bill of Sale by failing to deliver good and marketable title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Bill of Sale.

646.    36 Main was notified that title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Bill of Sale was not good or marketable.

647.    36 Main's conduct breached the warranty stated in the June 27, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

## COUNT 54
## (Breach of Warranty – 36 Main)

648.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 647 of this Complaint as if fully set forth herein.

649.    On or about July 28, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 101 Placed ATM machines to ATMA for the sum of $1,469,500.00 (the "July 28, 2006 Bill of Sale").

650.    The July 28, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

651.    ATMA relied on 36 Main's representations as a condition of the purchase.

652.    36 Main breached the warranty set forth in the July 28, 2006 Bill of Sale by failing to deliver good and marketable title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Bill of Sale.

653.    36 Main was notified that title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Bill of Sale was not good or marketable.

654.    36 Main's conduct breached the warranty stated in the July 28, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 55
## (Breach of Warranty – 36 Main)

655.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 654 of this Complaint as if fully set forth herein.

656.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 7 Placed ATM machines to ATMA for the sum of $136,500.00 (the "August 30, 2006 Bill of Sale #1").

657.    The August 30, 2006 Bill of Sale #1 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

658.    ATMA relied on 36 Main's representations as a condition of the purchase.

659.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #1 by failing to deliver good and marketable title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #1.

660.    36 Main was notified that title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #1 was not good or marketable.

661.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #1 and ATMA is therefore entitled to the award of the return of the $136,500.00 paid to 36 Main.

## COUNT 56
## (Breach of Warranty – 36 Main)

662.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 661 of this Complaint as if fully set forth herein.

663.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 17 Placed

ATM machines to ATMA for the sum of $331,500.00 (the "August 30, 2006 Bill of Sale #2").

664.    The August 30, 2006 Bill of Sale #2 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

665.    ATMA relied on 36 Main's representations as a condition of the purchase.

666.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #2 by failing to deliver good and marketable title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #2.

667.    36 Main was notified that title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #2 was not good or marketable.

668.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #2 and ATMA is therefore entitled to the award of the return of the $334,500.00 paid to 36 Main.

## COUNT 57
## (Breach of Warranty – 36 Main)

669.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 668 of this Complaint as if fully set forth herein.

670.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 36 Placed ATM machines to ATMA for the sum of $522,000.00 (the "August 30, 2006 Bill of Sale #3").

671.    The August 30, 2006 Bill of Sale #3 states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

672.    ATMA relied on 36 Main's representations as a condition of the purchase.

673.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #3

by failing to deliver good and marketable title to the 36 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #3.

674.    36 Main was notified that title to the 36 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #3 was not good or marketable.

675.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of

Sale #3 and ATMA is therefore entitled to the award of the return of the $522,000.00

paid to 36 Main.

## COUNT 58
## (Breach of Warranty – 36 Main)

676.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 675 of this Complaint as if fully set forth herein.

677.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for

the 36 Main to convey, transfer, sell and assign "right, title and interest" in 68 Placed

ATM machines to ATMA for the sum of $986,000.00 (the "August 30, 2006 Bill of Sale

#4").

678.    The August 30, 2006 Bill of Sale #4 states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

679.    ATMA relied on 36 Main's representations as a condition of the purchase.

680.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #4

by failing to deliver good and marketable title to the 68 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #4.

681.    36 Main was notified that title to the 68 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #4 was not good or marketable.

682.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of

Sale #4 and ATMA is therefore entitled to the award of the return of the $986,000.00

paid to 36 Main.

**COUNT 59**
**(Breach of Warranty – 36 Main)**

683.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 682 of this Complaint as if fully set forth herein.

684.    On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale

for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 2 Placed

ATM machines to ATMA for the sum of $44,000.00 (the "September 26, 2006 Bill of

Sale #1").

685.    The September 26, 2006 Bill of Sale #1 states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

686.    ATMA relied on 36 Main's representations as a condition of the purchase.

687.    36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #1 by failing to deliver good and marketable title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #1.

