UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

Automated Teller Machine Advantage LLC,
                                              :

                                    Plaintiff,  :  Index No.: 08-CV-3340(RMB)(FM)(ECF)

- against -

                                              :  **AMENDED COMPLAINT**

Vance Moore, Jr. a/k/a Vance Moore II a/k/a Vance     :
Moore, Exclusive Properties Group, Inc., Walter Netschi,    :  Plaintiff Demands a Trial By Jury
36 Main Street LLC, ATM Capital Inc., Danielle Jones,     :
Alain Brossman a/k/a Harry Brossman, and William       :
Munier,                                             :

                                      Defendants.  :

-------------------------------------------------------------------- x

        Plaintiff, Automated Teller Machine Advantage LLC ("ATMA")(hereinafter

referred to as the "Plaintiff"), by its attorneys, Lankler & Carragher, LLP, and for its

Complaint herein, alleges as follows:

# I
## INTRODUCTION

      1.      This action is brought against individual and corporate Defendants who have

engaged in a complex scheme to defraud Plaintiff of $16.475 million.

      2.      Defendants' scheme, committed by engaging in racketeering activities,

involved inducing Plaintiff to purchase large numbers of automated teller machines

("ATMs") and to enter into contracts for the management of the ATMs.

      3.      Plaintiff purchased 940 ATMs and subsequently discovered that: (i) the ATMs

did not exist; (ii) Plaintiff did not have an ownership interest in the ATMs; or (iii) others

had competing ownership claims to the ATMs, each contrary to the warranties and

representations made by Defendants.

4.      There is a well-established market, by persons or businesses other than bank owner/operators, for the purchase, operation and sale of ATMs.  Non-bank purchasers can either buy an ATM that has previously been placed at a location, generally via a lease agreement with a business store owner (a "Placed ATM"), or a new ATM that needs to be located in an existing or prospective business establishment.  A Placed ATM, particularly one with a long-term lease and verifiable transaction activity, will sell at a substantial premium compared to a non-Placed ATM.

5.      ATMA determined the value of a Placed ATM from its predicted ability to generate future revenue.  The revenue potential was, *inter alia*, predicated on the receipt and analysis of reliable reports reflecting due diligence for each Placed ATM being considered for purchase that demonstrated: (i) at least one year of transaction history with an average of 400 transactions per month; (ii) projected net revenues of approximately $4,800 per year based on the transaction history; (iii) the existence of a lease with at least a five year term with a renewal provision for an additional five year term provided that neither party terminated the lease (hereinafter the "Performance Criteria").[1]

6.      To effect their scheme, Defendants induced Plaintiff to purchase non-existent phantom Placed ATMs by making false verbal representations and delivering fraudulent, false, fabricated, and fictitious information to Plaintiff, including representations and warranties, purporting to demonstrate that the phantom Placed ATMs met the Performance Criteria set by Plaintiff to purchase Placed ATMs.

7.      Defendants furthered their scheme by delivering fraudulent, false, fabricated, and fictitious information to Plaintiff in connection with the ATMs purchased by Plaintiff

---

[1]      As described, *infra,* at Paragraph 49, Plaintiffs later purchased ATMs with alternative Performance Criteria at a different price.

including: bills of sale, due diligence reports, lease agreements, assignments of the lease agreements, and other fictitious documents.

8.     Following the sale of the phantom Placed ATMs to Plaintiff, the Defendants perpetuated their scheme by providing monthly reports to Plaintiff that purported to state the transactional activity of the Placed ATMs purchased by Plaintiff and by delivering funds purportedly based on that transactional activity.

9.     Defendants systematically sold additional phantom Placed ATMs to Plaintiff, and other purchasers of phantom Placed ATMs, to perpetuate the scheme.

10.     Defendants, through their scheme, induced Plaintiff, and other purchasers, to deliver tens of millions of dollars to Defendants for the purchase of the phantom Placed ATMs.

11.     Plaintiff brings this action against the Defendants for violations of the Racketeer Influenced and Corrupt Organizations statute (hereinafter "RICO"), 18 U.S.C. §§ 1961 through 1968, and New York State common law causes of action, including: fraudulent misrepresentation, fraudulent inducement, fraudulent concealment, negligent misrepresentation, breach of contract, breach of warranty, conversion, unjust enrichment, and breach of fiduciary duty.

12.     Plaintiff seeks the return of the funds it delivered to the Defendants to purchase the Placed ATMs, damages, treble damages, punitive damages, pre-judgment interest, costs and fees, and all other relief deemed appropriate by this Court.

**II**
**JURISDICTION**

13.    This Court has subject matter jurisdiction over this matter pursuant to RICO,

18 U.S.C. § 1964 and 28 U.S.C. § 1331, because Plaintiff's claims arise under the laws of

the United States, and pursuant to its supplemental jurisdiction, 28 U.S.C. § 1367.

**III**
**VENUE**

14.    The venue of this action is proper in this judicial district pursuant to 18 U.S.C.

§ 1965(a) and 18 U.S.C. § 1391 in that Defendants transacted affairs in the Southern

District of New York and in that the negotiations, decisions to enter in to the contractual

agreements, transfers of funds and subsequent business dealings between the parties

named herein occurred within the Southern District of New York.  Venue is also proper

in this judicial district pursuant to 18 U.S.C. § 1965(b) because, to the extent any

Defendant may reside outside of this district, the ends of justice require such Defendant

or Defendants to be brought before this Court.

**IV**
**THE PARTIES**

15.    Plaintiff ATMA is a limited liability company organized and existing under

the laws of the State of Delaware with a principal place of business at 324 Grix Court,

New Milford, New Jersey 07646.  ATMA was formed in November of 2004.  Two of the

three initial members of the board of managers for ATMA, including the chairman of the

board, maintain their offices in the county of Manhattan, New York.  The current

members of the board of managers for ATMA, including the chairman of the board,

maintain their offices in the county of New York, New York.

4

16.    Defendant Vance Moore, Jr., also known as Vance Moore II, ("Moore") is a resident of Fruitland Park, Lake County, Florida and also maintains a residence, upon information and belief, in Raleigh, Wake County, North Carolina.

17.    Moore owned and controlled unnamed co-conspirator ATM Financial Services LLC ("ATMFS"), a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at Leesburg, Lake County, Florida. ATMFS purported to provide fee-based services to owners of Placed ATMs as an Independent Sales Organization ("ISO"). An ISO, via a management agreement, is responsible for, *inter alia*, the deployment, management and servicing of Placed ATMs, and also for the reporting of the transaction activity of Placed ATMs, collection of revenue from that transaction activity, and payment of the net revenue to the owners of the Placed ATMs. ATMFS filed for Chapter 11 bankruptcy protection on February 12, 2008 in the United States Bankruptcy Court for the Middle District of Florida.

18.    Defendant Exclusive Properties Group, Inc. ("Exclusive Properties" or "EPG") is a domestic business corporation organized and existing under the laws of the State of Florida with a principal place of business at 301 S. Richey Road, Suite 101, Leesburg, Florida. Upon information and belief, Moore is the President, Secretary, Treasurer and Director of EPG. Upon information and belief, EPG is a real estate holding company controlled by Moore that owns two warehouses from which Moore operates numerous businesses, including ATMFS.

19.    Defendant Walter Netschi ("Netschi") is a resident of Hot Springs Village, Garland County, Arkansas and McKinney, Collin County, Texas. Netschi is the

5

managing member of 36 Main Street LLC and the President of Defendant ATM Capital, Inc.

20.    Defendant 36 Main Street LLC ("36 Main") is a limited liability company organized and existing under the laws of the State of Nevada with a principal place of business at 2400 Dallas Parkway, Suite 180, Plano, TX 75093. Since at least 2005, 36 Main has been engaged in the business of selling ATMs to third-parties, including ATMA.

21.    Defendant ATM Capital Inc. ("ATM Capital") is a domestic business corporation organized and existing under the laws of the State of Texas with a principal place of business at 2001 Beach Street, Fort Worth, Texas. Netschi is the President of ATM Capital.

22.    Defendant Danielle Jones ("Jones") is the Secretary Treasurer and Vice-President of 36 Main and the daughter of Netschi. Jones maintains a residence in McKinney, Collin County, Texas.

23.    Defendant Alain Brossman a/k/a Harry Brossman ("Brossman") is a resident of Tabernacle, Burlington County, New Jersey. Brossman is a member and former employee of ATMA.

24.    Defendant William Munier ("Munier") is a resident of New Milford, Bergen County, New Jersey. Munier is a member and former employee of ATMA.

## V
## THE ENTERPRISE

25.    At all times material to this Complaint, the Defendants, collectively, have constituted an "enterprise" (hereinafter the "ATM Sales Enterprise") as that term is

defined in 18 U.S.C. § 1961(4), which enterprise was engaged in, and the activities of which affected, interstate, and foreign commerce.

## VI
## BACKGROUND

### *ATMA Enters the ATM Business*

26.     In or around November of 2004, Brossman and Munier, who had previously engaged in a prior scheme to sell ATMs with certain of the Defendants named herein (more fully described *infra* at Paragraphs 83 through 90), sought to begin a business with the purported purpose being the purchasing and operating of a large number of Placed ATMs (the "ATM Venture").

27.     In or about August of 2005, Brossman, Munier and others, eventually including Netschi and Moore, approached, through unnamed intermediaries, Acta Realty Corp., doing business as the Wolfson Group, a New York Corporation ("the Wolfson Group,") and offered the Wolfson Group the opportunity to become part of the ATM Venture.  The Wolfson Group is engaged in the management of funds and assets owned by various entities formed primarily for the benefit of members of the Wolfson family.

28.     The ATM Venture involved the use of a limited liability company, known as ATMA, to purchase Placed ATMs, supervise and monitor the management of the Placed ATMs, and thereafter receive monthly revenue generated by the Placed ATMs.

29.     Although ATMA was previously formed, it did not conduct any business, of any kind, prior to the signing of the ATMA limited liability company agreement on November 14, 2005, and ATMA's decision to (i) purchase ATMs; (ii) supervise and monitor the management of the Placed ATMs; and (iii) thereafter receive monthly revenue generated by the Placed ATMs.

7

30.     On November 14, 2005, Brossman, Munier and unnamed others met with representatives of the Wolfson Group at the offices of the Wolfson Group in New York for the purpose of inducing the Wolfson Group to participate in the ATM Venture, to induce ATMA to purchase Placed ATMs from 36 Main, and to allow ATMFS to manage any Placed ATMs purchased by ATMA; Netschi and Moore participated in portions of the November 14, 2005 meeting telephonically.

31.     During the November 14, 2005 meeting, Netschi, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, through ATMFS, to operate as the ISO for the Placed ATMs represented to senior representatives of the Wolfson Group, who become members of ATMA's board of managers that very day, that:

  a.     Netschi, through 36 Main, was in the business of locating sellers of Placed ATMs, conducting due diligence on the Placed ATMs, negotiating a price for and purchasing the Placed ATMs, holding the 36 Main purchased Placed ATMs as inventory and reselling the Placed ATMs to interested third parties;

  b.     Moore, through ATMFS, served as the ISO for the 36 Main owned ATMs and that Moore was prepared to continue to act as the ISO for those Placed ATMs;

  c.     ATMFS was in possession of leases with businesses where Placed ATMs owned by 36 Main were located and that the leases were valid, in effect, and assignable to the purchaser of the Placed ATMs; and,

8

    d.      Moore, through ATMFS performed due diligence confirming the Performance Criteria for the Placed ATMs provided to the purchaser of the Placed ATMs prior to purchase.

32.     During the same meeting, representatives of the Wolfson Group, who become the majority and controlling members of ATMA's board of managers – as part of making an informed decision concerning (i) ATMA's purchases of Placed ATMs from 36 Main; and (ii) ATMA's decision to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs – specifically questioned Netschi with respect to whether Netschi and 36 Main were purchasing Placed ATMs from disinterested third-party owners and expressed their reliance on Netschi and 36 Main conducting due diligence on the Performance Criteria of the of the Placed ATMs being purchased by 36 Main for later resale to ATMA.

33.     Also during the same meeting, Netschi, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, represented that the business of 36 Main was separate from the business of Moore and ATMFS, and that 36 Main was exclusively in the business of purchasing and reselling Placed ATMs and that Moore was exclusively in the business of operating as an ISO.

34.     Also during the same meeting, Brossman, Munier, and Netschi, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, represented that Moore, through ATMFS, could act as the ISO for any ATMs purchased by ATMA and could conduct due diligence and provide truthful and accurate reporting as

9

to the Performance Criteria of the Placed ATMs identified for potential purchase by ATMA.

35.    Also during the same meeting, Brossman, Munier, representatives of the Wolfson Group and unnamed others participated in a conference call with Moore during which Moore, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, represented that: (i) neither he, nor his company ATMFS, were engaged in the purchase or sale of Placed ATMs; (ii) that ATMFS acted solely as an ISO for Placed ATMs; and (iii) that ATMFS's operations were separate and apart from those of 36 Main.

36.    Also during the same meeting, Netschi, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, caused to be sent, via electronic mail ("email"), copies of bills of sale, equipment management agreements and due diligence documents (more fully defined *infra* at Paragraph 52) for 100 Placed ATMs purportedly available for purchase by ATMA from 36 Main. *See* Volume I, Ex. 1 – Ex. 3.[2] The documents were forwarded at the request of ATMA's board of managers, to demonstrate the Performance Criteria of the 100 Placed ATMs purportedly being offered for sale and other factors relevant to ATMA's decision to purchase Placed ATMs from Netschi's company, 36 Main, and ATMA's decision to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs,

---

[2]    Due to the volume of exhibits to this Complaint, for the Court's convenience the exhibits hereto are attached and submitted herewith and incorporated herein by reference as part of separate Exhibit Appendices, Volumes I – XX (hereinafter referred to as Volume " ", Ex. " ").

37.     Also at the same meeting, Moore, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, made representations indicating the authenticity of the leases, due diligence documents and management agreements for the same 100 Placed ATMs.

38.     After receiving the representations set forth in paragraphs 30 through 37, *supra*, from Brossman, Munier, Netschi, and Moore, the Wolfson Group agreed to participate in the ATM Venture, ATMA agreed to purchase Placed ATMs from Netschi's company, 36 Main, and ATMA agreed to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs. On November 14, 2005, the limited liability company agreement of ATMA was drafted by an employee of the Wolfson Group. The ATMA limited liability company agreement was effective November 14, 2005.

39.     The ATMA limited liability company agreement provided that the management of the business and affairs of ATMA would be delegated to a board of managers. The ATMA board of managers consisted of three managers: two appointed by the Wolfson Group and one appointed by the Class B members of the board of managers. A chairman of the board of managers was to be selected by the two Wolfson Group appointed managers. The initial board of managers of ATMA consisted of two managers appointed by the Wolfson Group, Aaron Wolfson and Eli Levitin (the "Controlling Managers"), and Brossman. Brossman's position as a manager on the ATMA board of managers was contingent upon his continued employment with ATMA – employment that could be terminated at will and with or without cause by the Controlling Managers.

11

40.    Pursuant to the terms of the ATMA limited liability company agreement, ATMA was prohibited, among other acts, from: purchasing any ATMs, disposing of any ATMs, amending any lease agreements related to any ATM, or hiring any employees, without the unanimous approval of the board of managers.

41.    On the same day of the meeting and de-facto formation of ATMA, ATMA, via written employment agreements, hired Brossman, Munier, and an unnamed other employee, as co-chief executive officers of ATMA to operate the day-to-day business and affairs of ATMA.  Brossman and Munier were to receive: (i) a fixed salary for their work as co-chief executive officers; (ii) employee benefits, including health insurance; and (iii) three weeks vacation.  Brossman and Munier were to each be paid $10,416 per month out of the operating revenue of ATMA with salary increases, specifically linked to the number of Placed ATMs owned by ATMA (the "ATMA Machines").

42.    Brossman and Munier were at-will employees of ATMA.  Brossman and Munier could be terminated from their positions as co-chief executive officers by the Controlling Managers at any time, with or without cause.

43.    Pursuant to their employment agreements, Brossman and Munier were subject to the overall direction and authority of the ATMA board of managers, were required to report to the ATMA board of managers (or the board's designee), and owed a duty of loyalty to ATMA.  Brossman and Munier were prohibited from purchasing ATMs for ATMA, disposing of ATMs owned by ATMA, or modifying any lease related to an ATM owned by ATMA without the unanimous approval of the ATMA board of managers.

44.    In connection with Brossman's employment as the co-chief executive officer of ATMA, Brossman was required to perform due diligence obligations on behalf of

12

ATMA that included, but were not limited to: (i) identifying and vetting potential Placed ATM machines for purchase by ATMA; (ii) visiting existing ATMA Machines at their locations; and, (iii) exploring opportunities to enhance the value and performance of the ATMA Machines. Brossman's due diligence obligations also required interfacing with Moore as the ISO of the ATMA Machines. On numerous occasions during the period relevant to this Complaint, Brossman represented to ATMA's board of managers, or their designees, that he was performing the above duties, including representations that he was personally visiting the businesses where the ATMA Machines were located.

45.    In connection with Munier's employment as the co-chief executive officer of ATMA, Munier was required to receive and review monthly reports, delivered by Moore and purportedly related to the ATMA Machines, detailing the location, transaction activity, monthly costs and expenses, and net revenue for each ATMA Machine (the "Monthly Reports") and to subsequently deliver the Monthly Reports to ATMA's board of managers, or their designees.

