UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

Automated Teller Machine Advantage LLC,    :

                                            : Index No. 08 CV 3340 (RMB)(FM)

                    Plaintiffs,     :

        - against -            :

                                              :

Vance Moore, Jr. a/k/a Vance Moore II a/k/a Vance Moore,:

Exclusive Properties Group, Inc., Walter Netschi, 36 Main  :

Street LLC, ATM Capital Inc., Danielle Jones, Alain    :

Brossman a/k/a Harry Brossman, and William Munier,  :

                                              :

                    Defendants.     :

-----------------------------------------------------------------------x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

<table>
<tr><td>

FRANKEL & ABRAMS
230 Park Avenue
New York, New York 10169
Tel: (212) 661-5000
Fax: (212) 661-5007
*Attorneys for Defendants Vance Moore*
*and Exclusive Properties Group, Inc.,*

</td><td>

SPEARS & IMES LLP
51 Madison Avenue, 25th floor
New York, New York 10010
Tel: (212) 213-1715
Fax: (212) 213-0849
*Attorneys for Defendants Walter Netschi, Danielle*
*Jones, 36 Main Street LLC, and ATM Capital Inc.*

</td></tr>
<tr><td>

STILLMAN, FRIEDMAN &
SHECHTMAN, P.C.
425 Park Avenue
New York, New York 10022
Tel: (212) 223-0200
Fax: (212) 223-1942
*Attorneys for Defendant Alain Brossman*

</td><td>

BETTINA SCHEIN, ESQ.
260 Madison Avenue, 20th Floor
New York, New York 10016
Tel: (212) 679-6605
Fax: (212) 448-6273
*Attorneys for Defendant William Munier*

</td></tr>
</table>

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES……………………………………………………...…....iii

INTRODUCTION…..…………………………………………………………………..1

STATEMENT OF FACTS………………………………………………………….....2

    The Alleged ATM Venture……………………………………………………....2

    The Purported Fraudulent Inducement……………………………………………..4

    The ATM Venture Proceeds………………………………………………….........5

ARGUMENT…………………………………………………………………………..7

POINT 1:    THE CIVIL RICO CLAIMS IMPROPERLY RELY
          ON CONDUCT ACTIONABLE AS SECURITIES
          FRAUD…………………………………………………………………..7

    A.    Plaintiff's Attempt to Recast the Pleading to Portray the
          Wolfsons' Investment in the "ATM Venture" as a Mere
          Purchase of Goods Does Not Save Its RICO Claims………………………....8

    B.    The Alleged Investment in the ATM Venture
          Constitutes a Security…………………………………………………….....9

        1.    There was an investment of money in
             the ATM Venture…………………………………………………10

        2.    The ATM Venture was a common enterprise…………………………11

        3.    The expected profits of the ATM Venture were
             to come solely from the efforts of others………………………………12

POINT II:    THE RICO CAUSES OF ACTION MUST BE DISMISSED
          BECAUSE THE PLAINTIFFS HAVE FAILED TO ALLEGE
          A SUFFICIENT PATTERN OR ENTERPRISE……………………………...15

    A.    Plaintiff Fails to Properly Plead a Pattern of Racketeering
          Activity Because they Fail to Allege Close-Ended or
          Open-Ended Continuity…………………………………………………….16

B.     Plaintiff Fails to Plead the Enterprise Element of the RICO Statute Because It Alleges No Entity Separate from the Pattern Acts…………………………………………………………..19

POINT III:    THE PENDENT STATE CLAIMS SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION……………………...20

POINT IV:    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST DEFENDANT EXCLUSIVE PROPERTIES GROUP………………………..22

A.     18 U.S.C. § 1962(c)……………………………………………………...23

B.     18 U.S.C. §1962(d)……………………………………………………24

C.     Fed.R.Civ.P. 9(b)……………………………………………………25

CONCLUSION……………………………………………………………………..25

## TABLE OF AUTHORITIES

**CASES**                                                                                            **PAGE (S)**

*Ahrens v. American-Canadian Beaver Co.,*428 F.2d 926
    (10th Cir. 1970)...................................................................................................14

*Airlines Reporting Corp. v. Aero Voyagers, Inc.,* 721 F. Supp. 579
    (S.D.N.Y. 1989)....................................................................................................18

*Bailey v. J.W.K. Props., Inc.,* 904 F.2d 918 (4th Cir.1990) ...................................15

*Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.,*
    189 F.3d 321 (3d Cir. 1999)................................................................... 9

*Barsam v. Pure Tech Int'l, Inc.,* 864 F. Supp. 1440 (S.D.N.Y. 1994) ...................19

*Cedar Swamp Holdings, Inc., et al., v. Zaman,* 487 F. Supp. 2d 444
    (S.D.N.Y. May 17, 2008)......................................................................16

*Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,* 187 F.3d 229
    (2d Cir. 1999).......................................................................................18

*Congregacion de la Mision Provincia de Venezuela v. Curi,*
    978 F. Supp. 435 (E.D.N.Y. 1997................................................…. 23-24

*Continental Marketing Corp. v. SEC,* 387 F.2d 466 (10th Cir. 1967)...................14

*Continental Realty Corp. v. J.C. Penney Co., Inc.,* 729 F. Supp. 1452
    (S.D.N.Y. 1990)..............................................................................…17-18

*Crab House of Douglaston, Inc. v. Newsday, Inc.,* 418 F. Supp.2d 193
    (E.D.N.Y. 2006).............................................................................…..24-25

*DeFalco v. Berman*, 244 F.3d 286 (2d Cir. 2001) ..............................................15

*Dooner v. NMI Limited*, 725 F. Supp. 153 (S.D.N.Y. 1989) ................................11

*Dubai Islamic Bank v. Citibank, N.A.,* 256 F. Supp. 2d 158 (S.D.N.Y. 2003)............…...16, 23

*Fezzani v. Bear, Sterns & Co., Inc.,* No. 99 Civ. 0793, 2005 WL 500377
    (S.D.N.Y. March 2, 2005)........................................................…..…7, 8

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159
    (2d Cir. 2004)......................................................................................19

*First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763 (2d Cir. 1994)
 *cert. denied*, 513 U.S. 1079 (1995) ..........................................................................13

*GICC Capital Corp. v. Technology Fin. Group, Inc.*, 67 F.3d 463
 (2d Cir. 1995) ....................................................................................................17, 18

*Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027
 (2d Cir. 1974) ................................................................................................................14

*H.G. Heine v. Colton, Hartnick, Yamin & Sheresky,* 786 F. Supp. 360
 (S.D.N.Y. 1992) ...........................................................................................................11

*H.J. Inc. v. Northwestern Bell Telephone Co.* 492 U.S. 229 (1989) ..............................16-17

*Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248
 (S.D.N.Y. 1997) ...........................................................................................................23

*Hemispherx Biopharma, Inc. v. Asensio,* No. Civ. A. 98 5204, 1999 WL 144109,
 (E.D.Pa. Mar. 15, 1999) ...............................................................................................8

*Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 cv 698, 2004 WL 2278545,
 (N.D.Ill. Oct. 8, 2004) .....................................................................................................8

*Howard v. Am. Online, Inc.*, 208 F.3d 741 (9th Cir. 2000) ..............................................8

*In re Enron Corp. Secs., Derivative, & ERISA Litig.*, 284 F. Supp. 2d 511
 (S.D.Tex. 2003) ..............................................................................................................8

*Int'l Audiotext Network, Inc. v. AT&T*, 62 F.3d 69 (2d Cir. 1995) ................................11

