UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

Automated Teller Machine Advantage LLC, The Abraham  :
Wolfson 1983 Trust, The Aaron Wolfson 1983 Trust,    : Index No. 08 CV 3340 (RMB)(FM)
The Aliza Wolfson Safier 1983 Trust, The Rebecca     :
Wolfson Wolmark 1983 Trust, The Daniel Wolfson    : **DECLARATION**
1983 Trust, and The Elisheva Wolfson 1983 Trust,    :
                                    Plaintiffs,   :

- against -                                  :
                                             :
Vance Moore, Jr. a/k/a Vance Moore II a/k/a Vance Moore,:
Exclusive Properties Group, Inc., Walter Netschi, 36 Main  :
Street LLC, ATM Capital Inc., Danielle Jones, Alain     :
Brossman a/k/a Harry Brossman, and William Munier,   :
                               Defendants.   :

----------------------------------------------------------------------x

      John B. Harris, Esq., an attorney duly admitted to practice law in the Courts of New York, hereby affirms under penalty of perjury pursuant to 28 U.S.C. § 1746:

      1.     I am a member of the law firm of Stillman, Friedman & Shechtman, P.C., attorneys for defendant Alain Brossman and a member of the Bar of this Court. I make this declaration in support of the motion to dismiss for failure to state a claim brought by all defendants.

      2.     Annexed hereto as Exhibit A is a true and accurate copy of plaintiffs' original Complaint dated April 3, 2008.

      3.     Annexed hereto as Exhibit B is a true and accurate copy of plaintiff's Amended Complaint dated August 15, 2008.

      4.     Annexed hereto as Exhibit C is a true and accurate copy of a redline comparison provided by plaintiff to defendants (at defendants' request) showing the changes between the original Complaint and the Amended Complaint.

5.     Annexed hereto as Exhibit D is a true and accurate copy of the Limited Liability Company Agreement of Automated Teller Machine Advantage referenced in, but not attached to, the Amended Complaint.

6.     Annexed hereto as Exhibit E are the Automated Teller Machine Advantage employment agreements of defendants Brossman and Munier, referenced in, but not attached to, the Amended Complaint.


Dated: New York, New York
          September 5, 2008


                              /s John B. Harris
                              John B. Harris

Exhibit A

(Part 1 of 3)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

| | |
|---|---|
| Automated Teller Machine Advantage LLC, The Abraham Wolfson 1983 Trust, The Aaron Wolfson 1983 Trust, The Aliza Wolfson Safier 1983 Trust, The Rebecca Wolfson Wolmark 1983 Trust, The Daniel Wolfson 1983 Trust, and The Elisheva Wolfson 1983 Trust, | : : : : : : : : |

          : Index No. : 08-CV-3340(RMB)(FM)(ECF)

          : **COMPLAINT**

          Plaintiffs Demand a Trial By Jury

                                        Plaintiffs, :

  - against -                             :

Vance Moore, Jr. a/k/a Vance Moore II a/k/a Vance Moore, Exclusive Properties Group, Inc., Walter Netschi, 36 Main Street LLC, ATM Capital Inc., Danielle Jones, Alain Brossman a/k/a Harry Brossman, and William Munier,

                                  Defendants. :

---------------------------------------------------------------- x

       Plaintiffs, Automated Teller Machine Advantage LLC ("ATMA"), The Abraham

Wolfson 1983 Trust, The Aaron Wolfson 1983 Trust, The Aliza Wolfson Safier 1983

Trust, The Rebecca Wolfson Wolmark 1983 Trust, The Daniel Wolfson 1983 Trust and

The Elisheva Wolfson 1983 Trust (the "Plaintiff Trusts") (hereinafter collectively

referred to as the "Plaintiffs"), by their attorneys, Lankler & Carragher, LLP, and for their

Complaint herein, allege as follows:

# I
## INTRODUCTION

1.    This action is brought against individual and corporate Defendants who have

engaged in a complex scheme to defraud Plaintiffs of $16.475 million invested by

Plaintiffs with and through the Defendants.

2.  Defendants engaged in racketeering activities to solicit private investment capital to fund a scheme by which Defendants defrauded innocent individuals and entities out of their invested monies.

3.  Defendants' scheme involved inducing investors to purchase large numbers of automated teller machines ("ATMs"). There is a well-established market for investors, other than bank owner/operators, who wish to purchase and sell ATMs. Non-bank purchasers can either buy an ATM that has previously been placed at a location, generally via a lease agreement with a business store owner (a "Placed ATM"), or a new ATM that needs to be located in an existing or prospective business establishment. A Placed ATM, particularly one with a long-term lease and verifiable transaction activity, will sell at a substantial premium compared to a non-Placed ATM.

4.  The value of a Placed ATM and its eligibility for potential investment by Plaintiffs was derived from its predicted ability to generate future revenue and was, *inter alia*, predicated on the receipt and analysis of reliable reports reflecting due diligence for each Placed ATM demonstrating: (i) at least one year of transaction history with an average of 400 transactions per month; (ii) projected net revenues of approximately $4,800 per year based on the transaction history; (iii) the existence of a lease with at least a five year term with a renewal provision for an additional five year term provided that neither party terminated the lease (hereinafter the "Performance Criteria").[1]

5.  To effect their scheme, Defendants induced Plaintiffs to purchase non-existent "phantom" Placed ATMs by making false verbal representations and delivering fraudulent, false, fabricated and fictitious information to Plaintiffs, including

---

[1]  As described, *infra*, at Paragraph 42, Plaintiffs later purchased ATMs with alternative Performance Criteria at a different price.

representations and warranties, purporting to demonstrate that the "phantom" Placed ATMs met the Performance Criteria set by Plaintiffs to purchase Placed ATMs.

6.    Defendants furthered their scheme by delivering fraudulent, false, fabricated and fictitious information to Plaintiffs in connection with the ATMs purchased by Plaintiffs including: bills of sale, due diligence reports, lease agreements, assignments of the lease agreements and other fictitious documents.

7.    Following the sale of the "phantom" Placed ATMs to Plaintiffs, the Defendants perpetuated their scheme by providing monthly reports to Plaintiffs that purported to state the transactional activity of the Placed ATMs purchased by Plaintiffs and by delivering funds purportedly based on that transactional activity.

8.    Defendants systematically sought and received additional investments from Plaintiffs and other investors to perpetuate the scheme.

9.    Defendants, through their scheme, induced Plaintiffs and other investors to deliver millions of dollars to Defendants for the purchase of the ATMs.

10.    Plaintiffs bring this action against the Defendants for violations of the Racketeer Influenced and Corrupt Organizations statute (hereinafter "RICO"), 18 U.S.C. §§ 1961 through 1968, and New York State common law causes of action, including: fraudulent misrepresentation, fraudulent inducement, fraudulent concealment, negligent misrepresentation, breach of contract, breach of warranty, conversion, unjust enrichment and breach of fiduciary duty.

11.    Plaintiffs herein seek the return of the funds they invested with the Defendants, damages, treble damages, punitive damages, pre-judgment interest, costs and fees and all other relief deemed appropriate by this Court.

3

## II
## JURISDICTION

12.    This Court has subject matter jurisdiction over this matter pursuant to RICO,

18 U.S.C. § 1964 and 28 U.S.C. § 1331, because Plaintiffs' claims arise under the laws of

the United States, and pursuant to its supplemental jurisdiction, 28 U.S.C. § 1367.

## III
## VENUE

13.    The venue of this action is proper in this judicial district pursuant to 18 U.S.C.

§ 1965(a) and 18 U.S.C. § 1391 in that Defendants transacted affairs in the Southern

District of New York and in that the negotiations, decisions to enter in to the contractual

agreements, transfers of funds and subsequent business dealings between the parties

named herein occurred within the Southern District of New York.  Venue is also proper

in this judicial district pursuant to 18 U.S.C. § 1965(b) because, to the extent any

Defendant may reside outside of this district, the ends of justice require such Defendant

or Defendants to be brought before this Court.

## IV
## THE PARTIES

14.    ATMA is a limited liability company organized and existing under the laws

of the State of Delaware with a principal place of business at 324 Grix Court, New

Milford, New Jersey 07646.  ATMA was formed in November of 2004.

15.    The Plaintiff Trusts are trusts created under laws of the State of New York

with a principal place of business at One State Street Plaza, 29th Floor, New York, New

York 10004.

16.     Defendant Vance Moore, Jr., also known as Vance Moore II, ("Moore") is a resident of Fruitland Park, Lake County, Florida and also maintains a residence, upon information and belief, in Raleigh, Wake County, North Carolina.

17.     Moore owned and controlled unnamed co-conspirator ATM Financial Services LLC ("ATMFS"), a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at Leesburg, Lake County, Florida. ATMFS purported to provide services to owners of Placed ATMs as an Independent Sales Organization ("ISO"). An ISO, via a management agreement, is responsible for, *inter alia*, the deployment, management and servicing of Placed ATMs, and also for the reporting of the transaction activity of Placed ATMs, collection of revenue from that transaction activity, and payment of the net revenue to the owners of the Placed ATMs. ATMFS filed for Chapter 11 bankruptcy protection on February 12, 2008 in the United States Bankruptcy Court for the Middle District of Florida.

18.     Defendant Exclusive Properties Group, Inc. ("Exclusive Properties" or "EPG") is a domestic business corporation organized and existing under the laws of the State of Florida with a principal place of business at 301 S. Richey Road, Suite 101, Leesburg, Florida. Upon information and belief, Moore is the President, Secretary, Treasurer and Director of EPG. Upon information and belief, EPG is a real estate holding company controlled by Moore that owns two warehouses from which Moore operates numerous businesses, including ATMFS.

19.     Defendant Walter Netschi ("Netschi") is a resident of Hot Springs Village, Garland County, Arkansas and McKinney, Collin County, Texas. Netschi is the

5

managing member of 36 Main Street LLC and the President of Defendant ATM Capital, Inc.

20.    Defendant 36 Main Street LLC ("36 Main") is a limited liability company organized and existing under the laws of the State of Nevada with a principal place of business at 2400 Dallas Parkway, Suite 180, Plano, TX 75093. Since at least 2005, 36 Main has been engaged in the business of selling ATMs to third-parties, including ATMA.

21.    Defendant ATM Capital Inc. ("ATM Capital") is a domestic business corporation organized and existing under the laws of the State of Texas with a principal place of business at 2001 Beach Street, Fort Worth, Texas. Netschi is the President of ATM Capital.

22.    Defendant Danielle Jones ("Jones") is the Secretary Treasurer and Vice-President of 36 Main and the daughter of Netschi. Jones maintains a residence in McKinney, Collin County, Texas.

23.    Defendant Alain Brossman a/k/a Harry Brossman ("Brossman") is a resident of Tabernacle, Burlington County, New Jersey. Brossman is a member and former employee of ATMA.

24.    Defendant William Munier ("Munier") is a resident of New Milford, Bergen County, New Jersey. Munier is a member and former employee of ATMA.

## V
## THE ENTERPRISE

25.    At all times material to this Complaint, the Defendants, collectively, have constituted an "enterprise" (hereinafter the "ATM Sales Enterprise") as that term is

defined in 18 U.S.C. § 1961(4), which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce.

## VI
## BACKGROUND

### *The Plaintiff Trusts Are Fraudulently Induced by Defendants*

26.    In or around November of 2004, Brossman and Munier, who had conducted a prior scheme with certain of the Defendants named herein (more fully described *infra* at Paragraphs 76 through 83), sought to attract large scale financing for the purported purpose of investing in the purchase of a large number of Placed ATMs and to then make money managing that investment (the "ATM Venture").

27.    In or about August of 2005, Brossman, Munier and others, eventually including Netschi and Moore, approached the Plaintiff Trusts, through unnamed intermediaries, to request investment financing from the Plaintiff Trusts to participate in the "ATM Venture."

28.    The ATM Venture involved the use of a limited liability company, known as ATMA, in which Munier and Brossman would be members, employees and minor investors. ATMA would receive funding from the Plaintiff Trusts for the purchase of identified Placed ATMs and would thereafter receive a return on investment from the monthly revenue generated by the Placed ATMs.

29.    On November 14, 2005, Brossman, Munier and unnamed others met with representatives of the Plaintiff Trusts at the offices of the Plaintiff Trusts in New York for the purpose of inducing the Plaintiff Trusts to participate in the ATM Venture; Netschi and Moore participated in portions of the November 14, 2005 meeting telephonically.

7

30.     During the November 14, 2005 meeting, Netschi, prior to the Plaintiff Trusts'

agreement to participate in the ATM Venture and to induce the Plaintiff Trusts to

participate in the ATM Venture, represented to senior representatives of the Plaintiff

Trusts, that:

        a.     Netschi, through 36 Main, was in the business of locating sellers of

        Placed ATMs, conducting due diligence on the Placed ATMs, negotiating

        a price for and purchasing the Placed ATMs, holding the 36 Main

        purchased Placed ATMs as inventory and reselling the Placed ATMs to

        interested third parties;

        b.     Moore, through ATMFS, served as the ISO for the 36 Main owned

        ATMs and that Moore was prepared to continue to act as the ISO for those

        Placed ATMs;

        c.     ATMFS was in possession of leases with businesses where Placed

        ATMs owned by 36 Main were located and that the leases were valid, in

        effect, and assignable to the purchaser of the Placed ATMs; and,

        d.     Moore, through ATMFS performed due diligence confirming the

        Performance Criteria for the Placed ATMs provided to the purchaser of

        the Placed ATMs prior to purchase;

31.     During the same meeting, the Plaintiff Trusts, as part of making an informed

decision concerning their participation in the ATM Venture, specifically questioned

Netschi with respect to whether Netschi and 36 Main were purchasing Placed ATMs

from disinterested third party owners and expressed their reliance on Netschi and 36

Main conducting due diligence on the Performance Criteria of the of the Placed ATMs being purchased by 36 Main for later resale.

32.    Also during the same meeting, Netschi, to induce the Plaintiff Trusts to participate in the ATM Venture, represented that the business of 36 Main was separate from the business of Moore and ATMFS, and that 36 Main was exclusively in the business of purchasing and reselling Placed ATMs and Moore was exclusively in the business of operating as an ISO.

33.    Also during the same meeting, Brossman, Munier, and Netschi, to induce the Plaintiff Trusts to participate in the ATM Venture, informed Plaintiffs that Moore, through ATMFS, would act as the ISO for any ATMs purchased by ATMA and would conduct due diligence and provide truthful and accurate reporting as to the Performance Criteria of the Placed ATMs identified for potential purchase by ATMA.

34.    Also during the same meeting, Brossman, Munier, representatives of the Plaintiff Trusts and unnamed others participated in a conference call with Moore during which Moore, to induce the Plaintiff Trusts to participate in the ATM Venture, represented that: (i) neither he, nor his company ATMFS, were engaged in the purchase or sale of Placed ATMs; (ii) that ATMFS acted solely as an ISO for Placed ATMs; and, (iii) that ATMFS's operations were separate and apart from those of 36 Main.

35.    Also during the same meeting, Netschi, to induce the Plaintiff Trusts to participate in the ATM Venture, caused to be sent, via electronic mail ("email"), copies of bills of sale, equipment management agreements and due diligence documents (more fully defined *infra* at Paragraph 45) for 100 Placed ATMs purportedly available for

purchase from 36 Main, for the Plaintiff Trusts' review. See Volume I, Ex. 1 – Ex. 3.[2] The documents were forwarded at the Plaintiff Trusts' request to demonstrate the Performance Criteria of the 100 Placed ATMs purportedly being offered for sale and other factors relevant to the Plaintiff Trusts' review of the ATM Venture.

36.    Also at the same meeting, Moore, to induce the Plaintiff Trusts to participate in the ATM Venture, made representations indicating the authenticity of the leases, due diligence documents and management agreements for the same 100 Placed ATMs.

37.    Also at the same meeting, in reliance on the representations made by Munier, Brossman, Netschi, 36 Main and Moore, detailed *supra* at Paragraphs 29 through 36, the Plaintiff Trusts entered into the ATM Venture and became the largest Class A member of ATMA and agreed to make an initial investment of five million dollars to fund the purchase of Placed ATMs.

38.    Also at the same meeting, Munier and Brossman, each agreed to invest $62,500 in ATMA and entered into an employment relationship as co-Chief Executive Officers with ATMA pursuant to which they would each be paid $10,416 per month out of the operating revenue of ATMA with salary increases based on performance incentives, specifically linked to the number of Placed ATMs owned by ATMA (the "ATMA Machines"), plus other benefits of value including medical coverage.

39.    Brossman's agreed upon duties included performing due diligence obligations on behalf of ATMA that included, but were not limited to: (i) identifying and vetting

---

[2]    Due to the volume of exhibits to this Complaint, for the Court's convenience the exhibits hereto are attached and submitted herewith and incorporated herein by reference as part of separate Exhibit Appendices, Volumes I – XX (hereinafter referred to as Volume " ", Ex. " ").

potential Placed ATM machines for purchase by ATMA; (ii) visiting existing ATMA

Machines at their locations; and, (iii) exploring opportunities to enhance the value and

performance of the ATMA Machines.  Brossman's due diligence obligations also

required interfacing with Moore as the ISO of the ATMA Machines.  On numerous

occasions during the period relevant to this Complaint, Brossman represented to

representatives of the Plaintiff Trusts that he was performing the above duties, including

representations that he was personally visiting the businesses where the ATMA Machines

were located.

40.     Munier's duties were to receive and review monthly reports, delivered by

Moore and purportedly related to the ATMA Machines, detailing the location, transaction

activity, monthly costs and expenses, and net revenue for each ATMA Machine (the

"Monthly Reports") and to subsequently deliver the Monthly Reports to representatives

of the Plaintiff Trusts.

41.     In or about February of 2006, at the Plaintiff Trusts' offices in New York,

Netschi again represented to representatives of the Plaintiff Trusts that Netschi and 36

Main were purchasing Placed ATMs from disinterested third party owners and that

Netschi and 36 Main were conducting due diligence with respect to the Placed ATMs

being purchased by 36 Main for later resale.  At the same meeting, representatives of the

Plaintiff Trusts expressed their reliance on the representations made by Netschi to

continue ATMA's purchases of Placed ATMs from 36 Main.

### *Purported ATM Purchases/Sales*

42.     To date, Plaintiffs have transferred $16.475 million to 36 Main for the

purchase of 940 ATMA Machines.  The ATMA Machines purchases commenced in

November of 2005, and ended in September of 2006, and were accomplished in fifteen

(15) tranches, varying in size from 2 to 101 ATMs per tranche, (the "ATMA Tranche

Purchases"). The purchase price for each of the ATMA Machines varied from between

$14,500 to $22,000 per machine.[3]

43.    The individual ATMA Tranche Purchases occurred as follows:

a.    On or about November 16, 2005, ATMA purchased 100 Placed ATM machines from 36 Main for $1,900,000.00. (See the "November 16, 2005 Tranche Purchase" documents at Volumes II – III, Ex. 5 – Ex. 13);

b.    On or about December 20, 2005, ATMA purchased 100 Placed ATM machines from 36 Main for $1,900,000.00 (See the "December 20, 2005 Tranche Purchase" documents at Volumes III – V, Ex. 14 – Ex. 22);

c.    On or about February 22, 2006, ATMA purchased 100 Placed ATM machines from 36 Main for $1,900,000.00 (See the "February 22, 2005 Tranche Purchase" documents at Volumes VI - VII, Ex. 23 – Ex. 31);

d.    On or about April 26, 2006, ATMA purchased 100 Placed ATM machines from 36 Main for $1,950,000.00 (See the "April 26, 2006 Tranche Purchase" documents at Volumes VII – IX, Ex. 32 – Ex. 40);

e.    On or about May 27, 2006, ATMA purchased 100 Placed ATM machines from 36 Main for $1,950,000.00 (See the "May 27, 2006 Tranche Purchase" documents at Volumes IX – XI, Ex. 41 – Ex. 47);

f.    On or about June 16, 2006, ATMA purchased 50 Placed ATM machines from 36 Main for $975,000.00 (See the "June 16, 2006 Tranche Purchase" documents at Volume XII, Ex. 48 – Ex. 54);

---

[3]    The purchase price for a Placed ATM was based on the Performance Criteria of each tranche of Placed ATMs and subsequent designation of the Placed ATM as an "A" or "B" Placed ATM as determined by the verified transaction history of the ATMs in the tranche. Placed ATMs designated as "A" Placed ATMs had an average of at least 400 verified fee paying transactions per month. Placed ATMs with at least 400 verified fee paying transactions per month were originally priced at $19,000.00 per Placed ATM and were later priced at $19,500.00 per Placed ATM. Two of the Placed ATMs with an average of at least 500 verified fee paying transactions per month were priced at $22,000.00 per Placed ATM. Placed ATMs designated as "B" Placed ATMs had an average of from 330-399 verified fee paying transactions per month and were priced at $14,500.00 per Placed ATM. A chart summarizing the date of purchase and amount paid by ATMA for each tranche of ATM purchases is annexed hereto at Volume I, Ex. 4.

g.    On or about June 27, 2006, ATMA purchased 74 Placed ATM machines from 36 Main for $1,073,000.00 (See the "June 27, 2006 Tranche Purchase" documents at Volume XIII, Ex. 55 – Ex. 61);

h.    On or about July 28, 2006, ATMA purchased 101 Placed ATM machines from 36 Main for $1,469,500.00 (See the "July 28, 2006 Tranche Purchase" documents at Volumes XIV – XV, Ex. 62 – Ex. 68);

i.    On or about August 30, 2006, ATMA purchased 7 Placed ATM machines from 36 Main for $136,500.00 (See the "August 30, 2006 Tranche Purchase #1" documents at Volumes XVI - XVII, Ex. 69 – Ex. 70, Ex. 77 – Ex. 81);

j.    On or about August 30, 2006, ATMA purchased 17 Placed ATM machines from 36 Main for $331,500.00 (See the "August 30, 2006 Tranche Purchase #2" documents at Volumes XVI – XVII, Ex. 71 – Ex. 72, Ex. 77 – Ex. 81);

k.    On or about August 30, 2006, ATMA purchased 36 Placed ATM machines from 36 Main for $522,000.00 (See the "August 30, 2006 Tranche Purchase #3" documents at Volumes XVI – XVII, Ex. 73 – Ex. 74, Ex. 77 – Ex. 81);

l.    On or about August 30, 2006, ATMA purchased 68 Placed ATM machines from 36 Main for $986,000.00 (See the "August 30, 2006 Tranche Purchase #4" documents at Volumes XVI - XVII, Ex. 75 – Ex. 81);

m.    On or about September 26, 2006, ATMA purchased 2 Placed ATM machines from 36 Main for $44,000.00 (See the "September 26, 2006 Tranche Purchase #1" documents at Volumes XVII - XVIII, Ex. 82 – Ex. 83, Ex. 88);

n.    On or about September 26, 2006, ATMA purchased 21 Placed ATM machines from 36 Main for $409,500.00 (See the "September 26, 2006 Tranche Purchase #2" documents at Volumes XVII - XVIII, Ex. 84 – Ex. 85, Ex. 88);

o.    On or about September 26, 2006, ATMA purchased 64 Placed ATM machines from 36 Main for $928,000.00 (See the "September 26, 2006 Tranche Purchase #3" documents at Volumes XVII - XVIII, Ex. 86 – Ex. 88).

44.    With respect to each Tranche Purchase by ATMA, a series of documents were executed which, on their face, provided for the transfer of title and assignable leases to ATMA and provided for the management of the ATMA Machines.

45.    The documents executed for each Tranche Purchase are identified as follows:

       a.    Asset Purchase Agreement:  36 Main, by Netschi and Jones, prepared, or caused to be prepared, an Asset Purchase Agreement that sold title in Placed ATMs from 36 Main to ATMA (hereinafter "Asset Purchase Agreement").  The Asset Purchase Agreements provide a representation and warranty that 36 Main held good and marketable title to the Placed ATMs being sold to ATMA.  Upon delivery of an executed Asset Purchase Agreement by Jones on behalf of 36 Main, ATMA would remit funds to 36 Main via wire transfer in an amount corresponding to the value of ATMs set forth in a schedule of ATMs affixed to the Asset Purchase Agreement.  See Asset Purchase Agreements for the ATMA Tranche Purchases in Volume II, Ex. 5; Volume III, Ex. 14; Volume VI, Ex. 23; Volume VII, Ex. 32; Volume IX, Ex. 41;Volume XII, Ex. 48; Volume XIII, Ex. 55; Volume XIV, Ex. 62; Volume XVI, Exs. 69, 71, 73, 75; Volume XVII, Exs. 82, 84, 86.

       b.    Bills of Sale:  36 Main, by Netschi and Jones, prepared, or caused to be prepared, a Bill of Sale for each tranche of Placed ATMs being sold by 36 Main to ATMA.  Each Bill of Sale provided a representation and warranty that 36 Main held good and marketable title to the Placed ATMs being sold to ATMA.  See Bills of Sale for the ATMA Tranche Purchases

14

in Volume II, Ex. 6; Volume III, Ex. 15; Volume VI, Ex. 24; Volume VII,

Ex. 33; Volume IX, Ex. 42; Volume XII, Ex. 49; Volume XIII, Ex. 56;

Volume XIV, Ex. 63; Volume XVI, Exs. 70, 72, 74, 76; Volume XVII

Exs. 83, 85, 87.

c.    Addition to Equipment:  36 Main, by Netschi and Jones, prepared,

or caused to be prepared, a separate document entitled "Addition to

Equipment," that stated that the Placed ATM being sold to ATMA was

"Virtual switch capable."   Virtual switch capability allowed the Placed

ATM to fund minutes for pre-paid cell phone accounts (hereinafter

"Addition to Equipment").  After the completion of the first three tranche

purchases, ATMA elected to not pay for Virtual Switch capability and

Addition to Equipment documents were no longer delivered for

subsequent tranche purchases.  See the Addition to Equipment documents

in Volume II, Ex. 7; Volume III, Ex. 16; Volume VI, Ex. 25; Volume VII,

Ex. 34.

d.    Diligence Warranty:  Contemporaneous with the execution of a

Bill of Sale, and Asset Purchase Agreement, Netschi, by and through 36

Main provided a written statement that it had engaged the services of

Moore, through ATMFS, to perform a verification of the transaction

history of each ATM being  sold to ATMA (hereinafter "Diligence

Warranty").  See the Diligence Warranties in Volume II, Ex. 8; Volume

III, Ex. 17; Volume VI, Ex. 26; Volume VII, Ex. 35. Each Diligence

Warranty warranted that the transaction history that 36 Main provided to

15

ATMA was the same transaction history that 36 Main had received from Moore and ATMFS.

e.    Each and every Bill of Sale, Asset Purchase Agreement, Addition to Equipment and Diligence Warranty (hereinafter "36 Main Transaction Documents") was signed by Jones as Vice-President and/or Secretary Treasurer of 36 Main and was signed, upon information and belief, with the knowledge of and/or at the direction of Netschi.

f.    Placement Program Space Leases:  For each and every Placed ATM being sold to ATMA, Moore provided copies of a "Placement Program Space Lease" (hereinafter "Placed ATM Lease") between ATMFS and a purported lessor, usually a convenience store or other similar business, where the ATMs being sold to ATMA were allegedly located.  See the Placed ATM Leases in Volumes II – III, Ex. 9a – Ex. 9b; Volumes IV – V, Ex. 18a – Ex. 18b; Volumes VI – VII, Ex. 27a – Ex. 27b; Volumes VIII – IX, Ex. 36a – Ex. 36b; Volumes X – XI, Ex. 43a – Ex. 43b; Volume XII, Ex. 50; Volume XIII, Ex. 57; Volumes XIV – XV, Ex. 64a – Ex. 64b; Volumes XVI – XVII, Ex. 77a – Ex. 77b; Volume XVIII, Ex. 88. Annexed to each Placed ATM Lease were site surveys and audit reports, signed by Moore, that purportedly identified: (1) the business where each Placed ATM was located; (2) the annual merchandise sales for that business; (3) the terminal number for the Placed ATM at the location; (4) the average monthly transaction history for the Placed ATM; and, (5) purported reports from searches for UCC-1 statements.  The

purported Placed ATM Leases and the transaction history identified in the documents annexed to the Placed ATM Leases correlated to a schedule identifying each Placed ATM purchased in the ATMA Tranche Purchases.

g.    Assignment of Placement Programs Space (ATM) Leases:  The Placed ATMs sold to ATMA and their locations were further identified in a document entitled "Assignment of Placement Programs Space (ATM) Leases" (hereinafter "Lease Assignment(s)").  See the Lease Assignments in Volume III, Ex. 10; Volume V, Ex. 19; Volume VII, Ex. 28; Volume IX, Ex. 37; Volume XI, Ex. 44; Volume XII, Ex. 51; Volume XIII, Ex. 58; Volume XV, Ex. 65; Volume XVII, Ex. 78. Each Lease Assignment for each Placed ATM Lease was prepared, or caused to be prepared, by Moore and stated that ATMFS had a current and existing Placed ATM Lease and that the Placed ATM Lease was being assigned to ATMA for each ATM being sold to ATMA.  In each Lease Assignment, Moore warranted that each Placed ATM Lease was in full force and effect, was assignable, and was free and clear from all liens and encumbrances.

h.    Due Diligence Report:  Moore, prepared, or caused to be prepared, a separate document (hereinafter "Due Diligence Report"), that represented and warranted to ATMA that ATMFS had reviewed the average monthly transaction history for each ATM being sold to ATMA and that the average transactions reported on the schedules affixed to the Asset Purchase Agreements were correct.  Moore, in the Due Diligence Report, acknowledged that ATMA "was relying upon such data in making

17

its purchase from 36 main [sic] Street." <u>See</u> the Due Diligence Reports in Volume III, Ex. 11; Volume V, Ex. 20; Volume VII, Ex. 29; Volume IX, Ex. 38; Volume XI, Ex. 45; Volume XII, Ex. 52; Volume XIII, Ex. 59; Volume XV, Ex. 66; Volume XVII, Ex. 79.

i.      Equipment Management Agreement:  On or about the same day of a closing of a tranche purchase of ATMA Machines, ATMA and ATMFS would enter into an Automated Teller Machine (ATM) Equipment Management Agreement (hereinafter "Equipment Management Agreement") obligating ATMFS to manage a tranche of ATMA Machines.  ATMA entered into an Equipment Management Agreement for ATMFS, by Moore, to manage all of the ATMA Machines.   <u>See</u> the Equipment Management Agreements in Volume III, Ex. 12; Volume V, Ex. 21; Volume VII, Ex. 30; Volume IX, Ex. 39; Volume XI, Ex. 46; Volume XII, Ex. 53; Volume XIII, Ex. 60; Volume XV, Ex. 67; Volume XVII, Ex. 80.  Pursuant to the terms of each Equipment Management Agreement, ATMFS, by and through Moore, is obligated to manage the ATMA Machines for the benefit of ATMA.  The Equipment Management Agreement requires Moore and ATMFS to: (1) collect data processing and electronic deposit and transfer information for all collected revenues and fees, including surcharge revenues generated by the ATMA Machines, on a monthly basis; (2) provide ATMA with the Monthly Reports and to make regular payments to ATMA based on the monthly net revenue of the ATMA Machines (the "Periodic Revenue Payments"); and, (3) provide

18

ATMA with a full disclosure of the number of transactions for each ATMA Machine on a monthly basis.

j.    Amendment to the Equipment Management Agreement:  On or about April 27, 2006, ATMA and ATMFS entered into an Amendment to the Equipment Management Agreement ("hereinafter Equipment Management Agreement Amendment") that amended the existing Equipment Management Agreements between ATMFS and ATMA.  See the Equipment Management Agreement Amendments in Volume III, Ex. 13; Volume V, Ex. 22; Volume VII, Ex. 31; Volume IX, Ex. 40; Volume XI, Ex. 47; Volume XII, Ex. 54; Volume XIII, Ex. 61; Volume XV, Ex. 68; Volume XVII, Ex. 81. Pursuant to the terms of each Equipment Management Agreement Amendment, ATMFS, by and through Moore, is obligated, in addition to its obligations under the Equipment Management Agreements, to not: (1) solicit any business owner identified in the Lease Agreements to cease doing business with ATMA; or (2) solicit any business owner identified in the Lease Agreements to lease space to ATMFS or any other party for the purpose of placing any additional ATMs at the same business location.  ATMFS's non-solicitation obligation further prohibited ATMFS from sharing any information identifying the locations of the ATMA Machines or the terms of the Lease Agreements with any other parties.

k.    For each of the ATMA Tranche Purchases, Moore signed every Placed ATM Lease, Lease Assignment, Due Diligence Report, Equipment

Management Agreement and Equipment Management Agreement

Amendment (hereinafter the "ATMFS Transaction Documents")

individually or as a member or president of ATMFS.

46.    Each of the 36 Main Transaction Documents and ATMFS Transaction

Documents associated with the ATMA Tranche Purchases included a schedule of ATMs

that purportedly identified the transaction history of each Placed ATM in the ATMA

Tranche Purchases.

47.    Each Asset Purchase Agreement and corresponding Bill of Sale contained

representations and warranties by 36 Main, that 36 Main possessed good and marketable

title to the Placed ATMs being sold to ATMA, that it had full authority to sell the Placed

ATMs, that the Placed ATMs were in good condition and fit for use, and were free and

clear "of all liens, encumbrances, liabilities and adverse claims, of every nature and

description." See Paragraphs 45(a) and 45(b), supra.

48.    Every Tranche Purchase of ATMA Machines was accompanied by some or all

of the documents identified in Paragraphs 45(a) through 45(d) and 45(f) through 45(j) of

this Complaint.

49.    For every Tranche Purchase of ATMA Machines, the Plaintiff Trusts

transferred purchase funds, via a bank wire transfer, to the bank account of ATMA.

ATMA subsequently delivered, via a bank wire transfer, the purchase funds to Netschi,

through 36 Main. The purchase funds paid by ATMA to 36 Main for the ATMA

Machines are detailed, infra, at Paragraphs 107 through 117 and incorporated herein by

reference.

50.    Additionally, after each Tranche Purchase of ATMA Machines, ATMA
delivered, via a bank wire transfer, funds to ATM Capital and/or 36 Main which
represented 36 Main's prorated share of the monthly net-revenues earned by that tranche
of ATMA Machines for that portion of the month during which 36 Main owned those
ATMs sold to ATMA (the "Residual Revenue Funds").  See Paragraphs 140 through 147,
*infra*, incorporated herein by reference.

51.    Brossman and Munier, together and/or in conjunction with others, including
Netschi, calculated the Residual Revenue Funds purportedly owed 36 Main and to be
delivered to ATM Capital or 36 Main.  Munier, Brossman, and Netschi caused the
Residual Revenue Funds to be paid to ATM Capital and/or 36 Main with the knowledge
that the Residual Revenue Funds were based on fabricated calculations because the
ATMA Machines did not exist.

### *Post Sale Activities of Defendants*

52.    From on or about December of 2005 through November of 2007, Moore
forwarded via email to Munier and/or Brossman, the Monthly Reports.  See Paragraphs
153 - 154, 156, 162, 164, 169, 172, 175, 180, 183, 185, and 188, *infra*, incorporated
herein by reference.

53.    The Monthly Reports were received and reviewed by Munier and/or
Brossman for accuracy pursuant to their duties as employees of ATMA.  Brossman
and/or Munier subsequently delivered the Monthly Reports to representatives of the
Plaintiff Trust. See Paragraphs 155, 151 – 158, 160 – 161, 163, 165, 170 – 171, 174, 176
– 178, 181 – 182, 184, 186, 187, 189 – 190, 202 – 220, *infra*, incorporated herein by
reference.

54.    From on or about December of 2005 through September of 2007, Moore, by and through ATMFS and/or Exclusive Properties, delivered, by wire transfer, the Periodic Revenue Payments. See Paragraphs 118 through 139, *infra*, incorporated herein by reference.

55.    The Periodic Revenue Payment delivered in September of 2007, which related to the Monthly Report for June of 2007, was the final payment received from ATMFS, Moore, or Exclusive Properties. In or about November of 2007, Moore ceased providing the Monthly Reports.

56.    In response to numerous requests from Plaintiffs concerning the failures of ATMFS and Moore to provide the Monthly Reports and/or Periodic Revenue Payments, Moore, by letter dated December 20, 2007, stated:

> We'd like to give you an update on the events that occurred this year that has caused a delay in receiving your monthly payments. *In the Spring of 2007 we made a commitment to purchase Jack Henry ATM software . . . that would allow us to track ATM assets and transactions and receive electronic reports on a daily basis.* We *received the software in July* and did the installation at that time. . . . We expect to be fully operational and current with all reports by the mid to end of January. . . We're presently reconciling each ATM from the old manual system to the new system to get reports done to get them out to each one of our ATM owners . . . *I want to assure each ATM owner that their funds received on the settlement of each ATM are secure in a settlement account by each network.*

See Volume XIX, Ex. 89. (Emphasis added.)

57.    On January 10, 2008, Moore, in response to demands by Plaintiffs for information related to the ATMA Machines, delivered, via email, a report to a representative of Plaintiff Trusts that purportedly identified ATMA Placed ATM machines. See Volume XIX, Ex. 90.

58.     On January 11, 2008, Brossman emailed a representative of the Plaintiff Trust and represented that ". . . vance is going to be sending u a cornucopia of reports and then explain the first reports.i think that the first reports were from elan a processor owned by us bank-spoke to him at 830 and 1030 this morning-harry" [sic]. See Volume XIX, Ex. 91.

59.     On January 11, 2008, Moore, in response to demands by Plaintiffs for information related to the ATMA Machines, delivered, via email, a report, allegedly prepared by ATMFS, listing the store locations, without addresses, of 352 ATMs. Brossman also received a copy of the report via the same email. See Volume XIX, Ex. 92.

60.     Also on January 11, 2008, Brossman, in an email, represented to an agent of ATMA that he had ". . .matched 250 machines to the [Plaintiffs] . . ." list of the ATMA Machines. See Volume XIX, Ex. 93.

61.     Also on January 11, 2008, Moore, in response to further demands by Plaintiffs for information related to the ATMA Machines, represented that he had requested ". . . the file on transaction history from processors for recent months, and am still waiting for the files." See Volume XIX, Ex. 94.

62.     Also on January 11, 2008, Moore sent another email to a representative of the Plaintiff Trusts wherein he represented that he would provide a copy of a bank statement related to the settlement account where the Periodic Revenue Payments were purportedly being held. See Volume XIX, Ex. 94. Moore sent a copy of a purported bank statement via email on January 11, 2008. See Volume XIX, Ex. 95.

23

63.     On or about January 15, 2008, Moore, during a visit by a representative of the Plaintiff Trusts and a third party auditor to ATMFS's warehouse in Garner, North Carolina, presented a bank statement dated December 31, 2007, that purportedly showed an account balance of $11,259,194.75 which Moore stated represented Plaintiffs' Periodic Revenue Payments that were being held in escrow pending completion of software upgrades to ATMFS's computer system.  See Volume XIX, Ex. 96.

64.     On January 20, 2008, Brossman, in response to demands by Plaintiffs for information related to the ATMA Machines, represented to Plaintiffs in an email that: "ok-vance and i have gone through the lists till we accounted for the 940 machines including the moved ones.i have sent the list to you.they have all the present terminal numbers---i told u david that i would get it done no matter what-harry" [sic].  See Volume XIX, Ex. 97.

65.     On or about January 22, 2008, Moore, via an electronic message to Plaintiffs, represented that the ATMA Machines existed as Placed ATMs and represented that new lease agreements for any ATMA Machines moved from their original locations would be provided to Plaintiffs by January 24, 2008.  See Volume XIX, Ex. 98.

### *Discovery That the ATMA Machines Do Not Exist*

66.     In January of 2008, Plaintiffs directed a private investigative firm to investigate certain locations where ATMA Machines were, according to Moore and ATMFS, located.  The investigation was conducted for the purpose of determining whether the ATMA Machines were in fact present at those locations.

67.     On or about January 24, 2008, the investigative firm reported that its investigation had uncovered that the majority of the ATMA Machines they attempted to

locate: (1) were not located at the business locations identified by Moore, Netschi, 36

Main and Jones; (2) in some instances may not have ever existed at the locations

identified by Moore, Netschi, 36 Main, and Jones; and, (3) in some instances, were either

owned by persons other than Plaintiffs and/or were managed by parties other than

ATMFS.

### *Fraudulent Sales to Other Investor Groups Are Revealed*

68.     On or about February 6, 2008, a California based entity known as ATM

Equity, LP ("ATM Equity") filed suit against ATMFS in North Carolina Superior Court,

County of Wake, alleging that ATMFS and Moore had defrauded ATM Equity out of $20

million delivered to Netschi, through 36 Main, by providing fraudulent due diligence

reports in order to induce ATM Equity to purchase ATMs from 36 Main.  The complaint

further alleges that ATMFS and Moore misappropriated and/or failed to disclose the

locations of certain ATMs that ATM Equity owned and had contracted with ATMFS to

service, and that ATMFS and Moore had failed to remit monthly revenues for either the

ATMs purchased from 36 Main or the ATMs owned by ATM Equity being serviced by

ATMFS and Moore.

69.     On or about February 12, 2008, ATMFS filed for Chapter 11 bankruptcy

protection in the United States Bankruptcy Court for the Middle District of Florida (the

"ATMFS Bankruptcy").

70.     In its petition in the ATMFS Bankruptcy, ATMFS did not list or otherwise

disclose either ATMA or ATM Equity as creditors of ATMFS.

71.     Since the filing of the ATMFS Bankruptcy, numerous other investors in

ATMs purchased through Netschi and 36 Main, and managed by ATMFS and Moore

have surfaced, and appeared in the ATMFS Bankruptcy (together with ATMA and ATM Equity, the "ATMFS Creditors").

72.    The ATMFS Creditors have purchased, in the aggregate, in excess of 4000 ATMs through Netschi, 36 Main, Jones and Moore.

73.    In a disclosure made by the ATMFS Bankruptcy Trustee on or about March 10, 2008, the ATMFS Bankruptcy Trustee has only been able to confirm the existence of approximately 400 ATMs (ten percent 10% of the Placed ATMs purportedly being managed by ATMFS and Moore) and, that most of those 400 ATMs are owned by the merchants where the ATMs are located and not the ATMFS Creditors.

74.    Netschi, in a telephone call on February 28, 2008, admitted that 36 Main took a percentage of the gross purchase funds for each tranche purchase of ATMA Machines and then subsequently transferred the balance of Plaintiffs' funds to Moore or entities controlled by Moore - a representation totally at odds with prior representations made to representatives of the Plaintiff Trusts to induce them to participate in the ATM Venture. See Paragraphs 30 - 32, *supra.*

75.    Subsequently on March 19, 2008, Netschi was sued in New York State Supreme Court, New York County, by Fortress Credit Opportunities I LP for breach of guarantee in connection with the financing of purchases of Placed ATMs by ATM Equity from 36 Main.

### The Defendants Prior ATM Sales Scheme

76.    From approximately 2002 through 2005, Munier, Brossman, Moore and Netschi, along with others not named herein, engaged in the sale of ATM business

opportunities that bundled and sold ATMs together with management, operation and other services to investors (the "Business Opportunity").

77.    An investor in the Business Opportunity was entitled to receive a set monthly payment in exchange for his or her investment, with a bonus payment in the event that the transactional activity of an ATM exceeded a certain threshold number (usually 400 transactions) within a given month.

78.    Munier, operating through an entity that, on information and belief, was doing business as EFinancial, was responsible for the sale of the Business Opportunity to potential and actual investors.

79.    When Munier sold a Business Opportunity to an investor, he would arrange to purchase a single or multiple ATMs from an entity owned and controlled by Netschi.

80.    Brossman, operating through an entity that, on information and belief, was doing business as National Escrow Limited LLC ("National Escrow"), agreed, for a percentage of the revenue generated by the transaction activity of Business Opportunity ATMs, to purchase the ATMs from the Business Opportunity owners at the expiration of the term of the Business Opportunity (usually seven years) or a mutually agreeable date.

81.    Upon information and belief, each ATM sold to an investor as part of the Business Opportunity was purportedly operated by Moore pursuant to an agreement whereby a Moore controlled entity would act as the ISO for the ATM.

82.    In addition to Brossman and Munier, the Business Opportunity also included management services by a management company, unnamed herein, that employed, amongst others, Munier's sister, and which acted as conduit between the owner of the Business Opportunity and Netschi, Brossman, Munier and Moore.  Though the

management services were allegedly provided by a separate management company, Moore's entity controlled access to any funds generated from the Business Opportunity ATMs, and distributed funds to the purported management company and to Brossman's company, National Escrow.

83.    On information and belief, including statements made by investors and lawyers for investors in the Business Opportunity, investors in the Business Opportunity were sold non-existent "phantom" ATMs as part of a scheme conducted by Munier, Brossman, Netschi and Moore.

## VII
## PATTERN OF FRAUDULENT AND RACKETEERING ACTS

84.    Defendants, by and in furtherance of the ATM Sales Enterprise, induced Plaintiffs to enter into agreements to purchase phantom ATMs by providing Plaintiffs with false and misleading purchase information, including: (1) the source from whom Netschi and 36 Main were allegedly purchasing the ATM machines ultimately purchased by Plaintiffs; (2) the existence of the ATMs purchased by Plaintiffs; (3) the transaction activity of the ATMs purchased by Plaintiffs; (4) the locations of the ATMs purchased by Plaintiffs; and, (5) the existence of leases for the placement of the ATMs purchased by Plaintiffs.

85.    To effect the ATM Sales Enterprise scheme, Munier, Brossman, Netschi, 36 Main, Jones, ATM Capital, Exclusive Properties and Moore agreed and conspired to sell phantom ATMs to Plaintiffs.

86.    As part of the ATM Sales Enterprise scheme, Netschi and 36 Main explicitly and intentionally misrepresented to Plaintiffs that they had acquired ownership of the ATMs to be purchased by Plaintiffs from disinterested third-party owners of the ATMs

when, in fact, they had not done so, but had instead "purchased" the phantom ATMs from Moore.

87.    In furtherance of the ATM Sales Enterprise scheme, Netschi, 36 Main, and Jones created fictitious Asset Purchase Agreements, Bills of Sale, Additions to Equipment, and Due Diligence Warranties (collectively, the "36 Main Fictitious Transaction Documents").

88.    In furtherance of the ATM Sales Enterprise scheme, Moore created fictitious Lease Assignments, Placed ATM Leases, Due Diligence Reports, Equipment Management Agreements and Equipment Management Agreement Amendments (collectively, the "Moore Fictitious Transaction Documents")(collectively with the 36 Main Fictitious Documents, the "Fictitious Transaction Documents").

89.    Knowing that the Fictitious Transaction Documents related to the purchase of phantom Placed ATMs by Plaintiffs, Munier and Brossman furthered the ATM Sales Enterprise scheme by executing the Fictitious Transaction Documents on behalf of ATMA and/or not disclosing to Plaintiffs that the Fictitious Transaction Documents related to phantom ATMs.

90.    Knowing that ATMA had purchased "phantom" Placed ATMs, Brossman furthered the ATM Sales Enterprise scheme by stating he had performed due diligence on the ATMA Machines, including visits to ATMA Machine locations, when he had not performed such due diligence.

91.    In continued furtherance of the ATM Sales Enterprise scheme, Moore caused ATMFS to create fictitious Monthly Reports for the ATMA Machines (the "Fictitious

Monthly Reports"). See Paragraphs 153 - 154, 156, 162, 164, 169, 172, 175, 180, 183, 185, and 188, *infra*, incorporated herein by reference.

92.    The Fictitious Monthly Reports were transmitted to Munier and Brossman, who, knowing they were false and were generated for the purpose of misleading Plaintiffs, provided the Fictitious Monthly Reports to Plaintiffs. See Paragraphs 155, 157 – 158, 160 – 161, 163, 165, 170 – 171, 174, 176 – 178, 181 – 182, 184, 186, 187, 189 – 190, 202 – 220, *infra*, incorporated herein by reference.

93.    In continued furtherance of the ATM Sales Enterprise scheme, Moore caused the Periodic Revenue Payments to be made to ATMA.  The Periodic Revenue Payments were transmitted via a wire transfer at the direction of Moore and originated from either ATMFS or Exclusive Properties. See Paragraphs 118 – 139, *infra*, incorporated herein reference.

94.    Upon information and belief, the source of the Periodic Revenue Payments was the monies invested in the purchase of phantom ATMs by Plaintiffs and/or the other ATMFS Creditors.

95.    In continued furtherance of the ATM Sales Enterprise scheme, Munier and Brossman caused the Periodic Revenue Payments to be recorded by ATMA as revenue and paid their individual salaries and benefits, along with the salaries and benefits of others, from the Periodic Revenue Payments with the knowledge that the Periodic Revenue Payments had a source other than the revenue generated by the transaction activity of the ATMA Machines.

96.    In continued furtherance of the ATM Sales Enterprise scheme, upon completion of the sale of a tranche of ATMs to ATMA, Netschi and ATM Capital would

demand payment of the Residual Revenue Funds. The Residual Revenue Funds were paid by ATMA via an interstate bank wire transfer to Netschi, through ATM Capital.

97.    In continued furtherance of the ATM Sales Enterprise scheme, when ATMFS ceased to provide Plaintiffs with the Fictitious Monthly Reports in or around November of 2007 and Periodic Revenue Payments in or around September of 2007, Munier and Brossman represented to Plaintiffs that they were actively communicating with Moore and ATMFS for the purpose of ascertaining the cause for the absence of reporting and payments from ATMFS. Munier and Brossman, knowing such representations to be false, informed Plaintiffs that the cause for the delay in reporting and payment from ATMFS was a software upgrade allegedly installed by ATMFS on its computers.

## COUNT 1
### (Civil Racketeering Violations – All Defendants)
### (18 U.S.C. § 1962(c))

98.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.    At all times relevant to this Complaint, Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier and Brossman were "persons" as defined by 18 U.S.C. § 1961(3).

100.    At all times relevant to this Complaint, Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier and Brossman, as detailed in Paragraphs 26 - 65, 74 and 84 – 97, *supra*, engaged in the operation or management of the ATM Sales Enterprise, which is an enterprise as defined by 18 U.S.C. § 1961(4), the activities of which affect interstate commerce.

101.    Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier and Brossman conducted the ATM Sales Enterprise's affairs through a pattern of racketeering activity, detailed in Paragraphs 106 - 239 below, which were directed at Plaintiffs since at least November of 2005.

102.    Since at least November of 2005, Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier and Brossman shared a common purpose while engaging in the fraudulent course of conduct detailed in Paragraphs 26 – 65 and 84 – 97 above, and worked together to achieve such purpose, specifically to:

    a.    Induce Plaintiffs and other individuals and entities to enter into agreements to purchase ATMs which do not exist in exchange for the receipt of millions of dollars of funds.  The scheme was carried out through the complex offering of fraudulent documentation and verbal statements by the Defendants to hide the true nature of their "sale" of "phantom" ATMs to Plaintiffs.

    b.    Use funds from new investors, including Plaintiffs', to provide an apparent return on investment of at least twenty percent (20%) per annum to investors, including Plaintiffs, thus allowing Defendants to maintain the scheme while reaping substantial profits for themselves.

103.    Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier and Brossman, operating together and individually, and in conjunction with unnamed others, directed and controlled the ATM Sales Enterprise, by: (a) creating the Fictitious Transaction Documents and delivering, or causing to be delivered, the Fictitious Transaction Documents to Plaintiffs or their representatives/agents; (b) creating the

Fictitious Monthly Reports and delivering, or causing to be delivered, the Fictitious Monthly Reports to Plaintiffs or their agents; (c) delivering, or causing to be delivered, the Periodic Revenue Payments to ATMA or their agents; (d) demanding from ATMA, and receiving, the Residual Revenue Funds; and, (e) engaging in a fraudulent course of conduct against Plaintiffs, and unnamed others.

104.    The pattern of racketeering activity engaged in by Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier and Brossman involved fraudulent acts in support of the above conduct constituting wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341), all of which constitute "racketeering activity," as defined in 18 U.S.C. § 1961(1)(B).

105.    Defendants engaged in the predicate acts detailed below between November 14, 2005, when Netschi delivered Fictitious Transaction Documents to a representative of the Plaintiff Trust, and continued through January 31, 2008, when Brossman delivered Fictitious Monthly Reports to a representative of the Plaintiff Trust.

**Violations of 18 U.S.C. § 1343 (Wire Fraud)**

106.    The predicate acts, and evidence of the schemes constituting the pattern of racketeering, include, but are not limited to interstate telephone calls, interstate electronic ("e-mail") messages, interstate facsimile transmissions, and interstate electronic banking transactions containing false or fraudulent pretenses, representations, or promises made in furtherance of the ATM Sales Enterprise caused to be transmitted by the Defendants, in violation of 18 U.S.C. § 1343.

***Predicate Acts and Evidence Concerning Interstate Wire Transfers Related to the
Purchases of ATMA Machines***

107.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on or about
November 16, 2005 from ATMA's Citibank, N.A. account located in New York to 36
Main's account number 061003415 at Florida Choice Bank located in Florida to purchase
ATMA Machines.

108.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on December 19,
2005 from ATMA's Citibank, N.A. account located in New York to 36 Main's account
number 061003415 at Florida Choice Bank located in Florida to purchase ATMA
Machines. See Volume XIX, Ex. 99.

109.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on February 24,
2006 from ATMA's Citibank, N.A. account located in New York to 36 Main's account
number 061003415 at Florida Choice Bank located in Florida to purchase ATMA
Machines. See Volume XIX, Ex. 100.

110.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,950,000 on April 27, 2006
from ATMA's Citibank, N.A. account located in New York to 36 Main's account number
061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See
Volume XIX, Ex. 101.

111.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the
ATM Sales Enterprise,  caused ATMA to wire transfer  $1,950,000.00 on May 26, 2006

from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 102.

112.   Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $975,000.00 on June 14, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 103.

113.   Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,073,000.00 on June 29, 2006, from ATMA's Citibank, N.A. account located in New York to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 104.

114.   Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,469,500 on July 27, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 105.

115.   Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,975,500.00 on September 5, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 106.

116.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $500.00 on September 6, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 107.

117.    Netschi, 36 Main, Jones, Moore, Brossman and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,381,500.00 on September 29, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. See Volume XIX, Ex. 108.

### Predicate Acts and Evidence Concerning Interstate Wire Transfers for the Periodic Revenue Payments

118.    On December 30, 2005, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $42,812.46 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 109.

119.    On February 3, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $85,760.28 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 110.

120.    On March 2, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of am interstate bank wire transfer, the following:

$56,646.44 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 111.

121.    On April 3, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $51,911.65 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 112.

122.    On April 4, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $26,997.50 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments the ATMA Machines. See Volume XIX, Ex. 113.

123.    On May 1, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $126,283.26 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 114.

124.    On May 31, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $170,993.83 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 115.

125.   On July 5, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $212,902.75 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 116.

126.   On August 2, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $256,028.99 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 117.

127.   On September 12, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $289,021.76 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 118.

128.   On October 11, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $340,231.77 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 119.

129.   On November 14, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $369,447.76 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. <u>See</u> Volume XIX, Ex. 120.

130. On December 19, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $358,430.65 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. <u>See</u> Volume XIX, Ex. 121.

131. On February 1, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $353,017.35 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. <u>See</u> Volume XIX, Ex. 122.

132. On February 28, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $344,170.03 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. <u>See</u> Volume XIX, Ex. 123.

133. On April 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $161,012.89 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. <u>See</u> Volume XIX, Ex. 124.

39

134.    On May 14, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $120,000.00 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 125.

135.    On May 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $48,000.00 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 126.

136.    On May 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $5,784.37 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 127.

137.    On June 18, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $254,382.50 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 128.

138.    On August 15, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $695,737.93 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. See Volume XIX, Ex. 129.

139.    On September 27, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $374,187.25 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines.

### *Interstate Wire Transfers: Residual Revenue Payments*

140.    On January 3, 2006, Netschi and 36 Main caused ATMA to wire transfer $21,406.23 from Citibank, N.A. account number 48842629 located in New York to Automated Teller Machine Advantage Ltd's bank account number 977285936 at First American Bank located in Dallas, Texas in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the November 16, 2005 Tranche Purchase. See Volume XIX, Ex. 130.

141.    On February 6, 2006, Netschi and 36 Main caused ATMA to wire transfer $27,801.71 from Citibank, N.A. account number 48842629 located in New York to ATM Capital's bank account number 977285936 at First American Bank located in Dallas, Texas in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the December 20, 2005 Tranche Purchase. See Volume XIX, Ex. 131.

142.    On June 1, 2006, Netschi and 36 Main caused ATMA to wire transfer $35,560.14 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta,

Georgia in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the April 26, 2006 Tranche Purchase. See Volume XIX, Ex. 132.

143.    On July 11, 2006, Netschi and 36 Main caused ATMA to wire transfer $38,458.55 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the May 27, 2006 Tranche Purchase. See Volume XIX, Ex. 133.

144.    On August 7, 2006, Netschi and 36 Main caused ATMA to wire transfer $33,621.17 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the June 16, 2006 Tranche Purchase and the June 27, 2006 Tranche Purchase. See Volume XIX, Ex. 134.

145.    On September 11, 2006, Netschi and 36 Main caused ATMA to wire transfer $30,500.33 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the July 28, 2006 Tranche Purchase. See Volume XIX, Ex. 135.

146.    On October 13, 2006, Netschi and 36 Main caused ATMA to wire transfer $43,911.72 from Citibank, N.A. account number 48842629 located in New York to 36

Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the August 30, 2006 Tranche Purchase #1, August 30, 2006 Tranche Purchase #2, August 30, 2006 Tranche Purchase #3 and August 30, 2006 Tranche Purchase #4. See Volume XIX, Ex. 136.

147.    On November 14, 2006, Netschi and 36 Main caused ATMA to wire transfer $27,389.12 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer Residual Revenue Funds allegedly owed 36 Main for the September 26, 2006 Tranche Purchase #1, the September 26, 2006 Tranche Purchase #2, and September 26, 2006 Tranche Purchase #3. See Volume XIX, Ex. 137.

### Predicate Acts and Evidence Concerning Interstate Telephonic Wire Communications

148.    As detailed in Paragraphs 34 and 36, *supra*, on November 14, 2005, in furtherance of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM Venture, Moore, while in Florida or North Carolina, engaged in an interstate telephone conversation with representatives of the Plaintiff Trusts in New York during which he made false representations concerning the operations of ATMFS and 36 Main.

149.    As detailed in Paragraphs 30 – 33, *supra*, on November 14, 2005, in furtherance of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM Venture, Netschi, while in Texas, engaged in an interstate telephone conversation with representatives of the Plaintiff Trusts in New York during which he made false representations concerning the operations of ATMFS and 36 Main.

*Predicate Acts and Evidence Concerning Interstate Wire Communications*

150.    On November 14, 2005, at 3:18 p.m., in furtherance of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM Venture, ATM Capital, at the direction of Netschi, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from ATM Capital in Texas to a representative of the Plaintiff Trusts in New York, Munier in New Jersey and Brossman in New Jersey, attaching a schedule of phantom Placed ATMs and an undated Equipment Management Agreement, each constituting false information related to the existence of Placed ATMs available for sale and management. See Volume I, Ex. 1.

151.    On November 14, 2005, at 3:19 p.m., in furtherance of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM Venture, ATM Capital, at the direction of Netschi, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from ATM Capital in Texas to a representative of the Plaintiff Trusts in New York, attaching a Bill of Sale dated November 16, 2005, an Asset Purchase Agreement dated November 16, 2005, and a schedule of phantom Placed ATMs, each constituting false information related to the existence of Placed ATMs available for sale and management. See Volume I, Ex. 2.

152.    On November 14, 2005, at 4:17 p.m., in furtherance of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM Venture, ATM Capital, at the direction of Netschi, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from

ATM Capital in Texas to a representative of the Plaintiff Trusts in New York, Munier in New Jersey, Brossman in New Jersey, and Bernard Bushnell, a potential investor in ATMA, in New York, attaching an undated Equipment Management Agreement, constituting false information related to the existence of Placed ATMs available for sale and management. See Volume I, Ex. 3.

153.    On November 30, 2005, at 9:00 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to ATM Capital in Texas, Brossman in New Jersey and Marianne Munier with an attached Fictitious Monthly Report. See Volume XIX, Ex. 138.

154.    On December 29, 2005, at 7:52 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XIX, Ex. 138 – Ex. 141.

155.    On January 5, 2006, at 12:15 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 142.

Exhibit A

(Part 2 of 3)

156.    On February 2, 2006, at 9:00 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XIX, Ex. 143 – Ex. 145.

157.    On February 6, 2006, at 2:38 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 146.

158.    On March 7, 2006, at 10:11 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York with an attached Fictitious Revenue Report. See Volume XIX, Ex. 147.

159.    On April 27, 2006, at 1:21 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York containing false

46

representations as to ATMFS's possession of $200,000,000.00 in capital funds held in escrow by ATMFS for the expansion of ATMFS's business. See Volume XIX, Ex. 148.

160.    On May 2, 2006, at 11:43 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to Brossman in New Jersey and A representative of ATMA in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 149.

161.    On May 4, 2006, at 1:49 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 150.

162.    On May 31, 2006, at 9:43 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to ATM Capital in Texas and Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XIX, Ex. 151.

163.    On May 31, 2006, at 11:13 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Brossman, knowingly transmitted and caused to be transmitted by wire communication in

interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 151.

164.    On July 3, 2006, at 2:34 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina, Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. See Volume XIX, Ex. 152.

165.    On July 3, 2006, at 4:34 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of the Plaintiff Trusts in New York with an attached Fictitious Monthly Report See Volume XIX, Ex. 152.

166.    On July 4, 2006, at 10:55 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York containing false representations as to the operation of, and potential upgrades to, the ATMA Machines. See Volume XIX, Ex. 153.

167.    On July 26, 2006, at 2:31 p.m., in furtherance of the ATM Sales Enterprise
and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture,
Moore knowingly transmitted and caused to be transmitted by wire communication in
interstate commerce the following writing: an e-mail from Moore in Florida or North
Carolina to a representative of the Plaintiff Trusts in New York containing false
information related to the operation of the ATMA Machines. See Volume XIX, Ex. 154.

168.    On July 26, 2006, at 2:53 p.m., in furtherance of the ATM Sales Enterprise
and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture,
Moore knowingly transmitted and caused to be transmitted by wire communication in
interstate commerce the following writing: an e-mail from Moore in Florida or North
Carolina to a representative of the Plaintiff Trusts in New York containing false
information related to operation of the ATMA Machines. See Volume XIX, Ex. 155.

169.    On July 31, 2006, at 3:26 p.m., in furtherance of the ATM Sales Enterprise,
Moore, knowingly transmitted and caused to be transmitted by wire communication in
interstate commerce the following writing: an e-mail from Moore in Florida or North
Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached
Fictitious Monthly Report. See Volume XIX, Ex. 156 – Ex. 158.

170.    On August 2, 2006, at 5:28 p.m., in furtherance of the ATM Sales Enterprise
and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture,
Munier, knowingly transmitted and caused to be transmitted by wire communication in
interstate commerce the following writing: an e-mail from Munier in New Jersey to a
representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an
attached Fictitious Monthly Report. See Volume XIX, Ex. 159.

171.   On September 12, 2006, at 10:21 a.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 160.

172.   On October 6, 2006, at 11:26 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. See Volume XIX, Ex. 161 – Ex. 162.

173.   On October 30, 2006, at 11:04 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York containing a false "ATM Detail Transaction Report." See Volume XIX, Ex. 163.

174.   On November 14, 2006, at 11:55 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XIX, Ex. 164.

175.   On January 19, 2007, at 2:42 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire

50

communication in interstate commerce the following writing: an e-mail from Moore in
Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an
attached Fictitious Monthly Report. See Volume XIX, Ex. 165 – Ex. 167.

176.    On January 22, 2007, at 11:03 p.m., in furtherance of the ATM Sales
Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire
communication in interstate commerce the following writing: an e-mail from Munier in
New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New
Jersey with an attached Fictitious Monthly Report. See Volume XIX, Ex. 168.

177.    On February 26, 2007, at 10:43 p.m., in furtherance of the ATM Sales
Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire
communication in interstate commerce the following writing: an e-mail from Munier in
New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New
Jersey with an attached Fictitious Monthly Report. See Volume XIX, Ex. 169.

178.    On April 11, 2007, at 10:49 a.m., in furtherance of the ATM Sales Enterprise,
Munier, knowingly transmitted and caused to be transmitted by wire communication in
interstate commerce the following writing: an e-mail from Munier in New Jersey to a
representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an
attached Fictitious Monthly Report. See Volume XX, Ex. 170.

179.    On April 12, 2007, at 8:38 a.m., in furtherance of the ATM Sales Enterprise,
Moore, knowingly transmitted and caused to be transmitted by wire communication in
interstate commerce the following writing: an e-mail from Moore in Florida or North
Carolina to a representative of the Plaintiff Trusts in New York and Brossman in New

Jersey containing false information related to the operation of the ATMA Machines. <u>See</u> Volume XX, Ex. 171.

180.    On April 30, 2007, at 9:17 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 172 – Ex.174.

181.    On April 30, 2007, at 3:49 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 175.

182.    On June 6, 2007, at 11:33 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report <u>See</u> Volume XX, Ex. 176.

183.    On July 12, 2007, at 3:20 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 177 – Ex.179.

184.    On July 12, 2007, at 11:56 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XX, Ex. 180.

185.    On August 15, 2007, at 7:58 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. See Volume XX, Ex. 181 – Ex. 182.

186.    On August 15, 2007, at 1:40 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XX, Ex. 183.

187.    On September 18, 2007, at 10:34 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. See Volume XX, Ex. 184.

188.    On November 5, 2007, at 2:33 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in

Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. See Volume XX, Ex. 185 – Ex. 186.

189.    On November 5, 2007, at 11:52 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of Plaintiff Trust in New York and Brossman in New Jersey with an attached Fictitious Monthly Report.  See Volume XX, Ex. 187.

190.    On January 10, 2008, at 2:38 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XX, Ex. 188.

191.    On January 10, 2008, at 3:20 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York, attaching a report from a third-party processor, constituting false information related to the existence of ATMA Machines. See Volume XIX, Ex. 90.

192.    On January 11, 2008, at 11:49 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York,

attaching a report from a ATMFS, constituting false information related to the existence of ATMA Machines. <u>See</u> Volume XIX, Ex. 92.

193.    On January 11, 2008, at 12:34 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York containing false representations that requests had been submitted to third-party processors for reports pertaining to the operation of the ATMA Machines. <u>See</u> Volume XIX, Ex. 94.

194.    On January 11, 2008, at 2:14 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York containing a false representation that a bank account existed where ATMA Periodic Revenue Payments were being held and that a statement from that account would be produced to a representative of the Plaintiff Trusts. <u>See</u> Volume XIX, Ex. 94.

195.    On January 11, 2008, at 3:19 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of the Plaintiff Trusts in New York, attaching a purported bank statement dated December 31, 2007, constituting false information related to the amount of funds being held in escrow on behalf of ATMA. <u>See</u> Volume XIX, Ex. 95.

196.    On January 11, 2008, at 7:18 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA containing a misrepresentation that 250 of the ATMA Machines had been identified. See Volume XIX, Ex. 93.

197.    On January 18, 2008, at 5:47 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman attaching a purported schedule identifying the locations of the ATMA Machines, constituting false information related to the existence and location of the ATMA Machines. See Volume XX, Ex. 189.

198.    On January 20, 2008, at 12:30 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of the Plaintiff Trusts in New York containing a misrepresentation that Brossman had accounted for the existence of the ATMA Machines. See Volume XIX, Ex. 97.

199.    On January 20, 2008, at 9:05 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of the Plaintiff Trusts in New York containing a false representation as to the existence of ATMs owned by Brossman. See Volume XX, Ex. 190.

56

200.    On January 22, 2008, at 1:23 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of the Plaintiff Trusts in New York, attaching a schedule identifying the locations of the ATMA Machines, constituting false information related to the existence and location of the ATMA Machines. See Volume XX, Ex. 189.

201.    On January 22, 2008, at 2:32 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in North Carolina or Florida to a representative of the Plaintiff Trusts in New York, containing a false representation as to the existence and locations of the ATMA Machines. See Volume XIX, Ex. 98.

202.    On January 31, 2008, at 3:51 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 138.

203.    On January 31, 2008, at 3:58 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 139.

204.    On January 31, 2008, at 3:59 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 140.

205.    On January 31, 2008, at 4:00 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 143.

206.    On January 31, 2008, at 4:01 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 144.

207.    On January 31, 2008, at 4:05 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 156.

208.    On January 31, 2008, at 4:06 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XIX, Ex. 157.

209.    On January 31, 2008, at 4:09 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XIX, Ex. 161.

210.    On January 31, 2008, at 4:10 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XIX, Ex. 165.

211.    On January 31, 2008, at 4:12 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 172 – Ex. 173.

212.    On January 31, 2008, at 4:20 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XIX, Ex. 141.

213.    On January 31, 2008, at 4:24 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 158.

214.    On January 31, 2008, at 4:26 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 162.

215.    On January 31, 2008, at 4:30 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XX, Ex. 174.

216.    On January 31, 2008, at 4:31 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XX, Ex. 179, Ex. 181.

217.    On January 31, 2008, at 4:32 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Exs. 182 and 186.

218.    On January 31, 2008, at 5:03 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 191 – Ex. 192.

219.    On January 31, 2008, at 5:19 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 191.

220.    On January 31, 2008, at 5:20 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of Plaintiff Trusts in New York with an attached Fictitious Monthly Report. <u>See</u> Volume XX, Ex. 192.

### <u>Violations of 18 U.S.C. § 1341 (Mail Fraud)</u>

221.    The predicate acts, and evidence of the schemes constituting the pattern of racketeering, further include, but are not limited to interstate mailings containing false or fraudulent pretenses, representations, or promises made in furtherance of the ATM Sales Enterprise caused to be transmitted by the Defendants, in violation of 18 U.S.C. § 1341.

*__Interstate Mailings__*

222.    Upon information and belief, on or about November 15, 2005, in furtherance of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM Venture, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated November 15, 2005; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; and an Equipment Management Agreement dated November 15, 2005.

223.    Upon information and belief, on or about December 20, 2005, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to further invest funds in the ATM Venture, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated December 20, 2005; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; and, an Equipment Management Agreement dated December 20, 2005.

224.    Upon information and belief, on or about February 22, 2006, in furtherance of the ATM Sales Enterprise and to further  induce the Plaintiff Trusts to further invest funds in the ATM Venture, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to

Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated February 22, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; and, an Equipment Management Agreement dated February 22, 2006.

225.    Upon information and belief, on or about April 26, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to further invest funds in the ATM Venture, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated April 26, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; an Equipment Management Agreement dated April 26, 2006.

226.    Upon information and belief, on or about May 27, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to further invest funds in the ATM Venture, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated May 23, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; and, an Equipment Management Agreement dated May 23, 2006.

227.    Upon information and belief, on or about August 30, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to further invest funds in the ATM Venture, Moore, knowingly placed or caused to be placed in a post office or

authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated September 5, 2006; a Due Diligence Report and Placed ATM Leases for each of the 127 ATMs; and an Equipment Management Agreement dated September 5, 2006.

228.    Upon information and belief, on or about November 15, 2005, in furtherance of the ATM Sales Enterprise and to induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated November 16, 2005, Asset Purchase Agreement dated November 16, 2005, and Due Diligence Commitment dated November 16, 2005.

229.    Upon information and belief, on or about December 20, 2005, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated December 20, 2005, Asset Purchase Agreement dated December 20, 2005, and Addition to Equipment dated December 20, 2005.

230.    Upon information and belief, on or about February 22, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated February 22, 2006, Asset Purchase Agreement dated February 22, 2006, and Addition to Equipment dated December 20, 2005.

231.    Upon information and belief, on or about April 26, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated April 26, 2006, Asset Purchase Agreement dated April 26, 2006, and Addition to Equipment dated April 26, 2006.

232.    Upon information and belief, on or about May 27, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated May 27, 2006, and Asset Purchase Agreement dated May 27, 2006.

233.    Upon information and belief, on or about June 16, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated June 16, 2006, and Asset Purchase Agreement dated June 16, 2006.

234.    Upon information and belief, on or about June 27, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated June 27, 2006, and Asset Purchase Agreement dated June 27, 2006.

235.    Upon information and belief, on or about July 28, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated July 28, 2006, and Asset Purchase Agreement dated July 28, 2006.

236.    Upon information and belief, on or about August 30, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the

ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: four Bills of Sale dated August 30, 2006, and four Asset Purchase Agreements dated August 30, 2006.

237.    Upon information and belief, on or about September 26, 2006, in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to invest funds in the ATM Venture, 36 Main, Netschi and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: three Bills of Sale dated September 26, 2006, and three Asset Purchase Agreements dated September 26, 2006.

238.    The allegations in Paragraphs 222 - 237 are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.  The allegations in Paragraphs 222 - 237 are based in part upon information and belief because the Defendants are alleged to have sent or delivered the documents identified in Paragraphs 222 - 237 above amongst themselves.

239.    As a direct and proximate result of Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman's conduct of the ATM Sales Enterprise through the pattern of racketeering activity detailed in Paragraphs 106 – 237 above, Plaintiffs have been injured in their business and property, specifically the loss of $16,475,000.00 paid to purchase the phantom ATMA Machines.  Netschi, 36 Main, Jones, Moore, Exclusive Properties ATM Capital, Munier, and Brossman's conduct and

participation in the ATM Sales Enterprise as part of their pattern of racketeering activity

was in the violation of 18 U.S.C. § 1962(c) and caused Plaintiffs' losses. Accordingly,

Plaintiffs are entitled, under the provisions of 18 U.S.C. § 1964(c), to recover treble

damages, the costs of bringing this action, pre-judgment interest, and reasonable

attorney's fees.

### COUNT 2
#### (Civil Racketeering Violations – All Defendants)
#### (18 U.S.C. § 1962(d))

240.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 239 of this Complaint as if fully set forth herein.

241.    The Defendants, as detailed in Paragraphs 26 – 65, 74 and 84 – 97 above,

entered into an agreement with each other to engage in a conspiracy to violate 18 U.S.C.

§ 1962(c). As set forth Each Defendant entered into an agreement to join the conspiracy,

took acts in the furtherance of the conspiracy and knowingly participated in the

conspiracy.

242.    The purpose of the conspiracy was to induce investors, including Plaintiffs, to

enter into agreements to purchase phantom Placed ATMs to their economic detriment and

to the economic benefit of the Defendants. The conspirators each carried out the scheme

and each conspirator was put on notice of the general nature of the conspiracy, that the

conspiracy extended beyond the individual role of any single member, and that the

conspiratorial venture, the ATM Sales Enterprise, functioned as a continuing unit for a

common purpose. The Defendants, as conspirators, adopted the goal of furthering the

ATM Sales Enterprise. Each of the Defendants' stake in the ATM Sales Enterprise was

in making profits through each Defendant's role in the ATM Sales Enterprise.

243.    The Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by: (1) participating or causing the acquisition or maintenance of, through a pattern of racketeering activity, an interest or control in the ATM Sales Enterprise, the activities of which affect interstate or foreign commerce; and, (2) participating, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

244.    By engaging in the overt acts and other conduct described in Paragraphs 26 – 65 and 84 – 97 above, Defendants have agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d), to engage in illegal predicate acts, detailed in Paragraphs 106 - 237 above, which formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. § 1962(c).

245.    The Defendants participated in and cooperated with each other in the aforementioned conspiracy that enabled Defendants to engage in the fraudulent sale of ATMs and thereby amass substantial sums of money, believed to be tens of millions of dollars, from investors throughout the United States of America, including Plaintiffs who reside and conduct business in the Southern District of New York.

246.    The membership of the conspiracy includes each of the Defendants. As coconspirators, the Defendants are liable for all of the actions committed by all of the coconspirators within the conspiracy and are liable for all of the damages sustained by Plaintiffs that were caused by any members of the conspiracy, regardless of whether the Defendants were themselves directly involved in a particular aspect of the ATM Sales Enterprise.

247.    As a direct and proximate result of the violations set forth above, Plaintiffs,

have been injured in their business and property. The Defendants violations of 18 U.S.C.

§ 1962(d) were the proximate cause of these losses.  Under the provisions of 18 U.S.C. §

1962(c), Plaintiffs are entitled to bring this action and recover herein treble damages, the

cost of bringing this suit, pre-judgment interest, and recoverable attorney's fees.

## COUNT 3
## (Fraudulent Misrepresentation, Inducement – Moore)

248.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 247 of this Complaint as if fully set forth herein.

249.    The representations by Moore, as detailed above at Paragraphs 34, 36, 52, 54,

56 – 57, 59, 61 – 63, 65, 88, 91, 93, 159, 166 - 168, 173, 179, 191 - 195, and 197 - 201

were material false representations made to Plaintiffs that Moore knew were false, or

were made recklessly without regard to their truth, with an intent to defraud Plaintiffs and

Plaintiffs justifiably relied on Moore's materially false representations.

250.    Moore, as detailed above at Paragraphs 34, 36, 52, 54, 56 – 57, 59, 61 – 63,

65, 88, 91, 93, 159, 166 - 168, 173, 179, 191 - 195, and 197 - 201 made false

misrepresentations to Plaintiffs of facts that were material to Plaintiffs' decision to enter

the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines,

and engage the management services of Moore's ISO company, ATMFS, to manage the

ATMA Machines.

251.    Moore knew or should have known of: the falsity of the verbal and written

representations made to Plaintiffs; the incompleteness of the representations made to

Plaintiffs at the time they were made; and, that the representations made to Plaintiffs

omitted material facts.

252.    Moore's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 34, 36, 52, 54, 56 – 57, 59, 61 – 63, 65, 88, 91, 93, 159, 166 - 168, 173, 179, 191 - 195, and 197 - 201, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiffs to enter into the Asset Purchase Agreements for the purchase of "phantom" Placed ATMs from 36 Main, to transfer funds to 36 Main for those "phantom" Placed ATMs, and to engage the services of ATMFS, through Moore, to manage the ATMA Machines. Moore intentionally or recklessly attempted to hide such fraud by delivering the Moore Fictitious Transaction Documents, Fictitious Monthly Reports, and Periodic Revenue Payments to Plaintiffs.

253.    Plaintiffs reasonably and justifiably relied to their detriment on the truthfulness of Moore's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines, and conduct business with the ATM Sales Enterprise.

254.    In addition, for Tranche Purchases subsequent to the November 15, 2005 Tranche Purchase, Plaintiffs justifiably relied upon and were further induced into continuing to purchase the "phantom" Placed ATMs by Moore's delivery of Fictitious Monthly Reports and Periodic Revenue Payments.

255.    But for Moore's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiffs would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

256.    Moore had a pecuniary interest in the transactions between Plaintiffs and 36 Main and/or the ATM Sales Enterprise.

257.    As a direct and proximate result of the Moore's intentional misrepresentations, omissions, and concealment of material facts, Plaintiffs have been damaged to the extent that it has lost the value of all principal amounts invested with and through 36 Main, plus all applicable interest thereon.

258.    Moore's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiffs.  Plaintiffs are therefore entitled to the award of punitive damages from Moore.

## COUNT 4
### (Fraudulent Misrepresentation and Inducement – Netschi)

259.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 258 of this Complaint as if fully set forth herein.

260.    The representations by Netschi, as detailed above at Paragraphs 30 – 33, 35, 41, 74, 87, and 96, were material false representations made to Plaintiffs that Netschi knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiffs and Plaintiffs reasonably relied on Netschi's materially false representations.

261.    Netschi, as detailed above at Paragraphs 30 – 33, 35, 41, 74, 87, and 96, made false misrepresentations to Plaintiffs of facts that were material to Plaintiffs' decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

262.    Netschi knew or should have known of: the falsity of the verbal and written representations made to Plaintiffs; the incompleteness of the representations made to Plaintiffs at the time they were made; and, that the representations made to Plaintiffs omitted material facts.

263.    Netschi's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 30 – 33, 35, 41, 74, 87, and 96, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiffs to enter into the Asset Purchase Agreements for the purchase of "phantom" ATMs from 36 Main, to transfer funds to 36 Main for those "phantom" ATMs, and to engage the services of ATMFS, through Moore, to manage the ATMA Machines. Netschi intentionally or recklessly attempted to hide such fraud by delivering or causing to be delivered the 36 Main Transaction Documents.

264.    Plaintiffs reasonably and justifiably relied to their detriment on the truthfulness of Netschi's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

265.    But for Netschi's material misrepresentations, omissions, and concealment of facts concerning the 36 Main Fictitious Transaction Documents, Plaintiffs would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

266.    Netschi had a pecuniary interest in the transactions between Plaintiffs and 36 Main and/or the ATM Sales Enterprise.

267. As a direct and proximate result of the Netschi's intentional misrepresentations, omissions, and concealment of material facts, Plaintiffs have been damaged to the extent that it has lost the value of all principal amounts invested with and through 36 Main, plus all applicable interest thereon.

268. Netschi's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiffs. Plaintiffs are therefore entitled to the award of punitive damages from Netschi.

## COUNT 5
### (Fraudulent Misrepresentation, Inducement, Concealment – Brossman)

269. Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 268 of this Complaint as if fully set forth herein.

270. The representations by Brossman, as detailed above at Paragraphs 33, 53, 58, 60, 64, 89 – 90, 92, 95, 97, 196, 198 - 200, 202 - 220, were material false representations made to Plaintiffs that Brossman knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiffs and Plaintiffs reasonably relied on Brossman's materially false representations.

271. Brossman, as detailed above at Paragraphs 33, 53, 58, 60, 64, 89 – 90, 92, 95, 97, 196, 198 - 200, 202 - 220, made false misrepresentations to Plaintiffs of facts that were material to Plaintiffs' decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

272. Brossman knew or should have known of: the falsity of the verbal and written representations made to Plaintiffs; the incompleteness of the representations made to

Plaintiffs at the time they were made; and, that the representations made to Plaintiffs omitted material facts.

273.    Brossman's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 33, 53, 58, 60, 64, 89 – 90, 92, 95, 97, 196, 198 - 200, 202-220, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiffs to enter into the Asset Purchase Agreements for the purchase of "phantom" ATMs from 36 Main, to transfer funds to 36 Main for those "phantom" ATMs, and to engage the services of ATMFS, through Brossman, to manage the ATMA Machines. Brossman intentionally or recklessly attempted to hide such fraud by delivering the Fictitious Transaction Documents and/or Fictitious Monthly Reports to Plaintiffs.

274.    Plaintiffs reasonably and justifiably relied to their detriment on the truthfulness of Brossman's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

275.    But for Brossman's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiffs would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

276.    Brossman had a pecuniary interest in the transactions between Plaintiffs and 36 Main and/or the ATM Sales Enterprise.

277.    Brossman was under a duty to disclose the facts described in Paragraphs 33, 53, 58, 60, 64, 89 – 90, 92, 95, 97, 193, 196, 198 - 200, 202 - 220, above and chose to not do so.

278.    As a direct and proximate result of the Brossman's intentional misrepresentations, omissions, and concealment of material facts, Plaintiffs have been damaged to the extent that it has lost the value of all principal amounts invested with and through 36 Main, plus all applicable interest thereon.

279.    Brossman's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiffs.  Plaintiffs are therefore entitled to the award of punitive damages from Brossman.

## COUNT 6
### (Fraudulent Misrepresentation, Inducement, Concealment – Munier)

280.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 279 of this Complaint as if fully set forth herein.

281.    The representations by Munier, as detailed above at Paragraphs 33, 53, 89, 92, 95 and 97, were material false representations made to Plaintiffs that Munier knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiffs and Plaintiffs reasonably relied on Munier's materially false representations.

282.    Munier, as detailed above at Paragraphs, 33, 53, 89, 92, 95 and 97, made false misrepresentations to Plaintiffs of facts that were material to Plaintiffs' decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

283.    Munier knew or should have known of: the falsity of the verbal and written representations made to Plaintiffs; the incompleteness of the representations made to Plaintiffs at the time they were made; and, that the representations made to Plaintiffs omitted material facts.

284.    Munier's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 33, 53, 89, 92, 95 and 97were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiffs to enter into the Asset Purchase Agreements for the purchase of "phantom" ATMs from 36 Main, to transfer funds to 36 Main for those "phantom" ATMs, and to engage the services of ATMFS, through Munier, to manage the ATMA Machines. Munier intentionally or recklessly attempted to hide such fraud by delivering the Fictitious Transaction Documents and/or Fictitious Monthly Reports to Plaintiffs.

285.    Plaintiffs reasonably and justifiably relied to their detriment on the truthfulness of Munier's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

286.    But for Munier's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiffs would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

287.    Munier had a pecuniary interest in the transactions between Plaintiffs and 36 Main and/or the ATM Sales Enterprise.

288.    Munier was under a duty to disclose the facts described in Paragraphs 33, 53, 89, 92, 95 and 97 above and chose to not do so.

289.    As a direct and proximate result of the Munier's intentional misrepresentations, omissions, and concealment of material facts, Plaintiffs have been damaged to the extent that it has lost the value of all principal amounts invested with and through 36 Main, plus all applicable interest thereon.

290.    Munier's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiffs.  Plaintiffs are therefore entitled to the award of punitive damages from Munier.

### COUNT 7
### (Negligent Misrepresentation – 36 Main and Netschi)

291.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 290 of this Complaint as if fully set forth herein.

292.    The representations made by Netschi and 36 Main to Plaintiffs in Paragraphs 30 - 33, and 35 above (collectively the "36 Main Misrepresentations") were false when made and material to Plaintiffs' decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines and conduct business with the ATM Sales Enterprise.

293.    Netschi and 36 Main were in a superior position to know the truth or falsity of the 36 Main Misrepresentations.

294.    Netschi and 36 Main should have known the truth or falsity of the 36 Main Misrepresentations.

295.    Under the circumstances, Netschi and 36 Main were under a duty to ensure the accuracy of the 36 Main Misrepresentations.

296.    Netschi and 36 Main made the 36 Main Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

297.    Netschi and 36 Main intended and were aware that Plaintiffs would rely upon the 36 Main Misrepresentations in deciding whether to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines and conduct business with the ATM Sales Enterprise.

298.    Netschi and 36 Main had a pecuniary interest in the ATM Venture and the ATM Sales Enterprise.

299.    Plaintiffs reasonably and justifiably relied to their detriment upon the 36 Main Misrepresentations and on the completeness of their disclosure of material facts, in choosing to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise and but for the 36 Main Misrepresentations, Plaintiffs would not have entered the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise.

300.    Netschi and 36 Main's breach of their duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

301.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the 36 Main Misrepresentations.

302.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the value of all principal amounts invested with and through the Defendants, plus all applicable interest thereon.

## COUNT 8
### (Negligent Misrepresentation – Moore)

303.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 302 of this Complaint as if fully set forth herein.

304.    The representations made by Moore in Paragraphs 34, 36, and 52 above (collectively the "Moore Misrepresentations") were false when made and material to Plaintiffs' decision to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with the ATM Sales Enterprise.

305.    Moore was in a superior position to know the truth or falsity of the Moore Misrepresentations.

306.    Moore should have known the truth or falsity of the Moore Misrepresentations.

307.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore Misrepresentations.

308.    Moore made the Moore Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

309.    Moore intended and was aware that Plaintiffs would rely upon the Moore Misrepresentations in deciding whether to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise.

310.    Moore had a pecuniary interest in the ATM Venture, the sale of the ATMA Machines by 36 Main and/or the ATM Sales Enterprise.

311.    Plaintiffs justifiably relied to their detriment upon the Moore Misrepresentations by entering the ATM Venture, purchasing the ATMA Machines and/or conducting business with ATM Sales Enterprise and but for the Moore Misrepresentations, Plaintiffs would not have entered the ATM Venture, purchased the ATMA Machines and/or conducted business with ATM Sales Enterprise.

312.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

313.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore Misrepresentations.

314.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the value of all principal amounts invested with and through the Defendants, plus all applicable interest thereon.

**COUNT 9**
**(Negligent Misrepresentation – Moore)**

315.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 314 of this Complaint as if fully set forth herein.

316.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the undated Due Diligence Report provided to Plaintiffs on or about November 16, 2005 (the "Moore November 2005 Due Diligence Misrepresentations") (See Volume III, Ex. 11) were false when made and material to Plaintiffs' decision to enter into the November 16, 2005 Tranche Purchase.

317.    Moore was in a superior position to know the truth or falsity of the Moore November 2005 Due Diligence Misrepresentations.

318.    Moore should have known the truth or falsity of the Moore November 2005 Due Diligence Misrepresentations.

319.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore November 2005 Due Diligence Misrepresentations.

320.    Moore made the Moore November 2005 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

321.    Moore intended and was aware that Plaintiffs would rely upon the Moore November 2005 Due Diligence Misrepresentations in deciding whether to enter into the November 16, 2005 Tranche Purchase.

322.    Moore had an undisclosed pecuniary interest in the November 16, 2005 Tranche Purchase, because his company, ATMFS, was actually 36 Main's source of the ATMs for the November 16, 2005 Tranche Purchase.

323.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore November 2005 Due Diligence Misrepresentations by entering into the November 16, 2005 Tranche Purchase, whereby Plaintiffs agreed to purchase 100 Placed ATM machines for $1,900,000.00.

324.    But for the Moore November 2005 Due Diligence Misrepresentations, Plaintiffs would not have entered the November 16, 2005 Tranche Purchase.

325.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

326.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore November 2005 Due Diligence Misrepresentations.

327.   By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

## COUNT 10
### (Negligent Misrepresentation – Moore)

328.   Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 327 of this Complaint as if fully set forth herein.

329.   The representations made by Moore, as detailed in Paragraph 45(h) above, in the undated Due Diligence Report provided to Plaintiffs on or about December 20, 2005 (the "Moore December 2005 Due Diligence Misrepresentations") (See Volume V, Ex. 20) were false when made and material to Plaintiffs' decision to enter into the December 20, 2005 Tranche Purchase.

330.   Moore was in a superior position to know the truth or falsity of the Moore December 2005 Due Diligence Misrepresentations.

331.   Moore should have known the truth or falsity of the Moore December 2005 Due Diligence Misrepresentations.

332.   Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore December 2005 Due Diligence Misrepresentations.

333.   Moore made the Moore December 2005 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

334.   Moore intended and was aware that Plaintiffs would rely upon the Moore December 2005 Due Diligence Misrepresentations in deciding whether to enter into the December 20, 2005 Tranche Purchase.

335.    Moore had an undisclosed pecuniary interest in the December 20, 2005 Tranche Purchase, because his company, ATMFS, was actually 36 Main's source of the ATMs for the December 20, 2005 Tranche Purchase.

336.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore December 2005 Due Diligence Misrepresentations by entering into the December 20, 2005 Tranche Purchase, whereby Plaintiffs agreed to purchase 100 Placed ATM machines for $1,900,000.00.

337.    But for the Moore December 2005 Due Diligence Misrepresentations, Plaintiffs would not have entered the December 20, 2005 Tranche Purchase.

338.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

339.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore December 2005 Due Diligence Misrepresentations.

340.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

## COUNT 11
### (Negligent Misrepresentation – Moore)

341.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 340 of this Complaint as if fully set forth herein.

342.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the Due Diligence Report for the February 22, 2006 Tranche Purchase and provided to Plaintiffs on or about February 22, 2006 (the "Moore February 2006 Due Diligence Misrepresentations") (See Volume VII, Ex. 29) were false when made and material to Plaintiffs' decision to enter into the February 22, 2006 Tranche Purchase.

84

343.    Moore was in a superior position to know the truth or falsity of the Moore February 2006 Due Diligence Misrepresentations.

344.    Moore should have known the truth or falsity of the Moore February 2006 Due Diligence Misrepresentations.

345.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore February 2006 Due Diligence Misrepresentations.

346.    Moore made the Moore February 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

347.    Moore intended and was aware that Plaintiffs would rely upon the Moore February 2006 Due Diligence Misrepresentations in deciding whether to enter into the February 22, 2006 Tranche Purchase.

348.    Moore had an undisclosed pecuniary interest in the February 22, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the February 22, 2006 Tranche Purchase.

349.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore February 2006 Due Diligence Misrepresentations by entering into the February 22, 2006 Tranche Purchase, whereby Plaintiffs agreed to purchase 100 Placed ATM machines for $1,900,000.00.

350.    But for the Moore February 2006 Due Diligence Misrepresentations, Plaintiffs would not have entered the February 22, 2006 Tranche Purchase.

351.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

352. The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore February 2006 Due Diligence Misrepresentations.

353. By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

## COUNT 12
### (Negligent Misrepresentation – Moore)

354. Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 353 of this Complaint as if fully set forth herein.

355. The representations made by Moore, as detailed in Paragraph 45(h) above, in the Due Diligence Report dated April 26, 2006 (the "Moore April 2006 Due Diligence Misrepresentations") (See Volume IX, Ex. 38) were false when made and material to Plaintiffs' decision to enter into the April 26, 2006 Tranche Purchase.

356. Moore was in a superior position to know the truth or falsity of the Moore April 2006 Due Diligence Misrepresentations.

357. Moore should have known the truth or falsity of the Moore April 2006 Due Diligence Misrepresentations.

358. Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore April 2006 Due Diligence Misrepresentations.

359. Moore made the Moore April 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

360. Moore intended and was aware that Plaintiffs would rely upon the Moore April 2006 Due Diligence Misrepresentations in deciding whether to enter into the April 26, 2006 Tranche Purchase.

361.    Moore had an undisclosed pecuniary interest in the April 26, 2006 Deal because his company, ATMFS, was actually 36 Main's source of the ATMs for the April 26, 2006 Tranche Purchase.

362.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore April 2006 Due Diligence Misrepresentations by entering into the April 26, 2006 Tranche Purchase, whereby Plaintiffs agreed to purchase 100 Placed ATM machines for $1,950,000.00.

363.    But for the Moore April 2006 Due Diligence Misrepresentations, Plaintiffs would not have entered the April 26, 2006 Tranche Purchase.

364.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

365.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore April 2006 Due Diligence Misrepresentations.

366.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,950,000.00 paid to 36 Main.

## COUNT 13
### (Negligent Misrepresentation – Moore)

367.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 366 of this Complaint as if fully set forth herein.

368.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the undated Due Diligence Report provided to Plaintiffs on or about May 27, 2006 (the "Moore May 2006 Due Diligence Misrepresentations") (See Volume XI, Ex. 45) were false when made and material to Plaintiffs' decision to enter into the May 27, 2006 Tranche Purchase.

369.    Moore was in a superior position to know the truth or falsity of the Moore May 2006 Due Diligence Misrepresentations.

370.    Moore should have known the truth or falsity of the Moore May 2006 Due Diligence Misrepresentations.

371.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore May 2006 Due Diligence Misrepresentations.

372.    Moore made the Moore May 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

373.    Moore intended and was aware that Plaintiffs would rely upon the Moore May 2006 Due Diligence Misrepresentations in deciding whether to enter into the May 27, 2006 Tranche Purchase.

374.    Moore had an undisclosed pecuniary interest in the May 27, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the May 27, 2006 Tranche Purchase.

375.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore May 2006 Due Diligence Misrepresentations by entering into the May 27, 2006 Tranche Purchase, whereby Plaintiffs agreed to purchase 100 Placed ATM machines for $1,950,000.00.

376.    But for the Moore May 2006 Due Diligence Misrepresentations, Plaintiffs would not have entered the May 27, 2006 Tranche Purchase.

377.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

378.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore May 2006 Due Diligence Misrepresentations.

379.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,950,000.00 paid to 36 Main.

**COUNT 14**
**(Negligent Misrepresentation – Moore)**

380.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 379 of this Complaint as if fully set forth herein.

381.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the undated Due Diligence Report provided to Plaintiffs on or about June 16, 2006 (the "Moore June 16, 2006 Due Diligence Misrepresentations") (See Volume XII, Ex. 52) were false when made and material to Plaintiffs' decision to enter into the June 16, 2006 Tranche Purchase.

382.    Moore was in a superior position to know the truth or falsity of the Moore June 16, 2006 Due Diligence Misrepresentations.

383.    Moore should have known the truth or falsity of the Moore June 16, 2006 Due Diligence Misrepresentations.

384.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore June 16, 2006 Due Diligence Misrepresentations.

385.    Moore made the Moore June 16, 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

386.    Moore intended and was aware that Plaintiffs would rely upon the Moore June 16, 2006 Due Diligence Misrepresentations in deciding whether to enter into the June 16, 2006 Tranche Purchase.

387.    Moore had an undisclosed pecuniary interest in the June 16, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the June 16, 2006 Tranche Purchase.

388.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore June 16, 2006 Due Diligence Misrepresentations by entering into the June 16, 2006 Tranche Purchase, whereby Plaintiffs agreed to purchase 50 Placed ATM machines for $975,000.00.

389.    But for the Moore June 16, 2006 Due Diligence Misrepresentations, Plaintiffs would not have entered the June 16, 2006 Tranche Purchase.

390.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

391.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore June 16, 2006 Due Diligence Misrepresentations.

392.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $975,000.00 paid to 36 Main.

## COUNT 15
### (Negligent Misrepresentation – Moore)

393.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 392 of this Complaint as if fully set forth herein.

394.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the undated Due Diligence Report provided to Plaintiffs on or about June 27, 2006 (the "Moore June 27, 2006 Due Diligence Misrepresentations") (See Volume XIII, Ex. 59) were false when made and material to Plaintiffs' decision to enter into the June 27, 2006 Tranche Purchase.

395.    Moore was in a superior position to know the truth or falsity of the Moore June 27, 2006 Due Diligence Misrepresentations.

396.    Moore should have known the truth or falsity of the Moore June 27, 2006 Due Diligence Misrepresentations.

397.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore June 27, 2006 Due Diligence Misrepresentations.

398.    Moore made the Moore June 27, 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

399.    Moore intended and was aware that Plaintiffs would rely upon the Moore June 27, 2006 Due Diligence Misrepresentations in deciding whether to enter into the June 27, 2006 Tranche Purchase.

400.    Moore had an undisclosed pecuniary interest in the June 27, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the June 27, 2006 Tranche Purchase.

401.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore June 27, 2006 Due Diligence Misrepresentations by entering into the June 27, 2006 Tranche Purchase, whereby Plaintiffs agreed to purchase 74 Placed ATM machines for $1,073,000.00.

402.    But for the Moore June 27, 2006 Due Diligence Misrepresentations, Plaintiffs would not have entered the June 27, 2006 Tranche Purchase.

403.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

404.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore June 27, 2006 Due Diligence Misrepresentations.

405.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,073,000.00 paid to 36 Main.

### COUNT 16
### (Negligent Misrepresentation – Moore)

406.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 405 of this Complaint as if fully set forth herein.

407.    The representations made by Moore, as detailed in Paragraph 45(h) above, in the undated Due Diligence Report provided to Plaintiffs on or about July 28, 2006 (the "Moore July 2006 Due Diligence Misrepresentations") (See Volume XV, Ex. 66) were false when made and material to Plaintiffs' decision to enter into the July 28, 2006 Tranche Purchase.

408.    Moore was in a superior position to know the truth or falsity of the Moore July 2006 Due Diligence Misrepresentations.

409.    Moore should have known the truth or falsity of the Moore July 2006 Due Diligence Misrepresentations.

410.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore July 2006 Due Diligence Misrepresentations.

411.    Moore made the Moore July 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

412.    Moore intended and was aware that Plaintiffs would rely upon the Moore July 2006 Due Diligence Misrepresentations in deciding whether to enter into the July 28, 2006 Tranche Purchase.

413.    Moore had an undisclosed pecuniary interest in the July 28, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the July 28, 2006 Tranche Purchase.

414.    Plaintiffs reasonably and justifiably relied to their detriment upon the Moore July 2006 Due Diligence Misrepresentations by entering into the July 28, 2006 Tranche Purchase, whereby Plaintiffs agreed to purchase 100 Placed ATM machines for $1,450,000.00.

415.    But for the Moore July 2006 Due Diligence Misrepresentations, Plaintiffs would not have entered the July 28, 2006 Tranche Purchase.

416.    Moore's breach of his duty of reasonable care to Plaintiffs is the proximate cause of Plaintiffs' injuries.

417.    The type and extent of Plaintiffs' injuries were reasonably foreseeable results of the Moore July 2006 Due Diligence Misrepresentations.

418.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but not less than the $1,450,000.00 paid to 36 Main.

## COUNT 17
### (Breach of Contract – 36 Main)

419.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 418 of this Complaint as if fully set forth herein.

420.    On or about November 16, 2005, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "November 16, 2005 Asset Purchase Agreement") (See Volume II, Ex. 5).

93

Exhibit A

(Part 3 of 3)

421.    Pursuant to the terms of the November 16, 2005 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM machines to ATMA.

422.    On or about November 16, 2005, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

423.    36 Main, in breach of the November 16, 2005 Asset Purchase Agreement failed to perform in accordance with the terms of the November 16, 2005 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the November 16, 2005 Asset Purchase Agreement.

424.    36 Main's conduct detailed above constituted a material breach of the November 16, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 18
### (Breach of Contract – 36 Main)

425.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 424 of this Complaint as if fully set forth herein.

426.    On or about December 20, 2005, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "December 20, 2005 Asset Purchase Agreement") (See Volume III, Ex. 14).

427.    Pursuant to the terms of the December 20, 2005 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM machines to ATMA.

428.    On or about December 20, 2005, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

94

429.    36 Main, in breach of the December 20, 2005 Asset Purchase Agreement failed to perform in accordance with the terms of the December 20, 2005 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the December 20, 2005 Asset Purchase Agreement.

430.    36 Main's conduct detailed above constituted a material breach of the December 20, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 19
### (Breach of Contract – 36 Main)

431.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 430 of this Complaint as if fully set forth herein.

432.    On or about February 22, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "February 22, 2006 Asset Purchase Agreement") (See Volume IV, Ex. 23).

433.    Pursuant to the terms of the February 22, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM Machines to ATMA.

434.    On or about February 22, 2006, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

435.    36 Main, in breach of the February 22, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the February 22, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the February 22, 2006 Asset Purchase Agreement.

436.    36 Main's conduct detailed above constituted a material breach of the February 22, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 20
### (Breach of Contract – 36 Main)

437.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 436 of this Complaint as if fully set forth herein.

438.    On or about April 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "April 26, 2006 Asset Purchase Agreement") (See Volume VII, Ex. 32).

439.    Pursuant to the terms of the April 26, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,950,000.00, 36 Main agreed to sell 100 Placed ATM Machines to ATMA.

440.    On or about April 26, 2006, ATMA paid $1,950,000.00 to 36 Main via a bank wire transfer.

441.    36 Main, in breach of the April 26, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the April 26, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the April 26, 2006 Asset Purchase Agreement.

442.    36 Main's conduct detailed above constituted a material breach of the April 26, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 21
### (Breach of Contract – 36 Main)

443.     Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 442 of this Complaint as if fully set forth herein.

444.     On or about May 27, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "May 27, 2006 Asset Purchase Agreement") (See Volume IX, Ex. 41).

445.     Pursuant to the terms of the May 27, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,950,000.00, 36 Main agreed to sell 100 Placed ATM Machines to ATMA.

446.     On or about May 27, 2006, ATMA paid $1,950,000.00 to 36 Main via a bank wire transfer.

447.     36 Main, in breach of the May 27, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the May 27, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the May 27, 2006 Asset Purchase Agreement.

448.     36 Main's conduct detailed above constituted a material breach of the May 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 22
### (Breach of Contract – 36 Main)

449.     Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 448 of this Complaint as if fully set forth herein.

450.    On or about June 16, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 50 Placed ATM machines (the "June 16, 2006 Asset Purchase Agreement") (See Volume XII, Ex. 48).

451.    Pursuant to the terms of the June 16, 2006 Asset Purchase Agreement, in exchange for the consideration of $975,000.00, 36 Main agreed to sell 50 Placed ATM Machines to ATMA.

452.    On or about June 16, 2006, ATMA paid $975,000.00 to 36 Main via a bank wire transfer.

453.    36 Main, in breach of the June 16, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the June 16, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement.

454.    36 Main's conduct detailed above constituted a material breach of the June 16, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 23
### (Breach of Contract – 36 Main)

455.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 454 of this Complaint as if fully set forth herein.

456.    On or about June 27, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 74 Placed ATM machines (the "June 27, 2006 Asset Purchase Agreement") (See Volume XIII, Ex. 55).

457.    Pursuant to the terms of the June 27, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,073,000.00, 36 Main agreed to sell 74 Placed ATM Machines to ATMA.

458.    On or about June 27, 2006, ATMA paid $1,073,000.00 to 36 Main via a bank wire transfer.

459.    36 Main, in breach of the June 27, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the June 27, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the June 27, 2006 Asset Purchase Agreement.

460.    36 Main's conduct detailed above constituted a material breach of the June 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

## COUNT 24
### (Breach of Contract – 36 Main)

461.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 460 of this Complaint as if fully set forth herein.

462.    On or about July 28, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 101 Placed ATM machines identified in Schedule A of the Asset Purchase Agreement (the "July 28, 2006 Asset Purchase Agreement") (See Volume XIV, Ex. 62).

463.    Pursuant to the terms of the July 28, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,450,000.00, 36 Main agreed to sell 101 Placed ATM Machines to ATMA.

464.   On or about July 28, 2006, ATMA paid $1,469,500.00 to 36 Main via a bank wire transfer.

465.   36 Main, in breach of the July 28, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the July 28, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement.

466.   36 Main's conduct detailed above constituted a material breach of the July 28, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 25
### (Breach of Contract – 36 Main)

467.   Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 466 of this Complaint as if fully set forth herein.

468.   On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 7 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #1") (See Volume XVI, Ex. 69).

469.   Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #1, in exchange for the consideration of $136,500.00, 36 Main agreed to sell 7 Placed ATM Machines to ATMA.

470.   On or about August 30, 2006, ATMA paid $136,500.00 to 36 Main via a bank wire transfer.

471.   36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #1 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase

100

Agreement #1 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1.

472.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $136,500.00 paid to 36 Main.

## COUNT 26
## (Breach of Contract – 36 Main)

473.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 472 of this Complaint as if fully set forth herein.

474.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 17 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #2") (See Volume XVI, Ex. 71).

475.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #2, in exchange for the consideration of $331,500.00, 36 Main agreed to sell 17 Placed ATM Machines to ATMA.

476.    On or about August 30, 2006, ATMA paid $331,500.00 to 36 Main via a bank wire transfer.

477.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #2 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #2 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #2.

478.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $331,500.00 paid to 36 Main.

101

**COUNT 27**
**(Breach of Contract – 36 Main)**

479.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 478 of this Complaint as if fully set forth herein.

480.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 36 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #3") (See Volume XVI, Ex. 73).

481.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #3, in exchange for the consideration of $522,000.00, 36 Main agreed to sell 36 Placed ATM Machines to ATMA.

482.    On or about August 30, 2006, ATMA paid $522,000.00 to 36 Main via a bank wire transfer.

483.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #3 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #3 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3.

484.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $522,000.00 paid to 36 Main.

**COUNT 28**
**(Breach of Contract – 36 Main)**

485.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 484 of this Complaint as if fully set forth herein.

486.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 68 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #4") (See Volume XVI, Ex. 75).

487.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #4, in exchange for the consideration of $986,000.00, 36 Main agreed to sell 68 Placed ATM Machines to ATMA.

488.    On or about August 30, 2006, ATMA paid $986,000.00 to 36 Main via a bank wire transfer.

489.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #4 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #4 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4.

490.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #4 and ATMA is therefore entitled to the award of the return of the $986,000.00 paid to 36 Main.

## COUNT 29
### (Breach of Contract – 36 Main)

491.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 490 of this Complaint as if fully set forth herein.

492.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 2 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #1") (See Volume XVII, Ex. 82).

103

493.    Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #1, in exchange for the consideration of $44,000.00, 36 Main agreed to sell 2 Placed ATM machines to ATMA.

494.    On or about September 26, 2006, ATMA paid $44,000.00 to 36 Main via a bank wire transfer.

495.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #1 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #1 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1.

496.    36 Main's conduct detailed above constituted a material breach of the September 26, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

## COUNT 30
## (Breach of Contract – 36 Main)

497.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 496 of this Complaint as if fully set forth herein.

498.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 21 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #2") (See Volume XVII, Ex. 84).

499.    Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #2, in exchange for the consideration of $409,500.00, 36 Main agreed to sell 21 Placed ATM machines to ATMA.

500.    On or about September 26, 2006, ATMA paid $409,500.00 to 36 Main via a bank wire transfer.

501.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #2 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #2 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2.

502.    36 Main's conduct detailed above constituted a material breach of the September 26, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

## COUNT 31
### (Breach of Contract – 36 Main)

503.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 502 of this Complaint as if fully set forth herein.

504.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 64 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #3") (See Volume XVII, Ex. 86).

505.    Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #3, in exchange for the consideration of $928,000.00, 36 Main agreed to sell 64 Placed ATM machines to ATMA.

506.    On or about September 26, 2006, ATMA paid $928,000.00 to 36 Main via a bank wire transfer.

507.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #3 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #3 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3.

508.    36 Main's conduct detailed above constituted a material breach of the

September 26, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the

award of the return of the $928,000.00 paid to 36 Main.

## COUNT 32
### (Breach of Warranty – 36 Main)

509.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 508 of this Complaint as if fully set forth herein.

510.    The November 15, 2005 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

511.    ATMA relied on 36 Main's representations as a condition of the purchase.

512.    36 Main breached the warranty set forth in section 4.5 of the November 15,

2005 Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the November 15, 2005 Asset Purchase

Agreement purchased by ATMA.

513.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the November 15, 2005 Asset Purchase Agreement purchased by

ATMA was not good or marketable.

514.    36 Main's conduct breached the warranty stated in the November 15, 2005

Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of

the $1,900,000.00 paid to 36 Main.

106

**COUNT 33**
**(Breach of Warranty – 36 Main)**

515.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 514 of this Complaint as if fully set forth herein.

516.    The December 20, 2005 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

517.    ATMA relied on 36 Main's representations as a condition of the purchase.

518.    36 Main breached the warranty set forth in section 4.5 of the December 20,

2005 Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the December 20, 2005 Asset Purchase

Agreement purchased by ATMA.

519.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the December 20, 2005 Asset Purchase Agreement purchased by ATMA

was not good or marketable.

520.    36 Main's conduct breached the warranty stated in the December 20, 2005

Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of

the $1,900,000.00 paid to 36 Main.

**COUNT 34**
**(Breach of Warranty – 36 Main)**

521.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 520 of this Complaint as if fully set forth herein.

522.    The February 22, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

523.    ATMA relied on 36 Main's representations as a condition of the purchase.

524.    36 Main breached the warranty set forth in section 4.5 of the February 22, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Asset Purchase Agreement purchased by ATMA.

525.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

526.    36 Main's conduct breached the warranty stated in the February 22, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 35
## (Breach of Warranty – 36 Main)

527.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 526 of this Complaint as if fully set forth herein.

528.    The April 26, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

529.    ATMA relied on 36 Main's representations as a condition of the purchase.

530.   36 Main breached the warranty set forth in section 4.5 of the April 26, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Asset Purchase Agreement purchased by ATMA.

531.   36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

532.   36 Main's conduct breached the warranty stated in the April 26, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 36
### (Breach of Warranty – 36 Main)

533.   Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 532 of this Complaint as if fully set forth herein.

534.   The May 27, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

535.   ATMA relied on 36 Main's representations as a condition of the purchase.

536.   36 Main breached the warranty set forth in section 4.5 of the May 27, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Asset Purchase Agreement purchased by ATMA.

537.   36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

538.   36 Main's conduct breached the warranty stated in the May 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 37
## <u>(Breach of Warranty – 36 Main)</u>

539.   Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 538 of this Complaint as if fully set forth herein.

540.   The June 16, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

541.   ATMA relied on 36 Main's representations as a condition of the purchase.

542.   36 Main breached the warranty set forth in section 4.5 of the June 16, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement purchased by ATMA.

543.   36 Main was notified that title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

544. 36 Main's conduct breached the warranty stated in the June 16, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 38
### (Breach of Warranty – 36 Main)

545. Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 544 of this Complaint as if fully set forth herein.

546. The June 27, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

547. ATMA relied on 36 Main's representations as a condition of the purchase.

548. 36 Main breached the warranty set forth in section 4.5 of the June 27, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Asset Purchase Agreement purchased by ATMA.

549. 36 Main was notified that title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

550. 36 Main's conduct breached the warranty stated in the June 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

## COUNT 39
### (Breach of Warranty – 36 Main)

551.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 550 of this Complaint as if fully set forth herein.

552.    The July 28, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

553.    ATMA relied on 36 Main's representations as a condition of the purchase.

554.    36 Main breached the warranty set forth in section 4.5 of the July 28, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement purchased by ATMA.

555.    36 Main was notified that title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

556.    36 Main's conduct breached the warranty stated in the July 28, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 40
### (Breach of Warranty – 36 Main)

557.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 556 of this Complaint as if fully set forth herein.

558.    The August 30, 2006 Asset Purchase Agreement #1 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

559.    ATMA relied on 36 Main's representations as a condition of the purchase.

560.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #1 by failing to deliver good and marketable title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1 purchased by ATMA.

561.    36 Main was notified that title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1 purchased by ATMA was not good or marketable.

562.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $136,500.00 paid to 36 Main.

## COUNT 41
### (Breach of Warranty – 36 Main)

563.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 562 of this Complaint as if fully set forth herein.

564.    The August 30, 2006 Asset Purchase Agreement #2 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

565.    ATMA relied on 36 Main's representations as a condition of the purchase.

566.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #2 by failing to deliver good and marketable title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #2 purchased by ATMA.

567.    36 Main was notified that title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #2 purchased by ATMA was not good or marketable.

568.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $331,500.00 paid to 36 Main.

## COUNT 42
## (Breach of Warranty – 36 Main)

569.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 568 of this Complaint as if fully set forth herein.

570.    The August 30, 2006 Asset Purchase Agreement #3 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

571.    ATMA relied on 36 Main's representations as a condition of the purchase.

572.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #3 by failing to deliver good and marketable title to the 36 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3 purchased by ATMA.

114

573.    36 Main was notified that title to the 36 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3 purchased by ATMA was not good or marketable.

574.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $522,000.00 paid to 36 Main.

<div align="center">

**COUNT 43**
**(Breach of Warranty – 36 Main)**

</div>

575.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 574 of this Complaint as if fully set forth herein.

576.    The August 30, 2006 Asset Purchase Agreement #4 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

577.    ATMA relied on 36 Main's representations as a condition of the purchase.

578.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #4 by failing to deliver good and marketable title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4 purchased by ATMA.

579.    36 Main was notified that title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4 purchased by ATMA was not good or marketable.

580.   36 Main's conduct breached the warranty stated in the August 30, 2006 Asset

Purchase Agreement #4 and ATMA is therefore entitled to the award of the return of the

$986,000.00 paid to 36 Main.

## COUNT 44
### (Breach of Warranty – 36 Main)

581.   Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 580 of this Complaint as if fully set forth herein.

582.   The September 26, 2006 Asset Purchase Agreement #1 states at section 4.5

that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

583.   ATMA relied on 36 Main's representations as a condition of the purchase.

584.   36 Main breached the warranty set forth in section 4.5 of the September 26,

2006 Asset Purchase Agreement #1 by failing to deliver good and marketable title to the

64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset

Purchase Agreement #1 purchased by ATMA.

585.   36 Main was notified that title to the 2 Placed ATM machines listed in

Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1 purchased by

ATMA was not good or marketable.

586.   36 Main's conduct breached the warranty stated in the September 26, 2006

Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return

of the $44,000.00 paid to 36 Main.

116

## COUNT 45
### (Breach of Warranty – 36 Main)

587.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 586 of this Complaint as if fully set forth herein.

588.    The September 26, 2006 Asset Purchase Agreement #2 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

589.    ATMA relied on 36 Main's representations as a condition of the purchase.

590.    36 Main breached the warranty set forth in section 4.5 of the September 26, 2006 Asset Purchase Agreement #2 by failing to deliver good and marketable title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2 purchased by ATMA.

591.    36 Main was notified that title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2 purchased by ATMA was not good or marketable.

592.    36 Main's conduct breached the warranty stated in the September 26, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

## COUNT 46
### (Breach of Warranty – 36 Main)

593.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 592 of this Complaint as if fully set forth herein.

594.    The September 26, 2006 Asset Purchase Agreement #3 states at section 4.5

that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

595.    ATMA relied on 36 Main's representations as a condition of the purchase.

596.    36 Main breached the warranty set forth in section 4.5 of the September 26,

2006 Asset Purchase Agreement #3 by failing to deliver good and marketable title to the

64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset

Purchase Agreement #3 purchased by ATMA.

597.    36 Main was notified that title to the 64 Placed ATM machines listed in

Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3 purchased by

ATMA was not good or marketable.

598.    36 Main's conduct breached the warranty stated in the September 26, 2006

Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return

of the $928,000.00 paid to 36 Main.

## COUNT 47
### (Breach of Warranty – 36 Main)

599.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 598 of this Complaint as if fully set forth herein.

600.    On or about November 16, 2005, ATMA and 36 Main executed Bill of Sale

for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed

ATM machines to ATMA for the sum of $1,900,000.00 (the "November 16, 2005 Bill of

Sale").

601.    The November 16, 2005 Bill of Sale states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

602.    ATMA relied on 36 Main's representations as a condition of the purchase.

603.    36 Main breached the warranty set forth in the November 16, 2005 Bill of

Sale by failing to deliver good and marketable title to the 100 Placed ATM machines

listed in Schedule "A" of the November 16, 2005 Bill of Sale.

604.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the November 16, 2005 Bill of Sale was not good or marketable.

605.    36 Main's conduct breached the warranty stated in the November 16, 2005

Bill of Sale and ATMA is therefore entitled to the award of the return of the

$1,900,000.00 paid to 36 Main.

## COUNT 48
## (Breach of Warranty – 36 Main)

606.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 605 of this Complaint as if fully set forth herein.

607.    On or about December 20, 2005, ATMA and 36 Main executed Bill of Sale

for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed

ATM machines to ATMA for the sum of $1,900,000.00 (the "December 20, 2005 Bill of

Sale").

608.    The December 20, 2005 Bill of Sale states at the second unnumbered

Paragraph that:

119

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

609.    ATMA relied on 36 Main's representations as a condition of the purchase.

610.    36 Main breached the warranty set forth in the December 20, 2005 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the December 20, 2005 Bill of Sale.

611.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the December 20, 2005 Bill of Sale was not good or marketable.

612.    36 Main's conduct breached the warranty stated in the December 20, 2005 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

### COUNT 49
### (Breach of Warranty – 36 Main)

613.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 612 of this Complaint as if fully set forth herein.

614.    On or about February 22, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,900,000.00 (the "February 22, 2006 Bill of Sale").

615.    The February 22, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

120

616.    ATMA relied on 36 Main's representations as a condition of the purchase.

617.    36 Main breached the warranty set forth in the February 22, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Bill of Sale.

618.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Bill of Sale was not good or marketable.

619.    36 Main's conduct breached the warranty stated in the February 22, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 50
### (Breach of Warranty – 36 Main)

620.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 619 of this Complaint as if fully set forth herein.

621.    On or about April 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,950,000.00 (the "April 26, 2006 Bill of Sale").

622.    The April 26, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

623.    ATMA relied on 36 Main's representations as a condition of the purchase.

121

624. 36 Main breached the warranty set forth in the April 26, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Bill of Sale.

625. 36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Bill of Sale was not good or marketable.

626. 36 Main's conduct breached the warranty stated in the April 26, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 51
### (Breach of Warranty – 36 Main)

627. Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 626 of this Complaint as if fully set forth herein.

628. On or about May 27, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,950,000.00 (the "May 27, 2006 Bill of Sale").

629. The May 27, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

630. ATMA relied on 36 Main's representations as a condition of the purchase.

631. 36 Main breached the warranty set forth in the May 27, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Bill of Sale.

122

632.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Bill of Sale was not good or marketable.

633.    36 Main's conduct breached the warranty stated in the May 27, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 52
## (Breach of Warranty – 36 Main)

634.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 633 of this Complaint as if fully set forth herein.

635.    On or about June 16, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 50 Placed ATM machines to ATMA for the sum of $975,000.00 (the "June 16, 2006 Bill of Sale").

636.    The June 16, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

637.    ATMA relied on 36 Main's representations as a condition of the purchase.

638.    36 Main breached the warranty set forth in the June 16, 2006 Bill of Sale by failing to deliver good and marketable title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Bill of Sale.

639.    36 Main was notified that title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Bill of Sale was not good or marketable.

640.   36 Main's conduct breached the warranty stated in the June 16, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 53
### (Breach of Warranty – 36 Main)

641.   Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 640 of this Complaint as if fully set forth herein.

642.   On or about June 27, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 74 Placed ATM machines to ATMA for the sum of $1,073,000.00 (the "June 27, 2006 Bill of Sale").

643.   The June 27, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

644.   ATMA relied on 36 Main's representations as a condition of the purchase.

645.   36 Main breached the warranty set forth in the June 27, 2006 Bill of Sale by failing to deliver good and marketable title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Bill of Sale.

646.   36 Main was notified that title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Bill of Sale was not good or marketable.

647.   36 Main's conduct breached the warranty stated in the June 27, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

## COUNT 54
## (Breach of Warranty – 36 Main)

648.     Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 647 of this Complaint as if fully set forth herein.

649.     On or about July 28, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 101 Placed ATM machines to ATMA for the sum of $1,469,500.00 (the "July 28, 2006 Bill of Sale").

650.     The July 28, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

651.     ATMA relied on 36 Main's representations as a condition of the purchase.

652.     36 Main breached the warranty set forth in the July 28, 2006 Bill of Sale by failing to deliver good and marketable title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Bill of Sale.

653.     36 Main was notified that title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Bill of Sale was not good or marketable.

654.     36 Main's conduct breached the warranty stated in the July 28, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 55
## (Breach of Warranty – 36 Main)

655.     Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 654 of this Complaint as if fully set forth herein.

656.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 7 Placed ATM machines to ATMA for the sum of $136,500.00 (the "August 30, 2006 Bill of Sale #1").

657.    The August 30, 2006 Bill of Sale #1 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

658.    ATMA relied on 36 Main's representations as a condition of the purchase.

659.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #1 by failing to deliver good and marketable title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #1.

660.    36 Main was notified that title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #1 was not good or marketable.

661.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #1 and ATMA is therefore entitled to the award of the return of the $136,500.00 paid to 36 Main.

## COUNT 56
### (Breach of Warranty – 36 Main)

662.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 661 of this Complaint as if fully set forth herein.

663.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 17 Placed

ATM machines to ATMA for the sum of $331,500.00 (the "August 30, 2006 Bill of Sale #2").

664.    The August 30, 2006 Bill of Sale #2 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

665.    ATMA relied on 36 Main's representations as a condition of the purchase.

666.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #2 by failing to deliver good and marketable title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #2.

667.    36 Main was notified that title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #2 was not good or marketable.

668.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #2 and ATMA is therefore entitled to the award of the return of the $334,500.00 paid to 36 Main.

## COUNT 57
### (Breach of Warranty – 36 Main)

669.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 668 of this Complaint as if fully set forth herein.

670.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 36 Placed ATM machines to ATMA for the sum of $522,000.00 (the "August 30, 2006 Bill of Sale #3").

127

671.    The August 30, 2006 Bill of Sale #3 states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

672.    ATMA relied on 36 Main's representations as a condition of the purchase.

673.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #3

by failing to deliver good and marketable title to the 36 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #3.

674.    36 Main was notified that title to the 36 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #3 was not good or marketable.

675.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of

Sale #3 and ATMA is therefore entitled to the award of the return of the $522,000.00

paid to 36 Main.

## COUNT 58
### (Breach of Warranty – 36 Main)

676.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1

through 675 of this Complaint as if fully set forth herein.

677.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for

the 36 Main to convey, transfer, sell and assign "right, title and interest" in 68 Placed

ATM machines to ATMA for the sum of $986,000.00 (the "August 30, 2006 Bill of Sale

#4").

678.    The August 30, 2006 Bill of Sale #4 states at the second unnumbered

Paragraph that:

128

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

679.    ATMA relied on 36 Main's representations as a condition of the purchase.

680.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #4 by failing to deliver good and marketable title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #4.

681.    36 Main was notified that title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #4 was not good or marketable.

682.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #4 and ATMA is therefore entitled to the award of the return of the $986,000.00 paid to 36 Main.

## COUNT 59
## (Breach of Warranty – 36 Main)

683.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 682 of this Complaint as if fully set forth herein.

684.    On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 2 Placed ATM machines to ATMA for the sum of $44,000.00 (the "September 26, 2006 Bill of Sale #1").

685.    The September 26, 2006 Bill of Sale #1 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

686.    ATMA relied on 36 Main's representations as a condition of the purchase.

687.    36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #1 by failing to deliver good and marketable title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #1.

688.    36 Main was notified that title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #1 was not good or marketable.

689.    36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

## COUNT 60
### (Breach of Warranty – 36 Main)

690.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 689 of this Complaint as if fully set forth herein.

691.    On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 21 Placed ATM machines to ATMA for the sum of $409,500.00 (the "September 26, 2006 Bill of Sale #2").

692.    The September 26, 2006 Bill of Sale #2 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

693.    ATMA relied on 36 Main's representations as a condition of the purchase.

130

694. 36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #2 by failing to deliver good and marketable title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #2.

695. 36 Main was notified that title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #2 was not good or marketable.

696. 36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

## COUNT 61
### (Breach of Warranty – 36 Main)

697. Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 696 of this Complaint as if fully set forth herein.

698. On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 64 Placed ATM machines to ATMA for the sum of $928,000.00 (the "September 26, 2006 Bill of Sale #3").

699. The September 26, 2006 Bill of Sale #3 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

700. ATMA relied on 36 Main's representations as a condition of the purchase.

701. 36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #3 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #3.

702. 36 Main was notified that title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #3 was not good or marketable.

703. 36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #3 and ATMA is therefore entitled to the award of the return of the $928,000.00 paid to 36 Main.

## COUNT 62
### (Conversion – 36 Main)

704. Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 703 of this Complaint as if fully set forth herein.

705. Plaintiffs delivered funds to 36 Main for the sole purpose of purchasing Placed ATM machines as set forth in the Asset Purchase Agreements and Bills of Sale between 36 Main and ATMA. Plaintiffs delivered, via bank wire transfers from ATMA, $16,475,000.00 to 36 Main for the sole purpose of purchasing the ATMA Machines.

706. 36 Main failed to use Plaintiffs' funds to purchase the ATMA Machines identified in the schedules attached to the Asset Purchase Agreements and Bills of Sale signed by 36 Main and ATMA.

707. 36 Main utilized the funds delivered by Plaintiffs to 36 Main for the purchase of the ATMA Machines for an unauthorized purpose.

708. 36 Main has improperly converted Plaintiffs' funds and failed to return the funds to Plaintiffs and should be ordered to return the $16,475,000.00 in funds delivered to 36 Main for the purchase of the ATMA Machines.

**COUNT 63**
**(Unjust Enrichment – 36 Main)**

709.   Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 708 as if fully set forth herein.

710.   By misappropriating Plaintiffs' funds delivered to 36 Main designated for the sale of the ATMA Machines, 36 Main obtained the benefit of Plaintiffs' capital without returning comparable consideration, specifically the ATMA Machines identified in the schedules attached to the Asset Purchase Agreements and Bills of Sale signed by ATMA and 36 Main.

711.   36 Main acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $16,475,000.00, thereby damaging Plaintiffs in the same amount.

712.   36 Main has retained the benefits of Plaintiffs' funds under such circumstances that equity and good conscience require 36 Main make restitution to Plaintiffs in the amount of the value of the benefits 36 Main acquired from Plaintiffs.

**COUNT 64**
**(Unjust Enrichment – 36 Main)**

713.   Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 712 as if fully set forth herein.

714.   By misappropriating Plaintiffs' funds delivered to 36 Main designated for the payment of Residual Revenue Funds associated with the ATMA Tranche Purchases, 36 Main obtained the benefit of Plaintiffs' capital without returning comparable consideration.

133

715.    36 Main acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $209,441.03, thereby damaging Plaintiffs in the same amount.

716.    36 Main has retained the benefits of Plaintiffs' funds under such circumstances that equity and good conscience require 36 Main make restitution to Plaintiffs in the amount of the value of the benefits 36 Main acquired from Plaintiffs.

### COUNT 65
### (Unjust Enrichment – ATM Capital)

717.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 716 as if fully set forth herein.

718.    By misappropriating Plaintiffs' funds delivered to ATM Capital designated for the payment of Residual Revenue Funds associated with the December 20, 2005 Tranche Purchase, ATM Capital obtained the benefit of Plaintiffs' capital without returning comparable consideration.

719.    ATM Capital acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $27,801.71, thereby damaging Plaintiffs in the same amount.

720.    ATM Capital has retained the benefits of Plaintiffs' funds under such circumstances that equity and good conscience require ATM Capital make restitution to Plaintiffs in the amount of the value of the benefits ATM Capital acquired from Plaintiffs.

134

## COUNT 66
### (Breach of Fiduciary Duty – Brossman)

721.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 720 of this Complaint as if fully set forth herein.

722.    That Brossman, as a co-chief executive and employee of ATMA has a duty to his employer to act in good faith and in the employer's best interests during the period of the employment. Brossman owed ATMA his undivided and unqualified loyalty during the period of his employment and was prohibited from acting in any manner contrary to the interests of ATMA. As a fiduciary to ATMA, Brossman was required to make truthful and complete disclosures to ATMA and Brossman was forbidden to obtain an improper advantage at ATMA's expense.

723.    While employed at ATMA, Brossman was required to exert his best efforts on behalf of ATMA, and not compete with it or profit at its expense, or place his private interests in conflict with its interests.

724.    Brossman did not act in good faith or in the best interests of ATMA when Brossman: (1) participated in the ATM Sales Enterprise; (2) misrepresented the true nature of the ATM Venture; (3) failed to disclose the non-existence of Placed ATM machines sold by 36 Main to ATMA and others; and, (4) failed to disclose prior and continuing business relationships with Netschi and Moore.

725.    As a result of Brossman's acts, ATMA sustained damages and Brossman's acts were a substantial cause of those damages.

726.    Accordingly, ATMA is entitled to recover the actual damages sustained for compensation and expenses that ATMA paid to Brossman during the period of

Brossman's disloyalty, profits that Plaintiffs lost due to Brossman's disloyalty, and investment funds that Plaintiffs lost due to Brossman's disloyalty.

## COUNT 67
### (Breach of Fiduciary Duty – Munier)

727.    Plaintiffs repeat and re-allege each and every allegation made in Paragraphs 1 through 726 of this Complaint as if fully set forth herein.

728.    That Munier, as a co-chief executive and employee of ATMA has a duty to his employer to act in good faith and in the employer's best interests during the period of the employment. Munier owed ATMA his undivided and unqualified loyalty during the period of his employment and was prohibited from acting in any manner contrary to the interests of ATMA. As a fiduciary to ATMA, Munier was required to make truthful and complete disclosures to ATMA and Munier was forbidden to obtain an improper advantage at ATMA's expense.

729.    While employed at ATMA, Munier was required to exert his best efforts on behalf of ATMA, and not compete with it or profit at its expense, or place his private interests in conflict with its interests.

730.    Munier did not act in good faith or in the best interests of ATMA when he: (1) participated in the ATM Sales Enterprise; (2) misrepresented the true nature of the ATM Venture; (3) failed to disclose the non-existence of Placed ATM machines sold by 36 Main to ATMA and others; (4) failed to disclose prior and continuing business relationships with Netschi and Moore; and, (5) knowingly forwarded fraudulent monthly net revenue reports from Moore to Plaintiffs.

731.    As a result of Munier's acts, Plaintiffs sustained damages and Munier's acts were a substantial cause of those damages.

732. Accordingly, ATMA is entitled to recover the actual damages sustained for compensation and expenses that ATMA paid to Munier during the period of Munier's disloyalty, profits that Plaintiffs lost due to Munier's disloyalty, and investment funds that Plaintiffs lost due to Munier's disloyalty.

## IX
## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against in their favor and against Defendants as follows:

i. on Count 1, damages, including interest, against the Defendants, jointly and severally, the precise amount to be proved at trial but not less that $16,475,000.00 and treble the actual damages pursuant to 18 U.S.C. § 1964(c);

ii. on Count 2, damages, including interest, against the Defendants, jointly and severally, the precise amount to be proved at trial but not less that $16,475,000.00 and treble the actual damages pursuant to 18 U.S.C. § 1964(c);

iii. on Count 3, as against Moore, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

iv. on Count 4, as against Netschi, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

v. on Count 5, as against Brossman, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

vi. on Count 6, as against Munier, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

vii.  on Count 7, as against 36 Main and Netschi, jointly and severally, in an amount to
be determined at trial, but in no event less than $16,475,000.00, together with
interest thereon;

viii.  on Count 8, as against Moore, in an amount to be determined at trial, but in no
event less than $16,475,000.00, together with interest thereon;

ix.  on Count 9, as against Moore, in an amount to be determined at trial, but in no
event less than $1,900,000.00, together with interest thereon;

x.  on Count 10, as against Moore, in an amount to be determined at trial, but in no
event less than $1,900,000.00, together with interest thereon;

xi.  on Count 11 as against Moore, in an amount to be determined at trial, but in no
event less than $1,900,000.00, together with interest thereon;

xii.  on Count 12, as against Moore, in an amount to be determined at trial, but in no
event less than $1,950,000.00, together with interest thereon;

xiii.  on Count 13, as against Moore, in an amount to be determined at trial, but in no
event less than $1,950,000.00, together with interest thereon;

xiv.  on Count 14, as against Moore, in an amount to be determined at trial, but in no
event less than $975,000.00, together with interest thereon;

xv.  on Count 15, as against Moore, in an amount to be determined at trial, but in no
event less than $1,073,000.00, together with interest thereon;

xvi.  on Count 16, as against Moore, in an amount to be determined at trial, but in no
event less than $1,450,000.00, together with interest thereon;

xvii.  on Count 17, as against 36 Main, in an amount to be determined at trial, but in no
event less than $1,900,000.00, together with interest thereon;

xviii.  on Count 18 as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xix.  on Count 19, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xx.  on Count 20, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxi.  on Count 21, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxii.  on Count 22, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xxiii.  on Count 23, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xxiv.  on Count 24, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

xxv.  on Count 25, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

xxvi.  on Count 26, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

xxvii.  on Count 27, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

xxviii.  on Count 28, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

xxix.   on Count 29, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000, together with interest thereon;

xxx.    on Count 30, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

xxxi.   on Count 31, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

xxxii.  on Count 32, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxiii. on Count 33, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxiv.  on Count 34, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxv.   on Count 35, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxxvi.  on Count 36, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxxvii. on Count 37, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xxxviii. on Count 38, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xxxix.  on Count 39, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

xl. on Count 40, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

xli. on Count 41, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

xlii. on Count 42, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

xliii. on Count 43, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

xliv. on Count 44, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000.00, together with interest thereon;

xlv. on Count 45, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

xlvi. on Count 46, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

xlvii. on Count 47, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xlviii. on Count 48, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xlix. on Count 49, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

l. on Count 50, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

li.  on Count 51, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

lii.  on Count 52, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

liii.  on Count 53, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

liv.  on Count 54, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

lv.  on Count 55, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

lvi.  on Count 56, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

lvii.  on Count 57, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

lviii.  on Count 58, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

lix.  on Count 59, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000.00, together with interest thereon;

lx.  on Count 60, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

lxi.  on Count 61, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

142

lxii.  on Count 62, as against 36 Main, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxiii.  on Count 63, as against 36 Main, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxiv.  on Count 64, as against 36 Main, in an amount to be determined at trial, but in no event less than $209,441.03, together with interest thereon;

lxv.  on Count 65, as against ATM Capital, in an amount to be determined at trial, but in no event less than $27,801.71, together with interest thereon;

lxvi.  on Count 66, as against Brossman, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxvii.  on Count 67, as against Munier, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxviii.  awarding Plaintiffs punitive damages;

lxix.  awarding Plaintiffs their attorneys' fees, costs and disbursements incurred in connection with this action; and,

lxx.  awarding Plaintiff such other and further relief as the Court seems just and proper.

X

**DEMAND FOR A TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand

a trial by jury in this action.

Dated:  New York, New York
        April 3, 2008

LANKLER & CARRAGHER, LLP

By: _____

Andrew M. Lankler (AL1202)
James W. Versocki (JV6877)
Joseph J. Porrovecchio (JP6788)
Attorneys for Plaintiffs
845 Third Avenue, 17th Floor
New York, New York 10022
alankler@lcattorneys.com
jversocki@lcattorneys.com
jporrovecchio@lcattorneys.com
(212) 812-8910
(212) 812-8920 facsimile

144

# Exhibit B

# (Part 1 of 3)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

Automated Teller Machine Advantage LLC,                    :

                                                       Plaintiff,    :   Index No.: 08-CV-3340(RMB)(FM)(ECF)

- against -                                                :   **AMENDED COMPLAINT**

Vance Moore, Jr. a/k/a Vance Moore II a/k/a Vance         :   Plaintiff Demands a Trial By Jury
Moore, Exclusive Properties Group, Inc., Walter Netschi,   :
36 Main Street LLC, ATM Capital Inc., Danielle Jones,      :
Alain Brossman a/k/a Harry Brossman, and William           :
Munier,                                                     :
                                              Defendants.   :

------------------------------------------------------------------- x

      Plaintiff, Automated Teller Machine Advantage LLC ("ATMA")(hereinafter

referred to as the "Plaintiff"), by its attorneys, Lankler & Carragher, LLP, and for its

Complaint herein, alleges as follows:

## I
## INTRODUCTION

    1.     This action is brought against individual and corporate Defendants who have

engaged in a complex scheme to defraud Plaintiff of $16.475 million.

    2.     Defendants' scheme, committed by engaging in racketeering activities,

involved inducing Plaintiff to purchase large numbers of automated teller machines

("ATMs") and to enter into contracts for the management of the ATMs.

    3.     Plaintiff purchased 940 ATMs and subsequently discovered that: (i) the ATMs

did not exist; (ii) Plaintiff did not have an ownership interest in the ATMs; or (iii) others

had competing ownership claims to the ATMs, each contrary to the warranties and

representations made by Defendants.

4.     There is a well-established market, by persons or businesses other than bank owner/operators, for the purchase, operation and sale of ATMs.  Non-bank purchasers can either buy an ATM that has previously been placed at a location, generally via a lease agreement with a business store owner (a "Placed ATM"), or a new ATM that needs to be located in an existing or prospective business establishment.  A Placed ATM, particularly one with a long-term lease and verifiable transaction activity, will sell at a substantial premium compared to a non-Placed ATM.

5.     ATMA determined the value of a Placed ATM from its predicted ability to generate future revenue.  The revenue potential was, *inter alia*, predicated on the receipt and analysis of reliable reports reflecting due diligence for each Placed ATM being considered for purchase that demonstrated: (i) at least one year of transaction history with an average of 400 transactions per month; (ii) projected net revenues of approximately $4,800 per year based on the transaction history; (iii) the existence of a lease with at least a five year term with a renewal provision for an additional five year term provided that neither party terminated the lease (hereinafter the "Performance Criteria").[1]

6.     To effect their scheme, Defendants induced Plaintiff to purchase non-existent phantom Placed ATMs by making false verbal representations and delivering fraudulent, false, fabricated, and fictitious information to Plaintiff, including representations and warranties, purporting to demonstrate that the phantom Placed ATMs met the Performance Criteria set by Plaintiff to purchase Placed ATMs.

7.     Defendants furthered their scheme by delivering fraudulent, false, fabricated, and fictitious information to Plaintiff in connection with the ATMs purchased by Plaintiff

---

[1]     As described, *infra,* at Paragraph 49, Plaintiffs later purchased ATMs with alternative Performance Criteria at a different price.

2

including: bills of sale, due diligence reports, lease agreements, assignments of the lease agreements, and other fictitious documents.

8.    Following the sale of the phantom Placed ATMs to Plaintiff, the Defendants perpetuated their scheme by providing monthly reports to Plaintiff that purported to state the transactional activity of the Placed ATMs purchased by Plaintiff and by delivering funds purportedly based on that transactional activity.

9.    Defendants systematically sold additional phantom Placed ATMs to Plaintiff, and other purchasers of phantom Placed ATMs, to perpetuate the scheme.

10.    Defendants, through their scheme, induced Plaintiff, and other purchasers, to deliver tens of millions of dollars to Defendants for the purchase of the phantom Placed ATMs.

11.    Plaintiff brings this action against the Defendants for violations of the Racketeer Influenced and Corrupt Organizations statute (hereinafter "RICO"), 18 U.S.C. §§ 1961 through 1968, and New York State common law causes of action, including: fraudulent misrepresentation, fraudulent inducement, fraudulent concealment, negligent misrepresentation, breach of contract, breach of warranty, conversion, unjust enrichment, and breach of fiduciary duty.

12.    Plaintiff seeks the return of the funds it delivered to the Defendants to purchase the Placed ATMs, damages, treble damages, punitive damages, pre-judgment interest, costs and fees, and all other relief deemed appropriate by this Court.

## II
## JURISDICTION

13.    This Court has subject matter jurisdiction over this matter pursuant to RICO,

18 U.S.C. § 1964 and 28 U.S.C. § 1331, because Plaintiff's claims arise under the laws of

the United States, and pursuant to its supplemental jurisdiction, 28 U.S.C. § 1367.

## III
## VENUE

14.    The venue of this action is proper in this judicial district pursuant to 18 U.S.C.

§ 1965(a) and 18 U.S.C. § 1391 in that Defendants transacted affairs in the Southern

District of New York and in that the negotiations, decisions to enter in to the contractual

agreements, transfers of funds and subsequent business dealings between the parties

named herein occurred within the Southern District of New York.  Venue is also proper

in this judicial district pursuant to 18 U.S.C. § 1965(b) because, to the extent any

Defendant may reside outside of this district, the ends of justice require such Defendant

or Defendants to be brought before this Court.

## IV
## THE PARTIES

15.    Plaintiff ATMA is a limited liability company organized and existing under

the laws of the State of Delaware with a principal place of business at 324 Grix Court,

New Milford, New Jersey 07646.  ATMA was formed in November of 2004.  Two of the

three initial members of the board of managers for ATMA, including the chairman of the

board, maintain their offices in the county of Manhattan, New York.  The current

members of the board of managers for ATMA, including the chairman of the board,

maintain their offices in the county of New York, New York.

4

16.     Defendant Vance Moore, Jr., also known as Vance Moore II, ("Moore") is a resident of Fruitland Park, Lake County, Florida and also maintains a residence, upon information and belief, in Raleigh, Wake County, North Carolina.

17.     Moore owned and controlled unnamed co-conspirator ATM Financial Services LLC ("ATMFS"), a limited liability company organized and existing under the laws of the State of Delaware with a principal place of business at Leesburg, Lake County, Florida.  ATMFS purported to provide fee-based services to owners of Placed ATMs as an Independent Sales Organization ("ISO").  An ISO, via a management agreement, is responsible for, *inter alia,* the deployment, management and servicing of Placed ATMs, and also for the reporting of the transaction activity of Placed ATMs, collection of revenue from that transaction activity, and payment of the net revenue to the owners of the Placed ATMs. ATMFS filed for Chapter 11 bankruptcy protection on February 12, 2008 in the United States Bankruptcy Court for the Middle District of Florida.

18.     Defendant Exclusive Properties Group, Inc. ("Exclusive Properties" or "EPG") is a domestic business corporation organized and existing under the laws of the State of Florida with a principal place of business at 301 S. Richey Road, Suite 101, Leesburg, Florida.  Upon information and belief, Moore is the President, Secretary, Treasurer and Director of EPG.  Upon information and belief, EPG is a real estate holding company controlled by Moore that owns two warehouses from which Moore operates numerous businesses, including ATMFS.

19.     Defendant Walter Netschi ("Netschi") is a resident of Hot Springs Village, Garland County, Arkansas and McKinney, Collin County, Texas.  Netschi is the

5

managing member of 36 Main Street LLC and the President of Defendant ATM Capital, Inc.

20.     Defendant 36 Main Street LLC ("36 Main") is a limited liability company organized and existing under the laws of the State of Nevada with a principal place of business at 2400 Dallas Parkway, Suite 180, Plano, TX 75093. Since at least 2005, 36 Main has been engaged in the business of selling ATMs to third-parties, including ATMA.

21.     Defendant ATM Capital Inc. ("ATM Capital") is a domestic business corporation organized and existing under the laws of the State of Texas with a principal place of business at 2001 Beach Street, Fort Worth, Texas. Netschi is the President of ATM Capital.

22.     Defendant Danielle Jones ("Jones") is the Secretary Treasurer and Vice-President of 36 Main and the daughter of Netschi. Jones maintains a residence in McKinney, Collin County, Texas.

23.     Defendant Alain Brossman a/k/a Harry Brossman ("Brossman") is a resident of Tabernacle, Burlington County, New Jersey. Brossman is a member and former employee of ATMA.

24.     Defendant William Munier ("Munier") is a resident of New Milford, Bergen County, New Jersey. Munier is a member and former employee of ATMA.

## V
## THE ENTERPRISE

25.     At all times material to this Complaint, the Defendants, collectively, have constituted an "enterprise" (hereinafter the "ATM Sales Enterprise") as that term is

6

defined in 18 U.S.C. § 1961(4), which enterprise was engaged in, and the activities of which affected, interstate, and foreign commerce.

## VI
## BACKGROUND

### *ATMA Enters the ATM Business*

26.     In or around November of 2004, Brossman and Munier, who had previously engaged in a prior scheme to sell ATMs with certain of the Defendants named herein (more fully described *infra* at Paragraphs 83 through 90), sought to begin a business with the purported purpose being the purchasing and operating of a large number of Placed ATMs (the "ATM Venture").

27.     In or about August of 2005, Brossman, Munier and others, eventually including Netschi and Moore, approached, through unnamed intermediaries, Acta Realty Corp., doing business as the Wolfson Group, a New York Corporation ("the Wolfson Group,") and offered the Wolfson Group the opportunity to become part of the ATM Venture.  The Wolfson Group is engaged in the management of funds and assets owned by various entities formed primarily for the benefit of members of the Wolfson family.

28.     The ATM Venture involved the use of a limited liability company, known as ATMA, to purchase Placed ATMs, supervise and monitor the management of the Placed ATMs, and thereafter receive monthly revenue generated by the Placed ATMs.

29.     Although ATMA was previously formed, it did not conduct any business, of any kind, prior to the signing of the ATMA limited liability company agreement on November 14, 2005, and ATMA's decision to (i) purchase ATMs; (ii) supervise and monitor the management of the Placed ATMs; and (iii) thereafter receive monthly revenue generated by the Placed ATMs.

7

30.     On November 14, 2005, Brossman, Munier and unnamed others met with representatives of the Wolfson Group at the offices of the Wolfson Group in New York for the purpose of inducing the Wolfson Group to participate in the ATM Venture, to induce ATMA to purchase Placed ATMs from 36 Main, and to allow ATMFS to manage any Placed ATMs purchased by ATMA; Netschi and Moore participated in portions of the November 14, 2005 meeting telephonically.

31.     During the November 14, 2005 meeting, Netschi, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, through ATMFS, to operate as the ISO for the Placed ATMs represented to senior representatives of the Wolfson Group, who become members of ATMA's board of managers that very day, that:

    a.    Netschi, through 36 Main, was in the business of locating sellers of Placed ATMs, conducting due diligence on the Placed ATMs, negotiating a price for and purchasing the Placed ATMs, holding the 36 Main purchased Placed ATMs as inventory and reselling the Placed ATMs to interested third parties;

    b.    Moore, through ATMFS, served as the ISO for the 36 Main owned ATMs and that Moore was prepared to continue to act as the ISO for those Placed ATMs;

    c.    ATMFS was in possession of leases with businesses where Placed ATMs owned by 36 Main were located and that the leases were valid, in effect, and assignable to the purchaser of the Placed ATMs; and,

8

    d.      Moore, through ATMFS performed due diligence confirming the Performance Criteria for the Placed ATMs provided to the purchaser of the Placed ATMs prior to purchase.

32.     During the same meeting, representatives of the Wolfson Group, who become the majority and controlling members of ATMA's board of managers – as part of making an informed decision concerning (i) ATMA's purchases of Placed ATMs from 36 Main; and (ii) ATMA's decision to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs – specifically questioned Netschi with respect to whether Netschi and 36 Main were purchasing Placed ATMs from disinterested third-party owners and expressed their reliance on Netschi and 36 Main conducting due diligence on the Performance Criteria of the of the Placed ATMs being purchased by 36 Main for later resale to ATMA.

33.     Also during the same meeting, Netschi, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, represented that the business of 36 Main was separate from the business of Moore and ATMFS, and that 36 Main was exclusively in the business of purchasing and reselling Placed ATMs and that Moore was exclusively in the business of operating as an ISO.

34.     Also during the same meeting, Brossman, Munier, and Netschi, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, represented that Moore, through ATMFS, could act as the ISO for any ATMs purchased by ATMA and could conduct due diligence and provide truthful and accurate reporting as

to the Performance Criteria of the Placed ATMs identified for potential purchase by ATMA.

35.     Also during the same meeting, Brossman, Munier, representatives of the Wolfson Group and unnamed others participated in a conference call with Moore during which Moore, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, represented that: (i) neither he, nor his company ATMFS, were engaged in the purchase or sale of Placed ATMs; (ii) that ATMFS acted solely as an ISO for Placed ATMs; and (iii) that ATMFS's operations were separate and apart from those of 36 Main.

36.     Also during the same meeting, Netschi, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, caused to be sent, via electronic mail ("email"), copies of bills of sale, equipment management agreements and due diligence documents (more fully defined *infra* at Paragraph 52) for 100 Placed ATMs purportedly available for purchase by ATMA from 36 Main. *See* Volume I, Ex. 1 – Ex. 3.[2] The documents were forwarded at the request of ATMA's board of managers, to demonstrate the Performance Criteria of the 100 Placed ATMs purportedly being offered for sale and other factors relevant to ATMA's decision to purchase Placed ATMs from Netschi's company, 36 Main, and ATMA's decision to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs,

---

[2]     Due to the volume of exhibits to this Complaint, for the Court's convenience the exhibits hereto are attached and submitted herewith and incorporated herein by reference as part of separate Exhibit Appendices, Volumes I – XX (hereinafter referred to as Volume " ", Ex. " ").

37.     Also at the same meeting, Moore, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, made representations indicating the authenticity of the leases, due diligence documents and management agreements for the same 100 Placed ATMs.

38.     After receiving the representations set forth in paragraphs 30 through 37, *supra*, from Brossman, Munier, Netschi, and Moore, the Wolfson Group agreed to participate in the ATM Venture, ATMA agreed to purchase Placed ATMs from Netschi's company, 36 Main, and ATMA agreed to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs. On November 14, 2005, the limited liability company agreement of ATMA was drafted by an employee of the Wolfson Group. The ATMA limited liability company agreement was effective November 14, 2005.

39.     The ATMA limited liability company agreement provided that the management of the business and affairs of ATMA would be delegated to a board of managers. The ATMA board of managers consisted of three managers: two appointed by the Wolfson Group and one appointed by the Class B members of the board of managers. A chairman of the board of managers was to be selected by the two Wolfson Group appointed managers. The initial board of managers of ATMA consisted of two managers appointed by the Wolfson Group, Aaron Wolfson and Eli Levitin (the "Controlling Managers"), and Brossman. Brossman's position as a manager on the ATMA board of managers was contingent upon his continued employment with ATMA – employment that could be terminated at will and with or without cause by the Controlling Managers.

40.    Pursuant to the terms of the ATMA limited liability company agreement, ATMA was prohibited, among other acts, from: purchasing any ATMs, disposing of any ATMs, amending any lease agreements related to any ATM, or hiring any employees, without the unanimous approval of the board of managers.

41.    On the same day of the meeting and de-facto formation of ATMA, ATMA, via written employment agreements, hired Brossman, Munier, and an unnamed other employee, as co-chief executive officers of ATMA to operate the day-to-day business and affairs of ATMA. Brossman and Munier were to receive: (i) a fixed salary for their work as co-chief executive officers; (ii) employee benefits, including health insurance; and (iii) three weeks vacation. Brossman and Munier were to each be paid $10,416 per month out of the operating revenue of ATMA with salary increases, specifically linked to the number of Placed ATMs owned by ATMA (the "ATMA Machines").

42.    Brossman and Munier were at-will employees of ATMA. Brossman and Munier could be terminated from their positions as co-chief executive officers by the Controlling Managers at any time, with or without cause.

43.    Pursuant to their employment agreements, Brossman and Munier were subject to the overall direction and authority of the ATMA board of managers, were required to report to the ATMA board of managers (or the board's designee), and owed a duty of loyalty to ATMA. Brossman and Munier were prohibited from purchasing ATMs for ATMA, disposing of ATMs owned by ATMA, or modifying any lease related to an ATM owned by ATMA without the unanimous approval of the ATMA board of managers.

44.    In connection with Brossman's employment as the co-chief executive officer of ATMA, Brossman was required to perform due diligence obligations on behalf of

12

ATMA that included, but were not limited to: (i) identifying and vetting potential Placed
ATM machines for purchase by ATMA; (ii) visiting existing ATMA Machines at their
locations; and, (iii) exploring opportunities to enhance the value and performance of the
ATMA Machines.  Brossman's due diligence obligations also required interfacing with
Moore as the ISO of the ATMA Machines.  On numerous occasions during the period
relevant to this Complaint, Brossman represented to ATMA's board of managers, or their
designees, that he was performing the above duties, including representations that he was
personally visiting the businesses where the ATMA Machines were located.

45.     In connection with Munier's employment as the co-chief executive officer of
ATMA, Munier was required to receive and review monthly reports, delivered by Moore
and purportedly related to the ATMA Machines, detailing the location, transaction
activity, monthly costs and expenses, and net revenue for each ATMA Machine (the
"Monthly Reports") and to subsequently deliver the Monthly Reports to ATMA's board
of managers, or their designees.

46.     In or about February of 2006, at the offices of the ATMA board of managers
in New York, Netschi again represented to ATMA that Netschi and 36 Main were
purchasing Placed ATMs from disinterested third party owners and that Netschi and 36
Main were conducting due diligence with respect to the Placed ATMs being purchased
by 36 Main for later resale.  At the same meeting, an ATMA board member and his
representative expressed their reliance on the representations made by Netschi to
continue ATMA's purchases of Placed ATMs from 36 Main.

47.     Based on the fraudulent and misleading acts of the Defendants, from
approximately November of 2005 through February of 2008, ATMA believed it

purchased 940 Placed ATMs – the ATMA Machines – from 36 Main, entered into management agreements with ATMFS to manage the operation of the ATMA Machines, and continued to employ Brossman and Munier as employees of ATMA to assist ATMA's board of managers with the day-to-day operations of ATMA.

48.     During all periods relevant to this Complaint, the board of managers of ATMA, and/or its designees, were actively engaged in the operation and business affairs of ATMA, including but not limited to the decision whether to purchase Placed ATMs from 36 Main.

### *Purported ATM Purchases/Sales*

49.     To date, Plaintiff has transferred $16.475 million to 36 Main for the purchase of the ATMA Machines. The purported purchase of the ATMA Machines commenced in November of 2005, and ended in September of 2006, and were accomplished in fifteen (15) tranches, varying in size from 2 to 101 ATMs per tranche, (the "ATMA Tranche Purchases"). The purchase price for each of the ATMA Machines was negotiated by the Controlling Members of the ATMA board and 36 Main. The purchase price for the ATMA Machines varied from between $14,500 to $22,000 per machine.[3]

50.     The individual ATMA Tranche Purchases occurred as follows:

---

[3]     The purchase price for a Placed ATM was based on the Performance Criteria of each tranche of Placed ATMs and subsequent designation of the Placed ATM as an "A" or "B" Placed ATM as determined by the verified transaction history of the ATMs in the tranche. Placed ATMs designated as "A" Placed ATMs had an average of at least 400 verified fee paying transactions per month. Placed ATMs with at least 400 verified fee paying transactions per month were originally priced at $19,000.00 per Placed ATM and were later priced at $19,500.00 per Placed ATM. Two of the Placed ATMs with an average of at least 500 verified fee paying transactions per month were priced at $22,000.00 per Placed ATM. Placed ATMs designated as "B" Placed ATMs had an average of from 330-399 verified fee paying transactions per month and were priced at $14,500.00 per Placed ATM. A chart summarizing the date of purchase and amount paid by ATMA for each tranche of ATM purchases is annexed hereto at Volume I, Ex. 4.

a.   On or about November 16, 2005, ATMA paid $1,900,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "November 16, 2005 Tranche Purchase" documents at Volumes II – III, Ex. 5 – Ex. 13);

b.   On or about December 20, 2005, ATMA paid $1,900,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "December 20, 2005 Tranche Purchase" documents at Volumes III – V, Ex. 14 – Ex. 22);

c.   On or about February 22, 2006, ATMA paid $1,900,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "February 22, 2005 Tranche Purchase" documents at Volumes VI - VII, Ex. 23 – Ex. 31);

d.   On or about April 26, 2006, ATMA paid $1,950,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "April 26, 2006 Tranche Purchase" documents at Volumes VII – IX, Ex. 32 – Ex. 40);

e.   On or about May 27, 2006, ATMA paid $1,950,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "May 27, 2006 Tranche Purchase" documents at Volumes IX – XI, Ex. 41 – Ex. 47);

f.   On or about June 16, 2006, ATMA paid $975,000.00 for the purchase of 50 Placed ATM machines from 36 Main (*See* the "June 16, 2006 Tranche Purchase" documents at Volume XII, Ex. 48 – Ex. 54);

g.   On or about June 27, 2006, ATMA paid $1,073,000.00 for the purchase of 74 Placed ATM machines from 36 Main (*See* the "June 27, 2006 Tranche Purchase" documents at Volume XIII, Ex. 55 – Ex. 61);

h.   On or about July 28, 2006, ATMA paid $1,469,500.00 for the purchase of 101 Placed ATM machines from 36 Main (*See* the "July 28, 2006 Tranche Purchase" documents at Volumes XIV – XV, Ex. 62 – Ex. 68);

i.   On or about August 30, 2006, ATMA paid $136,500.00 for the purchase of 7 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #1" documents at Volumes XVI - XVII, Ex. 69 – Ex. 70, Ex. 77 – Ex. 81);

j.   On or about August 30, 2006, ATMA paid $331,500.00 for the purchase of 17 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #2" documents at Volumes XVI – XVII, Ex. 71 – Ex. 72, Ex. 77 – Ex. 81);

k.     On or about August 30, 2006, ATMA paid $522,000.00 for the purchase of 36 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #3" documents at Volumes XVI – XVII, Ex. 73 – Ex. 74, Ex. 77 – Ex. 81);

l.     On or about August 30, 2006, ATMA paid $986,000.00 for the purchase of 68 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #4" documents at Volumes XVI - XVII, Ex. 75 – Ex. 81);

m.     On or about September 26, 2006, ATMA paid $44,000.00 for the purchase of 2 Placed ATM machines from 36 Main (*See* the "September 26, 2006 Tranche Purchase #1" documents at Volumes XVII - XVIII, Ex. 82 – Ex. 83, Ex. 88);

n.     On or about September 26, 2006, ATMA paid $409,500.00 for the purchase of 21 Placed ATM machines from 36 Main (*See* the "September 26, 2006 Tranche Purchase #2" documents at Volumes XVII - XVIII, Ex. 84 – Ex. 85, Ex. 88);

o.     On or about September 26, 2006, ATMA paid $928,000.00 for the purchase of 64 Placed ATM machines from 36 Main (*See* the "September 26, 2006 Tranche Purchase #3" documents at Volumes XVII - XVIII, Ex. 86 – Ex. 88).

51.     With respect to each Tranche Purchase by ATMA, a series of documents were executed which, on their face, provided for (i) the transfer of title and assignable leases to ATMA; and (ii) the management of the ATMA Machines.

52.     The documents executed for each Tranche Purchase are identified as follows:

a.     Asset Purchase Agreement:  36 Main, by Netschi and Jones, prepared, or caused to be prepared, an Asset Purchase Agreement that supposedly sold title in Placed ATMs from 36 Main to ATMA (hereinafter "Asset Purchase Agreement").  The Asset Purchase Agreements provide a representation and warranty that 36 Main held good and marketable title to the Placed ATMs being sold to ATMA.  Upon delivery of an executed Asset Purchase Agreement by Jones on behalf of 36 Main, ATMA would

16

Case 1:08-cv-03840-RMB-FM    Document 27    Filed 08/15/2008    Page 17 of 78

remit funds to 36 Main via wire transfer in an amount corresponding to the value of the Placed ATMs set forth in a schedule of the Placed ATMs affixed to the Asset Purchase Agreement. *See* Asset Purchase Agreements for the ATMA Tranche Purchases in Volume II, Ex. 5; Volume III, Ex. 14; Volume VI, Ex. 23; Volume VII, Ex. 32; Volume IX, Ex. 41; Volume XII, Ex. 48; Volume XIII, Ex. 55; Volume XIV, Ex. 62; Volume XVI, Exs. 69, 71, 73, 75; Volume XVII, Exs. 82, 84, 86.

b.    Bills of Sale:  36 Main, by Netschi and Jones, prepared, or caused to be prepared, a Bill of Sale for each tranche of Placed ATMs supposedly being sold by 36 Main to ATMA.  Each Bill of Sale provided a representation and warranty that 36 Main held good and marketable title to the Placed ATMs supposedly being sold to ATMA. *See* Bills of Sale for the ATMA Tranche Purchases in Volume II, Ex. 6; Volume III, Ex. 15; Volume VI, Ex. 24; Volume VII, Ex. 33; Volume IX, Ex. 42; Volume XII, Ex. 49; Volume XIII, Ex. 56; Volume XIV, Ex. 63; Volume XVI, Exs. 70, 72, 74, 76; Volume XVII Exs. 83, 85, 87.

c.    Addition to Equipment:  36 Main, by Netschi and Jones, prepared, or caused to be prepared, a separate document entitled "Addition to Equipment," that stated that the Placed ATMs supposedly being sold to ATMA were "Virtual switch capable."   Virtual switch capability allowed the Placed ATM to fund minutes for pre-paid cell phone accounts (hereinafter "Addition to Equipment").  After the completion of the first three tranche purchases, ATMA elected not to pay for Virtual Switch

17

capability and Addition to Equipment documents were no longer delivered for subsequent tranche purchases. *See* the Addition to Equipment documents in Volume II, Ex. 7; Volume III, Ex. 16; Volume VI, Ex. 25; Volume VII, Ex. 34.

d.    Diligence Warranty:  Contemporaneous with the execution of a Bill of Sale, and Asset Purchase Agreement, Netschi, by and through 36 Main provided a written statement that it had engaged the services of Moore, through ATMFS, to perform a verification of the transaction history of each ATM supposedly being sold to ATMA (hereinafter "Diligence Warranty"). *See* the Diligence Warranties in Volume II, Ex. 8; Volume III, Ex. 17; Volume VI, Ex. 26; Volume VII, Ex. 35. Each Diligence Warranty warranted that the transaction history that 36 Main provided to ATMA was the same transaction history that 36 Main had received from Moore and ATMFS.

e.    Each and every Bill of Sale, Asset Purchase Agreement, Addition to Equipment and Diligence Warranty (hereinafter "36 Main Transaction Documents") were signed by Jones as Vice-President and/or Secretary Treasurer of 36 Main and were signed, upon information and belief, with the knowledge of and/or at the direction of Netschi.

f.    Placement Program Space Leases:  For each and every Placed ATM supposedly being sold to ATMA, Moore provided copies of a "Placement Program Space Lease" (hereinafter "Placed ATM Lease") between ATMFS and a purported lessor, usually a convenience store or other

18

similar business, where the ATMs supposedly being sold to ATMA were allegedly located. *See* the Placed ATM Leases in Volumes II – III, Ex. 9a – Ex. 9b; Volumes IV – V, Ex. 18a – Ex. 18b; Volumes VI – VII, Ex. 27a – Ex. 27b; Volumes VIII – IX, Ex. 36a – Ex. 36b; Volumes X – XI, Ex. 43a – Ex. 43b; Volume XII, Ex. 50; Volume XIII, Ex. 57; Volumes XIV – XV, Ex. 64a – Ex. 64b; Volumes XVI – XVII, Ex. 77a – Ex. 77b; Volume XVIII, Ex. 88. Annexed to each Placed ATM Lease were site surveys and audit reports, signed by Moore, that purportedly identified: (1) the business where each Placed ATM was located; (2) the annual merchandise sales for that business; (3) the terminal number for the Placed ATM at the location; (4) the average monthly transaction history for the Placed ATM; and, (5) purported reports from searches for UCC-1 statements. The purported Placed ATM Leases and the transaction history identified in the documents annexed to the Placed ATM Leases correlated to a schedule identifying each Placed ATM purchased in the ATMA Tranche Purchases.

g.   Assignment of Placement Programs Space (ATM) Leases: The Placed ATMs supposedly sold to ATMA and their alleged locations were further identified in a document entitled "Assignment of Placement Programs Space (ATM) Leases" (hereinafter "Lease Assignment(s)"). *See* the Lease Assignments in Volume III, Ex. 10; Volume V, Ex. 19; Volume VII, Ex. 28; Volume IX, Ex. 37; Volume XI, Ex. 44; Volume XII, Ex. 51; Volume XIII, Ex. 58; Volume XV, Ex. 65; Volume XVII, Ex. 78. Each Lease Assignment for each Placed ATM Lease was prepared, or caused to be

prepared, by Moore and stated that ATMFS had a current and existing Placed ATM Lease and that the Placed ATM Lease was being assigned to ATMA for each ATM supposedly being sold to ATMA. In each Lease Assignment, Moore warranted that each Placed ATM Lease was in full force and effect, was assignable, and was free and clear from all liens and encumbrances.

h.   Due Diligence Report:  Moore prepared, or caused to be prepared, a separate document (hereinafter "Due Diligence Report"), that represented and warranted to ATMA that ATMFS had reviewed the average monthly transaction history for each ATM being sold to ATMA and that the average transactions reported on the schedules affixed to the Asset Purchase Agreements were correct.  Moore, in the Due Diligence Report, acknowledged that ATMA "was relying upon such data in making its purchase from 36 main [sic] Street." *See* the Due Diligence Reports in Volume III, Ex. 11; Volume V, Ex. 20; Volume VII, Ex. 29; Volume IX, Ex. 38; Volume XI, Ex. 45; Volume XII, Ex. 52; Volume XIII, Ex. 59; Volume XV, Ex. 66; Volume XVII, Ex. 79.

i.   Equipment Management Agreement:  On or about the same day of a closing of a tranche purchase of ATMA Machines, ATMA and ATMFS would enter into an Automated Teller Machine (ATM) Equipment Management Agreement (hereinafter "Equipment Management Agreement") obligating ATMFS to manage a tranche of ATMA Machines.  ATMA entered into an Equipment Management Agreement for

20

ATMFS, by Moore, to manage all of the ATMA Machines.  *See* the

Equipment Management Agreements in Volume III, Ex. 12; Volume V,

Ex. 21; Volume VII, Ex. 30; Volume IX, Ex. 39; Volume XI, Ex. 46;

Volume XII, Ex. 53; Volume XIII, Ex. 60; Volume XV, Ex. 67; Volume

XVII, Ex. 80.  Pursuant to the terms of each Equipment Management

Agreement, ATMFS, by and through Moore, is obligated to manage the

ATMA Machines for the benefit of ATMA.  The Equipment Management

Agreement requires Moore and ATMFS to: (1) collect data processing and

electronic deposit and transfer information for all collected revenues and

fees, including surcharge revenues generated by the ATMA Machines, on

a monthly basis; (2) provide ATMA with the Monthly Reports and to

make regular payments to ATMA based on the monthly net revenue of the

ATMA Machines (the "Periodic Revenue Payments"); and, (3) provide

ATMA with a full disclosure of the number of transactions for each

ATMA Machine on a monthly basis.

j.     Amendment to the Equipment Management Agreement:  On or about

April 27, 2006, ATMA and ATMFS entered into an Amendment to the

Equipment Management Agreement ("hereinafter Equipment

Management Agreement Amendment") that amended the existing

Equipment Management Agreements between ATMFS and ATMA. *See*

the Equipment Management Agreement Amendments in Volume III, Ex.

13; Volume V, Ex. 22; Volume VII, Ex. 31; Volume IX, Ex. 40; Volume

XI, Ex. 47; Volume XII, Ex. 54; Volume XIII, Ex. 61; Volume XV, Ex.

21

68; Volume XVII, Ex. 81. Pursuant to the terms of each Equipment Management Agreement Amendment, ATMFS, by and through Moore, is obligated, in addition to its obligations under the Equipment Management Agreements, not to: (1) solicit any business owner identified in the Lease Agreements to cease doing business with ATMA; or (2) solicit any business owner identified in the Lease Agreements to lease space to ATMFS or any other party for the purpose of placing any additional ATMs at the same business location. ATMFS's non-solicitation obligation further prohibited ATMFS from sharing any information identifying the locations of the ATMA Machines or the terms of the Lease Agreements with any other parties.

k.   For each of the ATMA Tranche Purchases, Moore signed every Placed ATM Lease, Lease Assignment, Due Diligence Report, Equipment Management Agreement and Equipment Management Agreement Amendment (hereinafter the "ATMFS Transaction Documents").

53.   Each of the 36 Main Transaction Documents and ATMFS Transaction Documents associated with the ATMA Tranche Purchases included a schedule of Placed ATMs that purportedly identified the transaction history of each Placed ATM in the ATMA Tranche Purchases.

54.   Each Asset Purchase Agreement and corresponding Bill of Sale contained representations and warranties by 36 Main, that 36 Main possessed good and marketable title to the Placed ATMs supposedly being sold to ATMA, that it had full authority to sell the Placed ATMs, that the Placed ATMs were in good condition and fit for use, and were

22

free and clear "of all liens, encumbrances, liabilities and adverse claims, of every nature and description." *See* Paragraphs 52(a) and 52(b), *supra*.

55.    Every Tranche Purchase of ATMA Machines was accompanied by some or all of the documents identified in Paragraphs 52(a) through 52(d) and 52(f) through 52(j) of this Complaint.

56.    For every Tranche Purchase of ATMA Machines, ATMA delivered, via a bank wire transfer, purchase funds to Netschi, through 36 Main.  The purchase funds paid by ATMA to 36 Main for the ATMA Machines are detailed, *infra*, at Paragraphs 114 through 124 and incorporated herein by reference.

57.    Additionally, after each Tranche Purchase of ATMA Machines, ATMA delivered, via a bank wire transfer, funds to ATM Capital and/or 36 Main which represented 36 Main's prorated share of the monthly net-revenues earned by that tranche of ATMA Machines for that portion of the month during which 36 Main owned those ATMs sold to ATMA (the "Residual Revenue Funds").  *See* Paragraphs 147 through 154, *infra*, incorporated herein by reference.

58.    Brossman and Munier, together and/or in conjunction with others, including Netschi, calculated the Residual Revenue Funds purportedly owed 36 Main and to be delivered to ATM Capital or 36 Main.  Munier, Brossman, and Netschi caused the Residual Revenue Funds to be paid to ATM Capital and/or 36 Main with the knowledge that the Residual Revenue Funds were based on fabricated calculations because the ATMA Machines did not exist.

### *Post Sale Activities of Defendants*

59.    From on or about December of 2005 through November of 2007, Moore

forwarded the Monthly Reports, via email, to Munier and/or Brossman.  *See* Paragraphs

160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195, *infra*, incorporated

herein by reference.

60.    The Monthly Reports were received and reviewed by Munier and/or

Brossman for accuracy pursuant to their duties as employees of ATMA.  Brossman

and/or Munier subsequently delivered the Monthly Reports to representatives of ATMA.

*See* Paragraphs 162, 158 – 165, 167 – 168, 170, 172, 177 – 178, 181, 183 – 185, 188 –

189, 191, 193, 194, 196 – 197, 209 – 227, *infra*, incorporated herein by reference.

61.    From on or about December of 2005 through September of 2007, Moore, by

and through ATMFS and/or Exclusive Properties, delivered, by wire transfer, the

Periodic Revenue Payments.  *See* Paragraphs 125 through 146, *infra*, incorporated herein

by reference.

62.    The Periodic Revenue Payment delivered in September of 2007, which related

to the Monthly Report for June of 2007, was the final Periodic Revenue Payment

received by ATMA from ATMFS, Moore, or Exclusive Properties.  In or about

November of 2007, Moore ceased providing the Monthly Reports.

63.    In response to numerous requests from Plaintiff concerning the failures of

ATMFS and Moore to provide the Monthly Reports and/or Periodic Revenue Payments,

Moore, by letter dated December 20, 2007, stated:

> We'd like to give you an update on the events that occurred this year that
> has caused a delay in receiving your monthly payments. *In the Spring of
> 2007 we made a commitment to purchase Jack Henry ATM software . . .
> that would allow us to track ATM assets and transactions and receive*

24

> *electronic reports on a daily basis.* We *received the software in July* and did the installation at that time. . . . We expect to be fully operational and current with all reports by the mid to end of January. . . We're presently reconciling each ATM from the old manual system to the new system to get reports done to get them out to each one of our ATM owners . . . *I want to assure each ATM owner that their funds received on the settlement of each ATM are secure in a settlement account by each network.*

*See* Volume XIX, Ex. 89. (Emphasis added.)

64.  On January 10, 2008, Moore, in response to demands by Plaintiff for information related to the ATMA Machines, delivered, via email, a report to a representative of ATMA that purportedly identified the ATMA Machines. *See* Volume XIX, Ex. 90.

65.  On January 11, 2008, Brossman emailed a representative of ATMA and represented that ". . . vance is going to be sending u a cornucopia of reports and then explain the first reports.i think that the first reports were from elan a processor owned by us bank-spoke to him at 830 and 1030 this morning-harry" [sic]. *See* Volume XIX, Ex. 91.

66.  On January 11, 2008, Moore, in response to demands by Plaintiff for information related to the ATMA Machines, delivered, via email, a report, allegedly prepared by ATMFS, listing the store locations, without addresses, of 352 ATMs. Brossman also received a copy of the report via the same email. *See* Volume XIX, Ex. 92.

67.  Also on January 11, 2008, Brossman, in an email, represented to an agent of ATMA that he had ". . .matched 250 machines to the [Plaintiff's] . . ." list of the ATMA Machines. *See* Volume XIX, Ex. 93.

68.     Also on January 11, 2008, Moore, in response to further demands by Plaintiff for information related to the ATMA Machines, represented that he had requested ". . . the file on transaction history from processors for recent months, and am still waiting for the files." *See* Volume XIX, Ex. 94.

69.     Also on January 11, 2008, Moore sent another email to a representative of ATMA wherein he represented that he would provide a copy of a bank statement related to the settlement account where the Periodic Revenue Payments were purportedly being held. *See* Volume XIX, Ex. 94. Moore sent a copy of a purported bank statement to a representative of ATMA via email on January 11, 2008. *See* Volume XIX, Ex. 95.

70.     On or about January 15, 2008, Moore, during a visit by a representative of ATMA and a third-party auditor to ATMFS's warehouse in Garner, North Carolina, presented a bank statement dated December 31, 2007, that purportedly showed an account balance of $11,259,194.75, which Moore stated represented Plaintiff's Periodic Revenue Payments that were being held in escrow pending completion of software upgrades to ATMFS's computer system. *See* Volume XIX, Ex. 96.

71.     On January 20, 2008, Brossman, in response to demands by Plaintiff for information related to the ATMA Machines, represented to a representative of ATMA in an email that: "ok-vance and i have gone through the lists till we accounted for the 940 machines including the moved ones.i have sent the list to you.they have all the present terminal numbers---i told u david that i would get it done no matter what-harry" [sic]. *See* Volume XIX, Ex. 97.

72.     On or about January 22, 2008, Moore, via an electronic message to a representative of ATMA, represented that the ATMA Machines existed as Placed ATMs

26

and represented that new lease agreements for any ATMA Machines moved from their
original locations would be provided to Plaintiff by January 24, 2008. *See* Volume XIX,
Ex. 98.

### Discovery That the ATMA Machines Do Not Exist

73.     In January of 2008, Plaintiff directed a private investigative firm to investigate
certain locations where ATMA Machines were, according to Moore and ATMFS,
located. The investigation was conducted for the purpose of determining whether the
ATMA Machines were in fact present at those locations.

74.     On or about January 24, 2008, the private investigative firm reported that its
investigation had uncovered that the majority of the ATMA Machines they attempted to
locate: (1) were not located at the business locations identified by Moore, Netschi, 36
Main, and Jones; (2) in some instances may not have ever existed at the locations
identified by Moore, Netschi, 36 Main, and Jones; and (3) in some instances, were either
owned by persons other than Plaintiff and/or were managed by parties other than
ATMFS.

### Fraudulent Sales to Other Investor Groups Are Revealed

75.     On or about February 6, 2008, a California based entity known as ATM
Equity, LP ("ATM Equity") filed suit against ATMFS in North Carolina Superior Court,
Wake County, alleging that ATMFS and Moore had defrauded ATM Equity out of $20
million delivered to Netschi, through 36 Main, by providing fraudulent due diligence
reports in order to induce ATM Equity to purchase ATMs from 36 Main. The complaint
further alleges that ATMFS and Moore misappropriated and/or failed to disclose the
locations of certain ATMs that ATM Equity owned and had contracted with ATMFS to

27

service, and that ATMFS and Moore had failed to remit monthly revenues for either the ATMs purchased from 36 Main or the ATMs owned by ATM Equity being serviced by ATMFS and Moore.

76.    On or about February 12, 2008, ATMFS filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Middle District of Florida (the "ATMFS Bankruptcy").

77.    In its petition in the ATMFS Bankruptcy, ATMFS did not list or otherwise disclose either ATMA or ATM Equity as creditors of ATMFS.

78.    Since the filing of the ATMFS Bankruptcy, numerous other persons who purchased ATMs through Netschi and 36 Main, and whose ATMs were allegedly managed by ATMFS and Moore, have appeared in the ATMFS Bankruptcy (together with ATMA and ATM Equity, the "ATMFS Creditors").

79.    The ATMFS Creditors believe they purchased, in the aggregate, in excess of 4000 ATMs through Netschi, 36 Main, Jones, and Moore.

80.    In a disclosure made by the ATMFS Bankruptcy Trustee on or about March 10, 2008, the ATMFS Bankruptcy Trustee has only been able to confirm the existence of approximately 400 ATMs (ten percent 10% of the Placed ATMs purportedly being managed by ATMFS and Moore) and, that most of those 400 ATMs are owned by the merchants where the ATMs are located and not the ATMFS Creditors.

81.    Netschi, in a telephone call with a member of the ATMA board of managers on February 28, 2008, admitted that 36 Main took a percentage of the gross purchase funds for each tranche purchase of ATMA Machines and then subsequently transferred the balance of Plaintiff's funds to Moore or entities controlled by Moore - a

representation totally at odds with prior representations made to representatives of ATMA to induce ATMA to participate in the ATM Venture, to purchase Placed ATMs from 36 Main, and to allow ATMFS to manage any of the ATMA Machines. *See* Paragraphs 31 - 33, *supra.*

82.     Subsequently on March 19, 2008, Netschi was sued in New York State Supreme Court, New York County, by Fortress Credit Opportunities I LP for breach of guarantee in connection with the financing of purchases of Placed ATMs by ATM Equity from 36 Main.

### The Defendants Prior ATM Sales Scheme

83.     From approximately 2002 through 2005, Munier, Brossman, Moore, and Netschi, along with others not named herein, engaged in the sale of ATM business opportunities that bundled and sold ATMs together with management, operation, and other services to investors (the "Business Opportunity").

84.     An investor in the Business Opportunity was entitled to receive a set monthly payment in exchange for his or her investment, with a bonus payment in the event that the transactional activity of an ATM exceeded a certain threshold number (usually 400 transactions) within a given month.

85.     Munier, operating through an entity that, on information and belief, was doing business as EFinancial, was responsible for the sale of the Business Opportunity to potential and actual investors.

86.     When Munier sold a Business Opportunity to an investor, he would arrange to purchase a single or multiple ATMs from an entity owned and controlled by Netschi.

87.     Brossman, operating through an entity that, on information and belief, was doing business as National Escrow Limited LLC ("National Escrow"), agreed, for a percentage of the revenue generated by the transaction activity of Business Opportunity ATMs, to purchase the ATMs from the Business Opportunity owners at the expiration of the term of the Business Opportunity (usually seven years) or a mutually agreeable date.

88.     Upon information and belief, each ATM sold to an investor as part of the Business Opportunity was purportedly operated by Moore pursuant to an agreement whereby a Moore-controlled entity would act as the ISO for the ATM.

89.     In addition to Brossman and Munier, the Business Opportunity also included management services by a management company, unnamed herein, that employed, amongst others, Munier's sister, and which acted as conduit between the owner of the Business Opportunity and Netschi, Brossman, Munier, and Moore.  Though the management services were allegedly provided by a separate management company, Moore's entity controlled access to any funds generated from the Business Opportunity ATMs, and distributed funds to the purported management company and to Brossman's company, National Escrow.

90.     On information and belief, including statements made by investors and lawyers for investors in the Business Opportunity, investors in the Business Opportunity were sold non-existent phantom ATMs as part of a scheme conducted by Munier, Brossman, Netschi, and Moore.

## VII
## PATTERN OF FRAUDULENT AND RACKETEERING ACTS

91.     Defendants, by and in furtherance of the ATM Sales Enterprise, induced Plaintiff to enter into agreements to purchase phantom ATMs by providing Plaintiff with

false and misleading purchase information, including: (1) the source from whom Netschi and 36 Main were allegedly purchasing the ATM machines ultimately purchased by Plaintiff; (2) the existence of the ATMs purchased by Plaintiff; (3) the transaction activity of the ATMs purchased by Plaintiff; (4) the locations of the ATMs purchased by Plaintiff; and, (5) the existence of leases for the placement of the ATMs purchased by Plaintiff.

92.     To effect the ATM Sales Enterprise scheme, Munier, Brossman, Netschi, 36 Main, Jones, ATM Capital, Exclusive Properties, and Moore agreed and conspired to sell phantom ATMs to Plaintiff.

93.     As part of the ATM Sales Enterprise scheme, Netschi and 36 Main explicitly and intentionally misrepresented to Plaintiff that they had acquired ownership of the ATMs to be purchased by Plaintiff from disinterested third-party owners of the ATMs when, in fact, they had not done so, but had instead "purchased" the phantom ATMs from Moore, or an entity controlled by Moore.

94.     In furtherance of the ATM Sales Enterprise scheme, Netschi, 36 Main, and Jones created fictitious Asset Purchase Agreements, Bills of Sale, Additions to Equipment, and Due Diligence Warranties (collectively, the "36 Main Fictitious Transaction Documents").

95.     In furtherance of the ATM Sales Enterprise scheme, Moore created fictitious Lease Assignments, Placed ATM Leases, Due Diligence Reports, Equipment Management Agreements, and Equipment Management Agreement Amendments (collectively, the "Moore Fictitious Transaction Documents")(collectively with the 36 Main Fictitious Documents, the "Fictitious Transaction Documents").

96.     Knowing that the Fictitious Transaction Documents related to the purchase of phantom Placed ATMs by Plaintiff, Munier and Brossman furthered the ATM Sales Enterprise scheme by executing the Fictitious Transaction Documents on behalf of ATMA and/or not disclosing to Plaintiff that the Fictitious Transaction Documents related to phantom ATMs.

97.     Knowing that ATMA had purchased phantom Placed ATMs, Brossman furthered the ATM Sales Enterprise scheme by stating he had performed due diligence on the ATMA Machines, including visits to ATMA Machine locations, when he had not performed such due diligence.

98.     In continued furtherance of the ATM Sales Enterprise scheme, Moore caused ATMFS to create fictitious Monthly Reports for the ATMA Machines (the "Fictitious Monthly Reports"). *See* Paragraphs 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195, *infra*, incorporated herein by reference.

99.     The Fictitious Monthly Reports were transmitted to Munier and Brossman, who, knowing they were false and were generated for the purpose of misleading Plaintiff, provided the Fictitious Monthly Reports to Plaintiff. *See* Paragraphs 162, 158 – 165, 167 – 168, 170, 172, 177 – 178, 181, 183 – 185, 188 – 189, 191, 193, 194, 196 – 197, 209 – 227, *infra*, incorporated herein by reference.

100.    In continued furtherance of the ATM Sales Enterprise scheme, Moore caused the Periodic Revenue Payments to be made to ATMA.  The Periodic Revenue Payments were transmitted via a wire transfer at the direction of Moore and originated from either ATMFS or Exclusive Properties. *See* Paragraphs 125 – 146, *infra*, incorporated herein reference.

101. Upon information and belief, the source of the Periodic Revenue Payments was the monies delivered by Plaintiff and/or the other ATMFS Creditors to 36 Main to purchase Placed ATMs.

102. In continued furtherance of the ATM Sales Enterprise scheme, Munier and Brossman caused the Periodic Revenue Payments to be recorded by ATMA as revenue and paid their individual salaries and benefits, along with the salaries and benefits of others, from the Periodic Revenue Payments with the knowledge that the Periodic Revenue Payments had a source other than the revenue generated by the transaction activity of the ATMA Machines.

103. In continued furtherance of the ATM Sales Enterprise scheme, upon completion of the sale of a tranche of ATMs to ATMA, Netschi and ATM Capital would demand payment of the Residual Revenue Funds. The Residual Revenue Funds were paid by ATMA via an interstate bank wire transfer to Netschi, through ATM Capital.

104. In continued furtherance of the ATM Sales Enterprise scheme, when ATMFS ceased to provide Plaintiff with the Fictitious Monthly Reports in or around November of 2007 and Periodic Revenue Payments in or around September of 2007, Munier and Brossman represented to Plaintiff that they were actively communicating with Moore and ATMFS for the purpose of ascertaining the cause for the absence of reporting and payments from ATMFS. Munier and Brossman, knowing such representations to be false, informed Plaintiff that the cause for the delay in reporting and payment from ATMFS was a software upgrade allegedly installed by ATMFS on its computers.

## COUNT 1
### (Civil Racketeering Violations – All Defendants)
### (18 U.S.C. § 1962(c))

105.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106.    At all times relevant to this Complaint, Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman were "persons" as defined by 18 U.S.C. § 1961(3).

107.    At all times relevant to this Complaint, Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman, as detailed in Paragraphs 26 - 72, 81 and 91 – 104, *supra*, engaged in the operation or management of the ATM Sales Enterprise, which is an enterprise as defined by 18 U.S.C. § 1961(4), the activities of which affect interstate commerce.

108.    Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman conducted the ATM Sales Enterprise's affairs through a pattern of racketeering activity, detailed in Paragraphs 114 - 227 below, which were directed at Plaintiff since at least November of 2005.

109.    Since at least November of 2005, Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman shared a common purpose while engaging in the fraudulent course of conduct detailed in Paragraphs 26 – 72, 81 and 91 – 104 above, and worked together to achieve such purpose, specifically to induce Plaintiff and other individuals and entities to enter into agreements to purchase Placed ATMs which do not exist in exchange for the receipt of millions of dollars of funds. The scheme was carried out through the complex offering of fraudulent documentation and

34

verbal statements by the Defendants to hide the true nature of their "sale" of phantom ATMs to Plaintiff and others, thus allowing Defendants to maintain the ATM Sales Enterprise scheme while reaping substantial profits for themselves.

110.    Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman, operating together and individually, and in conjunction with unnamed others, directed and controlled the ATM Sales Enterprise, by: (a) creating the Fictitious Transaction Documents and delivering, or causing to be delivered, the Fictitious Transaction Documents to Plaintiff or their representatives/agents; (b) creating the Fictitious Monthly Reports and delivering, or causing to be delivered, the Fictitious Monthly Reports to Plaintiff or their representatives/agents; (c) delivering, or causing to be delivered, the Periodic Revenue Payments to ATMA or their representatives/agents; (d) demanding from ATMA, and receiving, the Residual Revenue Funds; and, (e) engaging in a fraudulent course of conduct against Plaintiff, and unnamed others.

111.    The pattern of racketeering activity engaged in by Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman involved fraudulent acts in support of the above conduct constituting wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341), all of which constitute "racketeering activity," as defined in 18 U.S.C. § 1961(1)(B).

112.    Defendants engaged in the predicate acts detailed below between November 14, 2005, when Netschi delivered Fictitious Transaction Documents to a representative of the Plaintiff, and continued through January 31, 2008, when Brossman delivered Fictitious Monthly Reports to a representative of the Plaintiff.

### Violations of 18 U.S.C. § 1343 (Wire Fraud)

113.    The predicate acts, and evidence of the schemes constituting the pattern of

racketeering, include, but are not limited to interstate telephone calls, interstate electronic

("e-mail") messages, interstate facsimile transmissions, and interstate electronic banking

transactions containing false or fraudulent pretenses, representations, or promises made in

furtherance of the ATM Sales Enterprise caused to be transmitted by the Defendants, in

violation of 18 U.S.C. § 1343.

#### *Predicate Acts and Evidence Concerning Interstate Wire Transfers Related to the Purchases of ATMA Machines*

114.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the

ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on or about

November 16, 2005 from ATMA's Citibank, N.A. account located in New York to 36

Main's account number 061003415 at Florida Choice Bank located in Florida to purchase

ATMA Machines.

115.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the

ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on December 19,

2005 from ATMA's Citibank, N.A. account located in New York to 36 Main's account

number 061003415 at Florida Choice Bank located in Florida to purchase ATMA

Machines. *See* Volume XIX, Ex. 99.

116.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the

ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on February 24,

2006 from ATMA's Citibank, N.A. account located in New York to 36 Main's account

number 061003415 at Florida Choice Bank located in Florida to purchase ATMA

Machines. *See* Volume XIX, Ex. 100.

117.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,950,000 on April 27, 2006
from ATMA's Citibank, N.A. account located in New York to 36 Main's account number
061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See*
Volume XIX, Ex. 101.

118.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the
ATM Sales Enterprise,  caused ATMA to wire transfer $1,950,000.00 on May 26, 2006
from ATMA's Citibank, N.A. account located in New York, to 36 Main's account
number 061003415 at Florida Choice Bank located in Florida to purchase ATMA
Machines. *See* Volume XIX, Ex. 102.

119.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the
ATM Sales Enterprise,  caused ATMA to wire transfer $975,000.00 on June 14, 2006
from ATMA's Citibank, N.A. account located in New York, to 36 Main's account
number 061003415 at Florida Choice Bank located in Florida to purchase ATMA
Machines. *See* Volume XIX, Ex. 103.

120.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,073,000.00 on June 29, 2006,
from ATMA's Citibank, N.A. account located in New York to 36 Main's account number
061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See*
Volume XIX, Ex. 104.

121.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the
ATM Sales Enterprise, caused ATMA to wire transfer $1,469,500 on July 27, 2006 from
ATMA's Citibank, N.A. account located in New York, to 36 Main's account number

061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 105.

122.   Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,975,500.00 on September 5, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 106.

123.   Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $500.00 on September 6, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 107.

124.   Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,381,500.00 on September 29, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 108.

### *Predicate Acts and Evidence Concerning Interstate Wire Transfers for the Periodic Revenue Payments*

125.   On December 30, 2005, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $42,812.46 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 109.

126.    On February 3, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $85,760.28 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 110.

127.    On March 2, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of am interstate bank wire transfer, the following: $56,646.44 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 111.

128.    On April 3, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $51,911.65 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 112.

129.    On April 4, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $26,997.50 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments the ATMA Machines. *See* Volume XIX, Ex. 113.

130.    On May 1, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $126,283.26 from The Bankers Bank account number 061003415 located in Georgia to

ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 114.

131.    On May 31, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $170,993.83 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 115.

132.    On July 5, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $212,902.75 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 116.

133.    On August 2, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $256,028.99 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 117.

134.    On September 12, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $289,021.76 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 118.

135.    On October 11, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $340,231.77 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 119.

136.    On November 14, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $369,447.76 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 120.

137.    On December 19, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $358,430.65 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 121.

138.    On February 1, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $353,017.35 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 122.

139.    On February 28, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $344,170.03 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic
Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 123.

140.    On April 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused
ATMFS to transmit, by means of an interstate bank wire transfer, the following:
$161,012.89 from Florida Choice Bank account number 063114632 located in Florida to
ATMA's account located at Citibank N.A. located in New York, representing Periodic
Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 124.

141.    On May 14, 2007, in furtherance of the ATM Sales Enterprise, Moore caused
Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the
following: $120,000.00 from The Bankers Bank account number 061003415 located in
Georgia to ATMA's account located at Citibank N.A. located in New York, representing
Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 125.

142.    On May 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused
Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the
following: $48,000.00 from The Bankers Bank account number 061003415 located in
Georgia to ATMA's account located at Citibank N.A. located in New York, representing
Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 126.

143.    On May 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused
ATMFS to transmit, by means of an interstate bank wire transfer, the following:
$5,784.37 from Florida Choice Bank account number 063114632 located in Florida to
ATMA's account located at Citibank N.A. located in New York, representing Periodic
Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 127.

144.     On June 18, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $254,382.50 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 128.

145.     On August 15, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $695,737.93 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 129.

146.     On September 27, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $374,187.25 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines.

### *Interstate Wire Transfers: Residual Revenue Funds*

147.     On January 3, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $21,406.23 from Citibank, N.A. account number 48842629 located in New York to Automated Teller Machine Advantage Ltd's bank account number 977285936 at First American Bank located in Dallas, Texas, representing Residual Revenue Funds allegedly owed 36 Main for the November 16, 2005 Tranche Purchase. *See* Volume XIX, Ex. 130.

148.    On February 6, 2006, in furtherance of the ATM Sales Enterprise, Netschi and

36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the

following: $27,801.71 from Citibank, N.A. account number 48842629 located in New

York to ATM Capital's bank account number 977285936 at First American Bank located

in Dallas, Texas, representing Residual Revenue Funds allegedly owed 36 Main for the

December 20, 2005 Tranche Purchase. *See* Volume XIX, Ex. 131.

149.    On June 1, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36

Main caused ATMA to transmit, by means of an interstate bank wire transfer, the

following: $35,560.14 from Citibank, N.A. account number 48842629 located in New

York to 36 Main's bank account number 061003415 at The Bankers Bank located in

Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the

April 26, 2006 Tranche Purchase. *See* Volume XIX, Ex. 132.

150.    On July 11, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36

Main caused ATMA to transmit, by means of an interstate bank wire transfer, the

following: $38,458.55 from Citibank, N.A. account number 48842629 located in New

York to 36 Main's bank account number 061003415 at The Bankers Bank located in

Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the

May 27, 2006 Tranche Purchase. *See* Volume XIX, Ex. 133.

151.    On August 7, 2006, in furtherance of the ATM Sales Enterprise, Netschi and

36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the

following: $33,621.17 from Citibank, N.A. account number 48842629 located in New

York to 36 Main's bank account number 061003415 at The Bankers Bank located in

Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the

Exhibit B

(Part 2 of 3)

June 16, 2006 Tranche Purchase and the June 27, 2006 Tranche Purchase. *See* Volume XIX, Ex. 134.

152.    On September 11, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $30,500.33 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the July 28, 2006 Tranche Purchase. *See* Volume XIX, Ex. 135.

153.    On October 13, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $43,911.72 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the August 30, 2006 Tranche Purchase #1, August 30, 2006 Tranche Purchase #2, August 30, 2006 Tranche Purchase #3 and August 30, 2006 Tranche Purchase #4. *See* Volume XIX, Ex. 136.

154.    On November 14, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $27,389.12 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the September 26, 2006 Tranche Purchase #1, the September 26, 2006 Tranche Purchase #2, and September 26, 2006 Tranche Purchase #3. *See* Volume XIX, Ex. 137.

### Predicate Acts and Evidence Concerning Interstate Telephonic Wire Communications

155.    As detailed in Paragraphs 35 and 37, *supra*, on November 14, 2005, in furtherance of the ATM Sales Enterprise, Moore, while in Florida or North Carolina, engaged in an interstate telephone conversation with representatives of ATMA in New York during which he made false representations concerning the operations of ATMFS and 36 Main.

156.    As detailed in Paragraphs 31 – 34, *supra*, on November 14, 2005, in furtherance of the ATM Sales Enterprise, Netschi, while in Texas, engaged in an interstate telephone conversation with representatives of ATMA in New York during which he made false representations concerning the operations of ATMFS and 36 Main.

### Predicate Acts and Evidence Concerning Interstate Wire Communications

157.    On November 14, 2005, at 3:18 p.m., in furtherance of the ATM Sales Enterprise, ATM Capital, at the direction of Netschi, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from ATM Capital in Texas to a representative of ATMA in New York, Munier in New Jersey and Brossman in New Jersey, attaching a schedule of phantom Placed ATMs and an undated Equipment Management Agreement, each constituting false information related to the existence of Placed ATMs available for sale and management. *See* Volume I, Ex. 1.

158.    On November 14, 2005, at 3:19 p.m., in furtherance of the ATM Sales Enterprise, at the direction of Netschi, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from ATM Capital in Texas to a representative of ATMA in New York, attaching a

Bill of Sale dated November 16, 2005, an Asset Purchase Agreement dated November 16, 2005, and a schedule of phantom Placed ATMs, each constituting false information related to the existence of Placed ATMs available for sale and management. *See* Volume I, Ex. 2.

159.    On November 14, 2005, at 4:17 p.m., in furtherance of the ATM Sales Enterprise, ATM Capital, at the direction of Netschi, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from ATM Capital in Texas to representatives of ATMA in New York, Munier in New Jersey, and Brossman in New Jersey, attaching an undated Equipment Management Agreement, constituting false information related to the existence of Placed ATMs available for sale and management. *See* Volume I, Ex. 3.

160.    On November 30, 2005, at 9:00 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to ATM Capital in Texas, Brossman in New Jersey and Marianne Munier with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 138.

161.    On December 29, 2005, at 7:52 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 138 – Ex. 141.

162.    On January 5, 2006, at 12:15 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 142.

163.    On February 2, 2006, at 9:00 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 143 – Ex. 145.

164.    On February 6, 2006, at 2:38 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 146.

165.    On March 7, 2006, at 10:11 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a

representative of ATMA in New York with an attached Fictitious Revenue Report. *See* Volume XIX, Ex. 147.

166.   On April 27, 2006, at 1:21 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false representations as to ATMFS's possession of $200,000,000.00 in capital funds held in escrow by ATMFS for the expansion of ATMFS's business. *See* Volume XIX, Ex. 148.

167.   On May 2, 2006, at 11:43 a.m., in furtherance of the ATM Sales Enterprise and ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to Brossman in New Jersey and a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 149.

168.   On May 4, 2006, at 1:49 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 150.

169.   On May 31, 2006, at 9:43 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore,

knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to ATM Capital in Texas and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 151.

170.   On May 31, 2006, at 11:13 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 151.

171.   On July 3, 2006, at 2:34 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina, Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 152.

172.   On July 3, 2006, at 4:34 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report *See* Volume XIX, Ex. 152.

173.    On July 4, 2006, at 10:55 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false representations as to the operation of, and potential upgrades to, the ATMA Machines. *See* Volume XIX, Ex. 153.

174.    On July 26, 2006, at 2:31 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false information related to the operation of the ATMA Machines. *See* Volume XIX, Ex. 154.

175.    On July 26, 2006, at 2:53 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false information related to operation of the ATMA Machines. *See* Volume XIX, Ex. 155.

176.    On July 31, 2006, at 3:26 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 156 – Ex. 158.

177.   On August 2, 2006, at 5:28 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 159.

178.   On September 12, 2006, at 10:21 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 160.

179.   On October 6, 2006, at 11:26 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 161 – Ex. 162.

180.   On October 30, 2006, at 11:04 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing a false "ATM Detail Transaction Report." *See* Volume XIX, Ex. 163.

181.   On November 14, 2006, at 11:55 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 164.

182.   On January 19, 2007, at 2:42 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 165 – Ex. 167.

183.   On January 22, 2007, at 11:03 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 168.

184.   On February 26, 2007, at 10:43 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 169.

185.   On April 11, 2007, at 10:49 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a

53

representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 170.

186.    On April 12, 2007, at 8:38 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York and Brossman in New Jersey containing false information related to the operation of the ATMA Machines. *See* Volume XX, Ex. 171.

187.    On April 30, 2007, at 9:17 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 172 – Ex.174.

188.    On April 30, 2007, at 3:49 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 175.

189.    On June 6, 2007, at 11:33 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report *See* Volume XX, Ex. 176.

190.    On July 12, 2007, at 3:20 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 177 – Ex.179.

191.    On July 12, 2007, at 11:56 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 180.

192.    On August 15, 2007, at 7:58 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 181 – Ex. 182.

193.    On August 15, 2007, at 1:40 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 183.

194.    On September 18, 2007, at 10:34 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in

New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 184.

195.    On November 5, 2007, at 2:33 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 185 – Ex. 186.

196.    On November 5, 2007, at 11:52 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 187.

197.    On January 10, 2008, at 2:38 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 188.

198.    On January 10, 2008, at 3:20 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York, attaching a report from a third-party processor, constituting false information related to the existence of ATMA Machines. *See* Volume XIX, Ex. 90.

199.    On January 11, 2008, at 11:49 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York, attaching a report from a ATMFS, constituting false information related to the existence of ATMA Machines. *See* Volume XIX, Ex. 92.

200.    On January 11, 2008, at 12:34 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false representations that requests had been submitted to third-party processors for reports pertaining to the operation of the ATMA Machines. *See* Volume XIX, Ex. 94.

201.    On January 11, 2008, at 2:14 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing a false representation that a bank account existed where ATMA Periodic Revenue Payments were being held and that a statement from that account would be produced to a representative of ATMA. *See* Volume XIX, Ex. 94.

202.    On January 11, 2008, at 3:19 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York, attaching a

purported bank statement dated December 31, 2007, constituting false information related to the amount of funds being held in escrow on behalf of ATMA. *See* Volume XIX, Ex. 95.

203.    On January 11, 2008, at 7:18 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA containing a misrepresentation that 250 of the ATMA Machines had been identified. *See* Volume XIX, Ex. 93.

204.    On January 18, 2008, at 5:47 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman attaching a purported schedule identifying the locations of the ATMA Machines, constituting false information related to the existence and location of the ATMA Machines. *See* Volume XX, Ex. 189.

205.    On January 20, 2008, at 12:30 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York containing a misrepresentation that Brossman had accounted for the existence of the ATMA Machines. *See* Volume XIX, Ex. 97.

206.    On January 20, 2008, at 9:05 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York containing a false representation as to the existence of ATMs owned by Brossman. *See* Volume XX, Ex. 190.

207.   On January 22, 2008, at 1:23 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York, attaching a schedule identifying the locations of the ATMA Machines, constituting false information related to the existence and location of the ATMA Machines. *See* Volume XX, Ex. 189.

208.   On January 22, 2008, at 2:32 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in North Carolina or Florida to a representative of ATMA in New York, containing a false representation as to the existence and locations of the ATMA Machines. *See* Volume XIX, Ex. 98.

209.   On January 31, 2008, at 3:51 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 138.

210.   On January 31, 2008, at 3:58 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 139.

211.    On January 31, 2008, at 3:59 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 140.

212.    On January 31, 2008, at 4:00 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 143.

213.    On January 31, 2008, at 4:01 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 144.

214.    On January 31, 2008, at 4:05 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 156.

215.    On January 31, 2008, at 4:06 p.m., in furtherance of the ATM Sales
Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire
communication in interstate commerce the following writing: an e-mail from Brossman
in New Jersey to a representative of ATMA in New York with an attached Fictitious
Monthly Report. *See* Volume XIX, Ex. 157.

216.    On January 31, 2008, at 4:09 p.m., in furtherance of the ATM Sales
Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire
communication in interstate commerce the following writing: an e-mail from Brossman
in New Jersey to a representative of ATMA in New York with an attached Fictitious
Monthly Report. *See* Volume XIX, Ex. 161.

217.    On January 31, 2008, at 4:10 p.m., in furtherance of the ATM Sales
Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire
communication in interstate commerce the following writing: an e-mail from Brossman
in New Jersey to a representative of ATMA in New York with an attached Fictitious
Monthly Report. *See* Volume XIX, Ex. 165.

218.    On January 31, 2008, at 4:12 p.m., in furtherance of the ATM Sales
Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire
communication in interstate commerce the following writing: an e-mail from Brossman
in New Jersey to a representative of ATMA in New York with an attached Fictitious
Monthly Report. *See* Volume XX, Ex. 172 – Ex. 173.

219.    On January 31, 2008, at 4:20 p.m., in furtherance of the ATM Sales
Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire
communication in interstate commerce the following writing: an e-mail from Brossman

61

in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 141.

220.    On January 31, 2008, at 4:24 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 158.

221.    On January 31, 2008, at 4:26 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 162.

222.    On January 31, 2008, at 4:30 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 174.

223.    On January 31, 2008, at 4:31 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 179, Ex. 181.

62

224.    On January 31, 2008, at 4:32 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Exs. 182 and 186.

225.    On January 31, 2008, at 5:03 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 191 – Ex. 192.

226.    On January 31, 2008, at 5:19 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 191.

227.    On January 31, 2008, at 5:20 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 192.

**Violations of 18 U.S.C. § 1341 (Mail Fraud)**

228.    The predicate acts, and evidence of the schemes constituting the pattern of racketeering, further include, but are not limited to interstate mailings containing false or

fraudulent pretenses, representations, or promises made in furtherance of the ATM Sales

Enterprise caused to be transmitted by the Defendants, in violation of 18 U.S.C. § 1341.

### *Interstate Mailings*

229.    Upon information and belief, on or about November 15, 2005, in furtherance

of the ATM Sales Enterprise and to induce ATMA to purchase phantom Placed ATMs,

Moore, knowingly placed or caused to be placed in a post office or authorized depository

for the Postal Service in Florida or North Carolina or with a private, commercial

interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey,

the following Fictitious Transaction Documents: a Lease Assignment dated November

15, 2005; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs;

and an Equipment Management Agreement dated November 15, 2005.

230.    Upon information and belief, on or about December 20, 2005, in furtherance

of the ATM Sales Enterprise to induce ATMA to continue to purchase phantom Placed

ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized

depository for the Postal Service in Florida or North Carolina or with a private,

commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in

New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated

December 20, 2005; a Due Diligence Report and Placed ATM Leases for each of the 100

ATMs; and, an Equipment Management Agreement dated December 20, 2005.

231.    Upon information and belief, on or about February 22, 2006, in furtherance of

the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed

ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized

depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated February 22, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; and, an Equipment Management Agreement dated February 22, 2006.

232.    Upon information and belief, on or about April 26, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated April 26, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; an Equipment Management Agreement dated April 26, 2006.

233.    Upon information and belief, on or about May 27, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Florida or North Carolina or with a private, commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated May 23, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs; and, an Equipment Management Agreement dated May 23, 2006.

234.    Upon information and belief, on or about August 30, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed

ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized

depository for the Postal Service in Florida or North Carolina or with a private,

commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in

New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated

September 5, 2006; a Due Diligence Report and Placed ATM Leases for each of the 127

ATMs; and an Equipment Management Agreement dated September 5, 2006.

235.    Upon information and belief, on or about November 15, 2005, in furtherance

of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom

Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a

post office or authorized depository for the Postal Service in Texas or with a private,

commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the

following Fictitious Transaction Documents: a Bill of Sale dated November 16, 2005,

Asset Purchase Agreement dated November 16, 2005, and Due Diligence Commitment

dated November 16, 2005.

236.    Upon information and belief, on or about December 20, 2005, in furtherance

of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom

Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a

post office or authorized depository for the Postal Service in Texas or with a private,

commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the

following Fictitious Transaction Documents: a Bill of Sale dated December 20, 2005,

Asset Purchase Agreement dated December 20, 2005, and Addition to Equipment dated

December 20, 2005.

237.    Upon information and belief, on or about February 22, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated February 22, 2006, Asset Purchase Agreement dated February 22, 2006, and Addition to Equipment dated December 20, 2005.

238.    Upon information and belief, on or about April 26, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated April 26, 2006, Asset Purchase Agreement dated April 26, 2006, and Addition to Equipment dated April 26, 2006.

239.    Upon information and belief, on or about May 27, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated May 27, 2006, and Asset Purchase Agreement dated May 27, 2006.

67

240.   Upon information and belief, on or about June 16, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated June 16, 2006, and Asset Purchase Agreement dated June 16, 2006.

241.   Upon information and belief, on or about June 27, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated June 27, 2006, and Asset Purchase Agreement dated June 27, 2006.

242.   Upon information and belief, on or about July 28, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated July 28, 2006, and Asset Purchase Agreement dated July 28, 2006.

243.   Upon information and belief, on or about August 30, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed

ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: four Bills of Sale dated August 30, 2006, and four Asset Purchase Agreements dated August 30, 2006.

244.     Upon information and belief, on or about September 26, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: three Bills of Sale dated September 26, 2006, and three Asset Purchase Agreements dated September 26, 2006.

245.     The allegations in Paragraphs 229 - 244 are likely to have evidentiary support after a reasonable opportunity for investigation and discovery.  The allegations in Paragraphs 229 - 244 are based in part upon information and belief because the Defendants are alleged to have sent or delivered the documents identified in Paragraphs 229 - 244 above amongst themselves.

246.     As a direct and proximate result of Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier, and Brossman's conduct of the ATM Sales Enterprise through the pattern of racketeering activity detailed in Paragraphs 114 – 244 above, Plaintiff has been injured in its business and property, specifically the loss of $16,475,000.00 paid to purchase the phantom ATMA Machines.  Netschi, 36 Main, Jones, Moore, Exclusive Properties ATM Capital, Munier, and Brossman's conduct and

participation in the ATM Sales Enterprise as part of their pattern of racketeering activity was in the violation of 18 U.S.C. § 1962(c) and caused Plaintiff's losses. Accordingly, Plaintiff is entitled, under the provisions of 18 U.S.C. § 1964(c), to recover treble damages, the costs of bringing this action, pre-judgment interest, and reasonable attorney's fees.

### COUNT 2
### (Civil Racketeering Violations – All Defendants)
### (18 U.S.C. § 1962(d))

247.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 246 of this Complaint as if fully set forth herein.

248.    The Defendants, as detailed in Paragraphs 26 – 72, 81 and 91 – 104 above, entered into an agreement with each other to engage in a conspiracy to violate 18 U.S.C. § 1962(c). As set forth Each Defendant entered into an agreement to join the conspiracy, took acts in the furtherance of the conspiracy and knowingly participated in the conspiracy.

249.    The purpose of the conspiracy was to induce the Plaintiff, and others, to enter into agreements to purchase phantom Placed ATMs to their economic detriment and to the economic benefit of the Defendants. The conspirators each carried out the scheme and each conspirator was put on notice of the general nature of the conspiracy, that the conspiracy extended beyond the individual role of any single member, and that the conspiratorial venture, the ATM Sales Enterprise, functioned as a continuing unit for a common purpose. The Defendants, as conspirators, adopted the goal of furthering the ATM Sales Enterprise. Each of the Defendants' stake in the ATM Sales Enterprise was in making profits through each Defendant's role in the ATM Sales Enterprise.

250. The Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by: (1) participating or causing the acquisition or maintenance of, through a pattern of racketeering activity, an interest or control in the ATM Sales Enterprise, the activities of which affect interstate or foreign commerce; and, (2) participating, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

251. By engaging in the overt acts and other conduct described in Paragraphs 26 – 65 and 84 – 97 above, Defendants have agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d), to engage in illegal predicate acts, detailed in Paragraphs 106 - 237 above, which formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. § 1962(c).

252. The Defendants participated in and cooperated with each other in the aforementioned conspiracy that enabled Defendants to engage in the fraudulent sale of ATMs and thereby amass substantial sums of money, believed to be tens of millions of dollars, from persons throughout the United States of America, including Plaintiff.

253. The membership of the conspiracy includes each of the Defendants. As coconspirators, the Defendants are liable for all of the actions committed by all of the coconspirators within the conspiracy and are liable for all of the damages sustained by Plaintiff that were caused by any members of the conspiracy, regardless of whether the Defendants were themselves directly involved in a particular aspect of the ATM Sales Enterprise.

254.    As a direct and proximate result of the violations set forth above, Plaintiff has

been injured in its business and property. The Defendants' violations of 18 U.S.C. §

1962(d) were the proximate cause of these losses.  Under the provisions of 18 U.S.C. §

1962(c), Plaintiff is  entitled to bring this action and recover herein treble damages, the

cost of bringing this suit, pre-judgment interest, and recoverable attorney's fees.

## COUNT 3
### (Fraudulent Misrepresentation, Inducement – Moore)

255.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 254 of this Complaint as if fully set forth herein.

256.    The representations by Moore, as detailed above at Paragraphs 35, 37, 52, 53,

59, 61 – 64, 66, 68 – 70, 72, 95, 98, 100, 160 - 161, 163, 169, 171, 176, 179, 182, 187,

190, 192, and 195 were material false representations made to Plaintiff that Moore knew

were false, or were made recklessly without regard to their truth, with an intent to defraud

Plaintiff and Plaintiff justifiably relied on Moore's materially false representations.

257.    Moore, as detailed above at Paragraphs 35, 37, 52, 53, 59, 61 – 64, 66, 68 –

70, 72, 95, 98, 100, 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195 made

false misrepresentations to Plaintiff of facts that were material to Plaintiff's decision to

enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA

Machines, and engage the management services of Moore's ISO company, ATMFS, to

manage the ATMA Machines.

258.    Moore knew or should have known of: the falsity of the verbal and written

representations made to Plaintiff; the incompleteness of the representations made to

Plaintiff at the time they were made; and, that the representations made to Plaintiff

omitted material facts.

259.    Moore's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 35, 37, 52, 53, 59, 61 – 64, 66, 68 – 70, 72, 95, 98, 100, 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195 were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom Placed ATMs from 36 Main, to transfer funds to 36 Main for those phantom Placed ATMs, and to engage the services of ATMFS, through Moore, to manage the ATMA Machines. Moore intentionally or recklessly attempted to hide such fraud by delivering the Moore Fictitious Transaction Documents, Fictitious Monthly Reports, and Periodic Revenue Payments to Plaintiff.

260.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Moore's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines, and conduct business with the ATM Sales Enterprise.

261.    In addition, for Tranche Purchases subsequent to the November 15, 2005 Tranche Purchase, Plaintiff justifiably relied upon and were further induced into continuing to purchase the phantom Placed ATMs by Moore's delivery of Fictitious Monthly Reports and Periodic Revenue Payments.

262.    But for Moore's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

263.     Moore had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

264.     As a direct and proximate result of the Moore's intentional misrepresentations, omissions, and concealment of material facts, Plaintiff has been damaged to the extent that it has lost the value of all principal amounts delivered to 36 Main, plus all applicable interest thereon.

265.     Moore's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiff.  Plaintiff is therefore entitled to the award of punitive damages from Moore.

## COUNT 4
### (Fraudulent Misrepresentation and Inducement – Netschi)

266.     Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 265 of this Complaint as if fully set forth herein.

267.     The representations by Netschi, as detailed above at Paragraphs 31 – 34, 36, 46, 81, 94, and 103, were material false representations made to Plaintiff that Netschi knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiff and Plaintiff reasonably relied on Netschi's materially false representations.

268.     Netschi, as detailed above at Paragraphs 31 – 34, 36, 46, 81, 94, and 103, made false misrepresentations to Plaintiff of facts that were material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

269.    Netschi knew or should have known of: the falsity of the verbal and written representations made to Plaintiff; the incompleteness of the representations made to Plaintiff at the time they were made; and, that the representations made to Plaintiff omitted material facts.

270.    Netschi's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 31 – 34, 36, 46, 81, 94, and 103, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom ATMs from 36 Main, to transfer funds to 36 Main for those phantom ATMs, and to engage the services of ATMFS, through Moore, to manage the ATMA Machines. Netschi intentionally or recklessly attempted to hide such fraud by delivering or causing to be delivered the 36 Main Transaction Documents.

271.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Netschi's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

272.    But for Netschi's material misrepresentations, omissions, and concealment of facts concerning the 36 Main Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

273.    Netschi had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

274.    As a direct and proximate result of the Netschi's intentional misrepresentations, omissions, and concealment of material facts, Plaintiff has been damaged to the extent that it has lost the value of all principal amounts delivered to 36 Main, plus all applicable interest thereon.

275.    Netschi's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiff.  Plaintiff is therefore entitled to the award of punitive damages from Netschi.

## COUNT 5
## (Fraudulent Misrepresentation, Inducement, Concealment – Brossman)

276.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 275 of this Complaint as if fully set forth herein.

277.    The representations by Brossman, as detailed above at Paragraphs 30, 34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, were material false representations made to Plaintiff that Brossman knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiff and Plaintiff reasonably relied on Brossman's materially false representations.

278.    Brossman, as detailed above at Paragraphs 30, 34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, made false misrepresentations to Plaintiff of facts that were material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

279.    Brossman knew or should have known of: the falsity of the verbal and written representations made to Plaintiff; the incompleteness of the representations made to

Plaintiff at the time they were made; and, that the representations made to Plaintiff omitted material facts.

280.    Brossman's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 30, 34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom ATMs from 36 Main, to transfer funds to 36 Main for those phantom ATMs, and to engage the services of ATMFS, through Brossman, to manage the ATMA Machines. Brossman intentionally or recklessly attempted to hide such fraud by delivering the Fictitious Transaction Documents and/or Fictitious Monthly Reports to Plaintiff.

281.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Brossman's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

282.    But for Brossman's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

283.    Brossman had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

284.    Brossman was under a duty to disclose the facts described in Paragraphs 30, 34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, above and chose to not do so.

285.    As a direct and proximate result of the Brossman's intentional misrepresentations, omissions, and concealment of material facts, Plaintiff has been damaged to the extent that it has lost the value of all principal amounts delivered to 36 Main, plus all applicable interest thereon.

286.    Brossman's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiff. Plaintiff is therefore entitled to the award of punitive damages from Brossman.

## COUNT 6
### (Fraudulent Misrepresentation, Inducement, Concealment – Munier)

287.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 286 of this Complaint as if fully set forth herein.

288.    The representations by Munier, as detailed above at Paragraphs 30, 34, 45, 60, 96, 99, 102 and 104, were material false representations made to Plaintiff that Munier knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiff, and Plaintiff reasonably relied on Munier's materially false representations.

289.    Munier, as detailed above at Paragraphs, 30, 34, 45, 60, 96, 99, 102 and 104, made false misrepresentations to Plaintiff of facts that were material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the

ATMA Machines, and engage the management services of Moore's ISO company,

ATMFS, to manage the ATMA Machines.

290.    Munier knew or should have known of: the falsity of the verbal and written

representations made to Plaintiff; the incompleteness of the representations made to

Plaintiff at the time they were made; and, that the representations made to Plaintiff

omitted material facts.

291.    Munier's misrepresentations, omissions, and concealment of material facts, as

detailed above at Paragraphs 30, 34, 45, 60, 96, 99, 102 and 104 were made with reckless

and utter disregard as to their truthfulness or completeness, were made intentionally or

recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase

Agreements for the purchase of phantom ATMs from 36 Main, to transfer funds to 36

Main for those phantom ATMs, and to engage the services of ATMFS, through Munier,

to manage the ATMA Machines. Munier intentionally or recklessly attempted to hide

such fraud by delivering the Fictitious Transaction Documents and/or Fictitious Monthly

Reports to Plaintiff.

292.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness

of Munier's representations and on the completeness of his disclosure of material facts, in

choosing to join the ATM Venture, purchase the ATMA Machines conduct business with

the ATM Sales Enterprise.

293.    But for Munier's material misrepresentations, omissions, and concealment of

facts concerning the Fictitious Transaction Documents, Plaintiff would not have joined

the ATM Venture, purchased the ATMA Machines and/or conducted business with the

ATM Sales Enterprise.

294.   Munier had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

295.   Munier was under a duty to disclose the facts described in Paragraphs 30, 34, 45, 60, 96, 99, 102 and 104 above and chose to not do so.

296.   As a direct and proximate result of the Munier's intentional misrepresentations, omissions, and concealment of material facts, Plaintiff has been damaged to the extent that it has lost the value of all principal amounts delivered to 36 Main, plus all applicable interest thereon.

297.   Munier's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiff.  Plaintiff is therefore entitled to the award of punitive damages from Munier.

## COUNT 7
### (Negligent Misrepresentation – 36 Main and Netschi)

298.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 297 of this Complaint as if fully set forth herein.

299.   The representations made by Netschi and 36 Main to Plaintiff in Paragraphs 31 - 34, and 36 above (collectively the "36 Main Misrepresentations") were false when made and material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines and conduct business with the ATM Sales Enterprise.

300.   Netschi and 36 Main were in a superior position to know the truth or falsity of the 36 Main Misrepresentations.

80

301.    Netschi and 36 Main should have known the truth or falsity of the 36 Main Misrepresentations.

302.    Under the circumstances, Netschi and 36 Main were under a duty to ensure the accuracy of the 36 Main Misrepresentations.

303.    Netschi and 36 Main made the 36 Main Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

304.    Netschi and 36 Main intended and were aware that Plaintiff would rely upon the 36 Main Misrepresentations in deciding whether to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines and conduct business with the ATM Sales Enterprise.

305.    Netschi and 36 Main had a pecuniary interest in the ATM Venture and the ATM Sales Enterprise.

306.    Plaintiff reasonably and justifiably relied to their detriment upon the 36 Main Misrepresentations and on the completeness of their disclosure of material facts, in choosing to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise and but for the 36 Main Misrepresentations, Plaintiff would not have entered the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise.

307.    Netschi and 36 Main's breach of their duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

308.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the 36 Main Misrepresentations.

309.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the value of all principal amounts delivered to the Defendants, plus all applicable interest thereon.

## COUNT 8
### (Negligent Misrepresentation – Moore)

310.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 309 of this Complaint as if fully set forth herein.

311.    The representations made by Moore in Paragraphs 35, 37,and 59 above (collectively the "Moore Misrepresentations") were false when made and material to Plaintiff's decision to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with the ATM Sales Enterprise.

312.    Moore was in a superior position to know the truth or falsity of the Moore Misrepresentations.

313.    Moore should have known the truth or falsity of the Moore Misrepresentations.

314.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore Misrepresentations.

315.    Moore made the Moore Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

316.    Moore intended and was aware that Plaintiff would rely upon the Moore Misrepresentations in deciding whether to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise.

317.    Moore had a pecuniary interest in the ATM Venture, the sale of the ATMA Machines by 36 Main and/or the ATM Sales Enterprise.

318.    Plaintiff justifiably relied to their detriment upon the Moore
Misrepresentations by entering the ATM Venture, purchasing the ATMA Machines
and/or conducting business with ATM Sales Enterprise and but for the Moore
Misrepresentations, Plaintiff would not have entered the ATM Venture, purchased the
ATMA Machines and/or conducted business with ATM Sales Enterprise.

319.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate
cause of Plaintiff's injuries.

320.    The type and extent of Plaintiff's injuries were reasonably foreseeable results
of the Moore Misrepresentations.

321.    By reason of the foregoing, Plaintiff has been damaged in an amount to be
determined at trial, but not less than the value of all principal amounts delivered to the
Defendants, plus all applicable interest thereon.

## COUNT 9
### (Negligent Misrepresentation – Moore)

322.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs
1 through 321 of this Complaint as if fully set forth herein.

323.    The representations made by Moore, as detailed in Paragraph 52(h) above, in
the undated Due Diligence Report provided to Plaintiff on or about November 16, 2005
(the "Moore November 2005 Due Diligence Misrepresentations") (*See* Volume III, Ex.
11) were false when made and material to Plaintiff's decision to enter into the November
16, 2005 Tranche Purchase.

324.    Moore was in a superior position to know the truth or falsity of the Moore
November 2005 Due Diligence Misrepresentations.

83

325.    Moore should have known the truth or falsity of the Moore November 2005 Due Diligence Misrepresentations.

326.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore November 2005 Due Diligence Misrepresentations.

327.    Moore made the Moore November 2005 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

328.    Moore intended and was aware that Plaintiff would rely upon the Moore November 2005 Due Diligence Misrepresentations in deciding whether to enter into the November 16, 2005 Tranche Purchase.

329.    Moore had an undisclosed pecuniary interest in the November 16, 2005 Tranche Purchase, because his company, ATMFS, was actually 36 Main's source of the ATMs for the November 16, 2005 Tranche Purchase.

330.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore November 2005 Due Diligence Misrepresentations by entering into the November 16, 2005 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,900,000.00.

331.    But for the Moore November 2005 Due Diligence Misrepresentations, Plaintiff would not have entered the November 16, 2005 Tranche Purchase.

332.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

333.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore November 2005 Due Diligence Misrepresentations.

334.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

## COUNT 10
### (Negligent Misrepresentation – Moore)

335.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 334 of this Complaint as if fully set forth herein.

336.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about December 20, 2005 (the "Moore December 2005 Due Diligence Misrepresentations") (*See* Volume V, Ex. 20) were false when made and material to Plaintiff's decision to enter into the December 20, 2005 Tranche Purchase.

337.    Moore was in a superior position to know the truth or falsity of the Moore December 2005 Due Diligence Misrepresentations.

338.    Moore should have known the truth or falsity of the Moore December 2005 Due Diligence Misrepresentations.

339.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore December 2005 Due Diligence Misrepresentations.

340.    Moore made the Moore December 2005 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

341.    Moore intended and was aware that Plaintiff would rely upon the Moore December 2005 Due Diligence Misrepresentations in deciding whether to enter into the December 20, 2005 Tranche Purchase.

342.    Moore had an undisclosed pecuniary interest in the December 20, 2005 Tranche Purchase, because his company, ATMFS, was actually 36 Main's source of the ATMs for the December 20, 2005 Tranche Purchase.

343.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore December 2005 Due Diligence Misrepresentations by entering into the December 20, 2005 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,900,000.00.

344.    But for the Moore December 2005 Due Diligence Misrepresentations, Plaintiff would not have entered the December 20, 2005 Tranche Purchase.

345.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

346.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore December 2005 Due Diligence Misrepresentations.

347.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

### COUNT 11
### (Negligent Misrepresentation – Moore)

348.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 347 of this Complaint as if fully set forth herein.

349.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the Due Diligence Report for the February 22, 2006 Tranche Purchase and provided to Plaintiff on or about February 22, 2006 (the "Moore February 2006 Due Diligence Misrepresentations") (*See* Volume VII, Ex. 29) were false when made and material to Plaintiff's decision to enter into the February 22, 2006 Tranche Purchase.

350.    Moore was in a superior position to know the truth or falsity of the Moore February 2006 Due Diligence Misrepresentations.

351.    Moore should have known the truth or falsity of the Moore February 2006 Due Diligence Misrepresentations.

352.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore February 2006 Due Diligence Misrepresentations.

353.    Moore made the Moore February 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

354.    Moore intended and was aware that Plaintiff would rely upon the Moore February 2006 Due Diligence Misrepresentations in deciding whether to enter into the February 22, 2006 Tranche Purchase.

355.    Moore had an undisclosed pecuniary interest in the February 22, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the February 22, 2006 Tranche Purchase.

356.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore February 2006 Due Diligence Misrepresentations by entering into the February 22, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,900,000.00.

357.    But for the Moore February 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the February 22, 2006 Tranche Purchase.

358.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

359.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore February 2006 Due Diligence Misrepresentations.

360.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

## COUNT 12
### (Negligent Misrepresentation – Moore)

361.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 360 of this Complaint as if fully set forth herein.

362.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the Due Diligence Report dated April 26, 2006 (the "Moore April 2006 Due Diligence Misrepresentations") (*See* Volume IX, Ex. 38) were false when made and material to Plaintiff's decision to enter into the April 26, 2006 Tranche Purchase.

363.    Moore was in a superior position to know the truth or falsity of the Moore April 2006 Due Diligence Misrepresentations.

364.    Moore should have known the truth or falsity of the Moore April 2006 Due Diligence Misrepresentations.

365.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore April 2006 Due Diligence Misrepresentations.

366.    Moore made the Moore April 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

367.    Moore intended and was aware that Plaintiff would rely upon the Moore April 2006 Due Diligence Misrepresentations in deciding whether to enter into the April 26, 2006 Tranche Purchase.

368.    Moore had an undisclosed pecuniary interest in the April 26, 2006 Deal because his company, ATMFS, was actually 36 Main's source of the ATMs for the April 26, 2006 Tranche Purchase.

369.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore April 2006 Due Diligence Misrepresentations by entering into the April 26, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,950,000.00.

370.    But for the Moore April 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the April 26, 2006 Tranche Purchase.

371.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

372.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore April 2006 Due Diligence Misrepresentations.

373.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,950,000.00 paid to 36 Main.

## COUNT 13
### (Negligent Misrepresentation – Moore)

374.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 373 of this Complaint as if fully set forth herein.

375.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about May 27, 2006 (the "Moore May 2006 Due Diligence Misrepresentations") (*See* Volume XI, Ex. 45) were false when made and material to Plaintiff's decision to enter into the May 27, 2006 Tranche Purchase.

Case 1:08-cv-03340-RMB-FM    Document 36-6    Filed 08/05/2008    Page 11 of 49

376.    Moore was in a superior position to know the truth or falsity of the Moore May 2006 Due Diligence Misrepresentations.

377.    Moore should have known the truth or falsity of the Moore May 2006 Due Diligence Misrepresentations.

378.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore May 2006 Due Diligence Misrepresentations.

379.    Moore made the Moore May 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

380.    Moore intended and was aware that Plaintiff would rely upon the Moore May 2006 Due Diligence Misrepresentations in deciding whether to enter into the May 27, 2006 Tranche Purchase.

381.    Moore had an undisclosed pecuniary interest in the May 27, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the May 27, 2006 Tranche Purchase.

382.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore May 2006 Due Diligence Misrepresentations by entering into the May 27, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,950,000.00.

383.    But for the Moore May 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the May 27, 2006 Tranche Purchase.

384.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

385.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore May 2006 Due Diligence Misrepresentations.

386.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,950,000.00 paid to 36 Main.

## COUNT 14
### (Negligent Misrepresentation – Moore)

387.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 386 of this Complaint as if fully set forth herein.

388.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about June 16, 2006 (the "Moore June 16, 2006 Due Diligence Misrepresentations") (*See* Volume XII, Ex. 52) were false when made and material to Plaintiff's decision to enter into the June 16, 2006 Tranche Purchase.

389.    Moore was in a superior position to know the truth or falsity of the Moore June 16, 2006 Due Diligence Misrepresentations.

390.    Moore should have known the truth or falsity of the Moore June 16, 2006 Due Diligence Misrepresentations.

391.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore June 16, 2006 Due Diligence Misrepresentations.

392.    Moore made the Moore June 16, 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

393.    Moore intended and was aware that Plaintiff would rely upon the Moore June 16, 2006 Due Diligence Misrepresentations in deciding whether to enter into the June 16, 2006 Tranche Purchase.

91

394.    Moore had an undisclosed pecuniary interest in the June 16, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the June 16, 2006 Tranche Purchase.

395.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore June 16, 2006 Due Diligence Misrepresentations by entering into the June 16, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 50 Placed ATM machines for $975,000.00.

396.    But for the Moore June 16, 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the June 16, 2006 Tranche Purchase.

397.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

398.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore June 16, 2006 Due Diligence Misrepresentations.

399.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $975,000.00 paid to 36 Main.

### COUNT 15
### (Negligent Misrepresentation – Moore)

400.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 399 of this Complaint as if fully set forth herein.

401.    The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about June 27, 2006 (the "Moore June 27, 2006 Due Diligence Misrepresentations") (*See* Volume XIII, Ex. 59) were false when made and material to Plaintiff's decision to enter into the June 27, 2006 Tranche Purchase.

Exhibit B

(Part 3 of 3)

402. Moore was in a superior position to know the truth or falsity of the Moore June 27, 2006 Due Diligence Misrepresentations.

403. Moore should have known the truth or falsity of the Moore June 27, 2006 Due Diligence Misrepresentations.

404. Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore June 27, 2006 Due Diligence Misrepresentations.

405. Moore made the Moore June 27, 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

406. Moore intended and was aware that Plaintiff would rely upon the Moore June 27, 2006 Due Diligence Misrepresentations in deciding whether to enter into the June 27, 2006 Tranche Purchase.

407. Moore had an undisclosed pecuniary interest in the June 27, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the June 27, 2006 Tranche Purchase.

408. Plaintiff reasonably and justifiably relied to their detriment upon the Moore June 27, 2006 Due Diligence Misrepresentations by entering into the June 27, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 74 Placed ATM machines for $1,073,000.00.

409. But for the Moore June 27, 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the June 27, 2006 Tranche Purchase.

410. Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

411.   The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore June 27, 2006 Due Diligence Misrepresentations.

412.   By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,073,000.00 paid to 36 Main.

### COUNT 16
### (Negligent Misrepresentation – Moore)

413.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 412 of this Complaint as if fully set forth herein.

414.   The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about July 28, 2006 (the "Moore July 2006 Due Diligence Misrepresentations") (*See* Volume XV, Ex. 66) were false when made and material to Plaintiff's decision to enter into the July 28, 2006 Tranche Purchase.

415.   Moore was in a superior position to know the truth or falsity of the Moore July 2006 Due Diligence Misrepresentations.

416.   Moore should have known the truth or falsity of the Moore July 2006 Due Diligence Misrepresentations.

417.   Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore July 2006 Due Diligence Misrepresentations.

418.   Moore made the Moore July 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

419.   Moore intended and was aware that Plaintiff would rely upon the Moore July 2006 Due Diligence Misrepresentations in deciding whether to enter into the July 28, 2006 Tranche Purchase.

420.   Moore had an undisclosed pecuniary interest in the July 28, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the July 28, 2006 Tranche Purchase.

421.   Plaintiff reasonably and justifiably relied to their detriment upon the Moore July 2006 Due Diligence Misrepresentations by entering into the July 28, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,450,000.00.

422.   But for the Moore July 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the July 28, 2006 Tranche Purchase.

423.   Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

424.   The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore July 2006 Due Diligence Misrepresentations.

425.   By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,450,000.00 paid to 36 Main.

## COUNT 17
### (Breach of Contract – 36 Main)

426.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 425 of this Complaint as if fully set forth herein.

427.   On or about November 16, 2005, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "November 16, 2005 Asset Purchase Agreement") (*See* Volume II, Ex. 5).

95

428.   Pursuant to the terms of the November 16, 2005 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM machines to ATMA.

429.   On or about November 16, 2005, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

430.   36 Main, in breach of the November 16, 2005 Asset Purchase Agreement failed to perform in accordance with the terms of the November 16, 2005 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the November 16, 2005 Asset Purchase Agreement.

431.   36 Main's conduct detailed above constituted a material breach of the November 16, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

### COUNT 18
### (Breach of Contract – 36 Main)

432.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 431 of this Complaint as if fully set forth herein.

433.   On or about December 20, 2005, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "December 20, 2005 Asset Purchase Agreement") (*See* Volume III, Ex. 14).

434.   Pursuant to the terms of the December 20, 2005 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM machines to ATMA.

435.   On or about December 20, 2005, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

436.    36 Main, in breach of the December 20, 2005 Asset Purchase Agreement

failed to perform in accordance with the terms of the December 20, 2005 Asset Purchase

Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the

December 20, 2005 Asset Purchase Agreement.

437.    36 Main's conduct detailed above constituted a material breach of the

December 20, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the

award of the return of the $1,900,000.00 paid to 36 Main.

### COUNT 19
### (Breach of Contract – 36 Main)

438.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 437 of this Complaint as if fully set forth herein.

439.    On or about February 22, 2006, ATMA and 36 Main executed an Asset

Purchase Agreement for the purchase of 100 Placed ATM machines (the "February 22,

2006 Asset Purchase Agreement") (*See* Volume IV, Ex. 23).

440.    Pursuant to the terms of the February 22, 2006 Asset Purchase Agreement, in

exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM

Machines to ATMA.

441.    On or about February 22, 2006, ATMA paid $1,900,000.00 to 36 Main via a

bank wire transfer.

442.    36 Main, in breach of the February 22, 2006 Asset Purchase Agreement failed

to perform in accordance with the terms of the February 22, 2006 Asset Purchase

Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the

February 22, 2006 Asset Purchase Agreement.

443.   36 Main's conduct detailed above constituted a material breach of the February 22, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 20
### (Breach of Contract – 36 Main)

444.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 443 of this Complaint as if fully set forth herein.

445.   On or about April 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "April 26, 2006 Asset Purchase Agreement") (*See* Volume VII, Ex. 32).

446.   Pursuant to the terms of the April 26, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,950,000.00, 36 Main agreed to sell 100 Placed ATM Machines to ATMA.

447.   On or about April 26, 2006, ATMA paid $1,950,000.00 to 36 Main via a bank wire transfer.

448.   36 Main, in breach of the April 26, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the April 26, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the April 26, 2006 Asset Purchase Agreement.

449.   36 Main's conduct detailed above constituted a material breach of the April 26, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 21
### (Breach of Contract – 36 Main)

450.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 449 of this Complaint as if fully set forth herein.

451.    On or about May 27, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "May 27, 2006 Asset Purchase Agreement") (*See* Volume IX, Ex. 41).

452.    Pursuant to the terms of the May 27, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,950,000.00, 36 Main agreed to sell 100 Placed ATM Machines to ATMA.

453.    On or about May 27, 2006, ATMA paid $1,950,000.00 to 36 Main via a bank wire transfer.

454.    36 Main, in breach of the May 27, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the May 27, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the May 27, 2006 Asset Purchase Agreement.

455.    36 Main's conduct detailed above constituted a material breach of the May 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 22
### (Breach of Contract – 36 Main)

456.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 455 of this Complaint as if fully set forth herein.

457.    On or about June 16, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 50 Placed ATM machines (the "June 16, 2006 Asset Purchase Agreement") (*See* Volume XII, Ex. 48).

458.    Pursuant to the terms of the June 16, 2006 Asset Purchase Agreement, in exchange for the consideration of $975,000.00, 36 Main agreed to sell 50 Placed ATM Machines to ATMA.

459.    On or about June 16, 2006, ATMA paid $975,000.00 to 36 Main via a bank wire transfer.

460.    36 Main, in breach of the June 16, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the June 16, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement.

461.    36 Main's conduct detailed above constituted a material breach of the June 16, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 23
### (Breach of Contract – 36 Main)

462.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 461 of this Complaint as if fully set forth herein.

463.    On or about June 27, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 74 Placed ATM machines (the "June 27, 2006 Asset Purchase Agreement") (*See* Volume XIII, Ex. 55).

464.    Pursuant to the terms of the June 27, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,073,000.00, 36 Main agreed to sell 74 Placed ATM Machines to ATMA.

465.    On or about June 27, 2006, ATMA paid $1,073,000.00 to 36 Main via a bank wire transfer.

466.    36 Main, in breach of the June 27, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the June 27, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the June 27, 2006 Asset Purchase Agreement.

467.    36 Main's conduct detailed above constituted a material breach of the June 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

**COUNT 24**
**(Breach of Contract – 36 Main)**

468.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 467 of this Complaint as if fully set forth herein.

469.    On or about July 28, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 101 Placed ATM machines identified in Schedule A of the Asset Purchase Agreement (the "July 28, 2006 Asset Purchase Agreement") (*See* Volume XIV, Ex. 62).

470.    Pursuant to the terms of the July 28, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,450,000.00, 36 Main agreed to sell 101 Placed ATM Machines to ATMA.

471.    On or about July 28, 2006, ATMA paid $1,469,500.00 to 36 Main via a bank wire transfer.

472.    36 Main, in breach of the July 28, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the July 28, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement.

473.    36 Main's conduct detailed above constituted a material breach of the July 28, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 25
### (Breach of Contract – 36 Main)

474.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 473 of this Complaint as if fully set forth herein.

475.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 7 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #1") (*See* Volume XVI, Ex. 69).

476.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #1, in exchange for the consideration of $136,500.00, 36 Main agreed to sell 7 Placed ATM Machines to ATMA.

477.    On or about August 30, 2006, ATMA paid $136,500.00 to 36 Main via a bank wire transfer.

478.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #1 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase

Agreement #1 by failing to deliver valid title to the ATMs listed in Schedule "A" of the

August 30, 2006 Asset Purchase Agreement #1.

479. 36 Main's conduct detailed above constituted a material breach of the August

30, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of

the return of the $136,500.00 paid to 36 Main.

<div align="center">

**COUNT 26**
**(Breach of Contract – 36 Main)**

</div>

480. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 479 of this Complaint as if fully set forth herein.

481. On or about August 30, 2006, ATMA and 36 Main executed an Asset

Purchase Agreement for the purchase of 17 Placed ATM machines (the "August 30, 2006

Asset Purchase Agreement #2") (*See* Volume XVI, Ex. 71).

482. Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #2, in

exchange for the consideration of $331,500.00, 36 Main agreed to sell 17 Placed ATM

Machines to ATMA.

483. On or about August 30, 2006, ATMA paid $331,500.00 to 36 Main via a bank

wire transfer.

484. 36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #2

failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase

Agreement #2 by failing to deliver valid title to the ATMs listed in Schedule "A" of the

August 30, 2006 Asset Purchase Agreement #2.

485. 36 Main's conduct detailed above constituted a material breach of the August

30, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of

the return of the $331,500.00 paid to 36 Main.

### COUNT 27
### (Breach of Contract – 36 Main)

486.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 485 of this Complaint as if fully set forth herein.

487.   On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 36 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #3") (*See* Volume XVI, Ex. 73).

488.   Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #3, in exchange for the consideration of $522,000.00, 36 Main agreed to sell 36 Placed ATM Machines to ATMA.

489.   On or about August 30, 2006, ATMA paid $522,000.00 to 36 Main via a bank wire transfer.

490.   36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #3 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #3 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3.

491.   36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $522,000.00 paid to 36 Main.

### COUNT 28
### (Breach of Contract – 36 Main)

492.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 491 of this Complaint as if fully set forth herein.

493.     On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 68 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #4") (*See* Volume XVI, Ex. 75).

494.     Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #4, in exchange for the consideration of $986,000.00, 36 Main agreed to sell 68 Placed ATM Machines to ATMA.

495.     On or about August 30, 2006, ATMA paid $986,000.00 to 36 Main via a bank wire transfer.

496.     36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #4 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #4 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4.

497.     36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #4 and ATMA is therefore entitled to the award of the return of the $986,000.00 paid to 36 Main.

### COUNT 29
### (Breach of Contract – 36 Main)

498.     Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 497 of this Complaint as if fully set forth herein.

499.     On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 2 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #1") (*See* Volume XVII, Ex. 82).

500.    Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #1, in exchange for the consideration of $44,000.00, 36 Main agreed to sell 2 Placed ATM machines to ATMA.

501.    On or about September 26, 2006, ATMA paid $44,000.00 to 36 Main via a bank wire transfer.

502.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #1 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #1 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1.

503.    36 Main's conduct detailed above constituted a material breach of the September 26, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

## COUNT 30
## (Breach of Contract – 36 Main)

504.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 503 of this Complaint as if fully set forth herein.

505.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 21 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #2") (*See* Volume XVII, Ex. 84).

506.    Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #2, in exchange for the consideration of $409,500.00, 36 Main agreed to sell 21 Placed ATM machines to ATMA.

507.    On or about September 26, 2006, ATMA paid $409,500.00 to 36 Main via a bank wire transfer.

106

508.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #2 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #2 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2.

509.    36 Main's conduct detailed above constituted a material breach of the September 26, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

### COUNT 31
### (Breach of Contract – 36 Main)

510.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 509 of this Complaint as if fully set forth herein.

511.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 64 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #3") (*See* Volume XVII, Ex. 86).

512.    Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #3, in exchange for the consideration of $928,000.00, 36 Main agreed to sell 64 Placed ATM machines to ATMA.

513.    On or about September 26, 2006, ATMA paid $928,000.00 to 36 Main via a bank wire transfer.

514.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #3 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #3 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3.

515.   36 Main's conduct detailed above constituted a material breach of the

September 26, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the

award of the return of the $928,000.00 paid to 36 Main.

### COUNT 32
### (Breach of Warranty – 36 Main)

516.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 515 of this Complaint as if fully set forth herein.

517.   The November 15, 2005 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

518.   ATMA relied on 36 Main's representations as a condition of the purchase.

519.   36 Main breached the warranty set forth in section 4.5 of the November 15,

2005 Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the November 15, 2005 Asset Purchase

Agreement purchased by ATMA.

520.   36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the November 15, 2005 Asset Purchase Agreement purchased by

ATMA was not good or marketable.

521.   36 Main's conduct breached the warranty stated in the November 15, 2005

Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of

the $1,900,000.00 paid to 36 Main.

## COUNT 33
### (Breach of Warranty – 36 Main)

522.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 521 of this Complaint as if fully set forth herein.

523.    The December 20, 2005 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

524.    ATMA relied on 36 Main's representations as a condition of the purchase.

525.    36 Main breached the warranty set forth in section 4.5 of the December 20, 2005 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the December 20, 2005 Asset Purchase Agreement purchased by ATMA.

526.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the December 20, 2005 Asset Purchase Agreement purchased by ATMA was not good or marketable.

527.    36 Main's conduct breached the warranty stated in the December 20, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 34
### (Breach of Warranty – 36 Main)

528.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 527 of this Complaint as if fully set forth herein.

529.    The February 22, 2006 Asset Purchase Agreement states at section 4.5 that,

109

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

530.     ATMA relied on 36 Main's representations as a condition of the purchase.

531.     36 Main breached the warranty set forth in section 4.5 of the February 22,

2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the February 22, 2006 Asset Purchase

Agreement purchased by ATMA.

532.     36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the February 22, 2006 Asset Purchase Agreement purchased by ATMA

was not good or marketable.

533.     36 Main's conduct breached the warranty stated in the February 22, 2006

Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of

the $1,900,000.00 paid to 36 Main.

## COUNT 35
## (Breach of Warranty – 36 Main)

534.     Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 533 of this Complaint as if fully set forth herein.

535.     The April 26, 2006 Asset Purchase Agreement states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

536.     ATMA relied on 36 Main's representations as a condition of the purchase.

110

537.    36 Main breached the warranty set forth in section 4.5 of the April 26, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the April 26, 2006 Asset Purchase

Agreement purchased by ATMA.

538.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the April 26, 2006 Asset Purchase Agreement purchased by ATMA was

not good or marketable.

539.    36 Main's conduct breached the warranty stated in the April 26, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$1,950,000.00 paid to 36 Main.

### COUNT 36
### (Breach of Warranty – 36 Main)

540.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 539 of this Complaint as if fully set forth herein.

541.    The May 27, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

542.    ATMA relied on 36 Main's representations as a condition of the purchase.

543.    36 Main breached the warranty set forth in section 4.5 of the May 27, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 100

Placed ATM machines listed in Schedule "A" of the May 27, 2006 Asset Purchase

Agreement purchased by ATMA.

544.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

545.    36 Main's conduct breached the warranty stated in the May 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

### COUNT 37
### (Breach of Warranty – 36 Main)

546.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 545 of this Complaint as if fully set forth herein.

547.    The June 16, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

548.    ATMA relied on 36 Main's representations as a condition of the purchase.

549.    36 Main breached the warranty set forth in section 4.5 of the June 16, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement purchased by ATMA.

550.    36 Main was notified that title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

Case 1:08-cv-03340-RMB-FM    Document 36-2    Filed 08/05/2008    Page 22 of 53

551.    36 Main's conduct breached the warranty stated in the June 16, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 38
### (Breach of Warranty – 36 Main)

552.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 551 of this Complaint as if fully set forth herein.

553.    The June 27, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

554.    ATMA relied on 36 Main's representations as a condition of the purchase.

555.    36 Main breached the warranty set forth in section 4.5 of the June 27, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Asset Purchase Agreement purchased by ATMA.

556.    36 Main was notified that title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

557.    36 Main's conduct breached the warranty stated in the June 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

113

## COUNT 39
### (Breach of Warranty – 36 Main)

558.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 557 of this Complaint as if fully set forth herein.

559.    The July 28, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

560.    ATMA relied on 36 Main's representations as a condition of the purchase.

561.    36 Main breached the warranty set forth in section 4.5 of the July 28, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement purchased by ATMA.

562.    36 Main was notified that title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

563.    36 Main's conduct breached the warranty stated in the July 28, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 40
### (Breach of Warranty – 36 Main)

564.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 563 of this Complaint as if fully set forth herein.

565.    The August 30, 2006 Asset Purchase Agreement #1 states at section 4.5 that,

114

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

566.    ATMA relied on 36 Main's representations as a condition of the purchase.

567.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #1 by failing to deliver good and marketable title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1 purchased by ATMA.

568.    36 Main was notified that title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1 purchased by ATMA was not good or marketable.

569.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $136,500.00 paid to 36 Main.

**COUNT 41**
**(Breach of Warranty – 36 Main)**

570.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 569 of this Complaint as if fully set forth herein.

571.    The August 30, 2006 Asset Purchase Agreement #2 states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

572.    ATMA relied on 36 Main's representations as a condition of the purchase.

115

573.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006

Asset Purchase Agreement #2 by failing to deliver good and marketable title to the 17

Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase

Agreement #2 purchased by ATMA.

574.    36 Main was notified that title to the 17 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Asset Purchase Agreement #2 purchased by ATMA

was not good or marketable.

575.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset

Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the

$331,500.00 paid to 36 Main.

### COUNT 42
### (Breach of Warranty – 36 Main)

576.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 575 of this Complaint as if fully set forth herein.

577.    The August 30, 2006 Asset Purchase Agreement #3 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

578.    ATMA relied on 36 Main's representations as a condition of the purchase.

579.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006

Asset Purchase Agreement #3 by failing to deliver good and marketable title to the 36

Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase

Agreement #3 purchased by ATMA.

580.    36 Main was notified that title to the 36 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3 purchased by ATMA

was not good or marketable.

581.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset

Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the

$522,000.00 paid to 36 Main.

### COUNT 43
### (Breach of Warranty – 36 Main)

582.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 581 of this Complaint as if fully set forth herein.

583.    The August 30, 2006 Asset Purchase Agreement #4 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to
> the Assets set forth on Schedule A, full authority to sell and transfer same
> and that the Assets are in good working condition, and are free and clear
> of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
> every nature and description.

584.    ATMA relied on 36 Main's representations as a condition of the purchase.

585.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006

Asset Purchase Agreement #4 by failing to deliver good and marketable title to the 68

Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase

Agreement #4 purchased by ATMA.

586.    36 Main was notified that title to the 68 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4 purchased by ATMA

was not good or marketable.

587.   36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #4 and ATMA is therefore entitled to the award of the return of the $986,000.00 paid to 36 Main.

## COUNT 44
### (Breach of Warranty – 36 Main)

588.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 587 of this Complaint as if fully set forth herein.

589.   The September 26, 2006 Asset Purchase Agreement #1 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

590.   ATMA relied on 36 Main's representations as a condition of the purchase.

591.   36 Main breached the warranty set forth in section 4.5 of the September 26, 2006 Asset Purchase Agreement #1 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1 purchased by ATMA.

592.   36 Main was notified that title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1 purchased by ATMA was not good or marketable.

593.   36 Main's conduct breached the warranty stated in the September 26, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

118

## COUNT 45
### (Breach of Warranty – 36 Main)

594.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 593 of this Complaint as if fully set forth herein.

595.    The September 26, 2006 Asset Purchase Agreement #2 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

596.    ATMA relied on 36 Main's representations as a condition of the purchase.

597.    36 Main breached the warranty set forth in section 4.5 of the September 26, 2006 Asset Purchase Agreement #2 by failing to deliver good and marketable title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2 purchased by ATMA.

598.    36 Main was notified that title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2 purchased by ATMA was not good or marketable.

599.    36 Main's conduct breached the warranty stated in the September 26, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

## COUNT 46
### (Breach of Warranty – 36 Main)

600.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 599 of this Complaint as if fully set forth herein.

119

601.    The September 26, 2006 Asset Purchase Agreement #3 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

602.    ATMA relied on 36 Main's representations as a condition of the purchase.

603.    36 Main breached the warranty set forth in section 4.5 of the September 26, 2006 Asset Purchase Agreement #3 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3 purchased by ATMA.

604.    36 Main was notified that title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3 purchased by ATMA was not good or marketable.

605.    36 Main's conduct breached the warranty stated in the September 26, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $928,000.00 paid to 36 Main.

## COUNT 47
### (Breach of Warranty – 36 Main)

606.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 605 of this Complaint as if fully set forth herein.

607.    On or about November 16, 2005, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,900,000.00 (the "November 16, 2005 Bill of Sale").

608.   The November 16, 2005 Bill of Sale states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

609.   ATMA relied on 36 Main's representations as a condition of the purchase.

610.   36 Main breached the warranty set forth in the November 16, 2005 Bill of

Sale by failing to deliver good and marketable title to the 100 Placed ATM machines

listed in Schedule "A" of the November 16, 2005 Bill of Sale.

611.   36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the November 16, 2005 Bill of Sale was not good or marketable.

612.   36 Main's conduct breached the warranty stated in the November 16, 2005

Bill of Sale and ATMA is therefore entitled to the award of the return of the

$1,900,000.00 paid to 36 Main.

### COUNT 48
### (Breach of Warranty – 36 Main)

613.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 612 of this Complaint as if fully set forth herein.

614.   On or about December 20, 2005, ATMA and 36 Main executed Bill of Sale

for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed

ATM machines to ATMA for the sum of $1,900,000.00 (the "December 20, 2005 Bill of

Sale").

615.   The December 20, 2005 Bill of Sale states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

616.    ATMA relied on 36 Main's representations as a condition of the purchase.

617.    36 Main breached the warranty set forth in the December 20, 2005 Bill of Sale

by failing to deliver good and marketable title to the 100 Placed ATM machines listed in

Schedule "A" of the December 20, 2005 Bill of Sale.

618.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the December 20, 2005 Bill of Sale was not good or marketable.

619.    36 Main's conduct breached the warranty stated in the December 20, 2005

Bill of Sale and ATMA is therefore entitled to the award of the return of the

$1,900,000.00 paid to 36 Main.

## COUNT 49
### (Breach of Warranty – 36 Main)

620.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 619 of this Complaint as if fully set forth herein.

621.    On or about February 22, 2006, ATMA and 36 Main executed Bill of Sale for

the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed

ATM machines to ATMA for the sum of $1,900,000.00 (the "February 22, 2006 Bill of

Sale").

622.    The February 22, 2006 Bill of Sale states at the second unnumbered Paragraph

that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

122

623.    ATMA relied on 36 Main's representations as a condition of the purchase.

624.    36 Main breached the warranty set forth in the February 22, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Bill of Sale.

625.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Bill of Sale was not good or marketable.

626.    36 Main's conduct breached the warranty stated in the February 22, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 50
## (Breach of Warranty – 36 Main)

627.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 626 of this Complaint as if fully set forth herein.

628.    On or about April 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,950,000.00 (the "April 26, 2006 Bill of Sale").

629.    The April 26, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

630.    ATMA relied on 36 Main's representations as a condition of the purchase.

123

631.   36 Main breached the warranty set forth in the April 26, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Bill of Sale.

632.   36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Bill of Sale was not good or marketable.

633.   36 Main's conduct breached the warranty stated in the April 26, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 51
## (Breach of Warranty – 36 Main)

634.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 633 of this Complaint as if fully set forth herein.

635.   On or about May 27, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,950,000.00 (the "May 27, 2006 Bill of Sale").

636.   The May 27, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

637.   ATMA relied on 36 Main's representations as a condition of the purchase.

638.   36 Main breached the warranty set forth in the May 27, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Bill of Sale.

639.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Bill of Sale was not good or marketable.

640.    36 Main's conduct breached the warranty stated in the May 27, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 52
### (Breach of Warranty – 36 Main)

641.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 640 of this Complaint as if fully set forth herein.

642.    On or about June 16, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 50 Placed ATM machines to ATMA for the sum of $975,000.00 (the "June 16, 2006 Bill of Sale").

643.    The June 16, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

644.    ATMA relied on 36 Main's representations as a condition of the purchase.

645.    36 Main breached the warranty set forth in the June 16, 2006 Bill of Sale by failing to deliver good and marketable title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Bill of Sale.

646.    36 Main was notified that title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Bill of Sale was not good or marketable.

647.   36 Main's conduct breached the warranty stated in the June 16, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 53
### (Breach of Warranty – 36 Main)

648.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 647 of this Complaint as if fully set forth herein.

649.   On or about June 27, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 74 Placed ATM machines to ATMA for the sum of $1,073,000.00 (the "June 27, 2006 Bill of Sale").

650.   The June 27, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

651.   ATMA relied on 36 Main's representations as a condition of the purchase.

652.   36 Main breached the warranty set forth in the June 27, 2006 Bill of Sale by failing to deliver good and marketable title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Bill of Sale.

653.   36 Main was notified that title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Bill of Sale was not good or marketable.

654.   36 Main's conduct breached the warranty stated in the June 27, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

126

## COUNT 54
## (Breach of Warranty – 36 Main)

655.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 654 of this Complaint as if fully set forth herein.

656.    On or about July 28, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 101 Placed ATM machines to ATMA for the sum of $1,469,500.00 (the "July 28, 2006 Bill of Sale").

657.    The July 28, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

658.    ATMA relied on 36 Main's representations as a condition of the purchase.

659.    36 Main breached the warranty set forth in the July 28, 2006 Bill of Sale by failing to deliver good and marketable title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Bill of Sale.

660.    36 Main was notified that title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Bill of Sale was not good or marketable.

661.    36 Main's conduct breached the warranty stated in the July 28, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 55
## (Breach of Warranty – 36 Main)

662.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 661 of this Complaint as if fully set forth herein.

127

663.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 7 Placed ATM machines to ATMA for the sum of $136,500.00 (the "August 30, 2006 Bill of Sale #1").

664.    The August 30, 2006 Bill of Sale #1 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

665.    ATMA relied on 36 Main's representations as a condition of the purchase.

666.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #1 by failing to deliver good and marketable title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #1.

667.    36 Main was notified that title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #1 was not good or marketable.

668.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #1 and ATMA is therefore entitled to the award of the return of the $136,500.00 paid to 36 Main.

## COUNT 56
## (Breach of Warranty – 36 Main)

669.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 668 of this Complaint as if fully set forth herein.

670.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 17 Placed

ATM machines to ATMA for the sum of $331,500.00 (the "August 30, 2006 Bill of Sale #2").

671.    The August 30, 2006 Bill of Sale #2 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

672.    ATMA relied on 36 Main's representations as a condition of the purchase.

673.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #2 by failing to deliver good and marketable title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #2.

674.    36 Main was notified that title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #2 was not good or marketable.

675.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #2 and ATMA is therefore entitled to the award of the return of the $334,500.00 paid to 36 Main.

## COUNT 57
### (Breach of Warranty – 36 Main)

676.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 675 of this Complaint as if fully set forth herein.

677.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 36 Placed ATM machines to ATMA for the sum of $522,000.00 (the "August 30, 2006 Bill of Sale #3").

129

678.    The August 30, 2006 Bill of Sale #3 states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

679.    ATMA relied on 36 Main's representations as a condition of the purchase.

680.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #3

by failing to deliver good and marketable title to the 36 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #3.

681.    36 Main was notified that title to the 36 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #3 was not good or marketable.

682.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of

Sale #3 and ATMA is therefore entitled to the award of the return of the $522,000.00

paid to 36 Main.

## COUNT 58
### (Breach of Warranty – 36 Main)

683.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 682 of this Complaint as if fully set forth herein.

684.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for

the 36 Main to convey, transfer, sell and assign "right, title and interest" in 68 Placed

ATM machines to ATMA for the sum of $986,000.00 (the "August 30, 2006 Bill of Sale

#4").

685.    The August 30, 2006 Bill of Sale #4 states at the second unnumbered

Paragraph that:

130

36 Main represents and warrants that it has good title to the Assets, full
authority to sell and transfer same and that the Assets are in good working
condition, and are free and clear of all liens, encumbrances, liabilities and
adverse claims, of every nature and description.

686.   ATMA relied on 36 Main's representations as a condition of the purchase.

687.   36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #4
by failing to deliver good and marketable title to the 68 Placed ATM machines listed in
Schedule "A" of the August 30, 2006 Bill of Sale #4.

688.   36 Main was notified that title to the 68 Placed ATM machines listed in
Schedule "A" of the August 30, 2006 Bill of Sale #4 was not good or marketable.

689.   36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of
Sale #4 and ATMA is therefore entitled to the award of the return of the $986,000.00
paid to 36 Main.

### COUNT 59
### (Breach of Warranty – 36 Main)

690.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs
1 through 689 of this Complaint as if fully set forth herein.

691.   On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale
for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 2 Placed
ATM machines to ATMA for the sum of $44,000.00 (the "September 26, 2006 Bill of
Sale #1").

692.   The September 26, 2006 Bill of Sale #1 states at the second unnumbered
Paragraph that:

36 Main represents and warrants that it has good title to the Assets, full
authority to sell and transfer same and that the Assets are in good working
condition, and are free and clear of all liens, encumbrances, liabilities and
adverse claims, of every nature and description.

131

693.   ATMA relied on 36 Main's representations as a condition of the purchase.

694.   36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #1 by failing to deliver good and marketable title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #1.

695.   36 Main was notified that title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #1 was not good or marketable.

696.   36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

## COUNT 60
## (Breach of Warranty – 36 Main)

697.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 696 of this Complaint as if fully set forth herein.

698.   On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 21 Placed ATM machines to ATMA for the sum of $409,500.00 (the "September 26, 2006 Bill of Sale #2").

699.   The September 26, 2006 Bill of Sale #2 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

700.   ATMA relied on 36 Main's representations as a condition of the purchase.

701. 36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #2 by failing to deliver good and marketable title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #2.

702. 36 Main was notified that title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #2 was not good or marketable.

703. 36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

## COUNT 61
### (Breach of Warranty – 36 Main)

704. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 703 of this Complaint as if fully set forth herein.

705. On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 64 Placed ATM machines to ATMA for the sum of $928,000.00 (the "September 26, 2006 Bill of Sale #3").

706. The September 26, 2006 Bill of Sale #3 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

707. ATMA relied on 36 Main's representations as a condition of the purchase.

133

708.    36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #3 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #3.

709.    36 Main was notified that title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #3 was not good or marketable.

710.    36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #3 and ATMA is therefore entitled to the award of the return of the $928,000.00 paid to 36 Main.

## COUNT 62
### (Conversion – 36 Main)

711.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 710 of this Complaint as if fully set forth herein.

712.    Plaintiff delivered funds to 36 Main for the sole purpose of purchasing Placed ATM machines as set forth in the Asset Purchase Agreements and Bills of Sale between 36 Main and ATMA. Plaintiff delivered, via bank wire transfers from ATMA, $16,475,000.00 to 36 Main for the sole purpose of purchasing the ATMA Machines.

713.    36 Main failed to use Plaintiff's funds to purchase the ATMA Machines identified in the schedules attached to the Asset Purchase Agreements and Bills of Sale signed by 36 Main and ATMA.

714.    36 Main utilized the funds delivered by Plaintiff to 36 Main for the purchase of the ATMA Machines for an unauthorized purpose.

715.    36 Main has improperly converted Plaintiff's funds and failed to return the funds to Plaintiff and should be ordered to return the $16,475,000.00 in funds delivered to 36 Main for the purchase of the ATMA Machines.

134

## COUNT 63
### (Unjust Enrichment – 36 Main)

716.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 715 as if fully set forth herein.

717.    By misappropriating Plaintiff's funds delivered to 36 Main designated for the sale of the ATMA Machines, 36 Main obtained the benefit of Plaintiff's capital without returning comparable consideration, specifically the ATMA Machines identified in the schedules attached to the Asset Purchase Agreements and Bills of Sale signed by ATMA and 36 Main.

718.    36 Main acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $16,475,000.00, thereby damaging Plaintiff in the same amount.

719.    36 Main has retained the benefits of Plaintiff's funds under such circumstances that equity and good conscience require 36 Main make restitution to Plaintiff in the amount of the value of the benefits 36 Main acquired from Plaintiff.

## COUNT 64
### (Unjust Enrichment – 36 Main)

720.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 719 as if fully set forth herein.

721.    By misappropriating Plaintiff's funds delivered to 36 Main designated for the payment of Residual Revenue Funds associated with the ATMA Tranche Purchases, 36 Main obtained the benefit of Plaintiff's capital without returning comparable consideration.

722.    36 Main acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $209,441.03, thereby damaging Plaintiff in the same amount.

723.    36 Main has retained the benefits of Plaintiff's funds under such circumstances that equity and good conscience require 36 Main make restitution to Plaintiff in the amount of the value of the benefits 36 Main acquired from Plaintiff.

### COUNT 65
### (Unjust Enrichment – ATM Capital)

724.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 723 as if fully set forth herein.

725.    By misappropriating Plaintiff's funds delivered to ATM Capital designated for the payment of Residual Revenue Funds associated with the December 20, 2005 Tranche Purchase, ATM Capital obtained the benefit of Plaintiff's capital without returning comparable consideration.

726.    ATM Capital acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $27,801.71, thereby damaging Plaintiff in the same amount.

727.    ATM Capital has retained the benefits of Plaintiff's funds under such circumstances that equity and good conscience require ATM Capital make restitution to Plaintiff in the amount of the value of the benefits ATM Capital acquired from Plaintiff.

### COUNT 66
### (Breach of Fiduciary Duty – Brossman)

728.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 727 of this Complaint as if fully set forth herein.

136

Case 1:08-cv-03340-RMB-FM   Document 36-7   Filed 08/05/2008   Page 46 of 53

729.   That Brossman, as a co-chief executive and employee of ATMA has a duty to his employer to act in good faith and in the employer's best interests during the period of the employment. Brossman owed ATMA his undivided and unqualified loyalty during the period of his employment and was prohibited from acting in any manner contrary to the interests of ATMA. As a fiduciary to ATMA, Brossman was required to make truthful and complete disclosures to ATMA and Brossman was forbidden to obtain an improper advantage at ATMA's expense.

730.   While employed at ATMA, Brossman was required to exert his best efforts on behalf of ATMA, and not compete with it or profit at its expense, or place his private interests in conflict with its interests.

731.   Brossman did not act in good faith or in the best interests of ATMA when Brossman: (1) participated in the ATM Sales Enterprise; (2) misrepresented the true nature of the ATM Venture; (3) failed to disclose the non-existence of Placed ATM machines sold by 36 Main to ATMA and others; (4) failed to disclose prior and continuing business relationships Brossman had with Netschi and Moore; (5) failed to disclose prior and continuing business relationships between Netschi and Moore; and (6) knowingly forwarded fraudulent Monthly Reports, and other documents, from Moore to Plaintiff.

732.   As a result of Brossman's acts, ATMA sustained damages and Brossman's acts were a substantial cause of those damages.

733.   Accordingly, ATMA is entitled to recover the actual damages sustained for compensation and expenses that ATMA paid to Brossman during the period of Brossman's disloyalty, profits that Plaintiff lost due to Brossman's disloyalty, and

payment of funds to the ATM Sales Enterprise that Plaintiff lost due to Brossman's disloyalty.

## COUNT 67
### (Breach of Fiduciary Duty – Munier)

734.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 733 of this Complaint as if fully set forth herein.

735.    That Munier, as a co-chief executive and employee of ATMA has a duty to his employer to act in good faith and in the employer's best interests during the period of the employment. Munier owed ATMA his undivided and unqualified loyalty during the period of his employment and was prohibited from acting in any manner contrary to the interests of ATMA. As a fiduciary to ATMA, Munier was required to make truthful and complete disclosures to ATMA and Munier was forbidden to obtain an improper advantage at ATMA's expense.

736.    While employed at ATMA, Munier was required to exert his best efforts on behalf of ATMA, and not compete with it or profit at its expense, or place his private interests in conflict with its interests.

737.    Munier did not act in good faith or in the best interests of ATMA when he: (1) participated in the ATM Sales Enterprise; (2) misrepresented the true nature of the ATM Venture; (3) failed to disclose the non-existence of Placed ATM machines sold by 36 Main to ATMA and others; (4) failed to disclose prior and continuing business relationships Munier had with Netschi and Moore; (5) failed to disclose prior and continuing business relationships between Netschi and Moore; and (6) knowingly forwarded fraudulent Monthly Reports from Moore to Plaintiff.

138

738.   As a result of Munier's acts, Plaintiff sustained damages and Munier's acts were a substantial cause of those damages.

739.   Accordingly, ATMA is entitled to recover the actual damages sustained for compensation and expenses that ATMA paid to Munier during the period of Munier's disloyalty, profits that Plaintiff lost due to Munier's disloyalty, and payment of funds to the ATM Sales Enterprise that Plaintiff lost due to Munier's disloyalty.

## IX
## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against in their favor and against Defendants as follows:

  i.   on Count 1, damages, including interest, against the Defendants, jointly and severally, the precise amount to be proved at trial but not less that $16,475,000.00 and treble the actual damages pursuant to 18 U.S.C. § 1964(c);

 ii.   on Count 2, damages, including interest, against the Defendants, jointly and severally, the precise amount to be proved at trial but not less that $16,475,000.00 and treble the actual damages pursuant to 18 U.S.C. § 1964(c);

iii.   on Count 3, as against Moore, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

 iv.   on Count 4, as against Netschi, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

  v.   on Count 5, as against Brossman, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

 vi.   on Count 6, as against Munier, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

vii.   on Count 7, as against 36 Main and Netschi, jointly and severally, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

viii.   on Count 8, as against Moore, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

ix.   on Count 9, as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

x.   on Count 10, as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xi.   on Count 11 as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xii.   on Count 12, as against Moore, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xiii.   on Count 13, as against Moore, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xiv.   on Count 14, as against Moore, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xv.   on Count 15, as against Moore, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xvi.   on Count 16, as against Moore, in an amount to be determined at trial, but in no event less than $1,450,000.00, together with interest thereon;

xvii.   on Count 17, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

Case 1:08-cv-03340-RMB-FM    Document 36-2    Filed 08/05/2008    Page 56 of 53

xviii.  on Count 18 as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xix.  on Count 19, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xx.  on Count 20, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxi.  on Count 21, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxii.  on Count 22, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xxiii.  on Count 23, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xxiv.  on Count 24, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

xxv.  on Count 25, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

xxvi.  on Count 26, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

xxvii.  on Count 27, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

xxviii.  on Count 28, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

xxix.   on Count 29, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000, together with interest thereon;

xxx.   on Count 30, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

xxxi.   on Count 31, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

xxxii.   on Count 32, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxiii.   on Count 33, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxiv.   on Count 34, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxv.   on Count 35, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxxvi.   on Count 36, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxxvii.   on Count 37, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xxxviii.   on Count 38, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xxxix.   on Count 39, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

    xl.  on Count 40, as against 36 Main, in an amount to be determined at trial, but in no

event less than $136,500.00, together with interest thereon;

    xli.  on Count 41, as against 36 Main, in an amount to be determined at trial, but in no

event less than $331,500.00, together with interest thereon;

    xlii.  on Count 42, as against 36 Main, in an amount to be determined at trial, but in no

event less than $522,000.00, together with interest thereon;

    xliii.  on Count 43, as against 36 Main, in an amount to be determined at trial, but in no

event less than $986,000.00, together with interest thereon;

    xliv.  on Count 44, as against 36 Main, in an amount to be determined at trial, but in no

event less than $44,000.00, together with interest thereon;

    xlv.  on Count 45, as against 36 Main, in an amount to be determined at trial, but in no

event less than $409,500.00, together with interest thereon;

    xlvi.  on Count 46, as against 36 Main, in an amount to be determined at trial, but in no

event less than $928,000.00, together with interest thereon;

    xlvii.  on Count 47, as against 36 Main, in an amount to be determined at trial, but in no

event less than $1,900,000.00, together with interest thereon;

    xlviii.  on Count 48, as against 36 Main, in an amount to be determined at trial, but in no

event less than $1,900,000.00, together with interest thereon;

    xlix.  on Count 49, as against 36 Main, in an amount to be determined at trial, but in no

event less than $1,900,000.00, together with interest thereon;

    l.  on Count 50, as against 36 Main, in an amount to be determined at trial, but in no

event less than $1,950,000.00, together with interest thereon;

li.  on Count 51, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

lii.  on Count 52, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

liii.  on Count 53, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

liv.  on Count 54, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

lv.  on Count 55, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

lvi.  on Count 56, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

lvii.  on Count 57, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

lviii.  on Count 58, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

lix.  on Count 59, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000.00, together with interest thereon;

lx.  on Count 60, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

lxi.  on Count 61, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

144

lxii.  on Count 62, as against 36 Main, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxiii.  on Count 63, as against 36 Main, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxiv.  on Count 64, as against 36 Main, in an amount to be determined at trial, but in no event less than $209,441.03, together with interest thereon;

lxv.  on Count 65, as against ATM Capital, in an amount to be determined at trial, but in no event less than $27,801.71, together with interest thereon;

lxvi.  on Count 66, as against Brossman, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxvii.  on Count 67, as against Munier, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxviii.  awarding Plaintiff punitive damages;

lxix.  awarding Plaintiff their attorneys' fees, costs and disbursements incurred in connection with this action; and,

lxx.  awarding Plaintiff such other and further relief as the Court seems just and proper.

145

## X

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury in this action.

Dated:  New York, New York
       August 15, 2008

                      LANKLER & CARRAGHER, LLP

By:         _____

                 Andrew M. Lankler (AL1202)
                 James W. Versocki (JV6877)
                 Joseph J. Porrovecchio (JP6788)
                 Attorneys for Plaintiff
                 845 Third Avenue, 17th Floor
                 New York, New York 10022
                 alankler@lcattorneys.com
                 jversocki@lcattorneys.com
                 jporrovecchio@lcattorneys.com
                 (212) 812-8910
                 (212) 812-8920 facsimile

Exhibit C

(Part 1 of 3)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

Automated Teller Machine Advantage LLC,

         Plaintiff,  :  Index No.: 08-CV-3340(RMB)(FM)

- against -

              :  **AMENDED COMPLAINT**

Vance Moore, Jr. a/k/a Vance Moore II a/k/a Vance
Moore, Exclusive Properties Group, Inc., Walter Netschi,   :   Plaintiff Demands a Trial By Jury
36 Main Street LLC, ATM Capital Inc., Danielle Jones,
Alain Brossman a/k/a Harry Brossman, and William   :
Munier,

          Defendants.  :

-------------------------------------------------------- x

   Plaintiff, Automated Teller Machine Advantage LLC ("ATMA")(hereinafter

referred to as the "Plaintiff"), by its attorneys, Lankler & Carragher, LLP, and for its

Complaint herein, alleges as follows:

# I
## INTRODUCTION

   1.   This action is brought against individual and corporate Defendants who have

engaged in a complex scheme to defraud Plaintiff of $16.475 million.

   2.   Defendants' scheme, committed by engaging in racketeering activities,

involved inducing Plaintiff to purchase large numbers of automated teller machines

("ATMs") and to enter into contracts for the management of the ATMs.

   3.   Plaintiff purchased 940 ATMs and subsequently discovered that: (i) the ATMs

did not exist; (ii) Plaintiff did not have an ownership interest in the ATMs; or (iii) others

had competing ownership claims to the ATMs, each contrary to the warranties and

representations made by Defendants.

4. There is a well-established market, by persons or businesses other than bank owner/operators, for the purchase, operation and sale of ATMs. Non-bank purchasers can either buy an ATM that has previously been placed at a location, generally via a lease agreement with a business store owner (a "Placed ATM"), or a new ATM that needs to be located in an existing or prospective business establishment. A Placed ATM, particularly one with a long-term lease and verifiable transaction activity, will sell at a substantial premium compared to a non-Placed ATM.

5. ATMA determined the value of a Placed ATM from its predicted ability to generate future revenue. The revenue potential was, *inter alia*, predicated on the receipt and analysis of reliable reports reflecting due diligence for each Placed ATM being considered for purchase that demonstrated: (i) at least one year of transaction history with an average of 400 transactions per month; (ii) projected net revenues of approximately $4,800 per year based on the transaction history; (iii) the existence of a lease with at least a five year term with a renewal provision for an additional five year term provided that neither party terminated the lease (hereinafter the "Performance Criteria").[1]

6. To effect their scheme, Defendants induced Plaintiff to purchase non-existent phantom Placed ATMs by making false verbal representations and delivering fraudulent, false, fabricated, and fictitious information to Plaintiff, including representations and warranties, purporting to demonstrate that the phantom Placed ATMs met the Performance Criteria set by Plaintiff to purchase Placed ATMs.

7. Defendants furthered their scheme by delivering fraudulent, false, fabricated, and fictitious information to Plaintiff in connection with the ATMs purchased by Plaintiff

---

[1] As described, *infra*, at Paragraph 49, Plaintiffs later purchased ATMs with alternative Performance Criteria at a different price.

2

including: bills of sale, due diligence reports, lease agreements, assignments of the lease

agreements, and other fictitious documents.

8.    Following the sale of the phantom Placed ATMs to Plaintiff, the Defendants

perpetuated their scheme by providing monthly reports to Plaintiff that purported to state

the transactional activity of the Placed ATMs purchased by Plaintiff and by delivering

funds purportedly based on that transactional activity.

9.    Defendants systematically sold additional phantom Placed ATMs to Plaintiff,

and other purchasers of phantom Placed ATMs, to perpetuate the scheme.

10.    Defendants, through their scheme, induced Plaintiff and other purchasers, to

deliver tens of millions of dollars to Defendants for the purchase of the phantom Placed

ATMs.

11.    Plaintiff brings this action against the Defendants for violations of the

Racketeer Influenced and Corrupt Organizations statute (hereinafter "RICO"), 18 U.S.C.

§§ 1961 through 1968, and New York State common law causes of action, including:

fraudulent misrepresentation, fraudulent inducement, fraudulent concealment, negligent

misrepresentation, breach of contract, breach of warranty, conversion, unjust enrichment,

and breach of fiduciary duty.

12.    Plaintiff seeks the return of the funds it delivered to the Defendants to

purchase the Placed ATMs, damages, treble damages, punitive damages, pre-judgment

interest, costs and fees, and all other relief deemed appropriate by this Court.

| Deleted: " |
| Deleted: " |
| Deleted: s |
| Deleted: s |
| Deleted: s |

| Deleted: sought and received |
| Deleted: investments from Plaintiffs |
| Deleted: investors |

| Deleted: s |
| Deleted: investors |

| Deleted: Plaintiffs bring |

| Deleted: Plaintiffs herein seek |
| Deleted: they invested with |

3

## II
## JURISDICTION

13.    This Court has subject matter jurisdiction over this matter pursuant to RICO,

18 U.S.C. § 1964 and 28 U.S.C. § 1331, because Plaintiff's claims arise under the laws of

the United States, and pursuant to its supplemental jurisdiction, 28 U.S.C. § 1367.

## III
## VENUE

14.    The venue of this action is proper in this judicial district pursuant to 18 U.S.C.

§ 1965(a) and 18 U.S.C. § 1391 in that Defendants transacted affairs in the Southern

District of New York and in that the negotiations, decisions to enter in to the contractual

agreements, transfers of funds and subsequent business dealings between the parties

named herein occurred within the Southern District of New York.  Venue is also proper

in this judicial district pursuant to 18 U.S.C. § 1965(b) because, to the extent any

Defendant may reside outside of this district, the ends of justice require such Defendant

or Defendants to be brought before this Court.

## IV
## THE PARTIES

15.    Plaintiff ATMA is a limited liability company organized and existing under

the laws of the State of Delaware with a principal place of business at 324 Grix Court,

New Milford, New Jersey 07646.  ATMA was formed in November of 2004.  Two of the

three initial members of the board of managers for ATMA, including the chairman of the

board, maintain their offices in the county of Manhattan, New York.  The current

members of the board of managers for ATMA, including the chairman of the board,

maintain their offices in the county of New York, New York.

4

**Formatted:** Bullets and Numbering

**Deleted:** Plaintiffs'

**Formatted:** Bullets and Numbering

**Deleted:**

**Formatted:** Bullets and Numbering

16.     Defendant Vance Moore, Jr., also known as Vance Moore II, ("Moore") is a

resident of Fruitland Park, Lake County, Florida and also maintains a residence, upon

information and belief, in Raleigh, Wake County, North Carolina.

Deleted: <#>The Plaintiff Trusts are trusts created under laws of the State of New York with a principal place of business at One State Street Plaza, 29th Floor, New York, New York 10004. ¶

17.     Moore owned and controlled unnamed co-conspirator ATM Financial

Services LLC ("ATMFS"), a limited liability company organized and existing under the

laws of the State of Delaware with a principal place of business at Leesburg, Lake

County, Florida.  ATMFS purported to provide fee-based services to owners of Placed

ATMs as an Independent Sales Organization ("ISO").  An ISO, via a management

agreement, is responsible for, *inter alia*, the deployment, management and servicing of

Placed ATMs, and also for the reporting of the transaction activity of Placed ATMs,

collection of revenue from that transaction activity, and payment of the net revenue to the

owners of the Placed ATMs. ATMFS filed for Chapter 11 bankruptcy protection on

February 12, 2008 in the United States Bankruptcy Court for the Middle District of

Florida.

18.     Defendant Exclusive Properties Group, Inc. ("Exclusive Properties" or

"EPG") is a domestic business corporation organized and existing under the laws of the

State of Florida with a principal place of business at 301 S. Richey Road, Suite 101,

Leesburg, Florida.  Upon information and belief, Moore is the President, Secretary,

Treasurer and Director of EPG.  Upon information and belief, EPG is a real estate

holding company controlled by Moore that owns two warehouses from which Moore

operates numerous businesses, including ATMFS.

19.     Defendant Walter Netschi ("Netschi") is a resident of Hot Springs Village,

Garland County, Arkansas and McKinney, Collin County, Texas.  Netschi is the

5

managing member of 36 Main Street LLC and the President of Defendant ATM Capital, Inc.

20.    Defendant 36 Main Street LLC ("36 Main") is a limited liability company organized and existing under the laws of the State of Nevada with a principal place of business at 2400 Dallas Parkway, Suite 180, Plano, TX 75093. Since at least 2005, 36 Main has been engaged in the business of selling ATMs to third-parties, including ATMA.

21.    Defendant ATM Capital Inc. ("ATM Capital") is a domestic business corporation organized and existing under the laws of the State of Texas with a principal place of business at 2001 Beach Street, Fort Worth, Texas. Netschi is the President of ATM Capital.

22.    Defendant Danielle Jones ("Jones") is the Secretary Treasurer and Vice-President of 36 Main and the daughter of Netschi. Jones maintains a residence in McKinney, Collin County, Texas.

23.    Defendant Alain Brossman a/k/a Harry Brossman ("Brossman") is a resident of Tabernacle, Burlington County, New Jersey. Brossman is a member and former employee of ATMA.

24.    Defendant William Munier ("Munier") is a resident of New Milford, Bergen County, New Jersey. Munier is a member and former employee of ATMA.

## V
## THE ENTERPRISE

25.    At all times material to this Complaint, the Defendants, collectively, have constituted an "enterprise" (hereinafter the "ATM Sales Enterprise") as that term is

defined in 18 U.S.C. § 1961(4), which enterprise was engaged in, and the activities of which affected, interstate, and foreign commerce.

## VI
## BACKGROUND

### *ATMA Enters the ATM Business*

> **Deleted:** *The Plaintiff Trusts Are Fraudulently Induced by Defendants¶*
> ¶

26.    In or around November of 2004, Brossman and Munier, who had previously

> **Deleted:** conducted

engaged in a prior scheme to sell ATMs with certain of the Defendants named herein

> **Deleted:** 76

(more fully described *infra* at Paragraphs 83 through 90), sought to begin a business with

> **Deleted:** 83
> **Deleted:** attract large scale financing for the

the purported purpose being the purchasing and operating of a large number of Placed

> **Deleted:** of investing in the purchase

ATMs (the "ATM Venture").

> **Deleted:** and to then make money managing that investment

27.    In or about August of 2005, Brossman, Munier and others, eventually

> **Deleted:** the Plaintiff Trusts

including Netschi and Moore, approached, through unnamed intermediaries, Acta Realty

> **Deleted:** to request investment financing from the Plaintiff Trusts to participate in the "ATM Venture."

Corp., doing business as the Wolfson Group, a New York Corporation ("the Wolfson

Group,") and offered the Wolfson Group the opportunity to become part of the ATM

Venture. The Wolfson Group is engaged in the management of funds and assets owned

by various entities formed primarily for the benefit of members of the Wolfson family.

28.    The ATM Venture involved the use of a limited liability company, known as

> **Deleted:** in which Munier and Brossman would be members, employees and minor investors. ATMA would receive funding from the Plaintiff Trusts for the

ATMA, to purchase Placed ATMs, supervise and monitor the management of the Placed

> **Deleted:** of identified

ATMs, and thereafter receive monthly revenue generated by the Placed ATMs.

> **Deleted:** would thereafter receive a return on investment from the
> **Deleted:**

29.    Although ATMA was previously formed, it did not conduct any business, of

any kind, prior to the signing of the ATMA limited liability company agreement on

November 14, 2005, and ATMA's decision to (i) purchase ATMs; (ii) supervise and

monitor the management of the Placed ATMs; and (iii) thereafter receive monthly

revenue generated by the Placed ATMs.

30.     On November 14, 2005, Brossman, Munier and unnamed others met with representatives of the Wolfson Group at the offices of the Wolfson Group in New York for the purpose of inducing the Wolfson Group to participate in the ATM Venture, to induce ATMA to purchase Placed ATMs from 36 Main, and to allow ATMFS to manage any Placed ATMs purchased by ATMA; Netschi and Moore participated in portions of the November 14, 2005 meeting telephonically.

31.     During the November 14, 2005 meeting, Netschi, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, through ATMFS, to operate as the ISO for the Placed ATMs represented to senior representatives of the Wolfson Group, who become members of ATMA's board of managers that very day, that:

a.     Netschi, through 36 Main, was in the business of locating sellers of Placed ATMs, conducting due diligence on the Placed ATMs, negotiating a price for and purchasing the Placed ATMs, holding the 36 Main purchased Placed ATMs as inventory and reselling the Placed ATMs to interested third parties;

b.     Moore, through ATMFS, served as the ISO for the 36 Main owned ATMs and that Moore was prepared to continue to act as the ISO for those Placed ATMs;

c.     ATMFS was in possession of leases with businesses where Placed ATMs owned by 36 Main were located and that the leases were valid, in effect, and assignable to the purchaser of the Placed ATMs; and,

8

    d.    Moore, through ATMFS performed due diligence confirming the Performance Criteria for the Placed ATMs provided to the purchaser of the Placed ATMs prior to purchase.

32.    During the same meeting, representatives of the Wolfson Group, who become the majority and controlling members of ATMA's board of managers – as part of making an informed decision concerning (i) ATMA's purchases of Placed ATMs from 36 Main; and (ii) ATMA's decision to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs – specifically questioned Netschi with respect to whether Netschi and 36 Main were purchasing Placed ATMs from disinterested third-party owners and expressed their reliance on Netschi and 36 Main conducting due diligence on the Performance Criteria of the of the Placed ATMs being purchased by 36 Main for later resale to ATMA.

33.    Also during the same meeting, Netschi, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, represented that the business of 36 Main was separate from the business of Moore and ATMFS, and that 36 Main was exclusively in the business of purchasing and reselling Placed ATMs and that Moore was exclusively in the business of operating as an ISO.

34.    Also during the same meeting, Brossman, Munier, and Netschi, to induce ATMA to purchase Placed ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's Placed ATMs, represented that Moore, through ATMFS, could act as the ISO for any ATMs purchased by ATMA and could conduct due diligence and provide truthful and accurate reporting as

9

Deleted: :

Deleted: the Plaintiff Trusts,

Formatted: Bullets and Numbering

Deleted: their participation in the ATM Venture,

Deleted:

Deleted: the Plaintiff Trusts to participate in the ATM Venture

Deleted: the Plaintiff Trusts to participate in the ATM Venture, informed Plaintiffs that Moore

Deleted: would

Deleted: would

to the Performance Criteria of the Placed ATMs identified for potential purchase by

ATMA.

35.    Also during the same meeting, Brossman, Munier, representatives of the

Wolfson Group and unnamed others participated in a conference call with Moore during

which Moore, to induce ATMA to purchase Placed ATMs from Netschi's company, 36

Main, and to induce ATMA to allow Moore, via ATMFS, to act as the ISO for ATMA's

Placed ATMs, represented that: (i) neither he, nor his company ATMFS, were engaged in

the purchase or sale of Placed ATMs; (ii) that ATMFS acted solely as an ISO for Placed

ATMs; and (iii) that ATMFS's operations were separate and apart from those of 36 Main.

36.    Also during the same meeting, Netschi, to induce ATMA to purchase Placed

ATMs from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via

ATMFS, to act as the ISO for ATMA's Placed ATMs, caused to be sent, via electronic

mail ("email"), copies of bills of sale, equipment management agreements and due

diligence documents (more fully defined *infra* at Paragraph 52) for 100 Placed ATMs

purportedly available for purchase by ATMA from 36 Main. *See* Volume I, Ex. 1 – Ex.

3.[2] The documents were forwarded at the request of ATMA's board of managers, to

demonstrate the Performance Criteria of the 100 Placed ATMs purportedly being offered

for sale and other factors relevant to ATMA's decision to purchase Placed ATMs from

Netschi's company, 36 Main, and ATMA's decision to allow Moore, via ATMFS, to act

as the ISO for ATMA's Placed ATMs.

---

[2]    Due to the volume of exhibits to this Complaint, for the Court's convenience the
exhibits hereto are attached and submitted herewith and incorporated herein by reference
as part of separate Exhibit Appendices, Volumes I – XX (hereinafter referred to as
Volume " ", Ex. " ").

10

---

Deleted: Plaintiff Trusts

Deleted: the Plaintiff Trusts to participate in the ATM Venture

Deleted: ,

Deleted: the Plaintiff Trusts to participate in the ATM Venture

Deleted: 45

Deleted: , for the Plaintiff Trusts' review

Formatted: Font: Italic, No underline

Deleted: Plaintiff Trusts'

Deleted: the Plaintiff Trusts' review of the ATM Venture.

37.    Also at the same meeting, Moore, to induce ATMA to purchase Placed ATMs

from Netschi's company, 36 Main, and to induce ATMA to allow Moore, via ATMFS, to

act as the ISO for ATMA's Placed ATMs, made representations indicating the

authenticity of the leases, due diligence documents and management agreements for the

same 100 Placed ATMs.

38.    After receiving the representations set forth in paragraphs 30 through 37,

*supra*, from Brossman, Munier, Netschi, and Moore, the Wolfson Group agreed to

participate in the ATM Venture, ATMA agreed to purchase Placed ATMs from Netschi's

company, 36 Main, and ATMA agreed to allow Moore, via ATMFS, to act as the ISO for

ATMA's Placed ATMs. On November 14, 2005, the limited liability company

agreement of ATMA was drafted by an employee of the Wolfson Group. The ATMA

limited liability company agreement was effective November 14, 2005.

39.    The ATMA limited liability company agreement provided that the

management of the business and affairs of ATMA would be delegated to a board of

managers. The ATMA board of managers consisted of three managers: two appointed by

the Wolfson Group and one appointed by the Class B members of the board of managers.

A chairman of the board of managers was to be selected by the two Wolfson Group

appointed managers. The initial board of managers of ATMA consisted of two managers

appointed by the Wolfson Group, Aaron Wolfson and Eli Levitin (the "Controlling

Managers"), and Brossman. Brossman's position as a manager on the ATMA board of

managers was contingent upon his continued employment with ATMA – employment

that could be terminated at will and with or without cause by the Controlling Managers.

11

Deleted: the Plaintiff Trusts to participate in the ATM Venture,

Deleted: <#>Also at the same meeting, in reliance on the representations made by Munier, Brossman, Netschi, 36 Main and Moore, detailed *supra* at Paragraphs 29 through 36, the Plaintiff Trusts entered into the ATM Venture and became the largest Class A member of ATMA and agreed to make an initial investment of five million dollars to fund the purchase of Placed ATMs.¶
Also at the same meeting, Munier and Brossman, each agreed to invest $62,500 in ATMA and entered into an employment relationship as co-Chief Executive Officers with ATMA pursuant to which they would

40.    Pursuant to the terms of the ATMA limited liability company agreement, ATMA was prohibited, among other acts, from: purchasing any ATMs, disposing of any ATMs, amending any lease agreements related to any ATM, or hiring any employees, without the unanimous approval of the board of managers.

41.    On the same day of the meeting and de-facto formation of ATMA, ATMA, via written employment agreements, hired Brossman, Munier, and an unnamed other employee, as co-chief executive officers of ATMA to operate the day-to-day business and affairs of ATMA.  Brossman and Munier were to receive: (i) a fixed salary for their work as co-chief executive officers; (ii) employee benefits, including health insurance; and (iii) three weeks vacation.  Brossman and Munier were to each be paid $10,416 per month out of the operating revenue of ATMA with salary increases, specifically linked to the number of Placed ATMs owned by ATMA (the "ATMA Machines").

42.    Brossman and Munier were at-will employees of ATMA.  Brossman and Munier could be terminated from their positions as co-chief executive officers by the Controlling Managers at any time, with or without cause.

43.    Pursuant to their employment agreements, Brossman and Munier were subject to the overall direction and authority of the ATMA board of managers, were required to report to the ATMA board of managers (or the board's designee), and owed a duty of loyalty to ATMA.  Brossman and Munier were prohibited from purchasing ATMs for ATMA, disposing of ATMs owned by ATMA, or modifying any lease related to an ATM owned by ATMA without the unanimous approval of the ATMA board of managers.

44.    In connection with Brossman's employment as the co-chief executive officer of ATMA, Brossman was required to perform due diligence obligations on behalf of

12

ATMA that included, but were not limited to: (i) identifying and vetting potential Placed

ATM machines for purchase by ATMA; (ii) visiting existing ATMA Machines at their

locations; and, (iii) exploring opportunities to enhance the value and performance of the

ATMA Machines. Brossman's due diligence obligations also required interfacing with

Moore as the ISO of the ATMA Machines. On numerous occasions during the period

relevant to this Complaint, Brossman represented to ATMA's board of managers, or their

designees, that he was performing the above duties, including representations that he was

personally visiting the businesses where the ATMA Machines were located.

> **Deleted:** , representatives of the Plaintiff Trusts

45.    In connection with Munier's employment as the co-chief executive officer of

ATMA, Munier was required to receive and review monthly reports, delivered by Moore

and purportedly related to the ATMA Machines, detailing the location, transaction

activity, monthly costs and expenses, and net revenue for each ATMA Machine (the

"Monthly Reports") and to subsequently deliver the Monthly Reports to ATMA's board

of managers, or their designees.

> **Deleted:** duties were

> **Deleted:** representatives of the Plaintiff Trusts.

46.    In or about February of 2006, at the offices of the ATMA board of managers

in New York, Netschi again represented to ATMA that Netschi and 36 Main were

purchasing Placed ATMs from disinterested third party owners and that Netschi and 36

Main were conducting due diligence with respect to the Placed ATMs being purchased

by 36 Main for later resale. At the same meeting, an ATMA board member and his

representative expressed their reliance on the representations made by Netschi to

continue ATMA's purchases of Placed ATMs from 36 Main.

> **Deleted:** Plaintiff Trusts'

> **Deleted:** representatives of the Plaintiff Trusts

> **Deleted:** representatives of the Plaintiff Trusts

47.    Based on the fraudulent and misleading acts of the Defendants, from

approximately November of 2005 through February of 2008, ATMA believed it

13

purchased 940 Placed ATMs – the ATMA Machines – from 36 Main, entered into

management agreements with ATMFS to manage the operation of the ATMA Machines,

and continued to employ Brossman and Munier as employees of ATMA to assist

ATMA's board of managers with the day-to-day operations of ATMA.

48.    During all periods relevant to this Complaint, the board of managers of

ATMA, and/or its designees, were actively engaged in the operation and business affairs

of ATMA, including but not limited to the decision whether to purchase Placed ATMs

from 36 Main.

### *Purported ATM Purchases/Sales*

49.    To date, Plaintiff has transferred $16.475 million to 36 Main for the purchase

of the ATMA Machines. The purported purchase of the ATMA Machines commenced in

November of 2005, and ended in September of 2006, and were accomplished in fifteen

(15) tranches, varying in size from 2 to 101 ATMs per tranche, (the "ATMA Tranche

Purchases"). The purchase price for each of the ATMA Machines was negotiated by the

Controlling Members of the ATMA board and 36 Main. The purchase price for the

ATMA Machines varied from between $14,500 to $22,000 per machine.[3]

50.    The individual ATMA Tranche Purchases occurred as follows:

---

[3]    The purchase price for a Placed ATM was based on the Performance Criteria of each tranche of Placed ATMs and subsequent designation of the Placed ATM as an "A" or "B" Placed ATM as determined by the verified transaction history of the ATMs in the tranche. Placed ATMs designated as "A" Placed ATMs had an average of at least 400 verified fee paying transactions per month. Placed ATMs with at least 400 verified fee paying transactions per month were originally priced at $19,000.00 per Placed ATM and were later priced at $19,500.00 per Placed ATM. Two of the Placed ATMs with an average of at least 500 verified fee paying transactions per month were priced at $22,000.00 per Placed ATM. Placed ATMs designated as "B" Placed ATMs had an average of from 330-399 verified fee paying transactions per month and were priced at $14,500.00 per Placed ATM. A chart summarizing the date of purchase and amount paid by ATMA for each tranche of ATM purchases is annexed hereto at Volume I, Ex. 4.

---

Formatted: Bullets and Numbering

Deleted: Plaintiffs have

Deleted: 940

Deleted: purchases

a.   On or about November 16, 2005, ATMA paid $1,900,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "November 16, 2005 Tranche Purchase" documents at Volumes II – III, Ex. 5 – Ex. 13);

b.   On or about December 20, 2005, ATMA paid $1,900,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "December 20, 2005 Tranche Purchase" documents at Volumes III – V, Ex. 14 – Ex. 22);

c.   On or about February 22, 2006, ATMA paid $1,900,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "February 22, 2005 Tranche Purchase" documents at Volumes VI - VII, Ex. 23 – Ex. 31);

d.   On or about April 26, 2006, ATMA paid $1,950,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "April 26, 2006 Tranche Purchase" documents at Volumes VII – IX, Ex. 32 – Ex. 40);

e.   On or about May 27, 2006, ATMA paid $1,950,000.00 for the purchase of 100 Placed ATM machines from 36 Main (*See* the "May 27, 2006 Tranche Purchase" documents at Volumes IX – XI, Ex. 41 – Ex. 47);

f.   On or about June 16, 2006, ATMA paid $975,000.00 for the purchase of 50 Placed ATM machines from 36 Main (*See* the "June 16, 2006 Tranche Purchase" documents at Volume XII, Ex. 48 – Ex. 54);

g.   On or about June 27, 2006, ATMA paid $1,073,000.00 for the purchase of 74 Placed ATM machines from 36 Main (*See* the "June 27, 2006 Tranche Purchase" documents at Volume XIII, Ex. 55 – Ex. 61);

h.   On or about July 28, 2006, ATMA paid $1,469,500.00 for the purchase of 101 Placed ATM machines from 36 Main (*See* the "July 28, 2006 Tranche Purchase" documents at Volumes XIV – XV, Ex. 62 – Ex. 68);

i.   On or about August 30, 2006, ATMA paid $136,500.00 for the purchase of 7 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #1" documents at Volumes XVI - XVII, Ex. 69 – Ex. 70, Ex. 77 – Ex. 81);

j.   On or about August 30, 2006, ATMA paid $331,500.00 for the purchase of 17 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #2" documents at Volumes XVI – XVII, Ex. 71 – Ex. 72, Ex. 77 – Ex. 81);

---

**Deleted:** purchased
**Deleted:** for $1,900,000.00.
**Formatted:** Font: Italic, No underline

**Deleted:** purchased
**Deleted:** for $1,900,000.00
**Formatted:** Font: Italic, No underline

**Deleted:** purchased
**Deleted:** for $1,900,000.00
**Formatted:** Font: Italic, No underline

**Deleted:** purchased
**Deleted:** for $1,950,000.00
**Formatted:** Font: Italic, No underline

**Deleted:** purchased
**Deleted:** for $1,950,000.00
**Formatted:** Font: Italic, No underline

**Deleted:** purchased
**Deleted:** for $975,000.00
**Formatted:** Font: Italic, No underline

**Deleted:** purchased
**Deleted:** for $1,073,000.00
**Formatted:** Font: Italic, No underline

**Deleted:** purchased
**Deleted:** for $1,469,500.00
**Formatted:** Font: Italic, No underline

**Deleted:** purchased
**Deleted:** for $136,500.00
**Formatted:** Font: Italic, No underline

**Deleted:** purchased
**Deleted:** for $331,500.00
**Formatted:** Font: Italic, No underline

15

k. On or about August 30, 2006, ATMA paid $522,000.00 for the purchase of 36 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #3" documents at Volumes XVI – XVII, Ex. 73 – Ex. 74, Ex. 77 – Ex. 81);

l. On or about August 30, 2006, ATMA paid $986,000.00 for the purchase of 68 Placed ATM machines from 36 Main (*See* the "August 30, 2006 Tranche Purchase #4" documents at Volumes XVI - XVII, Ex. 75 – Ex. 81);

m. On or about September 26, 2006, ATMA paid $44,000.00 for the purchase of 2 Placed ATM machines from 36 Main (*See* the "September 26, 2006 Tranche Purchase #1" documents at Volumes XVII - XVIII, Ex. 82 – Ex. 83, Ex. 88);

n. On or about September 26, 2006, ATMA paid $409,500.00 for the purchase of 21 Placed ATM machines from 36 Main (*See* the "September 26, 2006 Tranche Purchase #2" documents at Volumes XVII - XVIII, Ex. 84 – Ex. 85, Ex. 88);

o. On or about September 26, 2006, ATMA paid $928,000.00 for the purchase of 64 Placed ATM machines from 36 Main (*See* the "September 26, 2006 Tranche Purchase #3" documents at Volumes XVII - XVIII, Ex. 86 – Ex. 88).

51. With respect to each Tranche Purchase by ATMA, a series of documents were executed which, on their face, provided for (i) the transfer of title and assignable leases to ATMA; and (ii) the management of the ATMA Machines.

52. The documents executed for each Tranche Purchase are identified as follows:

a. Asset Purchase Agreement: 36 Main, by Netschi and Jones, prepared, or caused to be prepared, an Asset Purchase Agreement that supposedly sold title in Placed ATMs from 36 Main to ATMA (hereinafter "Asset Purchase Agreement"). The Asset Purchase Agreements provide a representation and warranty that 36 Main held good and marketable title to the Placed ATMs being sold to ATMA. Upon delivery of an executed Asset Purchase Agreement by Jones on behalf of 36 Main, ATMA would

Deleted: purchased
Deleted: for $522,000.00
Formatted: Font: Italic, No underline
Deleted: purchased
Deleted: for $986,000.00
Formatted: Font: Italic, No underline
Deleted: purchased
Deleted: for $44,000.00
Formatted: Font: Italic, No underline
Deleted: purchased
Deleted: for $409,500.00
Formatted: Font: Italic, No underline
Deleted: purchased
Deleted: for $928,000.00
Formatted: Font: Italic, No underline
Formatted: Bullets and Numbering
Deleted: provided for
Formatted: Indent: Hanging: 0.5"

remit funds to 36 Main via wire transfer in an amount corresponding to the value of the Placed ATMs set forth in a schedule of the Placed ATMs affixed to the Asset Purchase Agreement. *See* Asset Purchase Agreements for the ATMA Tranche Purchases in Volume II, Ex. 5; Volume III, Ex. 14; Volume VI, Ex. 23; Volume VII, Ex. 32; Volume IX, Ex. 41;Volume XII, Ex. 48; Volume XIII, Ex. 55; Volume XIV, Ex. 62; Volume XVI, Exs. 69, 71, 73, 75; Volume XVII, Exs. 82, 84, 86.

b.   Bills of Sale: 36 Main, by Netschi and Jones, prepared, or caused to be prepared, a Bill of Sale for each tranche of Placed ATMs supposedly being sold by 36 Main to ATMA. Each Bill of Sale provided a representation and warranty that 36 Main held good and marketable title to the Placed ATMs supposedly being sold to ATMA. *See* Bills of Sale for the ATMA Tranche Purchases in Volume II, Ex. 6; Volume III, Ex. 15; Volume VI, Ex. 24; Volume VII, Ex. 33; Volume IX, Ex. 42; Volume XII, Ex. 49; Volume XIII, Ex. 56; Volume XIV, Ex. 63; Volume XVI, Exs. 70, 72, 74, 76; Volume XVII Exs. 83, 85, 87.

c.   Addition to Equipment:  36 Main, by Netschi and Jones, prepared, or caused to be prepared, a separate document entitled "Addition to Equipment," that stated that the Placed ATMs supposedly being sold to ATMA were "Virtual switch capable."  Virtual switch capability allowed the Placed ATM to fund minutes for pre-paid cell phone accounts (hereinafter "Addition to Equipment").  After the completion of the first three tranche purchases, ATMA elected not to pay for Virtual Switch

17

capability and Addition to Equipment documents were no longer delivered for subsequent tranche purchases. *See* the Addition to Equipment documents in Volume II, Ex. 7; Volume III, Ex. 16; Volume VI, Ex. 25; Volume VII, Ex. 34.

d.  Diligence Warranty:  Contemporaneous with the execution of a Bill of Sale, and Asset Purchase Agreement, Netschi, by and through 36 Main provided a written statement that it had engaged the services of Moore, through ATMFS, to perform a verification of the transaction history of each ATM supposedly being sold to ATMA (hereinafter "Diligence Warranty"). *See* the Diligence Warranties in Volume II, Ex. 8; Volume III, Ex. 17; Volume VI, Ex. 26; Volume VII, Ex. 35. Each Diligence Warranty warranted that the transaction history that 36 Main provided to ATMA was the same transaction history that 36 Main had received from Moore and ATMFS.

e.  Each and every Bill of Sale, Asset Purchase Agreement, Addition to Equipment and Diligence Warranty (hereinafter "36 Main Transaction Documents") were signed by Jones as Vice-President and/or Secretary Treasurer of 36 Main and were signed, upon information and belief, with the knowledge of and/or at the direction of Netschi.

f.  Placement Program Space Leases:  For each and every Placed ATM supposedly being sold to ATMA, Moore provided copies of a "Placement Program Space Lease" (hereinafter "Placed ATM Lease") between ATMFS and a purported lessor, usually a convenience store or other

18

similar business, where the ATMs supposedly being sold to ATMA were allegedly located. *See* the Placed ATM Leases in Volumes II – III, Ex. 9a – Ex. 9b; Volumes IV – V, Ex. 18a – Ex. 18b; Volumes VI – VII, Ex. 27a – Ex. 27b; Volumes VIII – IX, Ex. 36a – Ex. 36b; Volumes X – XI, Ex. 43a – Ex. 43b; Volume XII, Ex. 50; Volume XIII, Ex. 57; Volumes XIV – XV, Ex. 64a – Ex. 64b; Volumes XVI – XVII, Ex. 77a – Ex. 77b; Volume XVIII, Ex. 88. Annexed to each Placed ATM Lease were site surveys and audit reports, signed by Moore, that purportedly identified: (1) the business where each Placed ATM was located; (2) the annual merchandise sales for that business; (3) the terminal number for the Placed ATM at the location; (4) the average monthly transaction history for the Placed ATM; and, (5) purported reports from searches for UCC-1 statements. The purported Placed ATM Leases and the transaction history identified in the documents annexed to the Placed ATM Leases correlated to a schedule identifying each Placed ATM purchased in the ATMA Tranche Purchases.

g.   Assignment of Placement Programs Space (ATM) Leases: The Placed ATMs supposedly sold to ATMA and their alleged locations were further identified in a document entitled "Assignment of Placement Programs Space (ATM) Leases" (hereinafter "Lease Assignment(s)"). *See* the Lease Assignments in Volume III, Ex. 10; Volume V, Ex. 19; Volume VII, Ex. 28; Volume IX, Ex. 37; Volume XI, Ex. 44; Volume XII, Ex. 51; Volume XIII, Ex. 58; Volume XV, Ex. 65; Volume XVII, Ex. 78. Each Lease Assignment for each Placed ATM Lease was prepared, or caused to be

19

prepared, by Moore and stated that ATMFS had a current and existing

Placed ATM Lease and that the Placed ATM Lease was being assigned to

ATMA for each ATM supposedly being sold to ATMA. In each Lease

Assignment, Moore warranted that each Placed ATM Lease was in full

force and effect, was assignable, and was free and clear from all liens and

encumbrances.

h.    Due Diligence Report: Moore prepared, or caused to be prepared, a

separate document (hereinafter "Due Diligence Report"), that represented

and warranted to ATMA that ATMFS had reviewed the average monthly

transaction history for each ATM being sold to ATMA and that the

average transactions reported on the schedules affixed to the Asset

Purchase Agreements were correct. Moore, in the Due Diligence Report,

acknowledged that ATMA "was relying upon such data in making its

purchase from 36 main [sic] Street." See the Due Diligence Reports in

Volume III, Ex. 11; Volume V, Ex. 20; Volume VII, Ex. 29; Volume IX,

Ex. 38; Volume XI, Ex. 45; Volume XII, Ex. 52; Volume XIII, Ex. 59;

Volume XV, Ex. 66; Volume XVII, Ex. 79.

i.    Equipment Management Agreement: On or about the same day of a

closing of a tranche purchase of ATMA Machines, ATMA and ATMFS

would enter into an Automated Teller Machine (ATM) Equipment

Management Agreement (hereinafter "Equipment Management

Agreement") obligating ATMFS to manage a tranche of ATMA

Machines. ATMA entered into an Equipment Management Agreement for

20

**Deleted:** ,

**Formatted:** Font: Italic, No underline

ATMFS, by Moore, to manage all of the ATMA Machines. *See the*

Equipment Management Agreements in Volume III, Ex. 12; Volume V,

Ex. 21; Volume VII, Ex. 30; Volume IX, Ex. 39; Volume XI, Ex. 46;

Volume XII, Ex. 53; Volume XIII, Ex. 60; Volume XV, Ex. 67; Volume

XVII, Ex. 80. Pursuant to the terms of each Equipment Management

Agreement, ATMFS, by and through Moore, is obligated to manage the

ATMA Machines for the benefit of ATMA. The Equipment Management

Agreement requires Moore and ATMFS to: (1) collect data processing and

electronic deposit and transfer information for all collected revenues and

fees, including surcharge revenues generated by the ATMA Machines, on

a monthly basis; (2) provide ATMA with the Monthly Reports and to

make regular payments to ATMA based on the monthly net revenue of the

ATMA Machines (the "Periodic Revenue Payments"); and, (3) provide

ATMA with a full disclosure of the number of transactions for each

ATMA Machine on a monthly basis.

j.   Amendment to the Equipment Management Agreement:  On or about

April 27, 2006, ATMA and ATMFS entered into an Amendment to the

Equipment Management Agreement ("hereinafter Equipment

Management Agreement Amendment") that amended the existing

Equipment Management Agreements between ATMFS and ATMA. *See*

the Equipment Management Agreement Amendments in Volume III, Ex.

13; Volume V, Ex. 22; Volume VII, Ex. 31; Volume IX, Ex. 40; Volume

XI, Ex. 47; Volume XII, Ex. 54; Volume XIII, Ex. 61; Volume XV, Ex.

21

68; Volume XVII, Ex. 81. Pursuant to the terms of each Equipment

Management Agreement Amendment, ATMFS, by and through Moore, is

obligated, in addition to its obligations under the Equipment Management

Agreements, not to: (1) solicit any business owner identified in the Lease

Agreements to cease doing business with ATMA; or (2) solicit any

business owner identified in the Lease Agreements to lease space to

ATMFS or any other party for the purpose of placing any additional

ATMs at the same business location.  ATMFS's non-solicitation

obligation further prohibited ATMFS from sharing any information

identifying the locations of the ATMA Machines or the terms of the Lease

Agreements with any other parties.

k.    For each of the ATMA Tranche Purchases, Moore signed every Placed

ATM Lease, Lease Assignment, Due Diligence Report, Equipment

Management Agreement and Equipment Management Agreement

Amendment (hereinafter the "ATMFS Transaction Documents").

53.    Each of the 36 Main Transaction Documents and ATMFS Transaction

Documents associated with the ATMA Tranche Purchases included a schedule of Placed

ATMs that purportedly identified the transaction history of each Placed ATM in the

ATMA Tranche Purchases.

54.    Each Asset Purchase Agreement and corresponding Bill of Sale contained

representations and warranties by 36 Main, that 36 Main possessed good and marketable

title to the Placed ATMs supposedly being sold to ATMA, that it had full authority to sell

the Placed ATMs, that the Placed ATMs were in good condition and fit for use, and were

22

**Deleted:** to

**Deleted:** ") individually or as a member or president of ATMFS.

**Formatted:** Bullets and Numbering

free and clear "of all liens, encumbrances, liabilities and adverse claims, of every nature

and description." *See* Paragraphs 52(a) and 52(b), *supra*.

55.     Every Tranche Purchase of ATMA Machines was accompanied by some or all

of the documents identified in Paragraphs 52(a) through 52(d) and 52(f) through 52(j) of

this Complaint.

56.     For every Tranche Purchase of ATMA Machines, ATMA delivered, via a

bank wire transfer, purchase funds to Netschi, through 36 Main.  The purchase funds paid

by ATMA to 36 Main for the ATMA Machines are detailed, *infra*, at Paragraphs 114

through 124 and incorporated herein by reference.

57.     Additionally, after each Tranche Purchase of ATMA Machines, ATMA

delivered, via a bank wire transfer, funds to ATM Capital and/or 36 Main which

represented 36 Main's prorated share of the monthly net-revenues earned by that tranche

of ATMA Machines for that portion of the month during which 36 Main owned those

ATMs sold to ATMA (the "Residual Revenue Funds").  *See* Paragraphs 147 through 154,

*infra*, incorporated herein by reference.

58.     Brossman and Munier, together and/or in conjunction with others, including

Netschi, calculated the Residual Revenue Funds purportedly owed 36 Main and to be

delivered to ATM Capital or 36 Main.  Munier, Brossman, and Netschi caused the

Residual Revenue Funds to be paid to ATM Capital and/or 36 Main with the knowledge

that the Residual Revenue Funds were based on fabricated calculations because the

ATMA Machines did not exist.

23

*Post Sale Activities of Defendants*

59.    From on or about December of 2005 through November of 2007, Moore forwarded the Monthly Reports, via email, to Munier and/or Brossman. *See* Paragraphs 160 – 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195, *infra*, incorporated herein by reference.

60.    The Monthly Reports were received and reviewed by Munier and/or Brossman for accuracy pursuant to their duties as employees of ATMA. Brossman and/or Munier subsequently delivered the Monthly Reports to representatives of ATMA. *See* Paragraphs 162, 158 – 165, 167 – 168, 170, 172, 177 – 178, 181, 183 – 185, 188 – 189, 191, 193, 194, 196 – 197, 209 – 227, *infra*, incorporated herein by reference.

61.    From on or about December of 2005 through September of 2007, Moore, by and through ATMFS and/or Exclusive Properties, delivered, by wire transfer, the Periodic Revenue Payments. *See* Paragraphs 125 through 146, *infra*, incorporated herein by reference.

62.    The Periodic Revenue Payment delivered in September of 2007, which related to the Monthly Report for June of 2007, was the final Periodic Revenue Payment received by ATMA from ATMFS, Moore, or Exclusive Properties. In or about November of 2007, Moore ceased providing the Monthly Reports.

63.    In response to numerous requests from Plaintiff concerning the failures of ATMFS and Moore to provide the Monthly Reports and/or Periodic Revenue Payments, Moore, by letter dated December 20, 2007, stated:

> We'd like to give you an update on the events that occurred this year that has caused a delay in receiving your monthly payments. *In the Spring of 2007 we made a commitment to purchase Jack Henry ATM software . . . that would allow us to track ATM assets and transactions and receive*

24

*electronic reports on a daily basis. We received the software in July* and did the installation at that time. . . . We expect to be fully operational and current with all reports by the mid to end of January. . . We're presently reconciling each ATM from the old manual system to the new system to get reports done to get them out to each one of our ATM owners . . . *I want to assure each ATM owner that their funds received on the settlement of each ATM are secure in a settlement account by each network.*

*See* Volume XIX, Ex. 89. (Emphasis added.)

    64.    On January 10, 2008, Moore, in response to demands by Plaintiff for information related to the ATMA Machines, delivered, via email, a report to a representative of ATMA that purportedly identified the ATMA Machines. *See* Volume XIX, Ex. 90.

    65.    On January 11, 2008, Brossman emailed a representative of ATMA and represented that ". . . vance is going to be sending u a cornucopia of reports and then explain the first reports.i think that the first reports were from elan a processor owned by us bank-spoke to him at 830 and 1030 this morning-harry" [sic]. *See* Volume XIX, Ex. 91.

    66.    On January 11, 2008, Moore, in response to demands by Plaintiff for information related to the ATMA Machines, delivered, via email, a report, allegedly prepared by ATMFS, listing the store locations, without addresses, of 352 ATMs. Brossman also received a copy of the report via the same email. *See* Volume XIX, Ex. 92.

    67.    Also on January 11, 2008, Brossman, in an email, represented to an agent of ATMA that he had ". . .matched 250 machines to the [Plaintiff's]. . ." list of the ATMA Machines. *See* Volume XIX, Ex. 93.

25

68.    Also on January 11, 2008, Moore, in response to further demands by Plaintiff for information related to the ATMA Machines, represented that he had requested ". . . the file on transaction history from processors for recent months, and am still waiting for the files." *See* Volume XIX, Ex. 94.

69.    Also on January 11, 2008, Moore sent another email to a representative of ATMA wherein he represented that he would provide a copy of a bank statement related to the settlement account where the Periodic Revenue Payments were purportedly being held. *See* Volume XIX, Ex. 94. Moore sent a copy of a purported bank statement to a representative of ATMA via email on January 11, 2008. *See* Volume XIX, Ex. 95.

70.    On or about January 15, 2008, Moore, during a visit by a representative of ATMA and a third-party auditor to ATMFS's warehouse in Garner, North Carolina, presented a bank statement dated December 31, 2007, that purportedly showed an account balance of $11,259,194.75, which Moore stated represented Plaintiff's Periodic Revenue Payments that were being held in escrow pending completion of software upgrades to ATMFS's computer system. *See* Volume XIX, Ex. 96.

71.    On January 20, 2008, Brossman, in response to demands by Plaintiff for information related to the ATMA Machines, represented to a representative of ATMA in an email that: "ok-vance and i have gone through the lists till we accounted for the 940 machines including the moved ones.i have sent the list to you.they have all the present terminal numbers---i told u david that i would get it done no matter what-harry" [sic]. *See* Volume XIX, Ex. 97.

72.    On or about January 22, 2008, Moore, via an electronic message to a representative of ATMA, represented that the ATMA Machines existed as Placed ATMs

and represented that new lease agreements for any ATMA Machines moved from their

original locations would be provided to Plaintiff by January 24, 2008. *See* Volume XIX,

Ex. 98.

### Discovery That the ATMA Machines Do Not Exist

73.    In January of 2008, Plaintiff directed a private investigative firm to investigate

certain locations where ATMA Machines were, according to Moore and ATMFS,

located.  The investigation was conducted for the purpose of determining whether the

ATMA Machines were in fact present at those locations.

74.    On or about January 24, 2008, the private investigative firm reported that its

investigation had uncovered that the majority of the ATMA Machines they attempted to

locate: (1) were not located at the business locations identified by Moore, Netschi, 36

Main, and Jones; (2) in some instances may not have ever existed at the locations

identified by Moore, Netschi, 36 Main, and Jones; and (3) in some instances, were either

owned by persons other than Plaintiff and/or were managed by parties other than

ATMFS.

### Fraudulent Sales to Other Investor Groups Are Revealed

75.    On or about February 6, 2008, a California based entity known as ATM

Equity, LP ("ATM Equity") filed suit against ATMFS in North Carolina Superior Court,

Wake County, alleging that ATMFS and Moore had defrauded ATM Equity out of $20

million delivered to Netschi, through 36 Main, by providing fraudulent due diligence

reports in order to induce ATM Equity to purchase ATMs from 36 Main.  The complaint

further alleges that ATMFS and Moore misappropriated and/or failed to disclose the

locations of certain ATMs that ATM Equity owned and had contracted with ATMFS to

27

service, and that ATMFS and Moore had failed to remit monthly revenues for either the

ATMs purchased from 36 Main or the ATMs owned by ATM Equity being serviced by

ATMFS and Moore.

76.    On or about February 12, 2008, ATMFS filed for Chapter 11 bankruptcy

protection in the United States Bankruptcy Court for the Middle District of Florida (the

"ATMFS Bankruptcy").

77.    In its petition in the ATMFS Bankruptcy, ATMFS did not list or otherwise

disclose either ATMA or ATM Equity as creditors of ATMFS.

78.    Since the filing of the ATMFS Bankruptcy, numerous other persons who

purchased ATMs through Netschi and 36 Main, and whose ATMs were allegedly

managed by ATMFS and Moore, have appeared in the ATMFS Bankruptcy (together

with ATMA and ATM Equity, the "ATMFS Creditors").

79.    The ATMFS Creditors believe they purchased, in the aggregate, in excess of

4000 ATMs through Netschi, 36 Main, Jones, and Moore.

80.    In a disclosure made by the ATMFS Bankruptcy Trustee on or about March

10, 2008, the ATMFS Bankruptcy Trustee has only been able to confirm the existence of

approximately 400 ATMs (ten percent 10% of the Placed ATMs purportedly being

managed by ATMFS and Moore) and, that most of those 400 ATMs are owned by the

merchants where the ATMs are located and not the ATMFS Creditors.

81.    Netschi, in a telephone call with a member of the ATMA board of managers

on February 28, 2008, admitted that 36 Main took a percentage of the gross purchase

funds for each tranche purchase of ATMA Machines and then subsequently transferred

the balance of Plaintiff's funds to Moore or entities controlled by Moore - a

Deleted: investors in ATMs

Deleted: surfaced, and

Deleted: have

Deleted: Plaintiffs'

28

representation totally at odds with prior representations made to representatives of ATMA to induce ATMA to participate in the ATM Venture, to purchase Placed ATMs from 36 Main, and to allow ATMFS to manage any of the ATMA Machines. *See* Paragraphs 31 - 33, *supra.*

82.    Subsequently on March 19, 2008, Netschi was sued in New York State Supreme Court, New York County, by Fortress Credit Opportunities I LP for breach of guarantee in connection with the financing of purchases of Placed ATMs by ATM Equity from 36 Main.

### The Defendants Prior ATM Sales Scheme

83.    From approximately 2002 through 2005, Munier, Brossman, Moore, and Netschi, along with others not named herein, engaged in the sale of ATM business opportunities that bundled and sold ATMs together with management, operation, and other services to investors (the "Business Opportunity").

84.    An investor in the Business Opportunity was entitled to receive a set monthly payment in exchange for his or her investment, with a bonus payment in the event that the transactional activity of an ATM exceeded a certain threshold number (usually 400 transactions) within a given month.

85.    Munier, operating through an entity that, on information and belief, was doing business as EFinancial, was responsible for the sale of the Business Opportunity to potential and actual investors.

86.    When Munier sold a Business Opportunity to an investor, he would arrange to purchase a single or multiple ATMs from an entity owned and controlled by Netschi.

87.    Brossman, operating through an entity that, on information and belief, was doing business as National Escrow Limited LLC ("National Escrow"), agreed, for a percentage of the revenue generated by the transaction activity of Business Opportunity ATMs, to purchase the ATMs from the Business Opportunity owners at the expiration of the term of the Business Opportunity (usually seven years) or a mutually agreeable date.

88.    Upon information and belief, each ATM sold to an investor as part of the Business Opportunity was purportedly operated by Moore pursuant to an agreement whereby a Moore-controlled entity would act as the ISO for the ATM.

89.    In addition to Brossman and Munier, the Business Opportunity also included management services by a management company, unnamed herein, that employed, amongst others, Munier's sister, and which acted as conduit between the owner of the Business Opportunity and Netschi, Brossman, Munier, and Moore.  Though the management services were allegedly provided by a separate management company, Moore's entity controlled access to any funds generated from the Business Opportunity ATMs, and distributed funds to the purported management company and to Brossman's company, National Escrow.

90.    On information and belief, including statements made by investors and lawyers for investors in the Business Opportunity, investors in the Business Opportunity were sold non-existent phantom ATMs as part of a scheme conducted by Munier, Brossman, Netschi, and Moore.

## VII
## PATTERN OF FRAUDULENT AND RACKETEERING ACTS

91.    Defendants, by and in furtherance of the ATM Sales Enterprise, induced Plaintiff to enter into agreements to purchase phantom ATMs by providing Plaintiff with

30

false and misleading purchase information, including: (1) the source from whom Netschi and 36 Main were allegedly purchasing the ATM machines ultimately purchased by Plaintiff; (2) the existence of the ATMs purchased by Plaintiff; (3) the transaction activity of the ATMs purchased by Plaintiff; (4) the locations of the ATMs purchased by Plaintiff; and, (5) the existence of leases for the placement of the ATMs purchased by Plaintiff.

92.     To effect the ATM Sales Enterprise scheme, Munier, Brossman, Netschi, 36 Main, Jones, ATM Capital, Exclusive Properties, and Moore agreed and conspired to sell phantom ATMs to Plaintiff.

93.     As part of the ATM Sales Enterprise scheme, Netschi and 36 Main explicitly and intentionally misrepresented to Plaintiff that they had acquired ownership of the ATMs to be purchased by Plaintiff from disinterested third-party owners of the ATMs when, in fact, they had not done so, but had instead "purchased" the phantom ATMs from Moore, or an entity controlled by Moore.

94.     In furtherance of the ATM Sales Enterprise scheme, Netschi, 36 Main, and Jones created fictitious Asset Purchase Agreements, Bills of Sale, Additions to Equipment, and Due Diligence Warranties (collectively, the "36 Main Fictitious Transaction Documents").

95.     In furtherance of the ATM Sales Enterprise scheme, Moore created fictitious Lease Assignments, Placed ATM Leases, Due Diligence Reports, Equipment Management Agreements, and Equipment Management Agreement Amendments (collectively, the "Moore Fictitious Transaction Documents")(collectively with the 36 Main Fictitious Documents, the "Fictitious Transaction Documents").

31

96.     Knowing that the Fictitious Transaction Documents related to the purchase of

phantom Placed ATMs by Plaintiff, Munier and Brossman furthered the ATM Sales

Enterprise scheme by executing the Fictitious Transaction Documents on behalf of

ATMA and/or not disclosing to Plaintiff that the Fictitious Transaction Documents

related to phantom ATMs.

97.     Knowing that ATMA had purchased phantom Placed ATMs, Brossman

furthered the ATM Sales Enterprise scheme by stating he had performed due diligence on

the ATMA Machines, including visits to ATMA Machine locations, when he had not

performed such due diligence.

98.     In continued furtherance of the ATM Sales Enterprise scheme, Moore caused

ATMFS to create fictitious Monthly Reports for the ATMA Machines (the "Fictitious

Monthly Reports"). *See* Paragraphs 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190,

192, and 195, *infra*, incorporated herein by reference.

99.     The Fictitious Monthly Reports were transmitted to Munier and Brossman,

who, knowing they were false and were generated for the purpose of misleading Plaintiff,

provided the Fictitious Monthly Reports to Plaintiff. *See* Paragraphs 162, 158 – 165, 167

– 168, 170, 172, 177 – 178, 181, 183 – 185, 188 – 189, 191, 193, 194, 196 – 197, 209 –

227, *infra*, incorporated herein by reference.

100.    In continued furtherance of the ATM Sales Enterprise scheme, Moore caused

the Periodic Revenue Payments to be made to ATMA.  The Periodic Revenue Payments

were transmitted via a wire transfer at the direction of Moore and originated from either

ATMFS or Exclusive Properties. *See* Paragraphs 125 – 146, *infra*, incorporated herein

reference.

---

Deleted: s

Deleted: s

Deleted: "

Deleted: "

Formatted: Font: Italic, No underline

Deleted: 153 - 154, 156, 162, 164, 169, 172, 175, 180, 183, 185, and 188

Deleted: s

Deleted: s

Formatted: Font: Italic, No underline

Deleted: 155, 157 –

Deleted: , 160 – 161, 163,

Deleted: – 171, 174, 176

Deleted: – 182, 184, 186, 187,

Deleted: – 190, 202 – 220

Deleted: 118 – 139

Formatted: Font: Italic, No underline

101.   Upon information and belief, the source of the Periodic Revenue Payments was the monies delivered by Plaintiff and/or the other ATMFS Creditors to 36 Main to purchase Placed ATMs.

102.   In continued furtherance of the ATM Sales Enterprise scheme, Munier and Brossman caused the Periodic Revenue Payments to be recorded by ATMA as revenue and paid their individual salaries and benefits, along with the salaries and benefits of others, from the Periodic Revenue Payments with the knowledge that the Periodic Revenue Payments had a source other than the revenue generated by the transaction activity of the ATMA Machines.

103.   In continued furtherance of the ATM Sales Enterprise scheme, upon completion of the sale of a tranche of ATMs to ATMA, Netschi and ATM Capital would demand payment of the Residual Revenue Funds.  The Residual Revenue Funds were paid by ATMA via an interstate bank wire transfer to Netschi, through ATM Capital.

104.   In continued furtherance of the ATM Sales Enterprise scheme, when ATMFS ceased to provide Plaintiff with the Fictitious Monthly Reports in or around November of 2007 and Periodic Revenue Payments in or around September of 2007, Munier and Brossman represented to Plaintiff that they were actively communicating with Moore and ATMFS for the purpose of ascertaining the cause for the absence of reporting and payments from ATMFS.  Munier and Brossman, knowing such representations to be false, informed Plaintiff that the cause for the delay in reporting and payment from ATMFS was a software upgrade allegedly installed by ATMFS on its computers.

33

**COUNT 1**
**(Civil Racketeering Violations – All Defendants)**
**(18 U.S.C. § 1962(c))**

105.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 104 of this Complaint as if fully set forth herein.

106.    At all times relevant to this Complaint, Netschi, 36 Main, Jones, Moore,

Exclusive Properties, ATM Capital, Munier, and Brossman were "persons" as defined by

18 U.S.C. § 1961(3).

107.    At all times relevant to this Complaint, Netschi, 36 Main, Jones, Moore,

Exclusive Properties, ATM Capital, Munier, and Brossman, as detailed in Paragraphs 26

- 72, 81 and 91 – 104, *supra*, engaged in the operation or management of the ATM Sales

Enterprise, which is an enterprise as defined by 18 U.S.C. § 1961(4), the activities of

which affect interstate commerce.

108.    Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier,

and Brossman conducted the ATM Sales Enterprise's affairs through a pattern of

racketeering activity, detailed in Paragraphs 114 - 227 below, which were directed at

Plaintiff since at least November of 2005.

109.    Since at least November of 2005, Netschi, 36 Main, Jones, Moore, Exclusive

Properties, ATM Capital, Munier, and Brossman shared a common purpose while

engaging in the fraudulent course of conduct detailed in Paragraphs 26 – 72, 81 and 91 –

104 above, and worked together to achieve such purpose, specifically to induce Plaintiff

and other individuals and entities to enter into agreements to purchase Placed ATMs

which do not exist in exchange for the receipt of millions of dollars of funds.  The

scheme was carried out through the complex offering of fraudulent documentation and

34

verbal statements by the Defendants to hide the true nature of their "sale" of phantom

ATMs to Plaintiff and others, thus allowing Defendants to maintain the ATM Sales

Enterprise scheme while reaping substantial profits for themselves.

110.    Netschi, 36 Main, Jones, Moore, Exclusive Properties, ATM Capital, Munier,

and Brossman, operating together and individually, and in conjunction with unnamed

others, directed and controlled the ATM Sales Enterprise, by: (a) creating the Fictitious

Transaction Documents and delivering, or causing to be delivered, the Fictitious

Transaction Documents to Plaintiff or their representatives/agents; (b) creating the

Fictitious Monthly Reports and delivering, or causing to be delivered, the Fictitious

Monthly Reports to Plaintiff or their representatives/agents; (c) delivering, or causing to

be delivered, the Periodic Revenue Payments to ATMA or their representatives/agents;

(d) demanding from ATMA, and receiving, the Residual Revenue Funds; and, (e)

engaging in a fraudulent course of conduct against Plaintiff and unnamed others.

111.    The pattern of racketeering activity engaged in by Netschi, 36 Main, Jones,

Moore, Exclusive Properties, ATM Capital, Munier, and Brossman involved fraudulent

acts in support of the above conduct constituting wire fraud (18 U.S.C. § 1343) and mail

fraud (18 U.S.C. § 1341), all of which constitute "racketeering activity," as defined in 18

U.S.C. § 1961(1)(B).

112.    Defendants engaged in the predicate acts detailed below between November

14, 2005, when Netschi delivered Fictitious Transaction Documents to a representative of

the Plaintiff, and continued through January 31, 2008, when Brossman delivered

Fictitious Monthly Reports to a representative of the Plaintiff.

35

**Violations of 18 U.S.C. § 1343 (Wire Fraud)**

113.    The predicate acts, and evidence of the schemes constituting the pattern of racketeering, include, but are not limited to interstate telephone calls, interstate electronic ("e-mail") messages, interstate facsimile transmissions, and interstate electronic banking transactions containing false or fraudulent pretenses, representations, or promises made in furtherance of the ATM Sales Enterprise caused to be transmitted by the Defendants, in violation of 18 U.S.C. § 1343.

*Predicate Acts and Evidence Concerning Interstate Wire Transfers Related to the Purchases of ATMA Machines*

114.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on or about November 16, 2005 from ATMA's Citibank, N.A. account located in New York to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines.

115.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on December 19, 2005 from ATMA's Citibank, N.A. account located in New York to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 99.

116.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,900,000.00 on February 24, 2006 from ATMA's Citibank, N.A. account located in New York to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 100.

36

117.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,950,000 on April 27, 2006 from ATMA's Citibank, N.A. account located in New York to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 101.

118.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,950,000.00 on May 26, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 102.

119.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $975,000.00 on June 14, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 103.

120.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,073,000.00 on June 29, 2006, from ATMA's Citibank, N.A. account located in New York to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 104.

121.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,469,500 on July 27, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number

**Formatted:** Font: Italic, No underline

**Formatted:** Font: Italic, No underline

**Formatted:** Font: Italic, No underline

**Formatted:** Font: Italic, No underline

061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 105.

122.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,975,500.00 on September 5, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 106.

123.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $500.00 on September 6, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 107.

124.    Netschi, 36 Main, Jones, Moore, Brossman, and Munier, in furtherance of the ATM Sales Enterprise, caused ATMA to wire transfer $1,381,500.00 on September 29, 2006 from ATMA's Citibank, N.A. account located in New York, to 36 Main's account number 061003415 at Florida Choice Bank located in Florida to purchase ATMA Machines. *See* Volume XIX, Ex. 108.

### *Predicate Acts and Evidence Concerning Interstate Wire Transfers for the Periodic Revenue Payments*

125.    On December 30, 2005, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $42,812.46 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 109.

126.    On February 3, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $85,760.28 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 110.

127.    On March 2, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of am interstate bank wire transfer, the following: $56,646.44 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 111.

128.    On April 3, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $51,911.65 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 112.

129.    On April 4, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $26,997.50 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments the ATMA Machines. *See* Volume XIX, Ex. 113.

130.    On May 1, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $126,283.26 from The Bankers Bank account number 061003415 located in Georgia to

39

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 114.

Formatted: Font: Italic, No underline

131.    On May 31, 2006, in furtherance of the ATM Sales Enterprise, Moore caused

ATMFS to transmit, by means of an interstate bank wire transfer, the following:

$170,993.83 from The Bankers Bank account number 061003415 located in Georgia to

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 115.

Formatted: Font: Italic, No underline

132.    On July 5, 2006, in furtherance of the ATM Sales Enterprise, Moore caused

ATMFS to transmit, by means of an interstate bank wire transfer, the following:

$212,902.75 from The Bankers Bank account number 061003415 located in Georgia to

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 116.

Formatted: Font: Italic, No underline

133.    On August 2, 2006, in furtherance of the ATM Sales Enterprise, Moore

caused ATMFS to transmit, by means of an interstate bank wire transfer, the following:

$256,028.99 from The Bankers Bank account number 061003415 located in Georgia to

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 117.

Formatted: Font: Italic, No underline

134.    On September 12, 2006, in furtherance of the ATM Sales Enterprise, Moore

caused ATMFS to transmit, by means of an interstate bank wire transfer, the following:

$289,021.76 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 118.

Formatted: Font: Italic, No underline

40

135.   On October 11, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $340,231.77 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 119.

136.   On November 14, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $369,447.76 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 120.

137.   On December 19, 2006, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $358,430.65 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 121.

138.   On February 1, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $353,017.35 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 122.

139.   On February 28, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $344,170.03 from Florida Choice Bank account number 063114632 located in Florida to

41

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 123.

    140.   On April 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused

ATMFS to transmit, by means of an interstate bank wire transfer, the following:

$161,012.89 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 124.

    141.   On May 14, 2007, in furtherance of the ATM Sales Enterprise, Moore caused

Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the

following: $120,000.00 from The Bankers Bank account number 061003415 located in

Georgia to ATMA's account located at Citibank N.A. located in New York, representing

Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 125.

    142.   On May 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused

Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the

following: $48,000.00 from The Bankers Bank account number 061003415 located in

Georgia to ATMA's account located at Citibank N.A. located in New York, representing

Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 126.

    143.   On May 16, 2007, in furtherance of the ATM Sales Enterprise, Moore caused

ATMFS to transmit, by means of an interstate bank wire transfer, the following:

$5,784.37 from Florida Choice Bank account number 063114632 located in Florida to

ATMA's account located at Citibank N.A. located in New York, representing Periodic

Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 127.

144.    On June 18, 2007, in furtherance of the ATM Sales Enterprise, Moore caused Exclusive Properties Group to transmit, by means of an interstate bank wire transfer, the following: $254,382.50 from The Bankers Bank account number 061003415 located in Georgia to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 128.

**Formatted:** Font: Italic, No underline

145.    On August 15, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $695,737.93 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines. *See* Volume XIX, Ex. 129.

**Formatted:** Font: Italic, No underline

146.    On September 27, 2007, in furtherance of the ATM Sales Enterprise, Moore caused ATMFS to transmit, by means of an interstate bank wire transfer, the following: $374,187.25 from Florida Choice Bank account number 063114632 located in Florida to ATMA's account located at Citibank N.A. located in New York, representing Periodic Revenue Payments for the ATMA Machines.

*Interstate Wire Transfers: Residual Revenue Funds*

**Deleted:** *Payments*

**Formatted:** Bullets and Numbering

147.    On January 3, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $21,406.23 from Citibank, N.A. account number 48842629 located in New York to Automated Teller Machine Advantage Ltd's bank account number 977285936 at First American Bank located in Dallas, Texas, representing Residual Revenue Funds allegedly owed 36 Main for the November 16, 2005 Tranche Purchase. *See* Volume XIX, Ex. 130.

**Deleted:** in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer

**Formatted:** Font: Italic, No underline

43

148.   On February 6, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $27,801.71 from Citibank, N.A. account number 48842629 located in New York to ATM Capital's bank account number 977285936 at First American Bank located in Dallas, Texas, representing Residual Revenue Funds allegedly owed 36 Main for the December 20, 2005 Tranche Purchase. *See* Volume XIX, Ex. 131.

149.   On June 1, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $35,560.14 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the April 26, 2006 Tranche Purchase. *See* Volume XIX, Ex. 132.

150.   On July 11, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $38,458.55 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the May 27, 2006 Tranche Purchase. *See* Volume XIX, Ex. 133.

151.   On August 7, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $33,621.17 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the

**Deleted:** in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer

**Formatted:** Font: Italic, No underline

**Deleted:** in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer

**Formatted:** Font: Italic, No underline

**Deleted:** in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer

**Formatted:** Font: Italic, No underline

**Deleted:** in furtherance of the ATM Sales Enterprise scheme by causing ATMA to wire transfer

June 16, 2006 Tranche Purchase and the June 27, 2006 Tranche Purchase. *See* Volume XIX, Ex. 134.

152.    On September 11, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $30,500.33 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the July 28, 2006 Tranche Purchase. *See* Volume XIX, Ex. 135.

153.    On October 13, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $43,911.72 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the August 30, 2006 Tranche Purchase #1, August 30, 2006 Tranche Purchase #2, August 30, 2006 Tranche Purchase #3 and August 30, 2006 Tranche Purchase #4. *See* Volume XIX, Ex. 136.

154.    On November 14, 2006, in furtherance of the ATM Sales Enterprise, Netschi and 36 Main caused ATMA to transmit, by means of an interstate bank wire transfer, the following: $27,389.12 from Citibank, N.A. account number 48842629 located in New York to 36 Main's bank account number 061003415 at The Bankers Bank located in Atlanta, Georgia, representing Residual Revenue Funds allegedly owed 36 Main for the September 26, 2006 Tranche Purchase #1, the September 26, 2006 Tranche Purchase #2, and September 26, 2006 Tranche Purchase #3. *See* Volume XIX, Ex. 137.

45

***Predicate Acts and Evidence Concerning Interstate Telephonic Wire
Communications***

155.    As detailed in Paragraphs 35 and 37, *supra*, on November 14, 2005, in

furtherance of the ATM Sales Enterprise, Moore, while in Florida or North Carolina,

engaged in an interstate telephone conversation with representatives of ATMA in New

York during which he made false representations concerning the operations of ATMFS

and 36 Main.

156.    As detailed in Paragraphs 31 – 34, *supra*, on November 14, 2005, in

furtherance of the ATM Sales Enterprise, Netschi, while in Texas, engaged in an

interstate telephone conversation with representatives of ATMA in New York during

which he made false representations concerning the operations of ATMFS and 36 Main.

***Predicate Acts and Evidence Concerning Interstate Wire Communications***

157.    On November 14, 2005, at 3:18 p.m., in furtherance of the ATM Sales

Enterprise, ATM Capital, at the direction of Netschi, knowingly transmitted and caused

to be transmitted by wire communication in interstate commerce the following writing:

an e-mail from ATM Capital in Texas to a representative of ATMA in New York, Munier

in New Jersey and Brossman in New Jersey, attaching a schedule of phantom Placed

ATMs and an undated Equipment Management Agreement, each constituting false

information related to the existence of Placed ATMs available for sale and management.

*See* Volume I, Ex. 1.

158.    On November 14, 2005, at 3:19 p.m., in furtherance of the ATM Sales

Enterprise, at the direction of Netschi, knowingly transmitted and caused to be

transmitted by wire communication in interstate commerce the following writing: an e-

mail from ATM Capital in Texas to a representative of ATMA in New York, attaching a

46

---

**Deleted:** 34

**Deleted:** 36

**Formatted:** Bullets and Numbering

**Deleted:** and to induce the Plaintiff Trusts to invest funds in the ATM Venture

**Deleted:** the Plaintiff Trusts

**Deleted:** 30 – 33

**Deleted:** and to induce the Plaintiff Trusts to invest funds in the ATM Venture

**Deleted:** the Plaintiff Trusts

**Formatted:** Bullets and Numbering

**Deleted:** and to induce the Plaintiff Trusts to invest funds in the ATM Venture

**Deleted:** the Plaintiff Trusts

**Formatted:** Font: Italic, No underline

**Deleted:** and to induce the Plaintiff Trusts to invest funds in the ATM Venture, ATM Capital

**Deleted:** the Plaintiff Trusts

Bill of Sale dated November 16, 2005, an Asset Purchase Agreement dated November 16, 2005, and a schedule of phantom Placed ATMs, each constituting false information related to the existence of Placed ATMs available for sale and management. *See* Volume I, Ex. 2.

> **Formatted:** Font: Italic, No underline

159.    On November 14, 2005, at 4:17 p.m., in furtherance of the ATM Sales Enterprise, ATM Capital, at the direction of Netschi, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from ATM Capital in Texas to representatives of ATMA in New York, Munier in New Jersey, and Brossman in New Jersey, attaching an undated Equipment Management Agreement, constituting false information related to the existence of Placed ATMs available for sale and management. *See* Volume I, Ex. 3.

> **Deleted:** and to induce the Plaintiff Trusts to invest funds in the ATM Venture

> **Deleted:** a representative

> **Deleted:** the Plaintiff Trusts

> **Deleted:** and Bernard Bushnell, a potential investor in ATMA, in New York,

> **Formatted:** Font: Italic, No underline

160.    On November 30, 2005, at 9:00 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to ATM Capital in Texas, Brossman in New Jersey and Marianne Munier with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 138.

> **Deleted:** the Plaintiff Trusts

> **Deleted:** invest funds in the ATM Venture

> **Formatted:** Font: Italic, No underline

161.    On December 29, 2005, at 7:52 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 138 – Ex. 141.

> **Deleted:** the Plaintiff Trusts

> **Deleted:** invest funds in the ATM Venture

> **Formatted:** Font: Italic, No underline

47

Exhibit C

(Part 2 of 3)

162.    On January 5, 2006, at 12:15 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 142.

163.    On February 2, 2006, at 9:00 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 143 – Ex. 145.

164.    On February 6, 2006, at 2:38 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 146.

165.    On March 7, 2006, at 10:11 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a

**Deleted:** the Plaintiff Trusts

**Deleted:** invest funds in the ATM Venture

**Formatted:** Font: Italic, No underline

**Deleted:** the Plaintiff Trusts

**Deleted:** invest funds in the ATM Venture

**Formatted:** Font: Italic, No underline

**Deleted:** the Plaintiff Trusts

**Deleted:** invest funds

**Formatted:** Bullets and Numbering

**Deleted:** Venture

48

representative of ATMA in New York with an attached Fictitious Revenue Report. *See* Volume XIX, Ex. 147.

166.   On April 27, 2006, at 1:21 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false representations as to ATMFS's possession of $200,000,000.00 in capital funds held in escrow by ATMFS for the expansion of ATMFS's business. *See* Volume XIX, Ex. 148.

167.   On May 2, 2006, at 11:43 a.m., in furtherance of the ATM Sales Enterprise and ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to Brossman in New Jersey and a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 149.

168.   On May 4, 2006, at 1:49 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 150.

169.   On May 31, 2006, at 9:43 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore,

49

**Deleted:** the Plaintiff Trusts in New York with an attached Fictitious Monthly Report. See Volume XIX, Ex. 146. ¶ On March 7, 2006, at 10:11 p.m., in furtherance of the ATM Sales Enterprise and to further induce the Plaintiff Trusts to continue to invest funds in the ATM Venture, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of the Plaintiff Trusts

**Formatted:** Font: Italic, No underline

**Deleted:** the Plaintiff Trusts

**Deleted:** invest funds in the ATM Venture

**Deleted:** the Plaintiff Trusts

**Formatted:** Font: Italic, No underline

**Deleted:** to further induce the Plaintiff Trusts

**Deleted:** invest funds in the ATM Venture

**Deleted:** A

**Formatted:** Font: Italic, No underline

**Deleted:** the Plaintiff Trusts

**Deleted:** invest funds in the ATM Venture

**Deleted:** the Plaintiff Trusts

**Formatted:** Font: Italic, No underline

**Deleted:** the Plaintiff Trusts

**Deleted:** invest funds in the ATM Venture

knowingly transmitted and caused to be transmitted by wire communication in interstate

commerce the following writing: an e-mail from Moore in Florida or North Carolina to

ATM Capital in Texas and Brossman in New Jersey with an attached Fictitious Monthly

Report. *See* Volume XIX, Ex. 151.

> **Formatted:** Font: Italic, No underline

170.    On May 31, 2006, at 11:13 a.m., in furtherance of the ATM Sales Enterprise

and to further induce ATMA to continue to purchase phantom Placed ATMs, Brossman,

> **Deleted:** the Plaintiff Trusts
>
> **Deleted:** invest funds in the ATM Venture

knowingly transmitted and caused to be transmitted by wire communication in interstate

commerce the following writing: an e-mail from Brossman in New Jersey to a

representative of ATMA in New York with an attached Fictitious Monthly Report. *See*

> **Formatted:** Font: Italic, No underline

Volume XIX, Ex. 151.

171.    On July 3, 2006, at 2:34 p.m., in furtherance of the ATM Sales Enterprise and

to further induce ATMA to continue to purchase phantom Placed ATMs, Moore,

> **Deleted:** the Plaintiff Trusts to invest funds in the ATM Venture

knowingly transmitted and caused to be transmitted by wire communication in interstate

commerce the following writing: an e-mail from Moore in Florida or North Carolina,

Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly

Report. *See* Volume XIX, Ex. 152.

> **Formatted:** Font: Italic, No underline

172.    On July 3, 2006, at 4:34 p.m., in furtherance of the ATM Sales Enterprise and

to further induce ATMA to continue to purchase phantom Placed ATMs, Brossman,

> **Deleted:** the Plaintiff Trusts
>
> **Deleted:** invest funds in the ATM Venture

knowingly transmitted and caused to be transmitted by wire communication in interstate

commerce the following writing: an e-mail from Brossman in New Jersey to a

representative of ATMA in New York with an attached Fictitious Monthly Report *See*

> **Deleted:** the Plaintiff Trusts
>
> **Formatted:** Font: Italic, No underline

Volume XIX, Ex. 152.

50

173.    On July 4, 2006, at 10:55 a.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false representations as to the operation of, and potential upgrades to, the ATMA Machines. *See* Volume XIX, Ex. 153.

174.    On July 26, 2006, at 2:31 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false information related to the operation of the ATMA Machines. *See* Volume XIX, Ex. 154.

175.    On July 26, 2006, at 2:53 p.m., in furtherance of the ATM Sales Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false information related to operation of the ATMA Machines. *See* Volume XIX, Ex. 155.

176.    On July 31, 2006, at 3:26 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 156 – Ex. 158.

51

177.    On August 2, 2006, at 5:28 p.m., in furtherance of the ATM Sales Enterprise

and to further induce ATMA to continue to purchase phantom Placed ATMs, Munier,

knowingly transmitted and caused to be transmitted by wire communication in interstate

commerce the following writing: an e-mail from Munier in New Jersey to a

representative of ATMA in New York and Brossman in New Jersey with an attached

Fictitious Monthly Report. *See* Volume XIX, Ex. 159.

178.    On September 12, 2006, at 10:21 a.m., in furtherance of the ATM Sales

Enterprise and to further induce ATMA to continue to purchase phantom Placed ATMs,

Munier, knowingly transmitted and caused to be transmitted by wire communication in

interstate commerce the following writing: an e-mail from Munier in New Jersey to a

representative of ATMA in New York with an attached Fictitious Monthly Report. *See*

Volume XIX, Ex. 160.

179.    On October 6, 2006, at 11:26 a.m., in furtherance of the ATM Sales

Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Moore in

Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an

attached Fictitious Monthly Report. *See* Volume XIX, Ex. 161 – Ex. 162.

180.    On October 30, 2006, at 11:04 a.m., in furtherance of the ATM Sales

Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Moore in

Florida or North Carolina to a representative of ATMA in New York containing a false

"ATM Detail Transaction Report." *See* Volume XIX, Ex. 163.

**Deleted:** the Plaintiff Trusts

**Deleted:** invest funds in the ATM Venture

**Deleted:** the Plaintiff Trusts

**Formatted:** Font: Italic, No underline

**Deleted:** the Plaintiff Trusts

**Deleted:** invest funds in the ATM Venture

**Deleted:** the Plaintiff Trusts

**Formatted:** Font: Italic, No underline

**Formatted:** Font: Italic, No underline

**Deleted:** the Plaintiff Trusts

**Formatted:** Font: Italic, No underline

181.   On November 14, 2006, at 11:55 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 164.

**Deleted:** the Plaintiff Trusts

**Formatted:** Font: Italic, No underline

182.   On January 19, 2007, at 2:42 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 165 – Ex. 167.

**Formatted:** Font: Italic, No underline

183.   On January 22, 2007, at 11:03 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 168.

**Deleted:** the Plaintiff Trusts

**Formatted:** Font: Italic, No underline

184.   On February 26, 2007, at 10:43 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 169.

**Deleted:** the Plaintiff Trusts

**Formatted:** Font: Italic, No underline

185.   On April 11, 2007, at 10:49 a.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a

representative of ATMA in New York and Brossman in New Jersey with an attached

Fictitious Monthly Report. *See* Volume XX, Ex. 170.

186.    On April 12, 2007, at 8:38 a.m., in furtherance of the ATM Sales Enterprise,

Moore, knowingly transmitted and caused to be transmitted by wire communication in

interstate commerce the following writing: an e-mail from Moore in Florida or North

Carolina to a representative of ATMA in New York and Brossman in New Jersey

containing false information related to the operation of the ATMA Machines. *See*

Volume XX, Ex. 171.

187.    On April 30, 2007, at 9:17 a.m., in furtherance of the ATM Sales Enterprise,

Moore, knowingly transmitted and caused to be transmitted by wire communication in

interstate commerce the following writing: an e-mail from Moore in Florida or North

Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached

Fictitious Monthly Report. *See* Volume XX, Ex. 172 – Ex. 174.

188.    On April 30, 2007, at 3:49 p.m., in furtherance of the ATM Sales Enterprise,

Munier, knowingly transmitted and caused to be transmitted by wire communication in

interstate commerce the following writing: an e-mail from Munier in New Jersey to a

representative of ATMA in New York and Brossman in New Jersey with an attached

Fictitious Monthly Report. *See* Volume XX, Ex. 175.

189.    On June 6, 2007, at 11:33 a.m., in furtherance of the ATM Sales Enterprise,

Munier, knowingly transmitted and caused to be transmitted by wire communication in

interstate commerce the following writing: an e-mail from Munier in New Jersey to a

representative of ATMA in New York and Brossman in New Jersey with an attached

Fictitious Monthly Report *See* Volume XX, Ex. 176.

54

*Deleted: the Plaintiff Trusts*

*Formatted: Font: Italic, No underline*

190.    On July 12, 2007, at 3:20 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 177 – Ex.179.

> **Formatted:** Font: Italic, No underline

191.    On July 12, 2007, at 11:56 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 180.

> **Deleted:** the Plaintiff Trusts

> **Formatted:** Font: Italic, No underline

192.    On August 15, 2007, at 7:58 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 181 – Ex. 182.

> **Formatted:** Font: Italic, No underline

193.    On August 15, 2007, at 1:40 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 183.

> **Deleted:** the Plaintiff Trusts

> **Formatted:** Font: Italic, No underline

194.    On September 18, 2007, at 10:34 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in

55

New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 184.

195.    On November 5, 2007, at 2:33 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman in New Jersey and ATM Capital in Texas with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 185 – Ex. 186.

196.    On November 5, 2007, at 11:52 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York and Brossman in New Jersey with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 187.

197.    On January 10, 2008, at 2:38 p.m., in furtherance of the ATM Sales Enterprise, Munier, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Munier in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 188.

198.    On January 10, 2008, at 3:20 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York, attaching a report from a third-party processor, constituting false information related to the existence of ATMA Machines. *See* Volume XIX, Ex. 90.

Deleted: the Plaintiff Trusts

Formatted: Font: Italic, No underline

Formatted: Font: Italic, No underline

Deleted: Plaintiff Trust

Formatted: Font: Italic, No underline

Deleted: the Plaintiff Trusts

Formatted: Font: Italic, No underline

Deleted: the Plaintiff Trusts

Formatted: Font: Italic, No underline

Formatted: No underline

199.    On January 11, 2008, at 11:49 a.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York, attaching a report from a ATMFS, constituting false information related to the existence of ATMA Machines. *See* Volume XIX, Ex. 92.

> **Deleted:** the Plaintiff Trusts

> **Formatted:** Font: Italic, No underline

> **Formatted:** No underline

200.    On January 11, 2008, at 12:34 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing false representations that requests had been submitted to third-party processors for reports pertaining to the operation of the ATMA Machines. *See* Volume XIX, Ex. 94.

> **Deleted:** the Plaintiff Trusts

> **Formatted:** Font: Italic, No underline

> **Formatted:** No underline

201.    On January 11, 2008, at 2:14 p.m., in furtherance of the ATM Sales Enterprise, Moore, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York containing a false representation that a bank account existed where ATMA Periodic Revenue Payments were being held and that a statement from that account would be produced to a representative of ATMA. *See* Volume XIX, Ex. 94.

> **Deleted:** the Plaintiff Trusts

> **Deleted:** the Plaintiff Trusts.

> **Formatted:** Font: Italic, No underline

202.    On January 11, 2008, at 3:19 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to a representative of ATMA in New York, attaching a

> **Deleted:** the Plaintiff Trusts

purported bank statement dated December 31, 2007, constituting false information related to the amount of funds being held in escrow on behalf of ATMA. *See* Volume XIX, Ex. 95.

203. On January 11, 2008, at 7:18 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA containing a misrepresentation that 250 of the ATMA Machines had been identified. *See* Volume XIX, Ex. 93.

204. On January 18, 2008, at 5:47 p.m., in furtherance of the ATM Sales Enterprise, Moore knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Moore in Florida or North Carolina to Brossman attaching a purported schedule identifying the locations of the ATMA Machines, constituting false information related to the existence and location of the ATMA Machines. *See* Volume XX, Ex. 189.

205. On January 20, 2008, at 12:30 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York containing a misrepresentation that Brossman had accounted for the existence of the ATMA Machines. *See* Volume XIX, Ex. 97.

206. On January 20, 2008, at 9:05 p.m., in furtherance of the ATM Sales Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman

58

in New Jersey to a representative of ATMA in New York containing a false

representation as to the existence of ATMs owned by Brossman. *See* Volume XX, Ex.

190.

207.   On January 22, 2008, at 1:23 p.m., in furtherance of the ATM Sales

Enterprise, Brossman knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York, attaching a schedule

identifying the locations of the ATMA Machines, constituting false information related to

the existence and location of the ATMA Machines. *See* Volume XX, Ex. 189.

208.   On January 22, 2008, at 2:32 p.m., in furtherance of the ATM Sales

Enterprise, Moore knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Moore in

North Carolina or Florida to a representative of ATMA in New York, containing a false

representation as to the existence and locations of the ATMA Machines. *See* Volume

XIX, Ex. 98.

209.   On January 31, 2008, at 3:51 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious

Monthly Report. *See* Volume XIX, Ex. 138.

210.   On January 31, 2008, at 3:58 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

59

**Deleted:** the Plaintiff Trusts

**Formatted:** Font: Italic, No underline

**Deleted:** the Plaintiff Trusts

**Formatted:** Font: Italic, No underline

**Deleted:** the Plaintiff Trusts

**Formatted:** Font: Italic, No underline

**Deleted:** Plaintiff Trusts

**Formatted:** Font: Italic, No underline

in New Jersey to a representative of ATMA in New York with an attached Fictitious

Monthly Report. *See* Volume XIX, Ex. 139.

211.    On January 31, 2008, at 3:59 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious

Monthly Report. *See* Volume XIX, Ex. 140.

212.    On January 31, 2008, at 4:00 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious

Monthly Report. *See* Volume XIX, Ex. 143.

213.    On January 31, 2008, at 4:01 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious

Monthly Report. *See* Volume XIX, Ex. 144.

214.    On January 31, 2008, at 4:05 p.m., in furtherance of the ATM Sales

Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire

communication in interstate commerce the following writing: an e-mail from Brossman

in New Jersey to a representative of ATMA in New York with an attached Fictitious

Monthly Report. *See* Volume XIX, Ex. 156.

Deleted: Plaintiff Trusts

Formatted: Font: Italic, No underline

Deleted: Plaintiff Trusts

Formatted: Font: Italic, No underline

Deleted: Plaintiff Trusts

Formatted: Font: Italic, No underline

Deleted: Plaintiff Trusts

Formatted: Font: Italic, No underline

Deleted: Plaintiff Trusts

Formatted: Font: Italic, No underline

215.    On January 31, 2008, at 4:06 p.m., in furtherance of the ATM Sales
Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire
communication in interstate commerce the following writing: an e-mail from Brossman
in New Jersey to a representative of ATMA in New York with an attached Fictitious
Monthly Report. *See* Volume XIX, Ex. 157.

216.    On January 31, 2008, at 4:09 p.m., in furtherance of the ATM Sales
Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire
communication in interstate commerce the following writing: an e-mail from Brossman
in New Jersey to a representative of ATMA in New York with an attached Fictitious
Monthly Report. *See* Volume XIX, Ex. 161.

217.    On January 31, 2008, at 4:10 p.m., in furtherance of the ATM Sales
Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire
communication in interstate commerce the following writing: an e-mail from Brossman
in New Jersey to a representative of ATMA in New York with an attached Fictitious
Monthly Report. *See* Volume XIX, Ex. 165.

218.    On January 31, 2008, at 4:12 p.m., in furtherance of the ATM Sales
Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire
communication in interstate commerce the following writing: an e-mail from Brossman
in New Jersey to a representative of ATMA in New York with an attached Fictitious
Monthly Report. *See* Volume XX, Ex. 172 – Ex. 173.

219.    On January 31, 2008, at 4:20 p.m., in furtherance of the ATM Sales
Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire
communication in interstate commerce the following writing: an e-mail from Brossman

| Deleted: Plaintiff Trusts |
| Formatted: Font: Italic, No underline |

61

in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 141.

220. On January 31, 2008, at 4:24 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 158.

221. On January 31, 2008, at 4:26 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XIX, Ex. 162.

222. On January 31, 2008, at 4:30 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 174.

223. On January 31, 2008, at 4:31 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 179, Ex. 181.

Deleted: Plaintiff Trusts

Formatted: Font: Italic, No underline

Deleted: Plaintiff Trusts

Formatted: Font: Italic, No underline

Deleted: Plaintiff Trusts

Formatted: Font: Italic, No underline

Deleted: Plaintiff Trusts

Formatted: Font: Italic, No underline

Deleted: Plaintiff Trusts

Formatted: Font: Italic, No underline

62

224.   On January 31, 2008, at 4:32 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Exs. 182 and 186.

225.   On January 31, 2008, at 5:03 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 191 – Ex. 192.

226.   On January 31, 2008, at 5:19 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 191.

227.   On January 31, 2008, at 5:20 p.m., in furtherance of the ATM Sales Enterprise, Brossman, knowingly transmitted and caused to be transmitted by wire communication in interstate commerce the following writing: an e-mail from Brossman in New Jersey to a representative of ATMA in New York with an attached Fictitious Monthly Report. *See* Volume XX, Ex. 192.

**Violations of 18 U.S.C. § 1341 (Mail Fraud)**

228.   The predicate acts, and evidence of the schemes constituting the pattern of racketeering, further include, but are not limited to interstate mailings containing false or

63

fraudulent pretenses, representations, or promises made in furtherance of the ATM Sales

Enterprise caused to be transmitted by the Defendants, in violation of 18 U.S.C. § 1341.

### *Interstate Mailings*

229. Upon information and belief, on or about November 15, 2005, in furtherance

of the ATM Sales Enterprise and to induce ATMA to purchase phantom Placed ATMs,

Moore, knowingly placed or caused to be placed in a post office or authorized depository

for the Postal Service in Florida or North Carolina or with a private, commercial

interstate carrier in Florida or North Carolina, for delivery to Brossman in New Jersey,

the following Fictitious Transaction Documents: a Lease Assignment dated November

15, 2005; a Due Diligence Report and Placed ATM Leases for each of the 100 ATMs;

and an Equipment Management Agreement dated November 15, 2005.

230. Upon information and belief, on or about December 20, 2005, in furtherance

of the ATM Sales Enterprise to induce ATMA to continue to purchase phantom Placed

ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized

depository for the Postal Service in Florida or North Carolina or with a private,

commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in

New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated

December 20, 2005; a Due Diligence Report and Placed ATM Leases for each of the 100

ATMs; and, an Equipment Management Agreement dated December 20, 2005.

231. Upon information and belief, on or about February 22, 2006, in furtherance of

the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed

ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized

64

---

**Formatted:** Bullets and Numbering

**Deleted:** the Plaintiff Trusts to invest funds in the ATM Venture

**Deleted:** and

**Deleted:** further

**Deleted:** the Plaintiff Trusts

**Deleted:** further invest funds in the ATM Venture

**Deleted:** further

**Deleted:** the Plaintiff Trusts to further invest funds in the ATM Venture

depository for the Postal Service in Florida or North Carolina or with a private,

commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in

New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated

February 22, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100

ATMs; and, an Equipment Management Agreement dated February 22, 2006.

232.    Upon information and belief, on or about April 26, 2006, in furtherance of the

ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed

ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized

depository for the Postal Service in Florida or North Carolina or with a private,

commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in

New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated

April 26, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100

ATMs; an Equipment Management Agreement dated April 26, 2006.

233.    Upon information and belief, on or about May 27, 2006, in furtherance of the

ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed

ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized

depository for the Postal Service in Florida or North Carolina or with a private,

commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in

New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated

May 23, 2006; a Due Diligence Report and Placed ATM Leases for each of the 100

ATMs; and, an Equipment Management Agreement dated May 23, 2006.

234.    Upon information and belief, on or about August 30, 2006, in furtherance of

the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed

| Deleted: further |
|---|
| **Deleted:** the Plaintiff Trusts to further invest funds in the ATM Venture |

| Deleted: further |
|---|
| **Deleted:** the Plaintiff Trusts to further invest funds in the ATM Venture |

| **Deleted:** further induce the Plaintiff Trusts to further invest funds in the ATM Venture |
|---|

65

ATMs, Moore, knowingly placed or caused to be placed in a post office or authorized

depository for the Postal Service in Florida or North Carolina or with a private,

commercial interstate carrier in Florida or North Carolina, for delivery to Brossman in

New Jersey, the following Fictitious Transaction Documents: a Lease Assignment dated

September 5, 2006; a Due Diligence Report and Placed ATM Leases for each of the 127

ATMs; and an Equipment Management Agreement dated September 5, 2006.

235.    Upon information and belief, on or about November 15, 2005, in furtherance

of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom

Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a

post office or authorized depository for the Postal Service in Texas or with a private,

commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the

following Fictitious Transaction Documents: a Bill of Sale dated November 16, 2005,

Asset Purchase Agreement dated November 16, 2005, and Due Diligence Commitment

dated November 16, 2005.

236.    Upon information and belief, on or about December 20, 2005, in furtherance

of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom

Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a

post office or authorized depository for the Postal Service in Texas or with a private,

commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the

following Fictitious Transaction Documents: a Bill of Sale dated December 20, 2005,

Asset Purchase Agreement dated December 20, 2005, and Addition to Equipment dated

December 20, 2005.

| Deleted: the Plaintiff Trusts to invest funds in the ATM Venture |

| Deleted: further |
| Deleted: the Plaintiff Trusts to invest funds in the ATM Venture |

66

237.    Upon information and belief, on or about February 22, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated February 22, 2006, Asset Purchase Agreement dated February 22, 2006, and Addition to Equipment dated December 20, 2005.

238.    Upon information and belief, on or about April 26, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated April 26, 2006, Asset Purchase Agreement dated April 26, 2006, and Addition to Equipment dated April 26, 2006.

239.    Upon information and belief, on or about May 27, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated May 27, 2006, and Asset Purchase Agreement dated May 27, 2006.

**Deleted:** further

**Deleted:** the Plaintiff Trusts to invest funds in the ATM Venture

**Deleted:** further

**Deleted:** the Plaintiff Trusts to invest funds in the ATM Venture

**Deleted:** further induce the Plaintiff Trusts to invest funds in the ATM Venture

67

240.   Upon information and belief, on or about June 16, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated June 16, 2006, and Asset Purchase Agreement dated June 16, 2006.

241.   Upon information and belief, on or about June 27, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated June 27, 2006, and Asset Purchase Agreement dated June 27, 2006.

242.   Upon information and belief, on or about July 28, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post office or authorized depository for the Postal Service in Texas or with a private, commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the following Fictitious Transaction Documents: a Bill of Sale dated July 28, 2006, and Asset Purchase Agreement dated July 28, 2006.

243.   Upon information and belief, on or about August 30, 2006, in furtherance of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom Placed

**Deleted:** further

**Deleted:** the Plaintiff Trusts to invest funds in the ATM Venture

**Deleted:** further induce the Plaintiff Trusts to invest funds in the ATM Venture

**Deleted:** further

**Deleted:** the Plaintiff Trusts to invest funds in the ATM Venture

**Deleted:** further

**Deleted:** the Plaintiff Trusts to invest funds in the ATM Venture

68

ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a post

office or authorized depository for the Postal Service in Texas or with a private,

commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the

following Fictitious Transaction Documents: four Bills of Sale dated August 30, 2006,

and four Asset Purchase Agreements dated August 30, 2006.

244.    Upon information and belief, on or about September 26, 2006, in furtherance

of the ATM Sales Enterprise and to induce ATMA to continue to purchase phantom

Placed ATMs, 36 Main, Netschi, and Jones, knowingly placed or caused to be placed in a

post office or authorized depository for the Postal Service in Texas or with a private,

commercial interstate carrier in Texas, for delivery to Brossman in New Jersey, the

following Fictitious Transaction Documents: three Bills of Sale dated September 26,

2006, and three Asset Purchase Agreements dated September 26, 2006.

245.    The allegations in Paragraphs 229 - 244 are likely to have evidentiary support

after a reasonable opportunity for investigation and discovery. The allegations in

Paragraphs 229 - 244 are based in part upon information and belief because the

Defendants are alleged to have sent or delivered the documents identified in Paragraphs

229 - 244 above amongst themselves.

246.    As a direct and proximate result of Netschi, 36 Main, Jones, Moore, Exclusive

Properties, ATM Capital, Munier, and Brossman's conduct of the ATM Sales Enterprise

through the pattern of racketeering activity detailed in Paragraphs 114 – 244 above,

Plaintiff has been injured in its business and property, specifically the loss of

$16,475,000.00 paid to purchase the phantom ATMA Machines. Netschi, 36 Main,

Jones, Moore, Exclusive Properties ATM Capital, Munier, and Brossman's conduct and

participation in the ATM Sales Enterprise as part of their pattern of racketeering activity

was in the violation of 18 U.S.C. § 1962(c) and caused Plaintiff's losses.  Accordingly,

Plaintiff is entitled, under the provisions of 18 U.S.C. § 1964(c), to recover treble

damages, the costs of bringing this action, pre-judgment interest, and reasonable

attorney's fees.

## COUNT 2
### (Civil Racketeering Violations – All Defendants)
### (18 U.S.C. § 1962(d))

247.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 246 of this Complaint as if fully set forth herein.

248.    The Defendants, as detailed in Paragraphs 26 – 72, 81 and 91 – 104 above,

entered into an agreement with each other to engage in a conspiracy to violate 18 U.S.C.

§ 1962(c).  As set forth Each Defendant entered into an agreement to join the conspiracy,

took acts in the furtherance of the conspiracy and knowingly participated in the

conspiracy.

249.    The purpose of the conspiracy was to induce the Plaintiff, and others, to enter

into agreements to purchase phantom Placed ATMs to their economic detriment and to

the economic benefit of the Defendants.  The conspirators each carried out the scheme

and each conspirator was put on notice of the general nature of the conspiracy, that the

conspiracy extended beyond the individual role of any single member, and that the

conspiratorial venture, the ATM Sales Enterprise, functioned as a continuing unit for a

common purpose.  The Defendants, as conspirators, adopted the goal of furthering the

ATM Sales Enterprise.  Each of the Defendants' stake in the ATM Sales Enterprise was

in making profits through each Defendant's role in the ATM Sales Enterprise.

70

Deleted: Plaintiffs'

Deleted: Plaintiffs are

Deleted: Plaintiffs repeat

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

Deleted: allege

Deleted: 239

Deleted: 65, 74

Deleted: 84 – 97

Deleted: investors, including Plaintiffs

250.    The Defendants agreed and conspired to violate 18 U.S.C. § 1962(c) by: (1) participating or causing the acquisition or maintenance of, through a pattern of racketeering activity, an interest or control in the ATM Sales Enterprise, the activities of which affect interstate or foreign commerce; and, (2) participating, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the commission of two or more racketeering acts constituting such a pattern.

251.    By engaging in the overt acts and other conduct described in Paragraphs 26 – 65 and 84 – 97 above, Defendants have agreed to conspire and did so conspire in violation of 18 U.S.C. § 1962(d), to engage in illegal predicate acts, detailed in Paragraphs 106 - 237 above, which formed a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5) and otherwise agreed to violate 18 U.S.C. § 1962(c).

252.    The Defendants participated in and cooperated with each other in the aforementioned conspiracy that enabled Defendants to engage in the fraudulent sale of ATMs and thereby amass substantial sums of money, believed to be tens of millions of dollars, from persons throughout the United States of America, including Plaintiff.

| Deleted: investors |
| Deleted: s who reside and conduct business in the Southern District of New York |

253.    The membership of the conspiracy includes each of the Defendants. As coconspirators, the Defendants are liable for all of the actions committed by all of the coconspirators within the conspiracy and are liable for all of the damages sustained by Plaintiff that were caused by any members of the conspiracy, regardless of whether the

| Deleted: s |

Defendants were themselves directly involved in a particular aspect of the ATM Sales Enterprise.

71

254.    As a direct and proximate result of the violations set forth above, Plaintiff has

been injured in its business and property. The Defendants' violations of 18 U.S.C. §

1962(d) were the proximate cause of these losses.  Under the provisions of 18 U.S.C. §

1962(c), Plaintiff is entitled to bring this action and recover herein treble damages, the

cost of bringing this suit, pre-judgment interest, and recoverable attorney's fees.

### COUNT 3
### (Fraudulent Misrepresentation, Inducement – Moore)

255.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 254 of this Complaint as if fully set forth herein.

256.    The representations by Moore, as detailed above at Paragraphs 35, 37, 52, 53,

59, 61 – 64, 66, 68 – 70, 72, 95, 98, 100, 160 - 161, 163, 169, 171, 176, 179, 182, 187,

190, 192, and 195 were material false representations made to Plaintiff that Moore knew

were false, or were made recklessly without regard to their truth, with an intent to defraud

Plaintiff and Plaintiff justifiably relied on Moore's materially false representations.

257.    Moore, as detailed above at Paragraphs 35, 37, 52, 53, 59, 61 – 64, 66, 68 –

70, 72, 95, 98, 100, 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195 made

false misrepresentations to Plaintiff of facts that were material to Plaintiff's decision to

enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA

Machines, and engage the management services of Moore's ISO company, ATMFS, to

manage the ATMA Machines.

258.    Moore knew or should have known of: the falsity of the verbal and written

representations made to Plaintiff; the incompleteness of the representations made to

Plaintiff at the time they were made; and, that the representations made to Plaintiff

omitted material facts.

72

259.    Moore's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 35, 37, 52, 53, 59, 61 – 64, 66, 68 – 70, 72, 95, 98, 100, 160 - 161, 163, 169, 171, 176, 179, 182, 187, 190, 192, and 195 were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom Placed ATMs from 36 Main, to transfer funds to 36 Main for those phantom Placed ATMs, and to engage the services of ATMFS, through Moore, to manage the ATMA Machines. Moore intentionally or recklessly attempted to hide such fraud by delivering the Moore Fictitious Transaction Documents, Fictitious Monthly Reports, and Periodic Revenue Payments to Plaintiff.

260.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Moore's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines, and conduct business with the ATM Sales Enterprise.

261.    In addition, for Tranche Purchases subsequent to the November 15, 2005 Tranche Purchase, Plaintiff justifiably relied upon and were further induced into continuing to purchase the phantom Placed ATMs by Moore's delivery of Fictitious Monthly Reports and Periodic Revenue Payments.

262.    But for Moore's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

73

---

Deleted: 34, 36

Deleted: 54, 56 – 57

Deleted: 63, 65, 88, 91, 93, 159, 166 - 168, 173

Deleted: 191 - 195

Deleted: 197 - 201,

Deleted: s

Deleted: "

Deleted: "

Deleted: "

Deleted: "

Deleted: s

Deleted: s

Deleted: s

Deleted: "

Deleted: "

Deleted: s

263.    Moore had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

264.    As a direct and proximate result of the Moore's intentional misrepresentations, omissions, and concealment of material facts, Plaintiff has been damaged to the extent that it has lost the value of all principal amounts delivered to 36 Main, plus all applicable interest thereon.

265.    Moore's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiff. Plaintiff is therefore entitled to the award of punitive damages from Moore.

**COUNT 4**
**(Fraudulent Misrepresentation and Inducement – Netschi)**

266.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 265 of this Complaint as if fully set forth herein.

267.    The representations by Netschi, as detailed above at Paragraphs 31 – 34, 36, 46, 81, 94, and 103, were material false representations made to Plaintiff that Netschi knew were false, or were made recklessly without regard to their truth, with an intent to defraud Plaintiff, and Plaintiff reasonably relied on Netschi's materially false representations.

268.    Netschi, as detailed above at Paragraphs 31 – 34, 36, 46, 81, 94, and 103, made false misrepresentations to Plaintiff of facts that were material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

74

269.    Netschi knew or should have known of: the falsity of the verbal and written representations made to Plaintiff; the incompleteness of the representations made to Plaintiff at the time they were made; and, that the representations made to Plaintiff omitted material facts.

270.    Netschi's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 31 – 34, 36, 46, 81, 94, and 103, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom ATMs from 36 Main, to transfer funds to 36 Main for those phantom ATMs, and to engage the services of ATMFS, through Moore, to manage the ATMA Machines. Netschi intentionally or recklessly attempted to hide such fraud by delivering or causing to be delivered the 36 Main Transaction Documents.

271.    Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Netschi's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

272.    But for Netschi's material misrepresentations, omissions, and concealment of facts concerning the 36 Main Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

273.    Netschi had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

Deleted: s

Deleted: s

Deleted: s

Deleted: 30 – 33, 35, 41, 74, 87

Deleted: 96

Deleted: s

Deleted: "

Deleted: "

Deleted: "

Deleted: "

Deleted: s

Deleted: s

Deleted: s

274.    As a direct and proximate result of the Netschi's intentional

misrepresentations, omissions, and concealment of material facts, Plaintiff has been

damaged to the extent that it has lost the value of all principal amounts delivered to 36

Main, plus all applicable interest thereon.

275.    Netschi's conduct was knowing, intentional, engaged in with malice,

demonstrated a complete lack of care, and was made with a conscious disregard for the

rights of Plaintiff. Plaintiff is therefore entitled to the award of punitive damages from

Netschi.

## COUNT 5
## (Fraudulent Misrepresentation, Inducement, Concealment – Brossman)

276.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 275 of this Complaint as if fully set forth herein.

277.    The representations by Brossman, as detailed above at Paragraphs 30, 34, 35,

44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, were material false

representations made to Plaintiff that Brossman knew were false, or were made recklessly

without regard to their truth, with an intent to defraud Plaintiff and Plaintiff reasonably

relied on Brossman's materially false representations.

278.    Brossman, as detailed above at Paragraphs 30, 34, 35, 44, 60, 65, 67, 71, 96 –

97, 99, 102, 104, 203, 205 - 207, 209 - 227, made false misrepresentations to Plaintiff of

facts that were material to Plaintiff's decision to enter the ATM Venture, deliver funds to

36 Main for the purchase of the ATMA Machines, and engage the management services

of Moore's ISO company, ATMFS, to manage the ATMA Machines.

279.    Brossman knew or should have known of: the falsity of the verbal and written

representations made to Plaintiff, the incompleteness of the representations made to

76

**Deleted:** Plaintiffs have

**Deleted:** invested with and through

**Deleted:** s. Plaintiffs are

**Deleted:** Plaintiffs repeat

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

**Deleted:** allege

**Deleted:** 268

**Deleted:** 33, 53, 58

**Deleted:** 64, 89 – 90, 92, 95,

**Deleted:** 196, 198 - 200, 202 - 220

**Deleted:** s

**Deleted:** s

**Deleted:** s

**Deleted:** 33, 53, 58

**Deleted:** 64, 89 – 90, 92, 95,

**Deleted:** 196, 198 - 200, 202 - 220

**Deleted:** s

**Deleted:** Plaintiffs'

**Deleted:** s

Plaintiff at the time they were made; and, that the representations made to Plaintiff omitted material facts.

280.   Brossman's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 30, 34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 - 207, 209 - 227, were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom ATMs from 36 Main, to transfer funds to 36 Main for those phantom ATMs, and to engage the services of ATMFS, through Brossman, to manage the ATMA Machines. Brossman intentionally or recklessly attempted to hide such fraud by delivering the Fictitious Transaction Documents and/or Fictitious Monthly Reports to Plaintiff.

281.   Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Brossman's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

282.   But for Brossman's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

283.   Brossman had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

**Deleted:** s
**Deleted:** s
**Deleted:** 33, 53, 58
**Deleted:** 64, 89 – 90, 92, 95,
**Deleted:** 196, 198 - 200, 202-220
**Deleted:** s
**Deleted:** "
**Deleted:** "
**Deleted:** "
**Deleted:** "
**Deleted:** s
**Deleted:** s
**Deleted:** s
**Deleted:** s

284.    Brossman was under a duty to disclose the facts described in Paragraphs 30,

34, 35, 44, 60, 65, 67, 71, 96 – 97, 99, 102, 104, 203, 205 – 207, 209 – 227, above and

chose to not do so.

285.    As a direct and proximate result of the Brossman's intentional

misrepresentations, omissions, and concealment of material facts, Plaintiff has been

damaged to the extent that it has lost the value of all principal amounts delivered to 36

Main, plus all applicable interest thereon.

286.    Brossman's conduct was knowing, intentional, engaged in with malice,

demonstrated a complete lack of care, and was made with a conscious disregard for the

rights of Plaintiff. Plaintiff is therefore entitled to the award of punitive damages from

Brossman.

## COUNT 6
### (Fraudulent Misrepresentation, Inducement, Concealment – Munier)

287.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 286 of this Complaint as if fully set forth herein.

288.    The representations by Munier, as detailed above at Paragraphs 30, 34, 45, 60,

96, 99, 102 and 104, were material false representations made to Plaintiff that Munier

knew were false, or were made recklessly without regard to their truth, with an intent to

defraud Plaintiff, and Plaintiff reasonably relied on Munier's materially false

representations.

289.    Munier, as detailed above at Paragraphs, 30, 34, 45, 60, 96, 99, 102 and 104,

made false misrepresentations to Plaintiff of facts that were material to Plaintiff's

decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the

78

ATMA Machines, and engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines.

290.     Munier knew or should have known of: the falsity of the verbal and written representations made to Plaintiff; the incompleteness of the representations made to Plaintiff at the time they were made; and, that the representations made to Plaintiff omitted material facts.

291.     Munier's misrepresentations, omissions, and concealment of material facts, as detailed above at Paragraphs 30, 34, 45, 60, 96, 99, 102 and 104 were made with reckless and utter disregard as to their truthfulness or completeness, were made intentionally or recklessly for the purposes of inducing Plaintiff to enter into the Asset Purchase Agreements for the purchase of phantom ATMs from 36 Main, to transfer funds to 36 Main for those phantom ATMs, and to engage the services of ATMFS, through Munier, to manage the ATMA Machines. Munier intentionally or recklessly attempted to hide such fraud by delivering the Fictitious Transaction Documents and/or Fictitious Monthly Reports to Plaintiff.

292.     Plaintiff reasonably and justifiably relied to their detriment on the truthfulness of Munier's representations and on the completeness of his disclosure of material facts, in choosing to join the ATM Venture, purchase the ATMA Machines conduct business with the ATM Sales Enterprise.

293.     But for Munier's material misrepresentations, omissions, and concealment of facts concerning the Fictitious Transaction Documents, Plaintiff would not have joined the ATM Venture, purchased the ATMA Machines and/or conducted business with the ATM Sales Enterprise.

79

| Deleted: s |
| Deleted: s |
| Deleted: s |
| Deleted: 33, 53, 89, 92, 95 |
| Deleted: 97 |
| Deleted: s |
| Deleted: " |
| Deleted: " |
| Deleted: " |
| Deleted: " |
| Deleted: s |
| Deleted: s |
| Deleted: s |

294.    Munier had a pecuniary interest in the transactions between Plaintiff and 36 Main and/or the ATM Sales Enterprise.

295.    Munier was under a duty to disclose the facts described in Paragraphs 30, 34, 45, 60, 96, 99, 102 and 104 above and chose to not do so.

296.    As a direct and proximate result of the Munier's intentional misrepresentations, omissions, and concealment of material facts, Plaintiff has been damaged to the extent that it has lost the value of all principal amounts delivered to 36 Main, plus all applicable interest thereon.

297.    Munier's conduct was knowing, intentional, engaged in with malice, demonstrated a complete lack of care, and was made with a conscious disregard for the rights of Plaintiff. Plaintiff is therefore entitled to the award of punitive damages from Munier.

## COUNT 7
### (Negligent Misrepresentation – 36 Main and Netschi)

298.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 297 of this Complaint as if fully set forth herein.

299.    The representations made by Netschi and 36 Main to Plaintiff in Paragraphs 31 - 34, and 36 above (collectively the "36 Main Misrepresentations") were false when made and material to Plaintiff's decision to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines and conduct business with the ATM Sales Enterprise.

300.    Netschi and 36 Main were in a superior position to know the truth or falsity of the 36 Main Misrepresentations.

80

---

**Deleted margin notes:**

Deleted: s

Deleted: 33, 53, 89, 92, 95

Deleted: 97

Deleted: Plaintiffs have

Deleted: invested with and through

Deleted: s. Plaintiffs are

Deleted: Plaintiffs repeat

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

Deleted: allege

Deleted: 290

Deleted: s

Deleted: 30 - 33

Deleted: 35

Deleted:

Deleted: Plaintiffs'

301.    Netschi and 36 Main should have known the truth or falsity of the 36 Main Misrepresentations.

302.    Under the circumstances, Netschi and 36 Main were under a duty to ensure the accuracy of the 36 Main Misrepresentations.

303.    Netschi and 36 Main made the 36 Main Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

304.    Netschi and 36 Main intended and were aware that Plaintiff would rely upon the 36 Main Misrepresentations in deciding whether to enter the ATM Venture, deliver funds to 36 Main for the purchase of the ATMA Machines, engage the management services of Moore's ISO company, ATMFS, to manage the ATMA Machines and conduct business with the ATM Sales Enterprise.

305.    Netschi and 36 Main had a pecuniary interest in the ATM Venture and the ATM Sales Enterprise.

306.    Plaintiff reasonably and justifiably relied to their detriment upon the 36 Main Misrepresentations and on the completeness of their disclosure of material facts, in choosing to enter the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise and but for the 36 Main Misrepresentations, Plaintiff would not have entered the ATM Venture, purchase the ATMA Machines and/or conduct business with ATM Sales Enterprise.

307.    Netschi and 36 Main's breach of their duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

308.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the 36 Main Misrepresentations.

81

**Deleted: s**

**Deleted: s**

**Deleted: s**

**Deleted: s**

**Deleted: Plaintiffs'**

**Deleted: Plaintiffs'**

309.    By reason of the foregoing, Plaintiff has been damaged in an amount to be

determined at trial, but not less than the value of all principal amounts delivered to the

Defendants, plus all applicable interest thereon.

## COUNT 8
### (Negligent Misrepresentation – Moore)

310.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 309 of this Complaint as if fully set forth herein.

311.    The representations made by Moore in Paragraphs 35, 37 and 59 above

(collectively the "Moore Misrepresentations") were false when made and material to

Plaintiff's decision to enter the ATM Venture, purchase the ATMA Machines and/or

conduct business with the ATM Sales Enterprise.

312.    Moore was in a superior position to know the truth or falsity of the Moore

Misrepresentations.

313.    Moore should have known the truth or falsity of the Moore

Misrepresentations.

314.    Under the circumstances, Moore was under a duty to ensure the accuracy of

the Moore Misrepresentations.

315.    Moore made the Moore Misrepresentations without the exercise of reasonable

care to ascertain their truth or falsity.

316.    Moore intended and was aware that Plaintiff would rely upon the Moore

Misrepresentations in deciding whether to enter the ATM Venture, purchase the ATMA

Machines and/or conduct business with ATM Sales Enterprise.

317.    Moore had a pecuniary interest in the ATM Venture, the sale of the ATMA

Machines by 36 Main and/or the ATM Sales Enterprise.

82

---

**Deleted:** Plaintiffs have

**Deleted:** invested with and through

**Deleted:** Plaintiffs repeat

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at:  0.25" + Tab after:  0.75" + Indent at:  0"

**Deleted:** allege

**Deleted:** 302

**Deleted:** 34, 36

**Deleted:** 52

**Deleted:** Plaintiffs'

**Deleted:** s

318. Plaintiff justifiably relied to their detriment upon the Moore

Misrepresentations by entering the ATM Venture, purchasing the ATMA Machines

and/or conducting business with ATM Sales Enterprise and but for the Moore

Misrepresentations, Plaintiff would not have entered the ATM Venture, purchased the

ATMA Machines and/or conducted business with ATM Sales Enterprise.

319. Moore's breach of his duty of reasonable care to Plaintiff is the proximate

cause of Plaintiff's injuries.

320. The type and extent of Plaintiff's injuries were reasonably foreseeable results

of the Moore Misrepresentations.

321. By reason of the foregoing, Plaintiff has been damaged in an amount to be

determined at trial, but not less than the value of all principal amounts delivered to the

Defendants, plus all applicable interest thereon.

**COUNT 9**
**(Negligent Misrepresentation – Moore)**

322. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 321 of this Complaint as if fully set forth herein.

323. The representations made by Moore, as detailed in Paragraph 52(h) above, in

the undated Due Diligence Report provided to Plaintiff on or about November 16, 2005

(the "Moore November 2005 Due Diligence Misrepresentations") (*See* Volume III, Ex.

11) were false when made and material to Plaintiff's decision to enter into the November

16, 2005 Tranche Purchase.

324. Moore was in a superior position to know the truth or falsity of the Moore

November 2005 Due Diligence Misrepresentations.

83

---

**Deleted:** s

**Deleted:** s

**Deleted:** s

**Deleted:** Plaintiffs'

**Deleted:** Plaintiffs'

**Deleted:** Plaintiffs have

**Deleted:** invested with and through

**Deleted:** Plaintiffs repeat

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

**Deleted:** allege

**Deleted:** 314

**Deleted:** 45

**Deleted:** s

**Formatted:** Font: Italic, No underline

**Deleted:** Plaintiffs'

325.    Moore should have known the truth or falsity of the Moore November 2005 Due Diligence Misrepresentations.

326.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore November 2005 Due Diligence Misrepresentations.

327.    Moore made the Moore November 2005 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

328.    Moore intended and was aware that Plaintiff would rely upon the Moore November 2005 Due Diligence Misrepresentations in deciding whether to enter into the November 16, 2005 Tranche Purchase.

329.    Moore had an undisclosed pecuniary interest in the November 16, 2005 Tranche Purchase, because his company, ATMFS, was actually 36 Main's source of the ATMs for the November 16, 2005 Tranche Purchase.

330.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore November 2005 Due Diligence Misrepresentations by entering into the November 16, 2005 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,900,000.00.

331.    But for the Moore November 2005 Due Diligence Misrepresentations, Plaintiff would not have entered the November 16, 2005 Tranche Purchase.

332.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

333.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore November 2005 Due Diligence Misrepresentations.

| Deleted: s |
| --- |
| Deleted: s |
| Deleted: s |
| Deleted: s |
| Deleted: s |
| Deleted: Plaintiffs' |
| Deleted: Plaintiffs' |

84

334. By reason of the foregoing, Plaintiff has been damaged in an amount to be

determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

### COUNT 10
### (Negligent Misrepresentation – Moore)

335. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 334 of this Complaint as if fully set forth herein.

336. The representations made by Moore, as detailed in Paragraph 52(h) above, in

the undated Due Diligence Report provided to Plaintiff on or about December 20, 2005

(the "Moore December 2005 Due Diligence Misrepresentations") (*See* Volume V, Ex.

20) were false when made and material to Plaintiff's decision to enter into the December

20, 2005 Tranche Purchase.

337. Moore was in a superior position to know the truth or falsity of the Moore

December 2005 Due Diligence Misrepresentations.

338. Moore should have known the truth or falsity of the Moore December 2005

Due Diligence Misrepresentations.

339. Under the circumstances, Moore was under a duty to ensure the accuracy of

the Moore December 2005 Due Diligence Misrepresentations.

340. Moore made the Moore December 2005 Due Diligence Misrepresentations

without the exercise of reasonable care to ascertain their truth or falsity.

341. Moore intended and was aware that Plaintiff would rely upon the Moore

December 2005 Due Diligence Misrepresentations in deciding whether to enter into the

December 20, 2005 Tranche Purchase.

85

**Deleted:** Plaintiffs have

**Deleted:** Plaintiffs repeat

**Deleted:** allege

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

**Deleted:** 327

**Deleted:** 45

**Deleted:** s

**Formatted:** Font: Italic, No underline

**Deleted:** Plaintiffs'

**Deleted:** s

342.  Moore had an undisclosed pecuniary interest in the December 20, 2005

Tranche Purchase, because his company, ATMFS, was actually 36 Main's source of the

ATMs for the December 20, 2005 Tranche Purchase.

343.  Plaintiff reasonably and justifiably relied to their detriment upon the Moore

December 2005 Due Diligence Misrepresentations by entering into the December 20,

2005 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines

for $1,900,000.00.

344.  But for the Moore December 2005 Due Diligence Misrepresentations,

Plaintiff would not have entered the December 20, 2005 Tranche Purchase.

345.  Moore's breach of his duty of reasonable care to Plaintiff is the proximate

cause of Plaintiff's injuries.

346.  The type and extent of Plaintiff's injuries were reasonably foreseeable results

of the Moore December 2005 Due Diligence Misrepresentations.

347.  By reason of the foregoing, Plaintiff has been damaged in an amount to be

determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

## COUNT 11
### (Negligent Misrepresentation – Moore)

348.  Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 347 of this Complaint as if fully set forth herein.

349.  The representations made by Moore, as detailed in Paragraph 52(h) above, in

the Due Diligence Report for the February 22, 2006 Tranche Purchase and provided to

Plaintiff on or about February 22, 2006 (the "Moore February 2006 Due Diligence

Misrepresentations") (*See* Volume VII, Ex. 29) were false when made and material to

Plaintiff's decision to enter into the February 22, 2006 Tranche Purchase.

86

---

**Deleted: s**

**Deleted: s**

**Deleted: s**

**Deleted: s**

**Deleted: Plaintiffs'**

**Deleted: Plaintiffs'**

**Deleted: Plaintiffs have**

**Deleted: Plaintiffs repeat**

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

**Deleted: allege**

**Deleted: 340**

**Deleted: 45**

**Deleted: s**

**Formatted:** Font: Italic, No underline

**Deleted: Plaintiffs'**

350.    Moore was in a superior position to know the truth or falsity of the Moore February 2006 Due Diligence Misrepresentations.

351.    Moore should have known the truth or falsity of the Moore February 2006 Due Diligence Misrepresentations.

352.    Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore February 2006 Due Diligence Misrepresentations.

353.    Moore made the Moore February 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

354.    Moore intended and was aware that Plaintiff would rely upon the Moore February 2006 Due Diligence Misrepresentations in deciding whether to enter into the February 22, 2006 Tranche Purchase.

355.    Moore had an undisclosed pecuniary interest in the February 22, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the February 22, 2006 Tranche Purchase.

356.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore February 2006 Due Diligence Misrepresentations by entering into the February 22, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,900,000.00.

357.    But for the Moore February 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the February 22, 2006 Tranche Purchase.

358.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

87

359.    The type and extent of Plaintiff's injuries were reasonably foreseeable results

of the Moore February 2006 Due Diligence Misrepresentations.

360.    By reason of the foregoing, Plaintiff has been damaged in an amount to be

determined at trial, but not less than the $1,900,000.00 paid to 36 Main.

## COUNT 12
### (Negligent Misrepresentation – Moore)

361.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 360 of this Complaint as if fully set forth herein.

362.    The representations made by Moore, as detailed in Paragraph 52(h) above, in

the Due Diligence Report dated April 26, 2006 (the "Moore April 2006 Due Diligence

Misrepresentations") (*See* Volume IX, Ex. 38) were false when made and material to

Plaintiff's decision to enter into the April 26, 2006 Tranche Purchase.

363.    Moore was in a superior position to know the truth or falsity of the Moore

April 2006 Due Diligence Misrepresentations.

364.    Moore should have known the truth or falsity of the Moore April 2006 Due

Diligence Misrepresentations.

365.    Under the circumstances, Moore was under a duty to ensure the accuracy of

the Moore April 2006 Due Diligence Misrepresentations.

366.    Moore made the Moore April 2006 Due Diligence Misrepresentations without

the exercise of reasonable care to ascertain their truth or falsity.

367.    Moore intended and was aware that Plaintiff would rely upon the Moore April

2006 Due Diligence Misrepresentations in deciding whether to enter into the April 26,

2006 Tranche Purchase.

88

---

Deleted: Plaintiffs'

Deleted: Plaintiffs have

Deleted: Plaintiffs repeat

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

Deleted: allege

Deleted: 353

Deleted: 45

Formatted: Font: Italic, No underline

Deleted: Plaintiffs'

Deleted: s

368. Moore had an undisclosed pecuniary interest in the April 26, 2006 Deal because his company, ATMFS, was actually 36 Main's source of the ATMs for the April 26, 2006 Tranche Purchase.

369. Plaintiff reasonably and justifiably relied to their detriment upon the Moore April 2006 Due Diligence Misrepresentations by entering into the April 26, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,950,000.00.

370. But for the Moore April 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the April 26, 2006 Tranche Purchase.

371. Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

372. The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore April 2006 Due Diligence Misrepresentations.

373. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,950,000.00 paid to 36 Main.

## COUNT 13
### (Negligent Misrepresentation – Moore)

374. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 373 of this Complaint as if fully set forth herein.

375. The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about May 27, 2006 (the "Moore May 2006 Due Diligence Misrepresentations") (*See* Volume XI, Ex. 45) were false when made and material to Plaintiff's decision to enter into the May 27, 2006 Tranche Purchase.

89

Deleted: s

Deleted: s

Deleted: s

Deleted: s

Deleted: Plaintiffs'

Deleted: Plaintiffs'

Deleted: Plaintiffs have

Deleted: Plaintiffs repeat

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

Deleted: allege

Deleted: 366

Deleted: 45

Deleted: s

Formatted: Font: Italic, No underline

Deleted: Plaintiffs'

376. Moore was in a superior position to know the truth or falsity of the Moore May 2006 Due Diligence Misrepresentations.

377. Moore should have known the truth or falsity of the Moore May 2006 Due Diligence Misrepresentations.

378. Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore May 2006 Due Diligence Misrepresentations.

379. Moore made the Moore May 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

380. Moore intended and was aware that Plaintiff would rely upon the Moore May 2006 Due Diligence Misrepresentations in deciding whether to enter into the May 27, 2006 Tranche Purchase.

381. Moore had an undisclosed pecuniary interest in the May 27, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the May 27, 2006 Tranche Purchase.

382. Plaintiff reasonably and justifiably relied to their detriment upon the Moore May 2006 Due Diligence Misrepresentations by entering into the May 27, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,950,000.00.

383. But for the Moore May 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the May 27, 2006 Tranche Purchase.

384. Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

90

385.    The type and extent of Plaintiff's injuries were reasonably foreseeable results

of the Moore May 2006 Due Diligence Misrepresentations.

386.    By reason of the foregoing, Plaintiff has been damaged in an amount to be

determined at trial, but not less than the $1,950,000.00 paid to 36 Main.

**COUNT 14**
**(Negligent Misrepresentation – Moore)**

387.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 386 of this Complaint as if fully set forth herein.

388.    The representations made by Moore, as detailed in Paragraph 52(h) above, in

the undated Due Diligence Report provided to Plaintiff on or about June 16, 2006 (the

"Moore June 16, 2006 Due Diligence Misrepresentations") (*See* Volume XII, Ex. 52)

were false when made and material to Plaintiff's decision to enter into the June 16, 2006

Tranche Purchase.

389.    Moore was in a superior position to know the truth or falsity of the Moore

June 16, 2006 Due Diligence Misrepresentations.

390.    Moore should have known the truth or falsity of the Moore June 16, 2006 Due

Diligence Misrepresentations.

391.    Under the circumstances, Moore was under a duty to ensure the accuracy of

the Moore June 16, 2006 Due Diligence Misrepresentations.

392.    Moore made the Moore June 16, 2006 Due Diligence Misrepresentations

without the exercise of reasonable care to ascertain their truth or falsity.

393.    Moore intended and was aware that Plaintiff would rely upon the Moore June

16, 2006 Due Diligence Misrepresentations in deciding whether to enter into the June 16,

2006 Tranche Purchase.

91

394.   Moore had an undisclosed pecuniary interest in the June 16, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the June 16, 2006 Tranche Purchase.

395.   Plaintiff reasonably and justifiably relied to their detriment upon the Moore June 16, 2006 Due Diligence Misrepresentations by entering into the June 16, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 50 Placed ATM machines for $975,000.00.

396.   But for the Moore June 16, 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the June 16, 2006 Tranche Purchase.

397.   Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

398.   The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore June 16, 2006 Due Diligence Misrepresentations.

399.   By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $975,000.00 paid to 36 Main.

## COUNT 15
### (Negligent Misrepresentation – Moore)

400.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 399 of this Complaint as if fully set forth herein.

401.   The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about June 27, 2006 (the "Moore June 27, 2006 Due Diligence Misrepresentations") (*See* Volume XIII, Ex. 59) were false when made and material to Plaintiff's decision to enter into the June 27, 2006 Tranche Purchase.

92

Deleted: s
Deleted: s
Deleted: s
Deleted: s
Deleted: Plaintiffs'
Deleted: Plaintiffs'
Deleted: Plaintiffs have
Deleted: Plaintiffs repeat
Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"
Deleted: allege
Deleted: 392
Deleted: 45
Deleted: s
Formatted: Font: Italic, No underline
Deleted: Plaintiffs'

402.   Moore was in a superior position to know the truth or falsity of the Moore June 27, 2006 Due Diligence Misrepresentations.

403.   Moore should have known the truth or falsity of the Moore June 27, 2006 Due Diligence Misrepresentations.

404.   Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore June 27, 2006 Due Diligence Misrepresentations.

405.   Moore made the Moore June 27, 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

406.   Moore intended and was aware that Plaintiff would rely upon the Moore June 27, 2006 Due Diligence Misrepresentations in deciding whether to enter into the June 27, 2006 Tranche Purchase.

407.   Moore had an undisclosed pecuniary interest in the June 27, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the June 27, 2006 Tranche Purchase.

408.   Plaintiff reasonably and justifiably relied to their detriment upon the Moore June 27, 2006 Due Diligence Misrepresentations by entering into the June 27, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 74 Placed ATM machines for $1,073,000.00.

409.   But for the Moore June 27, 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the June 27, 2006 Tranche Purchase.

410.   Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

| Deleted: s |
| Deleted: s |
| Deleted: s |
| Deleted: s |
| Deleted: s |
| Deleted: Plaintiffs' |

411. The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore June 27, 2006 Due Diligence Misrepresentations.

412. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,073,000.00 paid to 36 Main.

**COUNT 16**
**(Negligent Misrepresentation – Moore)**

413. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 412 of this Complaint as if fully set forth herein.

414. The representations made by Moore, as detailed in Paragraph 52(h) above, in the undated Due Diligence Report provided to Plaintiff on or about July 28, 2006 (the "Moore July 2006 Due Diligence Misrepresentations") (*See* Volume XV, Ex. 66) were false when made and material to Plaintiff's decision to enter into the July 28, 2006 Tranche Purchase.

415. Moore was in a superior position to know the truth or falsity of the Moore July 2006 Due Diligence Misrepresentations.

416. Moore should have known the truth or falsity of the Moore July 2006 Due Diligence Misrepresentations.

417. Under the circumstances, Moore was under a duty to ensure the accuracy of the Moore July 2006 Due Diligence Misrepresentations.

418. Moore made the Moore July 2006 Due Diligence Misrepresentations without the exercise of reasonable care to ascertain their truth or falsity.

419. Moore intended and was aware that Plaintiff would rely upon the Moore July 2006 Due Diligence Misrepresentations in deciding whether to enter into the July 28, 2006 Tranche Purchase.

94

420.    Moore had an undisclosed pecuniary interest in the July 28, 2006 Tranche Purchase because his company, ATMFS, was actually 36 Main's source of the ATMs for the July 28, 2006 Tranche Purchase.

421.    Plaintiff reasonably and justifiably relied to their detriment upon the Moore July 2006 Due Diligence Misrepresentations by entering into the July 28, 2006 Tranche Purchase, whereby Plaintiff agreed to purchase 100 Placed ATM machines for $1,450,000.00.

422.    But for the Moore July 2006 Due Diligence Misrepresentations, Plaintiff would not have entered the July 28, 2006 Tranche Purchase.

423.    Moore's breach of his duty of reasonable care to Plaintiff is the proximate cause of Plaintiff's injuries.

424.    The type and extent of Plaintiff's injuries were reasonably foreseeable results of the Moore July 2006 Due Diligence Misrepresentations.

425.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but not less than the $1,450,000.00 paid to 36 Main.

## COUNT 17
### (Breach of Contract – 36 Main)

426.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 425 of this Complaint as if fully set forth herein.

427.    On or about November 16, 2005, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "November 16, 2005 Asset Purchase Agreement") (*See* Volume II, Ex. 5).

**Deleted: s**

**Deleted: s**

**Deleted: s**

**Deleted: s**

**Deleted: Plaintiffs'**

**Deleted: Plaintiffs'**

**Deleted: Plaintiffs have**

**Deleted: Plaintiffs repeat**

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

**Deleted: allege**

**Deleted: 418**

**Formatted:** Font: Italic, No underline

95

428.     Pursuant to the terms of the November 16, 2005 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM machines to ATMA.

429.     On or about November 16, 2005, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

430.     36 Main, in breach of the November 16, 2005 Asset Purchase Agreement failed to perform in accordance with the terms of the November 16, 2005 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the November 16, 2005 Asset Purchase Agreement.

431.     36 Main's conduct detailed above constituted a material breach of the November 16, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

<div align="center">

**COUNT 18**
**(Breach of Contract – 36 Main)**

</div>

432.     Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 431 of this Complaint as if fully set forth herein.

433.     On or about December 20, 2005, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "December 20, 2005 Asset Purchase Agreement") (*See* Volume III, Ex. 14).

434.     Pursuant to the terms of the December 20, 2005 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM machines to ATMA.

435.     On or about December 20, 2005, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

| Deleted: Plaintiffs repeat |
| --- |
| **Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at:  0.25" + Tab after:  0.75" + Indent at:  0" |
| Deleted: allege |
| Deleted: 424 |
| **Formatted:** Font: Italic, No underline |

96

436. 36 Main, in breach of the December 20, 2005 Asset Purchase Agreement failed to perform in accordance with the terms of the December 20, 2005 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the December 20, 2005 Asset Purchase Agreement.

437. 36 Main's conduct detailed above constituted a material breach of the December 20, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 19
### (Breach of Contract – 36 Main)

438. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 437 of this Complaint as if fully set forth herein.

439. On or about February 22, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "February 22, 2006 Asset Purchase Agreement") (*See* Volume IV, Ex. 23).

440. Pursuant to the terms of the February 22, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,900,000.00, 36 Main agreed to sell 100 Placed ATM Machines to ATMA.

441. On or about February 22, 2006, ATMA paid $1,900,000.00 to 36 Main via a bank wire transfer.

442. 36 Main, in breach of the February 22, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the February 22, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the February 22, 2006 Asset Purchase Agreement.

**Deleted:** Plaintiffs repeat

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

**Deleted:** allege

**Deleted:** 430

**Formatted:** Font: Italic, No underline

97

443.    36 Main's conduct detailed above constituted a material breach of the February 22, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 20
### (Breach of Contract – 36 Main)

444.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 443 of this Complaint as if fully set forth herein.

445.    On or about April 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "April 26, 2006 Asset Purchase Agreement") (*See* Volume VII, Ex. 32).

446.    Pursuant to the terms of the April 26, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,950,000.00, 36 Main agreed to sell 100 Placed ATM Machines to ATMA.

447.    On or about April 26, 2006, ATMA paid $1,950,000.00 to 36 Main via a bank wire transfer.

448.    36 Main, in breach of the April 26, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the April 26, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the April 26, 2006 Asset Purchase Agreement.

449.    36 Main's conduct detailed above constituted a material breach of the April 26, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

98

**Deleted:** Plaintiffs repeat

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

**Deleted:** allege

**Deleted:** 436

**Formatted:** Font: Italic, No underline

## COUNT 21
### (Breach of Contract – 36 Main)

450.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 449 of this Complaint as if fully set forth herein.

451.    On or about May 27, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 100 Placed ATM machines (the "May 27, 2006 Asset Purchase Agreement") (*See* Volume IX, Ex. 41).

452.    Pursuant to the terms of the May 27, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,950,000.00, 36 Main agreed to sell 100 Placed ATM Machines to ATMA.

453.    On or about May 27, 2006, ATMA paid $1,950,000.00 to 36 Main via a bank wire transfer.

454.    36 Main, in breach of the May 27, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the May 27, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the May 27, 2006 Asset Purchase Agreement.

455.    36 Main's conduct detailed above constituted a material breach of the May 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 22
### (Breach of Contract – 36 Main)

456.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 455 of this Complaint as if fully set forth herein.

99

457. On or about June 16, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 50 Placed ATM machines (the "June 16, 2006 Asset Purchase Agreement") (*See* Volume XII, Ex. 48).

*Formatted: Font: Italic, No underline*

458. Pursuant to the terms of the June 16, 2006 Asset Purchase Agreement, in exchange for the consideration of $975,000.00, 36 Main agreed to sell 50 Placed ATM Machines to ATMA.

459. On or about June 16, 2006, ATMA paid $975,000.00 to 36 Main via a bank wire transfer.

460. 36 Main, in breach of the June 16, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the June 16, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement.

461. 36 Main's conduct detailed above constituted a material breach of the June 16, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 23
### (Breach of Contract – 36 Main)

462. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 461 of this Complaint as if fully set forth herein.

*Deleted: Plaintiffs repeat*

*Deleted: allege*

*Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"*

*Deleted: 454*

463. On or about June 27, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 74 Placed ATM machines (the "June 27, 2006 Asset Purchase Agreement") (*See* Volume XIII, Ex. 55).

*Formatted: Font: Italic, No underline*

100

Exhibit C

(Part 3 of 3)

464.    Pursuant to the terms of the June 27, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,073,000.00, 36 Main agreed to sell 74 Placed ATM Machines to ATMA.

465.    On or about June 27, 2006, ATMA paid $1,073,000.00 to 36 Main via a bank wire transfer.

466.    36 Main, in breach of the June 27, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the June 27, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the June 27, 2006 Asset Purchase Agreement.

467.    36 Main's conduct detailed above constituted a material breach of the June 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

### COUNT 24
### (Breach of Contract – 36 Main)

468.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 467 of this Complaint as if fully set forth herein.

469.    On or about July 28, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 101 Placed ATM machines identified in Schedule A of the Asset Purchase Agreement (the "July 28, 2006 Asset Purchase Agreement") (*See* Volume XIV, Ex. 62).

470.    Pursuant to the terms of the July 28, 2006 Asset Purchase Agreement, in exchange for the consideration of $1,450,000.00, 36 Main agreed to sell 101 Placed ATM Machines to ATMA.

| Deleted: Plaintiffs repeat |
| Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0" |
| Deleted: allege |
| Deleted: 460 |
| Formatted: Font: Italic, No underline |

101

471. On or about July 28, 2006, ATMA paid $1,469,500.00 to 36 Main via a bank wire transfer.

472. 36 Main, in breach of the July 28, 2006 Asset Purchase Agreement failed to perform in accordance with the terms of the July 28, 2006 Asset Purchase Agreement by failing to deliver valid title to the ATMs listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement.

473. 36 Main's conduct detailed above constituted a material breach of the July 28, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 25
### (Breach of Contract – 36 Main)

474. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 473 of this Complaint as if fully set forth herein.

475. On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 7 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #1") (*See* Volume XVI, Ex. 69).

476. Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #1, in exchange for the consideration of $136,500.00, 36 Main agreed to sell 7 Placed ATM Machines to ATMA.

477. On or about August 30, 2006, ATMA paid $136,500.00 to 36 Main via a bank wire transfer.

478. 36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #1 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase

102

Agreement #1 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1.

479.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $136,500.00 paid to 36 Main.

## COUNT 26
### (Breach of Contract – 36 Main)

480.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 479 of this Complaint as if fully set forth herein.

481.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 17 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #2") (*See* Volume XVI, Ex. 71).

482.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #2, in exchange for the consideration of $331,500.00, 36 Main agreed to sell 17 Placed ATM Machines to ATMA.

483.    On or about August 30, 2006, ATMA paid $331,500.00 to 36 Main via a bank wire transfer.

484.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #2 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #2 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #2.

485.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $331,500.00 paid to 36 Main.

103

**Deleted:** Plaintiffs repeat

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, ... + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

**Deleted:** allege

**Deleted:** 472

**Formatted:** Font: Italic, No underline

## COUNT 27
### (Breach of Contract – 36 Main)

486.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 485 of this Complaint as if fully set forth herein.

487.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 36 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #3") (*See* Volume XVI, Ex. 73).

488.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #3, in exchange for the consideration of $522,000.00, 36 Main agreed to sell 36 Placed ATM Machines to ATMA.

489.    On or about August 30, 2006, ATMA paid $522,000.00 to 36 Main via a bank wire transfer.

490.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #3 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #3 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3.

491.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $522,000.00 paid to 36 Main.

## COUNT 28
### (Breach of Contract – 36 Main)

492.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 491 of this Complaint as if fully set forth herein.

104

493.    On or about August 30, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 68 Placed ATM machines (the "August 30, 2006 Asset Purchase Agreement #4") (*See* Volume XVI, Ex. 75).

494.    Pursuant to the terms of the August 30, 2006 Asset Purchase Agreement #4, in exchange for the consideration of $986,000.00, 36 Main agreed to sell 68 Placed ATM Machines to ATMA.

495.    On or about August 30, 2006, ATMA paid $986,000.00 to 36 Main via a bank wire transfer.

496.    36 Main, in breach of the August 30, 2006 Asset Purchase Agreement #4 failed to perform in accordance with the terms of the August 30, 2006 Asset Purchase Agreement #4 by failing to deliver valid title to the ATMs listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4.

497.    36 Main's conduct detailed above constituted a material breach of the August 30, 2006 Asset Purchase Agreement #4 and ATMA is therefore entitled to the award of the return of the $986,000.00 paid to 36 Main.

## COUNT 29
### (Breach of Contract – 36 Main)

498.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 497 of this Complaint as if fully set forth herein.

499.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 2 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #1") (*See* Volume XVII, Ex. 82).

105

500.    Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #1, in exchange for the consideration of $44,000.00, 36 Main agreed to sell 2 Placed ATM machines to ATMA.

501.    On or about September 26, 2006, ATMA paid $44,000.00 to 36 Main via a bank wire transfer.

502.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #1 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #1 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1.

503.    36 Main's conduct detailed above constituted a material breach of the September 26, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

## COUNT 30
### (Breach of Contract – 36 Main)

504.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 503 of this Complaint as if fully set forth herein.

505.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 21 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #2") (*See* Volume XVII, Ex. 84).

506.    Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #2, in exchange for the consideration of $409,500.00, 36 Main agreed to sell 21 Placed ATM machines to ATMA.

507.    On or about September 26, 2006, ATMA paid $409,500.00 to 36 Main via a bank wire transfer.

106

---

Deleted: Plaintiffs repeat

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, ... + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

Deleted: allege

Deleted: 496

Formatted: Font: Italic, No underline

508.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #2 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #2 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2.

509.    36 Main's conduct detailed above constituted a material breach of the September 26, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

## COUNT 31
### (Breach of Contract – 36 Main)

510.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 509 of this Complaint as if fully set forth herein.

511.    On or about September 26, 2006, ATMA and 36 Main executed an Asset Purchase Agreement for the purchase of 64 Placed ATM machines (the "September 26, 2006 Asset Purchase Agreement #3") (*See* Volume XVII, Ex. 86).

512.    Pursuant to the terms of the September 26, 2006 Asset Purchase Agreement #3, in exchange for the consideration of $928,000.00, 36 Main agreed to sell 64 Placed ATM machines to ATMA.

513.    On or about September 26, 2006, ATMA paid $928,000.00 to 36 Main via a bank wire transfer.

514.    36 Main, in breach of the September 26, 2006 Asset Purchase Agreement #3 failed to perform in accordance with the terms of the September 26, 2006 Asset Purchase Agreement #3 by failing to deliver valid title to the ATMs listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3.

107

Deleted: Plaintiffs repeat

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

Deleted: allege

Deleted: 502

Formatted: Font: Italic, No underline

515.   36 Main's conduct detailed above constituted a material breach of the September 26, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $928,000.00 paid to 36 Main.

## COUNT 32
### (Breach of Warranty – 36 Main)

516.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 515 of this Complaint as if fully set forth herein.

517.   The November 15, 2005 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

518.   ATMA relied on 36 Main's representations as a condition of the purchase.

519.   36 Main breached the warranty set forth in section 4.5 of the November 15, 2005 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the November 15, 2005 Asset Purchase Agreement purchased by ATMA.

520.   36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the November 15, 2005 Asset Purchase Agreement purchased by ATMA was not good or marketable.

521.   36 Main's conduct breached the warranty stated in the November 15, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

108

## COUNT 33
### (Breach of Warranty – 36 Main)

522.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 521 of this Complaint as if fully set forth herein.

523.    The December 20, 2005 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

524.    ATMA relied on 36 Main's representations as a condition of the purchase.

525.    36 Main breached the warranty set forth in section 4.5 of the December 20, 2005 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the December 20, 2005 Asset Purchase Agreement purchased by ATMA.

526.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the December 20, 2005 Asset Purchase Agreement purchased by ATMA was not good or marketable.

527.    36 Main's conduct breached the warranty stated in the December 20, 2005 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 34
### (Breach of Warranty – 36 Main)

528.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 527 of this Complaint as if fully set forth herein.

529.    The February 22, 2006 Asset Purchase Agreement states at section 4.5 that,

109

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

530.    ATMA relied on 36 Main's representations as a condition of the purchase.

531.    36 Main breached the warranty set forth in section 4.5 of the February 22, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Asset Purchase Agreement purchased by ATMA.

532.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

533.    36 Main's conduct breached the warranty stated in the February 22, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 35
### (Breach of Warranty – 36 Main)

534.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 533 of this Complaint as if fully set forth herein.

535.    The April 26, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

536.    ATMA relied on 36 Main's representations as a condition of the purchase.

110

537.    36 Main breached the warranty set forth in section 4.5 of the April 26, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Asset Purchase Agreement purchased by ATMA.

538.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

539.    36 Main's conduct breached the warranty stated in the April 26, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 36
## (Breach of Warranty – 36 Main)

540.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 539 of this Complaint as if fully set forth herein.

541.    The May 27, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

542.    ATMA relied on 36 Main's representations as a condition of the purchase.

543.    36 Main breached the warranty set forth in section 4.5 of the May 27, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Asset Purchase Agreement purchased by ATMA.

111

544.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

545.    36 Main's conduct breached the warranty stated in the May 27, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

<div align="center">

**COUNT 37**
**(Breach of Warranty – 36 Main)**

</div>

546.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 545 of this Complaint as if fully set forth herein.

547.    The June 16, 2006 Asset Purchase Agreement states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

548.    ATMA relied on 36 Main's representations as a condition of the purchase.

549.    36 Main breached the warranty set forth in section 4.5 of the June 16, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement purchased by ATMA.

550.    36 Main was notified that title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

112

551. 36 Main's conduct breached the warranty stated in the June 16, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$975,000.00 paid to 36 Main.

## COUNT 38
### (Breach of Warranty – 36 Main)

552. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 551 of this Complaint as if fully set forth herein.

553. The June 27, 2006 Asset Purchase Agreement states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to
the Assets set forth on Schedule A, full authority to sell and transfer same
and that the Assets are in good working condition, and are free and clear
of all mortgages, liens, encumbrances, liabilities, and adverse claims, of
every nature and description.

554. ATMA relied on 36 Main's representations as a condition of the purchase.

555. 36 Main breached the warranty set forth in section 4.5 of the June 27, 2006

Asset Purchase Agreement by failing to deliver good and marketable title to the 74

Placed ATM machines listed in Schedule "A" of the June 27, 2006 Asset Purchase

Agreement purchased by ATMA.

556. 36 Main was notified that title to the 74 Placed ATM machines listed in

Schedule "A" of the June 27, 2006 Asset Purchase Agreement purchased by ATMA was

not good or marketable.

557. 36 Main's conduct breached the warranty stated in the June 27, 2006 Asset

Purchase Agreement and ATMA is therefore entitled to the award of the return of the

$1,073,000.00 paid to 36 Main.

113

## COUNT 39
### (Breach of Warranty – 36 Main)

558.  Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 557 of this Complaint as if fully set forth herein.

559.  The July 28, 2006 Asset Purchase Agreement states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

560.  ATMA relied on 36 Main's representations as a condition of the purchase.

561.  36 Main breached the warranty set forth in section 4.5 of the July 28, 2006 Asset Purchase Agreement by failing to deliver good and marketable title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement purchased by ATMA.

562.  36 Main was notified that title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Asset Purchase Agreement purchased by ATMA was not good or marketable.

563.  36 Main's conduct breached the warranty stated in the July 28, 2006 Asset Purchase Agreement and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 40
### (Breach of Warranty – 36 Main)

564.  Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 563 of this Complaint as if fully set forth herein.

565.  The August 30, 2006 Asset Purchase Agreement #1 states at section 4.5 that,

114

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

566. ATMA relied on 36 Main's representations as a condition of the purchase.

567. 36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #1 by failing to deliver good and marketable title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1 purchased by ATMA.

568. 36 Main was notified that title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #1 purchased by ATMA was not good or marketable.

569. 36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $136,500.00 paid to 36 Main.

## COUNT 41
### (Breach of Warranty – 36 Main)

570. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 569 of this Complaint as if fully set forth herein.

571. The August 30, 2006 Asset Purchase Agreement #2 states at section 4.5 that,

4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

572. ATMA relied on 36 Main's representations as a condition of the purchase.

115

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

**Deleted:** Plaintiffs repeat

**Deleted:** allege

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

**Deleted:** 562

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

573.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #2 by failing to deliver good and marketable title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #2 purchased by ATMA.

574.    36 Main was notified that title to the 17 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #2 purchased by ATMA was not good or marketable.

575.    36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $331,500.00 paid to 36 Main.

## COUNT 42
### (Breach of Warranty – 36 Main)

576.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 575 of this Complaint as if fully set forth herein.

577.    The August 30, 2006 Asset Purchase Agreement #3 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

578.    ATMA relied on 36 Main's representations as a condition of the purchase.

579.    36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #3 by failing to deliver good and marketable title to the 36 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3 purchased by ATMA.

116

580.   36 Main was notified that title to the 36 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #3 purchased by ATMA was not good or marketable.

581.   36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $522,000.00 paid to 36 Main.

## COUNT 43
### (Breach of Warranty – 36 Main)

582.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 581 of this Complaint as if fully set forth herein.

583.   The August 30, 2006 Asset Purchase Agreement #4 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

584.   ATMA relied on 36 Main's representations as a condition of the purchase.

585.   36 Main breached the warranty set forth in section 4.5 of the August 30, 2006 Asset Purchase Agreement #4 by failing to deliver good and marketable title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4 purchased by ATMA.

586.   36 Main was notified that title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Asset Purchase Agreement #4 purchased by ATMA was not good or marketable.

117

---

**Deleted:** Plaintiffs repeat

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

**Deleted:** allege

**Deleted:** 574

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

587.  36 Main's conduct breached the warranty stated in the August 30, 2006 Asset Purchase Agreement #4 and ATMA is therefore entitled to the award of the return of the $986,000.00 paid to 36 Main.

## COUNT 44
### (Breach of Warranty – 36 Main)

588.  Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 587 of this Complaint as if fully set forth herein.

589.  The September 26, 2006 Asset Purchase Agreement #1 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

590.  ATMA relied on 36 Main's representations as a condition of the purchase.

591.  36 Main breached the warranty set forth in section 4.5 of the September 26, 2006 Asset Purchase Agreement #1 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1 purchased by ATMA.

592.  36 Main was notified that title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #1 purchased by ATMA was not good or marketable.

593.  36 Main's conduct breached the warranty stated in the September 26, 2006 Asset Purchase Agreement #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

118

## COUNT 45
### (Breach of Warranty – 36 Main)

594.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 593 of this Complaint as if fully set forth herein.

595.    The September 26, 2006 Asset Purchase Agreement #2 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

596.    ATMA relied on 36 Main's representations as a condition of the purchase.

597.    36 Main breached the warranty set forth in section 4.5 of the September 26, 2006 Asset Purchase Agreement #2 by failing to deliver good and marketable title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2 purchased by ATMA.

598.    36 Main was notified that title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #2 purchased by ATMA was not good or marketable.

599.    36 Main's conduct breached the warranty stated in the September 26, 2006 Asset Purchase Agreement #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

## COUNT 46
### (Breach of Warranty – 36 Main)

600.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 599 of this Complaint as if fully set forth herein.

119

601.    The September 26, 2006 Asset Purchase Agreement #3 states at section 4.5 that,

> 4.5. Seller represents and warrants that it has good and marketable title to the Assets set forth on Schedule A, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all mortgages, liens, encumbrances, liabilities, and adverse claims, of every nature and description.

602.    ATMA relied on 36 Main's representations as a condition of the purchase.

603.    36 Main breached the warranty set forth in section 4.5 of the September 26, 2006 Asset Purchase Agreement #3 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3 purchased by ATMA.

604.    36 Main was notified that title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Asset Purchase Agreement #3 purchased by ATMA was not good or marketable.

605.    36 Main's conduct breached the warranty stated in the September 26, 2006 Asset Purchase Agreement #3 and ATMA is therefore entitled to the award of the return of the $928,000.00 paid to 36 Main.

## COUNT 47
### (Breach of Warranty – 36 Main)

606.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 605 of this Complaint as if fully set forth herein.

607.    On or about November 16, 2005, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,900,000.00 (the "November 16, 2005 Bill of Sale").

608.   The November 16, 2005 Bill of Sale states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

609.   ATMA relied on 36 Main's representations as a condition of the purchase.

610.   36 Main breached the warranty set forth in the November 16, 2005 Bill of

Sale by failing to deliver good and marketable title to the 100 Placed ATM machines

listed in Schedule "A" of the November 16, 2005 Bill of Sale.

611.   36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the November 16, 2005 Bill of Sale was not good or marketable.

612.   36 Main's conduct breached the warranty stated in the November 16, 2005

Bill of Sale and ATMA is therefore entitled to the award of the return of the

$1,900,000.00 paid to 36 Main.

### COUNT 48
### (Breach of Warranty – 36 Main)

613.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 612 of this Complaint as if fully set forth herein.

614.   On or about December 20, 2005, ATMA and 36 Main executed Bill of Sale

for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed

ATM machines to ATMA for the sum of $1,900,000.00 (the "December 20, 2005 Bill of

Sale").

615.   The December 20, 2005 Bill of Sale states at the second unnumbered

Paragraph that:

121

36 Main represents and warrants that it has good title to the Assets, full
authority to sell and transfer same and that the Assets are in good working
condition, and are free and clear of all liens, encumbrances, liabilities and
adverse claims, of every nature and description.

616.    ATMA relied on 36 Main's representations as a condition of the purchase.

617.    36 Main breached the warranty set forth in the December 20, 2005 Bill of Sale

by failing to deliver good and marketable title to the 100 Placed ATM machines listed in

Schedule "A" of the December 20, 2005 Bill of Sale.

618.    36 Main was notified that title to the 100 Placed ATM machines listed in

Schedule "A" of the December 20, 2005 Bill of Sale was not good or marketable.

619.    36 Main's conduct breached the warranty stated in the December 20, 2005

Bill of Sale and ATMA is therefore entitled to the award of the return of the

$1,900,000.00 paid to 36 Main.

## COUNT 49
### (Breach of Warranty – 36 Main)

620.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 619 of this Complaint as if fully set forth herein.

621.    On or about February 22, 2006, ATMA and 36 Main executed Bill of Sale for

the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed

ATM machines to ATMA for the sum of $1,900,000.00 (the "February 22, 2006 Bill of

Sale").

622.    The February 22, 2006 Bill of Sale states at the second unnumbered Paragraph

that:

36 Main represents and warrants that it has good title to the Assets, full
authority to sell and transfer same and that the Assets are in good working
condition, and are free and clear of all liens, encumbrances, liabilities and
adverse claims, of every nature and description.

122

Formatted: Numbered + Level: 1 +
Numbering Style: 1, 2, 3, … + Start
at: 246 + Alignment: Left + Aligned
at: 0.25" + Tab after: 0.75" +
Indent at: 0"

Deleted: Plaintiffs repeat

Deleted: allege

Formatted: Numbered + Level: 1 +
Numbering Style: 1, 2, 3, … + Start
at: 246 + Alignment: Left + Aligned
at: 0.25" + Tab after: 0.75" +
Indent at: 0"

Deleted: 612

623.   ATMA relied on 36 Main's representations as a condition of the purchase.

624.   36 Main breached the warranty set forth in the February 22, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Bill of Sale.

625.   36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the February 22, 2006 Bill of Sale was not good or marketable.

626.   36 Main's conduct breached the warranty stated in the February 22, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,900,000.00 paid to 36 Main.

## COUNT 50
### (Breach of Warranty – 36 Main)

627.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 626 of this Complaint as if fully set forth herein.

628.   On or about April 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,950,000.00 (the "April 26, 2006 Bill of Sale").

629.   The April 26, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

630.   ATMA relied on 36 Main's representations as a condition of the purchase.

123

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

Deleted: Plaintiffs repeat

Deleted: allege

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

Deleted: 619

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

631.     36 Main breached the warranty set forth in the April 26, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Bill of Sale.

632.     36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the April 26, 2006 Bill of Sale was not good or marketable.

633.     36 Main's conduct breached the warranty stated in the April 26, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

### COUNT 51
### (Breach of Warranty – 36 Main)

634.     Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 633 of this Complaint as if fully set forth herein.

635.     On or about May 27, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 100 Placed ATM machines to ATMA for the sum of $1,950,000.00 (the "May 27, 2006 Bill of Sale").

636.     The May 27, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

637.     ATMA relied on 36 Main's representations as a condition of the purchase.

638.     36 Main breached the warranty set forth in the May 27, 2006 Bill of Sale by failing to deliver good and marketable title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Bill of Sale.

124

639.    36 Main was notified that title to the 100 Placed ATM machines listed in Schedule "A" of the May 27, 2006 Bill of Sale was not good or marketable.

640.    36 Main's conduct breached the warranty stated in the May 27, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,950,000.00 paid to 36 Main.

## COUNT 52
### (Breach of Warranty – 36 Main)

641.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 640 of this Complaint as if fully set forth herein.

642.    On or about June 16, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 50 Placed ATM machines to ATMA for the sum of $975,000.00 (the "June 16, 2006 Bill of Sale").

643.    The June 16, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

644.    ATMA relied on 36 Main's representations as a condition of the purchase.

645.    36 Main breached the warranty set forth in the June 16, 2006 Bill of Sale by failing to deliver good and marketable title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Bill of Sale.

646.    36 Main was notified that title to the 50 Placed ATM machines listed in Schedule "A" of the June 16, 2006 Bill of Sale was not good or marketable.

125

**Deleted:** Plaintiffs repeat

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

**Deleted:** allege

**Deleted:** 633

**Formatted:** Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

647.   36 Main's conduct breached the warranty stated in the June 16, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $975,000.00 paid to 36 Main.

## COUNT 53
### (Breach of Warranty – 36 Main)

648.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 647 of this Complaint as if fully set forth herein.

649.   On or about June 27, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 74 Placed ATM machines to ATMA for the sum of $1,073,000.00 (the "June 27, 2006 Bill of Sale").

650.   The June 27, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

651.   ATMA relied on 36 Main's representations as a condition of the purchase.

652.   36 Main breached the warranty set forth in the June 27, 2006 Bill of Sale by failing to deliver good and marketable title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Bill of Sale.

653.   36 Main was notified that title to the 74 Placed ATM machines listed in Schedule "A" of the June 27, 2006 Bill of Sale was not good or marketable.

654.   36 Main's conduct breached the warranty stated in the June 27, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,073,000.00 paid to 36 Main.

126

**[Margin annotations:]**

Deleted: Plaintiffs repeat

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

Deleted: allege

Deleted: 640

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 246 + Alignment: Left + Aligned at: 0.25" + Tab after: 0.75" + Indent at: 0"

## COUNT 54
### (Breach of Warranty – 36 Main)

655.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 654 of this Complaint as if fully set forth herein.

656.   On or about July 28, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 101 Placed ATM machines to ATMA for the sum of $1,469,500.00 (the "July 28, 2006 Bill of Sale").

657.   The July 28, 2006 Bill of Sale states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

658.   ATMA relied on 36 Main's representations as a condition of the purchase.

659.   36 Main breached the warranty set forth in the July 28, 2006 Bill of Sale by failing to deliver good and marketable title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Bill of Sale.

660.   36 Main was notified that title to the 101 Placed ATM machines listed in Schedule "A" of the July 28, 2006 Bill of Sale was not good or marketable.

661.   36 Main's conduct breached the warranty stated in the July 28, 2006 Bill of Sale and ATMA is therefore entitled to the award of the return of the $1,469,500.00 paid to 36 Main.

## COUNT 55
### (Breach of Warranty – 36 Main)

662.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 661 of this Complaint as if fully set forth herein.

127

663.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 7 Placed ATM machines to ATMA for the sum of $136,500.00 (the "August 30, 2006 Bill of Sale #1").

664.    The August 30, 2006 Bill of Sale #1 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

665.    ATMA relied on 36 Main's representations as a condition of the purchase.

666.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #1 by failing to deliver good and marketable title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #1.

667.    36 Main was notified that title to the 7 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #1 was not good or marketable.

668.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #1 and ATMA is therefore entitled to the award of the return of the $136,500.00 paid to 36 Main.

## COUNT 56
## (Breach of Warranty – 36 Main)

669.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 668 of this Complaint as if fully set forth herein.

670.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 17 Placed

128

ATM machines to ATMA for the sum of $331,500.00 (the "August 30, 2006 Bill of Sale #2").

671.    The August 30, 2006 Bill of Sale #2 states at the second unnumbered

Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full
> authority to sell and transfer same and that the Assets are in good working
> condition, and are free and clear of all liens, encumbrances, liabilities and
> adverse claims, of every nature and description.

672.    ATMA relied on 36 Main's representations as a condition of the purchase.

673.    36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #2

by failing to deliver good and marketable title to the 17 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #2.

674.    36 Main was notified that title to the 17 Placed ATM machines listed in

Schedule "A" of the August 30, 2006 Bill of Sale #2 was not good or marketable.

675.    36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of

Sale #2 and ATMA is therefore entitled to the award of the return of the $334,500.00

paid to 36 Main.

## COUNT 57
### (Breach of Warranty – 36 Main)

676.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 675 of this Complaint as if fully set forth herein.

677.    On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for

the 36 Main to convey, transfer, sell and assign "right, title and interest" in 36 Placed

ATM machines to ATMA for the sum of $522,000.00 (the "August 30, 2006 Bill of Sale

#3").

129

678. The August 30, 2006 Bill of Sale #3 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

679. ATMA relied on 36 Main's representations as a condition of the purchase.

680. 36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #3 by failing to deliver good and marketable title to the 36 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #3.

681. 36 Main was notified that title to the 36 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #3 was not good or marketable.

682. 36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #3 and ATMA is therefore entitled to the award of the return of the $522,000.00 paid to 36 Main.

## COUNT 58
### (Breach of Warranty – 36 Main)

683. Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 682 of this Complaint as if fully set forth herein.

684. On or about August 30, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 68 Placed ATM machines to ATMA for the sum of $986,000.00 (the "August 30, 2006 Bill of Sale #4").

685. The August 30, 2006 Bill of Sale #4 states at the second unnumbered Paragraph that:

130

36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

686.     ATMA relied on 36 Main's representations as a condition of the purchase.

687.     36 Main breached the warranty set forth in the August 30, 2006 Bill of Sale #4 by failing to deliver good and marketable title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #4.

688.     36 Main was notified that title to the 68 Placed ATM machines listed in Schedule "A" of the August 30, 2006 Bill of Sale #4 was not good or marketable.

689.     36 Main's conduct breached the warranty stated in the August 30, 2006 Bill of Sale #4 and ATMA is therefore entitled to the award of the return of the $986,000.00 paid to 36 Main.

## COUNT 59
### (Breach of Warranty – 36 Main)

690.     Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 689 of this Complaint as if fully set forth herein.

691.     On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 2 Placed ATM machines to ATMA for the sum of $44,000.00 (the "September 26, 2006 Bill of Sale #1").

692.     The September 26, 2006 Bill of Sale #1 states at the second unnumbered Paragraph that:

36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

131

693.    ATMA relied on 36 Main's representations as a condition of the purchase.

694.    36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #1 by failing to deliver good and marketable title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #1.

695.    36 Main was notified that title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #1 was not good or marketable.

696.    36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #1 and ATMA is therefore entitled to the award of the return of the $44,000.00 paid to 36 Main.

## COUNT 60
### (Breach of Warranty – 36 Main)

697.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 696 of this Complaint as if fully set forth herein.

698.    On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 21 Placed ATM machines to ATMA for the sum of $409,500.00 (the "September 26, 2006 Bill of Sale #2").

699.    The September 26, 2006 Bill of Sale #2 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

700.    ATMA relied on 36 Main's representations as a condition of the purchase.

701.  36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #2 by failing to deliver good and marketable title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #2.

702.  36 Main was notified that title to the 21 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #2 was not good or marketable.

703.  36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #2 and ATMA is therefore entitled to the award of the return of the $409,500.00 paid to 36 Main.

### COUNT 61
### (Breach of Warranty – 36 Main)

704.  Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 703 of this Complaint as if fully set forth herein.

705.  On or about September 26, 2006, ATMA and 36 Main executed Bill of Sale for the 36 Main to convey, transfer, sell and assign "right, title and interest" in 64 Placed ATM machines to ATMA for the sum of $928,000.00 (the "September 26, 2006 Bill of Sale #3").

706.  The September 26, 2006 Bill of Sale #3 states at the second unnumbered Paragraph that:

> 36 Main represents and warrants that it has good title to the Assets, full authority to sell and transfer same and that the Assets are in good working condition, and are free and clear of all liens, encumbrances, liabilities and adverse claims, of every nature and description.

707.  ATMA relied on 36 Main's representations as a condition of the purchase.

133

708.   36 Main breached the warranty set forth in the September 26, 2006 Bill of Sale #3 by failing to deliver good and marketable title to the 64 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #3.

709.   36 Main was notified that title to the 2 Placed ATM machines listed in Schedule "A" of the September 26, 2006 Bill of Sale #3 was not good or marketable.

710.   36 Main's conduct breached the warranty stated in the September 26, 2006 Bill of Sale #3 and ATMA is therefore entitled to the award of the return of the $928,000.00 paid to 36 Main.

### COUNT 62
### (Conversion – 36 Main)

711.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 710 of this Complaint as if fully set forth herein.

712.   Plaintiff delivered funds to 36 Main for the sole purpose of purchasing Placed ATM machines as set forth in the Asset Purchase Agreements and Bills of Sale between 36 Main and ATMA.  Plaintiff delivered, via bank wire transfers from ATMA, $16,475,000.00 to 36 Main for the sole purpose of purchasing the ATMA Machines.

713.   36 Main failed to use Plaintiff's funds to purchase the ATMA Machines identified in the schedules attached to the Asset Purchase Agreements and Bills of Sale signed by 36 Main and ATMA.

714.   36 Main utilized the funds delivered by Plaintiff to 36 Main for the purchase of the ATMA Machines for an unauthorized purpose.

715.   36 Main has improperly converted Plaintiff's funds and failed to return the funds to Plaintiff and should be ordered to return the $16,475,000.00 in funds delivered to 36 Main for the purchase of the ATMA Machines.

134

## COUNT 63
### (Unjust Enrichment – 36 Main)

716.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 715 as if fully set forth herein.

717.    By misappropriating Plaintiff's funds delivered to 36 Main designated for the sale of the ATMA Machines, 36 Main obtained the benefit of Plaintiff's capital without returning comparable consideration, specifically the ATMA Machines identified in the schedules attached to the Asset Purchase Agreements and Bills of Sale signed by ATMA and 36 Main.

718.    36 Main acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $16,475,000.00, thereby damaging Plaintiff in the same amount.

719.    36 Main has retained the benefits of Plaintiff's funds under such circumstances that equity and good conscience require 36 Main make restitution to Plaintiff in the amount of the value of the benefits 36 Main acquired from Plaintiff.

## COUNT 64
### (Unjust Enrichment – 36 Main)

720.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 719 as if fully set forth herein.

721.    By misappropriating Plaintiff's funds delivered to 36 Main designated for the payment of Residual Revenue Funds associated with the ATMA Tranche Purchases, 36 Main obtained the benefit of Plaintiff's capital without returning comparable consideration.

135

722.   36 Main acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $209,441.03, thereby damaging Plaintiff in the same amount.

723.   36 Main has retained the benefits of Plaintiff's funds under such circumstances that equity and good conscience require 36 Main make restitution to Plaintiff in the amount of the value of the benefits 36 Main acquired from Plaintiff.

## COUNT 65
## (Unjust Enrichment – ATM Capital)

724.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 723 as if fully set forth herein.

725.   By misappropriating Plaintiff's funds delivered to ATM Capital designated for the payment of Residual Revenue Funds associated with the December 20, 2005 Tranche Purchase, ATM Capital obtained the benefit of Plaintiff's capital without returning comparable consideration.

726.   ATM Capital acquired the funds voluntarily, intentionally and with full knowledge that it was not entitled to such funds and has been unjustly enriched in the amount of at least $27,801.71, thereby damaging Plaintiff in the same amount.

727.   ATM Capital has retained the benefits of Plaintiff's funds under such circumstances that equity and good conscience require ATM Capital make restitution to Plaintiff in the amount of the value of the benefits ATM Capital acquired from Plaintiff.

## COUNT 66
## (Breach of Fiduciary Duty – Brossman)

728.   Plaintiff repeats and re-alleges each and every allegation made in Paragraphs 1 through 727 of this Complaint as if fully set forth herein.

136

729.    That Brossman, as a co-chief executive and employee of ATMA has a duty to his employer to act in good faith and in the employer's best interests during the period of the employment. Brossman owed ATMA his undivided and unqualified loyalty during the period of his employment and was prohibited from acting in any manner contrary to the interests of ATMA. As a fiduciary to ATMA, Brossman was required to make truthful and complete disclosures to ATMA and Brossman was forbidden to obtain an improper advantage at ATMA's expense.

730.    While employed at ATMA, Brossman was required to exert his best efforts on behalf of ATMA, and not compete with it or profit at its expense, or place his private interests in conflict with its interests.

731.    Brossman did not act in good faith or in the best interests of ATMA when Brossman: (1) participated in the ATM Sales Enterprise; (2) misrepresented the true nature of the ATM Venture; (3) failed to disclose the non-existence of Placed ATM machines sold by 36 Main to ATMA and others; (4) failed to disclose prior and continuing business relationships Brossman had with Netschi and Moore; (5) failed to disclose prior and continuing business relationships between Netschi and Moore; and (6) knowingly forwarded fraudulent Monthly Reports, and other documents, from Moore to Plaintiff.

732.    As a result of Brossman's acts, ATMA sustained damages and Brossman's acts were a substantial cause of those damages.

733.    Accordingly, ATMA is entitled to recover the actual damages sustained for compensation and expenses that ATMA paid to Brossman during the period of Brossman's disloyalty, profits that Plaintiff lost due to Brossman's disloyalty, and

| Deleted: and, |
| Deleted: s |

137

payment of funds to the ATM Sales Enterprise that Plaintiff lost due to Brossman's

disloyalty.

## COUNT 67
### (Breach of Fiduciary Duty – Munier)

734.    Plaintiff repeats and re-alleges each and every allegation made in Paragraphs

1 through 733 of this Complaint as if fully set forth herein.

735.    That Munier, as a co-chief executive and employee of ATMA has a duty to

his employer to act in good faith and in the employer's best interests during the period of

the employment. Munier owed ATMA his undivided and unqualified loyalty during the

period of his employment and was prohibited from acting in any manner contrary to the

interests of ATMA.  As a fiduciary to ATMA, Munier was required to make truthful and

complete disclosures to ATMA and Munier was forbidden to obtain an improper

advantage at ATMA's expense.

736.    While employed at ATMA, Munier was required to exert his best efforts on

behalf of ATMA, and not compete with it or profit at its expense, or place his private

interests in conflict with its interests.

737.    Munier did not act in good faith or in the best interests of ATMA when he: (1)

participated in the ATM Sales Enterprise; (2) misrepresented the true nature of the ATM

Venture; (3) failed to disclose the non-existence of Placed ATM machines sold by 36

Main to ATMA and others; (4) failed to disclose prior and continuing business

relationships Munier had with Netschi and Moore; (5) failed to disclose prior and

continuing business relationships between Netschi and Moore; and (6) knowingly

forwarded fraudulent Monthly Reports from Moore to Plaintiff.

138

738. As a result of Munier's acts, Plaintiff sustained damages and Munier's acts were a substantial cause of those damages.

739. Accordingly, ATMA is entitled to recover the actual damages sustained for compensation and expenses that ATMA paid to Munier during the period of Munier's disloyalty, profits that Plaintiff lost due to Munier's disloyalty, and payment of funds to the ATM Sales Enterprise that Plaintiff lost due to Munier's disloyalty.

## IX
## DEMAND FOR RELIEF

WHEREFORE, Plaintiff demand judgment against in their favor and against Defendants as follows:

i. on Count 1, damages, including interest, against the Defendants, jointly and severally, the precise amount to be proved at trial but not less that $16,475,000.00 and treble the actual damages pursuant to 18 U.S.C. § 1964(c);

ii. on Count 2, damages, including interest, against the Defendants, jointly and severally, the precise amount to be proved at trial but not less that $16,475,000.00 and treble the actual damages pursuant to 18 U.S.C. § 1964(c);

iii. on Count 3, as against Moore, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

iv. on Count 4, as against Netschi, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

v. on Count 5, as against Brossman, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

vi. on Count 6, as against Munier, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

139

vii. on Count 7, as against 36 Main and Netschi, jointly and severally, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

viii. on Count 8, as against Moore, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

ix. on Count 9, as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

x. on Count 10, as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xi. on Count 11 as against Moore, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xii. on Count 12, as against Moore, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xiii. on Count 13, as against Moore, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xiv. on Count 14, as against Moore, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xv. on Count 15, as against Moore, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xvi. on Count 16, as against Moore, in an amount to be determined at trial, but in no event less than $1,450,000.00, together with interest thereon;

xvii. on Count 17, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

140

xviii.  on Count 18 as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xix.  on Count 19, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xx.  on Count 20, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxi.  on Count 21, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxii.  on Count 22, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xxiii.  on Count 23, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xxiv.  on Count 24, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

xxv.  on Count 25, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

xxvi.  on Count 26, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

xxvii.  on Count 27, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

xxviii.  on Count 28, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

141

xxix.  on Count 29, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000, together with interest thereon;

xxx.  on Count 30, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

xxxi.  on Count 31, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

xxxii.  on Count 32, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxiii.  on Count 33, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxiv.  on Count 34, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xxxv.  on Count 35, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxxvi.  on Count 36, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

xxxvii.  on Count 37, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

xxxviii.  on Count 38, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

xxxix.  on Count 39, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

142

xl.  on Count 40, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

xli.  on Count 41, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

xlii.  on Count 42, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

xliii.  on Count 43, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

xliv.  on Count 44, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000.00, together with interest thereon;

xlv.  on Count 45, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

xlvi.  on Count 46, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

xlvii.  on Count 47, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xlviii.  on Count 48, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

xlix.  on Count 49, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,900,000.00, together with interest thereon;

l.  on Count 50, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

li.  on Count 51, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,950,000.00, together with interest thereon;

lii.  on Count 52, as against 36 Main, in an amount to be determined at trial, but in no event less than $975,000.00, together with interest thereon;

liii.  on Count 53, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,073,000.00, together with interest thereon;

liv.  on Count 54, as against 36 Main, in an amount to be determined at trial, but in no event less than $1,469,500.00, together with interest thereon;

lv.  on Count 55, as against 36 Main, in an amount to be determined at trial, but in no event less than $136,500.00, together with interest thereon;

lvi.  on Count 56, as against 36 Main, in an amount to be determined at trial, but in no event less than $331,500.00, together with interest thereon;

lvii.  on Count 57, as against 36 Main, in an amount to be determined at trial, but in no event less than $522,000.00, together with interest thereon;

lviii.  on Count 58, as against 36 Main, in an amount to be determined at trial, but in no event less than $986,000.00, together with interest thereon;

lix.  on Count 59, as against 36 Main, in an amount to be determined at trial, but in no event less than $44,000.00, together with interest thereon;

lx.  on Count 60, as against 36 Main, in an amount to be determined at trial, but in no event less than $409,500.00, together with interest thereon;

lxi.  on Count 61, as against 36 Main, in an amount to be determined at trial, but in no event less than $928,000.00, together with interest thereon;

144

lxii.  on Count 62, as against 36 Main, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxiii.  on Count 63, as against 36 Main, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxiv.  on Count 64, as against 36 Main, in an amount to be determined at trial, but in no event less than $209,441.03, together with interest thereon;

lxv.  on Count 65, as against ATM Capital, in an amount to be determined at trial, but in no event less than $27,801.71, together with interest thereon;

lxvi.  on Count 66, as against Brossman, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxvii.  on Count 67, as against Munier, in an amount to be determined at trial, but in no event less than $16,475,000.00, together with interest thereon;

lxviii.  awarding Plaintiff punitive damages;

> Deleted: s

lxix.  awarding Plaintiff their attorneys' fees, costs and disbursements incurred in connection with this action; and,

> Deleted: s

lxx.  awarding Plaintiff such other and further relief as the Court seems just and proper.

145

X

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury in this action.

Dated:  New York, New York
       August 15, 2008

LANKLER & CARRAGHER, LLP

By: _____
      Andrew M. Lankler (AL1202)
      James W. Versocki (JV6877)
      Joseph J. Porrovecchio (JP6788)
      Attorneys for Plaintiff
      845 Third Avenue, 17th Floor
      New York, New York 10022
      alankler@lcattorneys.com
      jversocki@lcattorneys.com
      jporrovecchio@lcattorneys.com
      (212) 812-8910
      (212) 812-8920 facsimile

**Deleted: Plaintiffs demand**

**Deleted: April 3**

**Deleted: s**

146

# Exhibit D

EXECUTION COPY

LIMITED LIABILITY COMPANY AGREEMENT

OF

AUTOMATED TELLER MACHINE ADVANTAGE, LLC

Dated as of November 14, 2005

David/investments/ATM holdings llc.v1

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ...................................................................................... 1

ARTICLE 2 FORMATION; TERM; FISCAL YEAR .......................................... 1
    2.1.   Formation. ............................................................................ 1
    2.2.   Term. ................................................................................... 1
    2.3.   Fiscal Year. .......................................................................... 2

ARTICLE 3 NAME AND PLACE OF BUSINESS ............................................... 2
    3.1.   Name. ................................................................................... 2
    3.2.   Principal Place of Business. ................................................ 2

ARTICLE 4 PURPOSE AND POWERS ............................................................... 2
    4.1.   Purpose. ............................................................................... 2
    4.2.   Powers. ................................................................................ 2

ARTICLE 5 CAPITAL CONTRIBUTIONS ........................................................ 2
    5.1.   Capital Structure. ................................................................ 2
    5.2.   Capital Contributions by Class A Members. ...................... 3
    5.3.   Class B Units. ...................................................................... 4

ARTICLE 6 MANAGEMENT ............................................................................... 4
    6.1.   Board of Managers. ............................................................. 4
    6.2.   Management by CEOs. ........................................................ 7
    6.3.   Officers. ............................................................................... 7
    6.4.   Certain Transactions. .......................................................... 7

ARTICLE 7 ACCOUNTS, ALLOCATIONS AND DISTRIBUTIONS .............. 8
    7.1.   Capital Accounts. ................................................................ 8
    7.2.   Allocation of Net Profit and Net Loss. ............................... 8
    7.3.   Allocations of Nonrecourse Deductions; Minimum Gain
          Chargeback; Qualified Income Offset. ............................... 9
    7.4.   Distributions. ..................................................................... 10
    7.5.   Withholding Requirements. ............................................... 11

ARTICLE 8 RIGHTS AND LIABILITIES OF MEMBERS ............................. 12
    8.1.   No Right to Manage. ......................................................... 12
    8.2.   No Liability. ...................................................................... 12

ARTICLE 9 TRANSFER OF MEMBERSHIP INTERESTS ........................... 12
    9.1.   Transfers. ........................................................................... 12

David/investments/ATM holdings llc.v1

TABLE OF CONTENTS
(continued)

Page

9.2.    Liquidity Events. ................................................................13
9.3.    Right of First Offer/ Tag Along Rights. ...........................14
9.4.    Ownership of Membership Interests. ...............................15
9.5.    Effect of Transfer Not in Accordance with Agreement. ........15

ARTICLE 10 CONVERSION TO A CORPORATION ....................................15
10.1.    Conversion to a Corporation. ....................................15

ARTICLE 11 COVENANTS ................................................................16
11.1.    Books of Account; Access to Books and Records. ............16
11.2.    Financial Records. From and after the date hereof the
         Company agrees to furnish to Wolfson the following: ......16
11.3.    Filings; Compliance with Laws................................17
11.4.    Disclosure. ......................................................17

ARTICLE 12 WITHDRAWAL; DISSOLUTION AND LIQUIDATION ....................18
12.1.    Withdrawal of Members................................................18
12.2.    Events of Dissolution. ...........................................18
12.3.    Liquidation. .......................................................18
12.4.    Final Accounting. ................................................18
12.5.    Cancellation of Certificate. ....................................19

ARTICLE 13 TAX MATTERS; CERTAIN REPRESENTATIONS AND
           COVENANTS OF MEMBERS ................................................19
13.1.    Designation of Tax Matters Member. ..........................19
13.2.    Tax Returns. .......................................................19
13.3.    Taxable Year. ......................................................19
13.4.    Tax Elections. .....................................................19
13.5.    Certain Representations of Members. .........................19
13.6.    Tax Election. .......................................................21

ARTICLE 14 EXCULPATION AND INDEMNIFICATION .............................21
14.1.    Performance of Duties.............................................21
14.2.    Right to Indemnification. .......................................22
14.3.    Advance Payment. ................................................22
14.4.    Nonexclusivity of Rights.........................................22
14.5.    Insurance. ........................................................22
14.6.    Savings Clause. ...................................................23
14.7.    No Liability for Acts of Agents..................................23

- ii -

## TABLE OF CONTENTS
### (continued)

Page

14.8.   Survival. ...............................................................................................23

ARTICLE 15 MISCELLANEOUS ................................................................................23

15.1.   Amendments or Modification.  .........................................................23

15.2.   Approvals and Consents.  ...................................................................23

15.3.   Binding Effects; Benefits. ..................................................................24

15.4.   Headings. .............................................................................................24

15.5.   Counterparts. .......................................................................................24

15.6.   Grammatical Construction.  ...............................................................24

15.7.   Separability. ........................................................................................24

15.8.   Effect of Waiver or Consent...............................................................24

15.9.   Entire Agreement.  ..............................................................................24

15.10.  Notices.................................................................................................24

15.11.  Payments on Business Days.  .............................................................25

15.12.  Governing Law. ..................................................................................25

Appendix A          Definitions

Schedule A          Schedule of Membership Interests

David/investments/ATM holdings llc.vl

LIMITED LIABILITY COMPANY AGREEMENT

OF

AUTOMATED TELLER MACHINE ADVANTAGE, LLC

LIMITED LIABILITY COMPANY AGREEMENT of AUTOMATED TELLER MACHINE ADVANTAGE, LLC (the "Company"), dated as of November 14, 2005, by and among South Ferry Building Company, a Delaware limited partnership ("Wolfson") and the other persons listed on Schedule A hereto.

WHEREAS, the Certificate of Formation of the Company was filed with the Secretary of State of the State of Delaware on November 18, 2004; and

WHEREAS, the parties hereto desire to enter into this Limited Liability Company Agreement (the "Agreement") in accordance with the provisions of the Delaware Limited Liability Company Act, as amended (the "LLC Act");

NOW, THEREFORE, the parties hereto hereby agree as follows:

ARTICLE 1

DEFINITIONS

Capitalized terms used herein are defined in Appendix A attached hereto and made a part hereof.

ARTICLE 2

FORMATION; TERM; FISCAL YEAR

2.1.    Formation.

(a)    The Members hereby acknowledge the formation of the Company as a limited liability company pursuant to the LLC Act by virtue of the filing of a Certificate of Formation with the Secretary of State of the State of Delaware, and confirm and agree to their status as Members of the Company.

(b)    The Members hereby execute this Agreement for the purpose of establishing the rights, duties and relationship of the Members.

(c)    The Members hereby acknowledge and agree that, in accordance with Section 18-201(d) of the LLC Act, this Agreement shall be effective as of November 14, 2005.

2.2.    Term.    This Agreement shall continue until the Company is dissolved and liquidated in accordance with the provisions of Article 12 hereof.

- 1 -

2.3.   Fiscal Year.  Unless the Board of Managers at any time shall otherwise determine, the Fiscal Year of the Company (the "Fiscal Year") shall end on December 31.  The initial Fiscal Year shall commence on the date and year first written above and end on December 31, 2005.

## ARTICLE 3

## NAME AND PLACE OF BUSINESS

3.1.   Name.  The name of the Company shall be, and the business of the Company shall be conducted under the name, "Automated Teller Machine Advantage, LLC"; provided that such name shall be subject to change, from time to time, by consent of the Board of Managers.

3.2.   Principal Place of Business.  The principal place of business of the Company shall be at such place as the Board of Managers shall determine from time to time.  The Board of Managers shall notify the Members of any change of the principal place of business of the Company.  The Company may maintain such office or offices for the transaction of business at such other locations as the Board of Managers may deem advisable.

## ARTICLE 4

## PURPOSE AND POWERS

4.1.   Purpose.  The purpose of the Company is to acquire, operate and dispose of automated teller machines ("ATMs") and to engage in any other lawful business that may be engaged in by a limited liability company under the LLC Act, as such businesses may be determined from time to time by consent of the Board of Managers and the Class A Members.

4.2.   Powers.  The Company shall have and may exercise all the powers and privileges to the fullest extent permitted by law as are necessary, appropriate, advisable, desirable or incidental to the conduct, promotion or attainment of the purpose of the Company.

## ARTICLE 5

## CAPITAL CONTRIBUTIONS

5.1.   Capital Structure.

(a)     There are hereby established for issuance by the Company, in accordance with the terms of this Agreement, the following membership Interests: (i) "Class A Membership Interests," and (ii) "Class B Units."

(b)     Subject to Sections 5.1(c) and 5.1(d), the Board of Managers shall have the authority to issue (i) an unlimited amount of Class A Membership Interests, and (ii) up to 100 Class B Units.

(c)     The Company may not (i) authorize, issue or sell any other Membership Interests other than Class A Membership Interests and Class B Units without the prior approval

- 2 -

of the Class A Members and the Board of Managers, or (ii) increase the number of authorized Class B Units (including any new units of a different class or series authorized or issued in accordance with Section 5.3(d)) or modify the rights of the Class B Units (except in accordance with Section 7.4(d) hereof) in each case without the prior approval of the Class A Members and the Board of Managers, and in the case of (ii) above, the approval of Class B Members representing at least 75% of the outstanding Class B Units.

(d)    Persons hereafter admitted as Members of the Company in accordance with the terms hereof shall make such contributions of cash (or promissory obligations), property or services to the Company as shall (subject to the other terms of this Agreement) be determined by the Class A Members and the Board of Managers.  In order for a Person, other than an existing Member, to be admitted as a Member of the Company with respect to a Membership Interest: (i) such Membership Interest shall have been issued or Transferred in accordance with the terms of this Agreement, (ii) such Person shall have delivered to the Company a written undertaking to be bound by the terms and conditions of this Agreement and shall have delivered such documents and instruments as the Board of Managers determines to be necessary or appropriate in connection with the issuance or Transfer of such Membership Interest; and (iii) the Board of Managers shall amend Schedule A hereto to reflect such new Person as a Member and, upon the amendment of Schedule A hereto, such Member shall be issued his, her or its Membership Interest.  No Person shall be admitted as a Member until all of the requirements of clauses (i), (ii) and (iii) of the foregoing sentence have been satisfied, as determined by the Board of Managers.

(e)    Immediately prior to and in connection with the admission of additional Members or the issuance by the Company of additional Membership Interests to the existing Members, the Capital Account of each existing Member shall be adjusted in accordance with and pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f).

5.2.    Capital Contributions by Class A Members.

(a)    Upon the terms and subject to the conditions contained herein, each Class A Member is hereby making a capital commitment to the Company in the amount set forth opposite such Member's name on Schedule A hereto ("Capital Commitment").

(b)    Subject to Section 5.2(c), each Class A Member shall make Capital Contributions from time to time upon receipt of written notice from the Board of Managers (each such notice, a "Capital Call"), provided that the Board of Managers shall not make the initial Capital Call unless and until the Company requires the cash to make its initial purchase of ATMs.  No Class A Member may be required to make any Capital Contribution to the extent that such Capital Contribution exceeds, when added to all previous Capital Contributions made by such Class A Member, such Class A Member's Capital Commitment.  Upon the making of any Capital Contributions in response to a Capital Call, Schedule A hereto shall be amended by the Board of Managers to reflect the making of such Capital Contribution.  Subject to Section 5.2(c), any such additional Capital Contribution shall be made within 10 calendar days of receipt of the Capital Call.

David/investments/ATM holdings llc.v1

(c)     Subject to Sections 5.1(c), to the extent that the Board of Managers shall determine, at any time or from time to time after the date hereof, that additional Capital Contributions in excess of the aggregate Capital Commitments are required to finance the business and operations of the Company, each Class A Member shall have the right, but not the obligation, to contribute its pro rata share of such additional Capital Contributions in order to maintain its Capital Commitment Percentage Interest. Any such additional Capital Contributions shall be made within 10 business days of receipt by the Class A Members of notice of such determination by the Board of Managers.

(d)     The provisions of this Section 5.2 are not for the benefit of any creditor or other Person other than the Members to whom any debts, liabilities, or obligations are owed by, or who otherwise have any claim against, the Company, and no creditor or other Person shall obtain any rights under this section or by reason of this section, or shall be able to make any claim in respect of any debts, liabilities, or obligations against the Company or any Member.

5.3.   Class B Units.

(a)     Upon execution of this Agreement, the Company is hereby issuing an aggregate of 100 Class B Units to those individuals set forth in Schedule A hereto and in the individual amounts set forth in Schedule A hereto.

(b)     All Class B Units shall be subject to vesting and forfeiture. The terms and conditions relating to the vesting and forfeiture of Class B Units shall be governed by the individual Employment Agreement or Non-Compete Agreement, as the case may be, governing each Class B Member's relationship with the Company.

(c)     In the event any Class B Units are forfeited by any holder, the Membership Interests associated with such Class B Units shall be null and void, the holder of such Class B Units will have no rights (including with respect to distributions) with respect to such Class B Units, and such Class B Units shall be treated as authorized but unissued for all purposes contained herein (including for purposes of calculating distributions to the Members).

(d)     Subject to the limitations contained in Section 5.1(c), in lieu of Class B Units, the Board of Managers may, after the date hereof, issue new units of a different class or series with terms that are substantially identical economically to the Class B Units, except that they are structured, based on the value of the Company at the time of issuance, to represent solely a "profits interest" in the Company within the meaning of Internal Revenue Service Rev. Proc. 93-27, 1993-2 C.B. 343.

ARTICLE 6

MANAGEMENT

6.1.   Board of Managers.

(a)     The Members hereby unanimously agree that, pursuant to Section 18-404 of the LLC Act, the responsibility for management of the business and affairs of the Company

- 4 -

David/investments/ATM holdings llc.v1

shall be delegated to a board of managers (the "Board of Managers"). The Board of Managers shall at all times be composed of three members, (i) two of whom shall be appointed by Wolfson and (ii) for as long as Mr. Brossman is employed by the Company, one of whom shall be Mr. Brossman, and after such time such member of the Board of Managers shall be appointed by the Class B Management Members (Mr. Brossman or his successor to the Board of Managers, the "Class B Manager"). The Board of Managers shall, by resolution, appoint one member of the Board of Managers as Chairman of the Board of Managers to preside over meetings of the Board of Managers. The initial members of the Board of managers to be appointed by Wolfson shall be Aaron Wolfson and Eli Levitin and the initial Chairman of the Board of Managers shall be Aaron Wolfson. Each member of the Board of Managers shall serve until such member submits his or her written resignation to the Board of Managers, until removed or until the dissolution or termination of the Company in accordance with Section 12.2. At any time, Wolfson may remove, with or without cause, any of its appointees to the Board of Managers. In the event that a member of the Board of Managers is removed, resigns, or is otherwise unable to serve as a member of the Board of Managers, The Class B management Members shall have the right to appoint his or her successor. In the event there are no remaining Class B Management Members, Wolfson shall have the right to appoint his or her successor.

(b)     The Board of Managers shall meet at least once each fiscal year at the principal offices of the Company or at such other place as may be fixed by the Board of Managers, or at the request of any member of the Board of Managers upon three Business Days' notice to all other members of the Board of Managers in writing (including electronic mail), by telephone or by facsimile transmission. Meetings may be held by telephone. Subject to Section 6.1(e), no action may be taken at a meeting of the Board of Managers unless a quorum consisting of at least two members of the Board of Managers is present. Except as otherwise provided in this Agreement or in the LLC Act, matters on which the Board of Managers have a right to approval or disapproval shall require the approval or disapproval, as the case may be, of a majority of the members of the Board of Managers present at a duly held meeting at which a quorum was present.

(c)     Any action permitted or required by applicable law or this Agreement to be taken at a meeting of the Board of Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by the requisite number of members of the Board of Managers. Such consent shall have the same force and effect as a vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of the State of Delaware, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Board of Managers.

(d)     (i)     The Board of Managers may, by written instrument, (x) appoint an Executive Committee (the "Executive Committee") consisting of one or more members of the Board of Managers (which shall in any event include the Class B manager), and (y) delegate to such Executive Committee such rights, powers and authority as determined by the Board of Managers.

(ii)     In addition to the preceding clause (i), subject to the terms of this Agreement, the Board of Managers shall have the power and authority to delegate to one or more

- 5 -

Persons the Board of Managers' rights and powers to manage and control the business and affairs of the Company, including the power and authority, by written instrument, to delegate to any Officer, employee or agent of the Company, or any Member. The Board of Managers may, by written instrument, authorize any Person (including, without limitation, any Member) to enter into and perform under any document on behalf of the Company.

(e)    In addition to any other action required to be taken by the Board of Managers, the Company shall not, directly or indirectly, take any of the following actions (each, a "Major Transaction") without the unanimous approval of the Board of Managers (except for clause (vi) below which will only require the approval of the majority of the Board and clause (viii) below which will also require the approval of the holders of at least 75% of the outstanding Class B Units):

(i)    purchase any ATMs (whether or not they comply with the Purchase Parameters set forth on Schedule B);

(ii)    dispose of any ATMs;

(iii)    incur any indebtedness for borrowed money, including through any sale leaseback of ATM machines or other form of structured transaction;

(iv)    repay or retire any indebtedness for borrowed money;

(v)    commence or settle any litigation;

(vi)    effect any Liquidity Event;

(vii)    make any change in the Business Plan or incur expenses outside the approved Business Plan;

(viii)    reclassify any Membership Interests or otherwise alter or change through any means the preferences, rights, powers or privileges of the Membership Interests so as to affect the Membership Interests adversely

(ix)    authorize, increase the authorized number of, issue, or enter into any agreement providing for the issuance (contingent or otherwise) of, any Membership Interests or other equity securities; or otherwise raise additional capital for the Company,

(x)    consent to any transfer of any Membership Interests in the Company;

(xi)    voluntarily liquidate, dissolve or wind up;

(xii)    redeem, purchase or otherwise acquire any Membership Interests;

(xiii)    acquire, purchase, lease or acquire any rights in or to any assets or enter into any agreement requiring expenditures through any single transaction or a series of

- 6 -

David/investments/ATM holdings llc.v1

related transactions in any case involving consideration to be paid by the Company in excess of $10,000;

(xiv) adopt or amend any equity option plan, bonus plan or other employee benefit plan of the Company or modify, or grant any waiver under any employment or non-competition agreement to which the Company is a party or is bound;

(xv) hire any new employee of the Company;

(xvi) amend, modify or grant any waiver under any lease or similar space agreement related to any ATM machine;

(xvii) change the Company's independent public accountants;

(xviii) enter into any transaction with Affiliates except as explicitly permitted hereby; and

(xix) agree or otherwise commit to take any of the forgoing actions.

6.2.  **Management by CEOs.**  The day-to-day business and affairs of the Company will be managed by three Chief Executive Officers (the "CEOs") in accordance with the instructions and directives of the Board of Managers. The CEOs shall be appointed by the Board of Managers and shall hold such offices until their resignation or removal by the Board of Managers. The initial CEOs shall be Mr. Brossman, Mr. Munier and Mr. Bushell and their duties, responsibilities and authority shall be as set forth in the Employment Agreements, subject to modification at any time and from time to time by the Board of Managers. All actions of the CEO's shall require the affirmative action of at least two CEO's.

6.3.  **Officers.**  The officers (the "Officers") of the Company shall consist of the CEOs, a Treasurer, a Secretary and such other officers as the Board of Managers may choose to appoint from time to time.  Any number of offices may be held by the same person, as the Board of Managers may determine,.  The Officers shall hold office for the term for which they were appointed and until their successors are appointed; *provided, however,* that any Officer may be removed with or without cause by the Board of Managers, it being understood that the foregoing is in no way intended to alter the rights and obligations of the parties under the Employment Agreements.

6.4.  **Certain Transactions.**  Each Member expressly acknowledges and agrees that Wolfson and their Affiliates have other business interests and engage and may engage in the future in other business ventures of a variety of natures and descriptions, whether currently existing or hereafter created, some of which may compete, directly or indirectly, with the businesses conducted by the Company. Each Member agrees that Wolfson or their Affiliates may engage independently or with others in other business ventures of every nature and description. Neither the Company nor any other Member, nor any of its or their Affiliates, shall have any rights or obligations in or to such independent ventures or the income or profits derived therefrom.  Notwithstanding the foregoing, Wolfson shall not purchase directly or indirectly (other than through the Company) any ATM machines the availability of which was made known

- 7 -

to Wolfson by one or more of the Class B Management Members without the consent of the Class B Manager.

## ARTICLE 7

### ACCOUNTS, ALLOCATIONS AND DISTRIBUTIONS

7.1.    <u>Capital Accounts.</u>

(a)    Each Member shall have a Capital Account which shall be maintained in accordance with Treas. Reg. § 1.704-1(b)(2)(iv). The initial balance of the Capital Account of each Member shall be zero.

(b)    The Capital Account of each Member shall be increased by (i) any additional Capital Contribution made by such Member pursuant to Sections 5.2(b) and (d) when such additional Capital Contribution is made, (ii) the Net Profit allocated to such Member pursuant to Section 7.2, and (iii) the gross income allocated to such Member pursuant to Section 7.3(b).

(c)    The Capital Account of each Member shall be reduced by (i) the amount of any distribution of Cash (other than distributions in respect of guaranteed payments within the meaning of Sections 707(a) or 707(c) of the Code) and the Fair Market Value of any property (net of any liability secured by such property that the Member is considered to assume or take subject to under Section 752 of the Code) distributed to such Member, when such distribution is made, (ii) the Net Loss allocated to such Member pursuant to Section 7.2, and (iii) any "partner nonrecourse deductions" (as defined in Treas. Reg. § 1.704-2(i)) and any "nonrecourse deductions" (as defined in Treas. Reg. § 1.704-2(b)) allocated to such Member pursuant to Section 7.3(a).

(d)    The Capital Account of each Member shall be adjusted to reflect any adjustment to the Book Value of the Company's assets attributable to the application of Section 734 or 743 of the Code to the extent required pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(m).

(e)    Except as otherwise provided in this Agreement, whenever as at any date or time it is necessary to determine the Capital Account of any Member, the Capital Account of such Member shall be determined after giving effect to the allocations of Net Profit, Net Loss and other items realized prior to or concurrently with such determination (including, without limitation, any Net Profits and Net Losses attributable to adjustments to Book Values with respect to any concurrent distribution) and all contributions and distributions made prior to or concurrently with such determination.

7.2.    <u>Allocation of Net Profit and Net Loss.</u>

(a)    Net Profit or Net Loss for each Fiscal Year or other fiscal period shall be allocated among the Members (and credited or debited to their Capital Accounts) in such manner that if the Company were to liquidate completely immediately after the end of such Fiscal Year or other fiscal period and in connection with such liquidation sell all of its assets and settle all of

- 8 -

its liabilities at their then Book Values (i.e., without any Net Profit or Net Loss resulting therefrom): (i) the distribution by the Company of any remaining Cash to the Members in accordance with their respective positive Capital Account balances (after crediting or debiting Capital Accounts for Net Profit or Net Loss for such Fiscal Year or other fiscal period) would correspond as closely as possible to the distributions that would result if the liquidating distributions had instead been made in accordance with the provisions of Section 7.4, as applicable, and (ii) any resulting deficit Capital Account balances (after crediting or debiting Capital Accounts for Net Profit or Net Loss for such Fiscal Year or other fiscal period) would correspond as closely as possible to the manner in which economic responsibility for Company deficit balances (as determined in accordance with the principles of Treasury Regulations under Section 704 of the Code) would be borne by the Members under the terms of this Agreement and any collateral agreements. For purposes of maintaining the Capital Accounts, items of income, gain, loss, deduction, expense and credit shall be allocated to the Members in the same manner as Net Profits or Net Losses are allocated, except where otherwise necessary to more closely achieve the result contemplated by the first sentence of this Section 7.2(a). For purposes of applying this Section 7.2(a), the Capital Account of each Member shall be increased by such Member's share of "partnership minimum gain" and "partner minimum gain" (within the meaning of and in accordance with Treasury Regulations under Section 704(b) of the Code).

(b)    Notwithstanding any other provision of this Agreement, in no event shall Net Losses be allocated to a Member if such allocation would result in such Member having a Qualified Income Offset Amount.

(c)    For tax purposes, all items of income, gain, loss, deduction, expense and credit (other than tax items corresponding to items allocated pursuant to Section 7.3) shall be allocated to the Members in the same manner as are Net Profits and Net Losses; provided, however, that, in accordance with Section 704(c) of the Code, the Treasury Regulations promulgated thereunder and Treas. Reg. § 1.704-1(b)(4)(i), items of income, gain, loss, deduction, expense and credit with respect to any property whose Book Value differs from its adjusted basis for tax purposes shall, solely for tax purposes, be allocated among the Members so as to take account of both the amount and character of such variation.

(d)    All payments of Base Salary (as defined in the Employment Agreements), bonuses or other payments to any of the Class B Management Members pursuant to the Employment Agreements shall be treated for federal income tax purposes as guaranteed payments within the meaning of Section 707(c) of the Code.

7.3.    Allocations of Nonrecourse Deductions; Minimum Gain Chargeback; Qualified Income Offset.

(a)    Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Treas. Reg. § 1.704-2(i)), if any, of the Company shall be allocated for each Fiscal Year or other fiscal period to the Member that bears the economic risk of loss within the meaning of Treas. Reg. § 1.704-2(i), and (ii) "nonrecourse deductions" (as defined in Treas. Reg. § 1.704-2(b)), if any, of the Company shall be allocated for each Fiscal

David/investments/ATM holdings llc.v1

Year or other fiscal period in the same proportion as Net Profits and Net Losses for such Fiscal Year or other fiscal period.

(b)     This Agreement shall be deemed to include "qualified income offset" and "minimum gain chargeback" provisions within the meaning of Treasury Regulations under Section 704(b) of the Code and accordingly, prior to any allocation for a Fiscal Year or other fiscal period pursuant to Section 7.2, items of gross income shall be specially allocated to the Members so as to give effect to such provisions. Special allocations of items pursuant to this Section 7.3 shall be taken into account in computing subsequent allocations pursuant to Section 7.2, so that the cumulative net amount of all items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to such Member if there had never been any special allocation pursuant to this Section 7.3.

7.4.    <u>Distributions</u>.

(a)     Distributions of Available Cash or property may be made at any time and from time to time as determined by the Board of Managers, and any such distributions shall be made as follows:

(i)     First, to the Members, in proportion to their respective Class A Percentage Interests, until the Unrecovered Capital is reduced to zero;

(ii)    Second, 95% to the Class A Members in proportion to their respective 10% Return Amounts and 5% to the Class B Members in proportion to their Class B Units, until each Class A Member's 10% Return Amount is reduced to zero;

(iii)   Third, 90% to the Class A Members in proportion to their respective 15% Return Amounts and 10% to the Class B Members in proportion to their Class B Units, until each Class A Member's 15% Return Amount is reduced to zero;

(iv)    Fourth, 85% to the Class A Members, in proportion to their respective 20% Return Amounts and 15% to the Class B Members in proportion to their Class B Units, until each Class A Member's 20% Return Amount is reduced to zero; and

(v)     Fifth, 80% to the Class A Members in proportion to their respective Class A Percentage Interests and 20% to the Class B Members in proportion to their Class B Units.

(b)     All distributions to the Class B Members shall be made pro rata based upon the ratio of the number of Class B Units held by such Member to the total number of Class B Units outstanding at the time of distributions. For purposes of this Section 7.4(b), unvested Class B Units shall be treated as outstanding. Notwithstanding the foregoing, all distributions to a Class B Member shall instead be made to Wolfson until Wolfson has received an amount in respect of such distributions equal to the amount received by such Member pursuant to the Professional Services Agreement dated the date hereof between the Company and certain of the Class B Members.

David/investments/ATM holdings llc.v1

(c)    In the event that less than 100 Class B Units are outstanding when a distribution is made, the percentages in Sections 7.4(a)(ii) - (v) shall be adjusted as follows: (x) the percentage distributable to the Class B Members shall be multiplied by a fraction the numerator of which is the number of outstanding Class B Units and the denominator of which is 100 and (y) the percentage distributable to the holders of Class A Membership Interests shall be 100% less the percentage distributable to the Class B Members pursuant to clause (x).

(d)    The parties hereto agree and acknowledge that the distribution provisions of this Section 7.4 were negotiated and agreed upon in the context of an investment by Wolfson in the Company.  In furtherance of the foregoing, the parties hereto agree and acknowledge that, in the event that any other Person makes Capital Contributions or other investments in the Company (whether in exchange for Class A Membership Interests, other Membership Interests or otherwise), the parties hereto shall negotiate in good faith to modify the amount of distributions set forth in this Section 7.4., so that the Class A Members and the Class B Members shall be diluted by the new investment proportionately.

7.5.    <u>Withholding Requirements</u>.

(a)    Notwithstanding any other provision of this Agreement, the Board of Managers is authorized to take any action that it determines to be necessary or appropriate to cause the Company to comply with any withholding requirements imposed under Section 1446 or any other provision of the Code or state, local or foreign law.

(b)    If the Code or any state, local or foreign law requires that the Company remit to the IRS or any other taxing authority any withholding tax with respect to, or for the account of, any Member (in its capacity as a Member), the Board of Managers shall provide notice to such Member of such obligation and such Member shall have the opportunity to make such payment on its own behalf.  If such Member fails, or is not otherwise able, to make such payment on its own behalf, the Company shall so remit to the IRS or other taxing authority the full required amount of such withholding tax.  Any amount so remitted shall be credited against any distributions that would otherwise be made to such Member during such period or thereafter and any excess of the amount so remitted over amounts so credited against distributions shall be treated as a recourse demand loan from the Company to the Member, the outstanding balance of which from time to time shall accrue interest daily at an interest rate equal to the prime rate as quoted in the Wall Street Journal on the date remitted.  For so long as the Company is not dissolved and the Member remains a Member, unless otherwise paid, such loan and interest shall be payable by credit against the first amounts that would otherwise be distributed to such Member (with any such payment being allocated first to accrued and unpaid interest through the date of such payment) but may be prepaid in Cash by the Member, in whole or any part, at any time.

7.6.    <u>Mandatory Tax Distributions</u>.  Notwithstanding anything to the contrary in this Article 7, the Company shall, within 75 days after the end of each taxable year of the Company, make a cash distribution to each Member (a "<u>Tax Distribution</u>") in an amount equal to the Tax Distribution Amount of such Member for such taxable year.  Tax Distributions to a Member pursuant to this Section 7.5 shall be treated as advance payments of amounts to which a Member

would otherwise be entitled pursuant to Sections 7.4 (a)(ii)-(vi) and accordingly shall reduce the amount actually paid to such Member pursuant to those clauses of Section 7.4(a) until all Tax Distributions to such Member have been fully accounted for as offsets to amounts that would otherwise be payable under those clauses of Section 7.4(a) or deemed payable under those clauses of Section 7.4(a) in connection with a Liquidity Event, and to the extent necessary to effectuate the provisions of Section 7.4(a) following a Liquidity Event or dissolution of the Company, each Member shall be required to repay to the Company or the other Members as deemed appropriate by the Board of Managers any Tax Distributions received under this Section 7.6.

## ARTICLE 8

## RIGHTS AND LIABILITIES OF MEMBERS

8.1.    No Right to Manage.    Except as otherwise expressly provided for in this Agreement or with the consent of the Board of Managers, the Members (in their capacity as Members) shall not have any right to take part in the management of the business, affairs or properties of the Company or any right or authority to act for or bind the Company and shall have only the rights and powers granted to the Members hereunder, it being understood that the foregoing is in no way intended to alter the rights and obligations of the parties to the Employment Agreements.

8.2.    No Liability.    Except as otherwise required by the LLC Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and none of the Members or any Officers shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, officer or participating in the management of the Company. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under the LLC Act or this Agreement shall not be grounds for imposing personal liability on the Members for liabilities of the Company.

## ARTICLE 9

## TRANSFER OF MEMBERSHIP INTERESTS

9.1.    Transfers.

(a)    Except as set forth in clause (b) below, no Member may, directly or indirectly, sell, transfer, assign, pledge, hypothecate or otherwise dispose of all or any part of its Membership Interests, including, without limitation, its right to receive a share of profits, losses and other allocations and distributions of the Company ("Transfer") unless all of the following conditions have been satisfied: (i) The Board of Managers, in its sole and absolute discretion, shall have consented to such Transfer; (ii) the proposed transferee shall represent to the Board of Managers in writing that it is acquiring such Membership Interests in the Company for its own account for investment purposes only and not with a view to the resale or distribution thereof; (iii) the transferee agrees in writing with the Company to be bound by the provisions of this

- 12 -

Agreement hereof as though it were a Member; (iv) unless waived by the Board of Managers the transferee causes to be delivered to the Company, at such transferee's cost and expense, a favorable opinion of outside legal counsel to the effect that (x) such Transfer does not violate or result in registration being required under any applicable federal or state laws relating to securities or investment companies or advisors, (y) such transferee has the legal right, power and capacity to own the Member's interest and (z) as to any other legal matters reasonably required by the Board of Managers; (v) no Transfer shall be made which, in the opinion of counsel to the Company, may cause the Company to be, or materially increase any risk that the Company would be, treated as a "publicly traded partnership" taxable as a corporation under Section 7704 of the Code; and (vi) the Board of Managers shall have reviewed and approved the instrument evidencing the Transfer.

(b)    Notwithstanding anything in clause (a) above to the contrary, a Member shall be permitted to make the following Transfers (subject, in the case of any Transfers of Class B Units, to any vesting provisions associated with such Class B Units), so long as the transferee agrees in writing with the Company to be bound by the provisions of this Agreement as though it were a Member and represents and warrants to the Company as to the items set forth in Section 9.1(a)(iv); and provided that such transfer qualifies as a "private transfer" within the meaning of Treas. Reg. 1.7704-1(e):

(i)    a Transfer in the event of the death or incapacity of an individual Member, or in the event of the merger, consolidation, dissolution or liquidation of any Member not an individual, to such Member's personal representative, heir or distributee, in the case of an individual Member, or such Member's legal successor, in the case of any Member not an individual; and

(ii)    a Transfer by any Member made to such Member's spouse, parents, children or grandchildren or Affiliates or to a trust or similar entity, the beneficiaries of which, or to a corporation or partnership, the stockholders or limited and general partners of which, include only such Member's spouse, parents, children or grandchildren or Affiliates.

(c)    Any Transfer effected in accordance with this Agreement shall be reflected on Schedule A hereto, and the Board of Managers shall amend Schedule A hereto to reflect such Transfer as soon as practicable following such Transfer.  In no event shall any Member who transfers any Membership Interests retain any right or interest in the Company with respect to such Membership Interests.

9.2.    Liquidity Events.

(a)    Subject to the rights of first offer contained in Section 9.3, Wolfson may at any time compel the Company and/or its Members to enter into and consummate a "Liquidity Event," which shall include (i) compelling the Company to sell some or all of the assets of the business and (subject to its contractual commitments) promptly distributing any available proceeds from such sale, (ii) compelling the Members to sell their Membership Interests, through an interest purchase agreement, merger, consolidation, or similar transaction (iii)

- 13 -

compelling the Company to enter into any recapitalization transaction or reorganization, or (iv) compelling the Company to effect a publicly offering of the Membership Interests.

(b)    Wolfson may not compel the Members to consummate any Liquidity Event unless the proceeds to members from the Liquidity Event shall be allocated among the Members in the same proportions as would result if the proceeds were paid to the Members through the distribution provisions of Section 7.4.

(c)    As a part of any Liquidity Event, Wolfson may compel any Class B Management Memebr, and such Member shall, make an in-kind contribution to the Company of any and all ATMs held by such member or any member of his immediate family to the Company. Iin such event, such ATMs will be valued at the average value of all of the ATM machines held by the company immediately prior to the Liquidity Event (after giving effect to the in-kind contribution of personally held machines) as determined either explicitly or implicitly in connection with the Liquidity Event.  For the avoidance of doubt, the parties intend that , if requested by Wolfson, any sale of the business would also include those ATMs held by the Managers and their immediate family members and the value of such personally held ATMs should benefit all members of the Company ratably.

9.3.    <u>Right of First Offer/ Tag Along Rights</u>.

(a)    Wolfson may enter into and consummate, on behalf of the Company or the other Members, a transaction constituting a Liquidity Event, and/or notwithstanding the foregoing, Wolfson may Transfer its own Membership Interests to a Third-Party for consideration  (each such transactions, a "Sale Transaction") so long as Wolfson complies with the following procedures:

(i)    In no event shall Wolfson consummate any Sale Transaction with an individual, or an entity controlled by an individual, with a criminal record without the consent of the Class B Management Members.

(ii)    Wolfson shall provide each member with a written offer to purchase Wolfson's Membership Interest (the "<u>ROFO Offer Notice</u>") at a specified price.

(iii)    If holders of at least 75 Class B Units do not agree to buy Wolfson's Interest at the price specified in the ROFO Offer Notice within 30 days of delivery by Wolfson, then Wolfson may enter into a binding agreement to sell its interests or effect a Sale Transaction within 210 days following the delivery of the ROFO Offer Notice so long as the value of the consideration that Wolfson would receive in the transaction shall be at least as great as it would receive had the offer contained in the ROFO Offer Notice been accepted.

(iv)    If holders of at least 75 Class B Units do not agree as a group to jointly and severally accept Wolfson's offer, such Members shall (i) within 60 days of receipt of the ROFO Offer Notice provide Wolfson with evidence of its ability to finance the purchase including a binding term sheet or letter (subject to due diligence and definitive documentation conditions) from its financing source (which must be from a lender that has the financial where-

- 14 -

with-all to provide the purchaser(s) with the financing) and (ii) complete the purchase of Wolfson's interests within 90 days in cash at the price specified in the ROFO Offer Notice.

(v)    If the Members that accept the offer to purchase Wolfson's Membership Interests contained in the ROFO Offer Notice subsequently default on the transaction, such Members shall forfeit their rights of first offer hereunder and the time-period for Wolfson to enter into an agreement to effect a Sale Transaction shall be tolled for the time period from delivery of the ROFO Offer Notice to the default by the Member.

(vi)    In the event that

(vii)    Wolfson proposes a Sale Transaction thorough which only Wolfson's Membership Interest will be sold, Wolfson may not consummate the Sale Transaction unless (i) Wolfson first notifies each of the Members in writing of the material terms of the proposed Sale Transaction including the Enterprise Value implied by the proposed Sale Transaction (a "Tag-Along Offer Notice") and (ii) the buyer in the Sale Transaction simultaneously purchases the Membership Interest of any Member that has properly exercised its tag-along rights hereunder by delivering in writing to Wolfson a notice exercising its tag-along rights hereunder within 30 days of Delivery of the Tag-Along Offer Notice. Any such purchase by the buyer in the Sale Transaction shall be at a price based upon the Enterprise Value allocated among the Members in the same proportions as would result if the Enterprise Value were to be paid to all of the Members through the distribution provisions of Section 7.4.

9.4.    Ownership of Membership Interests. The Company and the Board of Managers shall be entitled to treat the record owner of any Membership Interests as the absolute owner thereof in all respects until such time as a written instrument evidencing the Transfer of such Membership Interests has been received by the Board of Managers and recorded on the books of the Company.

9.5.    Effect of Transfer Not in Accordance with Agreement. Any purported Transfer of any direct or indirect interest in the Company in violation of this Article 9 shall be null and void.

ARTICLE 10

CONVERSION TO A CORPORATION

10.1.    Conversion to a Corporation. The Board of Managers shall have the power and authority immediately prior to a Liquidity Event to cause the Company, at any time, to be converted into a corporation organized under the General Corporation Law of the State of Delaware (the "Conversion Vehicle"), on such terms and conditions as the Board of Managers shall reasonably determine (the "Conversion"). Upon such a Conversion, each Member shall be entitled to receive, as of the date of the Conversion, a percentage ownership in the common stock of the Conversion Vehicle as nearly as possible as would equal the percentage of the proceeds of the Company as if the Company were effecting a Liquidity Event. To the extent such Conversion requires, under the LLC Act or this Agreement, consent of some or all of the Members, each

- 15 -

Member agrees to execute and deliver a written consent thereto and such other documents as may be reasonably requested by the Board of Managers in connection with the Conversion.

<div align="center">ARTICLE 11</div>

<div align="center">COVENANTS</div>

11.1.  <u>Books of Account; Access to Books and Records</u>.  The Board of Managers shall keep, or cause to be kept, accurate and complete records and books of account of all transactions of the Company.  The Company books and records shall be maintained at the principal place of business of the Company.  From and after the date hereof, the Company shall, and shall cause each of its Subsidiaries to, afford Wolfson and their respective employees, counsel and other authorized representatives full access, during normal business hours, upon reasonable advance notice, to all of its books, records and properties, and to all of its officers and employees for any reasonable purpose whatsoever, including, without limitation, all internal management documents, reports of operations, reports of adverse developments, copies of any management letters, communications with Members or members of the Board of Managers, press releases, registration statements and access to all senior managers.

11.2.  <u>Financial Records</u>.  From and after the date hereof the Company agrees to furnish to Wolfson the following:

(a)  Within 90 days after the end of each quarterly fiscal period, (i) unaudited balance sheets and an income statement as of the end of such period, together with statements of retained earnings and cash flow for such period ("Quarterly Financials") prepared in accordance with GAAP (subject to normal year-end adjustments and the absence of footnotes) consistently applied, and a letter or memorandum discussing the summary financial information for such period and setting forth a comparison by reasonable categories of such financial information to the applicable budget and the comparable figures for the prior year and a reasonable explanation of any differences, plus (ii) a statement certified by the CEOs certifying that the financial position and results of operations for such period as presented in the Quarterly Financials are presented fairly and have been prepared in accordance with GAAP (subject to normal year-end adjustments and the absence of footnotes) consistently applied.

(b)  Within 120 days after the end of each Fiscal Year, commencing with the first Fiscal Year ending after the date hereof, (i) audited balance sheets and an income statement as of the end of such Fiscal Year, together with statements of retained earnings and cash flow for such Fiscal Year, all in reasonable detail and certified by a recognized international firm of independent accountants selected by the Board of Managers, as presenting fairly the financial position and results of operations and as having been prepared in accordance with GAAP consistently applied, including their opinion thereon, and (ii) the accounting firm's management letter.

(c)  Within 30 days after the end of each monthly fiscal period, (i) unaudited balance sheets and an income statement as of the end of such period, together with statements of retained earnings and cash flow for such period ("Monthly Financials") prepared in accordance

<div align="center">- 16 -</div>

<div align="right">David/investments/ATM holdings llc.v1</div>

with GAAP (subject to normal year-end adjustments and the absence of footnotes) consistently applied, and a letter or memorandum discussing the summary financial information for such period and setting forth a comparison by reasonable categories of such financial information to the applicable budget and the comparable figures for the prior year and a reasonable explanation of any differences, plus (ii) a statement certified by the CEOs certifying that the financial position and results of operations for such period as presented in the Monthly Financials are presented fairly and have been prepared in accordance with GAAP (subject to normal year-end adjustments and the absence of footnotes) consistently applied.

(d)    At least 30 days but not more than 90 days prior to the beginning of each Fiscal Year, an annual budget prepared on a monthly basis for such Fiscal Year (displaying anticipated statements of income and cash flows and balance sheets), and promptly upon preparation thereof any other significant budgets prepared by the Company and any revisions of such annual or other budgets, and, provided that Wolfson makes a request therefor, within 30 days after any monthly period in which there is a material adverse deviation from the annual budget, a statement certified by an Officer of the Company explaining the deviation and what actions the Company has taken and proposes to take with respect thereto.

(e)    Promptly (but in any event within five Business Days) after the discovery or receipt of notice of (i) any default under any material agreement to which the Company is a party, which default could have a material adverse effect on the Company, (ii) any material adverse change in the condition (financial or otherwise), operations, properties, prospects, results of operations, business, assets, or liabilities of the Company or any event or condition which could reasonably be expected to, individually or in the aggregate, have such a material adverse change on the Company (including, without limitation, the filing of any litigation against the Company or the existence of any dispute with any Person which involves a reasonable likelihood of such litigation being commenced), a statement certified by an Officer of the Company specifying the nature and period of existence thereof and what actions the Company has taken and proposes to take with respect thereto.

(f)    With reasonable promptness, such other information and financial data concerning the Company as Wolfson or any of their registered assigns may reasonably request.

11.3.    <u>Filings; Compliance with Laws</u>.

(a)    The Company shall file all statements and reports required to be filed by any applicable state or federal securities laws.

(b)    The Company shall comply with all applicable laws, rules, regulations and orders.

11.4.    <u>Disclosure</u>. From and after the date hereof, the Company shall provide Wolfson with the opportunity to review and modify any public disclosures or government filings which mention Wolfson or any of their respective Affiliates. Wolfson shall have the right to consent to any such public disclosure or government filing prior to its release or filing.

David/investments/ATM holdings llc.v1

ARTICLE 12

WITHDRAWAL; DISSOLUTION AND LIQUIDATION

12.1.  Withdrawal of Members.

(a)    Except following a Transfer permitted by Article 9 or as expressly provided in this Section 12.1, no Member may withdraw from the Company.

(b)    A Member shall be deemed to have withdrawn from the Company upon an Event of Bankruptcy of such Member or any dissolution or liquidation of such Member.

12.2.  Events of Dissolution.  The Company shall be dissolved upon the earliest to occur of the following:

(a)    the written request of Wolfson, and

(b)    the entry of a decree of judicial dissolution of the Company under Section 18-802 of the LLC Act.

12.3.  Liquidation.  If the Company is dissolved pursuant to Section 12.2, the Board of Managers (or any liquidating trustee appointed by Wolfson) or, in the event of a dissolution pursuant to Section 12.2(c), a liquidating trustee appointed by Wolfson shall (i) promptly file any notice, publish any advertisement or take any other action required under applicable law to effect such dissolution, (ii) commence to wind up the affairs of the Company and liquidate the assets of the Company and (iii) apply and distribute the proceeds of such liquidation and any undistributed cash no later than the end of the Fiscal Year following the Fiscal Year in which such liquidation occurs in accordance with the terms hereof and in the following order of priority:

(a)    First, to pay and discharge, or make provisions or establish reserves for, the claims of all creditors of the Company and to pay the expenses of liquidation;

(b)    Second, to establish such reserves as the Board of Managers or liquidating trustee deems reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; such reserve may be paid over by the Board of Managers or liquidating trustee to any attorney-at-law, or other party acceptable to the Board of Managers or liquidating trustee, as escrow agent to be held for disbursement in payment of any such liabilities or obligations and, at the expiration of such period as shall be deemed advisable by the Board of Managers or liquidating trustee, for distribution of the balance in the manner hereinafter provided in this Section 12.3; and

(c)    Third, to make distributions to the Members in accordance with Section 7.4 and 7.5, as applicable.

12.4.  Final Accounting.  Within 90 days following the date on which the Company is dissolved and liquidated pursuant to this Article 12, an independent accounting firm selected by Wolfson shall commence to take an account of the affairs and financial transactions of the

David/investments/ATM holdings llc.v1

Company and shall prepare a statement setting forth the financial position of the Company as of the close of business on the date the dissolution and liquidation of the Company is completed pursuant to this Article 12 establishing reasonable reserves for contingencies, showing the amount of each Member's share of the profits or losses of the Company through such date and stating each Member's Capital Account balance on such date.

12.5.   Cancellation of Certificate.  On completion of the distribution of the Company's assets as provided in Section 12.3, the Company shall be deemed terminated, and the Board of Managers or liquidating trustee shall file a certificate of cancellation of the Certificate of Formation with the Delaware Secretary, cancel any other filings made pursuant to Section 2.1 and take such other actions as may be necessary to terminate the legal existence of the Company as required by the LLC Act.

ARTICLE 13

TAX MATTERS; CERTAIN REPRESENTATIONS AND COVENANTS
OF MEMBERS

13.1.   Designation of Tax Matters Member.  Wolfson is hereby designated as the "Tax Matters Member" under Section 6231(a)(7) of the Code to manage administrative tax proceedings conducted at the Company level by the IRS with respect to Company matters. The Members are specifically directed and authorized to take whatever steps Wolfson, in its sole discretion, deems necessary or desirable to perfect such designation, including, without limitation, filing any forms or documents with the IRS and taking such other action as may from time to time be required under Treasury Regulations.

13.2.   Tax Returns.  The Tax Matters Member shall cause to be prepared and filed, at the cost and expense of the Company, all necessary Company tax returns, and the Members (and their Affiliates) shall prepare their tax returns consistently with such Company tax returns.

13.3.   Taxable Year.  The taxable year of the Company shall be the calendar year or such other year as may be reasonably determined by Wolfson.

13.4.   Tax Elections.  All tax elections required or permitted to be made under the Code and any applicable state, local or foreign tax law shall be made in the discretion of the Tax Matters Member, and any decision with respect to the treatment of Company transactions on the Company's federal, state, local or foreign tax returns shall be made in such manner as may be approved by the Tax Matters Member.

13.5.   Certain Representations of Members.  Each Member, severally and not jointly, as to itself only, hereby represents, warrants and acknowledges to the Company and each other Member as follows:

(a)   Such Member has full power and authority to execute and deliver this Agreement and to carry out its obligations hereunder in accordance with the terms and provisions hereof. The execution, delivery and performance of this Agreement and the consummation of the

- 19 -

David/investments/ATM holdings llc.v1

transactions contemplated hereby have been duly authorized by all requisite action, corporate or otherwise, on the part of such Member. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby do not conflict with any other agreements or obligations of such Member.

(b)     Such Member is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

(c)     Such Member is acquiring its Membership Interests solely for investment, for such Member's own account and not with a view to, or for resale in connection with, the distribution or other disposition thereof.

(d)     Such Member is financially able to bear the economic risk of an investment in the Company and has no need for liquidity in this investment. Furthermore, the financial capacity of such Member is of such a proportion that the total costs of such Member's investment in the Company is not material when compared with such Member's total financial capacity.

(e)     Such Member has such knowledge, experience and skill in financial and business matters in general and with respect to investments of a nature similar to an investment in the Company so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, this investment.

(f)     Such Member (i) has received all information that such Member deems necessary to make an informed investment decision with respect to an investment in the Company; (ii) has had the unrestricted opportunity to make such investigation as such Member desires pertaining to the Company and an investment therein and to verify any information furnished to such Member; and (iii) has had the opportunity to ask questions of representatives of the Company concerning the Company and such Member's investment.

(g)     Such Member understands that such Member must bear the economic risk of an investment in the Company for an indefinite period of time because (i) the Membership Interests have not been registered under the Securities Act and applicable state securities laws and (ii) the Membership Interests may not be sold, transferred, pledged or otherwise disposed of except in accordance with this Agreement and then only if (x) they are subsequently registered in accordance with the provisions of the Securities Act and applicable state securities laws or (y) registration under the Securities Act or any applicable state securities laws is not required.

(h)     Such Member understands that the Company is not obligated to register the Membership Interests for resale under the Securities Act or any applicable state securities laws and that the Company is not obligated to supply such Member with information or assistance in complying with any exemption under the Securities Act or any applicable state securities laws. Upon request of the Company, such Member will provide the Company with an opinion of counsel satisfactory to the Company that a proposed resale of the Membership Interests com+0plies with the Securities Act or any applicable state securities laws.

David/investments/ATM holdings llc.v1

(i)    Such Member is an "Accredited Investor" (as defined in Rule 501(a) under the Securities Act).

(j)    Such Member acknowledges that all information provided to Wolfson and the other Members relating to the Company and its business has been provided by the Company, and Marc Aronstein , Jeffrey Finkel, Qayyum Hafeez-Gondal and Matthew Smith are not assuming any responsibility for the accuracy or completeness of such information.

(k)    Such Member (other than Wolfson) represents to Wolfson that except as set forth on Schedule 13.15 hereto, the Company has conducted no operations prior to the date hereof and is free of liabilities as of the date hereof.

13.6.  Tax Election.  Each Person that acquires Class B Units (or units issued in lieu of Class B Units pursuant to Section 5.3(d)) that are in whole or part unvested at the time of acquisition of such Class B Units (or units issued in lieu of Class B Units pursuant to Section 5.3(d)) shall timely file a properly completed election under Section 83(b) of the Code (and Treasury Regulation 1.83-2) with respect to such Class B Units (or units issued in lieu of Class B Units pursuant to Section 5.3(d)).  Each such Person shall promptly after the filing of such election provide a copy of the election to the Company.

ARTICLE 14

EXCULPATION AND INDEMNIFICATION

14.1.  Performance of Duties.  No Member nor any other Indemnified Person shall have any duty to any other Member or the Company, except as expressly set forth herein or in the Collateral Agreements.  Except as expressly set forth herein or in the Collateral Agreements, no Member nor any other Indemnified Person shall be liable to the Company or to any other Member for any act or omission performed or omitted by him, her or it, as the case may be, or for any Damages arising therefrom, unless the Damages shall have been established by a final non-appealable adjudication to be the result of gross negligence, fraud or intentional misconduct of such Member.  In performing its duties, each such Person shall be entitled to rely in good faith on the provisions of this Agreement and on information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Company or any facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid) of the following other Persons or groups:  the Board of Managers, any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company or the Board of Managers, or any other Person who has been selected with reasonable care by or on behalf of the Company or the Board of Managers, in each case as to matters which such relying Person reasonably believes to be within such other Person's competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in Section 18-406 of the Act.  No Member shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise, solely by reason of being a Member.

- 21 -

14.2.  <u>Right to Indemnification</u>.  Subject to the limitations and conditions provided for in this Article 14, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative (hereinafter a "<u>Proceeding</u>"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that such Person, or a Person of which such Person is the legal representative, is or was a Member (or officer, director, member, employee, partner, agent or shareholder of any Member), Officer or member of the Board of Managers (each such Person, an "<u>Indemnified Person</u>") shall be indemnified by the Company to the fullest extent permitted by applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment), from and against any and all Damages incurred by such Person in connection with such Proceeding, appeal, inquiry or investigation, except to the extent that any such Damages shall have been the result of gross negligence, fraud or intentional misconduct of the Person otherwise entitled to indemnification. The indemnification under this Article 14 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article 14 shall be deemed contract rights, and no amendment, modification or repeal of this Article 14 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings, appeals, inquiries or investigations arising prior to any amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article 14 could involve indemnification for negligence or under theories of strict liability.

14.3.  <u>Advance Payment</u>.  The right to indemnification conferred in this Article 14 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person of the type entitled to be indemnified under Section 14.2 who was, is or is threatened to be, made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that such Person shall be obligated to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article 14 or otherwise.

14.4.  <u>Nonexclusivity of Rights</u>.  The right to indemnification and the advancement and payment of expenses conferred in this Article 14 shall not be exclusive of any other right that a Member, Officer, or member of the Board of Managers or any other Person entitled to indemnification pursuant to this Article 14 may have or hereafter acquire under any law (common or statutory) or provision of this Agreement, any other agreement or otherwise.

14.5.  <u>Insurance</u>.  From and after the date hereof, the Company shall maintain, with financially sound and reputable insurers, directors' and officers' liability insurance reasonably acceptable to Wolfson. The Company may purchase and maintain other insurance, at the direction of the Board of Managers and Wolfson, at the Company's expense, to protect itself and any Member or agent of the Company who is or was serving at the request of the Company as a manager, representative, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation,

- 22 -

David/investments/ATM holdings llc.v1

partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 14.

14.6.  Savings Clause.  If this Article 14 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Article 14 as to costs, charges and expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement with respect to any such Proceeding, appeal, inquiry or investigation to the fullest extent permitted by any applicable portion of this Article 14 that shall not have been invalidated and to the fullest extent permitted by applicable law.

14.7.  No Liability for Acts of Agents.  No Member or other Indemnified Person shall be liable for any act or omission of any third party with respect to the Company as long as such party is retained by the Board of Managers in good faith and with reasonable care and diligence.

14.8.  Survival.  The provisions of this Article 14 shall survive the termination of this Agreement and the dissolution and liquidation of the Company.

## ARTICLE 15

## MISCELLANEOUS

15.1.  Amendments or Modification.  Except as otherwise provided in this Agreement, this Agreement and any provision hereof may be amended or modified from time to time only by a written instrument adopted by the Board of Managers and the Class A Members; provided, however, that except as otherwise expressly provided herein, any amendment or modification (a) (other than amendments or modifications adding new classes of interests or issuing additional Membership Interests in accordance with and subject to the limitations set forth in Article 5 and 6) reducing disproportionately a Member's interest in profits or losses or in distributions shall be effective only with the consent of such Member, (b) reducing in any material respect the rights of any Member (or any officer, director, member, employee, partner, agent, legal representative or shareholder of such Member) under Article 14 shall be effective only with such Member's consent, (c) reducing the number of Managers that may be appointed by a Member or group of Members to the Board of Managers pursuant to Section 6.1(a) shall be effective only with the consent of such Member or such group of Members, (d) increasing any Member's obligations to make Capital Contributions to the Company shall be effective only with the consent of such Member, and (e) reducing the required interest for any consent or vote in this Agreement shall be effective only with the consent or vote of each Member having the interest theretofore required for such consent or vote.

15.2.  Approvals and Consents.  Unless otherwise specified in this Agreement, (i) whenever this Agreement requires the approval or other action of the Class A Members, such approval or other action shall require the approval of Class A Members representing more than 50% of the Capital Commitment Percentage Interests, and (ii) whenever this Agreement requires

- 23 -

David/investments/ATM holdings llc.v1

the approval or other action of the Class B Members, such approval or other action shall require the approval of the holders of more than 50% of the Class B Units.

15.3.  <u>Binding Effects; Benefits</u>.  This Agreement shall be binding upon and inure to the benefit of the Members hereto and their legal representatives and permitted successors, as applicable.  No Person, other than the Members, shall be entitled to any benefits under this Agreement, except as otherwise expressly provided herein.

15.4.  <u>Headings</u>.  The article, section and other headings of this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

15.5.  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same agreement.

15.6.  <u>Grammatical Construction</u>.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine and/or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

15.7.  <u>Separability</u>.  Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms or provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

15.8.  <u>Effect of Waiver or Consent</u>.  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations hereunder is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person hereunder.  Failure on the part of a Person to complain of any act of any Person or to declare any Person in default hereunder, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

15.9.  <u>Entire Agreement</u>.  This Agreement and the Collateral Agreements constitute the entire agreement among the parties hereto and supersede any prior agreements, understandings and arrangements, oral or written, among the parties hereto.

15.10.  <u>Notices</u>.

(a)    Any notice or other communication in connection with this Agreement may be made in writing delivered personally or by courier, or sent by facsimile transmission (with confirmation slip showing receipt at correct number) or by certified or registered mail and shall be addressed to the intended recipient at its address or number initially specified as follows:

David/investments/ATM holdings llc.v1

if to Wolfson:

South Ferry Building Company
One State Street Plaza, 29th Floor
New York, New York 10004
Fax Number: (212) 363-8459
Attn: Eli Levitin

if to Members other than Wolfson:

at the addresses that are listed below the names of the Members on Schedule A
hereto.

  (b) The addresses specified above may be changed by either party at any time
in writing delivered to the other party in accordance with this Section 15.12. Any such notice is
deemed to be given as follows: (i) if in writing and delivered in person or by courier, on the date
when it is delivered; (ii) if by facsimile, when received at correct number (proof of which shall be
an original facsimile transmission confirmation slip or equivalent); or (iii) if sent by certified or
registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that
mail is delivered or its delivery is attempted, unless the date of that delivery (or attempted
delivery) or that receipt, as applicable, is not a working day in the recipient's city or that
communication is delivered (or attempted) or received, as applicable, after the close of business
on a working day in the recipient's city in which case that communication shall be deemed given
and effective on the first following day that is a working day in the recipient's city.

  15.11. <u>Payments on Business Days</u>. Any payment required to be made hereunder on a
day which is not a Business Day shall be made on the next succeeding Business Day.

  15.12. <u>Governing Law</u>. This Agreement shall be governed by and construed both as to
validity and enforceability in accordance with the laws of the State of Delaware, without regard
to the conflict of laws provisions thereof.

  15.13. <u>Legal Representation</u>. The Members hereby agree and acknowledge that **(i)**
Fulbright & Jaworski L.L.P. ("<u>Legal Counsel</u>") has been retained by the Company in connection
with the formation of the Company, and in that capacity has provided legal services to the
Company; (ii) Legal Counsel has not represented, nor will it represent, any Member in
connection with this Agreement, the management and operation of the Company, or any dispute
that may arise between any Member on one hand, and the Company on the other (each a
"<u>Company Legal Matter</u>"); (iii) each Member will, if it wishes counsel on a Company Legal
Matter, retain its or his own independent counsel with respect thereto and will pay all fees and
expenses of the Member's independent counsel; and (iv) Legal Counsel may represent the
Company in connection with any and all Company Legal Matters.

  15.14.

David/investments/ATM holdings llc.v1

if to Wolfson:

South Ferry Building Company
One State Street Plaza, 29th Floor
New York, New York 10004
Fax Number: (212) 363-8459
Attn: Eli Levitin

if to Members other than Wolfson:

at the addresses that are listed below the names of the Members on Schedule A
hereto.

(b)    The addresses specified above may be changed by either party at any time
in writing delivered to the other party in accordance with this Section 15.12. Any such notice is
deemed to be given as follows: (i) if in writing and delivered in person or by courier, on the date
when it is delivered; (ii) if by facsimile, when received at correct number (proof of which shall be
an original facsimile transmission confirmation slip or equivalent); or (iii) if sent by certified or
registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that
mail is delivered or its delivery is attempted, unless the date of that delivery (or attempted
delivery) or that receipt, as applicable, is not a working day in the recipient's city or that
communication is delivered (or attempted) or received, as applicable, after the close of business
on a working day in the recipient's city in which case that communication shall be deemed given
and effective on the first following day that is a working day in the recipient's city.

15.11. <u>Payments on Business Days</u>. Any payment required to be made hereunder on a
day which is not a Business Day shall be made on the next succeeding Business Day.

15.12. <u>Governing Law</u>. This Agreement shall be governed by and construed both as to
validity and enforceability in accordance with the laws of the State of Delaware, without regard
to the conflict of laws provisions thereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date
first above written.

MEMBERS:

SOUTH FERRY BUILDING COMPANY

By: _____
    Name:
    Title:

- 25 -

David/investments/ATM holdings llc.v1

HARRY BROSSMAN

_____

WILLIAM MUNIER

_____

BERNARD BUSHELL

_____

MARC ARONSTEIN

_____

David/investments/ATM holdings llc.v1

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

MEMBERS:

SOUTH FERRY BUILDING COMPANY

By: _____
    Name:
    Title:

HARRY BROSSMAN

_____

WILLIAM MUNIER

_____

BERNARD BUSHELL

_____

MARC ARONSTEIN

_____

- 26 -

JEFFREY FINKLE

_____

QAYYUM HAFEEZ-GONDAL

_____

MATTHEW SMITH

_____

David/investments/ATM holdings llc v1

JEFFREY FINKLE

_____

QAYYUM HAFEEZ-GONDAL

_____

MATTHEW SMITH

_____

- 1 -

David/investments/ATM holdings llc.v1

**APPENDIX A**

DEFINITIONS

As used in the foregoing Agreement, the following terms shall have the meanings set forth below:

"Accredited Investor" shall have the meaning set forth in Section 13.5(i).

"Affiliate" means, with respect to any Person, any other Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with such Person. The term "control," as used in the immediately preceding sentence means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Person.

"Agreement" shall have the meaning set forth in the preamble.

"Associate" shall have the meaning ascribed to such term in Rule 14a-1(a) of the Securities Exchange Act of 1934, as amended.

"Available Cash" means Cash which is available in the accounts of the Company and not reserved to make any payments due and owing by the Company or otherwise reserved by the Board of Managers, in its reasonable discretion, for expenses (including, without limitation, distributions in respect of guaranteed payments within the meaning of Sections 707(a) and 707(c) of the Code), operations, or contingencies of the Company.

"Board of Managers" shall have the meaning set forth in Section 6.1(a).

"Book Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The Book Value of any asset contributed or deemed contributed by a Member to the Company shall be the Fair Market Value of such asset at the time of contribution as determined by The Board of Managers;

(ii)     The Book Value of any asset distributed or deemed distributed by the Company to any Member shall be adjusted immediately prior to such distribution to equal its Fair Market Value at such time;

(iii)     The Book Values of all Company assets shall be adjusted (unless the Board of Managers reasonably determines that such adjustment would be negligible) to equal their respective Fair Market Values as of:

(1)     The date of the acquisition of an additional interest in the Company by any new or existing Member in exchange for a contribution to the capital of the Company; or

David/investments/ATM holdings llc.v1

(2)    Upon the liquidation of the Company, or the distribution by the Company to a retiring or continuing Member of money or other Company property in reduction of such Member's interest in the Company;

(iv)    any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or 743 of the Code shall be taken into account in determining such asset's Book Value in a manner consistent with Reg. § 1.704-1(b)(2)(iv)(m); and

(v)    if the Book Value of an asset has been determined pursuant to paragraph (i) through (iii) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that depreciation deductions shall be computed based on the asset's Book Value as so determined, and not on the asset's adjusted tax basis;

"Business Day" means any day excluding Saturday, Sunday and any day which shall be in the City of New York a legal holiday or a day on which banking institutions are authorized by law or other government action to close.

"Business Plan" means the business plan as set forth on Schedule C hereto.

"Capital Account" means, with respect to any Member, the capital account of such Member maintained pursuant to Section 7.1, including all additions and subtractions thereto pursuant to this Agreement.

"Capital Call" shall have the meaning set forth in Section 5.2(b).

"Capital Commitment" shall have the meaning set forth in Section 5.2(a).

"Capital Contribution" means, as the context may require, contributions made (or deemed to be made) by a Member to, or on behalf of, the Company, including the Capital Contributions set forth on Schedule A hereto.

"Cash" when capitalized means money and cash equivalents.

"CEO" shall have the meaning set forth in Section 6.2.

"Certificate of Formation" means the certificate of formation of the Company and any and all amendments thereto filed in the office of the Secretary of State of the State of Delaware.

"Class A Members" means, on any date, individually and collectively, the holders of Class A Membership Interests.

"Class A Membership Interest" shall have the meaning set forth in Section 5.1(a).

"Class A Percentage Interest" as to any Member means the ratio of the Capital Contribution made by such Member to the total amount of Capital Contributions made as of the date of such calculation.

David/investments/ATM holdings llc.v1

"Class B Management Members" means, Messes. Brossman, Munier and Bushell.

"Class B Manager" shall have the meaning set forth in Section 5.2(c).

"Class B Members" means, on any date, individually or collectively, the holders of Class B Units.

"Class B Units" shall have the meaning set forth in Section 5.1(a).

"Code" means the Internal Revenue Code of 1986, as in effect on the date of the Agreement and as amended thereafter from time to time.

"Collateral Agreements" shall mean the Employment Agreements and the Non-Compete Agreements.

"Company" shall have the meaning set forth in the Preamble.

"Conversion" shall have the meaning set forth in Section 10.1.

"Conversion Vehicle" shall have the meaning set forth in Section 10.1.

"Damages" means any and all losses, damages, expenses and liabilities whether joint or several, including, without limitation, those losses, damages, expenses and liabilities (including reasonable attorneys' fees) arising under or connected with the securities laws of the United States, or any other provision of statutory law, common law, or other applicable law of any jurisdiction.

"Employment Agreements" shall mean the employment agreements, dated as of the date hereof, by and between the Company and each of the Class B Management Members, as they may be amended from time to time.

"Enterprise Value" means that value for the Company implied by the price offered or to be paid for any Membership Interest(s) if such amount had been distributed to holders of such Membership Interests as a final liquidation of the Company through the distribution provisions of Section 7.4

"Event of Bankruptcy" means, with respect to any Person, (i) the filing of a voluntary petition seeking liquidation, reorganization, arrangement or readjustment, in any form, of its debts under Title 11 of the United States Code or any other federal or state insolvency law, or the filing of an answer consenting to or acquiescing in any such petition; (ii) the making of any general assignment for the benefit of its creditors, or the admission in writing of its inability to pay debts as they become due; (iii) the expiration of 30 days after the filing of an involuntary petition under Title 11 of the United States Code, an application for the appointment of a receiver for the assets of such Person, or an involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal, state or foreign insolvency law, provided that the same shall not have been vacated, set aside or stayed within such 30-day period; (iv) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or

David/investments/ATM holdings llc.v1

other similar agent for the Person or for any substantial part of the Person's assets or property; and (v) the ordering of the winding up or liquidation of the Person's affairs.

"Executive Committee" shall have the meaning set forth in Section 6.1(d)(i).

"Executive Committee Manager" shall have the meaning set forth in Section 6.1(d)(i).

"Fair Market Value" of an asset means the fair market value of such asset as determined by the Board of Managers and Wolfson.

"15% Return Amount" means, with respect to any Member, at the time of determination, the amount, if any, that would have to be distributed to such Member at such time pursuant to Section 7.4(a)(ii) and 7.4(a)(iii) (after taking into account amounts concurrently distributable to the Members pursuant to Section 7.4(a)(i)) so as to provide such Member with a Realized Return of 15% per annum with respect to such Member's Capital Contribution.

"Fiscal Year" shall have the meaning set forth in Section 2.3.

"GAAP" shall mean United States generally accepted accounting principles, consistently applied.

"Indebtedness" shall mean as to any Person:  (a) all obligations, whether or not contingent, of such Person for borrowed money (including, without limitation, reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured); (b) all obligations of such Person evidenced by notes, bonds, debentures or similar instruments; (c) all obligations of such Person representing the balance of the deferred purchase price of property or services, except trade accounts payable and accrued commercial or trade liabilities arising in the ordinary course of business; (d) all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by such Person, whether periodically or upon the happening of a contingency; (e) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (f) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases; (g) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person; and (h) all Indebtedness of any other Person referred to in clauses (a) through (g) above, guaranteed, directly or indirectly, by that Person; but excluding all obligations of such Person for deferred rent.

"Indemnified Person" shall have the meaning set forth in Section 14.2.

"IRS" means the United States Internal Revenue Service.

(i)    "Liquidity Event" means any transaction whereby the Company consolidates or merges into or with any other Person, sells or transfers all or substantially all of

David/investments/ATM holdings llc.v1

its assets to another Person, or enters into any other similar business combination transaction including by reclassification, reorganization or recapitalization of the outstanding securities of the Company.

"LLC Act" shall have the meaning set forth in the Recitals.

"Major Transaction" shall have the meaning set forth in Section 6.1(e).

"Member" means each Person who is an initial signatory to this Agreement and any other Person who shall in the future execute and deliver this Agreement pursuant to the provisions hereof, and has not resigned, withdrawn, or, if other than an individual, dissolved.

"Membership Interest" means, as to any Member, such Member's interest in the Company (including any rights to receive distributions, to vote, to participate in the management of the Company, and to receive information concerning the business and affairs of the Company subject to the provisions of this Agreement and the LLC Act).

"Net Profit" and "Net Loss" mean, respectively, for any period the taxable income and taxable loss of the Company for such period as determined for federal income tax purposes, provided that for purposes of determining Net Profit and Net Loss and each item thereof (and not for income tax purposes) (i) there shall be taken into account any tax exempt income of the Company; (ii) any expenditures of the Company which are described in Section 705(a)(2)(B) of the Code or which are deemed to be described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations under Section 704(b) of the Code shall be treated as deductible expenses; (iii) if any Company asset has a Book Value which differs from its adjusted tax basis as determined for federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be computed based upon the asset's Book Value rather than its adjusted tax basis; (iv) items of gross income or deduction allocated pursuant to Section 7.3 shall be excluded from the computation of Net Profit and Net Loss; (v) there shall be taken into account any separately stated items under Section 702(a) of the Code; and (vi) if the Book Value of any Company asset is adjusted pursuant to clauses (ii) or (iii) of the definition thereof, the amount of such adjustment shall be taken into account in the taxable year of adjustment as gain or loss from the disposition of such asset for purposes of computing Net Profit and Net Loss.

"Non-Compete Agreements" shall mean each of the Non-Compete Agreements entered into as of the date hereof between the Company and each of Marc Aronstein, Jeffrey Finkel, Qayyum Hafeez and Matthew Smith.

"Officers" shall have the meaning set forth in Section 6.3.

"Person" means any natural person, corporation, membership, trust, partnership, limited liability company, association or other entity.

"Proceeding" shall have the meaning set forth in Section 14.2.

"Qualified Income Offset Amount" means, for any Member, the excess, if any, of (i) the negative balance a Member has in its Capital Account after taking into account any adjustments,

David/investments/ATM holdings llc.v1

allocations or distributions described in Treas. Reg. § 1.704-1(b)(2)(ii)(d)(4), (5) or (6) over (ii) the maximum amount of any negative balance in its Capital Account such Member may be obligated (or deemed obligated under the Treasury Regulations) to contribute to the Company upon liquidation.

"Quarterly Financials" shall have the meaning set forth in Section 11.2(a).

"Realized Return" means, with respect to any Member, at any specified time, the internal rate of return, determined on the basis of quarterly compounding from the time of contributions, realized by such Member taking into account: (i) all Capital Contributions made by such Member to the Company, and (ii) all distributions made to such Member pursuant to Sections 7.4(a)(i), 7.4(a)(ii), 7.4(a)(iii), 7.4(a)(iv) and 7.4(a)(v) on or before such time.

"Subsidiary" of any Person means another Person, an amount of the voting securities or other voting ownership or voting partnership interests of which are owned directly or indirectly by such first Person in an amount sufficient to elect at least a majority of its board of directors or other governing body (or, if there are no such voting securities or interests, 50% or more of the equity interests of which are owned directly or indirectly by such first Person).

"Tax Distribution" shall have the meaning set forth in Section 7.6.

"Tax Distribution Amount" means for a Member for a taxable year of the Company: (1) the excess, if any, of (A) the net taxable income of the Company (taking into account items separately stated under section 703(a) of the Code) allocated to such Member for such taxable year pursuant to Section 7.2 less (B) an amount equal to any net taxable loss of the Company (taking into account separately stated items) allocated to such Member pursuant to Section 7.2 in any prior taxable year of the Company that have not been previously subtracted pursuant to this clause (B) in computing the Tax Distribution Amount for any prior calendar year, multiplied by (2) forty two percent (42%) and (3) reduced by any Distributions made with respect to such taxable year to such Member pursuant to Section 7.4, other than pursuant to Section 7.4(a)(i). A distribution is considered made with respect to a taxable year to the extent it is made during such taxable year (except if made within 75 days of the beginning of such taxable year and designated as with respect to the prior taxable year) or within 75 days after the end of such taxable year and designated as made with respect to such taxable year.

"Tax Matters Member" shall have the meaning set forth in Section 13.1.

"10% Return Amount" means, with respect to any Member, at the time of determination, the amount, if any, that would have to be distributed to such Member at such time pursuant to Section 7.4(a)(ii) (after taking into account amounts concurrently distributable to the Members pursuant to Section 7.4(a)(i)) so as to provide such Member with a Realized Return of 10% per annum with respect to such Member's Capital Contribution.

"Third Party" means any Person other than (i) a Member or (ii) any Affiliate of a Member.

"Transfer" shall have the meaning set forth in Section 9.1(a).

-6-

David/investments/ATM holdings llc.v1

"20% Return Amount" means, with respect to any Member, at the time of determination, the amount, if any, that would have to be distributed to such Member at such time pursuant to Sections 7.4(a)(ii) through 7.4(a)(iv) (after taking into account amounts concurrently distributable to the Members pursuant to Section 7.4(a)(i)) so as to provide such Member with a Realized Return of 20% per annum with respect to such Member's Capital Contributions.

"United States person" shall have the meaning set forth in Section 13.5(b).

"Unrecovered Capital" means, at the time of determination, the excess of the aggregate Capital Contributions over the sum of all amounts previously distributed pursuant to Section 7.4(a)(i).

David/investments/ATM holdings llc.v1

## Schedule A

1.    Class A Membership Interests

| Name and Address | Capital Commitment | Aggregate Capital Contributions | Class A Percentage Interest |
|---|---|---|---|
| South Ferry Building Company | $5,000,000* | $1,900,000 | 91% |
| Harry Brossman 22 Foxhill Drive Tabernacles, NJ 08088 | $62,500 | $62,500 | 3% |
| William Munier 324 Grix Court New Milford , NJ 07646 | $62,500 | $62,500 | 3% |
| Bernard Bushell 425 East 58th Street New York, NY 10022 | $62,500 | $62,500 | 3% |
| Total | $5,187,500 | $62,500 | 100% |

*    Up to an additional $1,000,000 if the initial batch of ATMs purchased by the Company necessitates the additional capital contributions

**    A portion of the Wolfson investment  may be made as a Convertible Secured Loan collateralized by all current and after acquired ATM machines owned by the Company which would be convertible retroactively at any time into Class A Interests.

***  One of the Managers may fund his capital contributions in-kind with machines of equal value to the capital commitment as mutually determined by the parties.

David/investments/ATM holdings llc.v1

2.    Class B Units

| Name | Class B Units |
|------|---------------|
| Harry Brossman | 23.333 |
| William Munier | 23.333 |
| Bernard Bushell | 20.000 |
| Marc Aronstein<br>668 Greenwich Street, #947<br>New York, NY 10014 | 18.333 |
| Jeff Finkle<br>44A Murray Avenue<br>Port Washington, NY 11050 | 5.833 |
| Qayyum Hafeez-Gondal<br>473 Columbus Ave., Apt. 3C<br>New York, NY 10024 | 6.667 |
| Matthew Smith<br>241 Central Park West<br>Apt 4D<br>New York, NY 10024 | 2.500 |
| Total Authorized Units | 100 |

David/investments/ATM holdings llc.v1

## Schedule B – Purchase Parameters

Purchase Parameters for each ATM machine:

1.  at least one year in operations at the location in which the machine will be housed;

2.  Pro Forma net cash flows to the owner of the machine based on prospective operating and cost structure of $4,000 - $5,000;

3.  a new lease is agreed to with a term of at least five years with an option for five additional years;

4.  Cash drawers are refilled by the merchant where the machine is located; and

5.  price for the purchase transaction no greater than 4 times Pro Forma cash flows generated by the machine for the twelve months prior to purchase utilizing prospective operating and cost structure.

6.  The merchant would not be entitled to more than 25% of the surcharge charged to use the machine.

"Pro Forma" cash flows shall mean cash flows based upon historical revenue numbers and lease expenses numbers, but adjusted to reflect the expenses that would have applied had (i) the machine processing and maintenance been performed by the Company's vendors at the pricing they provide the Company.

David/investments/ATM holdings llc.v1

## Schedule 13.5

1.     Fees payable under the Professional Services Agreement

2.     Legal fees of Fulbright & Jaworski  for review of this transaction

3.     Approximately $1,500 in travel expenses for Harry Brossman.

David/investments/ATM holdings llc.v1

**Schedule C – Business Plan**

Confidential

Subject to Review and Change

## BALANCE SHEET

| | Beginning BS | Year 1 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | | | |
| Cash | 50,000.0 | 798,809 | 550,000 | $50,000 | $118,688 | $192,289 | $266,734 | $341,858 | $417,515 | $493,442 | $569,568 | $645,827 | $722,285 | $798,809 |
| Accounts Receivable | 0.0 | 261,435 | 249,990 | 503,400 | 239,205 | 259,850 | 260,390 | 260,750 | 260,525 | 261,070 | 261,215 | 261,360 | 261,395 | 261,435 |
| Inventory | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other Current Assets | 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Current Assets | 50,000.0 | 1,060,244 | 299,990 | 553,400 | 377,892.7 | 452,139.3 | 527,124.4 | 602,607.9 | 678,439.9 | 754,512.3 | 830,783.2 | 907,186.6 | 983,680.4 | 1,060,243.8 |
| Property, Plant & Equipment (equipment) | 1,703,000.0 | 1,709,240 | 1,703,510 | 1,704,040 | 1,704,560 | 1,705,080 | 1,705,600 | 1,706,120 | 1,706,640 | 1,707,160 | 1,707,680 | 1,708,200 | 1,708,720 | 1,709,240 |
| Depreciation (equipment) | 0.0 | (341,376) | (28,392) | (56,793) | (85,202) | (113,620) | (142,047) | (170,482) | (198,926) | (237,379) | (255,840) | (284,310) | (312,789) | (341,376) |
| Property, Plant & Equipment (contract) | 3,250,000.0 | 3,250,000 | 3,250,000 | 3,250,000 | 3,250,000 | 3,250,000 | 3,250,000 | 3,250,000 | 3,250,000 | 3,250,000 | 3,250,000 | 3,250,000 | 3,250,000 | 3,250,000 |
| Depreciation (contract) | 0.0 | (325,000) | (27,083) | (54,167) | (81,250) | (108,333) | (135,417) | (162,500) | (189,583) | (216,667) | (243,750) | (270,833) | (297,917) | (325,000) |
| Property, Plant & Equipment - Net | 4,953,000.0 | 4,292,864 | 4,898,045 | 4,843,081 | 4,788,108 | 4,733,127 | 4,678,137 | 4,623,134 | 4,568,131 | 4,513,115 | 4,458,090 | 4,403,057 | 4,348,015 | 4,292,864 |
| Capitalized Financing Fee & Expenses | 175,000.0 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 | 175,000 |
| Other Long-Term Assets | 0.0 | | | | | | | | | | | | | |
| Capitalized Software | 0.0 | | | | | | | | | | | | | |
| Software Depreciation | 0.0 | | | | | | | | | | | | | |
| Total Assets | 5,178,000.0 | 5,528,208 | 5,373,035 | 5,571,481 | 5,341,001 | 5,360,266 | 5,380,261 | 5,400,746 | 5,421,571 | 5,442,627 | 5,463,873 | 5,485,243 | 5,506,695 | 5,528,208 |
| **LIABILITIES & STOCKHOLDERS' EQUITY** | | | | | | | | | | | | | | |
| Accounts Payable (operations) | 0.0 | 132,023 | 132,023 | 264,045 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 |
| Accounts Payable (SG&A) | 0.0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Accrued Expenses | 0.0 | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Revolver Balance | 0.0 | | 61,644 | 115,514 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Taxes Payable | 0.0 | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other Current Liabilities | 0.0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Current Liabilities | 0.0 | 132,023 | 193,666 | 379,559 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 |
| Long-Term Liabilities | 0.0 | | | | | | | | | | | | | |
| Senior Term Loan A | 0.0 | · | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senior Term Loan B | 0.0 | · | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Long-Term Liabilities | | · | | | | | | | | | | | | |
| Total Liabilities | 0.0 | 132,023 | 193,666 | 379,559 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 |
| Stockholders' Equity | 5,178,000.0 | 5,396,185 | 5,179,368 | 5,191,922 | 5,208,978 | 5,228,243 | 5,248,239 | 5,268,723 | 5,289,548 | 5,310,604 | 5,331,851 | 5,353,221 | 5,374,673 | 5,396,185 |
| Total Liabilities and Stockholders' Equity | 5,178,000.0 | 5,528,208 | 5,373,035 | 5,571,481 | 5,341,001 | 5,360,266 | 5,380,261 | 5,400,746 | 5,421,571 | 5,442,627 | 5,463,873 | 5,485,243 | 5,506,695 | 5,528,208 |
| Balance check | | | | | | | | | | | | | | |

## Financial Summary

| Income Statement Items | Year 1 |
|---|---|
| Total ATMs online | 260 |
| Transaction Fees/Payable Trans | $2,496,000 |
| Interchange Fees/Gross Trans | 503,880 |
| Advertising & Virtual Switch Revenue | 99,925 |
| **Total Revenue** | **$3,099,805** |
| Revenue Growth (%) | |
| Total Cost of Service | $1,584,270 |
| **Gross Profit** | **$1,515,535** |
| Gross Margins (%) | 48.9% |
| Gross Profit Growth (%) | |
| S,G&A | $475,609 |
| % of Sales | 15.3% |
| **Total Operating Expenses** | **$2,726,155** |
| % of Sales | 87.9% |
| **EBITDA** | **$1,039,926** |
| Operating Margin (%) | 33.5% |
| EBITDA Growth (%) | |
| Depreciation & Amortization | $666,276 |
| **EBIT** | **$373,650** |
| % of Sales | 12.1% |
| Revolver Interest Expense | $886 |
| Senior Term - Interest Expense | 0 |
| Mezzanine - Interest Expense | 0 |
| Non-recurring Expenses | 0 |
| Pre-Tax Income | 372,764 |
| Income Taxes | $154,579 |
| **Net Income** | **$218,185** |

8.54 PM

11/11/2005

## PROJECT PEZ

| | Year 1 |
|---|---|
| ATMs acquired | 260 |
| Total ATMs (including ATMs down) | 260 |

## PROJECT PEZ

| | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ATMs acquired | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 |
| Total ATMs (including ATMs down) | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 |

### S, G&A Expense

| Description | Year 1 | Rate | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rent | 24,000 | 2000/mo | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Utilities & building maintenance | 3,600 | 15% of rent | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Facility insurance | 3,000 | $3000/year | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Office equipment rental | 3,600 | $300/month | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Office supplies, printing and postage | 3,000 | $250/month ($650/mo @ 4,000+ atms) | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Phone, cell phones and internet charges | 4,800 | $400/month (+25% at 10+ employees) | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Accounting, legal and tax | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| D&O insurance | 10,000 | $10,000/year | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 | 833 |
| Computer equipment (lease) | 3,109 | $375/month/unit | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 259 | 259 |
| Misc. and consulting fees/charges | 9,000 | $750/month | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 |
| Initial training (new systems) | 12,000 | First month only | 12,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Management travel expenses | 39,500 | $3,000/mo (initial $6,000/mo, $4,000/mo and $4,500/mo) | 6,000 | 4,500 | 4,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| **Total Other Expenses** | 115,609 | | 25,342 | 9,843 | 9,842 | 7,842 | 7,842 | 7,842 | 7,842 | 7,842 | 7,842 | 7,842 | 7,842 | 7,842 |

### Direct Payroll and Related Expenses

| Description | Year 1 | Rate | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Executive salary | 360,000 | $85K/year: Hire @ Month # 6 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Finance director | 0 | $90K/year (@2,000 ATM and 1 per 3,000 ATMs) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Field managers | 0 | $40K/year (plus ca. 1,3651 per 3,000 atms) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Operations managers | 0 | $90K/year (1/2 time @ <1000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bookkeeper | 25,000 | 1 x $30K/year @ 1,000+ ATMs | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 |
| Office manager | 0 | $30K/year (1/2 time @ <1000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Benefits | 32,500 | 10% of salary | 2,708 | 2,708 | 2,708 | 2,708 | 2,708 | 2,708 | 2,708 | 2,708 | 2,708 | 2,708 | 2,708 | 2,708 |
| Payroll taxes and other HR taxes | 2,500 | 10% of salary (excluding mgmt) | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 | 208 |
| **Total Payroll Expense** | 360,000 | | | | | | | | | | | | | |
| **Total S,G&A** | 475,609 | | 55,341 | 39,842 | 39,842 | 37,841 | 37,841 | 37,841 | 37,841 | 37,841 | 37,841 | 37,841 | 37,841 | 37,841 |

### Head count

| | Year 1 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sr. Executives | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| All other employees | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Total head count | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 | 3.5 |

Confidential Draft

Subject to Review and Change

## MONTHLY INCOME STATEMENT

| INCOME STATEMENT | Year 1 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Sales | 3,099,805 | $249,990 | $253,410 | $255,783 | $257,475 | $258,700 | $259,525 | $260,100 | $260,495 | $260,520 | $260,035 | $261,180 | $261,290 |
| % Growth | | NM | 1.4% | 0.9% | 0.7% | 0.5% | 0.3% | 0.2% | 0.2% | 0.0% | 0.1% | 0.1% | 0.0% |
| Cost of Services | 1,584,219 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 |
| Gross Profit | 1,515,555 | $117,968 | $121,388 | $123,763 | $125,453 | $126,678 | $127,503 | $128,078 | $128,473 | $128,498 | $129,013 | $129,158 | $129,268 |
| Gross Profit Margin | 48.9% | 47.2% | 47.9% | 48.4% | 48.7% | 49.0% | 49.1% | 49.2% | 49.3% | 49.3% | 49.4% | 49.5% | 49.5% |
| Selling, General & Administrative | 475,609 | 55,343 | 39,842 | 39,842 | 37,842 | 37,842 | 37,842 | 37,842 | 37,842 | 37,842 | 37,842 | 37,842 | 37,842 |
| SG&A (% of Sales) | 15.3% | 22.1% | 15.7% | 15.6% | 14.7% | 14.6% | 14.6% | 14.5% | 14.5% | 14.5% | 14.5% | 14.5% | 14.5% |
| EBITDA | 1,039,926 | $62,625 | $81,545 | $83,920 | $87,610 | $88,835 | $89,660 | $90,235 | $90,630 | $90,655 | $91,170 | $91,315 | $91,425 |
| EBITDA Margin | 33.5% | 22.1% | 32.2% | 32.8% | 34.0% | 34.3% | 34.5% | 34.7% | 34.8% | 34.9% | 34.9% | 35.0% | 35.0% |
| Non-tax Deductible Amortization | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Depreciation | 666,276 | 55,475 | 55,484 | 55,493 | 55,501 | 55,510 | 55,519 | 55,527 | 55,536 | 55,545 | 55,553 | 55,562 | 55,571 |
| EBIT | 373,650 | $7,150 | $26,061 | $28,427 | $32,109 | $33,325 | $34,141 | $34,708 | $35,094 | $35,410 | $35,617 | $35,753 | $35,854 |
| EBIT Margin | 12.1% | 2.9% | 10.3% | 11.1% | 12.5% | 12.9% | 13.2% | 13.3% | 13.5% | 13.6% | 13.6% | 13.7% | 13.7% |
| Interest Expense (revolver, bank and mez) | 886 | 108 | 578 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Interest Income | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other Expense / (Income) [1] | 372,764 | $6,842 | $25,484 | $28,427 | $32,109 | $33,325 | $34,141 | $34,708 | $35,094 | $35,410 | $35,410 | $35,753 | $35,854 |
| Pretax Margin | 12.0% | 2.7% | 10.1% | 11.1% | 12.5% | 12.9% | 13.2% | 13.3% | 13.5% | 13.6% | 13.6% | 13.7% | 13.7% |
| Income Taxes | 154,579 | 5,473 | 12,930 | 11,371 | 12,843 | 13,330 | 13,657 | 13,883 | 14,038 | 14,164 | 14,247 | 14,301 | 14,342 |
| Effective Tax Rate | 41.5% | 80.0% | 50.7% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% | 40.0% |
| Net Income | 218,185 | $1,368 | $12,553 | $17,056 | $19,265 | $19,995 | $20,485 | $20,825 | $21,056 | $21,246 | $21,370 | $21,452 | $21,513 |
| Net Income Margin | 7.0% | 0.5% | 5.0% | 6.7% | 7.5% | 7.7% | 7.9% | 8.0% | 8.1% | 8.1% | 8.2% | 8.2% | 8.2% |
| Net Income | 218,185 | 1,368 | 12,553 | 17,056 | 19,265 | 19,995 | 20,485 | 20,825 | 21,056 | 21,246 | 21,370 | 21,452 | 21,513 |
| Plus: Goodwill Amortization | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Cash Net Income | 218,185 | $1,368 | $12,553 | $17,056 | $19,265 | $19,995 | $20,485 | $20,825 | $21,056 | $21,246 | $21,370 | $21,452 | $21,513 |
| EBIT | 373,650 | $7,150 | $26,061 | $28,427 | $32,109 | $33,325 | $34,141 | $34,708 | $35,094 | $35,410 | $35,617 | $35,753 | $35,854 |
| Non-tax Deductible Amortization | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Depreciation | 666,276 | 55,475 | 55,484 | 55,493 | 55,501 | 55,510 | 55,519 | 55,527 | 55,536 | 55,545 | 55,553 | 55,562 | 55,571 |
| EBITDA | 1,039,926 | $62,625 | $81,545 | $83,920 | $87,610 | $88,835 | $89,660 | $90,235 | $90,630 | $90,955 | $91,170 | $91,315 | $91,425 |
| EBITDA Margin | 33.5% | 25.1% | 32.2% | 32.8% | 34.0% | 34.3% | 34.5% | 34.7% | 34.8% | 34.9% | 34.9% | 35.0% | 35.0% |

Note 1 – Includes non-cash interest expense (if any)

# PROJECT PEZ

| | Year 1 | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Month 6 | Month 7 | Month 8 | Month 9 | Month 10 | Month 11 | Month 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ATM Population** | | | | | | | | | | | | | |
| ATMs Owned (at year end) | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 |
| Total ATMs (excluding ATMs down) | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 | 260 |
| **Revenue** | | | | | | | | | | | | | |
| Transaction Fees/Payable Trans | 2,496,000 | 208,000 | 208,000 | 208,000 | 208,000 | 208,000 | 208,000 | 208,000 | 208,000 | 208,000 | 208,000 | 208,000 | 208,000 |
| Interchange Fees/Gross Trans | 503,880 | 41,990 | 41,990 | 41,990 | 41,990 | 41,990 | 41,990 | 41,990 | 41,990 | 41,990 | 41,990 | 41,990 | 41,990 |
| ATMs With Virtual/Switch Program | 252 | 0 | 76 | 129 | 167 | 194 | 213 | 226 | 235 | 242 | 247 | 250 | 252 |
| Virtual/Switch Program Revenue | 78,085 | 0 | 2,660 | 4,515 | 5,845 | 6,790 | 7,455 | 7,910 | 8,225 | 8,470 | 8,645 | 8,750 | 8,820 |
| ATMs With Active Advertising | 62 | 0 | 19 | 32 | 41 | 48 | 52 | 55 | 57 | 59 | 60 | 61 | 62 |
| Active Advertising Revenue | 21,840 | 0 | 760 | 1,280 | 1,640 | 1,920 | 2,080 | 2,200 | 2,280 | 2,360 | 2,400 | 2,440 | 2,480 |
| ATMs With Bank Branding | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fees From Bank Branding | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Gross revenue** | 3,099,805 | 249,990 | 253,410 | 255,785 | 257,475 | 258,700 | 259,525 | 260,100 | 260,495 | 260,820 | 261,035 | 261,180 | 261,290 |
| **Cost of Service** | | | | | | | | | | | | | |
| Processing Fees/Gross Trans | 331,500 | 27,625 | 27,625 | 27,625 | 27,625 | 27,625 | 27,625 | 27,625 | 27,625 | 27,625 | 27,625 | 27,625 | 27,625 |
| Self-Replenished - Site Commission | 624,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 | 52,000 |
| Vault Cash - Site Commission | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vault Cash Delivery & 1st Line Maintenance | 187,200 | 15,600 | 15,600 | 15,600 | 15,600 | 15,600 | 15,600 | 15,600 | 15,600 | 15,600 | 15,600 | 15,600 | 15,600 |
| Full Maintenance Program | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Internet on Vault Cash | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ATM Phone Line & SEP-Charge | 140,400 | 11,700 | 11,700 | 11,700 | 11,700 | 11,700 | 11,700 | 11,700 | 11,700 | 11,700 | 11,700 | 11,700 | 11,700 |
| Property & Casualty Insurance | 123,240 | 10,270 | 10,270 | 10,270 | 10,270 | 10,270 | 10,270 | 10,270 | 10,270 | 10,270 | 10,270 | 10,270 | 10,270 |
| Supplies & Property Tax | 109,200 | 9,100 | 9,100 | 9,100 | 9,100 | 9,100 | 9,100 | 9,100 | 9,100 | 9,100 | 9,100 | 9,100 | 9,100 |
| Depreciation Back-Stop Cost | 56,256 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 | 4,688 |
| Accounting Fee | 4,680 | 390 | 390 | 390 | 390 | 390 | 390 | 390 | 390 | 390 | 390 | 390 | 390 |
| Monitoring Software Licensing Fee | 6,240 | 520 | 520 | 520 | 520 | 520 | 520 | 520 | 520 | 520 | 520 | 520 | 520 |
| Other Misc. Expenses (legal, etc.) | 1,560 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 | 130 |
| **Total Cost of Service** | 1,584,276 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 | 132,023 |
| Gross Profit | 1,515,535 | 117,968 | 121,387 | 123,762 | 125,452 | 126,677 | 127,502 | 128,077 | 128,472 | 128,797 | 129,012 | 129,157 | 129,267 |
| Gross Margins (%) | 48.9% | 47.2% | 47.9% | 48.4% | 48.7% | 49.0% | 49.1% | 49.2% | 49.3% | 49.4% | 49.4% | 49.5% | 49.5% |
| S,G&A | 475,609 | 55,342 | 39,842 | 39,842 | 37,842 | 37,842 | 37,842 | 37,842 | 37,842 | 37,842 | 37,842 | 37,842 | 37,842 |
| % of Sales | 15.3% | 22.1% | 15.7% | 15.6% | 14.7% | 14.6% | 14.6% | 14.5% | 14.5% | 14.5% | 14.5% | 14.5% | 14.5% |
| Depreciation | 666,276 | 55,475 | 55,484 | 55,493 | 55,501 | 55,510 | 55,519 | 55,527 | 55,536 | 55,545 | 55,553 | 55,562 | 55,571 |
| Amortization | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Operating Expenses | 2,726,155 | 242,840 | 227,349 | 227,358 | 225,366 | 225,375 | 225,384 | 225,392 | 225,401 | 225,410 | 225,418 | 225,427 | 225,436 |
| % of Sales | 87.9% | 97.1% | 89.7% | 88.9% | 87.5% | 87.1% | 86.8% | 86.7% | 86.5% | 86.4% | 86.4% | 86.3% | 86.3% |
| EBITDA | 1,039,926 | 62,625 | 81,545 | 83,920 | 87,610 | 88,835 | 89,660 | 90,235 | 90,630 | 90,955 | 91,170 | 91,315 | 91,425 |
| Operating Margin (%) | 33.5% | 25.1% | 32.2% | 32.8% | 34.0% | 34.3% | 34.5% | 34.7% | 34.8% | 34.9% | 34.9% | 35.0% | 35.0% |
| Depreciation & Amortization | 666,276 | 55,475 | 55,484 | 55,493 | 55,501 | 55,510 | 55,519 | 55,527 | 55,536 | 55,545 | 55,553 | 55,562 | 55,571 |
| EBIT | 373,650 | 7,150 | 26,061 | 28,427 | 32,109 | 33,325 | 34,141 | 34,708 | 35,094 | 35,410 | 35,617 | 35,753 | 35,854 |
| % of Sales | 12.1% | 2.9% | 10.3% | 11.1% | 12.5% | 12.9% | 13.2% | 13.3% | 13.5% | 13.6% | 13.6% | 13.7% | 13.7% |
| Cash Interest Expense - Revolver | 886 | 308 | 578 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pre-Tax Income | 372,764 | 6,842 | 25,483 | 28,427 | 32,109 | 33,325 | 34,141 | 34,708 | 35,094 | 35,410 | 35,617 | 35,753 | 35,854 |
| % of Sales | 12.0% | 2.7% | 10.1% | 11.1% | 12.5% | 12.9% | 13.2% | 13.3% | 13.5% | 13.6% | 13.6% | 13.7% | 13.7% |

# Exhibit E

<u>EMPLOYMENT AGREEMENT</u>

THIS EMPLOYMENT AGREEMENT (this "<u>Agreement</u>") is made and entered into as of November 14, 2005 between Automated Teller Machine Advantage, LLC, a Delaware limited liability company (the "<u>Company</u>"), and Harry Brossman ("<u>Executive</u>").

WHEREAS, the Company wishes to employ Executive as Co-Chief Executive Officer of the Company effective as of the date hereof; and

WHEREAS, Executive wishes to accept such employment and to render services to the Company and its Affiliates on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Executive and the Company agree as follows:

1.    <u>Employment</u>. The Company shall employ Executive, and Executive hereby accepts employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the date hereof and ending on the earlier of (i) November 14, 2008 (or such later anniversary of such date as may be applicable pursuant to the next following sentence) and (ii) termination of Executive's employment pursuant to Section 5 hereof (such period of employment pursuant to this Agreement, the "<u>Employment Period</u>"). The Employment Period shall be extended for successive 1-year periods on November 14, 2008 and each subsequent anniversary of such date unless the Company shall, at least 30 days in advance of the third anniversary of such date (or, if applicable, at least 30 days in advance of any anniversary of such date), give notice to Executive that the Employment Period shall not be so extended.

2.    <u>Position and Duties</u>.

(a)    During the Employment Period, Executive shall serve as Co-Chief Executive Officer of the Company and, in such position, shall be subject to the overall direction and authority of the Company's Board of Managers (the "<u>Board</u>") or its designee. In addition, during the Employment Period, at the request of the Board and without further compensation, Executive shall serve as a director or officer (or both) of one or more of the Company's Subsidiaries.

(b)    During the Employment Period, Executive shall report to the Board or its designee, and Executive shall devote his best efforts and his full business time, business judgment, skill, knowledge and attention to advancing the business and affairs of the Company and its Subsidiaries as the Board or its designee may from time to time direct and to the discharge of his duties and responsibilities hereunder. Subject to Sections 6 and 7 of this

1

Agreement, Executive may devote time and attention to other investment activities during the Employment Period so long as such activities do not, in the reasonable judgment of the Board, interfere with Executive's performance of his duties hereunder.

(c)    During the Employment Period, and subject to business travel in the performance of his duties hereunder, Executive's services shall be performed at the Company's executive offices and at such other locations as Executive may be directed by the Board from time to time.

3.    Base Salary and Benefits.

(a)    During the Employment Period, Executive's base salary shall be $100,000 per year (the "Base Salary"), provided that the Base Salary shall increase to (i) $125,000 if the Company has purchased at least 500 ATMs that have generated EBITDA for the Company of at least $2,000 per machine for six months and (ii) $150,000 if the Company has purchased at least 1,000 ATMs that have generated EBITDA for the Company of at least $2,000 per machine for six months. The Base Salary shall be payable in regular installments in accordance with the Company's general payroll practices and shall be subject to withholding pursuant to applicable federal, state and local laws.

(b)    During the Employment Period, Executive shall be provided with such executive and employee benefits as are provided to executives and employees of the Company and its Subsidiaries from time to time, provided that such benefits shall include such health insurance approved by the Board of Managers.

(d)    The Company shall reimburse Executive for all reasonable out-of-pocket expenses incurred by him in the course of performing his duties under this Agreement in accordance with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's reasonable requirements with respect to reporting and documentation of such expenses.

(e)    During the Employment Period, Executive shll be entitle to 3 weeks of vacation per calendar year, subject to proration during partial years.

4.    Grant of Class B Units.

(a)    Effective as of the date hereof, the Company shall grant Executive 23.333 "Class B Units" as defined in the Limited Liability Company Agreement of the Company, dated as of November 14, 2005 (such 23.333 Class B Units, the "Initial Class B Units," and such Limited Liability Company Agreement, the "LLC Agreement").

(b)    The Class B Units shall be subject to vesting in equal one-third installments on November 14, 2006, 2007, and 2008

(c)    Upon termination of Executive's employment for any reason, any unvested Class B Units held by him shall be automatically and irrevocably forfeited without payment of consideration therefor; provided that upon a termination of Executive's employment by the Company without Cause or by Executive for Good Reason, all of the Executive's Class B Units

2

shall become fully vested as of the date of such termination  Upon a termination of Executive's employment by the Company with Cause any vested Class B Units held by him shall be automatically and irrevocably forfeited without payment of consideration therefor.  Executive shall have no rights as to any such forfeited Class B Units from the date of any such forfeiture.

5.    Term; Severance.

(a)    The Employment Period shall begin on the date hereof and shall terminate upon the earliest to occur of (i) November 14, 2008, (ii) Executive's resignation, death or disability, (iii) the termination of Executive's employment by the Company at any time without Cause, (iv) the termination of Executive's employment by the Company at any time with Cause and (v) the termination of Executive's employment by Executive at any time for Good Reason.

(b)    Upon termination of Executive's employment by the Company with Cause or by Executive other than for Good Reason, the sole payments and benefits that Executive shall be entitled to receive shall be (i) his Base Salary through the date of termination, (ii) any bonuses awarded but not yet paid to Executive, (iii) reimbursement of expenses pursuant to Section 3(d) of this Agreement, if any, and (iv) benefits to which Executive is entitled as a terminated employee under the employee benefit plans, if any, of the Company and its Subsidiaries.

(c)    Upon termination of Executive's employment by Executive for Good Reason or by the Company without Cause, Executive shall be entitled to receive (i) his Base Salary through the date of termination, (ii) any bonuses awarded but not yet paid to Executive, (iii) reimbursement of expenses pursuant to Section 3(d) of this Agreement, if any, (iv) benefits to which Executive is entitled as a terminated employee under the employee benefit plans, if any, of the Company and its Subsidiaries, and (v) subject to Executive executing on the date of termination of his employment, and not revoking, a Release, in a form attached hereto as Exhibit A, and subject to his continued compliance with the covenants set forth in Section 6, continuation of Base Salary through the period ending on the earlier of (i) six months following termination and (ii) the end of the Employment Period, payable in accordance with the normal payroll procedures of the Company.

(d)    The rights and obligations of Executive following his termination of employment with respect to Class B Units held by him shall be determined in accordance with Section 4 of this Agreement.

(e)    Upon any termination of Executive's employment with the Company, Executive shall be deemed to have resigned from all positions with the Company and any of its Subsidiaries and Affiliates, other than as a Member of the Company (as defined in the LLC Agreement).

6.    Noncompete; Non-Solicitation.

(a)    In consideration of the compensation to be paid to Executive hereunder, Executive acknowledges that (1) in the course of his employment with the Company or any of its Affiliates he shall become familiar with the Company's Confidential Information and Work Product concerning the Company and its Affiliates and (2) his services shall be of special, unique and extraordinary value to the Company and its Affiliates.  Therefore, Executive agrees that

3

during the period beginning on the date hereof and ending on the first anniversary of the termination of the Employment Period for any reason (the "Noncompete Period"), he shall not, directly or indirectly, either for himself or for any other Person, own, manage, control, participate in, consult with, render services for, permit his name to be used or in any other manner or capacity engage in any business or enterprise which constitutes a Competitive Business (as defined below) within the United States or Canada. For purposes of this Agreement, (i) the term "participate" includes any direct or indirect interest in any enterprise, whether as an officer, director, employee, partner, sole proprietor, agent, representative, independent contractor, consultant, executive, franchisor, franchisee, creditor, owner, member, shareholder or otherwise; provided that the foregoing activities shall not include passive ownership of less than 2% of the stock of a publicly-held corporation whose stock is traded on a national securities exchange or in the over-the-counter market, and (ii) the term "Competitive Business" means any business or enterprise engaged in or contemplated to be engaged in, in each case prior to the termination of the Employment Period, by the Company and/or its controlled Affiliates, or that otherwise competes with the businesses or enterprises of the Company and/or its controlled Affiliates.

(b)    During the Noncompete Period, Executive shall not directly or indirectly (i) induce or attempt to induce any individual who is, or who within 6 months prior to the termination of Executive's employment was, an employee of the Company or any of its controlled Affiliates (each, a "Subject Person") to leave the employ of the Company or such Affiliate, (ii) hire or employ any Subject Person, (iii) call on, solicit, or service any customer, supplier, licensee, licensor or other business relation or prospective client of the Company or any of its controlled Affiliates which relates to any of the businesses or enterprises of the Company or its controlled Affiliates or (iv) induce or attempt to induce any customer, supplier, licensee, licensor or other business relation of the Company or any of its controlled Affiliates to cease doing business with the Company or such controlled Affiliate.

(c)    Executive acknowledges that, in the course of his employment with the Company, he shall become familiar with the Confidential Information and Work Product of the Company and its controlled Affiliates. Executive further acknowledges that the scope of the business of the Company and its controlled Affiliates is independent of location within the United States (such that it is not practical to limit the restrictions contained in this Section 6 to a specified region, state, province, county, city, or part thereof) and that, therefore, as a senior executive of the Company, Executive has and will have direct and indirect responsibility, oversight and duties with respect to all of the businesses and enterprises of the Company and its controlled Affiliates and its and their current and prospective employees, vendors, customers, clients and other business relations, and that, accordingly, the restrictions contained in this Section 6 are reasonable in all respects and necessary to protect the goodwill and Confidential Information and Work Product of the Company and its controlled Affiliates and that, without such protection, the Company's and its controlled Affiliates' customer and client relations and competitive advantage would be materially adversely affected. It is specifically recognized by Executive that his services to the Company and its controlled Affiliates are special, unique, and of extraordinary value, that the Company has a protectable interest in prohibiting Executive as provided in this Section 6, that Executive is significantly responsible for the growth and development of the Company and its controlled Affiliates and the creation and preservation of their goodwill, and that money damages are insufficient to protect such interests, that such

4

prohibitions would be necessary and appropriate without regard to compensation being provided to Executive hereunder, and that the Company would not enter into this Agreement with Executive without the restrictions contained in this Section 6. Executive further acknowledges that the restrictions contained in this Section 6 do not impose an undue hardship on him and that, since he has general business skills which may be used in industries other than that in which each of the Company and its controlled Affiliates conduct their businesses and enterprises, do not deprive Executive of his livelihood. Executive agrees that the covenants made in this Section 6 shall be construed as agreements independent of any other provision(s) of this Agreement and shall survive any order of a court of competent jurisdiction terminating any other provision(s) of this Agreement.

7.    Confidential Information, Non-Disparagement; Confidentiality of Terms.

(a)    During the Employment Period and at all times thereafter, Executive shall not directly or indirectly at any time (i) use for personal benefit or for the benefit of any other Person any Confidential Information or Work Product or (ii) disclose to any Person any Confidential Information or Work Product, in each case other than (A) in the performance of his duties to the Company and its Affiliates, (B) as required by order of a court of competent jurisdiction (in which case Executive shall give sufficient notice to the Company so that the Company may seek a protective order or other relief) or (C) with the prior written consent of the Board.

(b)    Executive agrees that Executive shall not, at any time, whether during the Employment Period or after Executive ceases to provide services to the Company or any of its Affiliates, make or publish any untruthful statement (orally or in writing) that intentionally libels, slanders, disparages or otherwise defaces the goodwill or reputation (whether or not such disparagement legally constitutes libel or slander) of the Company, any Subsidiary or any of their Affiliates, or the officers, managers, directors, partners, members, shareholders or investment professionals of any of the foregoing. Executive acknowledges that he is responsible for preserving the goodwill and reputation of the aforementioned parties.

(c)    Executive agrees, subject to applicable law, to treat with confidentiality the terms of this Agreement and to not disclose or discuss or release any such terms to any Person (except Executive's attorneys, accountants and other consultants who agree to keep such information confidential) without the consent of the Board. Notwithstanding the foregoing, the Company and Executive hereby agree that Executive (and each representative or other agent of Executive) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to Executive relating to such tax treatment and tax structure.

8.    Enforcement. If, at the time of enforcement of Section 6 or 7 of this Agreement, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area. Because Executive's services are unique and because Executive has access to Confidential Information and Work Product, and for the other reasons set forth herein, the parties hereto agree that money damages would not be an adequate remedy for any breach of this Agreement. Therefore, in the event a

breach or threatened breach of any of Section 6 or 7 of this Agreement, the Company and its successors and assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security). To the fullest extent permitted by applicable law, in the event of a breach by Executive of Section 6, the Noncompete Period shall be tolled until such breach or violation has been duly cured. Executive agrees that the restrictions contained in this Section 8 are reasonable. The parties agree that the enforceability and scope of this Agreement shall not be limited on the ground that the termination of Executive's employment was initiated by the Company.

9.     Duty of Loyalty.

(a)     During the Noncompete Period, Executive may not directly or indirectly purchase any ATM machines for his own account or participate in or otherwise facilitate in any way the purchase of any ATM machines by any person or entity, other than the Company and other than in connection with a Liquidity Event (as defined in the LLC Agreement).

(b)     Notwithstanding the foregoing, Executive, together with his family members, may purchase up to two machines for his own account each month during the Noncompete Period or such greater number of machines to the extent required to comply with his obligations under the ATM Business Purchase Option Agreement between Harry Brossman and National Escrow Limited, LLC, so long as such manager provides the Board of Managers with prior notice of such transaction. No such machine purchased directly by Executive or his family member shall be sold or otherwise disposed of without the written consent of the Board of Managers.

(c)     Each Manager shall provide the Company within 30 days of the end of each calendar quarter a detailed accounting of the ATM machines held by him and his family as well as the cash flows generated by each such machine.

10.     Cooperation; Return of Company Property; Release.

(a)     Following termination of Executive's employment for any reason, Executive agrees to cooperate with the Company upon reasonable request of the Board and to be reasonably available to the Company with respect to continuing or future matters arising out of Executive's services to the Company and its Affiliates; provided, however, that the Company shall reimburse Executive for all reasonable out-of-pocket expenses incurred by him in connection therewith, subject to the Company's reasonable requirements with respect to reporting and documentation of such expenses.

(b)     Following termination of Executive's employment for any reason, Executive shall promptly return to the Company all property of the Company and its Affiliates, whether tangible or intangible, which he possessed or had control over at any time during the Employment Period, including, without limitation, credit cards, building and office access cards, keys, computer equipment, cell phones, electronic devices, manuals, files, documents, records, software, customer data base and other data, research, financial data and information, correspondence, statistics and payroll and other employee data, and any copies, compilations, extracts, excerpts, summaries and other notes thereof or relating thereto.

(c)    Following termination of Executive's employment for any reason, Executive shall execute a general release of claims in form and substance reasonably satisfactory to the Company.

11.    <u>Executive's Representations</u>.  Executive hereby represents and warrants to the Company that (i) the execution, delivery and performance of this Agreement by Executive do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which he is bound, (ii) Executive is not a party to or bound by any employment agreement, noncompete agreement or confidentiality agreement with any other person or entity and (iii) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of Executive, enforceable in accordance with its terms.  Executive hereby acknowledges and represents that he has had the opportunity to consult with independent legal counsel regarding his rights and obligations under this Agreement and that he fully understands the terms and conditions contained herein.

12.    <u>Definitions</u>.

"<u>Affiliate</u>" shall mean any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with another Person.  For purposes hereof, "control" means the power to vote or direct the voting of sufficient securities or other interests to elect a majority of the directors or to control the management of another Person.

"<u>Available Cash</u>" has the meaning set forth in the LLC Agreement.

"<u>Base Salary</u>" has the meaning set forth in Section 3(a) of this Agreement.

"<u>Capital Commitment</u>" has the meaning set forth in the LLC Agreement.

"<u>Capital Contribution</u>" has the meaning set forth in the LLC Agreement.

"<u>Cause</u>" shall mean (i) Executive's conviction for, or plea of nolo contendere to, any felony, or any other conviction of the Executive for, or plea of nolo contendere by the Executive to, any act or omission involving fraud, (ii) the commission of any other act or omission involving fraud with respect to the Company or any of its Affiliates or any of their directors, officers, stockholders, partners or members, (iii) any act or omission involving dishonesty having a material adverse effect on the Company or any of its Affiliates or any of their directors, officers, stockholders, partners or members, (iv) gross negligence or willful misconduct with respect to the Company or any of its Affiliates, (v) continued and purposeful failure to perform his responsibilities and duties to the Company or any of its Affiliates after Executive has received a written demand for performance from the Board which specifically sets forth the factual basis for the Board's belief that Executive has failed to perform his responsibilities and duties or (vi) any material breach of this Agreement by Executive, or any other agreement between Executive and the Company or any of its Affiliates, that is not cured within 10 days following delivery by the Board of written notice of such breach to Executive.

"<u>Competitive Business</u>" has the meaning set forth in Section 6(a) of this Agreement.

7

"Confidential Information" shall mean the information, observations and data (including, without limitation, trade secrets, know-how, research and product plans, customer lists, software, inventions, processes, formulas, technology, designs, drawings, specifications, marketing and advertising materials, distribution and sales methods and systems, sales and profit figures and other technical or business information) disclosed or otherwise revealed to Executive, or discovered or otherwise obtained by Executive, directly or indirectly, while employed by the Company and its Subsidiaries concerning the business or affairs of the Company or any of its Affiliates.

"EBITDA" means earnings before interest, taxes, depreciation and amortization.

"Employment Period" has the meaning set forth in Section 1 of this Agreement.

"Good Reason" means any of the following: (i) the assignment to Executive of duties materially and adversely inconsistent with respect to his offices, titles and reporting requirements but excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith that is remedied by the Company promptly after receipt of notice thereof given by Executive; and (ii) any material breach of this Agreement by the Company, or any other agreement between Executive and the Company or any of its Affiliates, that is not cured within 10 days following delivery by Executive of written notice of such breach to the Board.

"Noncompete Period" has the meaning set forth in Section 6(a) of this Agreement.

"Person" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Subject Person" has the meaning set forth in Section 6(b) of this Agreement.

"Subsidiaries" shall mean any Person of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors thereof is at the time owned or controlled, directly or indirectly, by the Company or one or more of the other Subsidiaries of the Company or a combination thereof, or (ii) if a Person other than a corporation, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by the Company or one or more Subsidiaries of the Company or a combination thereof. For purposes hereof, the Company and its Subsidiaries shall be deemed to have a majority ownership interest in a Person that is not a corporation if the Company and its Subsidiaries, on a collective basis, shall be allocated a majority of partnership, limited liability company, association or other business entity gains or losses or shall be or control the managing director, managing member, manager or a general partner of such partnership, limited liability company, association or other business entity.

"Work Product" shall mean any and all inventions, innovations, improvements, original works of authorship, developments, concepts, methods, trade secrets, designs, analyses, drawings, reports and all similar or related information (whether or not patentable or registrable under copyright or similar laws) which are solely or jointly conceived, developed, made or reduced to practice, or caused to be conceived, developed, made or reduced to practice, by

Executive while employed by the Company or any of its Affiliates; provided, however, that "Work Product" shall not include any invention that Executive developed entirely on his own time without using the Company's equipment, supplies, facilities or Confidential Information except for those inventions that either (i) relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company, or (ii) result from any work performed by Executive for the Company.

13.    Survival. For avoidance of doubt, and subject to Section 6(c) of this Agreement, the covenants of Executive contained in Sections 6 through 10 of this Agreement shall survive and continue in full force in accordance with their terms, notwithstanding termination of the Employment Period for any reason.

14.    Notices. Any notice provided for in this Agreement shall be in writing and shall be either personally delivered, mailed by first class mail (return receipt requested), or sent by overnight courier service, to the recipient at the address indicated below:

> Notices to Executive:
>
> Harry Brossman
> 22 Foxhill Drive
> Tabernacles, New Jersey 08088
>
> Notices to the Company:
>
> Automated Teller Machine Advantage, L.L.C.
> C/o William Munier
> 324 Grix Court
> New Milford, New Jersey 07646
> Fax Number: (609) 268-9083
> Attn: Harry Brossman.
>
> With a copy to:
>
> The Wolfson Group
> One State Street Plaza, 29th Floor
> New York, NY 10004
> Fax Number: (212) 363-8459
> Attn: Eli Levitin

or such other address or to the attention of such other person as the recipient party shall have specified by prior written notice to the sending party. Any notice under this Agreement shall be deemed to have been given when so delivered or mailed.

15.    Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any

applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

16. <u>Complete Agreement</u>. This Agreement embodies the complete agreement and understanding among the parties with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

17. <u>No Strict Construction</u>. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

18. <u>Further Assurances</u>. Executive and the Company shall execute and deliver all documents, provide all information, and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

19. <u>Descriptive Headings; Interpretation</u>. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. Without limiting the generality of the immediately preceding sentence, no amendment or other modification to any agreement, document or instrument that requires the consent of any Person pursuant to the terms of this Agreement or any other agreement will be given effect hereunder unless such Person has consented in writing to such amendment or modification. The use of the words "or," "either" and "any" shall not be exclusive.

20. <u>Counterparts</u>. This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

21. <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of and be enforceable by Executive, the Company and their respective heirs, successors and assigns. Executive may not assign his rights or delegate his obligations hereunder without the prior written consent of the Company. The Company shall be permitted to assign this Agreement to any successor to all or substantially all of its assets.

22. <u>Governing Law</u>. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions that would cause the application of the laws of any other jurisdiction.

23. <u>Amendment and Waiver</u>. The provisions of this Agreement may be amended or waived only with the prior written consent of the Company (with Board approval) and Executive, and no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement.

24. <u>Delivery by Facsimile</u>. This Agreement and any amendments hereto, to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each party hereto shall re-execute original forms thereof and deliver them to the other party hereto.

\*    \*    \*    \*    \*

11

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the date first written above.

HARRY BROSSMAN

AUTOMATED    TELLER    MACHINES ADVANTAGE, LLC

By: _BERNARD BUSTELL_

Its: _CEO_

12

**EXHIBIT A**

**RELEASE**

1.      In consideration of the payments and benefits to be provided to Harry Brossman (the "Executive") pursuant to his employment agreement with Automated Teller Machine Advantage, LLC (the "Company"), dated November 14, 2005 (the "Employment Agreement"), the Executive hereby releases and forever discharges the Company, its affiliates, whether direct or indirect, their present and former directors, officers, shareholders, members, partners and agents and the respective successors and assigns of any of the foregoing (collectively referred to as the "Releasees") from any and all obligations, liabilities, damages, costs, complaints, charges or causes of action in law or equity (collectively "Claims") that the Executive or his heirs, administrators, successors or assigns may now have or may ever have against any of the Releasees, whether accrued, absolute, contingent, unliquidated or otherwise, and whether known or unknown, and which have or may have arisen out of any act or omission occurring, on or prior to the date of execution of this Release (the "Release Date"), including any Claims based on federal, state, or local law or regulation or the common law, including but not limited to Claims in any way related to Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Equal Pay Act, the Fair Labor Standards Act, the Americans with Disabilities Act, the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and all applicable federal, state and local labor and employment laws (including all laws concerning unlawful and unfair labor and employment practices), breach of contract, wrongful discharge, defamation or intentional infliction of emotional distress, but excepting (i) any Claim for indemnification under the governing instruments of the Company, including for the advance of costs of expenses relating to any claims for which indemnification may be available, and for coverage under any directors and officers liability insurance policies maintained by the Company, (ii) any Claim in respect of any severance obligations under the Employment Agreement, (iii) any Claim for accrued benefits under any qualified or non-qualified retirement plan maintained by the Company or any of its affiliates and (iii) any Claim in respect of his membership interests in the Company.

2.      The Executive acknowledges and agrees that this Release is not to be construed in any way as an admission of any liability whatsoever by any Releasee under any federal or state statute or the principles of common law, any such liability having been expressly denied.

3.      The Executive acknowledges that he has been advised to consult with an attorney before executing this Release and has been given a period of twenty-one (21) days to consider whether to execute this Release. If the Executive accepts the terms hereof and executes this Release, he may thereafter, for a period of seven (7) days following (and not including) the date of execution, revoke this Release by delivering written notice of such revocation to the Company's Board of Managers, c/o Eli Levitin. This Release shall become irrevocable in its entirety, and binding and enforceable against the Executive, on the day next following the day on which the foregoing seven-day period has elapsed without the Executive having so revoked. Any revocation of this Release shall be deemed for all purposes a revocation of this Release in its entirety.

1

4.      The Executive specifically acknowledges that his acceptance of the terms of this Release is, among other things, a specific waiver of his rights under the Age Discrimination in Employment Act (as amended by the Older Workers' Benefit Protection Act) and any other federal, state or local law or regulation in respect of discrimination of any kind; provided, however, that nothing in this Release shall be deemed, nor does anything contained in this Release purport, to be a waiver of any right or claim or cause of action which by law the Executive is not permitted to waive.

5.      If and to the extent a court of competent jurisdiction shall determine any part or portion of the foregoing release to be invalid or unenforceable, the same shall not affect the remainder of the release, which shall be given full effect without regard to the invalid part or portion.

6.      The Executive acknowledges and agrees that he has carefully read and fully understands all of the provisions of this Release and has voluntarily executed this Release on the date set forth below.

HARRY BROSSMAN

*Harry Brossman*

Dated: 11/14/05

2

<u>EMPLOYMENT AGREEMENT</u>

THIS EMPLOYMENT AGREEMENT (this "<u>Agreement</u>") is made and entered into as of November 14, 2005 between Automated Teller Machine Advantage, LLC, a Delaware limited liability company (the "<u>Company</u>"), and William Munier ("<u>Executive</u>").

WHEREAS, the Company wishes to employ Executive as Co-Chief Executive Officer of the Company effective as of the date hereof; **and**

WHEREAS, Executive wishes to accept such employment and to render services to the Company and its Affiliates on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Executive and the Company agree as follows:

1.    <u>Employment</u>.  The Company shall employ Executive, and Executive hereby accepts employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the date hereof and ending on the earlier of (i) November 14, 2008 (or such later anniversary of such date as may be applicable pursuant to the next following sentence) and (ii) termination of Executive's employment pursuant to Section 5 hereof (such period of employment pursuant to this Agreement, the "<u>Employment Period</u>").  The Employment Period shall be extended for successive 1-year periods on November 14, 2008 and each subsequent anniversary of such date unless the Company shall, at least 30 days in advance of the third anniversary of such date (or, if applicable, at least 30 days in advance of any anniversary of such date), give notice to Executive that the Employment Period shall not be so extended.

2.    <u>Position and Duties</u>.

(a)    During the Employment Period, Executive shall serve as Co-Chief Executive Officer of the Company and, in such position, shall be subject to the overall direction and authority of the Company's Board of Managers (the "<u>Board</u>") or its designee.  In addition, during the Employment Period, at the request of the Board and without further compensation, Executive shall serve as a director or officer (or both) of one or more of the Company's Subsidiaries.

(b)    During the Employment Period, Executive shall report to the Board or its designee, and Executive shall devote his best efforts and his full business time, business judgment, skill, knowledge and attention to advancing the business and affairs of the Company and its Subsidiaries as the Board or its designee may from time to time direct and to the discharge of his duties and responsibilities hereunder.  Subject to Sections 6 and 7 of this

1

Agreement, Executive may devote time and attention to other investment activities during the Employment Period so long as such activities do not, in the reasonable judgment of the Board, interfere with Executive's performance of his duties hereunder.

(c)     During the Employment Period, and subject to business travel in the performance of his duties hereunder, Executive's services shall be performed at the Company's executive offices and at such other locations as Executive may be directed by the Board from time to time.

3.    Base Salary and Benefits.

(a)     During the Employment Period, Executive's base salary shall be $100,000 per year (the "Base Salary"), provided that the Base Salary shall increase to (i) $125,000 if the Company has purchased at least 500 ATMs that have generated EBITDA for the Company of at least $2,000 per machine for six months and (ii) $150,000 if the Company has purchased at least 1,000 ATMs that have generated EBITDA for the Company of at least $2,000 per machine for six months. The Base Salary shall be payable in regular installments in accordance with the Company's general payroll practices and shall be subject to withholding pursuant to applicable federal, state and local laws.

(b)     During the Employment Period, Executive shall be provided with such executive and employee benefits as are provided to executives and employees of the Company and its Subsidiaries from time to time, provided that such benefits shall include such health insurance approved by the Board of Managers.

(d)     The Company shall reimburse Executive for all reasonable out-of-pocket expenses incurred by him in the course of performing his duties under this Agreement in accordance with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's reasonable requirements with respect to reporting and documentation of such expenses.

(e)     During the Employment Period, Executive shll be entitle to 3 weeks of vacation per calendar year, subject to proration during partial years.

4.    Grant of Class B Units.

(a)     Effective as of the date hereof, the Company shall grant Executive 23.333 "Class B Units" as defined in the Limited Liability Company Agreement of the Company, dated as of November 14, 2005 (such 23.333 Class B Units, the "Initial Class B Units," and such Limited Liability Company Agreement, the "LLC Agreement").

(b)     The Class B Units shall be subject to vesting in equal one-third installments on November 14, 2006, 2007, and 2008

(c)     Upon termination of Executive's employment for any reason, any unvested Class B Units held by him shall be automatically and irrevocably forfeited without payment of consideration therefor; provided that upon a termination of Executive's employment by the Company without Cause or by Executive for Good Reason, all of the Executive's Class B Units

2

shall become fully vested as of the date of such termination  Upon a termination of Executive's employment by the Company with Cause any vested Class B Units held by him shall be automatically and irrevocably forfeited without payment of consideration therefor.  Executive shall have no rights as to any such forfeited Class B Units from the date of any such forfeiture.

5.    Term; Severance.

(a)    The Employment Period shall begin on the date hereof and shall terminate upon the earliest to occur of (i) November 14, 2008, (ii) Executive's resignation, death or disability, (iii) the termination of Executive's employment by the Company at any time without Cause, (iv) the termination of Executive's employment by the Company at any time with Cause and (v) the termination of Executive's employment by Executive at any time for Good Reason.

(b)    Upon termination of Executive's employment by the Company with Cause or by Executive other than for Good Reason, the sole payments and benefits that Executive shall be entitled to receive shall be (i) his Base Salary through the date of termination, (ii) any bonuses awarded but not yet paid to Executive, (iii) reimbursement of expenses pursuant to Section 3(d) of this Agreement, if any, and (iv) benefits to which Executive is entitled as a terminated employee under the employee benefit plans, if any, of the Company and its Subsidiaries.

(c)    Upon termination of Executive's employment by Executive for Good Reason or by the Company without Cause, Executive shall be entitled to receive (i) his Base Salary through the date of termination, (ii) any bonuses awarded but not yet paid to Executive, (iii) reimbursement of expenses pursuant to Section 3(d) of this Agreement, if any, (iv) benefits to which Executive is entitled as a terminated employee under the employee benefit plans, if any, of the Company and its Subsidiaries, and (v) subject to Executive executing on the date of termination of his employment, and not revoking, a Release, in a form attached hereto as Exhibit A, and subject to his continued compliance with the covenants set forth in Section 6, continuation of Base Salary through the period ending on the earlier of (i) six months following termination and (ii) the end of the Employment Period, payable in accordance with the normal payroll procedures of the Company.

(d)    The rights and obligations of Executive following his termination of employment with respect to Class B Units held by him shall be determined in accordance with Section 4 of this Agreement.

(e)    Upon any termination of Executive's employment with the Company, Executive shall be deemed to have resigned from all positions with the Company and any of its Subsidiaries and Affiliates, other than as a Member of the Company (as defined in the LLC Agreement).

6.    Noncompete; Non-Solicitation.

(a)    In consideration of the compensation to be paid to Executive hereunder, Executive acknowledges that (1) in the course of his employment with the Company or any of its Affiliates he shall become familiar with the Company's Confidential Information and Work Product concerning the Company and its Affiliates and (2) his services shall be of special, unique and extraordinary value to the Company and its Affiliates.  Therefore, Executive agrees that

3

during the period beginning on the date hereof and ending on the first anniversary of the termination of the Employment Period for any reason (the "Noncompete Period"), he shall not, directly or indirectly, either for himself or for any other Person, own, manage, control, participate in, consult with, render services for, permit his name to be used or in any other manner or capacity engage in any business or enterprise which constitutes a Competitive Business (as defined below) within the United States or Canada. For purposes of this Agreement, (i) the term "participate" includes any direct or indirect interest in any enterprise, whether as an officer, director, employee, partner, sole proprietor, agent, representative, independent contractor, consultant, executive, franchisor, franchisee, creditor, owner, member, shareholder or otherwise; provided that the foregoing activities shall not include passive ownership of less than 2% of the stock of a publicly-held corporation whose stock is traded on a national securities exchange or in the over-the-counter market, and (ii) the term "Competitive Business" means any business or enterprise engaged in or contemplated to be engaged in, in each case prior to the termination of the Employment Period, by the Company and/or its controlled Affiliates, or that otherwise competes with the businesses or enterprises of the Company and/or its controlled Affiliates.

(b)     During the Noncompete Period, Executive shall not directly or indirectly (i) induce or attempt to induce any individual who is, or who within 6 months prior to the termination of Executive's employment was, an employee of the Company or any of its controlled Affiliates (each, a "Subject Person") to leave the employ of the Company or such Affiliate, (ii) hire or employ any Subject Person, (iii) call on, solicit, or service any customer, supplier, licensee, licensor or other business relation or prospective client of the Company or any of its controlled Affiliates which relates to any of the businesses or enterprises of the Company or its controlled Affiliates or (iv) induce or attempt to induce any customer, supplier, licensee, licensor or other business relation of the Company or any of its controlled Affiliates to cease doing business with the Company or such controlled Affiliate.

(c)     Executive acknowledges that, in the course of his employment with the Company, he shall become familiar with the Confidential Information and Work Product of the Company and its controlled Affiliates. Executive further acknowledges that the scope of the business of the Company and its controlled Affiliates is independent of location within the United States (such that it is not practical to limit the restrictions contained in this Section 6 to a specified region, state, province, county, city, or part thereof) and that, therefore, as a senior executive of the Company, Executive has and will have direct and indirect responsibility, oversight and duties with respect to all of the businesses and enterprises of the Company and its controlled Affiliates and its and their current and prospective employees, vendors, customers, clients and other business relations, and that, accordingly, the restrictions contained in this Section 6 are reasonable in all respects and necessary to protect the goodwill and Confidential Information and Work Product of the Company and its controlled Affiliates and that, without such protection, the Company's and its controlled Affiliates' customer and client relations and competitive advantage would be materially adversely affected. It is specifically recognized by Executive that his services to the Company and its controlled Affiliates are special, unique, and of extraordinary value, that the Company has a protectable interest in prohibiting Executive as provided in this Section 6, that Executive is significantly responsible for the growth and development of the Company and its controlled Affiliates and the creation and preservation of their goodwill, and that money damages are insufficient to protect such interests, that such

4

prohibitions would be necessary and appropriate without regard to compensation being provided to Executive hereunder, and that the Company would not enter into this Agreement with Executive without the restrictions contained in this Section 6. Executive further acknowledges that the restrictions contained in this Section 6 do not impose an undue hardship on him and that, since he has general business skills which may be used in industries other than that in which each of the Company and its controlled Affiliates conduct their businesses and enterprises, do not deprive Executive of his livelihood. Executive agrees that the covenants made in this Section 6 shall be construed as agreements independent of any other provision(s) of this Agreement and shall survive any order of a court of competent jurisdiction terminating any other provision(s) of this Agreement.

7.   Confidential Information, Non-Disparagement; Confidentiality of Terms.

(a)   During the Employment Period and at all times thereafter, Executive shall not directly or indirectly at any time (i) use for personal benefit or for the benefit of any other Person any Confidential Information or Work Product or (ii) disclose to any Person any Confidential Information or Work Product, in each case other than (A) in the performance of his duties to the Company and its Affiliates, (B) as required by order of a court of competent jurisdiction (in which case Executive shall give sufficient notice to the Company so that the Company may seek a protective order or other relief) or (C) with the prior written consent of the Board.

(b)   Executive agrees that Executive shall not, at any time, whether during the Employment Period or after Executive ceases to provide services to the Company or any of its Affiliates, make or publish any untruthful statement (orally or in writing) that intentionally libels, slanders, disparages or otherwise defaces the goodwill or reputation (whether or not such disparagement legally constitutes libel or slander) of the Company, any Subsidiary or any of their Affiliates, or the officers, managers, directors, partners, members, shareholders or investment professionals of any of the foregoing. Executive acknowledges that he is responsible for preserving the goodwill and reputation of the aforementioned parties.

(c)   Executive agrees, subject to applicable law, to treat with confidentiality the terms of this Agreement and to not disclose or discuss or release any such terms to any Person (except Executive's attorneys, accountants and other consultants who agree to keep such information confidential) without the consent of the Board. Notwithstanding the foregoing, the Company and Executive hereby agree that Executive (and each representative or other agent of Executive) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to Executive relating to such tax treatment and tax structure.

8.   Enforcement. If, at the time of enforcement of Section 6 or 7 of this Agreement, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area. Because Executive's services are unique and because Executive has access to Confidential Information and Work Product, and for the other reasons set forth herein, the parties hereto agree that money damages would not be an adequate remedy for any breach of this Agreement. Therefore, in the event a

5

breach or threatened breach of any of Section 6 or 7 of this Agreement, the Company and its successors and assigns may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security). To the fullest extent permitted by applicable law, in the event of a breach by Executive of Section 6, the Noncompete Period shall be tolled until such breach or violation has been duly cured. Executive agrees that the restrictions contained in this Section 8 are reasonable. The parties agree that the enforceability and scope of this Agreement shall not be limited on the ground that the termination of Executive's employment was initiated by the Company.

9.    Duty of Loyalty.

(a)    During the Noncompete Period, Executive may not directly or indirectly purchase any ATM machines for his own account or participate in or otherwise facilitate in any way the purchase of any ATM machines by any person or entity, other than the Company and other than in connection with a Liquidity Event (as defined in the LLC Agreement).

(b)    Notwithstanding the foregoing, Executive, together with his family members, may purchase up to two machines for his own account each month during the Noncompete Period, so long as such manager provides the Board of Managers with prior notice of such transaction. No such machine purchased directly by Executive or his family member shall be sold or otherwise disposed of without the written consent of the Board of Managers.

(c)    Each Manager shall provide the Company within 30 days of the end of each calendar quarter a detailed accounting of the ATM machines held by him and his family as well as the cash flows generated by each such machine.

10.    Cooperation; Return of Company Property; Release.

(a)    Following termination of Executive's employment for any reason, Executive agrees to cooperate with the Company upon reasonable request of the Board and to be reasonably available to the Company with respect to continuing or future matters arising out of Executive's services to the Company and its Affiliates; provided, however, that the Company shall reimburse Executive for all reasonable out-of-pocket expenses incurred by him in connection therewith, subject to the Company's reasonable requirements with respect to reporting and documentation of such expenses.

(b)    Following termination of Executive's employment for any reason, Executive shall promptly return to the Company all property of the Company and its Affiliates, whether tangible or intangible, which he possessed or had control over at any time during the Employment Period, including, without limitation, credit cards, building and office access cards, keys, computer equipment, cell phones, electronic devices, manuals, files, documents, records, software, customer data base and other data, research, financial data and information, correspondence, statistics and payroll and other employee data, and any copies, compilations, extracts, excerpts, summaries and other notes thereof or relating thereto.

(c)    Following termination of Executive's employment for any reason, Executive shall execute a general release of claims in form and substance reasonably satisfactory to the Company.

6

11.    Executive's Representations.  Executive hereby represents and warrants to the Company that (i) the execution, delivery and performance of this Agreement by Executive do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which he is bound, (ii) Executive is not a party to or bound by any employment agreement, noncompete agreement or confidentiality agreement with any other person or entity and (iii) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of Executive, enforceable in accordance with its terms.  Executive hereby acknowledges and represents that he has had the opportunity to consult with independent legal counsel regarding his rights and obligations under this Agreement and that he fully understands the terms and conditions contained herein.

12.    Definitions.

"Affiliate" shall mean any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with another Person.  For purposes hereof, "control" means the power to vote or direct the voting of sufficient securities or other interests to elect a majority of the directors or to control the management of another Person.

"Available Cash" has the meaning set forth in the LLC Agreement.

"Base Salary" has the meaning set forth in Section 3(a) of this Agreement.

"Capital Commitment" has the meaning set forth in the LLC Agreement.

"Capital Contribution" has the meaning set forth in the LLC Agreement.

"Cause" shall mean (i) Executive's conviction for, or plea of nolo contendere to, any felony, or any other conviction of the Executive for, or plea of nolo contendere by the Executive to, any act or omission involving fraud, (ii) the commission of any other act or omission involving fraud with respect to the Company or any of its Affiliates or any of their directors, officers, stockholders, partners or members, (iii) any act or omission involving dishonesty having a material adverse effect on the Company or any of its Affiliates or any of their directors, officers, stockholders, partners or members, (iv) gross negligence or willful misconduct with respect to the Company or any of its Affiliates, (v) continued and purposeful failure to perform his responsibilities and duties to the Company or any of its Affiliates after Executive has received a written demand for performance from the Board which specifically sets forth the factual basis for the Board's belief that Executive has failed to perform his responsibilities and duties or (vi) any material breach of this Agreement by Executive, or any other agreement between Executive and the Company or any of its Affiliates, that is not cured within 10 days following delivery by the Board of written notice of such breach to Executive.

"Competitive Business" has the meaning set forth in Section 6(a) of this Agreement.

"Confidential Information" shall mean the information, observations and data (including, without limitation, trade secrets, know-how, research and product plans, customer lists, software, inventions, processes, formulas, technology, designs, drawings, specifications, marketing and

7

advertising materials, distribution and sales methods and systems, sales and profit figures and other technical or business information) disclosed or otherwise revealed to Executive, or discovered or otherwise obtained by Executive, directly or indirectly, while employed by the Company and its Subsidiaries concerning the business or affairs of the Company or any of its Affiliates.

"EBITDA" means earnings before interest, taxes, depreciation and amortization.

"Employment Period" has the meaning set forth in Section 1 of this Agreement.

"Good Reason" means any of the following: (i) the assignment to Executive of duties materially and adversely inconsistent with respect to his offices, titles and reporting requirements but excluding for this purpose an isolated, insubstantial and inadvertent action not taken in bad faith that is remedied by the Company promptly after receipt of notice thereof given by Executive; and (ii) any material breach of this Agreement by the Company, or any other agreement between Executive and the Company or any of its Affiliates, that is not cured within 10 days following delivery by Executive of written notice of such breach to the Board.

"Noncompete Period" has the meaning set forth in Section 6(a) of this Agreement.

"Person" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Subject Person" has the meaning set forth in Section 6(b) of this Agreement.

"Subsidiaries" shall mean any Person of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors thereof is at the time owned or controlled, directly or indirectly, by the Company or one or more of the other Subsidiaries of the Company or a combination thereof, or (ii) if a Person other than a corporation, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by the Company or one or more Subsidiaries of the Company or a combination thereof.  For purposes hereof, the Company and its Subsidiaries shall be deemed to have a majority ownership interest in a Person that is not a corporation if the Company and its Subsidiaries, on a collective basis, shall be allocated a majority of partnership, limited liability company, association or other business entity gains or losses or shall be or control the managing director, managing member, manager or a general partner of such partnership, limited liability company, association or other business entity.

"Work Product" shall mean any and all inventions, innovations, improvements, original works of authorship, developments, concepts, methods, trade secrets, designs, analyses, drawings, reports and all similar or related information (whether or not patentable or registrable under copyright or similar laws) which are solely or jointly conceived, developed, made or reduced to practice, or caused to be conceived, developed, made or reduced to practice, by Executive while employed by the Company or any of its Affiliates; provided, however, that "Work Product" shall not include any invention that Executive developed entirely on his own time without using the Company's equipment, supplies, facilities or Confidential Information

8

except for those inventions that either (i) relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company, or (ii) result from any work performed by Executive for the Company.

13. <u>Survival</u>. For avoidance of doubt, and subject to Section 6(c) of this Agreement, the covenants of Executive contained in Sections 6 through 10 of this Agreement shall survive and continue in full force in accordance with their terms, notwithstanding termination of the Employment Period for any reason.

14. <u>Notices</u>. Any notice provided for in this Agreement shall be in writing and shall be either personally delivered, mailed by first class mail (return receipt requested), or sent by overnight courier service, to the recipient at the address indicated below:

<u>Notices to Executive</u>:

William Munier
324 Grix Court
New Milford, New Jersey 07646

<u>Notices to the Company</u>:

Automated Teller Machine Advantage, LLC
C/o William Munier
324 Grix Court
New Milford, New Jersey 07646
Fax Number: (609) 268-9083
Attn: Harry Brossman.

<u>With a copy to</u>:

The Wolfson Group
One State Street Plaza, 29th Floor
New York, NY 10004
Fax Number: (212) 363-8459
Attn: Eli Levitin

or such other address or to the attention of such other person as the recipient party shall have specified by prior written notice to the sending party. Any notice under this Agreement shall be deemed to have been given when so delivered or mailed.

15. <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed,

construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

16.    Complete Agreement. This Agreement embodies the complete agreement and understanding among the parties with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

17.    No Strict Construction. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

18.    Further Assurances. Executive and the Company shall execute and deliver all documents, provide all information, and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

19.    Descriptive Headings; Interpretation. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. Reference to any agreement, document or instrument means such agreement, document or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof. Without limiting the generality of the immediately preceding sentence, no amendment or other modification to any agreement, document or instrument that requires the consent of any Person pursuant to the terms of this Agreement or any other agreement will be given effect hereunder unless such Person has consented in writing to such amendment or modification. The use of the words "or," "either" and "any" shall not be exclusive.

20.    Counterparts. This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

21.    Successors and Assigns. This Agreement is intended to bind and inure to the benefit of and be enforceable by Executive, the Company and their respective heirs, successors and assigns. Executive may not assign his rights or delegate his obligations hereunder without the prior written consent of the Company. The Company shall be permitted to assign this Agreement to any successor to all or substantially all of its assets.

22.    Governing Law. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions that would cause the application of the laws of any other jurisdiction.

23.    Amendment and Waiver. The provisions of this Agreement may be amended or waived only with the prior written consent of the Company (with Board approval) and

10

Executive, and no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement.

24.     <u>Delivery by Facsimile</u>.  This Agreement and any amendments hereto, to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each party hereto shall re-execute original forms thereof and deliver them to the other party hereto.

*     *     *     *     *

11

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the date first written above.

WILLIAM MUNIER

AUTOMATED    TELLER    MACHINES
ADVANTAGE, LLC

By: _____

Its: _____

12

## EXHIBIT A

## RELEASE

1.     In consideration of the payments and benefits to be provided to William Munier (the "Executive") pursuant to his employment agreement with Automated Teller Machine Advantage, LLC (the "Company"), dated November 14, 2005 (the "Employment Agreement"), the Executive hereby releases and forever discharges the Company, its affiliates, whether direct or indirect, their present and former directors, officers, shareholders, members, partners and agents and the respective successors and assigns of any of the foregoing (collectively referred to as the "Releasees") from any and all obligations, liabilities, damages, costs, claims, complaints, charges or causes of action in law or equity (collectively "Claims") that the Executive or his heirs, administrators, successors or assigns may now have or may ever have against any of the Releasees, whether accrued, absolute, contingent, unliquidated or otherwise, and whether known or unknown, and which have or may have arisen out of any act or omission occurring, on or prior to the date of execution of this Release (the "Release Date"), including any Claims based on federal, state, or local law or regulation or the common law, including but not limited to Claims in any way related to Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Equal Pay Act, the Fair Labor Standards Act, the Americans with Disabilities Act, the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and all applicable federal, state and local labor and employment laws (including all laws concerning unlawful and unfair labor and employment practices), breach of contract, wrongful discharge, defamation or intentional infliction of emotional distress, but excepting (i) any Claim for indemnification under the governing instruments of the Company, including for the advance of costs of expenses relating to any claims for which indemnification may be available, and for coverage under any directors and officers liability insurance policies maintained by the Company, (ii) any Claim in respect of any severance obligations under the Employment Agreement, (iii) any Claim for accrued benefits under any qualified or non-qualified retirement plan maintained by the Company or any of its affiliates and (iii) any Claim in respect of his membership interests in the Company.

2.     The Executive acknowledges and agrees that this Release is not to be construed in any way as an admission of any liability whatsoever by any Releasee under any federal or state statute or the principles of common law, any such liability having been expressly denied.

3.     The Executive acknowledges that he has been advised to consult with an attorney before executing this Release and has been given a period of twenty-one (21) days to consider whether to execute this Release. If the Executive accepts the terms hereof and executes this Release, he may thereafter, for a period of seven (7) days following (and not including) the date of execution, revoke this Release by delivering written notice of such revocation to the Company's Board of Managers, c/o Eli Levitin. This Release shall become irrevocable in its entirety, and binding and enforceable against the Executive, on the day next following the day on which the foregoing seven-day period has elapsed without the Executive having so revoked. Any revocation of this Release shall be deemed for all purposes a revocation of this Release in its entirety.

4.     The Executive specifically acknowledges that his acceptance of the terms of this Release is, among other things, a specific waiver of his rights under the Age Discrimination in Employment Act (as amended by the Older Workers' Benefit Protection Act) and any other federal, state or local law or regulation in respect of discrimination of any kind; provided, however, that nothing in this Release shall be deemed, nor does anything contained in this Release purport, to be a waiver of any right or claim or cause of action which by law the Executive is not permitted to waive.

5.     If and to the extent a court of competent jurisdiction shall determine any part or portion of the foregoing release to be invalid or unenforceable, the same shall not affect the remainder of the release, which shall be given full effect without regard to the invalid part or portion.

6.     The Executive acknowledges and agrees that he has carefully read and fully understands all of the provisions of this Release and has voluntarily executed this Release on the date set forth below.


WILLIAM MUNIER

Dated: _11/14/05_

2