688.    36 Main was notified that title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #1 was not good or marketable.

689.    36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

## COUNT 60
## (Breach of Warranty – 36 Main)

690.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 689 of this Complaint as if fully set forth herein.

691.    On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 21 Placed ATM machines to ATMA for the sum of $409,500.00 (the "September 26, 2006 Bill of Sale #2").

692.    The September 26, 2006 Bill of Sale #2 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

693.    ATMA relied on 36 Main's representations as a condition of the purchase.

694.    36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #2 by failing to deliver good and marketable title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #2.

695.    36 Main was notified that title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #2 was not good or marketable.

696.    36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

## COUNT 61
### (Breach of Warranty – 36 Main)

697.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 696 of this Complaint as if fully set forth herein.

698.    On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 64 Placed ATM machines to ATMA for the sum of $928,000.00 (the "September 26, 2006 Bill of Sale #3").

699.    The September 26, 2006 Bill of Sale #3 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

700.    ATMA relied on 36 Main's representations as a condition of the purchase.

701.    36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #3 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #3.

702.    36 Main was notified that title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #3 was not good or marketable.

703.    36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #3 and ATMA is therefore entitled to the award of the return of the $928,000.00 paid to 36 Main.

## COUNT 62
### (Conversion – 36 Main)

704.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 703 of this Complaint as if fully set forth herein.

705.    Plaintiffs delivered funds to 36 Main for the sole purpose of purchasing Placed ATM machines as set forth in the Asset Purchase Agreements and Bills of Sale between 36 Main and ATMA.  Plaintiffs delivered, via bank wire transfers from ATMA, $16,475,000.00 to 36 Main for the sole purpose of purchasing the ATMA Machines.

706.    36 Main failed to use Plaintiffs' funds to purchase the ATMA Machines identified in the schedules attached to the Asset Purchase Agreements and Bills of Sale signed by 36 Main and ATMA.

707.    36 Main utilized the funds delivered by Plaintiffs to 36 Main for the purchase of the ATMA Machines for an unauthorized purpose.

708.    36 Main has improperly converted Plaintiffs' funds and failed to return the funds to Plaintiffs and should be ordered to return the $16,475,000.00 in funds delivered to 36 Main for the purchase of the ATMA Machines.

**COUNT 63**
**(Unjust Enrichment – 36 Main)**

709.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 708 as if fully set forth herein.

710.    By misappropriating Plaintiffs' funds delivered to 36 Main designated for the sale of the ATMA Machines, 36 Main obtained the benefit of Plaintiffs' capital without returning comparable consideration, specifically the ATMA Machines identified in the schedules attached to the Asset Purchase Agreements and Bills of Sale signed by ATMA and 36 Main.

711.    36 Main acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $16,475,000.00, thereby damaging Plaintiffs in the same amount.

712.    36 Main has retained the benefits of Plaintiffs' funds under such circumstances that equity and good conscience require 36 Main make restitution to Plaintiffs in the amount of the value of the benefits 36 Main acquired from Plaintiffs.

**COUNT 64**
**(Unjust Enrichment – 36 Main)**

713.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 712 as if fully set forth herein.

714.    By misappropriating Plaintiffs' funds delivered to 36 Main designated for the payment of Residual Revenue Funds associated with the ATMA Tranche Purchases, 36 Main obtained the benefit of Plaintiffs' capital without returning comparable consideration.

715.    36 Main acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $209,441.03, thereby damaging Plaintiffs in the same amount.

716.    36 Main has retained the benefits of Plaintiffs' funds under such circumstances that equity and good conscience require 36 Main make restitution to Plaintiffs in the amount of the value of the benefits 36 Main acquired from Plaintiffs.

### COUNT 65
### (Unjust Enrichment – ATM Capital)

717.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 716 as if fully set forth herein.