46.    In or about February of 2006, at the offices of the ATMA board of managers in New York, Netschi again represented to ATMA that Netschi and 36 Main were purchasing Placed ATMs from disinterested third party owners and that Netschi and 36 Main were conducting due diligence with respect to the Placed ATMs being purchased by 36 Main for later resale. At the same meeting, an ATMA board member and his representative expressed their reliance on the representations made by Netschi to continue ATMA's purchases of Placed ATMs from 36 Main.

47.    Based on the fraudulent and misleading acts of the Defendants, from approximately November of 2005 through February of 2008, ATMA believed it

purchased 940 Placed ATMs – the ATMA Machines – from 36 Main, entered into management agreements with ATMFS to manage the operation of the ATMA Machines, and continued to employ Brossman and Munier as employees of ATMA to assist ATMA's board of managers with the day-to-day operations of ATMA.

48.    During all periods relevant to this Complaint, the board of managers of ATMA, and/or its designees, were actively engaged in the operation and business affairs of ATMA, including but not limited to the decision whether to purchase Placed ATMs from 36 Main.

### *Purported ATM Purchases/Sales*

49.    To date, Plaintiff has transferred $16.475 million to 36 Main for the purchase of the ATMA Machines. The purported purchase of the ATMA Machines commenced in November of 2005, and ended in September of 2006, and were accomplished in fifteen (15) tranches, varying in size from 2 to 101 ATMs per tranche, (the "ATMA Tranche Purchases"). The purchase price for each of the ATMA Machines was negotiated by the Controlling Members of the ATMA board and 36 Main. The purchase price for the ATMA Machines varied from between $14,500 to $22,000 per machine.[3]

50.    The individual ATMA Tranche Purchases occurred as follows:

---

[3]    The purchase price for a Placed ATM was based on the Performance Criteria of each tranche of Placed ATMs and subsequent designation of the Placed ATM as an "A" or "B" Placed ATM as determined by the verified transaction history of the ATMs in the tranche. Placed ATMs designated as "A" Placed ATMs had an average of at least 400 verified fee paying transactions per month. Placed ATMs with at least 400 verified fee paying transactions per month were originally priced at $19,000.00 per Placed ATM and were later priced at $19,500.00 per Placed ATM. Two of the Placed ATMs with an average of at least 500 verified fee paying transactions per month were priced at $22,000.00 per Placed ATM. Placed ATMs designated as "B" Placed ATMs had an average of from 330-399 verified fee paying transactions per month and were priced at $14,500.00 per Placed ATM. A chart summarizing the date of purchase and amount paid by ATMA for each tranche of ATM purchases is annexed hereto at Volume I, Ex. 4.

a.   On or about November 16, 2005, ATMA paid $1,900,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "November 16, 2005 Tranche Purchase" documents at Volumes II – III, Ex. 5 – Ex. 13);

b.   On or about December 20, 2005, ATMA paid $1,900,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "December 20, 2005 Tranche Purchase" documents at Volumes III – V, Ex. 14 – Ex. 22);

c.   On or about February 22, 2006, ATMA paid $1,900,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "February 22, 2005 Tranche Purchase" documents at Volumes VI - VII, Ex. 23 – Ex. 31);

d.   On or about April 26, 2006, ATMA paid $1,950,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "April 26, 2006 Tranche Purchase" documents at Volumes VII – IX, Ex. 32 – Ex. 40);

e.   On or about May 27, 2006, ATMA paid $1,950,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "May 27, 2006 Tranche Purchase" documents at Volumes IX – XI, Ex. 41 – Ex. 47);

f.   On or about June 16, 2006, ATMA paid $975,000.00 for the purchase of 50 Placed ATM machines from 36 Main (*See* the "June 16, 2006 Tranche Purchase" documents at Volume XII, Ex. 48 – Ex. 54);

g.   On or about June 27, 2006, ATMA paid $1,073,000.00 for the purchase of 74 Placed ATM machines from 36 Main (*See* the "June 27, 2006 Tranche Purchase" documents at Volume XIII, Ex. 55 – Ex. 61);

h.   On or about July 28, 2006, ATMA paid $1,469,500.00 for the purchase of 101 Placed ATM machines from 36 Main (*See* the "July 28, 2006 Tranche Purchase" documents at Volumes XIV – XV, Ex. 62 – Ex. 68);

i.   On or about August 30, 2006, ATMA paid $136,500.00 for the purchase of 7 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #1" documents at Volumes XVI - XVII, Ex. 69 – Ex. 70, Ex. 77 – Ex. 81);

j.   On or about August 30, 2006, ATMA paid $331,500.00 for the purchase of 17 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #2" documents at Volumes XVI – XVII, Ex. 71 – Ex. 72, Ex. 77 – Ex. 81);

k.    On or about August 30, 2006, ATMA paid $522,000.00 for the purchase of 36 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #3" documents at Volumes XVI – XVII, Ex. 73 – Ex. 74, Ex. 77 – Ex. 81);

l.    On or about August 30, 2006, ATMA paid $986,000.00 for the purchase of 68 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #4" documents at Volumes XVI - XVII, Ex. 75 – Ex. 81);

m.    On or about September 26, 2006, ATMA paid $44,000.00 for the purchase of 2 Placed ATM machines from 36 Main (*See* the "September 26, 2006 Tranche Purchase #1" documents at Volumes XVII - XVIII, Ex. 82 – Ex. 83, Ex. 88);

n.    On or about September 26, 2006, ATMA paid $409,500.00 for the purchase of 21 Placed ATM machines from 36 Main (*See* the "September 26, 2006 Tranche Purchase #2" documents at Volumes XVII - XVIII, Ex. 84 – Ex. 85, Ex. 88);

o.    On or about September 26, 2006, ATMA paid $928,000.00 for the purchase of 64 Placed ATM machines from 36 Main (*See* the "September 26, 2006 Tranche Purchase #3" documents at Volumes XVII - XVIII, Ex. 86 – Ex. 88).

51.    With respect to each Tranche Purchase by ATMA, a series of documents were executed which, on their face, provided for (i) the transfer of title and assignable leases to ATMA; and (ii) the management of the ATMA Machines.

52.    The documents executed for each Tranche Purchase are identified as follows:

a.    Asset Purchase Agreement: 36 Main, by Netschi and Jones, prepared, or caused to be prepared, an Asset Purchase Agreement that supposedly sold title in Placed ATMs from 36 Main to ATMA (hereinafter "Asset Purchase Agreement"). The Asset Purchase Agreements provide a representation and warranty that 36 Main held good and marketable title to the Placed ATMs being sold to ATMA. Upon delivery of an executed Asset Purchase Agreement by Jones on behalf of 36 Main, ATMA would

16

remit funds to 36 Main via wire transfer in an amount corresponding to the value of the Placed ATMs set forth in a schedule of the Placed ATMs affixed to the Asset Purchase Agreement. *See* Asset Purchase Agreements for the ATMA Tranche Purchases in Volume II, Ex. 5; Volume III, Ex. 14; Volume VI, Ex. 23; Volume VII, Ex. 32; Volume IX, Ex. 41;Volume XII, Ex. 48; Volume XIII, Ex. 55; Volume XIV, Ex. 62; Volume XVI, Exs. 69, 71, 73, 75; Volume XVII, Exs. 82, 84, 86.

b.   Bills of Sale: 36 Main, by Netschi and Jones, prepared, or caused to be prepared, a Bill of Sale for each tranche of Placed ATMs supposedly being sold by 36 Main to ATMA. Each Bill of Sale provided a representation and warranty that 36 Main held good and marketable title to the Placed ATMs supposedly being sold to ATMA. *See* Bills of Sale for the ATMA Tranche Purchases in Volume II, Ex. 6; Volume III, Ex. 15; Volume VI, Ex. 24; Volume VII, Ex. 33; Volume IX, Ex. 42; Volume XII, Ex. 49; Volume XIII, Ex. 56; Volume XIV, Ex. 63; Volume XVI, Exs. 70, 72, 74, 76; Volume XVII Exs. 83, 85, 87.

c.   Addition to Equipment: 36 Main, by Netschi and Jones, prepared, or caused to be prepared, a separate document entitled "Addition to Equipment," that stated that the Placed ATMs supposedly being sold to ATMA were "Virtual switch capable." Virtual switch capability allowed the Placed ATM to fund minutes for pre-paid cell phone accounts (hereinafter "Addition to Equipment"). After the completion of the first three tranche purchases, ATMA elected not to pay for Virtual Switch

17

capability and Addition to Equipment documents were no longer delivered for subsequent tranche purchases. *See* the Addition to Equipment documents in Volume II, Ex. 7; Volume III, Ex. 16; Volume VI, Ex. 25; Volume VII, Ex. 34.

d.  Diligence Warranty: Contemporaneous with the execution of a Bill of Sale, and Asset Purchase Agreement, Netschi, by and through 36 Main provided a written statement that it had engaged the services of Moore, through ATMFS, to perform a verification of the transaction history of each ATM supposedly being sold to ATMA (hereinafter "Diligence Warranty"). *See* the Diligence Warranties in Volume II, Ex. 8; Volume III, Ex. 17; Volume VI, Ex. 26; Volume VII, Ex. 35. Each Diligence Warranty warranted that the transaction history that 36 Main provided to ATMA was the same transaction history that 36 Main had received from Moore and ATMFS.

e.  Each and every Bill of Sale, Asset Purchase Agreement, Addition to Equipment and Diligence Warranty (hereinafter "36 Main Transaction Documents") were signed by Jones as Vice-President and/or Secretary Treasurer of 36 Main and were signed, upon information and belief, with the knowledge of and/or at the direction of Netschi.

f.  Placement Program Space Leases: For each and every Placed ATM supposedly being sold to ATMA, Moore provided copies of a "Placement Program Space Lease" (hereinafter "Placed ATM Lease") between ATMFS and a purported lessor, usually a convenience store or other

18

similar business, where the ATMs supposedly being sold to ATMA were allegedly located. *See* the Placed ATM Leases in Volumes II – III, Ex. 9a – Ex. 9b; Volumes IV – V, Ex. 18a – Ex. 18b; Volumes VI – VII, Ex. 27a – Ex. 27b; Volumes VIII – IX, Ex. 36a – Ex. 36b; Volumes X – XI, Ex. 43a – Ex. 43b; Volume XII, Ex. 50; Volume XIII, Ex. 57; Volumes XIV – XV, Ex. 64a – Ex. 64b; Volumes XVI – XVII, Ex. 77a – Ex. 77b; Volume XVIII, Ex. 88. Annexed to each Placed ATM Lease were site surveys and audit reports, signed by Moore, that purportedly identified: (1) the business where each Placed ATM was located; (2) the annual merchandise sales for that business; (3) the terminal number for the Placed ATM at the location; (4) the average monthly transaction history for the Placed ATM; and, (5) purported reports from searches for UCC-1 statements. The purported Placed ATM Leases and the transaction history identified in the documents annexed to the Placed ATM Leases correlated to a schedule identifying each Placed ATM purchased in the ATMA Tranche Purchases.

g.    Assignment of Placement Programs Space (ATM) Leases: The Placed ATMs supposedly sold to ATMA and their alleged locations were further identified in a document entitled "Assignment of Placement Programs Space (ATM) Leases" (hereinafter "Lease Assignment(s)"). *See* the Lease Assignments in Volume III, Ex. 10; Volume V, Ex. 19; Volume VII, Ex. 28; Volume IX, Ex. 37; Volume XI, Ex. 44; Volume XII, Ex. 51; Volume XIII, Ex. 58; Volume XV, Ex. 65; Volume XVII, Ex. 78. Each Lease Assignment for each Placed ATM Lease was prepared, or caused to be

19

prepared, by Moore and stated that ATMFS had a current and existing

Placed ATM Lease and that the Placed ATM Lease was being assigned to

ATMA for each ATM supposedly being sold to ATMA. In each Lease

Assignment, Moore warranted that each Placed ATM Lease was in full

force and effect, was assignable, and was free and clear from all liens and

encumbrances.

h.    Due Diligence Report: Moore prepared, or caused to be prepared, a

separate document (hereinafter "Due Diligence Report"), that represented

and warranted to ATMA that ATMFS had reviewed the average monthly

transaction history for each ATM being sold to ATMA and that the

average transactions reported on the schedules affixed to the Asset

Purchase Agreements were correct. Moore, in the Due Diligence Report,

acknowledged that ATMA "was relying upon such data in making its

purchase from 36 main [sic] Street." *See* the Due Diligence Reports in

Volume III, Ex. 11; Volume V, Ex. 20; Volume VII, Ex. 29; Volume IX,

Ex. 38; Volume XI, Ex. 45; Volume XII, Ex. 52; Volume XIII, Ex. 59;

Volume XV, Ex. 66; Volume XVII, Ex. 79.

i.    Equipment Management Agreement: On or about the same day of a

closing of a tranche purchase of ATMA Machines, ATMA and ATMFS

would enter into an Automated Teller Machine (ATM) Equipment

Management Agreement (hereinafter "Equipment Management

Agreement") obligating ATMFS to manage a tranche of ATMA

Machines. ATMA entered into an Equipment Management Agreement for

ATMFS, by Moore, to manage all of the ATMA Machines.    *See* the

Equipment Management Agreements in Volume III, Ex. 12; Volume V,

Ex. 21; Volume VII, Ex. 30; Volume IX, Ex. 39; Volume XI, Ex. 46;

Volume XII, Ex. 53; Volume XIII, Ex. 60; Volume XV, Ex. 67; Volume

XVII, Ex. 80.  Pursuant to the terms of each Equipment Management

Agreement, ATMFS, by and through Moore, is obligated to manage the

ATMA Machines for the benefit of ATMA.  The Equipment Management

Agreement requires Moore and ATMFS to: (1) collect data processing and

electronic deposit and transfer information for all collected revenues and

fees, including surcharge revenues generated by the ATMA Machines, on

a monthly basis; (2) provide ATMA with the Monthly Reports and to

make regular payments to ATMA based on the monthly net revenue of the

ATMA Machines (the "Periodic Revenue Payments"); and, (3) provide

ATMA with a full disclosure of the number of transactions for each

ATMA Machine on a monthly basis.

j.    Amendment to the Equipment Management Agreement:  On or about

April 27, 2006, ATMA and ATMFS entered into an Amendment to the

Equipment Management Agreement ("hereinafter Equipment

Management Agreement Amendment") that amended the existing

Equipment Management Agreements between ATMFS and ATMA.  *See*

the Equipment Management Agreement Amendments in Volume III, Ex.

13; Volume V, Ex. 22; Volume VII, Ex. 31; Volume IX, Ex. 40; Volume

XI, Ex. 47; Volume XII, Ex. 54; Volume XIII, Ex. 61; Volume XV, Ex.

68; Volume XVII, Ex. 81. Pursuant to the terms of each Equipment Management Agreement Amendment, ATMFS, by and through Moore, is obligated, in addition to its obligations under the Equipment Management Agreements, not to: (1) solicit any business owner identified in the Lease Agreements to cease doing business with ATMA; or (2) solicit any business owner identified in the Lease Agreements to lease space to ATMFS or any other party for the purpose of placing any additional ATMs at the same business location. ATMFS's non-solicitation obligation further prohibited ATMFS from sharing any information identifying the locations of the ATMA Machines or the terms of the Lease Agreements with any other parties.

k.      For each of the ATMA Tranche Purchases, Moore signed every Placed ATM Lease, Lease Assignment, Due Diligence Report, Equipment Management Agreement and Equipment Management Agreement Amendment (hereinafter the "ATMFS Transaction Documents").

53.    Each of the 36 Main Transaction Documents and ATMFS Transaction Documents associated with the ATMA Tranche Purchases included a schedule of Placed ATMs that purportedly identified the transaction history of each Placed ATM in the ATMA Tranche Purchases.

54.    Each Asset Purchase Agreement and corresponding Bill of Sale contained representations and warranties by 36 Main, that 36 Main possessed good and marketable title to the Placed ATMs supposedly being sold to ATMA, that it had full authority to sell the Placed ATMs, that the Placed ATMs were in good condition and fit for use, and were

22

free and clear "of all liens, encumbrances, liabilities and adverse claims, of every nature and description." *See* Paragraphs 52(a) and 52(b), *supra*.

55. Every Tranche Purchase of ATMA Machines was accompanied by some or all of the documents identified in Paragraphs 52(a) through 52(d) and 52(f) through 52(j) of this Complaint.

56. For every Tranche Purchase of ATMA Machines, ATMA delivered, via a bank wire transfer, purchase funds to Netschi, through 36 Main. The purchase funds paid by ATMA to 36 Main for the ATMA Machines are detailed, *infra*, at Paragraphs 114 through 124 and incorporated herein by reference.

57. Additionally, after each Tranche Purchase of ATMA Machines, ATMA delivered, via a bank wire transfer, funds to ATM Capital and/or 36 Main which represented 36 Main's prorated share of the monthly net-revenues earned by that tranche of ATMA Machines for that portion of the month during which 36 Main owned those ATMs sold to ATMA (the "Residual Revenue Funds"). *See* Paragraphs 147 through 154, *infra*, incorporated herein by reference.