*Jordan Bermuda Inv. Co. Ltd. v. Hunter Green Invs. Ltd.,* 154 F. Supp. 2d 682
 (S.D.N.Y. 2001) ...........................................................................................................18

*Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649 (S.D.N.Y.1996) ....................16

*Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971) .........................................................14

*Kirk v. Heppt*, 423 F.Supp.2d 147 (S.D.N.Y. 2006) ........................................................16

*Landy v. Heller, White & Co.*, 783 F. Supp. 125 (S.D.N.Y. 1991) ...........................24-25

*Leung v. Law*, 875 F. Supp. 2d 105 (E.D.N.Y. 2005) ......................................................16

*Menasco, Inc. v. Wasserman,* 886 F.2d 681 (4th Cir.1989) .............................................18

iv

*Murray v. Visiting Nurse Services of N.Y.*, 528 F. Supp. 2d 257
(S.D.N.Y. 2007) ..................................................................................................21

*N.Y. Transp., Inc. v. Naples Transp., Inc.,* 116 F. Supp. 2d 382
(E.D.N.Y. 2000) ..................................................................................................17

*OSRecovery, Inc. v. One Groupe Intern., Inc.*, 354 F. Supp. 2d 357
(S.D.N.Y. 2005) ....................................................................................................9

*Payton v. Flynn*, No. 06 Civ. 465, 2006 WL 3087075 (N.D.Ill. Oct. 26, 2006) ...................8

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ................................................11

*Rodriguez v. City of New York*, 535 F. Supp. 2d 436 (S.D.N.Y. 2008) ...............................21

*Rweyemamu v. Cote*, 520 F.3d 198 (2d Cir. 2008) .....................................................21

*Schnell v. Conseco, Inc.,* 43 F. Supp. 2d 446 (S.D.N.Y. 1999) ......................................17

*Seagrave Corp. v. Vista Resources, Inc.,* 696 F.2d 227 (2d Cir. 1982).................................9

*SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577 (2d Cir. 1982) ...............................14, 15

*SEC v. Energy Group of America, Inc.* 459 F. Supp. 1234 (S.D.N.Y. 1978).............…..10, 11

*SEC v. Galaxy Foods, Inc.,* 417 F. Supp. 1225 (E.D.N.Y. 1976).........................................12

*SEC v. Global Telecom Services L.L.C.*, 325 F. Supp. 2d 94 (D. Conn. 2004)....................12

*SEC v. Payne,* 35 F. Supp. 873 (S.D.N.Y. 1940)...................................................14

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)...............................................9-10, 14

*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479 (1985) ..............................................16

*Shams v. Fisher*, 107 F.Supp.2d 266 (S.D.N.Y. 2000)........................................24

*Stechler v. Sidley, Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580
(S.D.N.Y. 2005)...................................................................................................22

*Tuscano v. Tuscano*, 403 F. Supp. 2d 214 (E.D.N.Y. 2005) ........................…..24, 25

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966) ...............................21

*United States Fire Ins. Co. v. United Limousine Service, Inc.*, 303 F.Supp.2d 432
(S.D.N.Y. 2004)...................................................................................................23

*United States v. Coonan,* 938 F.2d 1553 (2d Cir. 1991) ........................................19

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) …………………………..10, 13, 14-15

*United States v. Turkette,* 452 U.S. 576 (1981)
    *vacated in aid of settlement,* 907 F. Supp. 79 (S.D.N.Y. 1995) ...........................19-20

*United States v. Viola*, 35 F.3d 37 (2nd Cir. 1994) ............................................23

*W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch,* No. 03 Civ. 8606,
    2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004) .........................................16

*Walther v. Maricopa Intern. Inv. Corp.*, No. 97 Civ. 4816, 1998 WL 186736
    (S.D.N.Y. April 17, 1998) ......................................................11

*Watral v. Silvernails Farms, L.L.C.,* 177 F. Supp.2d 141 (E.D.N.Y. 2001) .................17, 18

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.,*
    516 F. Supp.2d 270 (S.D.N.Y. 2007) ............................................21-22

*Yung v. Lee,* 432 F.3d 142 (2d Cir. 2005) ......................................................11

## **STATUTES**

15 U.S.C. § 78j(b) .....................................................................................9

18 U.S.C. § 1341 .......................................................................................6

18 U.S.C. § 1343 .......................................................................................6

18 U.S.C. § 1961, (4) and (5) ...................................................................16, 19

18 U.S.C. §1962(c) and (d)…………………………………………………………..2, 7, 23, 24

18 U.S.C. §1964, (c) ……………………………………………………………...7, 21

28 U.S.C. § 1331 .....................................................................................21

28 U.S.C. § 1332 .....................................................................................21

28 U.S.C. § 1367, (a) and (c)(3) ...............................................................20, 21

Fed.R.Civ.P. 9(b) .....................................................................................25

## <u>INTRODUCTION</u>

Defendants Vance Moore, Jr., Exclusive Properties Group, Inc., Walter Netschi, 36 Main Street LLC, ATM Capital Inc., Danielle Jones, Alain Brossman and William Munier respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint. As set forth below, despite a full opportunity to file an amended pleading that remedied the identified defects in its RICO claims, plaintiff has failed to do so for two central reasons: (1) its claims sound in securities fraud and are therefore absolutely barred by the Private Securities Litigation Reform Act ("PSLRA"); and (2) even if the claims do not sound in securities fraud, they fail to meet the stringent requirements for pleading a valid RICO claim. Because the RICO statute is the sole basis for federal jurisdiction, this case should be dismissed.

After receiving the original Complaint in this matter, defendants advised the then-multiple plaintiffs of the deficiencies in the pleading and the court granted leave to plaintiffs to amend to address the issues raised and to plead securities fraud if they wished. Plaintiffs have not only declined the invitation to plead securities fraud, they responded to the defendants' legal assertions with a transparent attempt to disguise the essence of the action, as framed in the original Complaint. Thus, plaintiff has simply excised from its pleading the 60+ references to themselves as passive "investors" who were deceived by the defendants and suffered more than $15 million in "investment" losses by trusting defendants to deliver the expected profits. Vanished as well are the several "Trust" plaintiffs who, having no expertise or experience in the underlying business of operating Automatic Teller Machines ("ATMs"), funded the investment in alleged reliance on the defendants' promises to do everything necessary to insure steady revenues from the already-placed ATMs. Instead, a single plaintiff now alleges that the scheme did not involve an investment at all, but merely the purchase of goods (the physical ATMs),

closing its eyes to the reality that the purchase was only the first phase of a broader investment vehicle allegedly promoted by defendants -- a vehicle in which the investors did nothing more than sit back and await the fruits of the defendants' work placing the ATMs; leasing, administering, promoting and servicing them; collecting the fees generated; and then distributing the money to the plaintiff's bank account. These features of the transaction bring it within the purview of the securities law. (Point I)

Similarly, plaintiff has failed to cure the pleading defects that doom the RICO claims even if it could be said that no security was conceivably involved. The RICO counts should be dismissed because plaintiff fails properly to plead the continuity, pattern and enterprise requirements of the RICO statute. (Point II) Because plaintiff can state no valid RICO claim, there is no basis for federal jurisdiction and no reason why this Court should retain jurisdiction over the remaining state law claims. (Point III) Finally, in the event that the Court chooses to retain this matter, defendant Exclusive Properties Group, Inc. seeks dismissal because plaintiff states no claim against it. (Point IV)

## STATEMENT OF FACTS

**The Alleged ATM Venture**

Plaintiff's exclusive federal claim is that the defendants violated, and conspired to violate, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), by engaging in a fraudulent scheme to induce it to enter what appeared to be a lucrative chance to profit from the revenues generated by ATMs already installed at various

locations -- machines and locations plaintiff now alleges to have been non-existent. Compl. ¶¶ 2-3, 9-11, 91-104, 109-12.[1]

Plaintiff alleges that defendants approached and offered the Wolfson Group -- a non-plaintiff that manages assets and trusts for members of the Wolfson family -- the opportunity to become parties to a so-called "ATM Venture" that would purchase ATMs at specifically identified locations and receive a return on investment from the monthly revenue generated by those ATMs. Id. ¶¶ 26-27. Interested in the substantial returns from the revenue stream generated by the use of the ATMs, the Wolfsons decided in the fall of 2005 to participate in the ATM Venture through a new limited liability company used solely for this purpose, plaintiff Automated Teller Machine Advantage LLC ("ATMA").[2] Id. ¶¶ 15, 28-29.