718.    By misappropriating Plaintiffs' funds delivered to ATM Capital designated for the payment of Residual Revenue Funds associated with the December 20, 2005 Tranche Purchase, ATM Capital obtained the benefit of Plaintiffs' capital without returning comparable consideration.

719.    ATM Capital acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $27,801.71, thereby damaging Plaintiffs in the same amount.

720.    ATM Capital has retained the benefits of Plaintiffs' funds under such circumstances that equity and good conscience require ATM Capital make restitution to Plaintiffs in the amount of the value of the benefits ATM Capital acquired from Plaintiffs.

## COUNT 66
### (Breach of Fiduciary Duty – Brossman)

721.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 720 of this Complaint as if fully set forth herein.

722.    That Brossman, as a co-chief executive and employee of ATMA has a duty to his employer to act in good faith and in the employer's best interests during the period of the employment.  Brossman owed ATMA his undivided and unqualified loyalty during the period of his employment and was prohibited from acting in any manner contrary to the interests of ATMA.  As a fiduciary to ATMA, Brossman was required to make truthful and complete disclosures to ATMA and Brossman was forbidden to obtain an improper advantage at ATMA's expense.

723.    While employed at ATMA, Brossman was required to exert his best efforts on behalf of ATMA, and not compete with it or profit at its expense, or place his private interests in conflict with its interests.

724.    Brossman did not act in good faith or in the best interests of ATMA when Brossman: (1) participated in the ATM Sales Enterprise; (2) misrepresented the true nature of the ATM Venture; (3) failed to disclose the non-existence of Placed ATM machines sold by 36 Main to ATMA and others; and, (4) failed to disclose prior and continuing business relationships with Netschi and Moore.

725.    As a result of Brossman's acts, ATMA sustained damages and Brossman's acts were a substantial cause of those damages.

726.    Accordingly, ATMA is entitled to recover the actual damages sustained for compensation and expenses that ATMA paid to Brossman during the period of

Brossman's disloyalty, profits that Plaintiffs lost due to Brossman's disloyalty, and investment funds that Plaintiffs lost due to Brossman's disloyalty.

### COUNT 67
### (Breach of Fiduciary Duty – Munier)

727.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 726 of this Complaint as if fully set forth herein.

728.    That Munier, as a co-chief executive and employee of ATMA has a duty to his employer to act in good faith and in the employer's best interests during the period of the employment. Munier owed ATMA his undivided and unqualified loyalty during the period of his employment and was prohibited from acting in any manner contrary to the interests of ATMA.  As a fiduciary to ATMA, Munier was required to make truthful and complete disclosures to ATMA and Munier was forbidden to obtain an improper advantage at ATMA's expense.

729.    While employed at ATMA, Munier was required to exert his best efforts on behalf of ATMA, and not compete with it or profit at its expense, or place his private interests in conflict with its interests.

730.    Munier did not act in good faith or in the best interests of ATMA when he: (1) participated in the ATM Sales Enterprise; (2) misrepresented the true nature of the ATM Venture; (3) failed to disclose the non-existence of Placed ATM machines sold by 36 Main to ATMA and others; (4) failed to disclose prior and continuing business relationships with Netschi and Moore; and, (5) knowingly forwarded fraudulent monthly net revenue reports from Moore to Plaintiffs.

731.    As a result of Munier's acts, Plaintiffs sustained damages and Munier's acts were a substantial cause of those damages.

732.    Accordingly, ATMA is entitled to recover the actual damages sustained for compensation and expenses that ATMA paid to Munier during the period of Munier's disloyalty, profits that Plaintiffs lost due to Munier's disloyalty, and investment funds that Plaintiffs lost due to Munier's disloyalty.