58. Brossman and Munier, together and/or in conjunction with others, including Netschi, calculated the Residual Revenue Funds purportedly owed 36 Main and to be delivered to ATM Capital or 36 Main. Munier, Brossman, and Netschi caused the Residual Revenue Funds to be paid to ATM Capital and/or 36 Main with the knowledge that the Residual Revenue Funds were based on fabricated calculations because the ATMA Machines did not exist.

*Post Sale Activities of Defendants*

59.    From on or about December of 2005 through November of 2007, Moore

forwarded the Monthly Reports, via email, to Munier and/or Brossman. *See* Paragraphs

160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195, *infra*, incorporated

herein by reference.

60.    The Monthly Reports were received and reviewed by Munier and/or

Brossman for accuracy pursuant to their duties as employees of ATMA. Brossman

and/or Munier subsequently delivered the Monthly Reports to representatives of ATMA.

*See* Paragraphs 162, 158 – 165, 167 – 168, 170, 172, 177 – 178, 181, 183 – 185, 188 –

189, 191, 193, 194, 196 – 197, 209 – 227, *infra*, incorporated herein by reference.

61.    From on or about December of 2005 through September of 2007, Moore, by

and through ATMFS and/or Exclusive Properties, delivered, by wire transfer, the

Periodic Revenue Payments. *See* Paragraphs 125 through 146, *infra*, incorporated herein

by reference.

62.    The Periodic Revenue Payment delivered in September of 2007, which related

to the Monthly Report for June of 2007, was the final Periodic Revenue Payment

received by ATMA from ATMFS, Moore, or Exclusive Properties. In or about

November of 2007, Moore ceased providing the Monthly Reports.

63.    In response to numerous requests from Plaintiff concerning the failures of

ATMFS and Moore to provide the Monthly Reports and/or Periodic Revenue Payments,

Moore, by letter dated December 20, 2007, stated:

> We'd like to give you an update on the events that occurred this year that
> has caused a delay in receiving your monthly payments. *In the Spring of*
> *2007 we made a commitment to purchase Jack Henry ATM software . . .*
> *that would allow us to track ATM assets and transactions and receive*

*electronic reports on a daily basis.* We *received the software in July* and did the installation at that time. . . . We expect to be fully operational and current with all reports by the mid to end of January. . . We're presently reconciling each ATM from the old manual system to the new system to get reports done to get them out to each one of our ATM owners . . . *I want to assure each ATM owner that their funds received on the settlement of each ATM are secure in a settlement account by each network.*

*See* Volume XIX, Ex. 89. (Emphasis added.)

64.    On January 10, 2008, Moore, in response to demands by Plaintiff for information related to the ATMA Machines, delivered, via email, a report to a representative of ATMA that purportedly identified the ATMA Machines. *See* Volume XIX, Ex. 90.

65.    On January 11, 2008, Brossman emailed a representative of ATMA and represented that ". . . vance is going to be sending u a cornucopia of reports and then explain the first reports.i think that the first reports were from elan a processor owned by us bank-spoke to him at 830 and 1030 this morning-harry" [sic]. *See* Volume XIX, Ex. 91.

66.    On January 11, 2008, Moore, in response to demands by Plaintiff for information related to the ATMA Machines, delivered, via email, a report, allegedly prepared by ATMFS, listing the store locations, without addresses, of 352 ATMs. Brossman also received a copy of the report via the same email. *See* Volume XIX, Ex. 92.

67.    Also on January 11, 2008, Brossman, in an email, represented to an agent of ATMA that he had ". . .matched 250 machines to the [Plaintiff's] . . ." list of the ATMA Machines. *See* Volume XIX, Ex. 93.

68.     Also on January 11, 2008, Moore, in response to further demands by Plaintiff for information related to the ATMA Machines, represented that he had requested ". . . the file on transaction history from processors for recent months, and am still waiting for the files." *See* Volume XIX, Ex. 94.

69.     Also on January 11, 2008, Moore sent another email to a representative of ATMA wherein he represented that he would provide a copy of a bank statement related to the settlement account where the Periodic Revenue Payments were purportedly being held. *See* Volume XIX, Ex. 94. Moore sent a copy of a purported bank statement to a representative of ATMA via email on January 11, 2008. *See* Volume XIX, Ex. 95.

70.     On or about January 15, 2008, Moore, during a visit by a representative of ATMA and a third-party auditor to ATMFS's warehouse in Garner, North Carolina, presented a bank statement dated December 31, 2007, that purportedly showed an account balance of $11,259,194.75, which Moore stated represented Plaintiff's Periodic Revenue Payments that were being held in escrow pending completion of software upgrades to ATMFS's computer system. *See* Volume XIX, Ex. 96.

71.     On January 20, 2008, Brossman, in response to demands by Plaintiff for information related to the ATMA Machines, represented to a representative of ATMA in an email that: "ok-vance and i have gone through the lists till we accounted for the 940 machines including the moved ones.i have sent the list to you.they have all the present terminal numbers---i told u david that i would get it done no matter what-harry" [sic]. *See* Volume XIX, Ex. 97.

72.     On or about January 22, 2008, Moore, via an electronic message to a representative of ATMA, represented that the ATMA Machines existed as Placed ATMs

26

and represented that new lease agreements for any ATMA Machines moved from their original locations would be provided to Plaintiff by January 24, 2008. *See* Volume XIX, Ex. 98.

### *Discovery That the ATMA Machines Do Not Exist*

73.    In January of 2008, Plaintiff directed a private investigative firm to investigate certain locations where ATMA Machines were, according to Moore and ATMFS, located. The investigation was conducted for the purpose of determining whether the ATMA Machines were in fact present at those locations.

74.    On or about January 24, 2008, the private investigative firm reported that its investigation had uncovered that the majority of the ATMA Machines they attempted to locate: (1) were not located at the business locations identified by Moore, Netschi, 36 Main, and Jones; (2) in some instances may not have ever existed at the locations identified by Moore, Netschi, 36 Main, and Jones; and (3) in some instances, were either owned by persons other than Plaintiff and/or were managed by parties other than ATMFS.

### *Fraudulent Sales to Other Investor Groups Are Revealed*

75.    On or about February 6, 2008, a California based entity known as ATM Equity, LP ("ATM Equity") filed suit against ATMFS in North Carolina Superior Court, Wake County, alleging that ATMFS and Moore had defrauded ATM Equity out of $20 million delivered to Netschi, through 36 Main, by providing fraudulent due diligence reports in order to induce ATM Equity to purchase ATMs from 36 Main. The complaint further alleges that ATMFS and Moore misappropriated and/or failed to disclose the locations of certain ATMs that ATM Equity owned and had contracted with ATMFS to

service, and that ATMFS and Moore had failed to remit monthly revenues for either the ATMs purchased from 36 Main or the ATMs owned by ATM Equity being serviced by ATMFS and Moore.

76.    On or about February 12, 2008, ATMFS filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Middle District of Florida (the "ATMFS Bankruptcy").

77.    In its petition in the ATMFS Bankruptcy, ATMFS did not list or otherwise disclose either ATMA or ATM Equity as creditors of ATMFS.

78.    Since the filing of the ATMFS Bankruptcy, numerous other persons who purchased ATMs through Netschi and 36 Main, and whose ATMs were allegedly managed by ATMFS and Moore, have appeared in the ATMFS Bankruptcy (together with ATMA and ATM Equity, the "ATMFS Creditors").

79.    The ATMFS Creditors believe they purchased, in the aggregate, in excess of 4000 ATMs through Netschi, 36 Main, Jones, and Moore.

80.    In a disclosure made by the ATMFS Bankruptcy Trustee on or about March 10, 2008, the ATMFS Bankruptcy Trustee has only been able to confirm the existence of approximately 400 ATMs (ten percent 10% of the Placed ATMs purportedly being managed by ATMFS and Moore) and, that most of those 400 ATMs are owned by the merchants where the ATMs are located and not the ATMFS Creditors.

81.    Netschi, in a telephone call with a member of the ATMA board of managers on February 28, 2008, admitted that 36 Main took a percentage of the gross purchase funds for each tranche purchase of ATMA Machines and then subsequently transferred the balance of Plaintiff's funds to Moore or entities controlled by Moore - a

28

representation totally at odds with prior representations made to representatives of
ATMA to induce ATMA to participate in the ATM Venture, to purchase Placed ATMs
from 36 Main, and to allow ATMFS to manage any of the ATMA Machines. *See*
Paragraphs 31 - 33, *supra*.

82.     Subsequently on March 19, 2008, Netschi was sued in New York State
Supreme Court, New York County, by Fortress Credit Opportunities I LP for breach of
guarantee in connection with the financing of purchases of Placed ATMs by ATM Equity
from 36 Main.

### The Defendants Prior ATM Sales Scheme

83.     From approximately 2002 through 2005, Munier, Brossman, Moore, and
Netschi, along with others not named herein, engaged in the sale of ATM business
opportunities that bundled and sold ATMs together with management, operation, and
other services to investors (the "Business Opportunity").

84.     An investor in the Business Opportunity was entitled to receive a set monthly
payment in exchange for his or her investment, with a bonus payment in the event that
the transactional activity of an ATM exceeded a certain threshold number (usually 400
transactions) within a given month.

85.     Munier, operating through an entity that, on information and belief, was doing
business as EFinancial, was responsible for the sale of the Business Opportunity to
potential and actual investors.

86.     When Munier sold a Business Opportunity to an investor, he would arrange to
purchase a single or multiple ATMs from an entity owned and controlled by Netschi.

87.    Brossman, operating through an entity that, on information and belief, was doing business as National Escrow Limited LLC ("National Escrow"), agreed, for a percentage of the revenue generated by the transaction activity of Business Opportunity ATMs, to purchase the ATMs from the Business Opportunity owners at the expiration of the term of the Business Opportunity (usually seven years) or a mutually agreeable date.

88.    Upon information and belief, each ATM sold to an investor as part of the Business Opportunity was purportedly operated by Moore pursuant to an agreement whereby a Moore-controlled entity would act as the ISO for the ATM.

89.    In addition to Brossman and Munier, the Business Opportunity also included management services by a management company, unnamed herein, that employed, amongst others, Munier's sister, and which acted as conduit between the owner of the Business Opportunity and Netschi, Brossman, Munier, and Moore.  Though the management services were allegedly provided by a separate management company, Moore's entity controlled access to any funds generated from the Business Opportunity ATMs, and distributed funds to the purported management company and to Brossman's company, National Escrow.

90.    On information and belief, including statements made by investors and lawyers for investors in the Business Opportunity, investors in the Business Opportunity were sold non-existent phantom ATMs as part of a scheme conducted by Munier, Brossman, Netschi, and Moore.

## VII
## PATTERN OF FRAUDULENT AND RACKETEERING ACTS

91.    Defendants, by and in furtherance of the ATM Sales Enterprise, induced Plaintiff to enter into agreements to purchase phantom ATMs by providing Plaintiff with

false and misleading purchase information, including: (1) the source from whom Netschi and 36 Main were allegedly purchasing the ATM machines ultimately purchased by Plaintiff; (2) the existence of the ATMs purchased by Plaintiff; (3) the transaction activity of the ATMs purchased by Plaintiff; (4) the locations of the ATMs purchased by Plaintiff; and, (5) the existence of leases for the placement of the ATMs purchased by Plaintiff.

92.    To effect the ATM Sales Enterprise scheme, Munier, Brossman, Netschi, 36 Main, Jones, ATM Capital, Exclusive Properties, and Moore agreed and conspired to sell phantom ATMs to Plaintiff.

93.    As part of the ATM Sales Enterprise scheme, Netschi and 36 Main explicitly and intentionally misrepresented to Plaintiff that they had acquired ownership of the ATMs to be purchased by Plaintiff from disinterested third-party owners of the ATMs when, in fact, they had not done so, but had instead "purchased" the phantom ATMs from Moore, or an entity controlled by Moore.

94.    In furtherance of the ATM Sales Enterprise scheme, Netschi, 36 Main, and Jones created fictitious Asset Purchase Agreements, Bills of Sale, Additions to Equipment, and Due Diligence Warranties (collectively, the "36 Main Fictitious Transaction Documents").

95.    In furtherance of the ATM Sales Enterprise scheme, Moore created fictitious Lease Assignments, Placed ATM Leases, Due Diligence Reports, Equipment Management Agreements, and Equipment Management Agreement Amendments (collectively, the "Moore Fictitious Transaction Documents")(collectively with the 36 Main Fictitious Documents, the "Fictitious Transaction Documents").

96.     Knowing that the Fictitious Transaction Documents related to the purchase of phantom Placed ATMs by Plaintiff, Munier and Brossman furthered the ATM Sales Enterprise scheme by executing the Fictitious Transaction Documents on behalf of ATMA and/or not disclosing to Plaintiff that the Fictitious Transaction Documents related to phantom ATMs.

97.     Knowing that ATMA had purchased phantom Placed ATMs, Brossman furthered the ATM Sales Enterprise scheme by stating he had performed due diligence on the ATMA Machines, including visits to ATMA Machine locations, when he had not performed such due diligence.

98.     In continued furtherance of the ATM Sales Enterprise scheme, Moore caused ATMFS to create fictitious Monthly Reports for the ATMA Machines (the "Fictitious Monthly Reports"). *See* Paragraphs 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195, *infra*, incorporated herein by reference.

99.     The Fictitious Monthly Reports were transmitted to Munier and Brossman, who, knowing they were false and were generated for the purpose of misleading Plaintiff, provided the Fictitious Monthly Reports to Plaintiff. *See* Paragraphs 162, 158 – 165, 167 – 168, 170, 172, 177 – 178, 181, 183 – 185, 188 – 189, 191, 193, 194, 196 – 197, 209 – 227, *infra*, incorporated herein by reference.

100.    In continued furtherance of the ATM Sales Enterprise scheme, Moore caused the Periodic Revenue Payments to be made to ATMA. The Periodic Revenue Payments were transmitted via a wire transfer at the direction of Moore and originated from either ATMFS or Exclusive Properties. *See* Paragraphs 125 – 146, *infra*, incorporated herein reference.

32

101.    Upon information and belief, the source of the Periodic Revenue Payments was the monies delivered by Plaintiff and/or the other ATMFS Creditors to 36 Main to purchase Placed ATMs.

102.    In continued furtherance of the ATM Sales Enterprise scheme, Munier and Brossman caused the Periodic Revenue Payments to be recorded by ATMA as revenue and paid their individual salaries and benefits, along with the salaries and benefits of others, from the Periodic Revenue Payments with the knowledge that the Periodic Revenue Payments had a source other than the revenue generated by the transaction activity of the ATMA Machines.

103.    In continued furtherance of the ATM Sales Enterprise scheme, upon completion of the sale of a tranche of ATMs to ATMA, Netschi and ATM Capital would demand payment of the Residual Revenue Funds.  The Residual Revenue Funds were paid by ATMA via an interstate bank wire transfer to Netschi, through ATM Capital.

104.    In continued furtherance of the ATM Sales Enterprise scheme, when ATMFS ceased to provide Plaintiff with the Fictitious Monthly Reports in or around November of 2007 and Periodic Revenue Payments in or around September of 2007, Munier and Brossman represented to Plaintiff that they were actively communicating with Moore and ATMFS for the purpose of ascertaining the cause for the absence of reporting and payments from ATMFS.  Munier and Brossman, knowing such representations to be false, informed Plaintiff that the cause for the delay in reporting and payment from ATMFS was a software upgrade allegedly installed by ATMFS on its computers.

**COUNT 1**
**(Civil Racketeering Violations – All Defendants)**
**(18 U.S.C. § 1962(c))**

105.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.    At all times relevant to this Complaint, Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman were "persons" as defined by 18 U.S.C. § 1961(3).

107.    At all times relevant to this Complaint, Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman, as detailed in Paragraphs 26 - 72, 81 and 91 – 104, *supra*, engaged in the operation or management of the ATM Sales Enterprise, which is an enterprise as defined by 18 U.S.C. § 1961(4), the activities of which affect interstate commerce.

108.    Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman conducted the ATM Sales Enterprise's affairs through a pattern of racketeering activity, detailed in Paragraphs 114 - 227 below, which were directed at Plaintiff since at least November of 2005.

109.    Since at least November of 2005, Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman shared a common purpose while engaging in the fraudulent course of conduct detailed in Paragraphs 26 – 72, 81 and 91 – 104 above, and worked together to achieve such purpose, specifically to induce Plaintiff and other individuals and entities to enter into agreements to purchase Placed ATMs which do not exist in exchange for the receipt of millions of dollars of funds.  The scheme was carried out through the complex offering of fraudulent documentation and

34

verbal statements by the Defendants to hide the true nature of their "sale" of phantom ATMs to Plaintiff and others, thus allowing Defendants to maintain the ATM Sales Enterprise scheme while reaping substantial profits for themselves.

110.    Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman, operating together and individually, and in conjunction with unnamed others, directed and controlled the ATM Sales Enterprise, by: (a) creating the Fictitious Transaction Documents and delivering, or causing to be delivered, the Fictitious Transaction Documents to Plaintiff or their representatives/agents; (b) creating the Fictitious Monthly Reports and delivering, or causing to be delivered, the Fictitious Monthly Reports to Plaintiff or their representatives/agents; (c) delivering, or causing to be delivered, the Periodic Revenue Payments to ATMA or their representatives/agents; (d) demanding from ATMA, and receiving, the Residual Revenue Funds; and, (e) engaging in a fraudulent course of conduct against Plaintiff, and unnamed others.