According to the Complaint, every aspect of the ATM Venture and ATMA's "day-to-day business and affairs" was handled by the defendants. The Wolfson Group is not alleged to have been involved at all in the business of the ATM Venture. Defendants Brossman and Munier are alleged to have been members and executives of ATMA and to have managed, controlled and operated that company as co-Chief Executives. Compl. ¶¶ 23-24, 41-42, 48. Their responsibilities allegedly included: identifying and vetting potential ATM machines for acquisition; visiting locations where the ATMs were situated; exploring opportunities to enhance the value and performance of the ATMs; reviewing monthly reports delivered by defendant Moore purportedly related to his servicing and revenue collection from the ATMs; reporting to

---

[1] Unless otherwise noted, "Complaint" or "Compl." refers to plaintiff's August 15, 2008 Amended Complaint, a copy of which is annexed as Exhibit B to the Declaration of John B. Harris, dated September 5, 2008 (the "Harris Decl."). Exhibit A to that Declaration is the April 3, 2008 original Complaint filed by multiple plaintiffs.

[2] ATMA was allegedly first formed in November 2004, but conducted no business until November 2005, when the Wolfsons decided to invest in the ATM Venture. Compl. ¶¶ 15, 29.

the ATMA board of managers (which included Brossman); and calculating the prorated share of revenues owed to the previous owner for the portion of the month they owned the machines. *Id.* ¶¶ 39, 43-45, 58. Brossman and Munier received a salary plus additional compensation directly linked to the success of the ATM Venture. *Id.* ¶ 41.

Defendants 36 Main Street LLC ("36 Main") and its principal, Walter Netschi,[3] attempted to find ATM locations to sell to ATMA. *Id.* ¶¶ 19-20, 31. Defendant Moore, through his company ATM Financial Services LLC ("ATMFS"),[4] was allegedly responsible for managing, servicing, collecting and distributing money from the ATMs owned by ATMA. *Id.* ¶¶ 16-18, 31.

**The Purported Fraudulent Inducement**

Plaintiff contends that defendants induced it to purchase non-existent ATMs by making false representations and warranties about those ATMs and delivering misleading documents. Compl. ¶¶ 6-7. The Complaint describes a November 14, 2005 meeting at which defendants allegedly falsely represented that: Netschi and 36 Main were in the business of buying and reselling Placed ATMs[5]; and that Moore, through his company, ATMFS, who performed due diligence to confirm certain performance criteria including transaction history, projected net revenues and the existence of a long-term lease. *Id.* ¶¶ 5, 30-37, 155-56. Plaintiff alleges that it relied on defendants' representations at the November 2005 meeting and a second meeting in

---

[3] Defendant Netschi ("Netschi") allegedly owned and controlled defendants 36 Main and ATM Capital, Inc. ("ATM Capital") and worked with his daughter, defendant Danielle Jones ("Jones"). Compl. ¶ 19-22.

[4] Moore allegedly owned and controlled defendant Exclusive Properties Group ("Exclusive Properties") and the now-bankrupt ATMFS. Compl. ¶¶ 16-18, 78.

[5] "Placed ATMs" – *i.e.*, those that have previously been placed at a location via a lease agreement with a store owner – are more valuable than new ATMs. Compl. ¶ 4.

February 2006 and believed that: (i) 36 Main had purchased Placed ATMs from disinterested third parties; (ii) 36 Main conducted due diligence on the performance criteria; (iii) 36 Main was separate from the business of Moore and ATMFS; and (iv) Moore and ATMFS did not engage in the purchase or sale of ATMs and would provide truthful and accurate reporting of the performance criteria for the ATMs that were part of the ATM Venture. Compl. ¶¶ 32-38, 46, 91-93. These representations are alleged to have been false. The Wolfson Group agreed to invest in the ATM Venture and drafted a limited liability agreement for plaintiff ATMA that same day. *Id.* ¶ 38.

**The ATM Venture Proceeds**

Between November 2005 and September 2006, ATMA allegedly transferred $16,475,000 to 36 Main to acquire already-placed ATMs in 15 "tranches". Compl. ¶¶ 49-50, 114-24. For each tranche, ATMA wired money to 36 Main and/or defendant ATM Capital to purchase ATMs and to make residual revenue payments purportedly representing a prorated share of monthly revenues. *Id.* ¶¶ 56-57, 103, 114-24, 147-54. To further the transaction, some or all of the defendants allegedly created fictitious documents -- including asset purchase agreements, bills of sale, leases, diligence warranties and equipment management agreements -- to make it appear that 36 Main actually owned the ATMs, that they were placed in choice locations, that 36 Main had the right to their revenue stream and had the right to sell them . *Id.* ¶¶ 53-55.

Between December 2005 and November 2007, Moore allegedly emailed monthly reports of the transactional activity of the ATMs to Munier and/or Brossman, who reviewed them in their capacity as ATMA executives. The Complaint alleges that these reports and other communications from Moore regarding the ATM Venture were fictitious or contained false information inflating the transactional activity. Compl. ¶¶ 8, 58-60, 98-99, 112, 160-227, 229-

244. Moore and ATMFS made periodic payments to plaintiff purportedly reflecting revenue generated from the ATM Venture, but this money allegedly came from other sources. *Id*. ¶¶ 61, 100-02, 125-46. Moore and ATMFS stopped making the periodic revenue payments in September 2007 and provided no monthly reports after November 2007. *Id*. ¶¶ 62, 104. Moore and Brossman allegedly made additional misleading statements designed to cover-up the fraud, including false representations that the non-reporting and non-payment stemmed from a problematic software upgrade. *Id*. ¶¶ 63-72, 104. In January 2008, plaintiff's investigative firm purportedly found that certain ATMs were not at their designated locations or, in some instances, were not owned by plaintiff or managed by ATMFS. Compl. ¶¶ 73-74.

In April 2008, plaintiffs -- including ATMA and a group of Trusts -- filed the original Complaint alleging that they were defrauded investors and invoking the federal court's jurisdiction through RICO. Defendants advised the plaintiffs and the Court that they intended to seek to dismiss the initial Complaint because the RICO claim improperly sounded in securities fraud. The Court gave plaintiffs leave to amend to remedy the identified defects and to plead securities fraud if they wished. On August 15, 2008, an Amended Complaint was filed by a single plaintiff alleging no securities fraud and persisting in claiming RICO violations by a so-called "ATM Sales Enterprise," an enterprise purportedly composed of all defendants.