## IX
## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against in their favor and against Defendants as follows:

i.   on Count 1, damages, including interest, against the Defendants, jointly and severally, the precise amount to be proved at trial but not less that $16,475,000.00 and treble the actual damages pursuant to 18 U.S.C. § 1964(c);

ii.  on Count 2, damages, including interest, against the Defendants, jointly and severally, the precise amount to be proved at trial but not less that $16,475,000.00 and treble the actual damages pursuant to 18 U.S.C. § 1964(c);

iii. on Count 3, as against Moore, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

iv.  on Count 4, as against Netschi, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

v.   on Count 5, as against Brossman, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

vi.  on Count 6, as against Munier, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

    vii.  on Count 7, as against 36 Main and Netschi, jointly and severally, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

   viii.  on Count 8, as against Moore, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

    ix.  on Count 9, as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

     x.  on Count 10, as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

    xi.  on Count 11 as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

   xii.  on Count 12, as against Moore, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

  xiii.  on Count 13, as against Moore, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

  xiv.  on Count 14, as against Moore, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

   xv.  on Count 15, as against Moore, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

  xvi.  on Count 16, as against Moore, in an amount to be determined at trial, but in no event less than $1,450,000.00, together with interest thereon;

 xvii.  on Count 17, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xviii.  on Count 18 as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xix.  on Count 19, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xx.  on Count 20, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxi.  on Count 21, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxii.  on Count 22, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xxiii.  on Count 23, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xxiv.  on Count 24, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

xxv.  on Count 25, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

xxvi.  on Count 26, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

xxvii.  on Count 27, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

xxviii.  on Count 28, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

xxix.    on Count 29, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000, together with interest thereon;

xxx.    on Count 30, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

xxxi.    on Count 31, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

xxxii.    on Count 32, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxiii.    on Count 33, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxiv.    on Count 34, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxv.    on Count 35, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxxvi.    on Count 36, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxxvii.    on Count 37, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xxxviii.    on Count 38, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xxxix.    on Count 39, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

    xl.   on Count 40, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

    xli.   on Count 41, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

    xlii.   on Count 42, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

    xliii.   on Count 43, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

    xliv.   on Count 44, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000.00, together with interest thereon;

    xlv.   on Count 45, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

    xlvi.   on Count 46, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

    xlvii.   on Count 47, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

    xlviii.   on Count 48, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

    xlix.   on Count 49, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

    l.   on Count 50, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

li.  on Count 51, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

lii.  on Count 52, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

liii.  on Count 53, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

liv.  on Count 54, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

lv.  on Count 55, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

lvi.  on Count 56, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

lvii.  on Count 57, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

lviii.  on Count 58, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

lix.  on Count 59, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000.00, together with interest thereon;

lx.  on Count 60, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

lxi.  on Count 61, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

lxii.  on Count 62, as against 36 Main, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxiii.  on Count 63, as against 36 Main, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxiv.  on Count 64, as against 36 Main, in an amount to be determined at trial, but in no event less than $209,441.03, together with interest thereon;

lxv.  on Count 65, as against ATM Capital, in an amount to be determined at trial, but in no event less than $27,801.71, together with interest thereon;

lxvi.  on Count 66, as against Brossman, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxvii.  on Count 67, as against Munier, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxviii.  awarding Plaintiffs punitive damages;

lxix.  awarding Plaintiffs their attorneys' fees, costs and disbursements incurred in connection with this action; and,

lxx.  awarding Plaintiff such other and further relief as the Court seems just and proper.

## X

## <u>DEMAND FOR A TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand

a trial by jury in this action.


Dated:  New York, New York
         April 3, 2008

                           LANKLER & CARRAGHER, LLP

              By:    _____
                           Andrew M. Lankler (AL1202)
                           James W. Versocki (JV6877)
                           Joseph J. Porrovecchio (JP6788)
                           Attorneys for Plaintiffs
                           845 Third Avenue, 17th Floor
                           New York, New York 10022
                           alankler@lcattorneys.com
                           jversocki@lcattorneys.com
                           jporrovecchio@lcattorneys.com
                           (212) 812-8910
                           (212) 812-8920 facsimile