111.    The pattern of racketeering activity engaged in by Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman involved fraudulent acts in support of the above conduct constituting wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341), all of which constitute "racketeering activity," as defined in 18 U.S.C. § 1961(1)(B).

112.    Defendants engaged in the predicate acts detailed below between November 14, 2005, when Netschi delivered Fictitious Transaction Documents to a representative of the Plaintiff, and continued through January 31, 2008, when Brossman delivered Fictitious Monthly Reports to a representative of the Plaintiff.

**Violations of 18 U.S.C. § 1343 (Wire Fraud)**

113.    The predicate acts, and evidence of the schemes constituting the pattern of

racketeering, include, but are not limited to interstate telephone calls, interstate electronic

("e-mail") messages, interstate facsimile transmissions, and interstate electronic banking

transactions containing false or fraudulent pretenses, representations, or promises made in

furtherance of the ATM Sales Enterprise caused to be transmitted by the Defendants, in

violation of 18 U.S.C. § 1343.

### *Predicate Acts and Evidence Concerning Interstate Wire Transfers Related to the Purchases of ATMA Machines*

114.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the

ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on or about

November 16, 2005 from ATMA's Citibank, N.A. account located in New York to 36

Main's account number 061003415 at Florida Choice Bank located in Florida to purchase

ATMA Machines.

115.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the

ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on December 19,

2005 from ATMA's Citibank, N.A. account located in New York to 36 Main's account

number 061003415 at Florida Choice Bank located in Florida to purchase ATMA

Machines. *See* Volume XIX, Ex. 99.

116.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the

ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on February 24,

2006 from ATMA's Citibank, N.A. account located in New York to 36 Main's account

number 061003415 at Florida Choice Bank located in Florida to purchase ATMA

Machines. *See* Volume XIX, Ex. 100.

117.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,950,000 on April 27, 2006
from ATMA's Citibank, N.A. account located in New York to 36 Main's account number
061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See*
Volume XIX, Ex. 101.

118.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,950,000.00 on May 26, 2006
from ATMA's Citibank, N.A. account located in New York, to 36 Main's account
number 061003415 at Florida Choice Bank located in Florida to purchase ATMA
Machines. *See* Volume XIX, Ex. 102.

119.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the
ATM Sales Enterprise,  caused ATMA to wire transfer $975,000.00 on June 14, 2006
from ATMA's Citibank, N.A. account located in New York, to 36 Main's account
number 061003415 at Florida Choice Bank located in Florida to purchase ATMA
Machines. *See* Volume XIX, Ex. 103.

120.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,073,000.00 on June 29, 2006,
from ATMA's Citibank, N.A. account located in New York to 36 Main's account number
061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See*
Volume XIX, Ex. 104.

121.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,469,500 on July 27, 2006 from
ATMA's Citibank, N.A. account located in New York, to 36 Main's account number

061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 105.

122.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,975,500.00 on September 5, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 106.

123.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $500.00 on September 6, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 107.

124.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,381,500.00 on September 29, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 108.

### Predicate Acts and Evidence Concerning Interstate Wire Transfers
### *for the Periodic Revenue Payments*

125.    On December 30, 2005, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $42,812.46 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 109.

126.     On February 3, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $85,760.28 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 110.

127.     On March 2, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of am interstate bank wire transfer, the following: $56,646.44 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 111.

128.     On April 3, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $51,911.65 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 112.

129.     On April 4, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $26,997.50 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments the ATMA Machines. *See* Volume XIX, Ex. 113.

130.     On May 1, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $126,283.26 from The Bankers Bank account number 061003415 located in Georgia to

ATMA's account located at Citibank N.A. located in New York, representing Periodic
Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 114.

131.    On May 31, 2006, in furtherance of the ATM Sales Enterprise, Moore caused
ATMFS to transmit, by means of an interstate bank wire transfer, the following:
$170,993.83 from The Bankers Bank account number 061003415 located in Georgia to
ATMA's account located at Citibank N.A. located in New York, representing Periodic
Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 115.

132.    On July 5, 2006, in furtherance of the ATM Sales Enterprise, Moore caused
ATMFS to transmit, by means of an interstate bank wire transfer, the following:
$212,902.75 from The Bankers Bank account number 061003415 located in Georgia to
ATMA's account located at Citibank N.A. located in New York, representing Periodic
Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 116.

133.    On August 2, 2006, in furtherance of the ATM Sales Enterprise, Moore
caused ATMFS to transmit, by means of an interstate bank wire transfer, the following:
$256,028.99 from The Bankers Bank account number 061003415 located in Georgia to
ATMA's account located at Citibank N.A. located in New York, representing Periodic
Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 117.

134.    On September 12, 2006, in furtherance of the ATM Sales Enterprise, Moore
caused ATMFS to transmit, by means of an interstate bank wire transfer, the following:
$289,021.76 from Florida Choice Bank account number 063114632 located in Florida to
ATMA's account located at Citibank N.A. located in New York, representing Periodic
Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 118.

135.    On October 11, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $340,231.77 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 119.

136.    On November 14, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $369,447.76 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 120.

137.    On December 19, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $358,430.65 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 121.

138.    On February 1, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $353,017.35 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 122.

139.    On February 28, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $344,170.03 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 123.

140.    On April 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $161,012.89 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 124.

141.    On May 14, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $120,000.00 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 125.

142.    On May 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $48,000.00 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 126.

143.    On May 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $5,784.37 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 127.

144.    On June 18, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $254,382.50 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 128.

145.    On August 15, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $695,737.93 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 129.

146.    On September 27, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $374,187.25 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines.

### *Interstate Wire Transfers: Residual Revenue Funds*

147.    On January 3, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $21,406.23 from Citibank, N.A. account number 48842629 located in New York to Automated Teller Machine Advantage Ltd's bank account number 977285936 at First American Bank located in Dallas, Texas, representing Residual Revenue Funds allegedly owed 36 Main for the November 16, 2005 Tranche Purchase. *See* Volume XIX, Ex. 130.

148.     On February 6, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $27,801.71 from Citibank, N.A. account number 48842629 located in New York to ATM Capital's bank account number 977285936 at First American Bank located in Dallas, Texas, representing Residual Revenue Funds allegedly owed 36 Main for the December 20, 2005 Tranche Purchase. *See* Volume XIX, Ex. 131.

149.     On June 1, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $35,560.14 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the April 26, 2006 Tranche Purchase. *See* Volume XIX, Ex. 132.

150.     On July 11, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $38,458.55 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the May 27, 2006 Tranche Purchase. *See* Volume XIX, Ex. 133.

151.     On August 7, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $33,621.17 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the

June 16, 2006 Tranche Purchase and the June 27, 2006 Tranche Purchase. *See* Volume XIX, Ex. 134.

152.    On September 11, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $30,500.33 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the July 28, 2006 Tranche Purchase. *See* Volume XIX, Ex. 135.

153.    On October 13, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $43,911.72 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the August 30, 2006 Tranche Purchase #1, August 30, 2006 Tranche Purchase #2, August 30, 2006 Tranche Purchase #3 and August 30, 2006 Tranche Purchase #4. *See* Volume XIX, Ex. 136.

154.    On November 14, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $27,389.12 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the September 26, 2006 Tranche Purchase #1, the September 26, 2006 Tranche Purchase #2, and September 26, 2006 Tranche Purchase #3. *See* Volume XIX, Ex. 137.

*Predicate Acts and Evidence Concerning Interstate Telephonic Wire*
*Communications*

155.    As detailed in Paragraphs 35 and 37, *supra*, on November 14, 2005, in

furtherance of the ATM Sales Enterprise, Moore, while in Florida or North Carolina,

engaged in an interstate telephone conversation with representatives of ATMA in New

York during which he made false representations concerning the operations of ATMFS

and 36 Main.

156.    As detailed in Paragraphs 31 – 34, *supra*, on November 14, 2005, in

furtherance of the ATM Sales Enterprise, Netschi, while in Texas, engaged in an

interstate telephone conversation with representatives of ATMA in New York during

which he made false representations concerning the operations of ATMFS and 36 Main.

*Predicate Acts and Evidence Concerning Interstate Wire Communications*

157.    On November 14, 2005, at 3:18 p.m., in furtherance of the ATM Sales

Enterprise, ATM Capital, at the direction of Netschi, knowingly transmitted and caused

to be transmitted by wire communication in interstate commerce the following writing:

an e-mail from ATM Capital in Texas to a representative of ATMA in New York, Munier

in New Jersey and Brossman in New Jersey, attaching a schedule of phantom Placed

ATMs and an undated Equipment Management Agreement, each constituting false

information related to the existence of Placed ATMs available for sale and management.

*See* Volume I, Ex. 1.

158.    On November 14, 2005, at 3:19 p.m., in furtherance of the ATM Sales

Enterprise, at the direction of Netschi, knowingly transmitted and caused to be

transmitted by wire communication in interstate commerce the following writing: an e-

mail from ATM Capital in Texas to a representative of ATMA in New York, attaching a

46

Bill of Sale dated November 16, 2005, an Asset Purchase Agreement dated November 16, 2005, and a schedule of phantom Placed ATMs, each constituting false information related to the existence of Placed ATMs available for sale and management. *See* Volume I, Ex. 2.

159.    On November 14, 2005, at 4:17 p.m., in furtherance of the ATM Sales Enterprise, ATM Capital, at the direction of Netschi, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from ATM Capital in Texas to representatives of ATMA in New York, Munier in New Jersey, and Brossman in New Jersey, attaching an undated Equipment Management Agreement, constituting false information related to the existence of Placed ATMs available for sale and management. *See* Volume I, Ex. 3.

160.    On November 30, 2005, at 9:00 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to ATM Capital in Texas, Brossman in New Jersey and Marianne Munier with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 138.

161.    On December 29, 2005, at 7:52 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 138 – Ex. 141.

162.    On January 5, 2006, at 12:15 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 142.

163.    On February 2, 2006, at 9:00 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 143 – Ex. 145.

164.    On February 6, 2006, at 2:38 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 146.

165.    On March 7, 2006, at 10:11 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a

representative of ATMA in New York with an attached Fictitious Revenue Report. *See* Volume XIX, Ex. 147.

166.    On April 27, 2006, at 1:21 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false representations as to ATMFS's possession of $200,000,000.00 in capital funds held in escrow by ATMFS for the expansion of ATMFS's business. *See* Volume XIX, Ex. 148.

167.    On May 2, 2006, at 11:43 a.m., in furtherance of the ATM Sales Enterprise and ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to Brossman in New Jersey and a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 149.

168.    On May 4, 2006, at 1:49 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 150.

169.    On May 31, 2006, at 9:43 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore,

knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to ATM Capital in Texas and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 151.

170.    On May 31, 2006, at 11:13 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 151.

171.    On July 3, 2006, at 2:34 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina, Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 152.

172.    On July 3, 2006, at 4:34 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report *See* Volume XIX, Ex. 152.

173.    On July 4, 2006, at 10:55 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false representations as to the operation of, and potential upgrades to, the ATMA Machines. *See* Volume XIX, Ex. 153.

174.    On July 26, 2006, at 2:31 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false information related to the operation of the ATMA Machines. *See* Volume XIX, Ex. 154.

175.    On July 26, 2006, at 2:53 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false information related to operation of the ATMA Machines. *See* Volume XIX, Ex. 155.

176.    On July 31, 2006, at 3:26 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 156 – Ex. 158.

177.    On August 2, 2006, at 5:28 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 159.

178.    On September 12, 2006, at 10:21 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 160.

179.    On October 6, 2006, at 11:26 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 161 – Ex. 162.

180.    On October 30, 2006, at 11:04 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing a false "ATM Detail Transaction Report." *See* Volume XIX, Ex. 163.

181.    On November 14, 2006, at 11:55 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 164.

182.    On January 19, 2007, at 2:42 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 165 – Ex. 167.

183.    On January 22, 2007, at 11:03 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 168.

184.    On February 26, 2007, at 10:43 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 169.

185.    On April 11, 2007, at 10:49 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a

representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 170.

186.    On April 12, 2007, at 8:38 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York and Brossman in New Jersey containing false information related to the operation of the ATMA Machines. *See* Volume XX, Ex. 171.

187.    On April 30, 2007, at 9:17 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 172 – Ex.174.

188.    On April 30, 2007, at 3:49 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 175.

189.    On June 6, 2007, at 11:33 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report *See* Volume XX, Ex. 176.

190.    On July 12, 2007, at 3:20 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 177 – Ex.179.

191.    On July 12, 2007, at 11:56 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 180.

192.    On August 15, 2007, at 7:58 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 181 – Ex. 182.

193.    On August 15, 2007, at 1:40 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 183.

194.    On September 18, 2007, at 10:34 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in

New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 184.

195.    On November 5, 2007, at 2:33 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 185 – Ex. 186.

196.    On November 5, 2007, at 11:52 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 187.

197.    On January 10, 2008, at 2:38 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 188.

198.    On January 10, 2008, at 3:20 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York, attaching a report from a third-party processor, constituting false information related to the existence of ATMA Machines. *See* Volume XIX, Ex. 90.

199.    On January 11, 2008, at 11:49 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York, attaching a report from a ATMFS, constituting false information related to the existence of ATMA Machines. *See* Volume XIX, Ex. 92.

200.    On January 11, 2008, at 12:34 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false representations that requests had been submitted to third-party processors for reports pertaining to the operation of the ATMA Machines. *See* Volume XIX, Ex. 94.

201.    On January 11, 2008, at 2:14 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing a false representation that a bank account existed where ATMA Periodic Revenue Payments were being held and that a statement from that account would be produced to a representative of ATMA. *See* Volume XIX, Ex. 94.

202.    On January 11, 2008, at 3:19 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York, attaching a

purported bank statement dated December 31, 2007, constituting false information related to the amount of funds being held in escrow on behalf of ATMA. *See* Volume XIX, Ex. 95.

203.    On January 11, 2008, at 7:18 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA containing a misrepresentation that 250 of the ATMA Machines had been identified. *See* Volume XIX, Ex. 93.

204.    On January 18, 2008, at 5:47 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman attaching a purported schedule identifying the locations of the ATMA Machines, constituting false information related to the existence and location of the ATMA Machines. *See* Volume XX, Ex. 189.

205.    On January 20, 2008, at 12:30 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York containing a misrepresentation that Brossman had accounted for the existence of the ATMA Machines. *See* Volume XIX, Ex. 97.

206.    On January 20, 2008, at 9:05 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York containing a false representation as to the existence of ATMs owned by Brossman. *See* Volume XX, Ex. 190.

207.    On January 22, 2008, at 1:23 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York, attaching a schedule identifying the locations of the ATMA Machines, constituting false information related to the existence and location of the ATMA Machines. *See* Volume XX, Ex. 189.

208.    On January 22, 2008, at 2:32 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in North Carolina or Florida to a representative of ATMA in New York, containing a false representation as to the existence and locations of the ATMA Machines. *See* Volume XIX, Ex. 98.

209.    On January 31, 2008, at 3:51 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 138.

210.    On January 31, 2008, at 3:58 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 139.

211.    On January 31, 2008, at 3:59 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 140.

212.    On January 31, 2008, at 4:00 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 143.

213.    On January 31, 2008, at 4:01 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 144.

214.    On January 31, 2008, at 4:05 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 156.

215.    On January 31, 2008, at 4:06 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 157.

216.    On January 31, 2008, at 4:09 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 161.

217.    On January 31, 2008, at 4:10 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 165.

218.    On January 31, 2008, at 4:12 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 172 – Ex. 173.

219.    On January 31, 2008, at 4:20 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 141.

220.    On January 31, 2008, at 4:24 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 158.

221.    On January 31, 2008, at 4:26 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 162.

222.    On January 31, 2008, at 4:30 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 174.

223.    On January 31, 2008, at 4:31 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 179, Ex. 181.

224.    On January 31, 2008, at 4:32 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Exs. 182 and 186.

225.    On January 31, 2008, at 5:03 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 191 – Ex. 192.

226.    On January 31, 2008, at 5:19 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 191.

227.    On January 31, 2008, at 5:20 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 192.

### Violations of 18 U.S.C. § 1341 (Mail Fraud)

228.    The predicate acts, and evidence of the schemes constituting the pattern of racketeering, further include, but are not limited to interstate mailings containing false or

fraudulent pretenses, representations, or promises made in furtherance of the ATM Sales

Enterprise caused to be transmitted by the Defendants, in violation of 18 U.S.C. § 1341.

### *Interstate Mailings*

229.    Upon information and belief, on or about November 15, 2005, in furtherance

of the ATM Sales Enterprise and to induce ATMA to purchase phantom Placed ATMs,

Moore, knowingly placed or caused to be placed in a post office or authorized depository

for the Postal Service in Florida or North Carolina or with a private, commercial

interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey,

the following Fictitious Transaction Documents: a Lease Assignment dated November

15, 2005; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs;

and an Equipment Management Agreement dated November 15, 2005.

230.    Upon information and belief, on or about December 20, 2005, in furtherance

of the ATM Sales Enterprise to induce ATMA to continue to purchase phantom Placed

ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized

depository for the Postal Service in Florida or North Carolina or with a private,

commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in

New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated

December 20, 2005; a Due Diligence Report and Placed ATM Leases for each of the 100

ATMs; and, an Equipment Management Agreement dated December 20, 2005.