Plaintiff's RICO claims allege that defendants conducted the affairs of that enterprise through a pattern of racketeering activity comprising various acts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, in order to induce plaintiff to enter into the transaction. Complaint ¶¶ 2, 25, 91-254. The remaining counts are New York State common law causes of action alleging: fraudulent misrepresentation and inducement against Moore, Netschi, Brossman and Munier (Counts 3-6); negligent misrepresentation against 36 Main and Netschi (Count 7)

6

and Moore (Count 8-16); breach of contract, breach of warranty, conversion and unjust

enrichment against 36 Main (Counts 17-64); unjust enrichment against ATM Capital (Count 65);

and breach of fiduciary duty against Brossman and Munier (Counts 66-67). Compl. ¶¶ 255-739.

## ARGUMENT

### POINT I

### THE CIVIL RICO CLAIMS IMPROPERLY RELY
### ON CONDUCT ACTIONABLE AS SECURITIES FRAUD

The RICO claims (Counts 1 and 2) do not state a valid claim because they rely upon

conduct that could be actionable as fraud in the purchase or sale of securities. Use of RICO to

remedy securities fraud has been barred since 1995, when the PSLRA amended RICO to read:

> Any person injured in his business or property by reason of a
> violation of section 1962 of this chapter may sue therefor in any
> appropriate United States district court and shall recover threefold
> the damages he sustains and the cost of the suit, including a
> reasonable attorney's fee, except that *no person may rely upon any
> conduct that would have been actionable as fraud in the purchase
> or sale of securities to establish a violation of section 1962*.

18 U.S.C. §1964(c) (emphasis added). The Committee Report accompanying the amendment

stated that Congress intended "that a plaintiff may not plead other specified offenses, such as

mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that

would have been actionable as securities fraud." H.R. Conf. Rep. No. 104-369, at 47 (1995). The

amendment was intended to eliminate "the so-called 'treble-damages blunderbuss of RICO' in

securities fraud cases." *Fezzani v. Bear, Sterns & Co., Inc.*, No. 99 Civ. 0793, 2005 WL 500377,

at *3, *4 (S.D.N.Y. March 2, 2005) (internal quotations and citations removed).

**A.      Plaintiff's Attempt to Recast the Pleading to Portray the Wolfsons' Investment in the "ATM Venture" as a Mere Purchase of Goods Does Not Save Its RICO Claims**

Significantly, the PSLRA bars the assertion of a RICO claim where <u>any of the conduct alleged</u> is actionable as securities fraud, regardless of whether the designated RICO plaintiff itself has standing to bring the claim. *Fezzani*, 2005 WL 500377 at *5; *Howard v. Am. Online, Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (plaintiff who lacked standing to allege securities fraud barred from relying upon the fraud for RICO claim); *Payton v. Flynn*, No. 06 Civ. 465, 2006 WL 3087075, at *8 (N.D.Ill. Oct. 26, 2006) ("[T]he PSLRA bar is based on whether the conduct is actionable as securities fraud, not whether it is actionable by a particular plaintiff."); *Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 Civ. 698, 2004 WL 2278545, at *7 (N.D.Ill. Oct. 8, 2004) (same); *In re Enron Corp. Secs., Derivative, & ERISA Litig.*, 284 F. Supp. 2d 511, 620 (S.D.Tex. 2003) ("The language of the statute does not require that the same plaintiff who sues under RICO must be the one who can sue under the securities laws."); *Hemispherx Biopharma, Inc. v. Asensio,* No. Civ. A. 98 5204, 1999 WL 144109, at *4 (E.D.Pa. Mar. 15, 1999) (same).

Here, in its original Complaint, plaintiff specifically pleaded conduct that was actionable as securities fraud, alleging that the defendants approached the Wolfson Group (the "Plaintiff Trusts" in the original complaint) with an opportunity to invest in the ATM business and that defendants fraudulently induced them to make that investment. *See* Harris Decl. Ex. A, Original Compl. ¶¶ 26-48. In its amended complaint, plaintiff has sought to salvage its RICO claims by simply omitting numerous allegations in the original complaint -- including 64 references to the "investment" or to plaintiffs as "investors" -- and to remove the numerous investor Trusts as plaintiffs. *See* Harris Decl. Ex. C. Plaintiff further tries to change the reality of its pleading through semantics, for example: (a) omitting the prior references to the plaintiffs' investment "in the ATM Venture" -- constituting the full range of defendants' allegedly promised services

8

ranging from ATM placement and leasing to ATM maintenance to revenue collection and distribution -- and replacing it with allegations directed only to plaintiff's <u>purchases</u> of Placed ATMs from 36 Main. *See e.g.* Harris Decl. Ex. C , ¶¶ 26, 28, 31-37; and (b) replacing the heading of the original complaint that trumpeted the "fraudulent inducement" of the investment with the benign "ATMA Enters the ATM Business."[6]

The law is clear that such semantics must be rejected. "[P]laintiffs cannot avoid the PSLRA through artful pleading." *OSRecovery, Inc. v. One Groupe Intern., Inc.*, 354 F. Supp. 2d 357, 369 (S.D.N.Y. 2005). "[A]llowing plaintiffs to engage in 'surgical presentation of the cause of action' would undermine the purpose of the RICO amendment." *Id.* at 369 n. 80 (*quoting Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 329-330 (3d Cir. 1999)). Thus, plaintiff's wordsmithing to omit 60+ references to its "investment," removing the references to the "ATM Venture" so as to suggest that the scheme involved only the purchase of goods and excising the "investor" Trusts as plaintiffs fails to avoid the force of the PSLRA. If the RICO claim relies upon *any* conduct actionable as securities fraud, it must be dismissed regardless of whether this plaintiff -- ATMA -- could have brought such a suit. 15 U.S.C. §78j(b). [7]

**B.     The Alleged Investment in the ATM Venture Constitutes a Security**

Even when an "instrument lacks the ordinarily accepted attributes of stock . . . the court [must] resort to the 'economic realities' test . . . to ascertain whether these instruments may be an uncommon form of securities covered by the Acts like, for example, an investment contract." *Seagrave Corp. v. Vista Resources, Inc.*, 696 F.2d 227, 230 (2d Cir. 1982) (*citing SEC v. W.J.*

---

[6] *See* Harris Decl. Ex. C ¶¶ 1, 2, 4, 5, 9, 10, 12, 26-28, 38, 78, 101, 109, 155, 157-175, 177, 178, 229-244, 249, 252, 264, 274, 285, 296, 309, 321, 739.

[7] Significantly, Counts 3 through 6 of the Amended Complaint, relying on the same allegations as the RICO Counts, still allege fraudulent misrepresentation and inducement against defendants relating to "the ATM Venture." *See* Compl. ¶¶ 257, 268, 278, 289.

9

*Howey Co.*, 328 U.S. 293 (1946)). The economic reality test dictates that a sale of securities exists where there is: [1] an investment of money; [2] in a common enterprise; and [3] profits to come solely from the efforts of others. *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301 (1946). Further, because of the "sheer diversity of LLCs, membership interests therein resist categorical classification." *United States v. Leonard*, 529 F.3d 83, 89 (2d Cir. 2008). As a result, an interest in an LLC, like ATMA investing in the ATMA Venture, "is the sort of instrument that requires 'case-by-case analysis' into the 'economic realities' of the underlying transaction." *Id.* That analysis satisfies the *Howey* test.