231.    Upon information and belief, on or about February 22, 2006, in furtherance of

the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed

ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized

depository for the Postal Service in Florida or North Carolina or with a private,
commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in
New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated
February 22, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100
ATMs; and, an Equipment Management Agreement dated February 22, 2006.

232.    Upon information and belief, on or about April 26, 2006, in furtherance of the
ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed
ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized
depository for the Postal Service in Florida or North Carolina or with a private,
commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in
New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated
April 26, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100
ATMs; an Equipment Management Agreement dated April 26, 2006.

233.    Upon information and belief, on or about May 27, 2006, in furtherance of the
ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed
ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized
depository for the Postal Service in Florida or North Carolina or with a private,
commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in
New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated
May 23, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100
ATMs; and, an Equipment Management Agreement dated May 23, 2006.

234.    Upon information and belief, on or about August 30, 2006, in furtherance of
the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed

ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized

depository for the Postal Service in Florida or North Carolina or with a private,

commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in

New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated

September 5, 2006; a Due Diligence Report and Placed ATM Leases for each of the 127

ATMs; and an Equipment Management Agreement dated September 5, 2006.

235.    Upon information and belief, on or about November 15, 2005, in furtherance

of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom

Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a

post office or authorized depository for the Postal Service in Texas or with a private,

commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the

following Fictitious Transaction Documents: a Bill of Sale dated November 16, 2005,

Asset Purchase Agreement dated November 16, 2005, and Due Diligence Commitment

dated November 16, 2005.

236.    Upon information and belief, on or about December 20, 2005, in furtherance

of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom

Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a

post office or authorized depository for the Postal Service in Texas or with a private,

commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the

following Fictitious Transaction Documents: a Bill of Sale dated December 20, 2005,

Asset Purchase Agreement dated December 20, 2005, and Addition to Equipment dated

December 20, 2005.

237.    Upon information and belief, on or about February 22, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated February 22, 2006, Asset Purchase Agreement dated February 22, 2006, and Addition to Equipment dated December 20, 2005.

238.    Upon information and belief, on or about April 26, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated April 26, 2006, Asset Purchase Agreement dated April 26, 2006, and Addition to Equipment dated April 26, 2006.

239.    Upon information and belief, on or about May 27, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated May 27, 2006, and Asset Purchase Agreement dated May 27, 2006.

240.    Upon information and belief, on or about June 16, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated June 16, 2006, and Asset Purchase Agreement dated June 16, 2006.

241.    Upon information and belief, on or about June 27, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated June 27, 2006, and Asset Purchase Agreement dated June 27, 2006.

242.    Upon information and belief, on or about July 28, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated July 28, 2006, and Asset Purchase Agreement dated July 28, 2006.

243.    Upon information and belief, on or about August 30, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed

ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: four Bills of Sale dated August 30, 2006, and four Asset Purchase Agreements dated August 30, 2006.

244.    Upon information and belief, on or about September 26, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: three Bills of Sale dated September 26, 2006, and three Asset Purchase Agreements dated September 26, 2006.

245.    The allegations in Paragraphs 229 - 244 are likely to have evidentiary support after a reasonable opportunity for investigation and discovery. The allegations in Paragraphs 229 - 244 are based in part upon information and belief because the Defendants are alleged to have sent or delivered the documents identified in Paragraphs 229 - 244 above amongst themselves.

246.    As a direct and proximate result of Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman's conduct of the ATM Sales Enterprise through the pattern of racketeering activity detailed in Paragraphs 114 – 244 above, Plaintiff has been injured in its business and property, specifically the loss of $16,475,000.00 paid to purchase the phantom ATMA Machines. Netschi, 36 Main, Jones, Moore, Exclusive Properties ATM Capital, Munier, and Brossman's conduct and

participation in the ATM Sales Enterprise as part of their pattern of racketeering activity

was in the violation of 18 U.S.C. § 1962(c) and caused Plaintiff's losses. Accordingly,

Plaintiff is entitled, under the provisions of 18 U.S.C. § 1964(c), to recover treble

damages, the costs of bringing this action, pre-judgment interest, and reasonable

attorney's fees.

**COUNT 2**
**(Civil Racketeering Violations – All Defendants)**
**(18 U.S.C. § 1962(d))**

247.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 246 of this Complaint as if fully set forth herein.

248.    The Defendants, as detailed in Paragraphs 26 – 72, 81 and 91 – 104 above,

entered into an agreement with each other to engage in a conspiracy to violate 18 U.S.C.

§ 1962(c). As set forth Each Defendant entered into an agreement to join the conspiracy,

took acts in the furtherance of the conspiracy and knowingly participated in the

conspiracy.

249.    The purpose of the conspiracy was to induce the Plaintiff, and others, to enter

into agreements to purchase phantom Placed ATMs to their economic detriment and to

the economic benefit of the Defendants. The conspirators each carried out the scheme

and each conspirator was put on notice of the general nature of the conspiracy, that the

conspiracy extended beyond the individual role of any single member, and that the

conspiratorial venture, the ATM Sales Enterprise, functioned as a continuing unit for a

common purpose. The Defendants, as conspirators, adopted the goal of furthering the

ATM Sales Enterprise. Each of the Defendants' stake in the ATM Sales Enterprise was

in making profits through each Defendant's role in the ATM Sales Enterprise.

70

250.    The Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by: (1) participating or causing the acquisition or maintenance of, through a pattern of racketeering activity, an interest or control in the ATM Sales Enterprise, the activities of which affect interstate or foreign commerce; and, (2) participating, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

251.    By engaging in the overt acts and other conduct described in Paragraphs 26 – 65 and 84 – 97 above, Defendants have agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d), to engage in illegal predicate acts, detailed in Paragraphs 106 - 237 above, which formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. § 1962(c).

252.    The Defendants participated in and cooperated with each other in the aforementioned conspiracy that enabled Defendants to engage in the fraudulent sale of ATMs and thereby amass substantial sums of money, believed to be tens of millions of dollars, from persons throughout the United States of America, including Plaintiff.

253.    The membership of the conspiracy includes each of the Defendants. As coconspirators, the Defendants are liable for all of the actions committed by all of the coconspirators within the conspiracy and are liable for all of the damages sustained by Plaintiff that were caused by any members of the conspiracy, regardless of whether the Defendants were themselves directly involved in a particular aspect of the ATM Sales Enterprise.

254.    As a direct and proximate result of the violations set forth above, Plaintiff has been injured in its business and property. The Defendants' violations of 18 U.S.C. § 1962(d) were the proximate cause of these losses.  Under the provisions of 18 U.S.C. § 1962(c), Plaintiff is  entitled to bring this action and recover herein treble damages, the cost of bringing this suit, pre-judgment interest, and recoverable attorney's fees.

### COUNT 3
### (Fraudulent Misrepresentation, Inducement – Moore)

255.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 254 of this Complaint as if fully set forth herein.

256.    The representations by Moore, as detailed above at Paragraphs 35, 37, 52, 53, 59, 61 – 64, 66, 68 – 70, 72, 95, 98, 100, 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195 were material false representations made to Plaintiff that Moore knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiff and Plaintiff justifiably relied on Moore's materially false representations.

257.    Moore, as detailed above at Paragraphs 35, 37, 52, 53, 59, 61 – 64, 66, 68 – 70, 72, 95, 98, 100, 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195 made false misrepresentations to Plaintiff of facts that were material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

258.    Moore knew or should have known of: the falsity of the verbal and written representations made to Plaintiff; the incompleteness of the representations made to Plaintiff at the time they were made; and, that the representations made to Plaintiff omitted material facts.

72

259.    Moore's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 35, 37, 52, 53, 59, 61 – 64, 66, 68 – 70, 72, 95, 98, 100, 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195 were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom Placed ATMs from 36 Main, to transfer funds to 36 Main for those phantom Placed ATMs, and to engage the services of ATMFS, through Moore, to manage the ATMA Machines. Moore intentionally or recklessly attempted to hide such fraud by delivering the Moore Fictitious Transaction Documents, Fictitious Monthly Reports, and Periodic Revenue Payments to Plaintiff.

260.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Moore's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines, and conduct business with the ATM Sales Enterprise.

261.    In addition, for Tranche Purchases subsequent to the November 15, 2005 Tranche Purchase, Plaintiff justifiably relied upon and were further induced into continuing to purchase the phantom Placed ATMs by Moore's delivery of Fictitious Monthly Reports and Periodic Revenue Payments.

262.    But for Moore's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

263.    Moore had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

264.    As a direct and proximate result of the Moore's intentional misrepresentations, omissions, and concealment of material facts, Plaintiff has been damaged to the extent that it has lost the value of all principal amounts delivered to 36 Main, plus all applicable interest thereon.

265.    Moore's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiff.  Plaintiff is therefore entitled to the award of punitive damages from Moore.

**COUNT 4**
**(Fraudulent Misrepresentation and Inducement – Netschi)**

266.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 265 of this Complaint as if fully set forth herein.

267.    The representations by Netschi, as detailed above at Paragraphs 31 – 34, 36, 46, 81, 94, and 103, were material false representations made to Plaintiff that Netschi knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiff and Plaintiff reasonably relied on Netschi's materially false representations.

268.    Netschi, as detailed above at Paragraphs 31 – 34, 36, 46, 81, 94, and 103, made false misrepresentations to Plaintiff of facts that were material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

74

269.    Netschi knew or should have known of: the falsity of the verbal and written representations made to Plaintiff; the incompleteness of the representations made to Plaintiff at the time they were made; and, that the representations made to Plaintiff omitted material facts.

270.    Netschi's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 31 – 34, 36, 46, 81, 94, and 103, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom ATMs from 36 Main, to transfer funds to 36 Main for those phantom ATMs, and to engage the services of ATMFS, through Moore, to manage the ATMA Machines. Netschi intentionally or recklessly attempted to hide such fraud by delivering or causing to be delivered the 36 Main Transaction Documents.

271.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Netschi's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

272.    But for Netschi's material misrepresentations, omissions, and concealment of facts concerning the 36 Main Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

273.    Netschi had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

274.    As a direct and proximate result of the Netschi's intentional misrepresentations, omissions, and concealment of material facts, Plaintiff has been damaged to the extent that it has lost the value of all principal amounts delivered to 36 Main, plus all applicable interest thereon.

275.    Netschi's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiff. Plaintiff is therefore entitled to the award of punitive damages from Netschi.

### COUNT 5
### (Fraudulent Misrepresentation, Inducement, Concealment – Brossman)

276.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 275 of this Complaint as if fully set forth herein.

277.    The representations by Brossman, as detailed above at Paragraphs 30, 34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, were material false representations made to Plaintiff that Brossman knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiff and Plaintiff reasonably relied on Brossman's materially false representations.

278.    Brossman, as detailed above at Paragraphs 30, 34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, made false misrepresentations to Plaintiff of facts that were material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

279.    Brossman knew or should have known of: the falsity of the verbal and written representations made to Plaintiff; the incompleteness of the representations made to

Plaintiff at the time they were made; and, that the representations made to Plaintiff omitted material facts.

280.    Brossman's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 30, 34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom ATMs from 36 Main, to transfer funds to 36 Main for those phantom ATMs, and to engage the services of ATMFS, through Brossman, to manage the ATMA Machines. Brossman intentionally or recklessly attempted to hide such fraud by delivering the Fictitious Transaction Documents and/or Fictitious Monthly Reports to Plaintiff.

281.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Brossman's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

282.    But for Brossman's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

283.    Brossman had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

284.    Brossman was under a duty to disclose the facts described in Paragraphs 30,

34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, above and

chose to not do so.

285.    As a direct and proximate result of the Brossman's intentional

misrepresentations, omissions, and concealment of material facts, Plaintiff has been

damaged to the extent that it has lost the value of all principal amounts delivered to 36

Main, plus all applicable interest thereon.

286.    Brossman's conduct was knowing, intentional, engaged in with malice,

demonstrated a complete lack of care, and was made with a conscious disregard for the

rights of Plaintiff.  Plaintiff is therefore entitled to the award of punitive damages from

Brossman.

### COUNT 6
### (Fraudulent Misrepresentation, Inducement, Concealment – Munier)

287.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 286 of this Complaint as if fully set forth herein.

288.    The representations by Munier, as detailed above at Paragraphs 30, 34, 45, 60,

96, 99, 102 and 104, were material false representations made to Plaintiff that Munier

knew were false, or were made recklessly without regard to their truth, with an intent to

defraud Plaintiff, and Plaintiff reasonably relied on Munier's materially false

representations.

289.    Munier, as detailed above at Paragraphs, 30, 34, 45, 60, 96, 99, 102 and 104,

made false misrepresentations to Plaintiff of facts that were material to Plaintiff's

decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the

ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

290.    Munier knew or should have known of: the falsity of the verbal and written representations made to Plaintiff; the incompleteness of the representations made to Plaintiff at the time they were made; and, that the representations made to Plaintiff omitted material facts.

291.    Munier's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 30, 34, 45, 60, 96, 99, 102 and 104 were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom ATMs from 36 Main, to transfer funds to 36 Main for those phantom ATMs, and to engage the services of ATMFS, through Munier, to manage the ATMA Machines. Munier intentionally or recklessly attempted to hide such fraud by delivering the Fictitious Transaction Documents and/or Fictitious Monthly Reports to Plaintiff.

292.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Munier's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

293.    But for Munier's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

294.    Munier had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

295.    Munier was under a duty to disclose the facts described in Paragraphs 30, 34, 45, 60, 96, 99, 102 and 104 above and chose to not do so.

296.    As a direct and proximate result of the Munier's intentional misrepresentations, omissions, and concealment of material facts, Plaintiff has been damaged to the extent that it has lost the value of all principal amounts delivered to 36 Main, plus all applicable interest thereon.

297.    Munier's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiff.  Plaintiff is therefore entitled to the award of punitive damages from Munier.

### COUNT 7
### (Negligent Misrepresentation – 36 Main and Netschi)

298.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 297 of this Complaint as if fully set forth herein.

299.    The representations made by Netschi and 36 Main to Plaintiff in Paragraphs 31 - 34, and 36 above (collectively the "36 Main Misrepresentations") were false when made and material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines and conduct business with the ATM Sales Enterprise.

300.    Netschi and 36 Main were in a superior position to know the truth or falsity of the 36 Main Misrepresentations.

80

301.    Netschi and 36 Main should have known the truth or falsity of the 36 Main Misrepresentations.

302.    Under the circumstances, Netschi and 36 Main were under a duty to ensure the accuracy of the 36 Main Misrepresentations.

303.    Netschi and 36 Main made the 36 Main Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

304.    Netschi and 36 Main intended and were aware that Plaintiff would rely upon the 36 Main Misrepresentations in deciding whether to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines and conduct business with the ATM Sales Enterprise.

305.    Netschi and 36 Main had a pecuniary interest in the ATM Venture and the ATM Sales Enterprise.

306.    Plaintiff reasonably and justifiably relied to their detriment upon the 36 Main Misrepresentations and on the completeness of their disclosure of material facts, in choosing to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise and but for the 36 Main Misrepresentations, Plaintiff would not have entered the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise.

307.    Netschi and 36 Main's breach of their duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

308.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the 36 Main Misrepresentations.

81

309. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the value of all principal amounts delivered to the Defendants, plus all applicable interest thereon.

## COUNT 8
### (Negligent Misrepresentation – Moore)

310. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 309 of this Complaint as if fully set forth herein.

311. The representations made by Moore in Paragraphs 35, 37, and 59 above (collectively the "Moore Misrepresentations") were false when made and material to Plaintiff's decision to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with the ATM Sales Enterprise.

312. Moore was in a superior position to know the truth or falsity of the Moore Misrepresentations.

313. Moore should have known the truth or falsity of the Moore Misrepresentations.

314. Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore Misrepresentations.

315. Moore made the Moore Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

316. Moore intended and was aware that Plaintiff would rely upon the Moore Misrepresentations in deciding whether to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise.

317. Moore had a pecuniary interest in the ATM Venture, the sale of the ATMA Machines by 36 Main and/or the ATM Sales Enterprise.

82

318.    Plaintiff justifiably relied to their detriment upon the Moore
Misrepresentations by entering the ATM Venture, purchasing the ATMA Machines
and/or conducting business with ATM Sales Enterprise and but for the Moore
Misrepresentations, Plaintiff would not have entered the ATM Venture, purchased the
ATMA Machines and/or conducted business with ATM Sales Enterprise.

319.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate
cause of Plaintiff's injuries.

320.    The type and extent of Plaintiff's injuries were reasonably foreseeable results
of the Moore Misrepresentations.

321.    By reason of the foregoing, Plaintiff has been damaged in an amount to be
determined at trial, but not less than the value of all principal amounts delivered to the
Defendants, plus all applicable interest thereon.

## COUNT 9
## (Negligent Misrepresentation – Moore)

322.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs
1 through 321 of this Complaint as if fully set forth herein.

323.    The representations made by Moore, as detailed in Paragraph 52(h) above, in
the undated Due Diligence Report provided to Plaintiff on or about November 16, 2005
(the "Moore November 2005 Due Diligence Misrepresentations") (*See* Volume III, Ex.
11) were false when made and material to Plaintiff's decision to enter into the November
16, 2005 Tranche Purchase.

324.    Moore was in a superior position to know the truth or falsity of the Moore
November 2005 Due Diligence Misrepresentations.