### 1.    There was an investment of money in the ATM Venture

Plaintiff alleges that the defendants "offered the Wolfson Group the opportunity to become part of the ATM Venture . . . involv[ing] the use of a limited liability company, known as ATMA, to purchase Placed ATMs, supervise and monitor the management of the Placed ATMs, and thereafter receive monthly revenue generated by the Placed ATMs." Compl. ¶¶ 27-28. This "opportunity to become part of the ATM Venture" was necessarily entered into with the expectation of profit, the standard by which an investment or investment contract is typically measured. *SEC v. Energy Group of America, Inc.,* 459 F. Supp. 1234, 1239 (S.D.N.Y. 1978). The Wolfson Group initially invested $1.9 million with a total commitment of $5 million in ATMA, whose stated purpose was "to acquire, operate and dispose of automated teller machines." *See* Schedule A & §4.2 Limited Liability Company Agreement of ATMA [the "LLC Agreement"], Harris Decl., Ex. D;[8] *See also* Compl. ¶ 38 (describing the formation of the LLC and the decision to invest based on the representations of the defendants).

---

[8] The Court can consider the LLC Agreement on this motion (as well as the employment agreements, discussed below) because the Amended Complaint explicitly incorporates them by reference (*See* Compl. ¶¶ 39-48), and they are part of the investment and employment documents

2.     **The ATM Venture was a common enterprise**

In determining the existence of a "common enterprise," courts examine whether there is "strict vertical commonality." *See Walther v. Maricopa Intern. Inv. Corp.*, No. 97 Civ. 4816, 1998 WL 186736 (S.D.N.Y. April 17, 1998); *H.G. Heine v. Colton, Hartnick, Yamin & Sheresky,* 786 F. Supp. 360, 370 (S.D.N.Y. 1992); *Dooner v. NMI Limited*, 725 F. Supp. 153, 158 (S.D.N.Y. 1989). Strict vertical commonality exists where the fortunes of the investor are tied to the fortunes of the promoter. *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994). That is, "the fortunes of plaintiff and defendant [must be] linked so that they rise and fall together." *Dooner*, 725 F. Supp. at 159. Where the "investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise" a common enterprise exists. *SEC v. Energy Group of America, Inc.*, 459 F. Supp. 1234, 1240 (S.D.N.Y. 1978).

The ATM Venture alleged here fits squarely within the definition of strict vertical commonality. Pursuant to the LLC Agreement, defendants Brossman and Munier each owned a 3% interest in ATMA. *See* Harris Decl., Ex. D, LLC Agreement, Schedule A. Additionally, the employment agreements of Brossman and Munier directly linked increases in their compensation

---

integral to plaintiff's claims. *See Yung v. Lee,* 432 F.3d 142, 146 (2d Cir. 2005) ("In addition to the allegations in the complaint, we also consider on a Rule 12(b)(6) motion . . . 'any statements or documents incorporated in it by reference,' and any document not incorporated but that is, nevertheless, 'integral' to the complaint because the complaint 'relies heavily upon its terms and effect.'") (citations omitted); *Int'l Audiotext Network, Inc. v. AT&T*, 62 F.3d 69, 72 (2d Cir. 1995) ("[T]he complaint is deemed to include . . . any statements or documents incorporated in it by reference . . . . Moreover, when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (quotation marks & citations omitted).

to the success of the investment vehicle. If the revenues generated by the ATMs rose, the salaries

of its co-Chief Executives also went up:

> . . . the Base Salary shall increase to (i) 125,000 if the Company has purchased at
> least 500 ATMs that have generated EBITDA for the Company of at least $2,000
> per machine for six months and (ii) $150,000 if the Company has purchased at
> least 1,000 ATMs that have generated EBITDA for the Company of at least
> $2,000 per machine for six months.

§3(a) Employment Agreements of Brossman and Munier, Harris Decl, Ex. E. Given their interest

in the overall profitability of ATMA arising from their equity interest and the increased salary

and bonus they would gain from maximizing ATMA's revenue stream, the fortunes of these co-

Chief Executives were closely linked to the fortunes of the Wolfson investors.

### 3. The expected profits of the ATM Venture were to come solely from the efforts of others

The third element of the economic realities test is met if the the investors' role is "merely

to provide investment funds" and the business is managed and conducted "without participation

by the investors in the company's daily operations." *SEC v. Global Telecom Services L.L.C.*, 325

F. Supp. 2d 94 (D. Conn. 2004). The "use of the word 'solely' in Howey[], does not foreclose

finding an investment contract in situations where there is some investor participation." *SEC v.

Galaxy Foods, Inc.,* 417 F. Supp. 1225, 1239 (E.D.N.Y. 1976). To satisfy the test, "the efforts by

those other than the investor (should be) the undeniably significant ones . . . which affect the

failure or success of the enterprise." *Id.* (internal quotation marks and citation removed).

Here, as alleged, the undeniably significant efforts of running the ATM Venture were

those of the defendants. Brossman and Munier were co-CEOs of ATMA with all day-to-day

operational functions. Brossman's responsibilities included due diligence, identifying and vetting

potential ATMs and growing the business. Compl. ¶ 44. Munier's job included his receipt and

review of monthly reports detailing the location, transaction activity, monthly costs and

expenses, and net revenue for each ATM. Compl. ¶ 45. Netschi and 36 Main were responsible for "purchasing Placed ATMs from disinterested third party owners" and "conducting due diligence with respect to the Placed ATMs being purchased by 36 Main for later resale." Compl. ¶ 46. Moore, through his company, was responsible for deploying, managing and servicing the ATMs, reporting their transaction activity, collecting revenue and paying out net revenue. Compl. ¶ 17.

Significantly, plaintiff does not identify anything that reflects active day-to-day involvement by any member of the Wolfson Group in the ATM Venture and acknowledges even that plaintiff conducted no independent due diligence. *See* Compl. ¶ 46. Although plaintiff cites language in the LLC Agreement allowing the Wolfsons to appoint two members to ATMA's "board of managers" and claims conclusorily that the board of managers was "actively engaged in the operation and business affairs of ATMA," it does not allege that anyone other than defendants Brossman and Munier acted with respect to the day-to-day management of the business. *See* Compl. ¶¶ 39-48. Indeed, given the allegations that the entire business was a sham, it is implausible that the plaintiff was, in fact, "actively engaged in the operation and business affairs" of an entity that had no business. *See First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir. 1994) *cert. denied,* 513 U.S. 1079 (1995) (Under Rule 12(b)(6) "unwarranted deductions of fact are not admitted . . . [t]his principle applies with even greater force in a fraud case.").

The inference arising from the pleading is that the Wolfsons were -- purely and simply -- interested in the ATM Venture because of the allure of handsome revenue returns generated by the ATM investment. They concededly played no role in the daily operations of the business, allegedly relying on the defendants to handle everything. "[T]he 'economic realities' of the

underlying transaction" demonstrate that the Wolfsons were passive investors relying on others to deliver a profit for them. *Leonard*, 529 F.3d at 89.

Where, as here, "the scheme was being promoted primarily as an investment" and not merely as "a means whereby participants could pool their own activities," the third element of the *Howey* test is satisfied. *SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 582 (2d Cir. 1982). In a similar case, *SEC v. Payne,* 35 F. Supp. 873 (S.D.N.Y. 1940), investors contracted to buy individual silver foxes, but relied upon the seller to care for the animals, sell the fur and deliver the net proceeds to the investors. The buyers acquired title and the right to possess the animals as well as other indicia of ownership (*e.g.*, identifying tattoos on each animal and a recorded bill of sale). In finding that the arrangement was an investment contract, the court held:

> [T]hese purchasers of foxes, while they may have owned the foxes, yet took no part and intended to take no part in their breeding, raising or marketing . . . were not buying animals, but the right to profits to be realized through no effort of their own, through an enterprise run by the defendant . . . .