325.    Moore should have known the truth or falsity of the Moore November 2005 Due Diligence Misrepresentations.

326.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore November 2005 Due Diligence Misrepresentations.

327.    Moore made the Moore November 2005 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

328.    Moore intended and was aware that Plaintiff would rely upon the Moore November 2005 Due Diligence Misrepresentations in deciding whether to enter into the November 16, 2005 Tranche Purchase.

329.    Moore had an undisclosed pecuniary interest in the November 16, 2005 Tranche Purchase, because his company, ATMFS, was actually 36 Main's source of the ATMs for the November 16, 2005 Tranche Purchase.

330.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore November 2005 Due Diligence Misrepresentations by entering into the November 16, 2005 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,900,000.00.

331.    But for the Moore November 2005 Due Diligence Misrepresentations, Plaintiff would not have entered the November 16, 2005 Tranche Purchase.

332.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

333.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore November 2005 Due Diligence Misrepresentations.

334.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

### COUNT 10
### (Negligent Misrepresentation – Moore)

335.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 334 of this Complaint as if fully set forth herein.

336.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about December 20, 2005 (the "Moore December 2005 Due Diligence Misrepresentations") (*See* Volume V, Ex. 20) were false when made and material to Plaintiff's decision to enter into the December 20, 2005 Tranche Purchase.

337.    Moore was in a superior position to know the truth or falsity of the Moore December 2005 Due Diligence Misrepresentations.

338.    Moore should have known the truth or falsity of the Moore December 2005 Due Diligence Misrepresentations.

339.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore December 2005 Due Diligence Misrepresentations.

340.    Moore made the Moore December 2005 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

341.    Moore intended and was aware that Plaintiff would rely upon the Moore December 2005 Due Diligence Misrepresentations in deciding whether to enter into the December 20, 2005 Tranche Purchase.

342.    Moore had an undisclosed pecuniary interest in the December 20, 2005
Tranche Purchase, because his company, ATMFS, was actually 36 Main's source of the
ATMs for the December 20, 2005 Tranche Purchase.

343.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore
December 2005 Due Diligence Misrepresentations by entering into the December 20,
2005 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines
for $1,900,000.00.

344.    But for the Moore December 2005 Due Diligence Misrepresentations,
Plaintiff would not have entered the December 20, 2005 Tranche Purchase.

345.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate
cause of Plaintiff's injuries.

346.    The type and extent of Plaintiff's injuries were reasonably foreseeable results
of the Moore December 2005 Due Diligence Misrepresentations.

347.    By reason of the foregoing, Plaintiff has been damaged in an amount to be
determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

### COUNT 11
### (Negligent Misrepresentation – Moore)

348.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs
1 through 347 of this Complaint as if fully set forth herein.

349.    The representations made by Moore, as detailed in Paragraph 52(h) above, in
the Due Diligence Report for the February 22, 2006 Tranche Purchase and provided to
Plaintiff on or about February 22, 2006 (the "Moore February 2006 Due Diligence
Misrepresentations") (*See* Volume VII, Ex. 29) were false when made and material to
Plaintiff's decision to enter into the February 22, 2006 Tranche Purchase.

86

350.    Moore was in a superior position to know the truth or falsity of the Moore February 2006 Due Diligence Misrepresentations.

351.    Moore should have known the truth or falsity of the Moore February 2006 Due Diligence Misrepresentations.

352.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore February 2006 Due Diligence Misrepresentations.

353.    Moore made the Moore February 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

354.    Moore intended and was aware that Plaintiff would rely upon the Moore February 2006 Due Diligence Misrepresentations in deciding whether to enter into the February 22, 2006 Tranche Purchase.

355.    Moore had an undisclosed pecuniary interest in the February 22, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the February 22, 2006 Tranche Purchase.

356.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore February 2006 Due Diligence Misrepresentations by entering into the February 22, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,900,000.00.

357.    But for the Moore February 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the February 22, 2006 Tranche Purchase.

358.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

359.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore February 2006 Due Diligence Misrepresentations.

360.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

### COUNT 12
### (Negligent Misrepresentation – Moore)

361.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 360 of this Complaint as if fully set forth herein.

362.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the Due Diligence Report dated April 26, 2006 (the "Moore April 2006 Due Diligence Misrepresentations") (*See* Volume IX, Ex. 38) were false when made and material to Plaintiff's decision to enter into the April 26, 2006 Tranche Purchase.

363.    Moore was in a superior position to know the truth or falsity of the Moore April 2006 Due Diligence Misrepresentations.

364.    Moore should have known the truth or falsity of the Moore April 2006 Due Diligence Misrepresentations.

365.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore April 2006 Due Diligence Misrepresentations.

366.    Moore made the Moore April 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

367.    Moore intended and was aware that Plaintiff would rely upon the Moore April 2006 Due Diligence Misrepresentations in deciding whether to enter into the April 26, 2006 Tranche Purchase.

368.    Moore had an undisclosed pecuniary interest in the April 26, 2006 Deal because his company, ATMFS, was actually 36 Main's source of the ATMs for the April 26, 2006 Tranche Purchase.

369.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore April 2006 Due Diligence Misrepresentations by entering into the April 26, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,950,000.00.

370.    But for the Moore April 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the April 26, 2006 Tranche Purchase.

371.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

372.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore April 2006 Due Diligence Misrepresentations.

373.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,950,000.00 paid to 36 Main.

### COUNT 13
### (Negligent Misrepresentation – Moore)

374.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 373 of this Complaint as if fully set forth herein.

375.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about May 27, 2006 (the "Moore May 2006 Due Diligence Misrepresentations") (*See* Volume XI, Ex. 45) were false when made and material to Plaintiff's decision to enter into the May 27, 2006 Tranche Purchase.

89

376.    Moore was in a superior position to know the truth or falsity of the Moore May 2006 Due Diligence Misrepresentations.

377.    Moore should have known the truth or falsity of the Moore May 2006 Due Diligence Misrepresentations.

378.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore May 2006 Due Diligence Misrepresentations.

379.    Moore made the Moore May 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

380.    Moore intended and was aware that Plaintiff would rely upon the Moore May 2006 Due Diligence Misrepresentations in deciding whether to enter into the May 27, 2006 Tranche Purchase.

381.    Moore had an undisclosed pecuniary interest in the May 27, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the May 27, 2006 Tranche Purchase.

382.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore May 2006 Due Diligence Misrepresentations by entering into the May 27, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,950,000.00.

383.    But for the Moore May 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the May 27, 2006 Tranche Purchase.

384.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

90

385.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore May 2006 Due Diligence Misrepresentations.

386.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,950,000.00 paid to 36 Main.

### COUNT 14
### (Negligent Misrepresentation – Moore)

387.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 386 of this Complaint as if fully set forth herein.

388.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about June 16, 2006 (the "Moore June 16, 2006 Due Diligence Misrepresentations") (*See* Volume XII, Ex. 52) were false when made and material to Plaintiff's decision to enter into the June 16, 2006 Tranche Purchase.

389.    Moore was in a superior position to know the truth or falsity of the Moore June 16, 2006 Due Diligence Misrepresentations.

390.    Moore should have known the truth or falsity of the Moore June 16, 2006 Due Diligence Misrepresentations.

391.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore June 16, 2006 Due Diligence Misrepresentations.

392.    Moore made the Moore June 16, 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

393.    Moore intended and was aware that Plaintiff would rely upon the Moore June 16, 2006 Due Diligence Misrepresentations in deciding whether to enter into the June 16, 2006 Tranche Purchase.

91

394.    Moore had an undisclosed pecuniary interest in the June 16, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the June 16, 2006 Tranche Purchase.

395.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore June 16, 2006 Due Diligence Misrepresentations by entering into the June 16, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 50 Placed ATM machines for $975,000.00.

396.    But for the Moore June 16, 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the June 16, 2006 Tranche Purchase.

397.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

398.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore June 16, 2006 Due Diligence Misrepresentations.

399.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $975,000.00 paid to 36 Main.

### COUNT 15
### (Negligent Misrepresentation – Moore)

400.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 399 of this Complaint as if fully set forth herein.

401.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about June 27, 2006 (the "Moore June 27, 2006 Due Diligence Misrepresentations") (*See* Volume XIII, Ex. 59) were false when made and material to Plaintiff's decision to enter into the June 27, 2006 Tranche Purchase.

402.    Moore was in a superior position to know the truth or falsity of the Moore June 27, 2006 Due Diligence Misrepresentations.

403.    Moore should have known the truth or falsity of the Moore June 27, 2006 Due Diligence Misrepresentations.

404.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore June 27, 2006 Due Diligence Misrepresentations.

405.    Moore made the Moore June 27, 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

406.    Moore intended and was aware that Plaintiff would rely upon the Moore June 27, 2006 Due Diligence Misrepresentations in deciding whether to enter into the June 27, 2006 Tranche Purchase.

407.    Moore had an undisclosed pecuniary interest in the June 27, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the June 27, 2006 Tranche Purchase.

408.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore June 27, 2006 Due Diligence Misrepresentations by entering into the June 27, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 74 Placed ATM machines for $1,073,000.00.

409.    But for the Moore June 27, 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the June 27, 2006 Tranche Purchase.

410.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

93

411.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore June 27, 2006 Due Diligence Misrepresentations.

412.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,073,000.00 paid to 36 Main.

### COUNT 16
### (Negligent Misrepresentation – Moore)

413.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 412 of this Complaint as if fully set forth herein.

414.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about July 28, 2006 (the "Moore July 2006 Due Diligence Misrepresentations") (*See* Volume XV, Ex. 66) were false when made and material to Plaintiff's decision to enter into the July 28, 2006 Tranche Purchase.

415.    Moore was in a superior position to know the truth or falsity of the Moore July 2006 Due Diligence Misrepresentations.

416.    Moore should have known the truth or falsity of the Moore July 2006 Due Diligence Misrepresentations.

417.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore July 2006 Due Diligence Misrepresentations.

418.    Moore made the Moore July 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

419.    Moore intended and was aware that Plaintiff would rely upon the Moore July 2006 Due Diligence Misrepresentations in deciding whether to enter into the July 28, 2006 Tranche Purchase.

420.    Moore had an undisclosed pecuniary interest in the July 28, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the July 28, 2006 Tranche Purchase.

421.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore July 2006 Due Diligence Misrepresentations by entering into the July 28, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,450,000.00.

422.    But for the Moore July 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the July 28, 2006 Tranche Purchase.

423.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

424.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore July 2006 Due Diligence Misrepresentations.

425.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,450,000.00 paid to 36 Main.

### COUNT 17
### (Breach of Contract – 36 Main)

426.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 425 of this Complaint as if fully set forth herein.

427.    On or about November 16, 2005, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "November 16, 2005 Asset Purchase Agreement") (*See* Volume II, Ex. 5).

428.    Pursuant to the terms of the November 16, 2005 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM machines to ATMA.

429.    On or about November 16, 2005, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

430.    36 Main, in breach of the November 16, 2005 Asset Purchase Agreement failed to perform in accordance with the terms of the November 16, 2005 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the November 16, 2005 Asset Purchase Agreement.

431.    36 Main's conduct detailed above constituted a material breach of the November 16, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

**COUNT 18**
**(Breach of Contract – 36 Main)**

432.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 431 of this Complaint as if fully set forth herein.

433.    On or about December 20, 2005, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "December 20, 2005 Asset Purchase Agreement") (*See* Volume III, Ex. 14).

434.    Pursuant to the terms of the December 20, 2005 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM machines to ATMA.

435.    On or about December 20, 2005, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

96

436.     36 Main, in breach of the December 20, 2005 Asset Purchase Agreement failed to perform in accordance with the terms of the December 20, 2005 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the December 20, 2005 Asset Purchase Agreement.

437.     36 Main's conduct detailed above constituted a material breach of the December 20, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 19
## (Breach of Contract – 36 Main)

438.     Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 437 of this Complaint as if fully set forth herein.

439.     On or about February 22, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "February 22, 2006 Asset Purchase Agreement") (*See* Volume IV, Ex. 23).

440.     Pursuant to the terms of the February 22, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM Machines to ATMA.

441.     On or about February 22, 2006, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

442.     36 Main, in breach of the February 22, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the February 22, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the February 22, 2006 Asset Purchase Agreement.

443.    36 Main's conduct detailed above constituted a material breach of the

February 22, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the

award of the return of the $1,900,000.00 paid to 36 Main.

**COUNT 20**
**(Breach of Contract – 36 Main)**

444.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 443 of this Complaint as if fully set forth herein.

445.    On or about April 26, 2006, ATMA and 36 Main executed an Asset Purchase

Agreement for the purchase of 100 Placed ATM machines (the "April 26, 2006 Asset

Purchase Agreement") (*See* Volume VII, Ex. 32).

446.    Pursuant to the terms of the April 26, 2006 Asset Purchase Agreement, in

exchange for the consideration of $1,950,000.00, 36 Main agreed to sell 100 Placed ATM

Machines to ATMA.

447.    On or about April 26, 2006, ATMA paid $1,950,000.00 to 36 Main via a bank

wire transfer.

448.    36 Main, in breach of the April 26, 2006 Asset Purchase Agreement failed to

perform in accordance with the terms of the April 26, 2006 Asset Purchase Agreement by

failing to deliver valid title to the ATMs listed in Schedule "A" of the April 26, 2006

Asset Purchase Agreement.

449.    36 Main's conduct detailed above constituted a material breach of the April

26, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the

return of the $1,950,000.00 paid to 36 Main.

98

## COUNT 21
## <u>(Breach of Contract – 36 Main)</u>

450.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 449 of this Complaint as if fully set forth herein.

451.    On or about May 27, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "May 27, 2006 Asset Purchase Agreement") (*See* Volume IX, Ex. 41).

452.    Pursuant to the terms of the May 27, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,950,000.00, 36 Main agreed to sell 100 Placed ATM Machines to ATMA.

453.    On or about May 27, 2006, ATMA paid $1,950,000.00 to 36 Main via a bank wire transfer.

454.    36 Main, in breach of the May 27, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the May 27, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the May 27, 2006 Asset Purchase Agreement.

455.    36 Main's conduct detailed above constituted a material breach of the May 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 22
## <u>(Breach of Contract – 36 Main)</u>

456.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 455 of this Complaint as if fully set forth herein.

457.    On or about June 16, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 50 Placed ATM machines (the "June 16, 2006 Asset Purchase Agreement") (*See* Volume XII, Ex. 48).

458.    Pursuant to the terms of the June 16, 2006 Asset Purchase Agreement, in exchange for the consideration of $975,000.00, 36 Main agreed to sell 50 Placed ATM Machines to ATMA.

459.    On or about June 16, 2006, ATMA paid $975,000.00 to 36 Main via a bank wire transfer.

460.    36 Main, in breach of the June 16, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the June 16, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement.

461.    36 Main's conduct detailed above constituted a material breach of the June 16, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 23
### (Breach of Contract – 36 Main)

462.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 461 of this Complaint as if fully set forth herein.

463.    On or about June 27, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 74 Placed ATM machines (the "June 27, 2006 Asset Purchase Agreement") (*See* Volume XIII, Ex. 55).

464. Pursuant to the terms of the June 27, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,073,000.00, 36 Main agreed to sell 74 Placed ATM Machines to ATMA.

465. On or about June 27, 2006, ATMA paid $1,073,000.00 to 36 Main via a bank wire transfer.

466. 36 Main, in breach of the June 27, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the June 27, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the June 27, 2006 Asset Purchase Agreement.

467. 36 Main's conduct detailed above constituted a material breach of the June 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

### COUNT 24
### (Breach of Contract – 36 Main)

468. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 467 of this Complaint as if fully set forth herein.

469. On or about July 28, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 101 Placed ATM machines identified in Schedule A of the Asset Purchase Agreement (the "July 28, 2006 Asset Purchase Agreement") (*See* Volume XIV, Ex. 62).

470. Pursuant to the terms of the July 28, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,450,000.00, 36 Main agreed to sell 101 Placed ATM Machines to ATMA.

471.    On or about July 28, 2006, ATMA paid $1,469,500.00 to 36 Main via a bank wire transfer.

472.    36 Main, in breach of the July 28, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the July 28, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement.

473.    36 Main's conduct detailed above constituted a material breach of the July 28, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

### COUNT 25
### (Breach of Contract – 36 Main)

474.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 473 of this Complaint as if fully set forth herein.

475.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 7 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #1") (*See* Volume XVI, Ex. 69).

476.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #1, in exchange for the consideration of $136,500.00, 36 Main agreed to sell 7 Placed ATM Machines to ATMA.

477.    On or about August 30, 2006, ATMA paid $136,500.00 to 36 Main via a bank wire transfer.

478.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #1 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase

Agreement #1 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1.

479.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $136,500.00 paid to 36 Main.

**COUNT 26**
**(Breach of Contract – 36 Main)**

480.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 479 of this Complaint as if fully set forth herein.

481.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 17 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #2") (*See* Volume XVI, Ex. 71).

482.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #2, in exchange for the consideration of $331,500.00, 36 Main agreed to sell 17 Placed ATM Machines to ATMA.

483.    On or about August 30, 2006, ATMA paid $331,500.00 to 36 Main via a bank wire transfer.

484.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #2 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #2 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #2.

485.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $331,500.00 paid to 36 Main.

103

**COUNT 27**
**(Breach of Contract – 36 Main)**

486.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 485 of this Complaint as if fully set forth herein.