*Id.*[9] Here, although the Wolfson Group nominally purchased the ATMs and received indicia of ownership and lease placement, they were not involved in any aspect of the day-to-day operations of the ATMs and purchased the ATMs with the expectation that they would receive profits through no active effort of their own.

Other indicia that the ATM Venture constituted a security is that the Wolfsons do not allege that they had any particular experience, knowledge or expertise in the ATM industry, strongly suggesting they had no intention of participating in the management of the enterprise.

---

[9] *See also Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974) (investment contract involving the offer and sale of Scotch whisky warehouse receipts, which evidence ownership of casks of whisky); *Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971) (investment contract involving the sale and upkeep of beavers); *Ahrens v. American-Canadian Beaver Co.*, 428 F.2d 926 (10th Cir. 1970) (same); *Continental Marketing Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967) (same).

*See e.g., Leonard*, 529 F.3d at 90 (investors with "no particular experience in film or entertainment" would have difficulty participating in the management of a company in that industry); *Aqua-Sonic Prods. Corp.,* 687 F.2d at 583-84 (investors with no experience selling dental products would be unlikely to feel capable of undertaking distribution themselves); *Bailey v. J.W.K. Props., Inc.,* 904 F.2d 918, 923-24 (4th Cir.1990) (finding investors had "little to no control over the ultimate success or failure" of their cattle breeding investments where they had contractual authority to direct breeding but no expertise in the area).

Thus, despite a determined effort to draft a new pleading that transformed the economic substance of the ATM Venture, plaintiff has failed to do so. The investment at issue here was a security and plaintiff's allegations that the Wolfsons were fraudulently induced to enter the venture would be actionable as securities fraud. As such, plaintiff's RICO claims are prohibited by the PSLRA and Counts 1 and 2 of the Amended Complaint should be dismissed.

## POINT II

### THE RICO CAUSES OF ACTION MUST BE DISMISSED BECAUSE THE PLAINTIFFS HAVE FAILED TO ALLEGE A SUFFICIENT PATTERN OR ENTERPRISE

The Amended Complaint purports to plead -- in no less than 146 pages -- state law claims of fraud, breach of contract, conversion, unjust enrichment, breach of warranty and breach of fiduciary duty, all by repeating and alleging the same facts. RICO is also pleaded in an obvious attempt to obtain federal jurisdiction over this case and to obtain other benefits and leverage afforded to successful RICO litigants, *e.g.*, treble damages. However, courts in the Second Circuit and beyond have consistently dismissed complaints where, as here, RICO was used merely to bootstrap ordinary fraud or breach of contract cases into "racketeering" cases notwithstanding the absence of the requisite long term continuous criminal conduct that presents

a recurring threat of harm or the type of criminal "enterprise" RICO was designed to address. *See DeFalco v. Berman*, 244 F.3d 286, 306 (2d Cir. 2001).

Courts have frequently stated that a RICO claim "must be reviewed with appreciation of the extreme sanctions it provides, so that actions traditionally brought in state courts do not gain access to treble damages and attorneys fees in federal court simply because they are cast in terms of RICO violations." *Leung v. Law,* 875 F. Supp. 2d 105, 113-14 (E.D.N.Y. 2005). Because putative civil RICO claims are often "nothing more than sheep masquerading in wolves' clothing,'" they should be dismissed at early stages of the litigation. *Kirk v. Heppt,* 423 F. Supp. 2d 147, 150 (S.D.N.Y. 2006), (*quoting W. 79th St. Corp. v. Congregation Kahl Minchas Chinuch,* No. 03 Civ. 8606 (RWS), 2004 WL 2187069 at *5 (S.D.N.Y. Sept. 29, 2004)); *Dubai Islamic Bank v. Citibank, N.A.,* 256 F. Supp. 2d 158, 163 (S.D.N.Y. 2003). Because allegations of RICO violations have a stigmatizing effect on defendants and carry the possibility of treble damages, RICO is an "unusually potent weapon," sometimes referred to as the "litigation equivalent of a thermonuclear device." *Cedar Swamp Holdings, Inc., et al., v. Zaman,* 487 F. Supp. 2d 444 (S.D.N.Y. May 17, 2008) (LAK) (*quoting Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y.1996)).

A.     **Plaintiff Fails to Properly Plead a Pattern of Racketeering Activity Because they Fail to Allege Close-Ended or Open-Ended Continuity**

Although RICO does not define in absolute terms what constitutes a "pattern of racketeering activity," it does set a minimum requirement: proof of "at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). Interpreting the statute, the Supreme Court has stated that "while two acts are necessary, they may not be sufficient." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497 (1985). "It is not the *number* of predicates" that determines whether they constitute a pattern of racketeering activity; rather, it is "the relationship

that they bear to each other or to some external organizing principle." *H.J. Inc. v. Northwestern Bell Telephone Co.* 492 U.S. 229 (1989) The two factors most important in this analysis are continuity and relatedness. *See id.* at 238. "It is this factor of *continuity plus relationship* which combines to produce a pattern." *Id*. at 251 (emphasis in the original).

Continuity can refer "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. As the Supreme Court stated in *H.J. Inc.*, "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time," or by evidence that the acts "include a specific threat of repetition extending indefinitely into the future." *Id.* at 242. Because RICO was intended by Congress to apply only to continuing criminal conduct, therefore "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.*

To determine whether a complaint has properly alleged closed-ended continuity, courts consider a number of factors including the number of alleged victims, the presence of separate schemes, the variety of acts and the length of time over which the alleged predicate acts took place. *GICC Capital Corp. v. Technology Fin. Group, Inc.*, 67 F. 3d 463, 466 (2d Cir. 1995) (*quoting, H.J. Inc.,* 492 U.S. at 241-42). "When calculating the relevant time period, the court considers only the time during which defendants committed the predicate acts alleged." *Watral v. Silvernails Farms, L.L.C.,* 177 F. Supp. 2d 141, 148 (E.D.N.Y. 2001).

Courts in this Circuit have consistently dismissed RICO causes of action where closed-ended continuity was lacking. *See, e.g., N.Y. Transp., Inc. v. Naples Transp., Inc.,* 116 F. Supp. 2d 382, 384 (E.D.N.Y. 2000) (scheme with a single objective and two alleged victims found insufficient); *Schnell v. Conseco, Inc.,* 43 F. Supp. 2d 446 (S.D.N.Y. 1999) (no closed-ended

continuity where only goal of scheme was to obtain control of a public corporation.); *Continental Realty Corp. v. J.C. Penney Co., Inc.*, 729 F. Supp. 1452, 1455 (S.D.N.Y. 1990) (RICO claim dismissed for lack of threat of continuity where repeated fraud acts arose from a single alleged scheme and there was no support for plaintiff's belief that defendants would continue the scheme). *See also Menasco, Inc. v. Wasserman,* 886 F.2d 681, 685 (4th Cir. 1989) (pattern requirement's force is in preventing ordinary commercial fraud from becoming a RICO claim).