487.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 36 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #3") (*See* Volume XVI, Ex. 73).

488.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #3, in exchange for the consideration of $522,000.00, 36 Main agreed to sell 36 Placed ATM Machines to ATMA.

489.    On or about August 30, 2006, ATMA paid $522,000.00 to 36 Main via a bank wire transfer.

490.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #3 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #3 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3.

491.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $522,000.00 paid to 36 Main.

**COUNT 28**
**(Breach of Contract – 36 Main)**

492.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 491 of this Complaint as if fully set forth herein.

493.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 68 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #4") (*See* Volume XVI, Ex. 75).

494.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #4, in exchange for the consideration of $986,000.00, 36 Main agreed to sell 68 Placed ATM Machines to ATMA.

495.    On or about August 30, 2006, ATMA paid $986,000.00 to 36 Main via a bank wire transfer.

496.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #4 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #4 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4.

497.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #4 and ATMA is therefore entitled to the award of the return of the $986,000.00 paid to 36 Main.

### COUNT 29
### (Breach of Contract – 36 Main)

498.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 497 of this Complaint as if fully set forth herein.

499.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 2 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #1") (*See* Volume XVII, Ex. 82).

500.   Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #1, in exchange for the consideration of $44,000.00, 36 Main agreed to sell 2 Placed ATM machines to ATMA.

501.   On or about September 26, 2006, ATMA paid $44,000.00 to 36 Main via a bank wire transfer.

502.   36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #1 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #1 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1.

503.   36 Main's conduct detailed above constituted a material breach of the September 26, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

### COUNT 30
### (Breach of Contract – 36 Main)

504.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 503 of this Complaint as if fully set forth herein.

505.   On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 21 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #2") (*See* Volume XVII, Ex. 84).

506.   Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #2, in exchange for the consideration of $409,500.00, 36 Main agreed to sell 21 Placed ATM machines to ATMA.

507.   On or about September 26, 2006, ATMA paid $409,500.00 to 36 Main via a bank wire transfer.

106

508.   36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #2 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #2 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2.

509.   36 Main's conduct detailed above constituted a material breach of the September 26, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

## COUNT 31
### (Breach of Contract – 36 Main)

510.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 509 of this Complaint as if fully set forth herein.

511.   On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 64 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #3") (*See* Volume XVII, Ex. 86).

512.   Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #3, in exchange for the consideration of $928,000.00, 36 Main agreed to sell 64 Placed ATM machines to ATMA.

513.   On or about September 26, 2006, ATMA paid $928,000.00 to 36 Main via a bank wire transfer.

514.   36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #3 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #3 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3.

515.   36 Main's conduct detailed above constituted a material breach of the

September 26, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the

award of the return of the $928,000.00 paid to 36 Main.

**COUNT 32**
**(Breach of Warranty – 36 Main)**

516.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 515 of this Complaint as if fully set forth herein.

517.   The November 15, 2005 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

518.   ATMA relied on 36 Main's representations as a condition of the purchase.

519.   36 Main breached the warranty set forth in section 4.5 of the November 15,

2005 Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the November 15, 2005 Asset Purchase

Agreement purchased by ATMA.

520.   36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the November 15, 2005 Asset Purchase Agreement purchased by

ATMA was not good or marketable.

521.   36 Main's conduct breached the warranty stated in the November 15, 2005

Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of

the $1,900,000.00 paid to 36 Main.

108

## COUNT 33
### (Breach of Warranty – 36 Main)

522.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 521 of this Complaint as if fully set forth herein.

523.    The December 20, 2005 Asset Purchase Agreement states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to
the Assets set forth on Schedule A, full authority to sell and transfer same
and that the Assets are in good working condition, and are free and clear
of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
every nature and description.

524.    ATMA relied on 36 Main's representations as a condition of the purchase.

525.    36 Main breached the warranty set forth in section 4.5 of the December 20,

2005 Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the December 20, 2005 Asset Purchase

Agreement purchased by ATMA.

526.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the December 20, 2005 Asset Purchase Agreement purchased by ATMA

was not good or marketable.

527.    36 Main's conduct breached the warranty stated in the December 20, 2005

Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of

the $1,900,000.00 paid to 36 Main.

## COUNT 34
### (Breach of Warranty – 36 Main)

528.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 527 of this Complaint as if fully set forth herein.

529.    The February 22, 2006 Asset Purchase Agreement states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

530.    ATMA relied on 36 Main's representations as a condition of the purchase.

531.    36 Main breached the warranty set forth in section 4.5 of the February 22, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Asset Purchase Agreement purchased by ATMA.

532.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

533.    36 Main's conduct breached the warranty stated in the February 22, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

### COUNT 35
### (Breach of Warranty – 36 Main)

534.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 533 of this Complaint as if fully set forth herein.

535.    The April 26, 2006 Asset Purchase Agreement states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

536.    ATMA relied on 36 Main's representations as a condition of the purchase.

537.    36 Main breached the warranty set forth in section 4.5 of the April 26, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the April 26, 2006 Asset Purchase

Agreement purchased by ATMA.

538.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the April 26, 2006 Asset Purchase Agreement purchased by ATMA was

not good or marketable.

539.    36 Main's conduct breached the warranty stated in the April 26, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$1,950,000.00 paid to 36 Main.

### COUNT 36
### (Breach of Warranty – 36 Main)

540.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 539 of this Complaint as if fully set forth herein.

541.    The May 27, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

542.    ATMA relied on 36 Main's representations as a condition of the purchase.

543.    36 Main breached the warranty set forth in section 4.5 of the May 27, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the May 27, 2006 Asset Purchase

Agreement purchased by ATMA.

544.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the May 27, 2006 Asset Purchase Agreement purchased by ATMA was

not good or marketable.

545.    36 Main's conduct breached the warranty stated in the May 27, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$1,950,000.00 paid to 36 Main.

### COUNT 37
### (Breach of Warranty – 36 Main)

546.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 545 of this Complaint as if fully set forth herein.

547.    The June 16, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

548.    ATMA relied on 36 Main's representations as a condition of the purchase.

549.    36 Main breached the warranty set forth in section 4.5 of the June 16, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 50

Placed ATM machines listed in Schedule "A" of the June 16, 2006 Asset Purchase

Agreement purchased by ATMA.

550.    36 Main was notified that title to the 50 Placed ATM machines listed in

Schedule "A" of the June 16, 2006 Asset Purchase Agreement purchased by ATMA was

not good or marketable.

112

551.    36 Main's conduct breached the warranty stated in the June 16, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$975,000.00 paid to 36 Main.

## COUNT 38
## (Breach of Warranty – 36 Main)

552.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 551 of this Complaint as if fully set forth herein.

553.    The June 27, 2006 Asset Purchase Agreement states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to
the Assets set forth on Schedule A, full authority to sell and transfer same
and that the Assets are in good working condition, and are free and clear
of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
every nature and description.

554.    ATMA relied on 36 Main's representations as a condition of the purchase.

555.    36 Main breached the warranty set forth in section 4.5 of the June 27, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 74

Placed ATM machines listed in Schedule "A" of the June 27, 2006 Asset Purchase

Agreement purchased by ATMA.

556.    36 Main was notified that title to the 74 Placed ATM machines listed in

Schedule "A" of the June 27, 2006 Asset Purchase Agreement purchased by ATMA was

not good or marketable.

557.    36 Main's conduct breached the warranty stated in the June 27, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$1,073,000.00 paid to 36 Main.

113

## COUNT 39
## (Breach of Warranty – 36 Main)

558.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 557 of this Complaint as if fully set forth herein.

559.    The July 28, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

560.    ATMA relied on 36 Main's representations as a condition of the purchase.

561.    36 Main breached the warranty set forth in section 4.5 of the July 28, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 101

Placed ATM machines listed in Schedule "A" of the July 28, 2006 Asset Purchase

Agreement purchased by ATMA.

562.    36 Main was notified that title to the 101 Placed ATM machines listed in

Schedule "A" of the July 28, 2006 Asset Purchase Agreement purchased by ATMA was

not good or marketable.

563.    36 Main's conduct breached the warranty stated in the July 28, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$1,469,500.00 paid to 36 Main.

## COUNT 40
## (Breach of Warranty – 36 Main)

564.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 563 of this Complaint as if fully set forth herein.

565.    The August 30, 2006 Asset Purchase Agreement #1 states at section 4.5 that,

114

4.5. Seller represents and warrants that it has good and marketable title to
the Assets set forth on Schedule A, full authority to sell and transfer same
and that the Assets are in good working condition, and are free and clear
of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
every nature and description.

566.    ATMA relied on 36 Main's representations as a condition of the purchase.

567.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006

Asset Purchase Agreement #1 by failing to deliver good and marketable title to the 7

Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase

Agreement #1 purchased by ATMA.

568.    36 Main was notified that title to the 7 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1 purchased by ATMA

was not good or marketable.

569.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset

Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the

$136,500.00 paid to 36 Main.

## COUNT 41
### (Breach of Warranty – 36 Main)

570.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 569 of this Complaint as if fully set forth herein.

571.    The August 30, 2006 Asset Purchase Agreement #2 states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to
the Assets set forth on Schedule A, full authority to sell and transfer same
and that the Assets are in good working condition, and are free and clear
of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
every nature and description.

572.    ATMA relied on 36 Main's representations as a condition of the purchase.

573.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006

Asset Purchase Agreement #2 by failing to deliver good and marketable title to the 17

Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase

Agreement #2 purchased by ATMA.

574.    36 Main was notified that title to the 17 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Asset Purchase Agreement #2 purchased by ATMA

was not good or marketable.

575.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset

Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the

$331,500.00 paid to 36 Main.

## COUNT 42
### (Breach of Warranty – 36 Main)

576.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 575 of this Complaint as if fully set forth herein.

577.    The August 30, 2006 Asset Purchase Agreement #3 states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to
the Assets set forth on Schedule A, full authority to sell and transfer same
and that the Assets are in good working condition, and are free and clear
of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
every nature and description.

578.    ATMA relied on 36 Main's representations as a condition of the purchase.

579.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006

Asset Purchase Agreement #3 by failing to deliver good and marketable title to the 36

Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase

Agreement #3 purchased by ATMA.

116

580.    36 Main was notified that title to the 36 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3 purchased by ATMA was not good or marketable.

581.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $522,000.00 paid to 36 Main.

## COUNT 43
### (Breach of Warranty – 36 Main)

582.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 581 of this Complaint as if fully set forth herein.

583.    The August 30, 2006 Asset Purchase Agreement #4 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

584.    ATMA relied on 36 Main's representations as a condition of the purchase.

585.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #4 by failing to deliver good and marketable title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4 purchased by ATMA.

586.    36 Main was notified that title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4 purchased by ATMA was not good or marketable.

117

587.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset

Purchase Agreement #4 and ATMA is therefore entitled to the award of the return of the

$986,000.00 paid to 36 Main.

## COUNT 44
### (Breach of Warranty – 36 Main)

588.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 587 of this Complaint as if fully set forth herein.

589.    The September 26, 2006 Asset Purchase Agreement #1 states at section 4.5

that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

590.    ATMA relied on 36 Main's representations as a condition of the purchase.

591.    36 Main breached the warranty set forth in section 4.5 of the September 26,

2006 Asset Purchase Agreement #1 by failing to deliver good and marketable title to the

64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset

Purchase Agreement #1 purchased by ATMA.

592.    36 Main was notified that title to the 2 Placed ATM machines listed in

Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1 purchased by

ATMA was not good or marketable.

593.    36 Main's conduct breached the warranty stated in the September 26, 2006

Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return

of the $44,000.00 paid to 36 Main.

118

## COUNT 45
### (Breach of Warranty – 36 Main)

594.     Plaintiff repeats and re-alleges each and every allegation made in Paragraphs
1 through 593 of this Complaint as if fully set forth herein.

595.     The September 26, 2006 Asset Purchase Agreement #2 states at section 4.5
that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

596.     ATMA relied on 36 Main's representations as a condition of the purchase.

597.     36 Main breached the warranty set forth in section 4.5 of the September 26,
2006 Asset Purchase Agreement #2 by failing to deliver good and marketable title to the
21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset
Purchase Agreement #2 purchased by ATMA.

598.     36 Main was notified that title to the 21 Placed ATM machines listed in
Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2 purchased by
ATMA was not good or marketable.

599.     36 Main's conduct breached the warranty stated in the September 26, 2006
Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return
of the $409,500.00 paid to 36 Main.

## COUNT 46
### (Breach of Warranty – 36 Main)

600.     Plaintiff repeats and re-alleges each and every allegation made in Paragraphs
1 through 599 of this Complaint as if fully set forth herein.

601. The September 26, 2006 Asset Purchase Agreement #3 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

602. ATMA relied on 36 Main's representations as a condition of the purchase.

603. 36 Main breached the warranty set forth in section 4.5 of the September 26, 2006 Asset Purchase Agreement #3 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3 purchased by ATMA.

604. 36 Main was notified that title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3 purchased by ATMA was not good or marketable.

605. 36 Main's conduct breached the warranty stated in the September 26, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $928,000.00 paid to 36 Main.

### COUNT 47
### (Breach of Warranty – 36 Main)

606. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 605 of this Complaint as if fully set forth herein.

607. On or about November 16, 2005, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,900,000.00 (the "November 16, 2005 Bill of Sale").

120

608.    The November 16, 2005 Bill of Sale states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

609.    ATMA relied on 36 Main's representations as a condition of the purchase.

610.    36 Main breached the warranty set forth in the November 16, 2005 Bill of

Sale by failing to deliver good and marketable title to the 100 Placed ATM machines

listed in Schedule "A" of the November 16, 2005 Bill of Sale.

611.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the November 16, 2005 Bill of Sale was not good or marketable.

612.    36 Main's conduct breached the warranty stated in the November 16, 2005

Bill of Sale and ATMA is therefore entitled to the award of the return of the

$1,900,000.00 paid to 36 Main.

### COUNT 48
### (Breach of Warranty – 36 Main)

613.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 612 of this Complaint as if fully set forth herein.

614.    On or about December 20, 2005, ATMA and 36 Main executed Bill of Sale

for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed

ATM machines to ATMA for the sum of $1,900,000.00 (the "December 20, 2005 Bill of

Sale").

615.    The December 20, 2005 Bill of Sale states at the second unnumbered

Paragraph that:

36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

616.    ATMA relied on 36 Main's representations as a condition of the purchase.

617.    36 Main breached the warranty set forth in the December 20, 2005 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the December 20, 2005 Bill of Sale.

618.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the December 20, 2005 Bill of Sale was not good or marketable.

619.    36 Main's conduct breached the warranty stated in the December 20, 2005 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 49
### (Breach of Warranty – 36 Main)

620.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 619 of this Complaint as if fully set forth herein.

621.    On or about February 22, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,900,000.00 (the "February 22, 2006 Bill of Sale").

622.    The February 22, 2006 Bill of Sale states at the second unnumbered Paragraph that:

36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

122

623.    ATMA relied on 36 Main's representations as a condition of the purchase.

624.    36 Main breached the warranty set forth in the February 22, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Bill of Sale.

625.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Bill of Sale was not good or marketable.

626.    36 Main's conduct breached the warranty stated in the February 22, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

### COUNT 50
### (Breach of Warranty – 36 Main)

627.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 626 of this Complaint as if fully set forth herein.

628.    On or about April 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,950,000.00 (the "April 26, 2006 Bill of Sale").

629.    The April 26, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

630.    ATMA relied on 36 Main's representations as a condition of the purchase.

631.    36 Main breached the warranty set forth in the April 26, 2006 Bill of Sale by
failing to deliver good and marketable title to the 100 Placed ATM machines listed in
Schedule "A" of the April 26, 2006 Bill of Sale.

632.    36 Main was notified that title to the 100 Placed ATM machines listed in
Schedule "A" of the April 26, 2006 Bill of Sale was not good or marketable.

633.    36 Main's conduct breached the warranty stated in the April 26, 2006 Bill of
Sale and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid
to 36 Main.

### COUNT 51
### (Breach of Warranty – 36 Main)

634.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs
1 through 633 of this Complaint as if fully set forth herein.

635.    On or about May 27, 2006, ATMA and 36 Main executed Bill of Sale for the
36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM
machines to ATMA for the sum of $1,950,000.00 (the "May 27, 2006 Bill of Sale").

636.    The May 27, 2006 Bill of Sale states at the second unnumbered Paragraph
that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

637.    ATMA relied on 36 Main's representations as a condition of the purchase.

638.    36 Main breached the warranty set forth in the May 27, 2006 Bill of Sale by
failing to deliver good and marketable title to the 100 Placed ATM machines listed in
Schedule "A" of the May 27, 2006 Bill of Sale.

124

639.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Bill of Sale was not good or marketable.

640.    36 Main's conduct breached the warranty stated in the May 27, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

### COUNT 52
### (Breach of Warranty – 36 Main)

641.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 640 of this Complaint as if fully set forth herein.

642.    On or about June 16, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 50 Placed ATM machines to ATMA for the sum of $975,000.00 (the "June 16, 2006 Bill of Sale").

643.    The June 16, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

644.    ATMA relied on 36 Main's representations as a condition of the purchase.

645.    36 Main breached the warranty set forth in the June 16, 2006 Bill of Sale by failing to deliver good and marketable title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Bill of Sale.

646.    36 Main was notified that title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Bill of Sale was not good or marketable.