The Second Circuit has not permitted a civil RICO complaint to stand where the predicate acts are alleged to have occurred over less than two years. *See Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999); *GICC Capital Corp. v. Tech. Fin., Group, Inc.*, 67 F.3d 463, 467 (2d Cir. 1995); *Watral v. Silvernails Farms, L.L.C.*, 177 F. Supp. 2d 141, 149 (E.D.N.Y. 2001) (scheme alleged between 1998 and September 1999 is plainly insufficient); *Jordan Bermuda Inv. Co. Ltd. v. Hunter Green Invs. Ltd.,* 154 F. Supp. 2d 682 (S.D.N.Y. 2001) (22 months insufficient to satisfy the continuity requirement); *Airlines Reporting Corp. v. Aero Voyagers, Inc.,* 721 F. Supp. 579, 584-585 (S.D.N.Y. 1989) (almost 50 acts of mail fraud over 13 months insufficient to sustain RICO claim).

Here, plaintiff alleges an "ATM Sales Enterprise scheme" Compl. ¶ 25. In essence, this Sales Enterprise scheme involves a single fraudulent scheme to obtain investment funds from the Wolfsons and their Trusts. The allegations do not satisfy the closed-ended continuity requirement because, as the Complaint alleges at ¶¶ 27-30, the initial predicate acts occurred at the November 14, 2005 meeting at the Wolfson offices in New York, prompting the Wolfson Trusts to make their first investment in the ATM Venture two days later. They made nine additional investments between December 12, 2005 until September 29, 2006, each allegedly induced by predicate acts of alleged mail and wire fraud. Compl. ¶¶ 49-50, 109. Thus, even

accepting these allegations as true, the predicate acts that induced the claimed loss spanned less than 10 months.

Plaintiff attempts to extend the continuity period by citing alleged predicate acts of fraud after the September 2006 investment, which supposedly delayed discovery of the scheme, *e.g.*, statements in 2007 falsely explaining why the monthly reports were late. But the law is clear that efforts to cover up prior fraudulent inducement do not extend the alleged scheme beyond September 26, 2006 and do not count as valid RICO predicate acts. *See Barsam v. Pure Tech Int'l, Inc.,* 864 F. Supp. 1440, 1450 (S.D.N.Y. 1994) *vacated in aid of settlement,* 907 F. Supp. 79 (S.D.N.Y. 1995) (closed-ended allegations of RICO violations to cover up the initial fraudulent act were inadequate to satisfy the continuity requirement of the RICO statute); *World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc*., 530 F. Supp. 2d 486, 512 (S.D.N.Y. 2007) (concealment allegations fail to extend the pattern of racketeering acts).

**B.       Plaintiff Fails to Plead the Enterprise Element of the RICO Statute Because It Alleges No Entity Separate from the Pattern Acts**

An "enterprise," for RICO purposes, is defined to include any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has explained that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proved "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583; *accord First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 173 (2d Cir.2004). Where a complaint alleges an association-in-fact enterprise, courts in this Circuit look to the "hierarchy, organization, and activities" of the association to determine whether "its members functioned as a unit." *United*

*States v. Coonan,* 938 F.2d 1553, 1560-61 (2d Cir. 1991). Accordingly, merely stringing together a list of defendants and labeling them an enterprise is insufficient to state a RICO claim.

In order to properly plead RICO, a pleading must separately allege the existence of both an "enterprise" and the alleged "pattern of racketeering activity" through which the affairs of the enterprise are conducted. *See, e.g. United States v. Turkette*, 452 U.S. 576 (1981). Here, the complaint simply groups together the individuals and entities and calls them "the ATM Sales Enterprise" without identifying any structure and alleges no separation between the alleged "enterprise" and the predicate acts comprising the alleged scheme. *See* Compl. ¶ 25. The absence of separation is well-illustrated by the use of the same label -- ATM Sales Enterprise -- to define the alleged scheme (as well as the basis for the pleading of breach of contract and other state causes of action) and in describing the predicate acts that allegedly constitute the scheme. *See* Compl. ¶ 92, Counts 3-66.

Put differently, the "enterprise" cannot be the "pattern of racketeering activity"; it must be alleged to be an entity separate from the pattern of activity in which it engages. Here, the pleading lists garden variety fraud, breach of contract and fiduciary duty claims and merely identifies the individuals who plaintiff believes committed these acts. This does not constitute an "enterprise" and these allegations cannot be woven together into a RICO complaint in order to gain federal jurisdiction and RICO penalties. Accordingly, the RICO counts should be dismissed in their entirety.

## POINT III

### THE PENDENT STATE CLAIMS SHOULD BE DISMISSED
### FOR LACK OF SUBJECT MATTER JURISDICTION

To obtain federal subject matter jurisdiction over its state law claims (*i.e.*, Counts 3-67), plaintiff relies on 28 U.S.C. § 1367(a), which permits trial courts to exercise supplemental

jurisdiction "in any civil action of which the district courts have original jurisdiction" over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."[10] Such jurisdiction is "a doctrine of discretion, not of plaintiff's right." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). Accordingly, the district court "may decline to exercise supplemental jurisdiction" over state claims if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

When federal claims are dismissed at an early stage, the court should decline to hear supplemental state law claims and instead dismiss the case. *See, e.g., United Mine Workers*, 383 U.S. at 726 ("if the federal claims are dismissed before trial . . . the state claims should be dismissed as well); *Rweyemamu v. Cote*, 520 F.3d 198, 210 (2d Cir. 2008) (affirming dismissal of entire complaint where federal claim was dismissed and district court "had no reason to exercise supplemental jurisdiction over [plaintiff's] state-law claims"). Here, defendants have moved to dismiss at the outset of the litigation. There has been little discovery, no motions (aside from this one) and no judicial decisions. *See, e.g., Rodriguez v. City of New York*, 535 F. Supp. 2d 436, 444 (S.D.N.Y. 2008) (Kaplan, J.) (declining to exercise supplemental jurisdiction where "[p]laintiffs likely have not expended a substantial amount of time, resources, or effort developing their state law claims independent of their federal claims because both are based on the same underlying facts.") Plaintiffs can claim no prejudice from dismissal. *See Murray v. Visiting Nurse Services of N.Y.*, 528 F. Supp. 2d 257, 281 (S.D.N.Y. 2007) (Sullivan, J.). Accordingly, the Court should decline to exercise supplemental jurisdiction over plaintiffs' state

---

[10] Plaintiffs allege only federal question jurisdiction under RICO, 18 U.S.C. § 1964 and 28 U.S.C. § 1331, *see* Compl. ¶ 13; they do not – and cannot – allege diversity jurisdiction pursuant to 28 U.S.C. § 1332. *Id.* ¶¶ 14-25.

law claims and dismiss the complaint in its entirety. *See, e.g., Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.,* 516 F. Supp. 2d 270, 297 (S.D.N.Y. 2007) (Castel, J.) (holding that it "is a 'usual case' in which the balance of factors counsels in favor of declining supplemental jurisdiction" where motion to dismiss federal claims was granted ten months after complaint filed); *Stechler v. Sidley, Austin Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580 (S.D.N.Y. 2005) (Scheindlin, J.) (declining to exercise supplemental jurisdiction over state law claims following dismissal of RICO claims).

## POINT IV

### PLAINTIFFS FAIL TO STATE A CLAIM AGAINST DEFENDANT EXCLUSIVE PROPERTIES GROUP

The allegations against defendant Exclusive Properties Group ("Exclusive") are conclusory and, therefore, inadequately pleaded. They should be dismissed.