647.    36 Main's conduct breached the warranty stated in the June 16, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 53
## (Breach of Warranty – 36 Main)

648.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 647 of this Complaint as if fully set forth herein.

649.    On or about June 27, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 74 Placed ATM machines to ATMA for the sum of $1,073,000.00 (the "June 27, 2006 Bill of Sale").

650.    The June 27, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

651.    ATMA relied on 36 Main's representations as a condition of the purchase.

652.    36 Main breached the warranty set forth in the June 27, 2006 Bill of Sale by failing to deliver good and marketable title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Bill of Sale.

653.    36 Main was notified that title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Bill of Sale was not good or marketable.

654.    36 Main's conduct breached the warranty stated in the June 27, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

## COUNT 54
## (Breach of Warranty – 36 Main)

655.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 654 of this Complaint as if fully set forth herein.

656.    On or about July 28, 2006, ATMA and 36 Main executed Bill of Sale for the

36 Main to convey, transfer, sell and assign "right, title and interest" in 101 Placed ATM

machines to ATMA for the sum of $1,469,500.00 (the "July 28, 2006 Bill of Sale").

657.    The July 28, 2006 Bill of Sale states at the second unnumbered Paragraph

that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

658.    ATMA relied on 36 Main's representations as a condition of the purchase.

659.    36 Main breached the warranty set forth in the July 28, 2006 Bill of Sale by

failing to deliver good and marketable title to the 101 Placed ATM machines listed in

Schedule "A" of the July 28, 2006 Bill of Sale.

660.    36 Main was notified that title to the 101 Placed ATM machines listed in

Schedule "A" of the July 28, 2006 Bill of Sale was not good or marketable.

661.    36 Main's conduct breached the warranty stated in the July 28, 2006 Bill of

Sale and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid

to 36 Main.

## COUNT 55
## (Breach of Warranty – 36 Main)

662.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 661 of this Complaint as if fully set forth herein.

663.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for

the 36 Main to convey, transfer, sell and assign "right, title and interest" in 7 Placed

ATM machines to ATMA for the sum of $136,500.00 (the "August 30, 2006 Bill of Sale

#1").

664.    The August 30, 2006 Bill of Sale #1 states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

665.    ATMA relied on 36 Main's representations as a condition of the purchase.

666.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #1

by failing to deliver good and marketable title to the 7 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #1.

667.    36 Main was notified that title to the 7 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #1 was not good or marketable.

668.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of

Sale #1 and ATMA is therefore entitled to the award of the return of the $136,500.00

paid to 36 Main.

### COUNT 56
### (Breach of Warranty – 36 Main)

669.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 668 of this Complaint as if fully set forth herein.

670.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for

the 36 Main to convey, transfer, sell and assign "right, title and interest" in 17 Placed

ATM machines to ATMA for the sum of $331,500.00 (the "August 30, 2006 Bill of Sale #2").

671.    The August 30, 2006 Bill of Sale #2 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

672.    ATMA relied on 36 Main's representations as a condition of the purchase.

673.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #2 by failing to deliver good and marketable title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #2.

674.    36 Main was notified that title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #2 was not good or marketable.

675.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #2 and ATMA is therefore entitled to the award of the return of the $334,500.00 paid to 36 Main.

## COUNT 57
### (Breach of Warranty – 36 Main)

676.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 675 of this Complaint as if fully set forth herein.

677.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 36 Placed ATM machines to ATMA for the sum of $522,000.00 (the "August 30, 2006 Bill of Sale #3").

678.   The August 30, 2006 Bill of Sale #3 states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

679.   ATMA relied on 36 Main's representations as a condition of the purchase.

680.   36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #3

by failing to deliver good and marketable title to the 36 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #3.

681.   36 Main was notified that title to the 36 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #3 was not good or marketable.

682.   36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of

Sale #3 and ATMA is therefore entitled to the award of the return of the $522,000.00

paid to 36 Main.

### COUNT 58
### (Breach of Warranty – 36 Main)

683.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 682 of this Complaint as if fully set forth herein.

684.   On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for

the 36 Main to convey, transfer, sell and assign "right, title and interest" in 68 Placed

ATM machines to ATMA for the sum of $986,000.00 (the "August 30, 2006 Bill of Sale

#4").

685.   The August 30, 2006 Bill of Sale #4 states at the second unnumbered

Paragraph that:

130

36 Main represents and warrants that it has good title to the Assets, full
authority to sell and transfer same and that the Assets are in good working
condition, and are free and clear of all liens, encumbrances, liabilities and
adverse claims, of every nature and description.

686.    ATMA relied on 36 Main's representations as a condition of the purchase.

687.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #4

by failing to deliver good and marketable title to the 68 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #4.

688.    36 Main was notified that title to the 68 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #4 was not good or marketable.

689.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of

Sale #4 and ATMA is therefore entitled to the award of the return of the $986,000.00

paid to 36 Main.

### COUNT 59
### (Breach of Warranty – 36 Main)

690.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 689 of this Complaint as if fully set forth herein.

691.    On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale

for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 2 Placed

ATM machines to ATMA for the sum of $44,000.00 (the "September 26, 2006 Bill of

Sale #1").

692.    The September 26, 2006 Bill of Sale #1 states at the second unnumbered

Paragraph that:

36 Main represents and warrants that it has good title to the Assets, full
authority to sell and transfer same and that the Assets are in good working
condition, and are free and clear of all liens, encumbrances, liabilities and
adverse claims, of every nature and description.

131

693.    ATMA relied on 36 Main's representations as a condition of the purchase.

694.    36 Main breached the warranty set forth in the September 26, 2006 Bill of

Sale #1 by failing to deliver good and marketable title to the 2 Placed ATM machines

listed in Schedule "A" of the September 26, 2006 Bill of Sale #1.

695.    36 Main was notified that title to the 64 Placed ATM machines listed in

Schedule "A" of the September 26, 2006 Bill of Sale #1 was not good or marketable.

696.    36 Main's conduct breached the warranty stated in the September 26, 2006

Bill of Sale #1 and ATMA is therefore entitled to the award of the return of the

$44,000.00 paid to 36 Main.

### COUNT 60
### (Breach of Warranty – 36 Main)

697.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 696 of this Complaint as if fully set forth herein.

698.    On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale

for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 21 Placed

ATM machines to ATMA for the sum of $409,500.00 (the "September 26, 2006 Bill of

Sale #2").

699.    The September 26, 2006 Bill of Sale #2 states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

700.    ATMA relied on 36 Main's representations as a condition of the purchase.

132

701.    36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #2 by failing to deliver good and marketable title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #2.

702.    36 Main was notified that title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #2 was not good or marketable.

703.    36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

## COUNT 61
### (Breach of Warranty – 36 Main)

704.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 703 of this Complaint as if fully set forth herein.

705.    On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 64 Placed ATM machines to ATMA for the sum of $928,000.00 (the "September 26, 2006 Bill of Sale #3").

706.    The September 26, 2006 Bill of Sale #3 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

707.    ATMA relied on 36 Main's representations as a condition of the purchase.

133

708.    36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #3 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #3.

709.    36 Main was notified that title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #3 was not good or marketable.

710.    36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #3 and ATMA is therefore entitled to the award of the return of the $928,000.00 paid to 36 Main.

### COUNT 62
### (Conversion – 36 Main)

711.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 710 of this Complaint as if fully set forth herein.

712.    Plaintiff delivered funds to 36 Main for the sole purpose of purchasing Placed ATM machines as set forth in the Asset Purchase Agreements and Bills of Sale between 36 Main and ATMA.  Plaintiff delivered, via bank wire transfers from ATMA, $16,475,000.00 to 36 Main for the sole purpose of purchasing the ATMA Machines.

713.    36 Main failed to use Plaintiff's funds to purchase the ATMA Machines identified in the schedules attached to the Asset Purchase Agreements and Bills of Sale signed by 36 Main and ATMA.

714.    36 Main utilized the funds delivered by Plaintiff to 36 Main for the purchase of the ATMA Machines for an unauthorized purpose.

715.    36 Main has improperly converted Plaintiff's funds and failed to return the funds to Plaintiff and should be ordered to return the $16,475,000.00 in funds delivered to 36 Main for the purchase of the ATMA Machines.

134

## COUNT 63
### (Unjust Enrichment – 36 Main)

716.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 715 as if fully set forth herein.

717.    By misappropriating Plaintiff's funds delivered to 36 Main designated for the sale of the ATMA Machines, 36 Main obtained the benefit of Plaintiff's capital without returning comparable consideration, specifically the ATMA Machines identified in the schedules attached to the Asset Purchase Agreements and Bills of Sale signed by ATMA and 36 Main.

718.    36 Main acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $16,475,000.00, thereby damaging Plaintiff in the same amount.

719.    36 Main has retained the benefits of Plaintiff's funds under such circumstances that equity and good conscience require 36 Main make restitution to Plaintiff in the amount of the value of the benefits 36 Main acquired from Plaintiff.

## COUNT 64
### (Unjust Enrichment – 36 Main)

720.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 719 as if fully set forth herein.

721.    By misappropriating Plaintiff's funds delivered to 36 Main designated for the payment of Residual Revenue Funds associated with the ATMA Tranche Purchases, 36 Main obtained the benefit of Plaintiff's capital without returning comparable consideration.

135

722.    36 Main acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $209,441.03, thereby damaging Plaintiff in the same amount.

723.    36 Main has retained the benefits of Plaintiff's funds under such circumstances that equity and good conscience require 36 Main make restitution to Plaintiff in the amount of the value of the benefits 36 Main acquired from Plaintiff.

## COUNT 65
## (Unjust Enrichment – ATM Capital)

724.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 723 as if fully set forth herein.

725.    By misappropriating Plaintiff's funds delivered to ATM Capital designated for the payment of Residual Revenue Funds associated with the December 20, 2005 Tranche Purchase, ATM Capital obtained the benefit of Plaintiff's capital without returning comparable consideration.

726.    ATM Capital acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $27,801.71, thereby damaging Plaintiff in the same amount.

727.    ATM Capital has retained the benefits of Plaintiff's funds under such circumstances that equity and good conscience require ATM Capital make restitution to Plaintiff in the amount of the value of the benefits ATM Capital acquired from Plaintiff.

## COUNT 66
## (Breach of Fiduciary Duty – Brossman)

728.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 727 of this Complaint as if fully set forth herein.

136

729.    That Brossman, as a co-chief executive and employee of ATMA has a duty to his employer to act in good faith and in the employer's best interests during the period of the employment. Brossman owed ATMA his undivided and unqualified loyalty during the period of his employment and was prohibited from acting in any manner contrary to the interests of ATMA. As a fiduciary to ATMA, Brossman was required to make truthful and complete disclosures to ATMA and Brossman was forbidden to obtain an improper advantage at ATMA's expense.

730.    While employed at ATMA, Brossman was required to exert his best efforts on behalf of ATMA, and not compete with it or profit at its expense, or place his private interests in conflict with its interests.

731.    Brossman did not act in good faith or in the best interests of ATMA when Brossman: (1) participated in the ATM Sales Enterprise; (2) misrepresented the true nature of the ATM Venture; (3) failed to disclose the non-existence of Placed ATM machines sold by 36 Main to ATMA and others; (4) failed to disclose prior and continuing business relationships Brossman had with Netschi and Moore; (5) failed to disclose prior and continuing business relationships between Netschi and Moore; and (6) knowingly forwarded fraudulent Monthly Reports, and other documents, from Moore to Plaintiff.

732.    As a result of Brossman's acts, ATMA sustained damages and Brossman's acts were a substantial cause of those damages.

733.    Accordingly, ATMA is entitled to recover the actual damages sustained for compensation and expenses that ATMA paid to Brossman during the period of Brossman's disloyalty, profits that Plaintiff lost due to Brossman's disloyalty, and

payment of funds to the ATM Sales Enterprise that Plaintiff lost due to Brossman's disloyalty.

## COUNT 67
## (Breach of Fiduciary Duty – Munier)

734.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 733 of this Complaint as if fully set forth herein.

735.    That Munier, as a co-chief executive and employee of ATMA has a duty to his employer to act in good faith and in the employer's best interests during the period of the employment. Munier owed ATMA his undivided and unqualified loyalty during the period of his employment and was prohibited from acting in any manner contrary to the interests of ATMA. As a fiduciary to ATMA, Munier was required to make truthful and complete disclosures to ATMA and Munier was forbidden to obtain an improper advantage at ATMA's expense.

736.    While employed at ATMA, Munier was required to exert his best efforts on behalf of ATMA, and not compete with it or profit at its expense, or place his private interests in conflict with its interests.

737.    Munier did not act in good faith or in the best interests of ATMA when he: (1) participated in the ATM Sales Enterprise; (2) misrepresented the true nature of the ATM Venture; (3) failed to disclose the non-existence of Placed ATM machines sold by 36 Main to ATMA and others; (4) failed to disclose prior and continuing business relationships Munier had with Netschi and Moore; (5) failed to disclose prior and continuing business relationships between Netschi and Moore; and (6) knowingly forwarded fraudulent Monthly Reports from Moore to Plaintiff.

738.    As a result of Munier's acts, Plaintiff sustained damages and Munier's acts were a substantial cause of those damages.

739.    Accordingly, ATMA is entitled to recover the actual damages sustained for compensation and expenses that ATMA paid to Munier during the period of Munier's disloyalty, profits that Plaintiff lost due to Munier's disloyalty, and payment of funds to the ATM Sales Enterprise that Plaintiff lost due to Munier's disloyalty.

## IX
## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against in their favor and against Defendants as follows:

  i.   on Count 1, damages, including interest, against the Defendants, jointly and severally, the precise amount to be proved at trial but not less that $16,475,000.00 and treble the actual damages pursuant to 18 U.S.C. § 1964(c);

 ii.   on Count 2, damages, including interest, against the Defendants, jointly and severally, the precise amount to be proved at trial but not less that $16,475,000.00 and treble the actual damages pursuant to 18 U.S.C. § 1964(c);

iii.   on Count 3, as against Moore, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

 iv.   on Count 4, as against Netschi, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

  v.   on Count 5, as against Brossman, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

 vi.   on Count 6, as against Munier, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

139

vii.  on Count 7, as against 36 Main and Netschi, jointly and severally, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

viii.  on Count 8, as against Moore, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

ix.  on Count 9, as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

x.  on Count 10, as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xi.  on Count 11 as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xii.  on Count 12, as against Moore, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xiii.  on Count 13, as against Moore, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xiv.  on Count 14, as against Moore, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xv.  on Count 15, as against Moore, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xvi.  on Count 16, as against Moore, in an amount to be determined at trial, but in no event less than $1,450,000.00, together with interest thereon;

xvii.  on Count 17, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xviii.  on Count 18 as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xix.  on Count 19, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xx.  on Count 20, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxi.  on Count 21, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxii.  on Count 22, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xxiii.  on Count 23, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xxiv.  on Count 24, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

xxv.  on Count 25, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

xxvi.  on Count 26, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

xxvii.  on Count 27, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

xxviii.  on Count 28, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

xxix.   on Count 29, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000, together with interest thereon;

xxx.    on Count 30, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

xxxi.   on Count 31, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

xxxii.  on Count 32, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxiii. on Count 33, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxiv.  on Count 34, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxv.   on Count 35, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxxvi.  on Count 36, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxxvii. on Count 37, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xxxviii. on Count 38, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xxxix.  on Count 39, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

xl.  on Count 40, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

xli.  on Count 41, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

xlii.  on Count 42, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

xliii.  on Count 43, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

xliv.  on Count 44, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000.00, together with interest thereon;

xlv.  on Count 45, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

xlvi.  on Count 46, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

xlvii.  on Count 47, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xlviii.  on Count 48, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xlix.  on Count 49, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

l.  on Count 50, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

li.   on Count 51, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

lii.   on Count 52, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

liii.   on Count 53, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

liv.   on Count 54, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

lv.   on Count 55, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

lvi.   on Count 56, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

lvii.   on Count 57, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

lviii.   on Count 58, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

lix.   on Count 59, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000.00, together with interest thereon;

lx.   on Count 60, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

lxi.   on Count 61, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

lxii.  on Count 62, as against 36 Main, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxiii.  on Count 63, as against 36 Main, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxiv.  on Count 64, as against 36 Main, in an amount to be determined at trial, but in no event less than $209,441.03, together with interest thereon;

lxv.  on Count 65, as against ATM Capital, in an amount to be determined at trial, but in no event less than $27,801.71, together with interest thereon;

lxvi.  on Count 66, as against Brossman, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxvii.  on Count 67, as against Munier, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxviii.  awarding Plaintiff punitive damages;

lxix.  awarding Plaintiff their attorneys' fees, costs and disbursements incurred in connection with this action; and,

lxx.  awarding Plaintiff such other and further relief as the Court seems just and proper.

**X**

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury in this action.


Dated:  New York, New York
       August 15, 2008


                                     LANKLER & CARRAGHER, LLP

By:       _____
                    Andrew M. Lankler (AL1202)
                    James W. Versocki (JV6877)
                    Joseph J. Porrovecchio (JP6788)
                    Attorneys for Plaintiff
                    845 Third Avenue, 17th Floor
                    New York, New York 10022
                    alankler@lcattorneys.com
                    jversocki@lcattorneys.com
                    jporrovecchio@lcattorneys.com
                    (212) 812-8910
                    (212) 812-8920 facsimile