Plaintiff's otherwise massively detailed Complaint is devoid of substantive factual allegations regarding Exclusive. In the section of the pleading alleging various acts of wire fraud, ¶¶ 147-227, there are no allegations of any payments to Exclusive, and no allegations of wire fraud by Exclusive. In the section of the pleading alleging various acts of mail fraud, ¶¶ 228-246, there are no allegations of any participation by Exclusive in mail fraud. Plaintiff does not allege that Exclusive made any profits or even received any income from the RICO enterprise. Exclusive is named as a defendant only in the two RICO counts; Counts 3 through 67 of the Complaint -- the state law state claims -- are not asserted against Exclusive.

Plaintiff recites, in incantatory fashion, the language of the RICO statute in its allegations against Exclusive, but offers no substantive factual allegations to support those conclusions. The only specific allegations against Exclusive are that on three occasions co-defendant Moore "caused" Exclusive to wire transfer funds to plaintiff's account at Citibank in New York in the

22

aggregate amount of $422,382.50. Compl. ¶¶ 141, 142, and 144. Even these token allegations against Exclusive are undermined in Count 3 of the Complaint where, at ¶¶ 259 and 261, plaintiff alleges that Moore, not Exclusive, was responsible for delivering Periodic Revenue Payments to plaintiff in an attempt to conceal a fraud. For several reasons, these allegations are simply insufficient to sustain a RICO claim against Exclusive.

A.      **18 U.S.C. § 1962(c)**

To state a claim under §1962(c), a plaintiff must allege that the defendant had some part in directing the "operation or management" of the alleged RICO enterprise. *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003) (citations omitted). In the Second Circuit, the "operation and management" test is "an extremely rigorous test." *United States Fire Ins. Co. v. United Limousine Service, Inc.*, 303 F. Supp. 2d 432, 451 (S.D.N.Y. 2004) (citations omitted). Merely providing services essential to the operation of the alleged RICO scheme is not sufficient. *Dubai Islamic Bank*, 256 F. Supp. 2d at 164 (collecting cases).

Here, plaintiff has not made any substantive allegations about Exclusive conducting the operation and management of the alleged RICO enterprise. The allegations as to Exclusive amount to no more than the provision of services -- acting as a conduit for payments to plaintiff -- and are thus insufficient to survive a motion to dismiss. *United States v. Viola*, 35 F.3d 37, 41 (2nd Cir. 1994) (janitor who performed menial tasks for central figure in conspiracy and who on two occasions agreed to sell goods for central figure knowing those goods were stolen, not liable under RICO); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248, 254 (S.D.N.Y. 1997) (plaintiffs' claims under §1962(c) dismissed because plaintiffs did not allege or present facts permitting a rational inference that defendants participated in the "operation or management" of a RICO enterprise); *Congregacion de la Mision Provincia de Venezuela v.*

*Curi*, 978 F. Supp. 435, 448-449 (E.D.N.Y. 1997) (defendants' mailing of intermittent mortgage payments to co-defendant did not constitute "operation or management" of the RICO enterprise).

**B.      18 U.S.C. §1962(d)**

Plaintiff's claim under §1962(d) fails as a matter of law if, as set forth above, the substantive claims based on the other sections of §1962 are defective. *Crab House of Douglaston, Inc. v. Newsday, Inc.,* 418 F. Supp. 2d 193, 212 (E.D.N.Y. 2006); *Tuscano v. Tuscano*, 403 F. Supp. 2d 214, 229 (E.D.N.Y. 2005). However, plaintiff's claim against Exclusive also fails even if the defective pleading of the §1962 substantive claims are not considered.

The Complaint makes only conclusory allegations regarding Exclusive's agreement to become part of a RICO conspiracy. Such allegations are insufficient to state a claim under §1962(d). *Tuscano*, 403 F. Supp. 2d at 229 (collecting cases). Nor is mere use of the term "conspiracy" in the Complaint a sufficient factual allegation of a defendant's agreement to participate in a RICO conspiracy. *Landy v. Heller, White & Co.*, 783 F. Supp. 125, 132 (S.D.N.Y. 1991). Exclusive's close association with those involved in the alleged RICO enterprise is an insufficient basis from which an inference of conspiracy can be drawn. *Shams v. Fisher*, 107 F. Supp. 2d 266, 278 (S.D.N.Y. 2000). Nor is Exclusive's alleged activity in forwarding payments to plaintiff at the request of Moore a sufficient basis for assertion of a claim under §1962(d) against Exclusive. *Shams*, 107 F. Supp. 2d at 277-279 (evidence that brother-in-law of alleged central figure in RICO enterprise performed bookkeeping services limited to signing checks at request of central figure or central figure's partner insufficient to establish that brother-in-law was part of conspiracy to defraud investors); *Landy*, 783 F. Supp. at 132 (defendant's provision of a limited number of reports for use by principals in the alleged

enterprise is an insufficient basis to infer that defendant had consciously agreed to engage in a RICO conspiracy).

## C.    Fed.R.Civ.P. 9(b)

The Complaint should also be dismissed as to Exclusive because it fails to meet the basic standards for pleading fraud under Fed.R.Civ.P. 9(b). Rule 9(b) requires that in all allegations of fraud " . . . the circumstances constituting the fraud . . . must [be stated] with particularity." Conclusory allegations that a defendant's conduct was fraudulent or deceptive, which is all that the Complaint contains as to Exclusive, are not sufficient to satisfy Rule 9(b)'s requirement of particularity. *Tuscano*, 403 F. Supp. 2d at 221. Further, where, as here, the fraud allegations apply to multiple defendants, Rule 9(b) requires that the plaintiff allege facts specifying each defendant's contribution to the fraud. *Tuscano*, 403 F. Supp. 2d at 221. Plaintiff fails to provide any detailed factual allegations as to Exclusive's fraudulent conduct and, for that reason alone, this RICO action against it should be dismissed. *Crab House*, 418 F. Supp. 2d at 211. As noted, the portions of the Complaint regarding mail and wire fraud contain no allegations of conduct by Exclusive. The mere forwarding of payments to plaintiff's bank account can hardly be qualified as fraudulent conduct, unless Exclusive is also alleged to have made some representation regarding those payments. Plaintiff does not allege that Exclusive made any fraudulent representations regarding those payments and thus fails to satisfy Fed.R.Civ.P. 9(b).

## <u>CONCLUSION</u>

For all of these reasons, the Amended Complaint should be dismissed with prejudice.

Dated: New York, New York
       September 5, 2008

FRANKEL & ABRAMS


 /s Stuart E. Abrams (with consent)
By:     Stuart E. Abrams
230 Park Avenue
New York, New York 10169
Tel: (212) 661-5000
Fax: (212) 661-5007

*Attorneys for Defendants Vance Moore and Exclusive Properties Group, Inc.,*


SPEARS & IMES LLP


 /s Debra A. Karlstein (with consent)
By:     David Spears
        Debra A. Karlstein
51 Madison Avenue, 25th floor
New York, New York 10010
Tel: (212) 213-1715
Fax: (212) 213-0849

*Attorneys for Defendants Walter Netschi, Danielle Jones, 36 Main Street LLC, and ATM Capital Inc.*


STILLMAN, FRIEDMAN & SHECHTMAN, P.C.


/s John B. Harris_____
By:     John B. Harris
425 Park Avenue
New York, New York 10022
Tel: (212) 223-0200
Fax: (212) 223-1942

*Attorneys for Defendant Alain Brossman*

26

BETTINA SCHEIN, ESQ.


 /s Bettina Schein (with consent)
260 Madison Avenue, 20th Floor
New York, New York 10016
Tel: (212) 679-6605
Fax: (212) 448-6273

*Attorneys for Defendant William Munier*